# EXHIBIT 1

**2nd original**

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A' and 'Barecon 'B' ". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
|---|---|
| **Arrow Tankers A/S** **Bredgade 31 B, 4.** **DK-1260 Copenhagen K** **Denmark** | CODE NAME: "BARECON 2001" PART I |

| 2. Place and date |
|---|
| **Copenhagen, 23rd February 2010** |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| **Psara Energy Limited** **Ajeltake Road, Ajeltake Island** **Majuro, MH 96960** **Marshall Island** | **Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers be mutually agreed.** |

| 5. Vessel's name, call sign and flag (Cl. 1 and 3) |
|---|
| **Name: m.t. CV STEALTH** **Flag: Malta** |

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| **Crude oil carrier** | **58,418 / 31,117** |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| **2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | **104,499** |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| **ABS** | **N/A** |

| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3) |
|---|
| **Attached Vessel's Q88. Vessel to be redeliverd with SS passed** |

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| **WW DLOSP at one safe port / safe anchorage ATDNSHINC** **Vessel to be delivered with SS passed** | **15th April 2010, 00:01 hrs lt** | **30th August 2010, 23:59 hrs lt** |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) |
|---|---|
| **DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | **SS/DD passed without extensions** |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
|---|---|
| **See Rider Clause 15.** | **As required by class without extensions** |

| 20. Trading limits (Cl. 6) |
|---|
| **Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.** **The vessel not to trade in ice, break ice nor follow ice breakers in ice.** |

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| **5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | **USD 9,750 gross pdpr the first 365 days after delivery** **USD 10,750 gross pdpr for the 2nd charter year** **USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year** **USD 10,750 gross pdpr for 4th charter year** **USD 10,750 gross pdpr for 5th charter year** **USD 13,250 for the optional period** |

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii)) |
|---|
| **10%** |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**"BARECON 2001" STANDARD BAREBOAT CHARTER**                                    PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br>**As per Clause 10 F** | 25. Currency and method of payment (Cl. 11)<br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br>**TBA** | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br>**N/A** | 33. Brokerage commission and to whom payable (Cl. 27)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br>**Seven (7) working days** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br>**30a** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br>**N/A** | 38. Name and place of Builders (only to be filled in if PART III applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>**N/A** | 40. Date of Building Contract (only to be filled in if PART III applies)<br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br>a) **N/A**<br>b) **N/A**<br>c) **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

1. **Definitions** 1
   In this Charter, the following terms shall have the 2
   meanings hereby assigned to them: 3
   *"The Owners"* shall mean the party identified in Box 3; 4
   *"The Charterers"* shall mean the party identified in Box 4; 5
   *"The Vessel"* shall mean the vessel named in Box 5 and 6
   with particulars as stated in Boxes 6 to 12; 7
   *"Financial Instrument"* means the mortgage, deed of 8
   covenant or other such financial security instrument as 9
   annexed to this Charter and stated in Box 28. 10

2. **Charter Period** 11
   In consideration of the hire detailed in Box 22, 12
   the Owners have agreed to let and the Charterers have 13
   agreed to hire the Vessel for the period stated in Box 21 14
   ("The Charter Period"). 15

3. **Delivery** 16
   *(not applicable when Part III applies, as indicated in Box 37)* 17
   **(a)** The Owners shall before and at the time of delivery 18
   exercise due diligence to make the Vessel seaworthy 19
   And in every respect ready in hull, machinery and 20
   equipment for service under this Charter. 21
   The Vessel shall be delivered by the Owners and taken 22
   over by the Charterers at the port or place indicated in 23
   Box 13 in such ready safe berth as the Charterers may 24
   direct. 25
   **(b)** The Vessel shall be properly documented on 26
   delivery in accordance with the laws of the flag State 27
   indicated in Box 5 and the requirements of the 28
   classification society stated in Box 10. The Vessel upon 29
   delivery shall have her survey cycles up to date and 30
   trading and class certificates valid for at least the number 31
   of months agreed in Box 12. 32
   **(c)** The delivery of the Vessel by the Owners and the 33
   taking over of the Vessel by the Charterers shall 34
   constitute a full performance by the Owners of all the 35
   Owners' obligations under this Clause 3, and thereafter 36
   the Charterers shall not be entitled to make or assert 37
   any claim against the Owners on account of any 38
   conditions, representations or warranties expressed or 39
   implied with respect to the Vessel but the Owners shall 40
   be liable for the cost of but not the time for repairs or 41
   renewals occasioned by latent defects in the Vessel, 42
   her machinery or appurtenances, existing at the time of 43
   delivery under this Charter, provided such defects have 44
   manifested themselves within twelve (12) months after 45
   delivery unless otherwise provided in Box 32. 46

4. **Time for Delivery** 47
   *(not applicable when Part III applies, as indicated in Box 37)* 48
   The Vessel shall not be delivered before the date 49
   indicated in Box 14 without the Charterers' consent and 50
   the Owners shall exercise due diligence to deliver the 51
   Vessel not later than the date indicated in Box 15 as per 52
   Box 18. 53
   ~~Unless otherwise agreed in Box 18, the Owners shall~~ 53
   ~~give the Charterers not less than thirty (30) running days'~~ 54
   ~~preliminary and not less than fourteen (14) running days'~~ 55
   ~~definite notice of the date on which the Vessel is~~ 56
   ~~expected to be ready for delivery.~~ 57
   The Owners shall keep the Charterers closely advised 58
   of possible changes in the Vessel's position. 59

5. **Cancelling** 60
   *(not applicable when Part III applies, as indicated in Box 37)* 61
   **(a)** Should the Vessel not be delivered by the 62
   cancelling date indicated in Box 15, the Charterers shall 63
   have the option of cancelling this Charter by giving the 64
   Owners notice of cancellation within thirty-six (36) 65
   running hours after the cancelling date stated in Box 66
   15, failing which this Charter shall remain in full force 67
   and effect. 68
   **(b)** If it appears that the Vessel will be delayed beyond 69
   the cancelling date, the Owners may, as soon as they 70
   are in a position to state with reasonable certainty the 71

day on which the Vessel should be ready, give notice 72
thereof to the Charterers asking whether they will 73
exercise their option of cancelling, and the option must 74
then be declared within one hundred and sixty-eight 75
(168) running hours of the receipt by the Charterers of 76
such notice or within thirty-six (36) running hours after 77
the cancelling date, whichever is the earlier. If the 78
Charterers do not then exercise their option of cancelling, 79
the seventh day after the readiness date stated in the 80
Owners' notice shall be substituted for the cancelling 81
date indicated in Box 15 for the purpose of this Clause 5. 82
**(c)** Cancellation under this Clause 5 shall be without 83
prejudice to any claim the Charterers may otherwise 84
have on the Owners under this Charter. 85

6. **Trading Restrictions** 86
   The Vessel shall be employed in lawful trades for the 87
   carriage of suitable lawful merchandise within the trading 88
   limits indicated in Box 20. 89
   The Charterers undertake not to employ the Vessel or 90
   suffer the Vessel to be employed otherwise than in 91
   conformity with the terms of the contracts of insurance 92
   (including any warranties expressed or implied therein) 93
   without first obtaining the consent of the insurers to such 94
   employment and complying with such requirements as 95
   to extra premium or otherwise as the insurers may 96
   prescribe. **When required by Owner, the Charterers** 97
   **shall keep the Owners and Mortgages advised on** 
   **intended employment of Vessel.**
   The Charterers also undertake not to employ the Vessel 98
   or suffer her employment in any trade or business which 99
   is forbidden by the law of any country to which the Vessel 100
   may sail or is otherwise illicit or in carrying illicit or 101
   prohibited goods or in any manner whatsoever which 102
   may render her liable to condemnation, destruction, 103
   seizure or confiscation. 104
   Notwithstanding any other provisions contained in this 105
   Charter it is agreed that nuclear fuels or radioactive 106
   products or waste are specifically excluded from the 107
   cargo permitted to be loaded or carried under this 108
   Charter. This exclusion does not apply to radio-isotopes 109
   used or intended to be used for any industrial, 110
   commercial, agricultural, medical or scientific purposes 111
   provided the Owners' prior approval has been obtained 112
   to loading thereof. 113

7. **Surveys on Delivery and Redelivery** 114
   *(not applicable when Part III applies, as indicated in Box 37)* 115
   The Owners and Charterers shall each appoint 116
   surveyors for the purpose of determining and agreeing 117
   in writing the condition of the Vessel at the time of 118
   delivery and redelivery hereunder. The Owners shall 119
   bear all expenses of the On-hire Survey including loss 120
   of time, if any, and the Charterers shall bear all expenses 121
   of the Off-hire Survey including loss of time, if any, at 122
   the daily equivalent to the rate of hire or pro rata thereof. 123

8. **Inspection** 124
   The Owners shall have the right at any time after giving 125
   reasonable notice to the Charterers to inspect or survey 126
   the Vessel or instruct a duly authorised surveyor to carry 127
   out such survey on their behalf:- **provided it does not** 128
   **interfere with the operation of the Vessel a/o crew,**
   **but not to be unreasonably withheld.**
   **(a)** to ascertain the condition of the Vessel and satisfy 129
   themselves that the Vessel is being properly repaired 130
   and maintained. The costs and fees for such inspection 131
   or survey shall be paid by the Owners unless the Vessel 132
   is found to require repairs or maintenance in order to 133
   achieve the condition so provided; 134
   **(b)** in dry-dock if the Charterers have not dry-docked 135
   Her in accordance with Clause 10(g). The costs and fees 136
   for such inspection or survey shall be paid by the 137
   Charterers; and 138
   **(c)** for any other commercial reason they consider 139
   necessary (provided it does not unduly interfere with 140

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.    Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.    Maintenance and Operation** 168
(a)(i)<u>Maintenance and Repairs</u> – During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in <u>Clause 14(l)</u>, if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in <u>Box 10</u> and maintain all other 181
necessary certificates in force at all times. If 182
**necessary as deemed by class, the Charterers to
take immediate steps to have the necessary
repairs done within a reasonable time (prior to or
upon SS-drydocking) failing which the Owners
shall have the right of withdrawing the Vessel
from the service of the Charterers and without
prejudice to any claim the Owners may
otherwise have against the Charterers under this
Charter.**
(ii)    <u>New Class and Other Safety Requirements</u> - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in <u>Box 23</u>, or if 189
<u>Box 23</u> is left blank, 5 per cent. of the Vessel's 190
insurance value as stated in <u>Box 29</u>, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in <u>Clause 30</u>. 200
(iii)    <u>Financial Security</u> - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204

or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
**(b)** <u>Operation of the Vessel</u> - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
**(c)** The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
**(d)** <u>Flag and Name of Vessel</u> – Charterers have the 238
**right to reflag the ship and install and display their
funnel insignia and fly their own house flag, but name
cannot be changed.** ~~During the Charter~~
~~Period, the Charterers shall have the liberty to paint the~~ 239
~~Vessel in their own colours, install and display their~~ 240
~~funnel insignia and fly their own house flag. The~~ 241
~~Charterers shall also have the liberty, with the Owners'~~ 242
~~consent, which shall not be unreasonably withheld, to~~ 243
~~change the flag and/or the name of the Vessel during~~ 244
~~the Charter Period. Painting and re-painting, instalment~~ 245
~~and re-instalment, registration and re-registration, if~~ 246
~~required by the Owners, shall be at the Charterers'~~ 247
~~expense and time.~~ 248
**(e)** <u>Changes to the Vessel</u> – Subject to <u>Clause 10(a)(ii)</u>, 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
**(f)** <u>Use of the Vessel's Outfit, Equipment and</u> 257
<u>Appliances</u> - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

Charterers shall assume the obligations and liabilities 277
of the Owners against any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith, also for any 280
new equipment required in order to comply with radio 281
regulations. 282
**(g)** Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
required by the Classification Society or flag State. 289

**11. Hire** 290
**(a)**   The Charterers shall pay hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
**(b)**   Payment of hire shall be made as per daily hire 294
in Box 22 basis per calender month in advance. First
hire payable prorata upto end of the month starting
from vessel's actual delivery date/time. ~~The Charterers~~
~~shall pay to the Owners for the hire~~
~~of the Vessel a lump sum in the amount indicated in~~ 295
~~Box 22 which shall be payable not later than every thirty~~ 296
~~(30) running days in advance, the first lump sum being~~ 297
~~payable on the date and hour of the Vessel's delivery to~~ 298
~~the Charterers. Hire shall be paid continuously~~ 299
~~throughout the Charter Period.~~ 300
**(c)**   Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
**(d)**   Final payment of hire, if for a period of less than 304
~~thirty (30) running days~~ a month, shall be calculated 305
proportionally
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
**(e)**   Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. ~~The date upon which the Vessel is to be treated~~ 311
~~as lost or missing shall be ten (10) days after the Vessel~~ 312
~~was last reported or when the Vessel is posted as~~ 313
~~missing by Lloyd's, whichever occurs first. Any hire paid~~ 314
~~in advance to be adjusted accordingly.~~ 315
**(f)**   Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
**(g)**   Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

**12. Mortgage** 328
(only to apply if Box 28 has been appropriately filled in) 329
*)  ~~(a)   The Owners warrant that they have not effected~~ 330
~~any mortgage(s) of the Vessel and that they shall not~~ 331
~~effect any mortgage(s) without the prior consent of the~~ 332
~~Charterers, which shall not be unreasonably withheld.~~ 333
*)  **(b)**   The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344

themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
~~amendment of the mortgage(s) referred to in Box 28 or~~ 351
~~effect any other mortgage(s) without the prior consent~~ 352
~~of the Charterers, which shall not be unreasonably~~ 353
~~withheld.~~ 354
*)   (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

**13. Insurance and Repairs** 357
**(a)**   During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
**(b)**   If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
**(c)**   The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
**(d)**   Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
**(e)**   The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| be required to enable the Charterers to abandon the | 419 |
| Vessel to insurers and claim a constructive total loss. | 420 |
| **(f)** For the purpose of insurance coverage against hull | 421 |
| and machinery and war risks under the provisions of | 422 |
| sub-clause 13(a), the value of the Vessel is the sum | 423 |
| indicated in Box 29. | 424 |

**14.** ~~Insurance, Repairs and Classification~~ — 425
~~(Optional, only to apply if expressly agreed and stated~~ — 426
~~in Box 29, in which event Clause 13 shall be considered~~ — 427
~~deleted).~~ — 428
~~(a)  During the Charter Period the Vessel shall be kept~~ — 429
~~insured by the Owners at their expense against hull and~~ — 430
~~machinery and war risks under the form of policy or~~ — 431
~~policies attached hereto. The Owners and/or insurers~~ — 432
~~shall not have any right of recovery or subrogation~~ — 433
~~against the Charterers on account of loss of or any~~ — 434
~~damage to the Vessel or her machinery or appurt-~~ — 435
~~enances covered by such insurance, or on account of~~ — 436
~~payments made to discharge claims against or liabilities~~ — 437
~~of the Vessel or the Owners covered by such insurance.~~ — 438
~~Insurance policies shall cover the Owners and the~~ — 439
~~Charterers according to their respective interests.~~ — 440
~~(b)  During the Charter Period the Vessel shall be kept~~ — 441
~~insured by the Charterers at their expense against~~ — 442
~~Protection and Indemnity risks (and any risks against~~ — 443
~~which it is compulsory to insure for the operation of the~~ — 444
~~Vessel, including maintaining financial security in~~ — 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ — 446
~~the Owners shall in writing approve which approval shall~~ — 447
~~not be unreasonably withheld.~~ — 448
~~(c)  In the event that any act or negligence of the~~ — 449
~~Charterers shall vitiate any of the insurance herein~~ — 450
~~provided, the Charterers shall pay to the Owners all~~ — 451
~~losses and indemnify the Owners against all claims and~~ — 452
~~demands which would otherwise have been covered by~~ — 453
~~such insurance.~~ — 454
~~(d)  The Charterers shall, subject to the approval of the~~ — 455
~~Owners or Owners' Underwriters, effect all insured~~ — 456
~~repairs, and the Charterers shall undertake settlement~~ — 457
~~of all miscellaneous expenses in connection with such~~ — 458
~~repairs as well as all insured charges, expenses and~~ — 459
~~liabilities, to the extent of coverage under the insurances~~ — 460
~~provided for under the provisions of sub-clause 14(a).~~ — 461
~~The Charterers to be secured reimbursement through~~ — 462
~~the Owners' Underwriters for such expenditures upon~~ — 463
~~presentation of accounts.~~ — 464
~~(e)  The Charterer to remain responsible for and to~~ — 465
~~effect repairs and settlement of costs and expenses~~ — 466
~~incurred thereby in respect of all other repairs not~~ — 467
~~covered by the insurances and/or not exceeding any~~ — 468
~~possible franchise(s) or deductibles provided for in the~~ — 469
~~insurances.~~ — 470
~~(f)  All time used for repairs under the provisions of~~ — 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ — 472
~~defects according to Clause 3 above, including any~~ — 473
~~deviation, shall be for the Charterers' account and shall~~ — 474
~~form part of the Charter Period.~~ — 475
~~The Owners shall not be responsible for any expenses~~ — 476
~~as are incident to the use and operation of the Vessel~~ — 477
~~for such time as may be required to make such repairs.~~ — 478
~~(g)  If the conditions of the above insurances permit~~ — 479
~~additional insurance to be placed by the parties such~~ — 480
~~cover shall be limited to the amount for each party set~~ — 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ — 482
~~the Charterers as the case may be shall immediately~~ — 483
~~furnish the other party with particulars of any additional~~ — 484
~~insurance effected, including copies of any cover notes~~ — 485
~~or policies and the written consent of the insurers of~~ — 486
~~any such required insurance in any case where the~~ — 487
~~consent of such insurers is necessary.~~ — 488
~~(h)  Should the Vessel become an actual, constructive,~~ — 489
~~compromised or agreed total loss under the insurances~~ — 490
~~required under sub-clause 14(a), all insurance payments~~ — 491
~~for such loss shall be paid to the Owners, who shall~~ — 492

| | |
|---|---|
| ~~distribute the moneys between themselves and the~~ | 493 |
| ~~Charterers according to their respective interests.~~ | 494 |
| ~~(i)  If the Vessel becomes an actual, constructive,~~ | 495 |
| ~~compromised or agreed total loss under the insurances~~ | 496 |
| ~~arranged by the Owners in accordance with sub-clause~~ | 497 |
| ~~14(a), this Charter shall terminate as of the date of such~~ | 498 |
| ~~loss.~~ | 499 |
| ~~(j)  The Charterers shall upon the request of the~~ | 500 |
| ~~Owners, promptly execute such documents as may be~~ | 501 |
| ~~required to enable the Owners to abandon the Vessel~~ | 502 |
| ~~to the insurers and claim a constructive total loss.~~ | 503 |
| ~~(k)  For the purpose of insurance coverage against hull~~ | 504 |
| ~~and machinery and war risks under the provisions of~~ | 505 |
| ~~sub-clause 14(a), the value of the Vessel is the sum~~ | 506 |
| ~~indicated in Box 29.~~ | 507 |
| ~~(l)  Notwithstanding anything contained in sub-clause~~ | 508 |
| ~~10(a), it is agreed that under the provisions of Clause~~ | 509 |
| ~~14, if applicable, the Owners shall keep the Vessel's~~ | 510 |
| ~~Class fully up to date with the Classification Society~~ | 511 |
| ~~indicated in Box 10 and maintain all other necessary~~ | 512 |
| ~~certificates in force at all times.~~ | 513 |

**15. Redelivery** — 514
At the expiration of the Charter Period the Vessel shall — 515
be redelivered by the Charterers to the Owners at a — 516
safe and ice-free port or place as indicated in Box 16, in — 517
such ready safe berth as the Charterers ~~Owners~~ may — 518
direct. The — 
Charterers shall give the Owners not less than thirty — 519
(30) running days' preliminary notice of expected date, — 520
range of ports of redelivery or port or place of redelivery — 521
and not less than **5/3/2/1** ~~fourteen (14)~~ running days' — 522
definite — 
notice of expected date and port or place of redelivery. — 523
Any changes thereafter in the Vessel's position shall be — 524
notified immediately to the Owners. — 525
The Charterers warrant that they will not permit the — 526
Vessel to commence a voyage (including any preceding — 527
ballast voyage) which cannot reasonably be expected — 528
to be completed in time to allow redelivery of the Vessel — 529
within the Charter Period. Notwithstanding the above, — 530
should the Charterers fail to redeliver the Vessel within — 531
The Charter Period, the Charterers shall pay the daily — 532
equivalent to the rate of hire stated in Box 22 plus 10 — 533
per cent. or to the market rate, whichever is the higher, — 534
for the number of days by which the Charter Period is — 535
exceeded. All other terms, conditions and provisions of — 536
this Charter shall continue to apply. — 537
Subject to the provisions of Clause 10, the Vessel shall — 538
be redelivered to the Owners in the same or as good — 539
structure, state, condition and class as that in which she — 540
was delivered, fair wear and tear not affecting class — 541
excepted. — 542
The Vessel upon redelivery shall have her survey cycles — 543
up to date and trading and class certificates valid for at — 544
least the number of months agreed in Box 17. — 545

**16. Non-Lien** — 546
The Charterers will not suffer, nor permit to be continued, — 547
any lien or encumbrance incurred by them or their — 548
agents, which might have priority over the title and — 549
interest of the Owners in the Vessel. The Charterers — 550
further agree to fasten to the Vessel in a conspicuous — 551
place and to keep so fastened during the Charter Period — 552
a notice reading as follows: — 553
"This Vessel is the property of (name of Owners). It is — 554
under charter to (name of Charterers) and by the terms — 555
of the Charter Party neither the Charterers nor the — 556
Master have any right, power or authority to create, incur — 557
or permit to be imposed on the Vessel any lien — 558
whatsoever." — 559

**17. Indemnity** — 560
**(a)** The Charterers shall indemnify the Owners against — 561
any loss, damage or expense incurred by the Owners — 562
arising out of or in relation to the operation of the Vessel — 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| by the Charterers, and against any lien of whatsoever | 564 |
| nature arising out of an event occurring during the | 565 |
| Charter Period. If the Vessel be arrested or otherwise | 566 |
| detained by reason of claims or liens arising out of her | 567 |
| operation hereunder by the Charterers, the Charterers | 568 |
| shall at their own expense take all reasonable steps to | 569 |
| secure that within a reasonable time the Vessel is | 570 |
| released, including the provision of bail. | 571 |
| Without prejudice to the generality of the foregoing, the | 572 |
| Charterers agree to indemnify the Owners against all | 573 |
| consequences or liabilities arising from the Master, | 574 |
| officers or agents signing Bills of Lading or other | 575 |
| documents. | 576 |
| **(b)** If the Vessel be arrested or otherwise detained by | 577 |
| reason of a claim or claims against the Owners, **by the** | 578 |
| **mortgage holder the** | |
| Owners shall at their own expense take all reasonable | 579 |
| steps to secure that within a reasonable time the Vessel | 580 |
| is released, including the provision of bail. | 581 |
| In such circumstances the Owners shall indemnify the | 582 |
| Charterers against any loss, damage or expense | 583 |
| incurred by the Charterers (including hire paid under | 584 |
| this Charter) as a direct consequence of such arrest or | 585 |
| detention. | 586 |

**18. Lien**

| | |
|---|---|
| The Owners to have a lien upon all cargoes, sub-hires | 587 |
| and sub-freights belonging or due to the Charterers or | 588 |
| any sub-charterers and any Bill of Lading freight for all | 589 |
| claims under this Charter, and the Charterers to have a | 590 |
| lien on the Vessel for all moneys paid in advance and | 591 |
| not earned. | 592 |
| | 593 |

**19. Salvage**

| | |
|---|---|
| All salvage and towage performed by the Vessel shall | 594 |
| be for the Charterers' benefit and the cost of repairing | 595 |
| damage occasioned thereby shall be borne by the | 596 |
| Charterers. | 597 |
| | 598 |

**20. Wreck Removal**

| | |
|---|---|
| In the event of the Vessel becoming a wreck or | 599 |
| obstruction to navigation the Charterers shall indemnify | 600 |
| the Owners against any sums whatsoever which the | 601 |
| Owners shall become liable to pay and shall pay in | 602 |
| consequence of the Vessel becoming a wreck or | 603 |
| obstruction to navigation. | 604 |
| | 605 |

**21. General Average**

| | |
|---|---|
| The Owners shall not contribute to General Average. | 606 |
| | 607 |

**22. Assignment, Sub-Charter and Sale**

| | |
|---|---|
| **(a)** The Charterers shall not assign this Charter nor | 608 |
| sub-charter the Vessel on a bareboat basis except with | 609 |
| the prior consent in writing of the Owners, which shall | 610 |
| not be unreasonably withheld, and subject to such terms | 611 |
| and conditions as the Owners shall approve. | 612 |
| **(b)** The Owners shall not sell the Vessel during the | 613 |
| currency of this Charter except with the prior written | 614 |
| consent of the Charterers, which shall not be unreason- | 615 |
| ably withheld, and subject to the buyer accepting an | 616 |
| assignment of this Charter. | 617 |
| | 618 |

**23. Contracts of Carriage**

| | |
|---|---|
| *) **(a)** The Charterers are to procure that all documents | 619 |
| issued during the Charter Period evidencing the terms | 620 |
| and conditions agreed in respect of carriage of goods | 621 |
| shall contain a paramount clause incorporating any | 622 |
| legislation relating to carrier's liability for cargo | 623 |
| compulsorily applicable in the trade; if no such legislation | 624 |
| exists, the documents shall incorporate the Hague-Visby | 625 |
| Rules. The documents shall also contain the New Jason | 626 |
| Clause and the Both-to-Blame Collision Clause. | 627 |
| | 628 |
| *) ~~(b) The Charterers are to procure that all passenger~~ | 629 |
| ~~tickets issued during the Charter Period for the carriage~~ | 630 |
| ~~of passengers and their luggage under this Charter shall~~ | 631 |
| ~~contain a paramount clause incorporating any legislation~~ | 632 |
| ~~relating to carrier's liability for passengers and their~~ | 633 |

| | |
|---|---|
| ~~luggage compulsorily applicable in the trade; if no such~~ | 634 |
| ~~legislation exists, the passenger tickets shall incorporate~~ | 635 |
| ~~the Athens Convention Relating to the Carriage of~~ | 636 |
| ~~Passengers and their Luggage by Sea, 1974, and any~~ | 637 |
| ~~protocol thereto.~~ | 638 |
| *) ~~Delete as applicable.~~ | 639 |

**24. Bank Guarantee**

| | |
|---|---|
| ~~(Optional, only to apply if Box 27 filled in)~~ | 640 |
| ~~The Charterers undertake to furnish, before delivery of~~ | 641 |
| ~~the Vessel, a first class bank guarantee or bond in the~~ | 642 |
| ~~sum and at the place as indicated in Box 27 as guarantee~~ | 643 |
| ~~for full performance of their obligations under this~~ | 644 |
| ~~Charter.~~ **Corporate Guarantee to be attached to the** | 645 |
| **BBCHP.** | 646 |

**25. Requisition/Acquisition**

| | |
|---|---|
| **(a)** In the event of the Requisition for Hire of the Vessel | 647 |
| by any governmental or other competent authority | 648 |
| (hereinafter referred to as "Requisition for Hire") | 649 |
| irrespective of the date during the Charter Period when | 650 |
| "Requisition for Hire" may occur and irrespective of the | 651 |
| length thereof and whether or not it be for an indefinite | 652 |
| or a limited period of time, and irrespective of whether it | 653 |
| may or will remain in force for the remainder of the | 654 |
| Charter Period, this Charter shall not be deemed thereby | 655 |
| or thereupon to be frustrated or otherwise terminated | 656 |
| and the Charterers shall continue to pay the stipulated | 657 |
| hire in the manner provided by this Charter until the time | 658 |
| when the Charter would have terminated pursuant to | 659 |
| any of the provisions hereof always provided however | 660 |
| that in the event of "Requisition for Hire" any Requisition | 661 |
| Hire or compensation received or receivable by the | 662 |
| Owners shall be payable to the Charterers during the | 663 |
| remainder of the Charter Period or the period of the | 664 |
| "Requisition for Hire" whichever be the shorter. | 665 |
| **(b)** In the event of the Owners being deprived of their | 666 |
| ownership in the Vessel by any Compulsory Acquisition | 667 |
| of the Vessel or requisition for title by any governmental | 668 |
| or other competent authority (hereinafter referred to as | 669 |
| "Compulsory Acquisition"), then, irrespective of the date | 670 |
| during the Charter Period when "Compulsory Acqui- | 671 |
| sition" may occur, this Charter shall be deemed | 672 |
| terminated as of the date of such "Compulsory | 673 |
| Acquisition". In such event Charter Hire to be considered | 674 |
| as earned and to be paid up to the date and time of | 675 |
| such "Compulsory Acquisition". | 676 |
| | 677 |

**26. War**

| | |
|---|---|
| **(a)** For the purpose of this Clause, the words "War | 678 |
| Risks" shall include any war (whether actual or | 679 |
| threatened), act of war, civil war, hostilities, revolution, | 680 |
| rebellion, civil commotion, warlike operations, the laying | 681 |
| of mines (whether actual or reported), acts of piracy, | 682 |
| acts of terrorists, acts of hostility or malicious damage, | 683 |
| blockades (whether imposed against all vessels or | 684 |
| imposed selectively against vessels of certain flags or | 685 |
| ownership, or against certain cargoes or crews or | 686 |
| otherwise howsoever), by any person, body, terrorist or | 687 |
| political group, or the Government of any state | 688 |
| whatsoever, which may be dangerous or are likely to be | 689 |
| or to become dangerous to the Vessel, her cargo, crew | 690 |
| or other persons on board the Vessel. | 691 |
| **(b)** The Charterers shall be at liberty to trade the | 692 |
| Vessel in War Risk Areas and any applicable | 693 |
| additional premium shall be for the Charterers' | |
| account, with full indemnity to Owners in regards | |
| to ransoms/accidents/deaths or loss of cargo, | |
| Charterers to show evidence of extra premia being | |
| paid. ~~The Vessel, unless the written consent of the~~ | |
| ~~Owners be first obtained, shall not continue to or go~~ | 694 |
| ~~through any port, place, area or zone (whether of land~~ | 695 |
| ~~or sea), or any waterway or canal, where it reasonably~~ | 696 |
| ~~appears that the Vessel, her cargo, crew or other~~ | 697 |
| ~~persons on board the Vessel, in the reasonable~~ | 698 |
| ~~judgement of the Owners, may be, or are likely to be,~~ | 699 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

exposed to War Risks. Should the Vessel be within any | 700
such place as aforesaid, which only becomes danger- | 701
ous; or is likely to be or to become dangerous, after her | 702
entry into it, the Owners shall have the right to require | 703
the Vessel to leave such area. | 704
**(c)** The Vessel shall not load contraband cargo, or to | 705
pass through any blockade, whether such blockade be | 706
imposed on all vessels, or is imposed selectively in any | 707
way whatsoever against vessels of certain flags or | 708
ownership, or against certain cargoes or crews or | 709
otherwise howsoever, or to proceed to an area where | 710
she shall be subject, or is likely to be subject to | 711
a belligerent's right of search and/or confiscation. | 712
**(d)** If the insurers of the war risks insurance, when | 713
Clause 14 is applicable, should require payment of | 714
premiums and/or calls because, pursuant to the | 715
Charterers' orders, the Vessel is within, or is due to enter | 716
and remain within, any area or areas which are specified | 717
by such insurers as being subject to additional premiums | 718
because of War Risks, then such premiums and/or calls | 719
shall be reimbursed by the Charterers to the Owners at | 720
the same time as the next payment of hire is due. | 721
**(e)** The Charterers shall have the liberty: | 722
**(i)** to comply with all orders, directions, recommend- | 723
ations or advice as to departure, arrival, routes, | 724
sailing in convoy, ports of call, stoppages, | 725
destinations, discharge of cargo, delivery, or in any | 726
other way whatsoever, which are given by the | 727
Government of the Nation under whose flag the | 728
Vessel sails, or any other Government, body or | 729
group whatsoever acting with the power to compel | 730
compliance with their orders or directions; | 731
**(ii)** to comply with the orders, directions or recom- | 732
mendations of any war risks underwriters who have | 733
the authority to give the same under the terms of | 734
the war risks insurance; | 735
**(iii)** to comply with the terms of any resolution of the | 736
Security Council of the United Nations, any | 737
directives of the European Community, the effective | 738
orders of any other Supranational body which has | 739
the right to issue and give the same, and with | 740
national laws aimed at enforcing the same to which | 741
the Owners are subject, and to obey the orders | 742
and directions of those who are charged with their | 743
enforcement. | 744
**(f)** In the event of outbreak of war (whether there be a | 745
declaration of war or not) (i) between any two or more | 746
of the following countries: the United States of America; | 747
Russia; the United Kingdom; France; and the People's | 748
Republic of China, (ii) between any two or more of the | 749
countries stated in Box 36, both the Owners and the | 750
Charterers shall have the right to cancel this Charter, | 751
whereupon the Charterers shall redeliver the Vessel to | 752
the Owners in accordance with Clause 15, if the Vessel | 753
has cargo on board after discharge thereof at | 754
destination, or if debarred under this Clause from | 755
reaching or entering it at a near, open and safe port as | 756
directed by the Owners, or if the Vessel has no cargo | 757
on board, at the port at which the Vessel then is or if at | 758
sea at a near, open and safe port as directed by the | 759
Owners. In all cases hire shall continue to be paid in | 760
accordance with Clause 11 and except as aforesaid all | 761
other provisions of this Charter shall apply until | 762
redelivery. | 763

**27.** **Commission** | 764
The Owners to pay a commission at the rate indicated | 765
in Box 33 to the Brokers named in Box 33 on any hire | 766
paid under this Charter. If no rate is indicated in Box 33, | 767
the commission to be paid by the Owners shall cover | 768
the actual expenses of the Brokers and a reasonable | 769
fee for their work. | 770
If the full hire is not paid owing to breach of the Charter | 771
by either of the parties the party liable therefor shall | 772
indemnify the Brokers against their loss of commission. | 773

Should the parties agree to cancel the Charter, the | 774
Owners shall indemnify the Brokers against any loss of | 775
commission but in such case the commission shall not | 776
exceed the brokerage on one year's hire. | 777

**28.** **Termination** | 778
**(a)** Charterers' Default | 779
The Owners shall be entitled to withdraw the Vessel from | 780
the service of the Charterers and terminate the Charter | 781
with immediate effect by written notice to the Charterers if: | 782
**(i)** the Charterers fail to pay hire in accordance with | 783
Clause 11. However, where there is a failure to | 784
make punctual payment of hire due to oversight, | 785
negligence, errors or omissions on the part of the | 786
Charterers or their bankers, the Owners shall give | 787
the Charterers written notice of the number of clear | 788
banking days stated in Box 34 (as recognised at | 789
the agreed place of payment) in which to rectify | 790
the failure, and when so rectified within such | 791
number of days following the Owners' notice, the | 792
payment shall stand as regular and punctual. | 793
Failure by the Charterers to pay hire within the | 794
number of days stated in Box 34 of their receiving | 795
the Owners' notice as provided herein, shall entitle | 796
the Owners to withdraw the Vessel from the service | 797
of the Charterers and terminate the Charter without | 798
further notice; | 799
**(ii)** the Charterers fail to comply with the requirements of: | 800
**(1)** Clause 6 (Trading Restrictions) | 801
**(2)** Clause 13(a) (Insurance and Repairs) | 802
provided that the Owners shall have the option, by | 803
written notice to the Charterers, to give the | 804
Charterers a specified number of days grace within | 805
which to rectify the failure without prejudice to the | 806
Owners' right to withdraw and terminate under this | 807
Clause if the Charterers fail to comply with such | 808
notice; | 809
**(iii)** the Charterers fail to rectify any failure to comply | 810
with the requirements of sub-clause 10(a)(i) | 811
(Maintenance and Repairs) as soon as practically | 812
possible after the Owners have requested them in | 813
writing so to do and in any event so that the Vessel's | 814
insurance cover is not prejudiced. | 815
**(b)** Owners' Default | 816
If the Owners shall by any act or omission be in breach | 817
of their obligations under this Charter to the extent that | 818
the Charterers are deprived of the use of the Vessel | 819
and such breach continues for a period of fourteen (14) | 820
running days after written notice thereof has been given | 821
by the Charterers to the Owners, the Charterers shall | 822
be entitled to terminate this Charter with immediate effect | 823
by written notice to the Owners. | 824
**(c)** Loss of Vessel | 825
This Charter shall be deemed to be terminated if the | 826
Vessel becomes a total loss or is declared as a | 827
constructive or compromised or arranged total loss. For | 828
the purpose of this sub-clause, the Vessel shall not be | 829
deemed to be lost unless she has either become an | 830
actual total loss or agreement has been reached with | 831
her underwriters in respect of her constructive, | 832
compromised or arranged total loss or if such agreement | 833
with her underwriters is not reached it is adjudged by a | 834
competent tribunal that a constructive loss of the Vessel | 835
has occurred. | 836
**(d)** Either party shall be entitled to terminate this | 837
Charter with immediate effect by written notice to the | 838
other party in the event of an order being made or | 839
resolution passed for the winding up, dissolution, | 840
liquidation or bankruptcy of the other party (otherwise | 841
than for the purpose of reconstruction or amalgamation) | 842
or if a receiver is appointed, or if it suspends payment, | 843
ceases to carry on business or makes any special | 844
arrangement or composition with its creditors. | 845
**(e)** The termination of this Charter shall be without | 846
prejudice to all rights accrued due between the parties | 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

prior to the date of termination and to any claim that either party might have. | 848 849

**29.  Repossession** | 850
In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities.  Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised represent-ative to board the Vessel as soon as reasonably practicable following the termination of the Charter. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative.  All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers. | 851–869

**30.  Dispute Resolution** | 870
\*) **(a)**  This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.
The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceed-ings are commenced.
The reference shall be to three arbitrators.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.  The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.
Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.
In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced. | 871–907

\*) ~~**(b)**  This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~
~~In cases where neither the claim nor any counterclaim~~ | 908–920

~~exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.  current at the time when the arbitration proceedings are commenced.~~ | 921–925
\*) ~~**(c)**  This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~ | 926–931
**(d)**  Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. | 932–935
In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:- | 936–938
**(i)**  Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation. | 939–943
**(ii)**  The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator. | 944–956
**(iii)**  If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties. | 957–961
**(iv)**  The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest. | 962–964
**(v)**  Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration. | 965–970
**(vi)**  Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses. | 971–974
**(vii)**  The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration. | 975–979
*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)* | 980–981
**(e)**  If Box 35 in Part I is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall apply in all cases. | 982–984
\*) *Sub-clauses 30(a), 30(b) and 30(c) are alternatives; indicate alternative agreed in Box 35.* | 985–986

**31.  Notices** | 987
**(a)**  Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, e-mail registered or recorded mail or by personal service. | 988–990
**(b)**  The address including e-mail(s) of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively. | 991–993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## "BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

**OPTIONAL PART**

**1.    Specifications and Building Contract**
(a)    The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.
(b)    No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.
(c)    The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.
(d)    The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

**2.    Time and Place of Delivery**
(a)    Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter to be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.
(b)    If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.
(c)    If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon
(i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or
(ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and or take delivery of the Vessel from the Builders and deliver her to the Charterers;
(iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;
(iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.
(d)    Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.

**3.    Guarantee Works**
If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

**4.    Name of Vessel**
The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.

**5.    Survey on Redelivery**
The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

### "BARECON 2001" Standard Bareboat Charter

**PART IV**
**HIRE/PURCHASE AGREEMENT**
*(Optional, only to apply if expressly agreed and stated in Box 42)*

OPTIONAL PART

| | |
|---|---|
| On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. | 1<br>2<br>3<br>4<br>5<br>6<br>7 |
| *In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* | 8<br>9 |
| The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. | 10<br>11 |
| The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. | 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 |

| | |
|---|---|
| In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. | 28<br>29<br>30<br>31<br>32<br>33<br>34<br>35<br>36<br>37<br>38 |
| The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. | 39<br>40<br>41 |
| The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. | 42<br>43<br>44<br>45<br>46<br>47<br>48 |
| The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. | 49<br>50<br>51<br>52<br>53 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**"BARECON 2001" Standard Bareboat Charter**

<table>
<tr><td></td><td>OPTIONAL<br>PART</td></tr>
</table>

**PART V**

**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**

*(Optional, only to apply if expressly agreed and stated in Box 43)*

1. ~~Definitions~~
   ~~For the purpose of this PART V, the following terms shall~~
   ~~have the meanings hereby assigned to them:~~
   ~~"The Bareboat Charter Registry" shall mean the registry~~
   ~~of the State whose flag the Vessel will fly and in which~~
   ~~the Charterers are registered as the bareboat charterers~~
   ~~during the period of the Bareboat Charter.~~
   ~~"The Underlying Registry" shall mean the registry of the~~
   ~~state in which the Owners of the Vessel are registered~~
   ~~as Owners and to which jurisdiction and control of the~~
   ~~Vessel will revert upon termination of the Bareboat~~
   ~~Charter Registration.~~

2. ~~Mortgage~~
   ~~The Vessel chartered under this Charter is financed by~~
   ~~a mortgage and the provisions of Clause 12(b) (Part II)~~
   ~~shall apply.~~

3. ~~Termination of Charter by Default~~
   ~~If the Vessel chartered under this Charter is registered~~
   ~~in a Bareboat Charter Registry as stated in Box 44, and~~
   ~~if the Owners shall default in the payment of any amounts~~
   ~~due under the mortgage(s) specified in Box 28, the~~
   ~~Charterers shall, if so required by the mortgagee, direct~~
   ~~the Owners to re-register the Vessel in the Underlying~~
   ~~Registry as shown in Box 45.~~
   ~~In the event of the Vessel being deleted from the~~
   ~~Bareboat Charter Registry as stated in Box 44, due to a~~
   ~~default by the Owners in the payment of any amounts~~
   ~~due under the mortgage(s), the Charterers shall have~~
   ~~the right to terminate this Charter forthwith and without~~
   ~~prejudice to any other claim they may have against the~~
   ~~Owners under this Charter.~~

Line numbers: 1–31

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ARROW
TANKERS A/S

# RIDER CLAUSES TO CHARTER PARTY
# M.T. "CV STEALTH "
# DATED 23rd February 2010

## CLAUSE 1.    CANCELLATION OF BAREBOAT CHARTER:

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

## CLAUSE 2.    DRY DRY-DOCKS:

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

## CLAUSE 3.    BUNKER CLAUSE:

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

## CLAUSE 4.    CHARTERERS LIABILITIES:

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

## CLAUSE 5.    OIL POLLUTION:

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1



ARROW
TANKERS A/S

cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6.    RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk  of    the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of  Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2





to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv) To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v) Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi) To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x) Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi) Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3





**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii) all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers  expense, such  alternative insurance as the Owners may in their discretion determine to be necessary  to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

## CLAUSE 7.   **INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

4

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. <u>CHARTERERS' COVENANTS:</u>

The Charterers Covenant with the Owners undertake throughout the term of this
Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;





**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(e) They will notify the Owners forthwith by telex, telefax or e -mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.


**CLAUSE 9.    INDEMNITY:**

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

**2nd original**



m.t. CV STEALTH – CP dated 23rd February 2010

ARROW
TANKERS A/S

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10.  TERMINATION EVENTS:

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

**2nd original**



**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

**2nd original**



m.t. CV STEALTH – CP dated 23rd February 2010

ARROW
TANKERS A/S

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

## CLAUSE 12.  CONTRADICTION CLAUSE

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

## CLAUSE 13.  THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

9





ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 14.**
MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**
Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.
Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**
Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**
Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**
Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**
Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)







m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET )  to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

11

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :                                        Charterers:

By   : Himoza Dimareli              By  :  Bjorn Thodocor
Title : Director                         Title :  Director

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery

USD 9,750 gross pdpr for the 2nd charter year

USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year

USD 9,750 gross pdpr for the 4th charter year

USD 9,750 gross pdpr for the 5th charter year

USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By   : Mimoza Dimaseli
Title :   DIRECTOR

Charterers:

By   : Togrul Tokan
Title :   DIRECTOR

**ADDENDUM NO 3**

Dated 23    January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")**
**as amended by an Addendum No 1 dated 2nd June 2010**
**and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed that:

1.  The payment of a portion of the daily charter hire of an amount of USD 3.225 arising from the charter hires starting 1st December 2012 until 1st December 2013 shall be deferred. With effect from 1st December 2013 the total amount of deferred charter hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal instalments until 22nd June 2015 and added to the daily charter hire.

2.  Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box 22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3.  In the event of default of payment by the charterers under the bareboat charters of the Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or undertakings thereto remain unaltered and in full force and effect.

-----------------------
For and on behalf of
the Charterers

-----------------------
For and on behalf of
the Guarantor

-----------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director