JOHN D. GIFFIN, CASB No. 89608
john.giffin@kyl.com
VALERIE I. HOLDER, CASB No. 326667
valerie.holder@kyl.com
KEESAL, YOUNG & LOGAN
A Professional Corporation
450 Pacific Avenue
San Francisco, California 94133
Telephone: (415) 398-6000
Facsimile: (415) 981-0136

Attorneys for Specially Appearing Defendants
ADVANTAGE SPRING SHIPPING, LLC, ADVANTAGE TANKERS, LLC,
and FLEETSCAPE SPRING LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PSARA ENERGY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> SPACE SHIPPING LTD., GEDEN HOLDINGS LTD.; ADVANTAGE SPRING SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET-WILLIAMS; TUGRUL TOKGOZ; MEHMET MAT; FLEETSCAPE SPRING, LLC; FLEETSCAPE ADVANTAGE HOLDINGS, LLC, <br><br> Defendants. | Case NO. 3:20-CV-04102-WHO <br><br> **DECLARATION OF MARC G. MATTHEWS** <br><br> Date: June 26, 2020 <br> Time: 10:00 a.m. <br> Place: Courtroom 2, 17th Floor <br> Judge: Hon. William H Orrick |

I, MARC G. MATTHEWS, declare as follows:

I am an attorney duly licensed to practice in all state and federal courts in Texas. I am counsel of record for ADVANTAGE ARROW SHIPPING, LLC; ADVANTAGE START SHIPPING, LLC; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; and FORWARD HOLDINGS, LLC (the "Advantage Defendants") in the matter entitled *Psara Energy, Ltd. v. Space Shipping Ltd. et al.* pending in the Federal District Court for the Eastern District of Texas, Beaumont Division, before Magistrate Judge Zack Hawthorn and District Judge Marcia Crone. My partner Kevin LaVie was counsel of record for the Defendants in the matter entitled *Psara*

*Energy, Ltd. v. Space Shipping Ltd. et al.* pending in the Federal District Court for the Eastern District of Louisiana, and I assisted Mr. LaVie in that case and also appeared on behalf of the Advantage Defendants at the hearing on the Advantage Defendants' Motion to Vacate. As such, I have personal knowledge of the facts set forth below and if called upon to testify thereto I would be competent to do so:

1. Plaintiff, Psara Energy, Ltd. through its counsel of record in Houston, Texas filed lawsuits in the Federal District Court for the Eastern District of Texas and later in the Federal District Court for the Eastern District of Louisiana (the "Texas action" and the "Louisiana action") alleging virtually identical claims and seeking recovery for the same alleged damages.

2. Attached hereto as Exhibits A and B are true and correct copies of those virtually identical complaints.

3. In both the Texas action and the Louisiana action Plaintiff, through its counsel, sought to attach vessels pursuant to Rule B in order to secure the same claim. Plaintiff's demand to the Courts for security in both matters was in excess of $18,000,000.

4. After substantial briefing and oral argument, Magistrate Judge Hawthorn in the Texas action found that Plaintiff's claim for damages was overstated and set security at $4,000,0000. Attached hereto as Exhibit C is a copy of Magistrate Judge Hawthorn's Order of May 4, 2018, setting security at $4,000,000.

5. The Advantage Defendants posted a Release Bond in that amount. Attached hereto as exhibit D is a true and correct copy of that Bond.

6. On the same day Plaintiff attached the vessel in Texas, Plaintiff also attached a vessel in New Orleans pursuant to Rule B and made the identical allegations of liability and damages against the same defendants and seeking security in the same amount sought in Texas, in excess of $18,000,000. The Judge in the Louisiana action refused their demand but required an additional bond of $800,000 for alleged towing costs, evidence of which had been purportedly unavailable to Plaintiff when Magistrate Judge Hawthorn set security in the Texas action.

7. Attached hereto as Exhibit E is a copy of the Order of Judge Lemelle in the Louisiana action setting an additional bond of $800,000.

8.      Also, attached hereto as Exhibit F is a transcript of the hearing before Judge Lemelle in New Orleans in which he stated that if Plaintiff were to demand additional security through subsequent attachment of additional vessels, such could be evidence of bad faith (*see* pages 23–27 of the transcript).

9.      A bond in the amount of $800,000 was posted by the Advantage Defendants. Attached as Exhibit G is a copy of that bond.

10.      Thereafter the Louisiana action was transferred to Texas and consolidated with the prior Texas action pending before District Judge Crone and Magistrate Judge Hawthorn.

11.      The Texas action is still pending and Judge Crone has maintained jurisdiction over the dispute, including the issue of security.

12.      The Plaintiff has not applied to the Court in the Texas Action for additional security.


I declare under the laws of the State of California that the foregoing is true and correct. Executed at Belfast, Maine on June 23, 2020.

MARC G. MATTHEWS

DECLARATION OF MARC G. MATTHEWS - Case No. 3:20-CV-04102-WHO
KYL4838-9908-9089.1

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **No. 1:18-cv-00178** |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS:** | | |
| **LTD.; ADVANTAGE ARROW SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI  KARAMEHMET -** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

Plaintiff PSARA ENERGY, LTD., by and through undersigned counsel, for its Verified

Complaint against Defendants: SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.;

ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A

GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC;

FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI

KARAMAEHMET - WILLIAMS; and TUĞRUL TOKGÖZ alleges and pleads as follows:

### I. JURISDICTION, VENUE, AND PARTIES

1.      This is an admiralty and maritime claim within the meaning of rule 9(h) of the

Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract,

*i.e.* an executed bareboat charter party for the employment of a seagoing cargo vessel.  This case

also falls under this court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and

is brought under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or

Maritime Claims, and Asset Forfeiture Actions (hereinafter "Supplemental Rule B") and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.      At all times material hereto Plaintiff, PSARA ENERGY, LTD. (hereinafter "PSARA" or "Plaintiff"), was a corporation organized under the laws of the Republic of the Marshall Islands and the registered owner of the Motor Tanker CV STEALTH (hereinafter "CV STEALTH" or "Vessel"), a crude oil tanker vessel registered in Malta.

3.      At all times material hereto Defendant, SPACE SHIPPING, LTD. (hereinafter "SPACE"), was and is a foreign company organized under the laws of Malta and the bareboat charterer of the M/T CV STEALTH under a bareboat charter party contract dated February 23, 2010 ("the bareboat charter"). A copy of the bareboat charter and addenda thereto are attached to this Original Verified Complaint as **EXHIBIT 1**. Though SPACE is incorporated in Malta, the business of SPACE is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

4.      At all times material hereto GEDEN HOLDINGS, LTD. (hereinafter "GEDEN HOLDINGS"), was and is a foreign company organized under the laws of Malta with its operating office at the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey. Though GEDEN HOLDINGS is incorporated in Malta, its business is actually carried on entirely by GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

5.      At all times material hereto Defendant ADVANTAGE ARROW SHIPPING, LLC (hereinafter "ADVANTAGE ARROW SHIPPING"), was and is a limited liability company organized under the laws of the Republic of the Marshall Islands, and the registered owner of the

Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7. Though ADVANTAGE ARROW SHIPPING is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

6.      At all times material hereto Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES (hereinafter "GEDEN LINES"), was and is a foreign corporate entity organized under the laws of Turkey with its principal place of business located at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey.

7.      At all times material hereto ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  ADVANTAGE TANKERS, LLC is a holding company that owns 100% of Defendant ADVANTAGE ARROW SHIPPING. Though ADVANTAGE TANKERS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

8.      At all times material hereto ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"), was a foreign limited liability company organized under the Laws of the Marshall Islands.  ADVANTAGE HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE TANKERS. Though ADVANTAGE HOLDINGS is incorporated in the Marshall Islands, its business is carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

9.     At all times material hereto FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  FORWARD HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE HOLDINGS.  Though FORWARD HOLDINGS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

10.     At all times material hereto MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHMET"), is an individual person and a citizen and resident of the Republic of Turkey and, respectively, through a Panamanian corporation that he entirely controls - Buselten Finance, S.A - is the 100% shareholder of GEDEN HOLDINGS and SPACE SHIPPING. Through another Turkish business entity he controls - Cukurova Holdings - he is 100% shareholder of Defendant GEDEN LINES.

11.     At all times material hereto, Tuğrul Tokgöz (hereinafter "TOKGÖZ") is an individual person and a citizen of the Republic of Turkey and a resident of Turkey. TOKGÖZ is the Chief Executive Officer of ADVANTAGE ARROW SHIPPING; ADVANTAGE TANKERS; and a director of GEDEN HOLDINGS and GEDEN LINES and, through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, is 15% controlling shareholder of ADVANTAGE TANKERS.

12.     At all times material hereto, GULSUN NAZLI KARAMEHMET–WILLIAMS (hereinafter "KARAMEHMET WILLIAMS") is an individual person and a dual citizen of the Republic of Turkey and the Swiss Confederation, and a resident of the United Kingdom. KARAMEHMET WILLIAMS is the adult daughter and only child of EMIN KARAMEHMET,

and through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, she is the 85% controlling shareholder of ADVANTAGE TANKERS.

13.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, to wit:  the M/T ADVANTAGE ARROW that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules as pled more fully in Section **V** of this Verified Complaint.

## II. THE SUBSTANTIVE CLAIMS

14.     Under the bareboat charter party dated February 23, 2010 and addenda thereto dated:  June 2, 2010; June 21, 2010; and January 29, 2010, Plaintiff chartered its vessel CV STEALTH for a "a term of 5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period" to "Geden Holdings Limited,[1] Malta or nominee always guaranteed by Geden Line."  *See* **EXHIBIT 1**, box 21.  The vessel was delivered to the service of the nominee of GEDEN HOLDINGS, *i.e.* SPACE, and to GEDEN LINES, and was used and operated for profit by them as part of GEDEN LINES' non-owned, chartered-in fleet.

15.     By subsequent addendum to the bareboat charter, GEDEN HOLDINGS became the performance guarantor of SPACE.  *See* **EXHIBIT 1**.  *See* also Addendum dated June 2, 2010, and performance guarantee of GEDEN HOLDINGS, dated March 4, 2010 hereto attached as **EXHIBIT 2.**

16.     Under Part II Clause  10 of the bareboat charter, SPACE was obligated to maintain the vessel in a good state of repair, with all of her class certificates up to date.

---

[1] Geden Holdings Limited (hereinafter "Geden Holdings") was a holding company incorporated in Malta. It held 100% of the shares of SPACE and 100% of the shares of several one-ship-companies as is more specifically pled in this Original Verified Complaint.

17.     Under Part II Clause 15 of the bareboat charter, SPACE was obligated to redeliver the vessel at the end of the bareboat charter party term "…in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted."  Moreover, the same clause provides that "…upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed…".

18.     Under Part II Clause  17 of the bareboat charter, SPACE was obligated "to indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the vessel by the Charterers..." and under Rider Clause 9, SPACE, as charterer undertook to indemnify the owners of the vessel "against, all costs charges, expenses, claims proceedings (whether civil or criminal), liabilities, losses, penalties, duties and fees…and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management, control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel…and regardless of when the same shall arise".

19.     Pursuant to clause 7 of a Settlement Agreement dated 8 December 2016, and entered into between Plaintiff as Owners, in settlement of interim disputes regarding an outstanding arbitration award in favor of Owners for unpaid charter hire; and Defendant SPACE as Charterers, and Geden Holdings as performance guarantors, the hire amount payable under the Charterparty was amended to USD 9,875 per day from 1 January 2017 onwards.

20.      Plaintiff delivered the vessel into the bareboat chartered service and rendered the contractual performance required of it.  However, Defendant SPACE (hereinafter also referred to as "Charterer"), though possessing and using the CV STEALTH, has failed and refused to perform

its obligations under the bareboat charter party contract, and is in breach thereof as is further pled below.

21.     On April 10, 2014, SPACE time chartered the Vessel to ST Shipping & Transport Pte. Ltd. (hereinafter "ST"), a Singapore business entity, for a term of approximately twelve months. ST, operating out of its Stamford, Connecticut branch office, where it is registered as a foreign corporation and carries on business as a cargo ship operator, sub-chartered the vessel on a voyage charter party dated September 4, 2014 to lift a cargo up to 400,000 barrels of Venezuelan crude oil from Puerto La Cruz for discharge at a terminal in the U.S.A.

22.     The Vessel was directed by ST to Puerto la Cruz, Venezuela to load her cargo where after arriving, and tendering her notice of readiness to load, she was boarded by local police and prosecutorial authorities on or about September 13, 2014 and was detained by them on suspicion of attempting to carry a stolen cargo of crude oil.

23.     At Puerto La Cruz, the CV STEALTH was further detained by court order, and at the request of the prosecutorial authorities, for a period exceeding three years, which was beyond the agreed bareboat charter party contractual redelivery date.

24.     Under the terms of the bareboat charter, the latest date for the redelivery of the CV STEALTH to Plaintiff was on June 22, 2015.  However, SPACE, in breach of the bareboat charter, failed to redeliver her to Plaintiff - her lawful owner - and at the same time was failing to pay hire as the bareboat charter requires.

25.     Owners commenced London maritime arbitration to enforce their claims against SPACE for unpaid hires. The arbitration tribunal ruled in favor of Plaintiff, requiring SPACE to

keep paying monthly bareboat charter hire until the Vessel was released and was actually redelivered to Plaintiff.

26.     On October 3, 2017, SPACE claimed the Venezuelan authorities' detention of the CV STEALTH had terminated and gave PSARA notice of its intent to redeliver the Vessel within approximately 30 days. However, the Vessel was incapable of being redelivered as she was out of class with her attending classification society the American Bureau of Shipping. Moreover, the Vessel was so extensively damaged due to SPACE's neglect and lack of maintenance throughout her 3 years long detention that she was incapable of sailing under her own power and was in need of extensive repairs.

27.     Ultimately SPACE arranged to have the vessel towed from Puerto La Cruz, Venezuela to Port of Spain, Trinidad where she was redelivered and taken over by Plaintiff's personnel on or about March 24, 2018 out of class, and in the same heavily damaged condition as she was before she was towed by SPACE to Port of Spain.

### Breach of Charterers' Maintenance/Redelivery Obligations

28.     Pursuant to Clause 10(a) of Part II the bareboat charter, SPACE was under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the charter.  SPACE was also under an obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

29.     Further, pursuant to Clause 15 of Part II of the bareboat charter, SPACE was obliged to:  redeliver the Vessel to Owners "in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted; " with her survey cycles up to date and trading and class certificates valid.  Box 17 of part I of the bareboat charter required the Vessel to have passed her Special Survey dry docking without

8

extensions.

30.     In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the bareboat charter, SPACE did not undertake any (or any non-negligible) maintenance on the Vessel, which since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

31.     The work needed in order for the Vessel to be restored to the required redelivery condition; to pass Special Survey; and to have all Class and statutory certificates reinstated, includes the following non-exhaustive list of works:

(i)     complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

(ii)     extensive piping system renewals, overhauling of valves, sensors and gauges;

(iii)     full hull and deck blasting and extensive steel renewals and recoating;

(iv)     extensive renewal of outfitting, supports, ladders;

(v)     extensive steel renewals in cargo and ballast tanks;

(vi)     re-tubing and/or replacement of auxiliary boilers and exhaust gas boilers;

(vii)     overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

(viii)  steam lines and heating coils renewals;

(ix)     deck machinery overhauling and renewal including cranes and their hydraulic systems;

(x)     electrical, electronics and automation system service, repair and renewal;

(xi)     extensive rewiring;

(xii)  bridge navigation and communication equipment service and renewals;

(xiii)  overhauling, repairs and renewal of steering and shafting system;

(xiv)  overhauling, service, repair and renewals of all safety equipment, firefighting systems and appliances including lifesaving equipment; and

(xv)  fitting of ballast water treatment system.

32.     As a consequence of the extensive damage to the Vessel, it would cost more to tow her to repair facilities and repair her than her (repaired) market value. Plaintiff, the Owner of the Vessel, has submitted in London Maritime arbitration a claim for damages in an amount equivalent to the (repaired) market value of the Vessel, which is USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS).

### *Unpaid Bareboat Charter Hire*

33.     SPACE has failed to pay outstanding hire that was earned during the month of February 2018, for which PSARA has obtained an award from the London maritime arbitration tribunal - that has jurisdiction over the merits of the case - in the amount of USD 276,500. In addition to this amount, the arbitration tribunal has awarded PSARA Pounds Sterling 4,550.00 (USD 6,515.50)  by way of arbitration costs for this particular reference relating to the February 2018 charter hire, with annual interests on each of the two amounts at the rate of 5%, compounded quarterly.

34.     SPACE has also failed to pay Plaintiff the charter hire for the month of March 2018 in the amount of USD 233,708.33, which Plaintiff is claiming in the ongoing London maritime arbitration.  This amount is also claimed in London maritime arbitration.

### III. UNDERLYING PROCEEDINGS ON THE MERITS

35.     Box 35 and clause 30(a) of the bareboat charter party (**EXHIBIT 1**) provide for arbitration of all disputes arising out of the contract in London.

36.     Plaintiff is claiming in London maritime arbitration the amount of USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS) as the repaired value of the vessel; and the unpaid hire for the month of March 2018 in the amount of USD 233,708.33, together with interest and costs.

37.     Plaintiff is also owed charter hire for the month of February 2018 under the London maritime arbitration award together with arbitration costs in the total amount of USD 283,015.50.

38.     Plaintiff estimates the legal costs that will be incurred to pursue these claims in London maritime arbitration proceedings will be approximately USD 400,000.00. As it is customary in London arbitration, legal costs, including lawyers' fees, are awarded to the prevailing party.

39.     This action is an ancillary proceeding, brought to obtain jurisdiction over Defendant Charterer and to obtain security for Plaintiff's claims in the London maritime arbitration proceedings.[2]

## IV. IDENTITY OF THE CORPORATE AND INDIVIDUAL DEFENDANTS AND THEIR INTERRELATIONSHIPS

40.     In June of 2015, when SPACE had fallen substantially in arrears in its bareboat charter hire payment obligations, and the contractual redelivery of the Vessel to Plaintiff was approaching, Plaintiff became concerned and made enquiries regarding the status of the CV STEALTH and the other crude oil tanker vessels that were being operated by Defendant GEDEN HOLDINGS.  Plaintiff was astounded to discover the entire "owned" – as opposed to the

---

[2]  Plaintiff is also filing a Rule B attachment against another vessel of Defendant in the Eastern District of Louisiana, in which it has sought the attachment of the M/T ADVANTAGE START.  It appears from the Marshall Islands mortgage records of the said vessel that the equity of the Defendants in the said vessel is approximately $ 8,000,000.00 and therefore insufficient to secure Plaintiff's claim, considering the lender mortgagee's interest.

"chartered-in" fleet - of GEDEN HOLDINGS had been surreptitiously transferred to new owners, as shown in **TABLE I** below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
| --- | --- | --- | --- |
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

41.    Not only had the said vessels been transferred to new corporate owners, but they had been renamed and reflagged from the Maltese shipping register to that of the Marshall Islands.

42.    Investigation into the ship register/ship mortgage record of the Republic of the Marshall Islands revealed that all of the above 11 crude oil tanker vessels which were formerly owned by one-ship-companies, and in turn, 100% controlled by shareholder GEDEN HOLDINGS, had been transferred in approximately the first 5 months of 2015 - without any notice to or the knowledge of Plaintiff - to new one-ship-companies 100% controlled by a new holding company:

ADVANTAGE TANKERS, LLC.  ADVANTAGE TANKERS is ultimately 85% controlled by the daughter and only child of Defendant EMIN KARAMEHMET, *i.e.* Defendant KARAMEHMET WILLIAMS and 15% by Defendant TOKGÖZ.  The said ship mortgage records contain a diagrammatic representation of the said new ownership structure which is hereto attached as **EXHIBIT 3**.

### A.  *SUCCESSOR CORPORATION RELATIONSHIP*

43.    The grouping of the following corporate entities: ADVANTAGE TANKERS; its subsidiary ADVANTAGE ARROW SHIPPING; ADVANTAGE HOLDINGS; FORWARD HOLDINGS; and 10 other one-ship-company entities that are subsidiaries of ADVANTAGE TANKERS[3] (said grouping hereinafter collectively referred to for the sake of brevity as "Advantage-Group") comprise, respectively, successor corporate business entities of the grouping formerly constituted of: GEDEN  HOLDINGS; Target Shipping, Ltd., GEDEN LINES; SPACE SHIPPING; and 10 other former one-ship-companies[4], as shown in TABLE I   (hereinafter collectively referred to, for the sake of brevity, as "Geden-Group").

44.    As particularized in the following paragraphs 45-55 the Advantage-Group corporate entities are successor corporations of the Geden-Group corporate entities in that: a) the former have acquired and are respectively in possession of the trading assets of the latter[5]

---

[3]  Foreign limited liability companies: Advantage Solar Shipping, LLC; Advantage Sky Shipping, LLC; Advantage Start Shipping, LLC; Advantage Arrow Shipping, LLC; Advantage Avenue Shipping, LLC; Advantage Award Shipping, LLC; Advantage Atom Shipping, LLC; Advantage Summer Shipping, LLC; Advantage Spring Shipping, LLC; Advantage Sun Shipping, LLC

[4]  Foreign limited liability companies: Profit Shipping, Ltd.; Blue Shipping, Ltd.; Blank Shipping, Ltd.; Target Shipping, Ltd.; True Shipping Ltd.; Value Shipping, Ltd; Bravo Shipping, Ltd; Barbaros Maritime, Ltd; Pink Shipping, Ltd; Reef Shipping Ltd.; Prima Shipping, Ltd.

[5] The said assets are the tankers: PROFIT now renamed ADVANTAGE SOLAR; BLUE now renamed ADVANTAGE SKY; BLANK now renamed ADVANTAGE START; TARGET now renamed ADVANTAGE ARROW; TRUE now renamed ADVANTAGE AVENUE; VALUE now renamed ADVANATGE AWARD; BRAVO now renamed ADVANTAGE ATOM; POWER now renamed ADVANTAGE ANTHEM; PINK now renamed ADVANTAGE SUMMER; REEF now renamed ADVANTAGE SPRING; ROYAL now renamed ADVANATGE SUN.  For the sake of brevity these vessels will be collectively referred to as "the 11 tanker vessels".

(hereinafter "the 11 tanker vessels"), as illustrated in the foregoing Table I;  b) they occupy and carry on business from the same business premises, *i.e.* Buyukdere Cad., Yapi  Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey;  c) they transact their business by and through identical personnel as the latter;  d) they share common officers and directors with the latter;  e) they have taken over and are servicing the same customers as were being served by the latter;  f) they have virtually the same financing banks financing their business as the latter;  g) they have assumed numerous of the latter's obligations, including long term charter parties with Shell Western Supply and Trading, Ltd.; h) there is continuity of shareholders, GEDEN HOLDINGS retains ultimate control over the corporate entities of the Advantage-Group that own  the 11 tanker vessels; i) the controlling shareholder of GEDEN HOLDINGS and GEDEN LINES - EMIN KARAMEHMET – continues to maintain a substantial financial interest in the Advantage-Group companies, as GEDEN LINES (which is 100% controlled by him) manages and operates all of its 11 tanker vessels formerly held by the one-ship-companies of the Geden-Group; j) GEDEN LINES exercises complete control over all of the corporate entities of the Advantage-Group as its administrative, operations, technical, commercial, and safety manager;  k) following the purported sale of the 11 tanker vessels, GEDEN HOLDINGS formally ceased its ordinary business operations, through its subsidiary one ship companies and wound down its remaining business of operating chartered-in tonnage.

45.     As part of a business reorganization arrangement conceived and implemented by the management of the Geden-Group, in concert with EMIN KARAMEHMET, KARAMEHMET WILLIAMS, and TOKGÖZ, the one-ship-companies of the Geden-Group "sold" the respective vessels each one of them had owned to its homologous Advantage-Group one-ship-company, with these transactions occurring approximately during the first and second quarter of 2015.  The said

"sales", were in actual fact part of a "reorganization" and makeover of the ownership structure, whereby newly minted corporate one-ship-companies of the Advantage-Group would take over ownership of the assets with the control, however, remaining with GEDEN HOLDINGS. *See* "Consent Letter" agreement dated February 6, 2015 between GEDEN HOLDINGS and Shell Western Supply and Trading, Ltd. hereto attached as **EXHIBIT 4** at Bates No. D01248, at ¶ 2 thereof, wherein GEDEN HOLDINGS assures Shell Western Supply and Trading, Ltd that each of the Advantage-Group one-ship-companies would be "wholly owned by the Shareholder", *i.e.* GEDEN HOLDINGS.

46.    Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies, to the respective Advantage-Group one-ship-companies, all of the time charter parties under which the said respective vessels, before and at the time of the transfer, were being employed by Shell Western Supply and Trading, Ltd. continued seamlessly with the Advantage-Group one-ship-companies.   This was accomplished under contractual arrangements with Shell Western, worked out by GEDEN HOLDINGS / GEDEN LINES, KARAMEHMET-WILLIAMS, and TOKGÖZ, whereby the said charter parties, several of which had significant unexpired terms, were renewed for a 5-year period, at rates and on such other terms as were agreed on behalf of the Advantage-Group one-ship-companies by GEDEN HOLDINGS. *Id.* at D01248 - D01250.

47.    Notwithstanding the purported transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer - Shell Western Supply and Trading, Ltd - that it retained ownership over the Advantage-Group one-ship-companies.  *Id*. at Bates No. D01248, at ¶ 2 thereof.  Said representations and warranties regarding

the ultimate ownership and control of the Advantage-Group one-ship-companies by GEDEN HOLDINGS were accepted by Shell Western Supply and Trading, Ltd in agreeing to enter into new time charters with the said Advantage-Group one-ship-companies.  *See* relevant extract from the deposition of the General Manager of Shell Western Supply & Trading, Ltd. specifically identifying GEDEN HOLDINGS as the "shareholder" retaining the ultimate control over the Advantage-Group one-ship-companies, hereto attached as **EXHIBIT 5.**

48.     Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, all day-to-day shore-side operations of the 11 tanker vessels continue to be performed by and through GEDEN LINES, including safety management, security management, crewing, victualing, supplying, technical monitoring and supervision, drydocking, repairs, accounting, insuring, and generally every function necessary in order to keep and maintain the said vessels trading as merchant vessels in the same manner and to the same extent that GEDEN LINES had performed before the said transfer of ownership of the 11 tanker vessels.  *See e.g.* Ship Management Agreement for the M/T ADVANTAGE ARROW dated February 25, 2015, hereto attached as **EXHIBIT 6** at pp. 2405-2414;  *See* also extract from Loan Agreement dated February 4, 2015 of Norddeutsche Landesbank Girozentale (hereinafter "NLDB") Loan Agreement with ADVANTAGE ARROW SHIPPING extract hereto attached as **EXHIBIT 7**  at p. 2**,** defining "Approved Manager" as "Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (Manager)", and designating "Genel Denizcilik" as Technical Manager and Operations Manager.  *Id.* at p.133.

49.     The operation and management of the 11 tanker vessels of the Advantage-Group is performed by EMIN KARAMEHMET's GEDEN LINES, using the same employees; working out

of the same address (Buyukdere Ca., Yapi Kredi Plaza, A Blok K: 12 34330-Levent-Istanbul-Turkey), as previously, before the same 11 tanker vessels were transferred to the Advantage-Group.

50.     Notwithstanding the transfer of ownership of the 11 tanker vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, the majority of the lenders that financed the acquisition of the vessels by the Advantage-Group one-ship companies remained the same, with new rollover-like refinancing arrangements and ship mortgaging arrangements having been negotiated and worked out by GEDEN HOLDINGS / GEDEN LINES executives and directors on behalf of ADVANTAGE TANKERS. *See* **EXHIBIT 4** at ANNEX I.

51.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, which is controlled by EMIN KARAMAHMET, continues to maintain a substantial financial interest in the 11 tanker vessels enjoying a significant economic benefit as operator and manager of the ADVANTAGE TANKERS fleet of approximately USD 4,015,000.00 annually as compensation for its services.

52.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, in its capacity as the sole operator and manager of the 11 tanker vessels, and thereby its controlling shareholder EMIN KARAMEHMET, exercise complete control over all of the operational, technical, and all other business activities of the 11 one-ship-companies of the Advantage-Group.

53.     GEDEN HOLDINGS, GEDEN LINES, ADVANTAGE TANKERS, and the respective one-ship-companies of the Geden-Group and Advantage-Group have in common key management personnel including: the same Chief Executive Officer, who is also a director of

17

GEDEN HOLDINGS, GEDEN LINES and ADVANTAGE TANKERS; and the same Chief Financial Officer, who is also a director of GEDEN HOLDINGS.

54.     Following the "sale" of the 11 tanker vessels, their respective former one-ship-company owners ceased to own vessels.

55.     The holding company role of GEDEN HOLDINGS and the one-ship-companies of the Geden-Group, following the transfer of the 11 tanker vessels, was taken over by ADVANTAGE TANKERS and its subsidiary one-ship-companies. ADVANTAGE TANKERS and its subsidiary one-ship-companies thereby have assumed the obligations previously incumbent on GEDEN HOLDINGS and its one-ship-subsidiaries.

56.     By reason of the foregoing facts pled in averments ¶¶ 45-55, ADVANTAGE TANKERS and the one-ship-companies it holds, and GEDEN HOLDINGS and the one-ship-companies and single-vessel chartering companies it holds, have either entered into a *de facto* merger; or ADVANTAGE TANKERS and the one-ship-companies it holds are a mere continuation of the business of GEDEN HOLDINGS.

57.     In the alternative the transfer of the assets of the Geden-Group to the Advantage-Group in the manner set out in the foregoing averments ¶¶ 45-55 was a transaction entered into by the parties involved to avoid liabilities.

58.      The one-ship companies that formerly owned the 11 tanker vessels were absorbed by the Advantage-Group, as evidenced by the identity of assets, location, management, personnel, and stockholders.

59.     Accordingly, ADVANTAGE TANKERS and the one-ship-companies it holds, including ADVANTAGE ARROW SHIPPING, are liable for Plaintiff's claims respectively as the successor corporations of EMIN KARAMEHMET - controlled GEDEN HOLDINGS, SPACE

SHIPPING and TARGET SHIPPING, LTD, and the M/T ADVANTAGE ARROW may be attached as security for Plaintiff's claims.

### B.   FRAUDULENT TRANSFER ALLEGATIONS

60.     Plaintiff realleges ¶¶ 1-59 of the above and foregoing Original Verified Complaint and further avers as follows:

61.     In agreeing to bareboat charter its vessel the CV STEALTH to SPACE, a Maltese corporation without any known tangible assets or business performance record, and to accept the performance guarantee of GEDEN HOLDINGS, Plaintiff relied on express affirmative representations of fact made on behalf of GEDEN HOLDINGS / GEDEN LINES by their common CEO and director TOKGÖZ.  Specifically, TOKGÖZ represented that GEDEN HOLDINGS was the parent company of the "special purpose companies", *i.e.* the-one-ship companies which at the time owned the 11 tanker vessels.  A Copy of the March 4, 2010 letter of GEDEN HOLDINGS containing such representations in writing is hereto attached as **EXHIBIT 8**.

62.     The performance guarantee of GEDEN HOLDINGS (**EXHIBIT 2**) contemporaneously issued with the March 4, 2010 letter, is a continual guarantee extending over the entire duration of the performance of the charter party, and indeed, for at least 7 years past the delivery of the vessel, and specifically provides in relevant part that that it is given in consideration of Plaintiff's refraining from arresting or otherwise detaining any of the assets of GEDEN HOLDINGS.

63.     Plaintiff relied on the representations made in the March 4, 2010 letter (**EXHIBIT 8**), particularly the representation that GEDEDN HOLDINGS owned and would continue to own through its one-ship-companies the 11 tanker vessels, and thereby agreed to continue chartering the CV STEALTH to SPACE and accept the performance guarantee of GEDEN HOLDINGS.

64.     GEDEN HOLDINGS purports that during the first 5 months of 2015 it divested itself of its entire interest in the 11 tanker vessels and "sold" same to the Defendants comprising the Advantage-Group through legitimate arm's length transactions. In actual fact, the Defendants implemented a fraudulent restructuring scheme that had been in their planning and contemplation as pled below[6].

65.     During 2012 and 2013 as a result of a faltering tanker market, the high prices it had paid for the construction of the 11 tanker vessels and the acquisition of other tonnage, the Geden-Group experienced severe economic difficulties and pressing demands by various creditors that included attachment of vessels of the group.  In consultation with the group's lending banks, GEDEN LINES commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business.  A report was prepared by AlixPartners, dated March 6, 2013 under the title "Project Hermitage Restructuring".  *See* Report of AlixPartners hereto attached as **EXHIBIT 9**[7]  (hereinafter referred to as "Project Hermitage").

66.     Project Hermitage recommended the replacement of GEDEN HOLDINGS as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing

---

[6]  In a similar manner GEDEN HOLDINGS purportedly "sold" its fleet of product carrier tankers to new buyers while it continued to maintain control over their operation and to profit from trading same under FUTURE HOLDINGS, LTD. a management company controlled by Defendants KARAMEHMET-WILLIAMS and TOKGÖZ.

[7]  The Alix Partners' report specifically states: "This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). EXHIBIT 10 at Bates No. P-001832.  As to the factual content of the AlixPartners report it provides in relevant part: "The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company" *Id.* at Bates No. P-001833. *Emphasis added.*

support." *See* **EXHIBIT 9** at Bates No. P-001870.   The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of the management of the vessels by GEDEN LINES; the rollover financing of the existing debt to the financing banks; the retention of the equity of GEDEN HOLDINGS; the transfer of the surplus of equity in the assets to Newco (**EXHIBIT 9** (flow chart) Bates No. P-001846); and the ring-fencing of potential sources of disruption (such as arrests and sister-ship arrests).  *Id*. at Bates No. P-001870.

67.     Even though the recommendations of Project Hermitage were not adopted by Defendants in their exact proposed form, they were nonetheless substantially adopted and implemented as evidenced by the following events: a) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.* the "Newco" contemplated by Project Hermitage[8];  b)  GEDEN HOLDINGS / GEDEN LINES, by and through their common chief executive officer and chief financial officer, made arrangements for the rollover financing of the loans of GEDEN HOLDINGS' one-ship-companies with ADVANTAGE TANKERS taking on the role of corporate guarantor; c) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the one-ship-companies controlled by GEDEN HOLDINGS to "sell" their vessels to newly minted Marshall Islands corporate entities that comprise the Advantage-Group shown in the foregoing TABLE I; d) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, arranged for the management of the 11 tanker vessels to continue

---

[8] At all times material hereto, all  Defendants have the same Chief Executive officer - Tugrul Tokgoz- and the same Chief Financial Officer -Mehmet Matt - who also hold overlapping roles as directors and /or officers of the respective corporate Defendants of the one-ship-companies controlled by ADVANTAGE TANKERS.

being performed by GEDEN LINES under new 5 year contracts; e) by transferring all of the tangible operating assets of GEDEN HOLDINGS to the ADVANTAGE TANKERS one-ship-companies, *i.e.* the 11 tanker vessels, GEDEN HOLDINGS  effectively "ringfenced" them, thereby blocking creditors of GEDEN HOLDINGS from seeking recourse against its assets.

68.     Project Hermitage specifically referred to the bareboat charter of the CV STEALTH and other chartered-in tonnage of other owners in the following terms: "Group D, Geden Oldco: 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable." With specific reference to Plaintiff's vessel the CV STEALTH Project Hermitage notes: "not ours". *See* **EXHIBIT 9** at P-001856.

69.      The actions of the Defendants in implementing the recommendations of Project Hermitage in the manner described in the foregoing, manifests the design, plan, and intent of the Defendants to deal with their assets in a fraudulent manner to the detriment and prejudice of their creditors, specifically including Plaintiff as noted in ¶ 68 *supra*.

70.     Defendant SPACE SHIPPING, LLC's sole business is to act as the nominee of GEDEN HOLDINGS in the performance of the bareboat charter.  As pled in the foregoing, Plaintiff entered in the bareboat charter relying on the representations and warranties that GEDEN HOLDINGS was the owner of the 11 tanker vessels and several other vessels, and on its performance guarantee.

71.      At all times material hereto and as pled in the foregoing, GEDEN HOLDINGS through the machinations of its equity holder EMIN KARAMEHMET "restructured" the ownership of its assets, by arranging their transfer to ADVANTAGE TANKERS, a company 85% controlled by his only child KARAMEHMET WILLIAMS, and 15% by his hand-picked CEO of

GEDEN LINES and GEDEN HOLDINGS, TOKGÖZ.  As a result, Plaintiff was left without any of the recourse that it had agreed to forego (*i.e.* the attachment of Geden Holdings' owned vessels) in consideration for GEDEN HOLDING's performance guarantee.

72.     Notwithstanding the fraudulent restructuring of the ownership of its shipping assets, GEDEN HOLDINGS provided in confidence express assurances to Shell Western Supply & Trading, Ltd. that it remained the controlling shareholder of the same 11 tanker vessels through its complete control of the Advantage-Group one-ship companies.

73.     Though Defendants KARAMEHMET WILLIAMS and TOKGÖZ have warranted to the lenders of the Advantage-Group that they hold respectively 85% and 15% of the ultimate beneficial interest in ADVANTAGE TANKERS, which, in turn,  warrants it controls 100% of the 11 tanker vessels, (See **EXHIBIT 3**),  TOKGÖZ, who is the Chief Executive Officer of ADVANTAGE TANKER and a director of GEDEN HOLDINGS, has also warranted to Shell Western Supply & Trading, Ltd. that it is actually GEDEN HOLDINGS, which controls the Advantage-Group corporate entities, that own the same vessels even after their purported transfer to the Advantage Group.   Based on the foregoing and the conflicting representations of Defendants, the ownership of the ADVANTAGE ARROW (ex TARGET) was fraudulently transferred to the detriment of unsecured creditors.

74.     Plaintiff invokes the power of this honorable court as a court of admiralty "…to protect its jurisdiction from being thwarted by a fraudulent transfer, [by] …. authorizing an attachment to secure an independent maritime claim." *Swift Co Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 694-695 (1950).

75.     Based on the expressed rationale underlying the transfer of the 11 tanker vessels from GEDEN HOLDINGS to ADVANTAGE TANKERS noted in the foregoing, *i.e.* the

"ringfencing" of the assets in order to avoid "arrests";  the close family relationship between EMIN KARAMEHMET and KARAMEHMET WILLIAMS that constitutes the latter an insider of the former in relation to his status as 100% shareholder of Plaintiff's obligors GEDEN HOLDINGS / GEDEN LINES and SPACE;  the transfer of what was substantially all of the assets of the said obligors of Plaintiff;  the failure of the Defendants to disclose to Plaintiff the impending transfer of the assets from the Geden-Group to the Advantage-Group; the Defendants express intent to fraudulently restructure the ownership of the corporate holding structures for the benefit of the equity holders and to the detriment of unsecured non-lending creditors;  and all of the factual circumstances pled in the foregoing ¶¶ 60-74, there are reasonable grounds and probable cause to believe that the said transfer was intended to hinder, delay, or defraud the creditors of  SPACE and same may and should be set aside as a fraudulent conveyance.

## V. APPLICATION FOR ATTACHMENT UNDER SUPPLEMENTAL ADMIRALTY RULE B

76.     None of the Defendants are or were at the time of the filing of this suit present within the District or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims and under the laws of Texas governing personal jurisdiction. *See* Attorney Declaration of George Gaitas attached hereto as **EXHIBIT 10**. Nevertheless, Defendants have within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of debts, credits, or effects.

77.     More specifically there is presently, or imminently due to arrive in the Eastern District of Texas, the Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7, as pled in the foregoing.

78.     Defendants have used and continue to use the purportedly corporate separateness, and incorporated status of their surrogate entities ADVANTAGE ARROW, ADVANTAGE TANKERS, ADVANTAGE HOLDINGS, and FORWARD HOLDINGS abusively, to wit: to engage in fraudulent corporate restructuring and asset reallocation practices in order to escape their lawful obligation to repair or pay the cost of repairs of the CV STEALTH and also pay bareboat charter hire until the redelivery of the CV STEALTH to Plaintiff - her lawful owner.

79.     Plaintiff has maritime claims against the Defendants arising out of the breach of a maritime contract (*i.e.* – the bareboat charter party with CV STEALTH dated February 23, 2010, and the performance guarantee dated April 4, 2010).

80.     The amounts of Plaintiff's claims as reasonably as it can be estimated is as follows:

A.      The repaired cost of the CV STEALTH……………….....$      18,000,000.00

B.      Unpaid Charter Hire due and owing………………………$      510,208.33

C.      Awarded legal costs………………………………............$      6,515.50

C.      Interest at 6% compounded quarterly for 1 year………...$      943,340.00

E.      Recoverable Legal Fees and Costs……………………… $      400,000.00

**Total Claim…………………………………………………………$ 19,860,063.80**

Therefore, Plaintiff's total claim for breach of the maritime contracts against Defendants is in the aggregate sum of **USD 19,860,063.80 (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A.      That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

B.      That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including, but not limited to the M/T ADVANTAGE ARROW and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.      That judgment be entered against each of the Defendants and each of them in the sum of Nineteen Million Eight Hundred Sixty Thousand Sixty Three Dollars and eighty cents **(USD 19,860,063.80) (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)** together with interest and costs, be applied in satisfaction thereof;

E.      That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

By:     GAITAS, KENNEDY & CHALOS, P.C.


/s/George A. Gaitas
George A. Gaitas
State Bar No. 24058885
Federal Bar No. 705176
Sean D. Kennedy
State Bar No. 24102006
Federal Bar No. 1007545
Jonathan M. Chalos
State Bar No. 24097482

Federal Bar No. 3008683
6250 Westpark Dr.
Suite 222
Houston, Texas 77057
Telephone: 281-501-1800
Fax: 832-962-8178
E-mail: gaitas@gkclaw.com
            kennedy@gkclaw.com
            chalos@gkclaw.com

*Attorneys for Plaintiff*
Psara Energy, Limited

# EXHIBIT 1

**2nd original**

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A' and "Barecon 'B' ". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
|---|---|
| **Arrow Tankers A/S** <br> **Bredgade 31 B, 4.** <br> **DK-1260 Copenhagen K** <br> **Denmark** | **CODE NAME: "BARECON 2001"**    **PART I** |

| 2. Place and date |
|---|
| **Copenhagen, 23rd February 2010** |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| **Psara Energy Limited** <br> **Ajeltake Road, Ajeltake Island** <br> **Majuro, MH 96960** <br> **Marshall Island** | **Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers be mutually agreed.** |

| 5. Vessel's name, call sign and flag (Cl. 1 and 3) |
|---|
| **Name: m.t. CV STEALTH** <br> **Flag: Malta** |

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| **Crude oil carrier** | **58,418 / 31,117** |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| **2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | **104,499** |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| **ABS** | **N/A** |

| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3) |
|---|
| **Attached Vessel's Q88. Vessel to be redeliverd with SS passed** |

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| **WW DLOSP at one safe port / safe anchorage ATDNSHINC** <br> **Vessel to be delivered with SS passed** | **15th April 2010, 00:01 hrs lt** | **30th August 2010, 23:59 hrs lt** |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) |
|---|---|
| **DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | **SS/DD passed without extensions** |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
|---|---|
| **See Rider Clause 15.** | **As required by class without extensions** |

| 20. Trading limits (Cl. 6) |
|---|
| **Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.** <br><br> **The vessel not to trade in ice, break ice nor follow ice breakers in ice.** |

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| **5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | **USD 9,750 gross pdpr the first 365 days after delivery** <br> **USD 10,750 gross pdpr for the 2nd charter year** <br> **USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year** <br> **USD 10,750 gross pdpr for 4th charter year** <br> **USD 10,750 gross pdpr for 5th charter year** <br> **USD 13,250 for the optional period** |

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii)) |
|---|
| **10%** |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br><br>**As per Clause 10 F** | 25. Currency and method of payment (Cl. 11)<br><br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br><br>**TBA** | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br><br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br><br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br><br>**N/A** | 33. Brokerage commission and to whom  payable (Cl. 27)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br><br>**Seven (7) working days** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br><br>**30a** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no"  whether PART III applies) (optional)<br><br>**N/A** | 38. Name and place of Builders (only to be filled in if PART III applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br><br>**N/A** | 40. Date of Building Contract (only to be filled in if PART III applies)<br><br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br><br>a)  **N/A**<br><br>b)  **N/A**<br><br>c)  **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | TIGOLL TREGE |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**"BARECON 2001" STANDARD BAREBOAT CHARTER** PART I

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| **1.** | **Definitions** |
| | In this Charter, the following terms shall have the |
| | meanings hereby assigned to them: |
| | *"The Owners"* shall mean the party identified in <u>Box 3</u>; |
| | *"The Charterers"* shall mean the party identified in <u>Box 4</u>; |
| | *"The Vessel"* shall mean the vessel named in <u>Box 5</u> and |
| | with particulars as stated in <u>Boxes 6</u> to <u>12</u>. |
| | *"Financial Instrument"* means the mortgage, deed of |
| | covenant or other such financial security instrument as |
| | annexed to this Charter and stated in <u>Box 28</u>. |

1
2
3
4
5
6
7
8
9
10

**2.   Charter Period**
In consideration of the hire detailed in <u>Box 22</u>,
the Owners have agreed to let and the Charterers have
agreed to hire the Vessel for the period stated in <u>Box 21</u>
("The Charter Period").

11
12
13
14
15

**3.   Delivery**
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)*
**(a)**   The Owners shall before and at the time of delivery
exercise due diligence to make the Vessel seaworthy
And in every respect ready in hull, machinery and
equipment for service under this Charter.
The Vessel shall be delivered by the Owners and taken
over by the Charterers at the port or place indicated in
<u>Box 13</u> in such ready safe berth as the Charterers may
direct.
**(b)**   The Vessel shall be properly documented on
delivery in accordance with the laws of the flag State
indicated in <u>Box 5</u> and the requirements of the
classification society stated in <u>Box 10</u>. The Vessel upon
delivery shall have her survey cycles up to date and
trading and class certificates valid for at least the number
of months agreed in <u>Box 12</u>.
**(c)**   The delivery of the Vessel by the Owners and the
taking over of the Vessel by the Charterers shall
constitute a full performance by the Owners of all the
Owners' obligations under this <u>Clause 3</u>, and thereafter
the Charterers shall not be entitled to make or assert
any claim against the Owners on account of any
conditions, representations or warranties expressed or
implied with respect to the Vessel but the Owners shall
be liable for the cost of but not the time for repairs or
renewals occasioned by latent defects in the Vessel,
her machinery or appurtenances, existing at the time of
delivery under this Charter, provided such defects have
manifested themselves within twelve (12) months after
delivery unless otherwise provided in <u>Box 32</u>.

16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46

**4.   Time for Delivery**
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)*
The Vessel shall not be delivered before the date
indicated in <u>Box 14</u> without the Charterers' consent and
the Owners shall exercise due diligence to deliver the
Vessel not later than the date indicated in <u>Box 15</u> as per
Box 18.
~~Unless otherwise agreed in Box 18, the Owners shall~~
~~give the Charterers not less than thirty (30) running days'~~
~~preliminary and not less than fourteen (14) running days'~~
~~definite notice of the date on which the Vessel is~~
~~expected to be ready for delivery.~~
The Owners shall keep the Charterers closely advised
of possible changes in the Vessel's position.

47
48
49
50
51
52
53
54
55
56
57
58
59

**5.   Cancelling**
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)*
**(a)**   Should the Vessel not be delivered by the
cancelling date indicated in <u>Box 15</u>, the Charterers shall
have the option of cancelling this Charter by giving the
Owners notice of cancellation within thirty-six (36)
running hours after the cancelling date stated in Box
15, failing which this Charter shall remain in full force
and effect.
**(b)**   If it appears that the Vessel will be delayed beyond
the cancelling date, the Owners may, as soon as they
are in a position to state with reasonable certainty the

60
61
62
63
64
65
66
67
68
69
70
71

day on which the Vessel should be ready, give notice
thereof to the Charterers asking whether they will
exercise their option of cancelling, and the option must
then be declared within one hundred and sixty-eight
(168) running hours of the receipt by the Charterers of
such notice or within thirty-six (36) running hours after
the cancelling date, whichever is the earlier. If the
Charterers do not then exercise their option of cancelling,
the seventh day after the readiness date stated in the
Owners' notice shall be substituted for the cancelling
date indicated in <u>Box 15</u> for the purpose of this <u>Clause 5</u>.
**(c)**   Cancellation under this <u>Clause 5</u> shall be without
prejudice to any claim the Charterers may otherwise
have on the Owners under this Charter.

72
73
74
75
76
77
78
79
80
81
82
83
84
85

**6.   Trading Restrictions**
The Vessel shall be employed in lawful trades for the
carriage of suitable lawful merchandise within the trading
limits indicated in <u>Box 20</u>.
The Charterers undertake not to employ the Vessel or
suffer the Vessel to be employed otherwise than in
conformity with the terms of the contracts of insurance
(including any warranties expressed or implied therein)
without first obtaining the consent of the insurers to such
employment and complying with such requirements as
to extra premium or otherwise as the insurers may
prescribe. **When required by Owner, the Charterers
shall keep the Owners and Mortgages advised on
intended employment of Vessel.**
The Charterers also undertake not to employ the Vessel
or suffer her employment in any trade or business which
is forbidden by the law of any country to which the Vessel
may sail or is otherwise illicit or in carrying illicit or
prohibited goods or in any manner whatsoever which
may render her liable to condemnation, destruction,
seizure or confiscation.
Notwithstanding any other provisions contained in this
Charter it is agreed that nuclear fuels or radioactive
products or waste are specifically excluded from the
cargo permitted to be loaded or carried under this
Charter. This exclusion does not apply to radio-isotopes
used or intended to be used for any industrial,
commercial, agricultural, medical or scientific purposes
provided the Owners' prior approval has been obtained
to loading thereof.

86
87
88
89
90
91
92
93
94
95
96
97

98
99
100
101
102
103
104
105
106
107
108
109
110
111
112
113

**7.   Surveys on Delivery and Redelivery**
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)*
The Owners and Charterers shall each appoint
surveyors for the purpose of determining and agreeing
in writing the condition of the Vessel at the time of
delivery and redelivery hereunder. The Owners shall
bear all expenses of the On-hire Survey including loss
of time, if any, and the Charterers shall bear all expenses
of the Off-hire Survey including loss of time, if any, at
the daily equivalent to the rate of hire or pro rata thereof.

114
115
116
117
118
119
120
121
122
123

**8.   Inspection**
The Owners shall have the right at any time after giving
reasonable notice to the Charterers to inspect or survey
the Vessel or instruct a duly authorised surveyor to carry
out such survey on their behalf:- **provided it does not
interfere with the operation of the Vessel a/o crew,
but not to  be unreasonably withheld.**
**(a)**   to ascertain the condition of the Vessel and satisfy
themselves that the Vessel is being properly repaired
and maintained. The costs and fees for such inspection
or survey shall be paid by the Owners unless the Vessel
is found to require repairs or maintenance in order to
achieve the condition so provided;
**(b)**   in dry-dock if the Charterers have not dry-docked
Her in accordance with <u>Clause 10(g)</u>. The costs and fees
for such inspection or survey shall be paid by the
Charterers; and
**(c)**   for any other commercial reason they consider
necessary (provided it does not unduly interfere with

124
125
126
127
128

129
130
131
132
133
134
135
136
137
138
139
140

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**2nd original**

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.   Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.   Maintenance and Operation** 168
(a)(i)Maintenance and Repairs - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in Clause 14(l), if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. If 182
necessary as deemed by class, the Charterers to
take immediate steps to have the necessary
repairs done within a reasonable time (prior to or
upon SS-drydocking) failing which the Owners
shall have the right of withdrawing the Vessel
from the service of the Charterers and without
prejudice to any claim the Owners may
otherwise have against the Charterers under this
Charter.

(ii) New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in Box 23, or if 189
Box 23 is left blank, 5 per cent. of the Vessel's 190
insurance value as stated in Box 29, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in Clause 30. 200

(iii) Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204

or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
**(b)** Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
The Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
**(c)** The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
**(d)** Flag and Name of Vessel – Charterers have the 238
**right to reflag the ship and install and display their**
**funnel insignia and fly their own house flag, but name**
**cannot be changed.** During the Charter
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
**(e)** Changes to the Vessel - Subject to Clause 10(a)(ii), 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
**(f)** Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

Charterers shall assume the obligations and liabilities 277
of the Owners under any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith, also for any 280
new equipment required in order to comply with radio 281
regulations. 282
**(g)** Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
required by the Classification Society or flag State. 289

**11.  Hire** 290
**(a)**  The Charterers shall pay  hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
**(b)**  ~~Payment of hire shall be made as per daily hire~~ 294
~~in Box 22 basis per calender month in advance. First~~
~~hire payable prorata upto end of the month starting~~
~~from vessel's actual delivery date/time.~~ The Charterers
shall pay to the Owners for the hire
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
**(c)**  Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
**(d)**  Final payment of hire, if for a period of less than 304
thirty (30) running days a month, shall be calculated 305
proportionally
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
**(e)**  Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first.  Any hire paid 314
in advance to be adjusted accordingly. 315
**(f)**  Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
**(g)**  Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

**12.  Mortgage** 328
(only to apply if Box 28 has been appropriately filled in) 329
*)  ~~(a)   The Owners warrant that they have not effected~~ 330
~~any mortgage(s) of the Vessel and that they shall not~~ 331
~~effect any mortgage(s) without the prior consent of the~~ 332
~~Charterers, which shall not be unreasonably withheld.~~ 333
*)  **(b)**  The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344

themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*)  (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

**13.  Insurance and Repairs** 357
**(a)**  During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
**(b)**  If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
**(c)**  The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
**(d)**  Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
**(e)**  The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| be required to enable the Charterers to abandon the | 419 |
| Vessel to insurers and claim a constructive total loss. | 420 |
| (f)   For the purpose of insurance coverage against hull | 421 |
| and machinery and war risks under the provisions of | 422 |
| sub-clause 13(a), the value of the Vessel is the sum | 423 |
| indicated in Box 29. | 424 |

~~**14.   Insurance, Repairs and Classification**~~ — 425
~~(Optional, only to apply if expressly agreed and stated~~ — 426
~~in Box 29, in which event Clause 13 shall be considered~~ — 427
~~deleted).~~ — 428
~~(a)   During the Charter Period the Vessel shall be kept~~ — 429
~~insured by the Owners at their expense against hull and~~ — 430
~~machinery and war risks under the form of policy or~~ — 431
~~policies attached hereto. The Owners and/or insurers~~ — 432
~~shall not have any right of recovery or subrogation~~ — 433
~~against the Charterers on account of loss of or any~~ — 434
~~damage to the Vessel or her machinery or appurt-~~ — 435
~~enances covered by such insurance, or on account of~~ — 436
~~payments made to discharge claims against or liabilities~~ — 437
~~of the Vessel or the Owners covered by such insurance.~~ — 438
~~Insurance policies shall cover the Owners and the~~ — 439
~~Charterers according to their respective interests.~~ — 440
~~(b)   During the Charter Period the Vessel shall be kept~~ — 441
~~insured by the Charterers at their expense against~~ — 442
~~Protection and Indemnity risks (and any risks against~~ — 443
~~which it is compulsory to insure for the operation of the~~ — 444
~~Vessel, including maintaining financial security in~~ — 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ — 446
~~the Owners shall in writing approve which approval shall~~ — 447
~~not be unreasonably withheld.~~ — 448
~~(c)   In the event that any act or negligence of the~~ — 449
~~Charterers shall vitiate any of the insurance herein~~ — 450
~~provided, the Charterers shall pay to the Owners all~~ — 451
~~losses and indemnify the Owners against all claims and~~ — 452
~~demands which would otherwise have been covered by~~ — 453
~~such insurance.~~ — 454
~~(d)   The Charterers shall, subject to the approval of the~~ — 455
~~Owners or Owners' Underwriters, effect all insured~~ — 456
~~repairs, and the Charterers shall undertake settlement~~ — 457
~~of all miscellaneous expenses in connection with such~~ — 458
~~repairs as well as all insured charges, expenses and~~ — 459
~~liabilities, to the extent of coverage under the insurances~~ — 460
~~provided for under the provisions of sub-clause 14(a).~~ — 461
~~The Charterers to be secured reimbursement through~~ — 462
~~the Owners' Underwriters for such expenditures upon~~ — 463
~~presentation of accounts.~~ — 464
~~(e)   The Charterers to remain responsible for and to~~ — 465
~~effect repairs and settlement of costs and expenses~~ — 466
~~incurred thereby in respect of all other repairs not~~ — 467
~~covered by the insurances and/or not exceeding any~~ — 468
~~possible franchise(s) or deductibles provided for in the~~ — 469
~~insurances.~~ — 470
~~(f)   All time used for repairs under the provisions of~~ — 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ — 472
~~defects according to Clause 3 above, including any~~ — 473
~~deviation, shall be for the Charterers' account and shall~~ — 474
~~form part of the Charter Period.~~ — 475
~~The Owners shall not be responsible for any expenses~~ — 476
~~as are incident to the use and operation of the Vessel~~ — 477
~~for such time as may be required to make such repairs.~~ — 478
~~(g)   If the conditions of the above insurances permit~~ — 479
~~additional insurance to be placed by the parties such~~ — 480
~~cover shall be limited to the amount for each party set~~ — 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ — 482
~~the Charterers as the case may be shall immediately~~ — 483
~~furnish the other party with particulars of any additional~~ — 484
~~insurance effected, including copies of any cover notes~~ — 485
~~or policies and the written consent of the insurers of~~ — 486
~~any such required insurance in any case where the~~ — 487
~~consent of such insurers is necessary.~~ — 488
~~(h)   Should the Vessel become an actual, constructive,~~ — 489
~~compromised or agreed total loss under the insurances~~ — 490
~~required under sub-clause 14(a), all insurance payments~~ — 491
~~for such loss shall be paid to the Owners, who shall~~ — 492

~~distribute the moneys between themselves and the~~ — 493
~~Charterers according to their respective interests.~~ — 494
~~(i)   If the Vessel becomes an actual, constructive,~~ — 495
~~compromised or agreed total loss under the insurances~~ — 496
~~arranged by the Owners in accordance with sub-clause~~ — 497
~~14(a), this Charter shall terminate as of the date of such~~ — 498
~~loss.~~ — 499
~~(j)   The Charterers shall upon the request of the~~ — 500
~~Owners, promptly execute such documents as may be~~ — 501
~~required to enable the Owners to abandon the Vessel~~ — 502
~~to the insurers and claim a constructive total loss.~~ — 503
~~(k)   For the purpose of insurance coverage against hull~~ — 504
~~and machinery and war risks under the provisions of~~ — 505
~~sub-clause 14(a), the value of the Vessel is the sum~~ — 506
~~indicated in Box 29.~~ — 507
~~(l)   Notwithstanding anything contained in sub-clause~~ — 508
~~10(a), it is agreed that under the provisions of Clause~~ — 509
~~14, if applicable, the Owners shall keep the Vessel's~~ — 510
~~Class fully up to date with the Classification Society~~ — 511
~~indicated in Box 10 and maintain all other necessary~~ — 512
~~certificates in force at all times.~~ — 513

**15.   Redelivery** — 514
At the expiration of the Charter Period the Vessel shall — 515
be redelivered by the Charterers to the Owners at a — 516
safe and ice-free port or place as indicated in Box 16, in — 517
such ready safe berth as the Charterers ~~Owners~~ may — 518
direct. The — 519
Charterers shall give the Owners not less than thirty — 519
(30) running days' preliminary notice of expected date, — 520
range of ports of redelivery or port or place of redelivery — 521
and not less than 5/3/2/1 ~~fourteen~~ (14) running days' — 522
definite — 523
notice of expected date and port or place of redelivery. — 523
Any changes thereafter in the Vessel's position shall be — 524
notified immediately to the Owners. — 525
The Charterers warrant that they will not permit the — 526
Vessel to commence a voyage (including any preceding — 527
ballast voyage) which cannot reasonably be expected — 528
to be completed in time to allow redelivery of the Vessel — 529
within the Charter Period. Notwithstanding the above, — 530
should the Charterers fail to redeliver the Vessel within — 531
The Charter Period, the Charterers shall pay the daily — 532
equivalent to the rate of hire stated in Box 22 plus 10 — 533
per cent. or to the market rate, whichever is the higher, — 534
for the number of days by which the Charter Period is — 535
exceeded.  All other terms, conditions and provisions of — 536
this Charter shall continue to apply. — 537
Subject to the provisions of Clause 10, the Vessel shall — 538
be redelivered to the Owners in the same or as good — 539
structure, state, condition and class as that in which she — 540
was delivered, fair wear and tear not affecting class — 541
excepted. — 542
The Vessel upon redelivery shall have her survey cycles — 543
up to date and trading and class certificates valid for at — 544
least the number of months agreed in Box 17. — 545

**16.   Non-Lien** — 546
The Charterers will not suffer, nor permit to be continued, — 547
any lien or encumbrance incurred by them or their — 548
agents, which might have priority over the title and — 549
interest of the Owners in the Vessel. The Charterers — 550
further agree to fasten to the Vessel in a conspicuous — 551
place and to keep so fastened during the Charter Period — 552
a notice reading as follows: — 553
"This Vessel is the property of (name of Owners). It is — 554
under charter to (name of Charterers) and by the terms — 555
of the Charter Party neither the Charterers nor the — 556
Master have any right, power or authority to create, incur — 557
or permit to be imposed on the Vessel any lien — 558
whatsoever." — 559

**17.   Indemnity** — 560
(a)   The Charterers shall indemnify the Owners against — 561
any loss, damage or expense incurred by the Owners — 562
arising out of or in relation to the operation of the Vessel — 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply, BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
**(b)** If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, **by the** 578
**mortgage holder the**
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

**18. Lien** 587
The Owners to have a lien upon all cargoes, sub-hires 588
and sub-freights belonging or due to the Charterers or 589
any sub-charterers and any Bill of Lading freight for all 590
claims under this Charter, and the Charterers to have a 591
lien on the Vessel for all moneys paid in advance and 592
not earned. 593

**19. Salvage** 594
All salvage and towage performed by the Vessel shall 595
be for the Charterers' benefit and the cost of repairing 596
damage occasioned thereby shall be borne by the 597
Charterers. 598

**20. Wreck Removal** 599
In the event of the Vessel becoming a wreck or 600
obstruction to navigation the Charterers shall indemnify 601
the Owners against any sums whatsoever which the 602
Owners shall become liable to pay and shall pay in 603
consequence of the Vessel becoming a wreck or 604
obstruction to navigation. 605

**21. General Average** 606
The Owners shall not contribute to General Average. 607

**22. Assignment, Sub-Charter and Sale** 608
**(a)** The Charterers shall not assign this Charter nor 609
sub-charter the Vessel on a bareboat basis except with 610
the prior consent in writing of the Owners, which shall 611
not be unreasonably withheld, and subject to such terms 612
and conditions as the Owners shall approve. 613
**(b)** The Owners shall not sell the Vessel during the 614
currency of this Charter except with the prior written 615
consent of the Charterers, which shall not be unreason- 616
ably withheld, and subject to the buyer accepting an 617
assignment of this Charter. 618

**23. Contracts of Carriage** 619
*) **(a)** The Charterers are to procure that all documents 620
issued during the Charter Period evidencing the terms 621
and conditions agreed in respect of carriage of goods 622
shall contain a paramount clause incorporating any 623
legislation relating to carrier's liability for cargo 624
compulsorily applicable in the trade; if no such legislation 625
exists, the documents shall incorporate the Hague-Visby 626
Rules. The documents shall also contain the New Jason 627
Clause and the Both-to-Blame Collision Clause. 628
*) ~~(b)   The Charterers are to procure that all passenger~~ 629
~~tickets issued during the Charter Period for the carriage~~ 630
~~of passengers and their luggage under this Charter shall~~ 631
~~contain a paramount clause incorporating any legislation~~ 632
~~relating to carrier's liability for passengers and their~~ 633

~~luggage compulsorily applicable in the trade; if no such~~ 634
~~legislation exists, the passenger tickets shall incorporate~~ 635
~~the Athens Convention Relating to the Carriage of~~ 636
~~Passengers and their Luggage by Sea, 1974, and any~~ 637
~~protocol thereto.~~ 638
*)   ~~Delete as applicable.~~ 639

**24. Bank Guarantee** 640
~~(Optional, only to apply if Box 27 filled in)~~ 641
~~The Charterers undertake to furnish, before delivery of~~ 642
~~the Vessel, a first class bank guarantee or bond in the~~ 643
~~sum and at the place as indicated in Box 27 as guarantee~~ 644
~~for full performance of their obligations under this~~ 645
~~Charter.~~ **Corporate Guarantee to be attached to the** 646
**BBCHP.**

**25. Requisition/Acquisition** 647
**(a)** In the event of the Requisition for Hire of the Vessel 648
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that in the event of "Requisition for Hire" any Requisition 662
Hire or compensation received or receivable by the 663
Owners shall be payable to the Charterers during the 664
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. 666
**(b)** In the event of the Owners being deprived of their 667
ownership in the Vessel by any Compulsory Acquisition 668
of the Vessel or requisition for title by any governmental 669
or other competent authority (hereinafter referred to as 670
"Compulsory Acquisition"), then, irrespective of the date 671
during the Charter Period when "Compulsory Acqui- 672
sition" may occur, this Charter shall be deemed 673
terminated as of the date of such "Compulsory 674
Acquisition". In such event Charter Hire to be considered 675
as earned and to be paid up to the date and time of 676
such "Compulsory Acquisition". 677

**26. War** 678
**(a)** For the purpose of this Clause, the words "War 679
Risks" shall include any war (whether actual or 680
threatened), act of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel. 692
**(b)** The Charterers shall be at liberty to trade the 693
**Vessel in War Risk Areas and any applicable**
**additional premium shall be for the Charterers'**
**account, but with full indemnity to Owners in regards**
**to ransoms/accidents/deaths or loss of cargo,**
**Charterers to show evidence of extra premia being**
**paid.** ~~The Vessel, unless the written consent of the~~ 694
~~Owners be first obtained, shall not continue to or go~~ 695
~~through any port, place, area or zone (whether of land~~ 696
~~or sea), or any waterway or canal, where it reasonably~~ 697
~~appears that the Vessel, her cargo, crew or other~~ 698
~~persons on board the Vessel, in the reasonable~~ 699
~~judgement of the Owners, may be, or are likely to be,~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous, or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704
**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712
~~(d)   If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721
**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; ~~France;~~ and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27.   Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. ~~If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~the actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable therefor shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773

~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

**28.   Termination** 778
**(a)   Charterers' Default** 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
**(ii)** the Charterers fail to comply with the requirements of: 800
**(1)** Clause 6 (Trading Restrictions) 801
**(2)** Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)   Owners' Default** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)   Loss of Vessel** 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss.  For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
~~(d)   Either party shall be entitled to terminate this~~ 837
~~Charter with immediate effect by written notice to the~~ 838
~~other party in the event of an order being made or~~ 839
~~resolution passed for the winding up, dissolution,~~ 840
~~liquidation or bankruptcy of the other party (otherwise~~ 841
~~than for the purpose of reconstruction or amalgamation)~~ 842
~~or if a receiver is appointed, or if it suspends payment,~~ 843
~~ceases to carry on business or makes any special~~ 844
~~arrangement or composition with its creditors.~~ 845
**(e)** The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

prior to the date of termination and to any claim that 848
either party might have. 849

**29. Repossession** 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of Clause 28, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities.  Pending physical repossession of the Vessel 857
in accordance with this Clause 29, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter.  The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative.  All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

**30. Dispute Resolution** 870
\*) **(a)**   This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876
the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators.  A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified.  If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly.  The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907
\*) ~~(b)   This Contract shall be governed by and construed~~ 908
~~in accordance with Title 9 of the United States Code~~ 909
~~and the Maritime Law of the United States and any~~ 910
~~dispute arising out of or in connection with this Contract~~ 911
~~shall be referred to three persons at New York, one to~~ 912
~~be appointed by each of the parties hereto, and the third~~ 913
~~by the two so chosen; their decision or that of any two~~ 914
~~of them shall be final, and for the purposes of enforcing~~ 915
~~any award, judgement may be entered on an award by~~ 916
~~any court of competent jurisdiction.  The proceedings~~ 917
~~shall be conducted in accordance with the rules of the~~ 918
~~Society of Maritime Arbitrators, Inc.~~ 919
~~In cases where neither the claim nor any counterclaim~~ 920

~~exceeds the sum of US$50,000 (or such other sum as~~ 921
~~the parties may agree) the arbitration shall be conducted~~ 922
~~in accordance with the Shortened Arbitration Procedure~~ 923
~~of the Society of Maritime Arbitrators, Inc.  current at~~ 924
~~the time when the arbitration proceedings are commenced.~~ 925
\*) ~~(c)   This Contract shall be governed by and construed~~ 926
~~in accordance with the laws of the place mutually agreed~~ 927
~~by the parties and any dispute arising out of or in~~ 928
~~connection with this Contract shall be referred to~~ 929
~~arbitration at a mutually agreed place, subject to the~~ 930
~~procedures applicable there.~~ 931
**(d)**   Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
(i)   Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
(ii)   The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951
purpose.  The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
(iii)   If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
(iv)   The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
(v)   Either party may advise the Tribunal that they have 965
agreed to mediation.  The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
(vi)   Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
(vii)   The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
(Note: The parties should be aware that the mediation 980
process may not necessarily interrupt time limits.) 981
(e)   If Box 35 in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply.  Sub-clause 30(d) shall 983
apply in all cases. 984
\*)   Sub-clauses 30(a), 30(b) and 30(c) are alternatives; 985
indicate alternative agreed in Box 35. 986

**31. Notices** 987
**(a)**   Any notice to be given by either party to the other 988
party shall be in writing and may be sent by fax, telex, e-mail 989
registered or recorded mail or by personal service. 990
**(b)**   The address including e-mail(s) of the Parties for 991
service of such
communication shall be as stated in Boxes 3 and 4 992
respectively. 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## "BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

<div style="float:right; border:1px solid #000; padding:4px;">OPTIONAL PART</div>

**1.  Specifications and Building Contract**

(a)  The Vessel shall be constructed in accordance with
the Building Contract (hereafter called "the Building
Contract") as annexed to this Charter, made between the
Builders and the Owners and in accordance with the
specifications and plans annexed thereto, such Building
Contract, specifications and plans having been counter-
signed as approved by the Charterers.

(b)  No change shall be made in the Building Contract or
in the specifications or plans of the Vessel as approved by
the Charterers as aforesaid, without the Charterers'
consent.

(c)  The Charterers shall have the right to send their
representative to the Builders' Yard to inspect the Vessel
during the course of her construction to satisfy themselves
that construction is in accordance with such approved
specifications and plans as referred to under sub-clause
(a) of this Clause.

(d)  The Vessel shall be built in accordance with the
Building Contract and shall be of the description set out
therein. Subject to the provisions of sub-clause 2(c)(ii)
hereunder, the Charterers shall be bound to accept the
Vessel from the Owners, completed and constructed in
accordance with the Building Contract, on the date of
delivery by the Builders.  The Charterers undertake that
having accepted the Vessel they will not thereafter raise
any claims against the Owners in respect of the Vessel's
performance or specification or defects, if any.
Nevertheless, in respect of any repairs, replacements or
defects which appear within the first 12 months from
delivery by the Builders, the Owners shall  endeavour to
compel the Builders to repair, replace or remedy any defects
or to recover from the Builders any expenditure incurred in
carrying out such repairs, replacements or remedies.
However, the Owners' liability to the Charterers shall be
limited  to the extent the Owners have a valid claim against
the Builders under the guarantee clause of the Building
Contract (a copy whereof has been supplied to the
Charterers) The Charterers shall be bound to accept such
sums as the Owners are reasonably able to recover under
this Clause and shall make no further claim on the Owners
for the difference between the amount(s) so recovered and
the actual expenditure on repairs, replacement or
remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies
shall accrue to the account of the party stated in Box 41(a)
or if not filled in shall be shared equally between the parties.
The costs of pursuing a claim or claims against the Builders
under this Clause (including any liability to the Builders)
shall be borne by the party stated in Box 41(b) or if not
filled in shall be shared equally between the parties.

**2.  Time and Place of Delivery**

(a)  Subject to the Vessel having completed her
acceptance trials including trials of cargo equipment in
accordance with the Building Contract and specifications
to the satisfaction of the Charterers, the Owners shall give
and the Charterers shall take delivery of the Vessel afloat
when ready for delivery and properly documented at the
Builders' Yard or some other safe and readily accessible
dock, wharf or place as may be agreed between the parties
hereto and the Builders. Under the Building Contract the
Builders have estimated that the Vessel will be ready for
delivery to the Owners as therein provided but the delivery
date for the purpose of this Charter shall be the date when
the Vessel is in fact ready for delivery by the Builders after
completion of trials whether that be before or after as
indicated in the Building Contract. The Charterers shall not
be entitled to refuse acceptance of delivery of the Vessel

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68

and upon and after such acceptance, subject to Clause
1(d), the Charterers shall not be entitled to make any claim
against the Owners in respect of any conditions,
representations or warranties, whether express or implied,
as to the seaworthiness of the Vessel or in respect of delay
in delivery.

(b)  If for any reason other than a default by the Owners
under the Building Contract, the Builders become entitled
under that Contract not to deliver the Vessel to the Owners,
the Owners shall upon giving to the Charterers written
notice of Builders becoming so entitled, be excused from
giving delivery of the Vessel to the Charterers and upon
receipt of such notice by the Charterers this Charter shall
cease to have effect.

(c)  If for any reason the Owners become entitled under
the Building Contract to reject the Vessel the Owners shall,
before exercising such right of rejection, consult the
Charterers and thereupon

(i)  if the Charterers do not wish to take delivery of the Vessel
they shall inform the Owners within seven (7) running days
by notice in writing and upon receipt by the Owners of such
notice this Charter shall cease to have effect; or

(ii)  if the Charterers wish to take delivery of the Vessel
they may by notice in writing within seven (7) running days
require the Owners to negotiate with the Builders as to the
terms on which delivery should be taken and/or refrain from
exercising their right to rejection and upon receipt of such
notice the Owners shall commence such negotiations and/
or take delivery of the Vessel from the Builders and deliver
her to the Charterers;

(iii)  in no circumstances shall the Charterers be entitled to
reject the Vessel unless the Owners are able to reject the
Vessel from the Builders;

(iv)  if this Charter terminates under sub-clause (b) or (c) of
this Clause, the Owners shall thereafter not be liable to the
Charterers for any claim under or arising out of this Charter
or its termination.

(d)  Any liquidated damages for delay in delivery under the
Building Contract and any costs incurred in pursuing a claim
therefor shall accrue to the account of the party stated in
Box 41(c) or if not filled in shall be shared equally between
the parties.

**3.  Guarantee Works**

If not otherwise agreed, the Owners authorise the
Charterers to arrange for the guarantee works to be
performed in accordance with the building contract terms,
and hire to continue during the period of guarantee works.
The Charterers have to advise the Owners about the
performance to the extent the Owners may request.

**4.  Name of Vessel**

The name of the Vessel shall be mutually agreed between
the Owners and the Charterers and the Vessel shall be
painted in the colours, display the funnel insignia and fly
the house flag as required by the Charterers.

**5.  Survey on Redelivery**

The Owners and the Charterers shall appoint surveyors
for the purpose of determining and agreeing in writing the
condition of the Vessel at the time of re-delivery.
Without prejudice to Clause 15 (Part II), the Charterers
shall bear all survey expenses and all other costs, if any,
including the cost of docking and undocking, if required,
as well as all repair costs incurred. The Charterers shall
also bear all loss of time spent in connection with any
docking and undocking as well as repairs, which shall be
paid at the rate of hire per day or pro rata.

69
70
71
72
73
74
75
76
77
78
79
80
81
82
83
84
85
86
87
88
89
90
91
92
93
94
95
96
97
98
99
100
101
102
103
104
105
106
107
108
109
110
111
112
113
114
115
116
117
118
119
120
121
122
123
124
125
126
127
128
129
130
131
132
133

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

### "BARECON 2001" Standard Bareboat Charter

### PART IV
### HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

<div style="border:1px solid black; display:inline-block">OPTIONAL PART</div>

On expiration of this Charter and provided the Charterers 1
have fulfilled their obligations according to Part I and II 2
as well as Part III, if applicable, it is agreed, that on 3
payment of the final payment of hire as per Clause 11 4
the Charterers have purchased the Vessel with 5
everything belonging to her and the Vessel is fully paid 6
for. 7

In the following paragraphs the Owners are referred to 8
as the Sellers and the Charterers as the Buyers. 9

The Vessel shall be delivered by the Sellers and taken 10
over by the Buyers on expiration of the Charter. 11

The Sellers guarantee that the Vessel, at the time of 12
delivery, is free from all encumbrances and maritime 13
liens or any debts whatsoever other than those arising 14
from anything done or not done by the Buyers or any 15
existing mortgage agreed not to be paid off by the time 16
of delivery. Should any claims, which have been incurred 17
prior to the time of delivery be made against the Vessel, 18
the Sellers hereby undertake to indemnify the Buyers 19
against all consequences of such claims to the extent it 20
can be proved that the Sellers are responsible for such 21
claims. Any taxes, notarial, consular and other charges 22
and expenses connected with the purchase and 23
registration under Buyers' flag, shall be for Buyers' 24
account. Any taxes, consular and other charges and 25
expenses connected with closing of the Sellers' register, 26
shall be for Sellers' account. 27

In exchange for payment of the last month's hire 28
instalment the Sellers shall furnish the Buyers with a 29
Bill of Sale duly attested and legalized, together with a 30
certificate setting out the registered encumbrances, if 31
any. On delivery of the Vessel the Sellers shall provide 32
for deletion of the Vessel from the Ship's Register and 33
deliver a certificate of deletion to the Buyers. 34
The Sellers shall, at the time of delivery, hand to the 35
Buyers all classification certificates (for hull, engines, 36
anchors, chains, etc.), as well as all plans which may 37
be in Sellers' possession. 38

The Wireless Installation and Nautical Instruments, 39
unless on hire, shall be included in the sale without any 40
extra payment. 41

The Vessel with everything belonging to her shall be at 42
Sellers' risk and expense until she is delivered to the 43
Buyers, subject to the conditions of this Contract and 44
the Vessel with everything belonging to her shall be 45
delivered and taken over as she is at the time of delivery, 46
after which the Sellers shall have no responsibility for 47
possible faults or deficiencies of any description. 48

The Buyers undertake to pay for the repatriation of the 49
Master, officers and other personnel if appointed by the 50
Sellers to the port where the Vessel entered the Bareboat 51
Charter as per Clause 3 (Part II) or to pay the equivalent 52
cost for their journey to any other place. 53



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**"BARECON 2001" Standard Bareboat Charter**

OPTIONAL
PART

**PART V**
**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**
*(Optional, only to apply if expressly agreed and stated in Box 43)*

1. Definitions
For the purpose of this PART V, the following terms shall
have the meanings hereby assigned to them:
"The Bareboat Charter Registry" shall mean the registry
of the State whose flag the Vessel will fly and in which
the Charterers are registered as the bareboat charterers
during the period of the Bareboat Charter.
"The Underlying Registry" shall mean the registry of the
state in which the Owners of the Vessel are registered
as Owners and to which jurisdiction and control of the
Vessel will revert upon termination of the Bareboat
Charter Registration.

2. Mortgage
The Vessel chartered under this Charter is financed by
a mortgage and the provisions of Clause 12(b) (Part II)
shall apply.

3. Termination of Charter by Default
If the Vessel chartered under this Charter is registered
in a Bareboat Charter Registry as stated in Box 44, and
if the Owners shall default in the payment of any amounts
due under the mortgage(s) specified in Box 28, the
Charterers shall, if so required by the mortgagee, direct
the Owners to re-register the Vessel in the Underlying
Registry as shown in Box 45.
In the event of the Vessel being deleted from the
Bareboat Charter Registry as stated in Box 44, due to a
default by the Owners in the payment of any amounts
due under the mortgage(s), the Charterers shall have
the right to terminate this Charter forthwith and without
prejudice to any other claim they may have against the
Owners under this Charter.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ARROW
TANKERS A/S

**RIDER CLAUSES TO CHARTER PARTY**

**M.T. "CV STEALTH "**

**DATED 23rd February 2010**

**CLAUSE 1.   CANCELLATION OF BAREBOAT CHARTER:**

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

**CLAUSE 2.   DRY DRY-DOCKS:**

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

**CLAUSE 3.   BUNKER CLAUSE:**

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

**CLAUSE 4.   CHARTERERS LIABILITIES:**

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

**CLAUSE 5.   OIL POLLUTION:**

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1


ARROW
TANKERS A/S

cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6.   RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk  of       the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of  Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2

**2nd original**



**ARROW**
TANKERS A/S

to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv)To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v)Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi)To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x)Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi)Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3

**2nd original**



**ARROW** TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii)all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers  expense, such  alternative insurance as the Owners may in their discretion determine to be necessary  to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

**CLAUSE 7.   INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

4



ARROW
TANKERS A/S

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. <u>CHARTERERS' COVENANTS:</u>

The Charterers Covenant with the Owners undertake throughout the term of this Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;

5







**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(e) They will notify the Owners forthwith by telex, telefax or e-mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.

## CLAUSE 9.   INDEMNITY:

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof



**m.t. CV STEALTH – CP dated 23rd February 2010**

ARROW
TANKERS A/S

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10.  **TERMINATION EVENTS:**

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

7



**2nd original**



**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

**2nd original**



m.t. CV STEALTH – CP dated 23rd February 2010

ARROW
TANKERS A/S

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

**CLAUSE 12.  CONTRADICTION CLAUSE**

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

**CLAUSE 13.  THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:**

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

**2nd original**



**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 14.**

MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**

Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.

Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**

Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**

Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**

Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)



2nd original



**m.t. CV STEALTH – CP dated 23rd February 2010**

ARROW
TANKERS A/S

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET )  to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

11

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :                                    Charterers:

By    : Himoza Dimareli            By   : Tzun>c Toleccon
Title : Director                          Title : Director

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery

USD 9,750 gross pdpr for the 2nd charter year

USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year

USD 9,750 gross pdpr for the 4th charter year

USD 9,750 gross pdpr for the 5th charter year

USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By  : Mimoza Dimaseli
Title :   DIRECTOR

Charterers:

By  : Tugran Tokan
Title :   DIRECTOR

**ADDENDUM NO 3**

Dated 23   January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")**
**as amended by an Addendum No 1 dated 2nd June 2010**
**and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed
that:

1. The payment of a portion of the daily charter hire of an amount of USD 3.225 arising
   from the charter hires starting 1st December 2012 until 1st December 2013 shall be
   deferred. With effect from 1st December 2013 the total amount of deferred charter
   hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal
   instalments until 22nd June 2015 and added to the daily charter hire.

2. Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box
   22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3. In the event of default of payment by the charterers under the bareboat charters of the
   Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as
   Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or
undertakings thereto remain unaltered and in full force and effect.

-----------------------
For and on behalf of
the Charterers

-----------------------
For and on behalf of
the Guarantor

-----------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director

# EXHIBIT 2

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

## IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty and MoA as per rider clause 13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT CV STEALTH under the Charterparty according to the Contract, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of  (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010                 GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010                 SUPER SHIPPING LTD of MALTA

# EXHIBIT 3

SCHEDULE 11 – Organisational Chart



All Nine Advantage Shipping Entities are Member-managed

1.14.6180.00 21327756 v4

# EXHIBIT 4

CONSENT LETTER

From:   Geden Holdings Ltd (the "Shareholder")
85 St.John's Street, Valletta, Malta

To:   Shell Western Supply and Trading Limited (the "Charterer")
Barbados

06.02.2015

Dear Sirs

1   We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2   As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

3   Upon each Vessel Sale:

(a)   the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant New Owner will register that Vessel in its name under Marshall Islands flag;

(b)   the relevant ship mortgage over that Vessel registered in the name of the banks and financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged and shall be replaced (as part of the financing and/or refinancing arrangements between that New Owner and its financiers) with a new ship mortgage s to be registered in the name of the banks and financial institutions listed in Annex 1 hereto as New Mortgagees;

(c)   subject to the respective New Owners being acceptable to Charterer following Charterer's KYC and other relevant checks, the Existing Charters will be terminated by mutual agreement between the respective Existing Owners and Charterer and new charters (the "New Charters") will be entered into between the Charterer and the relevant New Owner on terms, inter alia, as follows:

(i)   each New Charter shall come into effect on the time on which the relevant Vessel is delivered to, and accepted by, the relevant New Owner from the relevant Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

(ii)   the duration of each New Charter shall be 5 years from the Vessel Sale Effective Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

(iii)   the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New Owner shall be US$17,500 per day other than the vessels Advantage Sun, Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be US$18,500 during the initial period of 24 months (the "Base Rate"); The PSA will be calculated as the monthly averages of certain trading routes as described in the relevant charter parties.

Doc

54142984v2

D01248

      (iv)   the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4     A pro-forma of New Charter is annexed to this Letter as Annex 2.

5     The Shareholder confirms to the Charterer that:

      (a)   it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

      (b)   it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6     The Shareholder hereby:

      (a)   notifies the Charterer of its intention to complete the Vessel Sales;

      (b)   confirms that it shall be keep the Charterer (i) updated of the intended dates  and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

      (c)   requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

      (d)   agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing  and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

      (e)   agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7     For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters fails to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8     The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.



9      This Letter and any non-contractual obligations arising under or in connection with it shall be
        governed by English law.


Yours faithfully

..................................
For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title:   Director


Agreed, consented and accepted:

..................................
For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name: David Chapman
Title:  General Manager


54142964v2

D01250

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom ) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start ) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |



54142964v2

D01251

| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |



# EXHIBIT 5

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    PSARA ENERGY, LTD.,          )
 3        Plaintiff,             )
                                 )
 4  VS.                          )  CIV. ACTION NO. 16-CV-04840
                                 )
 5  SPACE SHIPPING, LTD.;        )
    ADVANTAGE AVENUE             )
 6  SHIPPING, LLC; GENEL         )
    DENIZCILIK NAKLIYATI A.S.)
 7  A/K/A GEDEN LINES;           )
    ADVANTAGE TANKERS, LLC,      )
 8  ADVANTAGE HOLDINGS, LLC;     )
    FORWARD HOLDINGS, LLC;       )
 9  MEHMET EMIN KARAMEHMET       )
    and GULSUN NAZLI             )
10  KARAMEHMET WILLIAMS,         )
         Defendants.             )
11
              *********************************
12
                    ORAL DEPOSITION OF
13                     DAVE CHAPMAN
                     NOVEMBER 30, 2016
14
              *********************************
15

16       ORAL DEPOSITION of DAVE CHAPMAN, produced as a

17  witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered cause

19  on November 30, 2016, from 1:22 p.m. to 2:32 p.m.,

20  before Patricia L. Fairley, RPR, CSR in and for the

21  State of Texas, reported by machine shorthand at the

22  offices of DepoTexas, 13101 Northwest Freeway,

23  Suite 210, Houston, Texas, pursuant to the Federal Rules

24  of Civil Procedure and the provisions stated in the

25  record or attached hereto.
```

Dave Chapman

2

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        Mr. George A. Gaitas
         Mr. Jonathan M. Chalos
5        CHALOS & CO., P.C.
         7210 Tickner Street
6        Houston, Texas  77055
         (713)936-2427           (866)702-4577 Facsimile
7        georgegaitas@chaloslaw.com
         jmc@chaloslaw.com

8

9    FOR THE DEFENDANTS ADVANTAGE AVENUE SHIPPING, LLC,
     ADVANTAGE TANKERS, LLC AND ADVANTAGE HOLDINGS, LLC:
10

         Mr. Marc Matthews (Not Present)
11       PHELPS DUNBAR, LLP
         500 Dallas Street
12       Suite 1300
         Houston, Texas  77002
13       (713)626-1386           (713)626-1388 Facsimile
         marc.matthews@phelps.com

14

15   FOR SHELL OIL COMPANY:

16       Mr. Marcus A. Carter
         SHELL OIL COMPANY
17       P.O. Box 2463
         Houston, Texas  77252-2463
18       (713)241-1232           (713)241-1427 Facsimile
         m.carter2@shell.com

19

20                        *  *  *  *  *

21

22

23

24

25

Dave Chapman

42

1          A.   I believe that's correct.

2          Q.   It was acknowledged on behalf of Shell Western?

3          A.   Yes.

4          Q.   And would -- would you agree with me that these

5     were binding contracts on Shell Western?

6          A.   Yes, I would agree.

7          Q.   And if someone told you in one of these time

8     charters that the daily rate was going to be $50,000 a

9     day and the charter itself said 18 1/2 thousand, they

10    would be wrong?  The charter party would be correct?

11    What it says in the charter would be correct?

12         A.   Well, it depends upon what other agreements

13    were entered into beyond the charter party agreement.

14    You can write amendments to various agreements.

15         Q.   Of course.  But if -- if the charter party

16    specifies 18 1/2 thousand dollars daily rate, that would

17    be correct?  These are correct documents that you were

18    signing; they were not fictitious or --

19         A.   No.  Those are binding documents that I signed.

20         Q.   Binding and accurate?

21         A.   They should be accurate.

22         Q.   Truthful?

23         A.   Yes.  Correct.

24         Q.   So I want to show you now a document,

25    Exhibit 17.

Dave Chapman

51

1    executing the document.  There were people in Shell that

2    had done that work, I'm certain, because I would have

3    asked for evidence to that effect; but I wouldn't have

4    done the work myself.

5        Q.  So if you look at Paragraph 2 again, "It has

6    been proposed that each Existing Owner will sell, the

7    Vessel Sales, all its title, interest to and right in

8    its Vessel to the relevant companies listed in Annex 1

9    hereto as new owners, and each wholly owned by the

10   Shareholder, the New Owners."

11            What sense does this make to you?  Who owns

12   the new owners?

13       A.  It says, "each wholly owned by the Shareholder,

14   the New Owner."  I mean, I can't -- I can't interpret it

15   any differently than it says in the paragraph.

16       Q.  Right.  And would you -- would you look at the

17   very first line, please, where it says, "From" --

18       A.  Yes.

19       Q.  -- "Geden Holdings, Limited" --

20       A.  Yes.

21       Q.  -- "the Shareholder"?

22       A.  Correct.

23       Q.  Do you have any reason to believe -- reason to

24   believe this is -- there is anything in here that's

25   untrue or inaccurate?

Dave Chapman

52

1    A.   No, I have no reason to believe that.

2    Q.   Give us a minute.

3    A.   Yeah, please.

4         (Discussion off the record)

5    Q.   (BY MR. GAITAS)  All right.  Let's go back on

6    the record.

7    A.   Okay.

8    Q.   Or do you want to take a break?

9    A.   No, I'm good.  I just don't normally talk this

10   much.  No one at the office lets me.

11   Q.   Right.  Then I'll -- I'll ask you to please

12   look at -- there's -- there's an Appendix 1 that is --

13   Annex 1 that is attached to this.

14   A.   Yes.

15   Q.   Do you see that?

16   A.   I do see that.

17   Q.   And if you -- if you go to the Consent Letter,

18   the front -- the front page --

19   A.   Yes.

20   Q.   -- Item 3, "Upon each Vessel Sale:  the

21   relevant Existing Owner will delete the Vessel from the

22   Maltese flag and the relevant New Owner will register

23   the vessel in its name under the Marshall Islands flag."

24   A.   Yes, I can see that.

25   Q.   From -- from the documents that we saw before,

Dave Chapman

53

1    Exhibits 1 with the exception of that letter of

2    Mr. Soudant, this was done?

3         A.  I presume so.  I --

4         Q.  If you look -- if you look at the -- if you

5    look at the Appendix 1 -- Annex 1 --

6         A.  Yes.

7         Q.  -- vessel PROFIT was renamed ADVANTAGE SOLAR?

8         A.  Correct, and went from --

9         Q.  And --

10        A.  -- the Malta flag to the Marshall flag.

11        Q.  -- went -- and from the charter parties you've

12   seen or if you can see, if you want to -- to look at

13   them closely, indeed, the flag changed?

14        A.  I -- yes, I presume so.

15        Q.  Yeah.  And from the documents we have seen

16   before, the previous exhibits, the condition of this

17   Consent Letter, (b), "the relevant ship mortgage

18   registered in the name of the banks and financial

19   institutions listed in Annex 1 hereto as Existing

20   Mortgagees shall be discharged and shall be replaced

21   with a new ship mortgage to be registered in the name of

22   the banks and financial institutions listed in Annex 1

23   hereto as New Mortgagees," again, from the documents you

24   have seen, this has taken place, has it not?

25        A.  I presume so.

# EXHIBIT 6

| SHIP MANAGEMENT AGREEMENT | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT CODE NAME: "SHIPMAN 98"          PART I |
|---|---|

| 1.Date of Agreement 10 February 2015 | Name of Vessel ADVANTAGE ARROW |
|---|---|

| 2. Owners (name, place of registered office and law of registry) (Cl. 1) | 3. Managers (name, place of registered office and law of registry) (Cl. 1) |
|---|---|
| Name Advantage Arrow Shipping LLC | Name Genel Denizcilik Nakliyati A.Ş. |
| Place of registered office Trust Company Complex, Ajeltake Road, Ajeltake Islands, Majuro, Marshall Islands MH96960 | Place of registered office Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul |
| Law of registry MARSHALL ISLAND | Law of registry Turkiye |

| 4. Day and year of commencement of Agreement (Cl. 2)        February 2015 |
|---|

| 5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1) YES | 6. Technical Management (state "yes" or "no" as agreed) (Cl.3.2) YES |
|---|---|
| 7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3) YES | 8. Insurance Arrangements (state "yes" or "no" as agreed)  Cl. 3.4) YES |
| 9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5) YES | 10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl.3.6) YES |
| 11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7) YES | 12. Bunkering (state "yes" or "no" as agreed) (Cl, 3.8) YES |
| 13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl. 3.3 (i)) 5 YEARS | 14. Owners' Insurance (state alternative (i), (ii) or (iii) of Cl. 6.3) YES |
| 15. Annual Management Fee (state annual amount) (Cl. 8.1) USD 365,000 (per annum) | 16. Severance Costs (state maximum amount) (Cl. 8.4(ii)) As per Crewing agreement |
| 17. Day and year of termination of Agreement (Cl. 17) 5 YEARS FROM DATE OF AGREEMENT | 18. Law and Arbitration (state alternative 19.1, 19.2 or 19.3; if 19.3 place of arbitration must be stated) (Cl. 19) English Law |
| 19. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Owners) (Cl. 20)  operations@advantagetankers.com | 20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20) Genel Denizcilik Nakliyati A.Ş. Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul Fax: +90 212 283 16 04-05 Tel: +90 212 319 51 00 |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) "C" ("Initial Budget") and "D" (Associated Vessels) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C" and "D" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners)  Signed by:  For & On behalf of the Owner TUGRUL TOKGOZ | Signature(s) (Managers)  Signed by:  For & On behalf of the Manager ORHAN KARADEMIR / COO |
|---|---|

D02405

PART II
"Shipman 98" Standard Ship Management Agreement

1    **1.   Definitions**
2  In this Agreement save where the context
3  otherwise requires, the following words and
4  expressions shall have the meanings hereby
5  assigned to them.
6  "Owners" means the party identified in Box 2.
7  "Managers" means the party identified in Box 3.
8  "Vessel" means the vessel or vessels details of
9  which are set out in <u>Annex "A"</u> attached hereto.
10  "Crew" means the Master, officers and ratings of
11  the numbers, rank and nationality specified in
12  <u>Annex "B"</u> hereto.
13  "Crew Support Costs" means all expenses of a
14  general nature which are not particularly
15  referable to any individual vessel for the time
16  being managed by the Managers and which are
17  incurred by the Managers for the purpose of
18  providing an efficient and economic management
19  service and, without prejudice to the generality of
20  the foregoing, shall include the cost of crew
21  standby pay, training schemes for officers and
22  ratings, cadet training schemes, sick pay, study
23  pay, recruitment and interviews.
24  "Severance Costs" means the costs which the
25  employers are legally obliged to pay to or in
26  respect of the Crew as a result of the early
27  termination of any employment contract for
28  service on the Vessel.
29  "Crew Insurances" means insurances against crew
30  risks which shall include but not limited to death,
31  sickness, repatriation, injury, shipwreck
32  unemployment indemnity and loss of personal
33  <u>effects.</u>
34  "Management Services" means the services
35  specified in sub-clauses 3.1 to 3.8 as indicated
36  affirmatively in Boxes <u>5</u> to <u>12</u>.
37  "ISM Code" means the International Management
38  Code for the Safe Operation of Ships and for
39  Pollution Prevention as adopted by the
40  International Maritime Organization (IMO) by
41  resolution A.741 (18) or any subsequent
42  amendment thereto.
43  "STCW 95" means the International Convention
44  on Standards of Training, Certification and
45  Watchkeeping for Seafarers, 1978, as amended in
46  1995 or any subsequent amendment thereto.
47    **2.   Appointment of Managers**
48  With effect from the day and year stated in <u>Box 4</u>
49  and continuing unless and until terminated as
50  provided herein, the Owners hereby appoint the
51  Managers, and the Managers hereby agree to act
52  as the Managers of the Vessel.
53    **3.   Basis of Agreement**
54  Subject to the terms and conditions herein
55  provided, during the period of this Agreement,
56  the Managers shall carry out Management
57  Services in respect of the Vessel as agents for and
58  on behalf of the Owners. The Managers shall have
59  authority to take such actions as they may from
60  time to time in their absolute discretion consider
61  to be necessary to enable them to perform this
62  Agreement in accordance with sound ship
63  management practice.

64    **3.1   Crew Management**
65  (only applicable if agreed according to <u>Box 5</u>)
66  The Managers shall provide suitably qualified
67  Crew for the Vessel as required by the Owners in
68  accordance with the STCW 95 requirements,
69  provision of which includes but is not limited to
70  the following functions:
71  (i)   selecting and engaging the Vessel's Crew,
72      including payroll arrangements, pension
73      administration, and insurances for the Crew
74      other than those mentioned in Clause 6;
75  (ii)   ensuring that the applicable requirements
76      of the law of the flag of the Vessel are
77      satisfied in respect of manning levels, rank,
78      qualification and certification of the Crew
79      and employment regulations including
80      Crew's tax, social insurance, discipline and
81      other requirements;
82  (iii)   ensuring that all members of the Crew have
83      passed a medical examination with a
84      qualified doctor certifying that they are fit
85      for the duties for which they are engaged
86      and are in possession of valid medical
87      certificates issued in accordance with
88      appropriate flag State requirements. In the
89      absence of applicable flag State
90      requirements the medical certificate shall
91      be dated not more than three months prior
92      to the respective Crew members leaving
93      their country of domicile and maintained
94      for the duration of their service on board
95      the Vessel;
96  (iv)   ensuring that the Crew shall have a
97      command of the English language of a
98      sufficient standard to enable them to
99      perform their duties safely;
100  (v)   arranging transportation of the Crew,
101      including repatriation;
102  (vi)   training the Crew and supervising their
103      efficiency;
104  (vii)  conducting union negotiations;
105  (viii) operating the Managers' drug and alcohol
106      policy unless otherwise agreed.
107
108    **3.2   Technical Management**
109  (only applicable if agreed according to <u>Box 6</u>)
110  The Managers shall provide technical
111  management, which includes, but is not limited
112  to, the following functions:
113  (i)   provision of competent personnel to
114      supervise the maintenance and general
115      efficiency of the Vessel;
116  (ii)   arrangement and supervision of dry
117      dockings, repairs, alterations and the
118      upkeep of the Vessel to the standards
119      required by the Owners provided that the
120      Managers shall be entitled to incur the
121      necessary expenditure to ensure that the
122      Vessel will comply with the law of the flag
123      of the Vessel and of the places where she
124      trades, and all requirements and
125      recommendations of the classification
126      society;

D02406

127 (iii) arrangement of the supply of necessary
128 stores, spares and lubricating oil;
129 (iv) appointment of surveyors and
130 technical consultants as the
131 Managers may consider from time to
132 time to be necessary;
133 (v) development, implementation and
134 maintenance of a Safety
135 Management System (SMS)in
136 accordance with the ISM Code (see
137 sub-clauses 4.2 and 5.3).
138 (vi) development, implementation and
139 compliance with International Port Facility
140 Security Code (ISPS)
141 **3.3 Commercial Management**
142 (only applicable if agreed according to Box 7)
143 The Managers shall provide the commercial
144 operation of the Vessel, as required by the
145 Owners, which includes, but is not limited to, the
146 following functions:
147 (I) providing chartering services in
148 accordance with the Owners'
149 instructions which include, but are not
150 limited to, seeking and negotiating
151 employment for the Vessel and the
152 conclusion (including the execution
153 thereof) of charter parties or other
154 contracts relating to the employment
155 of the Vessel. If such a contract
156 exceeds the period stated in Box 13,
157 consent thereto in writing shall first be
158 obtained from the Owners.
159 (ii) arranging of the proper payment to
160 Owners or their nominees of all hire
161 and/or freight revenues or other
162 moneys of whatsoever nature to which
163 Owners may be entitled arising out of
164 the employment of or otherwise in
165 connection with the Vessel.
166 (iii) providing voyage estimates and
167 accounts and calculating of hire,
168 freights, demurrage and/or despatch
169 moneys due from or due to the
170 charterers of the Vessel;
171 (iv) issuing of voyage instructions;
172 (v) appointing agents;
173 (vi) appointing stevedores;
174 (vii) arranging surveys associated with
175 the commercial operation of the
176 Vessel.
177 **3.4 Insurance Arrangements**
178 (only applicable if agreed according to Box 8)
179 The Managers shall arrange insurances in
180 accordance with Clause 6, on such terms and
181 conditions as the Owners shall have instructed or
182 agreed, in particular regarding conditions, insured
183 values, deductibles and franchises.
184
185 **3.5 Accounting Services**
186 (only applicable if agreed according to Box 9)
187 The Managers shall
188 (i) establish an accounting system which
189 meets the requirements of the
190 Owners and provide regular

191 accounting services, supply regular
192 reports and records,
193 (ii) maintain the records of all costs and
194 expenditure incurred as well as data
195 necessary or proper for the
196 settlement of accounts between the
197 parties.
198
199 **3.6 Sale or Purchase of the Vessel**
200 (only applicable if agreed according to Box 10)
201 The Managers shall, in accordance with the
202 Owners' instructions, supervise the sale or
203 purchase of the Vessel, including the performance
204 of any sale or purchase agreement, but not
205 negotiation of the same.
206 **3.7 Provisions** (only applicable if agreed according
207 to Box 11)
208 The Managers shall arrange for the supply of
209 provisions.
210 **3.8 Bunkering** (only applicable if agreed according
211 to Box 12)The Managers shall arrange for the
212 provision of bunker fuel of the quality specified by
213 the Owners as required for the Vessel's trade.
214
215 **4. Managers' Obligations**
216 **4.1** The Managers undertake to use their best
217 endeavors to provide the agreed Management
218 Services as agents for and on behalf of the
219 Owners in accordance with sound ship
220 management practice and to protect and promote
221 the interests of the Owners in all matters relating
222 to the provision of services hereunder.
223 Provided, however, that the Managers in the
224 performance of their management responsibilities
225 under this Agreement shall be entitled to have
226 regard to their overall responsibility in relation to
227 all vessels as may from time to time be entrusted
228 to their management and in particular, but
229 without prejudice to the generality of the
230 foregoing, the Managers shall be entitled to
231 allocate available supplies, manpower and
232 services in such manner as in the prevailing
233 circumstances the Managers in their absolute
234 discretion consider to be fair and reasonable.
235 **4.2** Where the Managers are providing Technical
236 Management in accordance with sub-clause 3.2,
237 they shall procure that the requirements of the
238 law of the flag of the Vessel are satisfied and they
239 shall in particular be deemed to be the
240 "Company" as defined by the ISM Code, assuming
241 the responsibility for the operation of the Vessel
242 and taking over the duties and responsibilities
243 imposed by the ISM Code when applicable.
244 **5. Owners' Obligations**
245 **5.1** The Owners shall pay all sums due to the
246 Managers punctually in accordance with the
247 terms of this Agreement.
248 **5.2** Where the Managers are providing Technical
249 Management in accordance with sub-clause 3.2,
250 the Owners shall:
251 (i) procure that all officers and ratings
252 supplied by them or on their behalf comply
253 with the requirements of STCW 95;
254 (ii) instruct such officers and ratings to obey
255 all reasonable orders of the Managers in

D02407

256 connection with the operation of the
257 Managers' safety management system.
258 5.3 Where the Managers are not providing
259 Technical Management in accordance with sub-
260 clause 3.2, the Owners shall procure that the
261 requirements of the law of the flag of the Vessel
262 are satisfied and that they, or such other entity as
263 may be appointed by them and identified to the
264 Managers, shall be deemed to be the "Company"
265 as defined by the ISM Code assuming the
266 responsibility for the operation of the Vessel and
267 taking over the duties and responsibilities
268 imposed by the ISM Code when applicable.
269    6.   Insurance Policies
270 The Owners shall procure, whether by instructing
271 the Managers under sub-clause 3.4 or otherwise,
272 that throughout the period of this Agreement:
273   6.1 at the Owners' expense, the Vessel is insured
274      for not less than her sound market value or
275      entered for her full gross tonnage, as the
276      case may be for:
277         (i)   usual hull and machinery marine
278             risks (including crew negligence)
279             and excess liabilities;
280         (ii)  protection and indemnity risks
281             (including pollution risks, and Crew
282             Insurances); and
283         (iii) war risks (including protection and
284             indemnity and crew risks) in
285             accordance with the best practice
286             of prudent owners of vessels of a
287             similar type to the Vessel, with first
288             class insurance companies
289             underwriters or associations ("the
290             Owners' Insurances");
291   6.2 all premiums and calls on the Owners'
292      Insurances are paid promptly by their due
293      date,
294   6.3 the Owners' Insurances name the Managers
295      and, subject to underwriters' agreement, any
296      third party designated by the Managers as a
297      joint assured, with full cover, with the
298      Owners obtaining cover in respect of each of
299      the insurances specified in sub-clause 6.1:
300         ~~(i)~~  ~~on terms whereby the Managers~~
301             ~~and any such third party are liable~~
302             ~~in respect of premiums or calls~~
303             ~~arising in connection with the~~
304             ~~Owners' Insurances; or~~
305         (ii)  If reasonably obtainable, on terms
306             such that neither the Managers nor
307             any such third party shall be under
308             any liability in respect of premiums
309             or calls arising in connection with
310             the Owners' Insurances or
311         ~~(iii)~~ ~~on such other terms as may be~~
312             ~~agreed in writing.~~
313      Indicate alternative (i), (ii) or (iii) in Box 14. If
314      Box 14 is left blank (i) applies
315   6.4 written evidence is provided, to the
316      reasonable satisfaction of the Managers, of
317      their compliance with their obligations under
318      Clause 6 within a reasonable time of the
319      commencement of the Agreement, and of
320      each renewal date and, if specifically

321      requested, of each payment date of the
322      Owners' Insurances.
323     7.   Income Collected and Expenses Paid on
324        Behalf of Owners
325   7.1 All moneys collected by the Managers under
326      the terms of this Agreement (other than
327      moneys payable by the Owners to the
328      Managers) and any interest thereon shall be
329      held to the credit of the Owners in a
330      separate bank account.
331   7.2 All expenses incurred by the Managers under
332      the terms of this Agreement on behalf of the
333      Owners (including expenses as provided in
334      Clause 8) may be debited against the Owners
335      in the account referred to under sub-clause
336      7.1 but shall in any event remain payable by
337      the Owners to the Managers on demand.
338     8.   Management Fee
339   8.1   The Owners shall pay to the Managers for
340   their services as Managers under this Agreement
341   an annual management fee as stated in Box 15,
342   which shall be payable by equal monthly
343   instalments in advance, the first instalment being
344   payable on the commencement of this Agreement
345   (see Clause 2 and Box 4) and subsequent
346   instalments being payable every month.
347   8.2 The management fee is fixed (see Box 15) for
348   the first two years and increasing by 5% per year
349   thereafter.
350   8.3 The Managers shall, at no extra cost to the
351   Owners, provide their own office accommodation,
352   office staff, facilities and stationery. Without
353   limiting the generality of Clause 7 the Owners shall
354   reimburse the Managers for postage and
355   communication expenses, travelling expenses, and
356   other out of pocket expenses properly incurred by
357   the Managers in pursuance of the Management
358   Services.
359   8.4  In the event of the appointment of the
360   Managers being terminated by the Owners or the
361   Managers in accordance with the provisions of
362   Clauses 17 and 18 other than by reason of default
363   by the Managers, or If the Vessel is lost, sold or
364   otherwise disposed of, the "management fee"
365   payable to the Managers according to the
366   provisions of sub-clause 8.1, shall continue to be
367   payable for a further period of three calendar
368   months as from the termination date. In addition,
369   provided that the Managers provide Crew for the
370   Vessel in accordance with sub-clause 3.1:
371   (i) the Owners shall continue to pay Crew Support
372      Costs during the said further period of *three*
373      *calendar months and*
374   (ii) The Owners shall pay an equitable proportion
375      of any Severance Costs which may materialize,
376      not exceeding the amount stated in Box 15.
377   8.5 If the Owners decide to lay-up the Vessel
378   whilst this Agreement remains in force and such
379   lay-up lasts for more than three months, an
380   appropriate reduction of the management fee for
381   the period exceeding three months until one
382   month before the Vessel is again put into service
383   shall be mutually agreed between the parties.
384   8.6 Unless otherwise agreed in writing all
385   discounts and commissions obtained by the

386 Managers in the course of the management of the
387 Vessel shall be credited to the Owners.

388    9.   **Budgets and Management of Funds**
389
390 **9.1** The Managers shall present to the Owners
391 annually a budget for the following twelve
392 months in such form as the Owners require. The
393 budget for the first year hereof is set out in
394 Annex "C" hereto. Subsequent annual budgets
395 shall be prepared by the Managers and
396 submitted to the Owners not less than three
397 months before the anniversary date of the
398 commencement of this Agreement (see Clause 2
399 and Box 4).
400 **9.2** The Owners shall indicate to the Managers
401 their acceptance and approval of the annual
402 budget within one month of presentation and in
403 the absence of any such indication the Managers
404 shall be entitled to assume that the Owners have
405 accepted the proposed budget.
406 **9.3** Following the agreement of the budget, the
407 Managers shall prepare and present to the
408 Owners their estimate of the working capital
409 requirement of the Vessel and the Managers
410 shall each month update this estimate, based
411 thereon, the Managers shall each month request
412 the Owners in writing for the funds required to
413 run the Vessel for the ensuing month including
414 the payment of any occasional or extraordinary
415 item of expenditure, such as emergency repair
416 costs, additional insurance premiums, bunkers,
417 or provisions. Such funds shall be received by the
418 Managers within ten running days after the
419 receipt by the Owners of the Managers' written
420 request and shall be held to the credit of the
421 Owners in a separate bank account.
422 **9.4** The Managers shall produce a comparison
423 between budgeted and actual income and
424 expenditure of the Vessel in such form as
425 required by the Owners monthly or at such other
426 intervals as mutually agreed.
427 **9.5** Notwithstanding anything contained herein
428 to the contrary, the Managers shall in no
429 circumstances be required to use or commit
430 their own funds to finance the provision of the
431 Management Services.
432    10.   **Managers' Right to Sub-Contract**
433 The Managers shall ~~not~~ have the right to sub-
434 contract any of their obligations hereunder,
435 including those mentioned in sub-clause 3.1
436 without the prior written consent of the Owners
437 which shall not be unreasonably withheld. In the
438 event of such a sub-contract, the Managers shall
439 remain fully liable for the due performance of
440 their obligations under this Agreement.
441    11.   **Responsibilities**
442 **11.1 Force Majeure -** Neither the Owners nor
443 the Managers shall be under any liability for any
444 failure to perform any of their obligations
445 hereunder by reason of any cause whatsoever of
446 any nature or kind beyond their reasonable
447 control.
448 **11.2** Liability to Owners –
449    (i)

450 Without prejudice to sub-clause 11.1, the
451 Managers shall be under no liability
452 whatsoever to the Owners for any loss,
453 damage, delay or expense of whatsoever
454 nature, whether direct or indirect,
455 (including but not limited to loss of profit
456 arising out of or in connection with
457 detention of or delay to the Vessel) and
458 howsoever arising in the course of
459 performance of the Management
460 Services UNLESS same is proved to have
461 resulted solely from the negligence, gross
462 negligence or wilful default of the
463 Managers or their employees, or agents
464 or sub-contractors employed by them in
465 connection with the Vessel, in which case
466 (save where loss, damage, delay or
467 expense has resulted from the Managers'
468 personal act or omission committed with
469 the intent to cause same or recklessly
470 and with knowledge that such loss,
471 damage, delay or expense would
472 probably result) the Managers' liability
473 for each incident or series of incidents
474 giving rise to a claim or claims shall never
475 exceed a total of ten times the annual
476 management fee payable hereunder.
477    (ii)   Notwithstanding anything that
478 may appear to the contrary in this
479 Agreement, the Managers shall not be
480 liable for any of the actions of the Crew,
481 even if such actions are negligent, grossly
482 negligent or wilful, except only to the
483 extent that they are shown to have
484 resulted from a failure by the Managers
485 to discharge their obligations under sub-
486 clause 3.1, in which case their liability
487 shall be limited in accordance with the
488 terms of this Clause 11.
489 **11.3 Indemnity -** Except to the extent and solely
490 for the amount therein set out that the Managers
491 would be liable under sub- clause 11.2, the
492 Owners hereby undertake to keep the Managers
493 and their employees, agents and sub-contractors
494 indemnified and to hold them harmless against all
495 actions, proceedings, claims, demands or
496 liabilities whatsoever or howsoever arising which
497 may be brought against them or incurred or
498 suffered by them arising out of or in connection
499 with the performance of the Agreement, and
500 against and in respect of all costs, losses, damages
501 and expenses (including legal costs and expenses
502 on a full indemnity basis) which the Managers
503 may suffer or incur (either directly or indirectly) in
504 the course of the performance of this Agreement.
505 **11.4 "Himalaya" -** It is hereby expressly agreed
506 that no employee or agent of the Managers
507 (including every sub - contractor from time to
508 time employed by the Managers) shall in any
509 circumstances whatsoever be under any liability
510 whatsoever to the Owners for any loss, damage or
511 delay of whatsoever kind arising or resulting
512 directly or indirectly from any act, neglect or
513 default on his party while acting in the course of
514 or in connection with his employment and,

515 without prejudice to the generality of the
516 foregoing provisions in this Clause 11, every
517 exemption, limitation, condition and liberty
518 herein contained and every right, exemption from
519 liability, defence and immunity of whatsoever
520 nature applicable to the Managers or to which the
521 Managers are entitled hereunder shall also be
522 available and shall extend to protect every such
523 employee or agent of the Managers acting as
524 aforesaid and for the purpose of all the foregoing
525 provisions of this Clause 11 the Managers are or
526 shall be deemed to be acting as agent or trustee
527 on behalf of and for the benefit of all persons who
528 are or might be their servants or agents from time
529 to time (including sub-contractors as aforesaid)
530 and all such persons shall to this extent be or be
531 deemed to be parties to this Agreement.
532 **12. Documentation**
533 Where the Managers are providing Technical
534 Management in accordance with sub-clause 3.2
535 and/or Crew Management in accordance with
536 sub-clause 3.1, they shall make available, upon
537 Owners' request, all documentation and records
538 related to the Safety Management System (SMS)
539 and/or the Crew which the Owners need in order
540 to demonstrate compliance with the ISM Code
541 and STCW 95 or to defend a claim against a third
542 party.
543 **13. General Administration**
544     13.1 The Managers shall notify Owners of all
545 claims arising out of the Management Services
546 hereunder and keep the Owners informed
547 regarding any incident of which the Managers
548 become aware which gives or may give rise to
549 claims or disputes involving third parties.
550     13.2 The owners shall bring or defend actions,
551 suits or proceedings in connection with matters
552 entrusted to the Managers according to this
553 Agreement.
554     13.3 The Owners shall obtain legal or technical
555 or other outside expert advice in relation to the
556 handling and settlement of claims and disputes or
557 all other matters affecting the interests respect of
558 the Vessel.
559     13.4 The Owners shall arrange for the provision
560 of any necessary guarantee bond or other
561 security.
562     13.5 Any costs reasonably incurred by the
563 Managers in carrying out their obligations
564 according to Clause 13 shall be reimbursed by the
565 Owners.
566 **14. Auditing**
567 The Managers shall at all times maintain and keep
568 true and correct accounts and shall make the
569 same available for inspection and auditing by the
570 Owners at such times as may be mutually agreed.
571 On the termination, for whatever reasons, of this
572 Agreement, the Managers shall release to the
573 Owners, if so requested, the originals where
574 possible, or otherwise certified copies, of all such
575 accounts and all documents specifically relating to
576 the Vessel and her operation.
577 **15. Inspection of Vessel**
578 The Owners shall have the right at any time after
579 giving reasonable notice to the Managers to

580 inspect the Vessel for any reason they consider
581 necessary.
582 **16. Compliance with Laws and Regulations**
583 The Managers will not do or permit to be done
584 anything which might cause any breach or
585 infringement of the laws and regulations of the
586 Vessel's flag, or of the places where she trades.
587 **17.   Duration of the Agreement**
588 This Agreement shall come into effect on the day
589 and year stated in Box 4 and shall continue until
590 the date stated in Box 17. Thereafter it shall
591 continue until terminated by either party giving to
592 the other notice in writing, in which event the
593 Agreement shall terminate upon the expiration of
594 a period of two months from the date upon which
595 such notice was given.
596 **18.   Termination**
597 **18.1  Owners' Default**
598     (i)  The Managers shall be entitled to
599          terminate the Agreement with
600          immediate effect by notice in writing if
601          any moneys payable by the Owners
602          under this Agreement and/or ~~the owners~~
603          ~~of any associated vessel, details of which~~
604          ~~are listed in Annex "D",~~ shall not have
605          been received in the Managers'
606          nominated account within ten running
607          days of receipt by the Owners of the
608          Manager's written request or if the
609          Vessel is repossessed by the Mortgagees.
610     (ii) If the Owners:
611     (a)  fail to meet their obligations under
612          clause 5.2 and 5.3 of this Agreement
613          for any reason within their control, or
614     (b)  proceed with the employment of or
615          continue to employ the Vessel in the
616          carriage of contraband, blockade
617          running, or an unlawful trade, or on a
618          voyage which in the reasonable
619          opinion of the Managers is unduly
620          hazardous or improper,
621 The Managers may give notice of the default to
622 the Owners, requiring them to remedy it as soon
623 as practically possible. In the event that the
624 Owners fail to remedy it within a reasonable time
625 to the satisfaction of the Managers, the Managers
626 shall be entitled to terminate the Agreement with
627 immediate effect by notice in writing.
628 **18.2  Managers' Default**
629 If the Managers fail to meet their obligations
630 under Clauses 3 and 4 of this Agreement for any
631 reason within the control of the Managers, the
632 Owners may give notice to the Managers of the
633 default, requiring them to remedy it as soon as
634 practically possible. In the event that the
635 Managers fail to remedy it within a reasonable
636 time to the satisfaction of the Owners, the
637 Owners shall be entitled to terminate the
638 Agreement with immediate effect by notice in
639 writing.
640 **18.3  Extraordinary Termination**
641 This Agreement shall be deemed to be terminated
642 in the case of the sale of the Vessel or if the
643 Vessel becomes a total loss or is declared as a

644 constructive or compromised or arranged total
645 loss or is requisitioned.
646 **18.4** For the purpose of sub-clause 18.3 hereof
647    (i) the date upon which the Vessel is to be
648      treated as having been sold or otherwise
649      disposed of shall be the date on which the
650      Owners cease to be registered as Owners
651      of the Vessel;
652    (ii) the Vessel shall not be deemed to be lost
653      unless either she has become an actual
654      total loss or agreement has been reached
655      with her underwriters in respect of her
656      constructive, compromised or arranged
657      total loss or if such agreement with her
658      underwriters is not reached it is adjudged
659      by a competent tribunal that a
660      constructive loss of the Vessel has
661      occurred.
662 **18.5** This Agreement shall terminate forthwith in
663 the event of an order being made or resolution
664 passed for the winding up, dissolution, liquidation
665 or bankruptcy of either party (otherwise than for
666 the purpose of reconstruction or amalgamation)
667 or if a receiver is appointed, or it if suspends
668 payment, ceases to carry on business or makes
669 any special arrangement or composition with its
670 creditors.
671 **18.6** The termination of this Agreement shall be
672 without prejudice to all rights accrued due
673 between the parties prior to the date of
674 termination.
675 **19.** Law and Arbitration
676 **19.1** This Agreement shall be governed by and
677 construed in accordance with English law and any
678 dispute arising out of or in connection with this
679 Agreement shall be referred to arbitration in
680 London in accordance with the Arbitration Act
681 1996 or any statutory modification or re-
682 enactment thereof save to the extent necessary
683 to give effect to the provisions of this Clause. The
684 arbitration shall be conducted in accordance with
685 the London Maritime Arbitrators Association
686 (LMAA) Terms current at the time when the
687 arbitration proceedings are commenced.
688 The reference shall be to three arbitrators. A
689 party wishing to refer a dispute to arbitration shall
690 appoint its arbitrator and send notice of such
691 appointment in writing to the other party
692 requiring , the other party to appoint its own
693 arbitrator within 14 calendar days of that notice
694 and stating that it will appoint its arbitrator as
695 sole arbitrator unless the other party appoints its
696 own arbitrator and gives notice that it has done so
697 within the 14 days specified. If the other party
698 does not appoint its own arbitrator and give
699 notice that it has done so within the 14 days
700 specified, the party referring a dispute to
701 arbitration may, without the requirement of any
702 further prior notice to the other party, appoint its
703 arbitrator as sole arbitrator and shall advise the
704 other party accordingly. The award of a sole
705 arbitrator shall be binding on both parties as if he
706 had been appointed by agreement.

707 Nothing herein shall prevent the parties agreeing
708 in writing to vary these provisions to provide for
709 the appointment of a sole arbitrator.
710 In cases where neither the claim nor any
711 counterclaim exceeds the sum of USD 50,000 (or
712 such other sum as the parties may agree) the
713 arbitration shall be conducted in accordance with
714 the LMAA Small Claims Procedure current at the
715 time when the arbitration proceedings are
716 commenced.
717 **19.2** ~~This Agreement shall be governed by and~~
718 ~~construed in accordance with Title 9 of the~~
719 ~~United States Code and the Maritime Law of the~~
720 ~~United States and any dispute arising out of or in~~
721 ~~connection with this Agreement shall be referred~~
722 ~~to three persons at New York, one to be~~
723 ~~appointed by each of the parties hereto, and the~~
724 ~~third by the two so chosen; their decision that of~~
725 ~~any two of them shall be final, and for the~~
726 ~~purposes of enforcing any award, judgment may~~
727 ~~be entered on an award by any court of~~
728 ~~competent jurisdiction. The proceedings shall be~~
729 ~~conducted in accordance with the rules of the~~
730 ~~Society of Maritime Arbitrators, Inc. In cases~~
731 ~~where neither the claim not any counterclaim~~
732 ~~exceeds the sum of USD 50,000 (or such other~~
733 ~~sum as the parties may agree) the arbitration~~
734 ~~shall be conducted in accordance with the~~
735 ~~Shortened Arbitration Procedure of the Society~~
736 ~~of Maritime Arbitrators, Inc. current at the time~~
737 ~~when the arbitration proceedings are~~
738 ~~commenced.~~
739 **19.3** This Agreement shall be governed by and
740 construed in accordance with the laws of the
741 ~~place mutually agreed by the parties and any~~
742 ~~dispute arising out of or in connection with this~~
743 ~~Agreement shall be referred to arbitration at a~~
744 ~~mutually agreed place, subject to the procedures~~
745 ~~applicable there.~~
746 **19.4** If Box 18 in Part I is not appropriately filled
747 in, sub-clause 19.1 of this Clause shall apply.
748 Note: 19.1, 19.2 and 19.3 are alternatives;
749 indicate alternative agreed in Box 18.
750 **20.** Notices
751 **20.1** Any notice to be given by either party to the
752 other party shall be in writing and may be sent
753 by fax, telex, registered or recorded mail or by
754 personal service.
755 **20.2** The address of the Parties for service of
756 such communication shall be as stated in Boxes
757 19 and 20, respectively.

D02411

ANNEX "A" (DETAILS OF VESSEL OR VESSELS) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| | |
|---|---|
| NAME OF VESSEL : | ADVANTAGE ARROW |
| OWNER: | ADVANTAGE ARROW SHIPPING LLC |
| IMO no: | 9419448 |
| Type: | Oil Tanker / Double Hull |
| Built: | 2009 - SAMSUNG HEAVY INDUSTRIES CO. LTD. KOJE, KOREA |
| Class: | Det Norske Veritas |
| Tonnage: | 61341 GT / 35396 NT |
| Deadweight: | 115804 mt |
| LOA: | 240,63 mtrs |
| Breadth: | 43,80 mtrs |
| Main Engine: | MAN B&W 6S60MC-C , 13560 kW @ 105 RPM |
| Auxilliary Boilers: | KANGRIM PB-25 25000 kg/hr 6/16 kg/cm2 |

D 0 2 4 1 2

ANNEX "B" (DETAILS OF CREW) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| | | |
|---|---|---|
| Date of Agreement | : | As mentioned in box 1 |
| Detail of Crew | : | 25 Crew Members in total |
| Contract Duration | : | abt 4 months Senior Officers |
| | | abt 5 -7 months Junior Officers, |
| | | abt 6 months Ratings |

| Numbers | Rank | Nationality |
|---|---|---|
| 1 | Master | Turkish |
| 1 | Chief Officer | Turkish |
| 1 | 2nd Officer | Turkish |
| 1 | 3rd Officer | Turkish |
| 1 | 4th Officer | Turkish |
| 1 | Extra Officer | Turkish |
| | | |
| 1 | Chief Engineer | Turkish |
| 1 | 2nd Engineer | Turkish |
| 1 | 3rd Engineer | Turkish |
| 1 | 4th Engineer | Turkish |
| 1 | Elect. Eng. | Turkish |
| | | |
| 1 | Pumpman | Turkish |
| 5 | Able Seaman | Turkish |
| 2 | Ordinary Seaman | Turkish |
| | | |
| 1 | Fitter | Turkish |
| 3 | Oiler | Turkish |
| 1 | Chief Cook | Turkish |
| 1 | Steward | Turkish |

This complement is for standard trade. In case of Special requirements (STS, Storage etc.) the complement may be adopted accordingly.

D02413

ANNEX "C" (BUDGET) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement                    :         10 FEBRUARY 2015
Manager's Budget for the first year with the effect from the commencement date of this agreement:
Please refer to operating Expense budget with detailed break down of the operating expenses

Estimated budget for 2015 in USD for MT ADVANTAGE ARROW

|  | Budget In USD |
| --- | --- |
|  | Perday |
| Crewing | 4,400 |
| Victualing | 250 |
| Luboil | 500 |
| Technical | 1,000 |
| Insurance and other miscellaneous items | 1,100 |
| G&A - Inclusive of management fees | 1,000 |
| Total | 8,250 |

Remarks:
Crewing is based on complement of 25 crew members with Turkish officers & ratings.
Luboil based on 270 seagoing days and on today's prices.
Technical expenses include all costs for stores , spares services,class for engine and deck department
General include all costs for ; communication,represantations,travelling,vetting,transportation,ISM/ISPS,port expenses.
Excluding dry docking and related costs.

D02414

# EXHIBIT 7

Execution copy

USD64,000,000

## TERM LOAN FACILITY

Dated                                   2015

(1)            The Companies listed in Schedule 1
as Borrowers

(2)            Advantage Tankers LLC
as Guarantor

arranged by

(3)            Norddeutsche Landesbank Girozentrale
as Arranger

with

(4)            The financial institutions listed in Schedule 1
as Lenders

(5)            Norddeutsche Landesbank Girozentrale
as Agent

(6)            Norddeutsche Landesbank Girozentrale
as Security Trustee

(7)            Norddeutsche Landesbank Girozentrale
as Swap Bank

---

## FACILITY AGREEMENT

relating to the financing of

MV "TRUE" (tbr "ADVANTAGE AVENUE") and MV "TARGET" (tbr "ADVANTAGE ARROW")

---

Ince & Co LLP
International House
1 St Katharine's Way
London, E1W 1AY
Tel: +44 20 7481 0010
Fax: +44 20 7481 4968

**"Advance"** means each of the TRUE Advance A, the TRUE Advance B, the TARGET Advance A and the TARGET Advance B being each borrowing (maximum of four (4)) of a proportion of the Total Commitments by the Borrowers or (as the context may require) the outstanding principal amount of such borrowing.

**"Affiliate"** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**"Agent"** includes any person who may be appointed as agent under this Agreement.

**"Annex VI"** means Annex VI (Regulations for the Preventions of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

**"Approved Manager"** means Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (*Manager*).

**"Approved Valuer"** means any of the ship brokers included in the list set out in Schedule 9 or such other independent reputable ship broker in respect of the crude tanker market approved by the Lenders from time to time.

**"Assignment Agreement"** means an agreement substantially in the form set out in Schedule 7 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

**"Auditors"** means any firm approved in advance by the Lenders (such approval not to be unreasonably withheld or delayed).

**"Authorisation"** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

**"Availability Period"** means the period from and including the date of this Agreement to and including

(i) in respect of Loan A the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree;

(b)     the Delivery Date of the second Vessel to be delivered; and

(c)     the date on which the Available Commitments are fully borrowed, cancelled or terminated

and (ii) in respect of Loan B the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree; and

(b)     the date on which the Available Commitments are cancelled or terminated.

**"Available Commitment"** means a Lender's Commitment less (a) the amount of its participation in any outstanding Advance and (b) in relation to any proposed Utilisation, the

| Borrower: | Advantage Arrow Shipping LLC |
|---|---|
| Seller: | Target Shipping Ltd |
| Name: | 115,000 dwt oil tanker, built 2009 at Samsung Heavy Industries South Korea m.v. "TARGET" (tbr "ADVANTAGE ARROW") with IMO No 9419450 |
| Scheduled Delivery Date: | Tba |
| Date and description of MoA: | Memorandum of Agreement made or to be made between the Seller as seller and the Borrower as buyer |
| Contract Price: | USD37,750,000 |
| Vessel Commitment: | USD27,700,000 plus USD3,300,000 |
| Flag State: | Malta, to be reflagged to Marshall Islands |
| Charter description: | Time charter made or to be made between the Borrower and the Charterer for a term of five years commencing on or before the Utilisation Date at the Floor Rate plus any Additional Hire Payments. |
| Charterer: | Shell Western Supply and Trading of Barbados |
| Classification: | 115,000 dwt type crude oil tanker |
| Classification Society: | Det norske Veritas (DNV) |
| Technical Manager: | Genel Denizcilik |
| Commercial Manager: | Genel Denizcilik |
| Management Agreement: | Management Agreement dated made or to be made between the Technical Manager and the Commercial Manager as manager and the Borrower as owner |

# EXHIBIT 8

# GEDEN HOLDINGS LTD.

85 St.John's Street , Valletta . Malta
Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for all single purpose companies which owns one vessel each. The borrowers for the bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd., Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

# EXHIBIT 9



Enterprise Improvement · Corporate Turnaround and Restructuring · Financial Advisory Services · Information Management Services



**AlixPartners**
*When it really matters.*

Chicago  Dallas  Detroit  Düsseldorf  London  Los Angeles  Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo  Washington, DC

# Project Hermitage
# Restructuring

March 6 2013



**EXHIBIT**

tabbies

*F*

www.alixpartners.com

DEKABANK copy, March 6 2013

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1. The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.

2. The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.

3. The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy  March 6 2013

AlixPartners

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising.  Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk.  Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

DEKABANK copy, March 6 2013

AlixPartners

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

DEKABANK copy, March 6 2013

AlixPartners



# Contents

I.   Executive Summary / Remarks from the Company

II.  Background

III. Restructuring Proposal

IV.  Financial Analysis

V.   Conclusions

DEKABANK copy. March 6 2013

AlixPartners



# I. Executive Summary

DEKABANK copy, March 6 2013

AlixPartners

# Executive Summary

▸ The November 20 Proposal provides the basis  for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

▸ The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

▸ In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  – Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  – Constrain cross subsidization between stakeholders related to different underlying assets
  – Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  – Maximize options for stakeholders and potential for self-selection

▸ A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

▸ This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D:  the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

DEKABANK copy, March 6 2013

AlixPartners



## II. Background

DEKABANK copy, March 6 2013

AlixPartners



# Background
## The Market

▸ Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
  – The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
  – The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013

▸ Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
  – 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
  – 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m





Source: Clarkson Research

9

AlixPartners

DRAFT / PRELIMINARY

# Background
## The Company

▸ The Company has actively been managing its portfolio since 2008, mainly via:
  - The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  - The Sale of 12 vessels upon delivery for net proceeds of $136m
  - The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  - The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)

▸ Earnings from vessels financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels have fallen $43m short of obligations in the period 2011-2012.

▸ In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  - Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  - Deferral of some November and December 2012 principal repayments
  - Deferral of 35% of the bareboat hire payments
  - Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue [1]
  - Management of supplier overdue through the quarter

▸ While all stakeholders have reserved their rights, some specific stakeholder actions have affected the cash flows
  - Unicredit has drawn on its deposit accounts
  - Icon issued a lien notice to the charterers and has directly received charter income

▸ With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and c.$7.5m in restricted cash deposits

---

[1] Does not include default interest, margin increases and bank fees

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Company and Fleet Overview

The Company — Recent Events

---

▶ Flash

    1. The Flash ran aground at the end of June and is currently arrested in Tunisia

    2. The customer has invoked damage of goods (wet coal) and has refused to take delivery

    3. 180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m

    4. The claim has been rejected by the Club on the basis that the damage is to cargo

    5. An arbitrator is to be appointed week of Mar 4 2013


▶ Baytur

    1. Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

▶ Royal Refinancing

    1. The Royal was refinanced through a $37.5m facility with Credit Europe

    2. Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal

    3. $10m has been paid to HSH and $10m is outstanding to the yard

---

DEKABANK copy March 6 2013

AlixPartners

# Company and Fleet Overview
Employment, Tanker

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Tankers** | | | | |

| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Jun-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

DEKABANK copy March 6 2013

AlixPartners

# Company and Fleet Overview

Employment, Bulk

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Bulkers** | | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | May-14 | 7 |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | - | - | - | Jan-00 | - |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | Jun-14 | - |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | Mar-13 | - |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | May-13 | 3 |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | | - | - | Jan-00 | - |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | | - | - | Jan-00 | - |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | 7,014 | Apr-13 | 3 |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | 7,267 | May-13 | 3 |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | 6,978 | Jul-13 | 2 |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | Feb-13 | - |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | 5,850 | May-13 | - |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | 7,256 | Apr-13 | 3 |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | 8,422 | Feb-13 | - |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | 7,219 | Apr-13 | 3 |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | 8,422 | Apr-13 | 3 |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | Jan-00 | - |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | 8,265 | Jul-13 | - |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | 11,700 | Apr-13 | 1 |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | 12,255 | Mar-13 | - |

AlixPartners

DER · BANK copy March 3 2013



III. Restructuring Proposal

DEKABANK copy, March 6 2013

AlixPartners



# Restructuring Proposal
## Key Assumptions

‣ Key assumptions under the Plan include
- – All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
- – There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
- – Stakeholders in groups **C and D will have the option to move into A** subject to loan modifications adhering to the conditions prevalent in that entity.
- – Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.

‣ The Company would prefer a coordinated financing approach in Newco

‣ The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here

‣ Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

DEKABANK copy, March 2013

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco A

Newco A Example

▸ **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities

▸ **Assumptions : 1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.



Note: Indicative transaction structure subject to legal due diligence
(1) Equity of $1.1m also as a result of transfer of Namrun at value greater than senior debt
(2) $52.6m financed in excess of market value of assets

AlixPartners

DERABANK copy   March 6 2012

## Plan B – Split of Fleet via Newco: Alpha
### Structuring: Facility #1

▸ **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m).

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan [1] | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #1** | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | | | |
| Aframax | NLB | Target | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| Aframax | Unicredit | Value | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Bravo | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Power | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| Suezmax | CB NLB BrLB | Blue | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| Suezmax | HSH 1 | Hero | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| MR | HSH 2 | Citron | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| MR | HSH 2 | Citrus | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| Handy | DVB NLB SAN | Acor | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| Handy | DVB NLB SAN | Carry | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB SAN | Rova | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cotton | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cargo | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| Handy | DVB NLB | Rock | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handy | DVB NLB | Rocket | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handymax | DVB | Asia | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| Mini Bulker | DVB | Earth | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| Mini Bulker | DVB | Wind | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | **20** | | **99%** | **95%** | **504.7** [1] | **511.0** | **(5.9)** [2] | **25.6** | **31.5** [3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)
[2] Represents sum of shortfall only
[3] Total amount of equity related to sale / purchase of vessels in Facility #1
[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

17

AlixPartners

DEKABANK copy, March 8 2013



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #1

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | 2.4 | 1.6 | 4.0 | 0.0 | 29.5 |

1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%



Note: Indicative transaction structure subject to legal due diligence

18

*AlixPartners*



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #2

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|------------------------------|------------------------------|------------------------------------------|---------------------------------------------------------|-----------------------------------------------------------------------------------|------------------------------------------|-------------------------------|
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the <u>excess cash remains in Oldco (C)</u>. Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%



DEKABANK copy. March 6 2013

# Plan B – Split of Fleet via Newco: Alpha
## Structuring

▶ Facility#2: Lloyds vessels sold and refinancing provided on the same terms
▶ Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
▶ Facility#4: Credit Europe sold and refinancing provided on the same terms
▶ Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
▶ Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #2** | **Lloyds facility rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| **FACILITY #3** | **Natixis facilities rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| **FACILITY #4** | **Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun** | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| **FACILITY #5** | **Deka facility rolled over into Newco but paid only from available cash from these vessels** | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| **FACILITY #6** | **NSF 2nd Lien facilities** | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | n/a | | | | 25.5 |
| **TOTAL Newco Alpha** | | | 29 | 97% | 95% | 799.3 | 795.0 | (5.9) [3] | 58.5 | 64.4 | 44.6 | 784.0 |

MV of Newco Alpha Assets
Total Capital required
New Alpha debt

[1] Royal refinancing includes second lien ; LTV on first lien is 75%
[2] Equity value from the rollover of the Namrun loan an $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
[3] Represents sum of shortfall only

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #3

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |

1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) <u>no new equity is required upon refinancing of Newco with $37.3m in debt</u>



DEKABANK copy, March 5 2013

# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #4



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

> Amount of loan novated is beyond market value at the time of the transaction; no recapitalization



DEKABANK copy. March 6 2013

# Plan B – Split of Fleet via Newco: Alpha
Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---|---|---|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

[1] Does not include additional liquidity for operational cash

DEKABANK copy. March 6 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Beta
Structuring

_____

▸ **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.

▸ **Assumptions :** Loans novated to Newco Beta on existing terms. **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|------|----------|------|-------------|---------------|-----------------------------|-----------------------------|
| Capesize | CCB | Flash | 100% | 100% | 33.1 | 33.0 |
| Capesize | CCB | Proud | 100% | 100% | 33.1 | 33.0 |
| Capesize | CDB | Angel | 119% | 119% | 43.0 | 36.0 |
| Capesize | CDB | Pretty | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

DEKABANK copy. March 6 2013

AlixPartners

# Plan B – Split of Fleet via Newco: Group C
Structuring

▸ **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.

▸ **Assumptions :**  Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Kamsarmax | GB Global | Cash | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | Coll./Chance | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | City | 96% | 96% | 26.0 | 27.0 |
| Handymax | NSF | South | 84% | 84% | 19.3 | 23.0 |
| Handymax | NSF | East | 84% | 84% | 19.3 | 23.0 |
| Handymax | GB Global | West | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Secret | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Sharp | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Capital | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Metropol | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | World | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

AlixPartners

DEKA BANK copy, March 8 20



# Plan B – Split of Fleet: Residual Oldco: Group D
Structuring

- ▶ **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.

- ▶ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan (PV of leases) | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Aframax | FSL | Aqua | 234% | 234% | 60.8 | 26.0 |
| Aframax | FSL | Action | 234% | 234% | 60.8 | 26.0 |
| Aframax | Stealth | Spike | 177% | 177% | 55.0 | 31.0 |
| Aframax | Stealth | Avor | 176% | 176% | 54.5 | 31.0 |
| Suezmax | Icon 1 | Center | 145% | 145% | 67.9 | 47.0 |
| Panamax | Octavian 1 | Enjoy | 141% | 141% | 42.2 | 30.0 |
| Panamax | Octavian 2 | Marka | 128% | 128% | 41.0 | 32.0 |
| Handymax | Icon 2 | Fantastic | 157% | 157% | 29.9 | 19.0 |
| Handymax | Icon 2 | Amazing | 157% | 157% | 29.9 | 19.0 |
| Chartered - Afra_Tanker | not ours | CV Stealth | | | | |
| Chartered - Afra_Tanker | not ours | CS Stealth | | | | |
| **Subtotal SPVs** | | **11** [1] | **169%** | **169%** | **441.9** | **261.0** |
| **Corporate facility** | Bank Asya | | | | 39.5 | |
| **Total Group D** | | | | | **481.4** | |

[1] Baytur sold before the transaction

DEKABANK copy, March 2013

AlixPartners

# Plan B – Summary
Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB SAN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

DEKABANK copy. March 6 2012

AlixPartners

# Plan B – Summary

Bank Exposure: By Bank

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

AlixPartners



IV. Financial Analysis

DEKABANK copy, March 6 2013

29

AlixPartners



# Assumptions
## General

▸ Business plan is based on the following main assumptions:

### Operations

— 20 offhire days for drydocking
— Rates applied to reflect type of vessel, adjusted for contract terms

— Charter-out options exercised if below market rate
— No Opex inflation
— No working capital movements

### Investments

— Dry docking taken from technical management schedule
— No asset sales
— Capex as per financing commitments

— Charter-in come off upon expiry
— Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

### Financing

— No variation in current base rate
— Margins as per specific facilities (following pages)
— Amortization as per specific facilities
— No interest rate swap

— Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
— Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

### Restructuring

— No mechanism for bareboat catch-up
— Bareboat purchase options not exercised

— No restructuring fees
— All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

DEKABANK copy, March 6 2013

AlixPartners

## Assumptions
Rates

---

▸ The Company's market projections  imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

▸ The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%



DEKABANK copy March 6 2013

AlixPartners

# Financial Analysis
Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 15 |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - Lloyds |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - Natixis |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - **Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope** |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - **Dekabank** |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - **NSF 2nd Lien (behind Unicredit)** |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

Summary of Terms: Newco Alpha

▸ The below tables summarises the features of debt on Newco Alpha



Note: surface area represents percentage share of total facility

DEKABANK copy. March 6 2013

34

AlixPartners

# Financial Analysis

## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | **-** | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | **-** | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | **-** | **66.7** | **(12.2)** | **(12.1)** | **(23.0)** | **(25.6)** | **(25.4)** | **(26.0)** | **(26.1)** | **(26.0)** | **(25.9)** |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | **-** | **(64.4)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Net cashflow for period** | **-** | **21.0** | **5.6** | **7.1** | **(2.7)** | **(5.6)** | **(5.5)** | **1.2** | **0.0** | **(1.0)** | **0.1** |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | **-** | **20.8** | **26.4** | **33.5** | **30.7** | **25.1** | **19.6** | **20.8** | **20.8** | **19.9** | **20.0** |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Senior Debt Balance* | - | (754.5) | (754.5) | (750.0) | (745.5) | (730.0) | (711.7) | (693.4) | (674.4) | (655.1) | (635.6) |
| *NSF 2nd lien Balance* | - | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV [3] | | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% |
| Hamburg Jumbo Value (depreciated) [4] | | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

[1] 9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.
[2] Asset purchases net of new financing
[3] Equity cure for 85% covenant in Q4 14 and 80% for Q4 16
[4] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis

Summary of Terms: Newco Beta

▸ The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 8 2013

AlixPartners

# Financial Analysis

## Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | (7.4) | (7.4) | (7.3) | (7.6) | (7.6) | (7.5) | (7.4) | (7.4) | (4.4) | (4.4) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | (0.4) | (0.4) | (0.9) | (1.8) | (3.3) | (3.3) | (2.4) | (2.3) | 0.8 | 0.7 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | (0.4) | (0.8) | (1.7) | (3.5) | (6.8) | (10.2) | (12.6) | (14.8) | (14.1) | (13.3) |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | (161.3) | (155.2) | (149.0) | (142.9) | (136.5) | (130.0) | (123.6) | (117.2) | (110.8) | (107.3) |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1]  Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis
## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| Working capital changes [1] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| | | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | 54.0 | (38.0) | (48.2) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| | | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | [2] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| **Net Investment** | (82.7) | (36.8) | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| | | | | | | | | | | | | |
| **Net cashflow for period** | 6.0 | (45.5) | 8.2 | (8.9) | (7.7) | (6.9) | (7.4) | (7.6) | (0.9) | (1.4) | (26.2) | (0.8) |
| | | | | | | | | | | | | |
| **Cumulative net cash balance** | 41.0 | (4.5) | 3.7 | (5.3) | (12.9) | (19.8) | (27.2) | (34.8) | (35.7) | (37.1) | (63.4) | (64.2) |
| | | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | *(1,109.5)* | *(1,064.2)* | - | - | - | - | - | - | - | - | - | - |
| *Bareboat balance* | *(471.3)* | *(453.4)* | *(433.7)* | *(412.8)* | *(392.0)* | *(371.7)* | *(351.1)* | *(330.3)* | *(309.6)* | *(289.3)* | *(268.8)* | *(250.3)* |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[1]  Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m ooutstanding to Rongsheng is left unpaid
[2]  Purchase obligations on sale leasebacks assumed to generate cash loss  equivalent to deficiency between current outstanding obligation and market value

AlixPartners

DEKABANK copy, March   2013



V. Conclusions

DEKABANK copy, March 6 2013

39

AlixPartners

# Current Proposal
## Strategy and Objectives

▶   The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

DEKABANK copy   March 6 2013

40



# Contents

A.     Facility Description
B.     Financials: Existing
C.     Market Overview

DEKABANK copy, March 6 2013

41

AlixPartners

DRAFT & PRELIMINARY

# Appendix
Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

# Appendix: Transaction Analysis
Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

43

AlixPartners

# Appendix: Transaction Analysis
Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

DEKABANK copy, March 6 2013

AlixPartners



# Assumptions

Revenue





DEKABANK copy March 6 2013

AlixPartners



## Assumptions
Revenue





# Appendix: Additional Financial Analysis

Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **54.4** | **(86.2)** | **(104.0)** | **(102.7)** | **(98.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | **(64.4)** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net cashflow for period** | **26.4** | **(6.8)** | **0.4** | **4.9** | **18.4** |
| | | | | | |
| **Cumulative net cash balance** | **26.4** | **19.6** | **20.0** | **24.9** | **43.3** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | *(754.5)* | *(749.8)* | *(693.2)* | *(616.0)* | *(536.9)* |
| *NSF 2nd lien Balance* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

DEKABANK Copy, March 8 2013

AlixPartners

# Appendix: Additional Financial Analysis

Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **(14.8)** | **(30.0)** | **(23.6)** | **(23.5)** | **(22.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | **-** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net cashflow for period** | **(0.8)** | **(9.4)** | **(3.2)** | **(2.2)** | **0.5** |
| | | | | | |
| **Cumulative net cash balance** | **(0.8)** | **(10.2)** | **(13.3)** | **(15.6)** | **(15.0)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(161.3)* | *(149.0)* | *(123.6)* | *(103.9)* | *(83.8)* |
| *Bareboat balance* | | | | | |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK corp., March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | **(53.0)** | **(82.4)** | **(77.9)** | **(64.0)** | **(49.6)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | **(75.0)** | **-** | **(23.9)** | **(37.2)** | **(24.1)** |
| | | | | | |
| **Net cashflow for period** | **(40.3)** | **(29.5)** | **(29.4)** | **(21.5)** | **(4.2)** |
| | | | | | |
| **Cumulative net cash balance** | **(5.3)** | **(34.8)** | **(64.2)** | **(85.7)** | **(89.9)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(1,109.5)* | *-* | *-* | *-* | *-* |
| *Bareboat balance* | *(471.3)* | *(392.0)* | *(309.6)* | *(231.7)* | *(167.7)* |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013

AlixPartners

# Appendix

Bank Exposure: Hamburg reduced to 90% LTV

▸ Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

DEKABANK copy. March 13

AlixPartners

DRAFT & PRELIMINARY

# Appendix

Potential loss on bareboat purchase obligations

▸   There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

|  | Purchase obligation ($m) | Estimated value today ($m) | Loss on resale | Depreciated value ($m) | Loss on resale | Purchase Ob. Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| TOTAL | 234.5 | 178 | -56.5 | 149.2 | -85.3 | | | |

DEKABANK copy. March 6 2013

AlixPartners

## Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

| Chicago | Dallas | Detroit | Dubai | Düsseldorf | London | Los Angeles | Milan |
|---|---|---|---|---|---|---|---|
| 300 N. LaSalle Street | 2101 Cedar Springs Road | 2000 Town Center | Gate Village 10, Level 03 | Königsallee 59 a | 20 North Audley Street | 515 S. Flower Street | Corso Matteotti 9 |
| Suite 1900 | Suite 1100 | Suite 2400 | P.O. Box 125115 | 40215 Düsseldorf | London W1K 6WE | Suite 3050 | 20121 Milan |
| Chicago, IL  60654 | Dallas, TX 75201 | Southfield, MI 48075 | Dubai Intl Financial Centre | Germany | United Kingdom | Los Angeles, CA  90071 | Italy |
| 312.346.2500 | 214.647.7500 | 248. 358.4420 | Dubai, United Arab Emirates | +49.211.97.55.10.00 | +44.20.7098.7400 | 213.437.7100 | +39.02.360.12000 |
| | | | +971.4.401.9246 | | | | |

| Munich | New York | Paris | San Francisco | Shanghai | Tokyo | Washington, DC |
|---|---|---|---|---|---|---|
| Mauerkircherstr. 1 a | 40 West 57th Street | 49/51 Avenue George V | 4 Embarcadero Center | Suite 6111 | Marunouchi Building 33F | 1602 L Street, NW |
| 81679 Munchen | New York, NY  10019 | 75008 Paris | 31st Floor, Suite 3110 | Plaza 66 Building I | 2-4-1 Marunouchi | Suite 300 |
| Germany | 212.490.2500 | France | San Francisco, CA  94111 | 1266 Nan Jing West Road | Chiyoda-ku | Washington, DC 20036 |
| +49.89.20.30.40.00 | | +33.1.76.74.72.00 | 415.848.0283 | Shanghai, 200040 China | Tokyo 100-6333  Japan | 202.756.9000 |
| | | | | +8621.6171.7555 | +81.3.5533.4800 | |

DEKABANK copy, March 8 2013

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | |
|---|---|
| **PSARA ENERGY, LTD.** : | |
| : | |
| **Plaintiff** : | |
| : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** : | |
| **LTD.; ADVANTAGE ARROW SHIPPING,** : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** : | |
| **A/K/A GEDEN LINES; ADVANTAGE** : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** : | |
| **MEHMET EMIN KARAMEHMET;** : | |
| **GULSUN NAZLI  KARAMEHMET -** : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** : | |
| : | |
| **Defendants** : | |

## ATTORNEY DECLARATION

Pursuant to 28 U.S.C. § 1746, this declaration is executed by George A. Gaitas, counsel for Plaintiff, PSARA ENREGY, LTD., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.  I, George A. Gaitas, declare under the penalty of perjury:

I am a Member of the firm of GAITAS, KENNEDY & CHALOS, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Original Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.; ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET;

1

GULSUN NAZLI KARAMEHMET WILLIAMS; TUGRUL TOKGOZ, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the Defendants in this District.

I have directed attorneys in my firm to check with the office of the Texas Secretary of State, using the Secretary of State's database, to determine whether the Defendants can be located within this District. SPACE SHIPPING LTD.; ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET WILLIAMS; TUGRUL TOKGOZ is not registered with the Texas Secretary of State.  Accordingly, I have determined that, as of April 20, 2018, none of these Defendants are incorporated or registered as foreign corporations pursuant to the laws of Texas, and have neither nominated nor appointed any agent for the service of process within this District.

GEDEN HOLDINGS, LTD. is registered with the Texas Secretary of State[1], but cannot be found within this District. GEDEN HOLDINGS, LTD. is not subject to the jurisdiction of the Eastern District of Texas nor amenable to service of process within the Eastern District of Texas.

I have directed attorneys in my firm to engage a search of the Superpages telephone directory on the internet, and determined that there are no telephone listings or addresses for the Defendants within this District.

---

[1] GEDEN HOLDINGS, LTD. has appointed an agent for service of process located in the Northern District of Texas.

I have directed attorneys in my firm to engage in a Google search as to whether the Defendants can be located within this District.  The Google search results did not provide a listing for the named Defendants.

I am unaware of any general or managing agent(s) of the named Defendants within this District.

In that I have been able to determine that the Defendants have not appointed an agent for service of process within the Eastern District of Texas and that I have found no indication that the Defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief based on the investigation of the attorneys under my direction that the Defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon an investigation performed by attorneys in my firm under my direction that the Defendant cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: April 20, 2018                                      Respectfully submitted,
       Houston, Texas
                                                Gaitas, Kennedy & Chalos, P.C.

                                    By:     _/s/ George A. Gaitas_____
                                            George A. Gaitas
                                            State Bar No. 24058885
                                            Federal Bar No. 705176
                                            6250 Westpark Dr.
                                            Suite 222
                                            Houston, Texas 77057
                                            Telephone: 281-501-1800
                                            Fax: 832-962-8178

3

E-mail:gaitas@gkclaw.com

*Attorneys for Plaintiff*

PSARA ENERGY, LTD.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| **PSARA ENERGY, LTD.** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : |
| **LTD.; ADVANTAGE ARROW SHIPPING,** | : |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : |
| **A/K/A GEDEN LINES; ADVANTAGE** | : |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : |
| **LLC;  FORWARD HOLDINGS, LLC;** | : |
| **MEHMET EMIN KARAMEHMET;** | : |
| **GULSUN NAZLI  KARAMEHMET-** | : |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : |
| | : |
| **Defendants** | : |

**ADMIRALTY**

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Despoina Bacha, declares under the penalty of perjury:

1.    I am an individual of sound mind, and have never been convicted of a crime of moral turpitude.

2.    I am a citizen of Greece and a resident of Athens and a lawful representative of the Plaintiff in the above action and duly authorized on its behalf to make this verification.

3.    I have read the foregoing Verified Complaint and exhibits thereto in the above captioned action and know the contents thereof; and

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed in Athens, Greece this 20th day of  April, 2018.

Despoina Bacha

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a)  PLAINTIFFS**

**DEFENDANTS**

Space Shipping, Ltd.; Geden Holdings, Ltd.; Advantage Arrow Shipping, LLC; Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines; Advantage Tankers, LLC; Advantage Holdings, LLC; Forward Holdings, LLC; Mehmet Emin Karamehmet; Gulsun Nazli Karamehmet Williams; Tugrol Tokgoz

**(b)**  County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**II.  BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
      Plaintiff
- ☐ 3   Federal Question
      *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government
      Defendant
- ☐ 4   Diversity
      *(Indicate Citizenship of Parties in Item III)*

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

**V.  ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1   Original
      Proceeding
- ☐ 2   Removed from
      State Court
- ☐ 3   Remanded from
      Appellate Court
- ☐ 4   Reinstated or
      Reopened
- ☐ 5   Transferred from
      Another District
      *(specify)*
- ☐ 6   Multidistrict
      Litigation

**VI.  CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

**VII.  REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

**VIII.  RELATED CASE(S) IF ANY**

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #

AMOUNT

APPLYING IFP

JUDGE

MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.**  Place an "X" in one of the six boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : | **No. 2:18-cv-4111** |
| **LTD.; ADVANTAGE START SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI  KARAMEHMET -** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

Plaintiff PSARA ENERGY, LTD., by and through undersigned counsel, for its Verified

Complaint against Defendants: SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.;

ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A

GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC;

FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI

KARAMAEHMET - WILLIAMS; and TUĞRUL TOKGÖZ alleges and pleads as follows:

### I. JURISDICTION, VENUE, AND PARTIES

1.     This is an admiralty and maritime claim within the meaning of rule 9(h) of the

Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract,

*i.e.* an executed bareboat charter party for the employment of a seagoing cargo vessel.  This case

also falls under this court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and

is brought under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or

Maritime Claims, and Asset Forfeiture Actions (hereinafter "Supplemental Rule B") and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.     At all times material hereto Plaintiff, PSARA ENERGY, LTD. (hereinafter "PSARA" or "Plaintiff"), was a corporation organized under the laws of the Republic of the Marshall Islands and the registered owner of the Motor Tanker CV STEALTH (hereinafter "CV STEALTH" or "Vessel"), a crude oil tanker vessel registered in Malta.

3.     At all times material hereto Defendant, SPACE SHIPPING, LTD. (hereinafter "SPACE"), was and is a foreign company organized under the laws of Malta and the bareboat charterer of the M/T CV STEALTH under a bareboat charter party contract dated February 23, 2010 ("the bareboat charter"). A copy of the bareboat charter and addenda thereto are attached to this Original Verified Complaint as **EXHIBIT 1**.  Though SPACE is incorporated in Malta, the business of SPACE is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

4.     At all times material hereto GEDEN HOLDINGS, LTD. (hereinafter "GEDEN HOLDINGS"), was and is a foreign company organized under the laws of Malta with its operating office at the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey. Though GEDEN HOLDINGS is incorporated in Malta, its business is actually carried on entirely by GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

5.     At all times material hereto Defendant, ADVANTAGE START SHIPPING, LLC (hereinafter "ADVANTAGE START SHIPPING"), was and is a limited liability company organized under the laws of the Republic of the Marshall Islands, and the registered owner of the

Motor Tanker ADVANTAGE START, a tanker vessel registered in the Marshall Islands, with IMO No. 9466570 and international call sign V7KY9. Though ADVANTAGE START SHIPPING is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

6.      At all times material hereto Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES (hereinafter "GEDEN LINES"), was and is a foreign corporate entity organized under the laws of Turkey with its principal place of business located at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey.

7.      At all times material hereto ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  ADVANTAGE TANKERS, LLC is a holding company that owns 100% of Defendant ADVANTAGE START SHIPPING. Though ADVANTAGE TANKERS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

8.      At all times material hereto ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"), was a foreign limited liability company organized under the Laws of the Marshall Islands.  ADVANTAGE HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE TANKERS. Though ADVANTAGE HOLDINGS is incorporated in the Marshall Islands, its business is carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

9.     At all times material hereto FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  FORWARD HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE HOLDINGS.  Though FORWARD HOLDINGS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

10.     At all times material hereto, MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHMET") is an individual person and a citizen and resident of the Republic of Turkey and, respectively, through a Panamanian corporation that he entirely controls - Buselten Finance, S.A - is the 100% shareholder of GEDEN HOLDINGS and SPACE SHIPPING. Through another Turkish business entity he controls - Cukurova Holdings - he is 100% shareholder of Defendant GEDEN LINES.

11.     At all times material hereto Tuğrul Tokgöz (hereinafter "TOKGÖZ"), is an individual person and a citizen of the Republic of Turkey and a resident of Turkey. TOKGÖZ is the Chief Executive Officer of ADVANTAGE START SHIPPING; ADVANTAGE TANKERS; and a director of GEDEN HOLDINGS and GEDEN LINES and, through the intermediary holding companies FORWARD HOLDINGS and ADVANTAGE HOLDINGS, is 15% controlling shareholder of ADVANTAGE TANKERS.

12.     At all times material hereto, GULSUN NAZLI KARAMEHMET–WILLIAMS (hereinafter "KARAMEHMET WILLIAMS") is an individual person and a dual citizen of the Republic of Turkey and the Swiss Confederation, and a resident of the United Kingdom. KARAMEHMET WILLIAMS is the adult daughter and only child of EMIN KARAMEHMET,

4

and through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, she is the 85% controlling shareholder of ADVANTAGE TANKERS.

13.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, to wit:  the M/T ADVANTAGE START that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules as pled more fully in Section **V** of this Verified Complaint.

## II. THE SUBSTANTIVE CLAIMS

14.     Under the bareboat charter party dated February 23, 2010 and addenda thereto dated:  June 2, 2010; June 21, 2010; and January 29, 2010, Plaintiff chartered its vessel CV STEALTH for a "a term of 5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period" to "Geden Holdings Limited,[1] Malta or nominee always guaranteed by Geden Line."  *See* **EXHIBIT 1**, box 21.  The vessel was delivered to the service of the nominee of GEDEN HOLDINGS, *i.e.* SPACE, and to GEDEN LINES, and was used and operated for profit by them as part of GEDEN LINES' non-owned, chartered-in fleet.

15.     By subsequent addendum to the bareboat charter, GEDEN HOLDINGS became the performance guarantor of SPACE.  *See* **EXHIBIT 1**.  *See also* Addendum dated June 2, 2010, and performance guarantee of GEDEN HOLDINGS, dated March 4, 2010 hereto attached as **EXHIBIT 2.**

16.     Under Part II Clause 10 of the bareboat charter, SPACE was obligated to maintain the vessel in a good state of repair, with all of her class certificates up to date.

---

[1] Geden Holdings Limited (hereinafter "Geden Holdings") was a holding company incorporated in Malta. It held 100% of the shares of SPACE and 100% of the shares of several one-ship-companies as is more specifically pled in this Original Verified Complaint.

17.     Under Part II Clause 15 of the bareboat charter, SPACE was obligated to redeliver the vessel at the end of the bareboat charter party term "…in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted." Moreover, the same clause provides that "…upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed…"

18.     Under Part II Clause 17 of the bareboat charter, SPACE was obligated "to indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the vessel by the Charterers..." and under Rider Clause 9,  SPACE as charterer undertook to indemnify the owners of the vessel "against, all costs charges, expenses, claims proceedings (whether civil or criminal), liabilities, losses, penalties, duties and fees…and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel…and regardless of when the same shall arise."

19.     Pursuant to clause 7 of a Settlement Agreement dated 8 December 2016, and entered into between Plaintiff as Owners, in settlement of interim disputes regarding an outstanding arbitration award in favor of Owners for unpaid charter hire, and Defendant SPACE as Charterers, and GEDEN HOLDINGS as performance guarantors, the hire amount payable under the Charterparty was amended to USD 9,875 per day from 1 January 2017 onwards.

20.      Plaintiff delivered the vessel into the bareboat chartered service and rendered the contractual performance required of it.  However, Defendant SPACE (hereinafter also referred to as "Charterer"), though possessing and using the CV STEALTH, has failed and refused to perform

its obligations under the bareboat charter party contract, and is in breach thereof as is further pled below.

21.     On April 10, 2014, SPACE time chartered the Vessel to ST Shipping & Transport Pte. Ltd. (hereinafter "ST"), a Singapore business entity, for a term of approximately twelve months. ST, operating out of its Stamford, Connecticut branch office, where it is registered as a foreign corporation and carries on business as a cargo ship operator, sub-chartered the vessel on a voyage charter party dated September 4, 2014 to lift a cargo up to 400,000 barrels of Venezuelan crude oil from Puerto La Cruz for discharge at a terminal in the U.S.A.

22.     The Vessel was directed by ST to Puerto la Cruz, Venezuela to load her cargo where after arriving, and tendering her notice of readiness to load, she was boarded by local police and prosecutorial authorities on or about September 13, 2014 and was detained by them on suspicion of attempting to carry a stolen cargo of crude oil.

23.     At Puerto La Cruz, the CV STEALTH was further detained by court order, and at the request of the prosecutorial authorities, for a period exceeding three years, which was beyond the agreed bareboat charter party contractual redelivery date.

24.     Under the terms of the bareboat charter, the latest date for the redelivery of the CV STEALTH to Plaintiff was on June 22, 2015.  However, SPACE, in breach of the bareboat charter, failed to redeliver her to Plaintiff - her lawful owner - and at the same time was failing to pay hire as the bareboat charter requires.

25.     Owners commenced London maritime arbitration to enforce their claims against SPACE for unpaid hires. The arbitration tribunal ruled in favor of Plaintiff, requiring SPACE to

keep paying monthly bareboat charter hire until the Vessel was released and was actually redelivered to Plaintiff.

26.     On October 3, 2017, SPACE claimed the Venezuelan authorities' detention of the CV STEALTH had terminated and gave PSARA notice of its intent to redeliver the Vessel within approximately 30 days. However, the Vessel was incapable of being redelivered as she was out of class with her attending classification society the American Bureau of Shipping. Moreover, the Vessel was so extensively damaged due to SPACE's neglect and lack of maintenance throughout her 3 years long detention that she was incapable of sailing under her own power and was in need of extensive repairs.

27.     Ultimately SPACE arranged to have the vessel towed from Puerto La Cruz, Venezuela to Port of Spain, Trinidad where she was redelivered and taken over by Plaintiff's personnel on or about March 24, 2018, out of class, and in the same heavily damaged condition as she was before she was towed by SPACE to Port of Spain.

### Breach of Charterers' Maintenance/Redelivery Obligations

28.     Pursuant to Clause 10(a) of Part II the bareboat charter, SPACE was under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the charter.  SPACE was also under an obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

29.     Further, pursuant to Clause 15 of Part II of the bareboat charter, SPACE was obliged to:  redeliver the Vessel to Owners "in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted"; with her survey cycles up to date and trading and class certificates valid.  Box 17 of part I of the bareboat charter required the Vessel to have passed her Special Survey dry docking without extensions.

8

30.     In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the bareboat charter, SPACE did not undertake any (or any non-negligible) maintenance on the Vessel, which since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

31.     The work needed in order for the Vessel to be restored to the required redelivery condition; to pass Special Survey; and to have all Class and statutory certificates reinstated, includes the following non-exhaustive list of works:

(i)     complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

(ii)    extensive piping system renewals, overhauling of valves, sensors and gauges;

(iii)   full hull and deck blasting and extensive steel renewals and recoating;

(iv)    extensive renewal of outfitting, supports, ladders;

(v)     extensive steel renewals in cargo and ballast tanks;

(vi)    re-tubing and/or replacement of auxiliary boilers and exhaust gas boilers;

(vii)   overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

(viii)  steam lines and heating coils renewals;

(ix)    deck machinery overhauling and renewal including cranes and their hydraulic systems;

(x)     electrical, electronics and automation system service, repair and renewal;

(xi)    extensive rewiring;

(xii)   bridge navigation and communication equipment service and renewals;

(xiii)  overhauling, repairs and renewal of steering and shafting system;

(xiv)  overhauling, service, repair and renewals of all safety equipment, firefighting systems

and appliances including lifesaving equipment; and

(xv)   fitting of ballast water treatment system.

32.     As a consequence of the extensive damage to the Vessel, it would cost more to tow

her to repair facilities and repair her than her (repaired) market value. Plaintiff, the Owner of the

Vessel, has submitted in London Maritime arbitration a claim for damages in an amount

equivalent to the (repaired) market value of the Vessel, which is USD 18,000,000.00

(EIGHTEEN MILLION U.S. DOLLARS).

### *Unpaid Bareboat Charter Hire*

33.     SPACE has failed to pay outstanding hire that was earned during the month of

February 2018, for which PSARA has obtained an award from the London maritime arbitration

tribunal - that has jurisdiction over the merits of the case - in the amount of USD 276,500. In

addition to this amount, the arbitration tribunal has awarded PSARA Pounds Sterling 4,550.00

(USD 6,515.50)  by way of arbitration costs for this particular reference relating to the February

2018 charter hire, with annual interests on each of the two amounts at the rate of 5%, compounded

quarterly.

34.     SPACE has also failed to pay Plaintiff the charter hire for the month of March 2018

in the amount of USD 233,708.33, which Plaintiff is claiming in the ongoing London maritime

arbitration.

## III. UNDERLYING PROCEEDINGS ON THE MERITS

35.     Box 35 and clause 30(a) of the bareboat charter party (**EXHIBIT 1**) provide for

arbitration of all disputes arising out of the contract in London.

36.     Plaintiff is claiming in London maritime arbitration the amount of USD

18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS) as the repaired value of the vessel; and the unpaid hire for the month of March 2018 in the amount of USD 233,708.33, together with interest and costs.

37.     Plaintiff is also owed charter hire for the month of February 2018 under the London maritime arbitration award together with arbitration costs in the total amount of USD 283,015.50

38.     Plaintiff estimates the legal costs that will be incurred to pursue these claims in London maritime arbitration proceedings will be approximately USD 400,000.00. As it is customary in London arbitration, legal costs, including lawyers' fees, are awarded to the prevailing party.

39.     This action is an ancillary proceeding, brought to obtain jurisdiction over Defendant Charterer and to obtain security for Plaintiff's claims in the London maritime arbitration proceedings.

## IV. IDENTITY OF THE CORPORATE AND INDIVIDUAL DEFENDANTS AND THEIR INTERRELATIONSHIPS

40.     In June of 2015, when SPACE had fallen substantially in arrears in its bareboat charter hire payment obligations, and the contractual redelivery of the Vessel to Plaintiff was approaching, Plaintiff became concerned and made enquiries regarding the status of the CV STEALTH and the other crude oil tanker vessels that were being operated by Defendant GEDEN HOLDINGS.  Plaintiff was astounded to discover the entire "owned" – as opposed to the "chartered-in" fleet - of GEDEN HOLDINGS had been surreptitiously transferred to new owners, as shown in **TABLE I** below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |

| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
|--------|----------------------|-----------------|-------------------------------|
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

41.     Not only had the said vessels been transferred to new corporate owners, but they had been renamed and reflagged from the Maltese shipping register to that of the Marshall Islands.

42.     Investigation into the ship register/ship mortgage record of the Republic of the Marshall Islands revealed that all of the above 11 crude oil tanker vessels which were formerly owned by one-ship-companies, and in turn, 100% controlled by shareholder GEDEN HOLDINGS, had been transferred in approximately the first 5 months of 2015 - without any notice to or the knowledge of Plaintiff - to new one-ship-companies 100% controlled by a new holding company: ADVANTAGE TANKERS, LLC.  ADVANTAGE TANKERS is ultimately 85% controlled by the daughter and only child of Defendant EMIN KARAMEHMET, *i.e.* Defendant KARAMEHMET WILLIAMS and 15% by Defendant TOKGÖZ.  The said ship mortgage records contain a diagrammatic representation of the said new ownership structure which is hereto attached as **EXHIBIT 3**.

A. *SUCCESSOR CORPORATION RELATIONSHIP*

43.    The grouping of the following corporate entities: ADVANTAGE TANKERS; its subsidiary ADVANTAGE START SHIPPING; ADVANTAGE HOLDINGS; FORWARD HOLDINGS; and 10 other one-ship-company entities that are subsidiaries of ADVANTAGE TANKERS[2] (said grouping hereinafter collectively referred to for the sake of brevity as "Advantage-Group") comprise, respectively, successor corporate business entities of the grouping formerly constituted of: GEDEN  HOLDINGS; Blank Shipping, Ltd. GEDEN LINES; SPACE SHIPPING; and 10 other former one-ship-companies[3], as shown in TABLE I (hereinafter collectively referred to, for the sake of brevity, as "Geden-Group").

44.    As particularized in the following paragraphs 45-55, the Advantage-Group corporate entities are successor corporations of the Geden-Group corporate entities in that: a) the former have acquired and are respectively in possession of the trading assets of the latter[4] (hereinafter "the 11 tanker vessels"), as illustrated in the foregoing Table I;  b) they occupy and carry on business from the same business premises, *i.e.* Buyukdere Cad., Yapi  Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey;  c) they transact their business by and through identical personnel as the latter;  d) they share common officers and directors with the latter;  e) they have taken over and are servicing the same customers as were being served by the latter;  f) they have

---

[2]  Foreign limited liability companies: Advantage Solar Shipping, LLC; Advantage Sky Shipping, LLC; Advantage Start Shipping, LLC; Advantage Arrow Shipping, LLC; Advantage Avenue Shipping, LLC; Advantage Award Shipping, LLC; Advantage Atom Shipping, LLC; Advantage Summer Shipping, LLC; Advantage Spring Shipping, LLC; Advantage Sun Shipping, LLC
[3]  Foreign limited liability companies: Profit Shipping, Ltd.; Blue Shipping, Ltd.; Blank Shipping, Ltd.; Target Shipping, Ltd.; True Shipping Ltd.; Value Shipping, Ltd; Bravo Shipping, Ltd; Barbaros Maritime, Ltd; Pink Shipping, Ltd; Reef Shipping Ltd.; Prima Shipping, Ltd.
[4] The said assets are the tankers: PROFIT now renamed ADVANTAGE SOLAR; BLUE now renamed ADVANTAGE SKY; BLANK now renamed ADVANTAGE START; TARGET now renamed ADVANTAGE ARROW; TRUE now renamed ADVANTAGE AVENUE;  VALUE now renamed ADVANATGE AWARD; BRAVO now renamed ADVANTAGE ATOM; POWER now renamed ADVANTAGE ANTHEM; PINK now renamed ADVANTAGE SUMMER; REEF now renamed ADVANTAGE SPRING; ROYAL now renamed ADVANATGE SUN.  For the sake of brevity these vessels will be collectively referred to as "the 11 tanker vessels".

virtually the same financing banks financing their business as the latter;  g) they have assumed numerous of the latter's obligations, including long term charter parties with Shell Western Supply and Trading, Ltd.; h) there is continuity of shareholders, GEDEN HOLDINGS retains ultimate control over the corporate entities of the Advantage-Group that own  the 11 tanker vessels; i) the controlling shareholder of GEDEN HOLDINGS and GEDEN LINES - EMIN KARAMEHMET – continues to maintain a substantial financial interest in the Advantage-Group companies, as GEDEN LINES (which is 100% controlled by him) manages and operates  all of its 11 tanker vessels formerly held by the one-ship-companies of the Geden-Group; j) GEDEN LINES exercises complete control over all of the corporate entities of the Advantage-Group as its administrative, operations, technical, commercial, and safety manager;  k) following the purported sale of the 11 tanker vessels, GEDEN HOLDINGS formally ceased its ordinary business operations, through its subsidiary one ship companies and wound down its remaining business of operating chartered-in tonnage. l) the transfer of the assets of the Geden-Group to the Advantage-Group was the implementation of a deliberate well planned scheme intended to ring fence assets from claims of unsecured non-lending creditors, such as Plaintiff, and frustrate their recourse.

45.     As part of a business reorganization arrangement conceived and implemented by the management of the Geden-Group, in concert with EMIN KARAMEHMET, KARAMEHMET WILLIAMS, and TOKGÖZ, the one-ship-companies of the Geden-Group "sold" the respective vessels each one of them had owned to its homologous Advantage-Group one-ship-company, with these transactions occurring approximately during the first and second quarter of 2015.  The said "sales", were in actual fact part of a "reorganization" and makeover of the ownership structure, whereby newly minted corporate one-ship-companies of the Advantage-Group would take over ownership of the assets with the control, however, remaining with GEDEN HOLDINGS. *See*

"Consent Letter" agreement dated February 6, 2015 between GEDEN HOLDINGS and Shell Western Supply and Trading, Ltd. hereto attached as **EXHIBIT 4** at Bates No. D01248, at ¶ 2 thereof, wherein GEDEN HOLDINGS assures Shell Western Supply and Trading, Ltd that each of the Advantage-Group one-ship-companies would be "wholly owned by the Shareholder", *i.e.* GEDEN HOLDINGS.

46.     Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies, to the respective Advantage-Group one-ship-companies, all of the time charter parties under which the said respective vessels, before and at the time of the transfer, were being employed by Shell Western Supply and Trading, Ltd. continued seamlessly with the Advantage-Group one-ship-companies. This was accomplished under contractual arrangements with Shell Western, worked out by GEDEN HOLDINGS / GEDEN LINES, KARAMEHMET WILLIAMS, and TOKGÖZ, whereby the said charter parties, several of which had significant unexpired terms, were renewed for a 5-year period, at rates and on such other terms as were agreed on behalf of the Advantage-Group one-ship-companies by GEDEN HOLDINGS. *Id.* at D01248 - D01250.

47.     Notwithstanding the purported transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer - Shell Western Supply and Trading, Ltd - that it retained ownership over the Advantage-Group one-ship-companies. *Id*. at Bates No. D01248, at ¶ 2 thereof.  Said representations and warranties regarding the ultimate ownership and control of the Advantage-Group one-ship-companies by GEDEN HOLDINGS were accepted by Shell Western Supply and Trading, Ltd in agreeing to enter into new time charters with the said Advantage-Group one-ship-companies.  *See* relevant extract from

15

the deposition of the General Manager of Shell Western Supply & Trading, Ltd. specifically identifying GEDEN HOLDINGS as the "shareholder" retaining the ultimate control over the Advantage-Group one-ship-companies, hereto attached as **EXHIBIT 5.**

48.     Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, all day-to-day shore-side operations of the 11 tanker vessels continue to be performed by and through GEDEN LINES, including safety management, security management, crewing, victualing, supplying, technical monitoring and supervision, drydocking, repairs, accounting, insuring, and generally every function necessary in order to keep and maintain the said vessels trading as merchant vessels in the same manner and to the same extent that GEDEN LINES had performed before the said transfer of ownership of the 11 tanker vessels. *See e.g*. Ship Management Agreement for the M/T ADVANTAGE START dated February 10, 2015, hereto attached as **EXHIBIT 6** at pp. 2475-2484; *See* also extracts from the Loan Agreement for the ADVANTAGE START dated March 16,  2015 with CIT Finance LLC (hereinafter "CIT") , hereto attached as **EXHIBIT 7** defining "Manager " as Genel Denizcilik Nakliyati A.S. "commercial and technical manager of each vessel under a Management Agreement and as corporate administrator of each borrower and the Guarantor" (at p. 14 of the loan agreement);  and**,** providing for a "Manager's Undertaking" whereby the manager, GENEL DENIZCILIK, is required to continue acting in these capacities throughout the period of the loan.

49.     The operation and management of the 11 tanker vessels of the Advantage-Group is performed by EMIN KARAMEHMET's GEDEN LINES, using the same employees; working out of the same address (Buyukdere Ca., Yapi Kredi Plaza, A Blok K: 12 34330-Levent-Istanbul-Turkey), as before the transfer of the 11 tanker vessels to the Advantage-Group.

50.     Notwithstanding the transfer of ownership of the 11 tanker vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, the majority of the lenders that financed the acquisition of the vessels by the Advantage-Group one-ship companies remained the same, with new rollover-like refinancing arrangements and ship mortgaging arrangements having been negotiated and worked out by GEDEN HOLDINGS / GEDEN LINES executives and directors on behalf of ADVANTAGE TANKERS.  *See* **EXHIBIT 4** at ANNEX I.

51.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, which is controlled by EMIN KARAMAHMET, continues to maintain a substantial financial interest in the 11 tanker vessels enjoying a significant economic benefit as operator and manager of the ADVANTAGE TANKERS fleet of approximately USD 4,015,000.00 annually as compensation for its services.

52.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, in its capacity as the sole operator and manager of the 11 tanker vessels, and thereby its controlling shareholder EMIN KARAMEHMET, exercise complete control over all of the operational, technical, and all other business activities of the 11 one-ship-companies of the Advantage-Group.

53.     GEDEN HOLDINGS, GEDEN LINES, ADVANTAGE TANKERS, and the respective one-ship-companies of the Geden-Group and Advantage-Group have in common key management personnel including: the same Chief Executive Officer, who is also a director of GEDEN HOLDINGS, GEDEN LINES and ADVANTAGE TANKERS; and the same Chief Financial Officer, who is also a director of GEDEN HOLDINGS.

54.     Following the "sale" of the 11 tanker vessels, their respective former one-ship-

company owners ceased to own vessels.

55.    The holding company role of GEDEN HOLDINGS and the one-ship-companies of the Geden-Group, following the transfer of the 11 tanker vessels, was taken over by ADVANTAGE TANKERS and its subsidiary one-ship-companies. ADVANTAGE TANKERS and its subsidiary one-ship-companies thereby have assumed the obligations previously incumbent on GEDEN HOLDINGS and its one-ship-subsidiaries.

56.    By reason of the foregoing facts pled in averments ¶¶ 45-55, ADVANTAGE TANKERS and the one-ship-companies it holds, and GEDEN HOLDINGS and the one-ship-companies and single-vessel chartering companies it holds, have either entered into a *de facto* merger; or ADVANTAGE TANKERS and the one-ship-companies it holds are a mere continuation of the business of GEDEN HOLDINGS.

57.    In the alternative, the transfer of the assets of the Geden-Group to the Advantage-Group in the manner set out in the foregoing averments ¶¶ 45-55 was a transaction entered into by the parties involved to avoid liabilities.

58.    The one-ship companies that formerly owned the 11 tanker vessels were absorbed by the Advantage-Group, as evidenced by the identity of assets, location, management, personnel, and stockholders.

59.    Accordingly, ADVANTAGE TANKERS and the one-ship-companies it holds, including ADVANTAGE START SHIPPING, are liable for Plaintiff's claims respectively as the successor corporations of EMIN KARAMEHMET - controlled GEDEN HOLDINGS, SPACE SHIPPING and BLANK SHIPPING, LTD, and the M/T ADVANTAGE START may be attached as security for Plaintiff's claims.

### B.   *FRAUDULENT TRANSFER ALLEGATIONS*

60.    Plaintiff realleges ¶¶ 1-59 of the above and foregoing Original Verified Complaint and further avers as follows:

61.    In agreeing to bareboat charter its vessel the CV STEALTH to SPACE, a Maltese corporation without any known tangible assets or business performance record, and to accept the performance guarantee of GEDEN HOLDINGS Plaintiff relied on express affirmative representations of fact made on behalf of GEDEN HOLDINGS / GEDEN LINES by their common CEO and director TOKGÖZ.  Specifically, TOKGÖZ represented that GEDEN HOLDINGS was the parent company of the "special purpose companies", *i.e.* the-one-ship companies which at the time owned the 11 tanker vessels.  A Copy of the March 4, 2010 letter of GEDEN HOLDINGS containing such representations in writing is hereto attached as **EXHIBIT 8**.

62.    The performance guarantee of GEDEN HOLDINGS (**EXHIBIT 2**) contemporaneously issued with the March 4, 2010 letter, is a continual guarantee extending over the entire duration of the performance of the charter party, and indeed, for at least 7 years past the delivery of the vessel, and specifically provides in relevant part that that it is given in consideration of Plaintiff's refraining from arresting or otherwise detaining any of the assets of GEDEN HOLDINGS.

63.    Plaintiff relied on the representations made in the March 4, 2010 letter (**EXHIBIT 8**), particularly the representation that GEDEDN HOLDINGS owned and would continue to own through its one-ship-companies the 11 tanker vessels, and thereby agreed to continue chartering the CV STEALTH to SPACE and accept the performance guarantee of GEDEN HOLDINGS.

64.    GEDEN HOLDINGS purports that during the first 5 months of 2015, it divested itself of its entire interest in the 11 tanker vessels and "sold" same to the Defendants comprising

the Advantage-Group through legitimate arm's length transactions. In actual fact, the Defendants implemented a fraudulent restructuring scheme that had been in their planning and contemplation as pled below[5].

65.      During 2012 and 2013 as a result of a faltering tanker market, the high prices it had paid for the construction of the 11 tanker vessels and the acquisition of other tonnage, the Geden-Group experienced severe economic difficulties and pressing demands by various creditors that included attachment of vessels of the group.   In consultation with the group's lending banks, GEDEN LINES commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business.  A report was prepared by AlixPartners, dated March 6, 2013 under the title "Project Hermitage Restructuring".   *See* Report of AlixPartners hereto attached as **EXHIBIT 9**[6]  (hereinafter referred to as "Project Hermitage").

66.      Project Hermitage recommended the replacement of GEDEN HOLDINGS as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support." *See* **EXHIBIT 9** at Bates No. P-001870.   The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of

---

[5]  In a similar manner GEDEN HOLDINGS purportedly "sold" its fleet of product carrier tankers to new buyers while it continued to maintain control over their operation and to profit from trading same under FUTURE HOLDINGS, LTD. a management company controlled by Defendants KARAMEHMET-WILLIAMS and TOKGÖZ.

[6]  The Alix Partners' report specifically states: "This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of <u>GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company")</u> pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). EXHIBIT 10 at Bates No.  P-001832.  As to the factual content of the AlixPartners report it provides in relevant part: "The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company" *Id.* at Bates No. P-001833. *Emphasis added.*

the management of the vessels by GEDEN LINES; the rollover financing of the existing debt to

the financing banks; the retention of the equity of GEDEN HOLDINGS; the transfer of the surplus

of equity in the assets to Newco (**EXHIBIT 9** (flow chart) Bates No. P-001846); and the ring-

fencing of potential sources of disruption (such as arrests and sister-ship arrests).  *Id*. at Bates No.

P-001870.

67.    Even though the recommendations of Project Hermitage were not adopted by

Defendants in their exact proposed form, they were nonetheless substantially adopted and

implemented as evidenced by the following events:  a) GEDEN HOLDINGS / GEDEN LINES,

acting by and through their common chief executive officer and chief financial officer, caused the

incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.*  the "Newco" contemplated

by Project Hermitage[7];  b)  GEDEN HOLDINGS / GEDEN LINES, by and through their common

chief executive officer and chief financial officer, made arrangements for the rollover financing of

the loans of GEDEN HOLDINGS' one-ship-companies with ADVANTAGE TANKERS taking

on the role of corporate guarantor; c) GEDEN HOLDINGS / GEDEN LINES, acting by and

through their common chief executive officer and chief financial officer, caused the one-ship-

companies controlled by GEDEN HOLDINGS to "sell" their vessels to newly minted Marshall

Islands corporate entities that comprise the Advantage-Group shown in the foregoing TABLE I;

d) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive

officer and chief financial officer, arranged for the management of the 11 tanker vessels to continue

being performed by GEDEN LINES under new 5 year contracts; e) by transferring all of the

tangible operating assets of GEDEN HOLDINGS to the ADVANTAGE TANKERS one-ship-

---

[7] At all times material hereto, all  Defendants have the same Chief Executive officer - Tugrul Tokgoz- and the same
Chief Financial Officer -Mehmet Matt - who also hold overlapping roles as directors and /or officers of the respective
corporate Defendants of the one-ship-companies controlled by ADVANTAGE TANKERS.

companies, *i.e.* the 11 tanker vessels, GEDEN HOLDINGS effectively "ringfenced" them, thereby blocking creditors of GEDEN HOLDINGS from seeking recourse against its assets.

68.     Project Hermitage specifically referred to the bareboat charter of the CV STEALTH and other chartered-in tonnage of other owners in the following terms: "Group D, Geden Oldco: 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable." With specific reference to Plaintiff's vessel the CV STEALTH Project Hermitage notes: "not ours". *See* **EXHIBIT 9** at P-001856.

69.      The actions of the Defendants in implementing the recommendations of Project Hermitage in the manner described in the foregoing manifests the design, plan, and intent of the Defendants to deal with their assets in a fraudulent manner to the detriment and prejudice of their creditors, specifically including Plaintiff as noted in ¶ 68 *supra*.

70.     Defendant SPACE SHIPPING, LLC's sole business is to act as the nominee of GEDEN HOLDINGS in the performance of the bareboat charter.  As pled in the foregoing, Plaintiff entered in the bareboat charter relying on the representations and warranties that GEDEN HOLDINGS was the owner of the 11 tanker vessels and several other vessels, and on its performance guarantee.

71.      At all times material hereto and as pled in the foregoing, GEDEN HOLDINGS, through the machinations of its equity holder EMIN KARAMEHMET, "restructured" the ownership of its assets, by arranging their transfer to ADVANTAGE TANKERS, a company 85% controlled by his only child KARAMEHMET WILLIAMS, and 15% by his hand-picked CEO of GEDEN LINES and GEDEN HOLDINGS - TOKGÖZ.  As a result, Plaintiff was left without any of the recourse that it had agreed to forego (*i.e.* the attachment of Geden Holdings' owned vessels)

in consideration for GEDEN HOLDING's performance guarantee.

72.     Notwithstanding the fraudulent restructuring of the ownership of its shipping assets, GEDEN HOLDINGS provided in confidence express assurances to Shell Western Supply & Trading, Ltd. that it remained the controlling shareholder of the same 11 tanker vessels through its complete control of the Advantage-Group one-ship-companies.

73.     Though Defendants KARAMEHMET WILLIAMS and TOKGÖZ have warranted to the lenders of the Advantage-Group that they hold respectively 85% and 15% of the ultimate beneficial interest in ADVANTAGE TANKERS, which, in turn, warrants it controls 100% of the 11 tanker vessels, (See **EXHIBIT 3**), TOKGÖZ, who is the Chief Executive Officer of ADVANTAGE TANKER and a director of GEDEN HOLDINGS, has also warranted to Shell Western Supply & Trading, Ltd. that it is actually GEDEN HOLDINGS controlling the Advantage-Group corporate entities that own the same vessels, even after their purported transfer to the Advantage-Group. Based on the foregoing and the conflicting representations of Defendants, the ownership of the ADVANTAGE START (ex BLANK) was fraudulently transferred to the detriment of unsecured creditors.

74.     Plaintiff invokes the power of this honorable court as a court of admiralty "…to protect its jurisdiction from being thwarted by a fraudulent transfer, [by] …. authorizing an attachment to secure an independent maritime claim." *Swift Co Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 694-695 (1950).

75.     Based on the expressed rationale underlying the transfer of the 11 tanker vessels from GEDEN HOLDINGS to ADVANTAGE TANKERS noted in the foregoing, *i.e.* the "ringfencing" of the assets in order to avoid "arrests";  the close family relationship between EMIN KARAMEHMET and KARAMEHMET WILLIAMS that constitutes the latter an insider of the

former in relation to his status as 100% shareholder of Plaintiff's obligors GEDEN HOLDINGS / GEDEN LINES and SPACE;  the transfer of what was substantially all of the assets of the said obligors of Plaintiff;  the failure of the Defendants to disclose to Plaintiff the impending transfer of the assets from the Geden-Group to the Advantage-Group; the Defendants express intent to fraudulently restructure the ownership of the corporate holding structures for the benefit of the equity holders and to the detriment of unsecured non-lending creditors;  and all of the factual circumstances pled in the foregoing ¶¶ 60-73, there are reasonable grounds and probable cause to believe that the said transfer was intended to hinder, delay, or defraud the creditors of  SPACE and same may and should be set aside as a fraudulent conveyance.

### V. APPLICATION FOR ATTACHMENT UNDER SUPPLEMENTAL ADMIRALTY RULE B

76.     None of the Defendants are or were at the time of the filing of this suit present within the District or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims and under the laws of  Louisiana governing personal jurisdiction. *See* Attorney Declaration of George Gaitas attached hereto as **EXHIBIT 10**. Nevertheless, Defendants have within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of debts, credits, or effects.

77.     More specifically, there is presently, or imminently due to arrive, in the Eastern District of Louisiana, the Motor Tanker ADVANTAGE START, a tanker vessel registered in the Marshall Islands, with IMO No. 9466570  and international call sign V7KY9 , as pled in the foregoing.

78.     Defendants have used and continue to use the purportedly corporate separateness, and incorporated status of their surrogate entities ADVANTAGE START, ADVANTAGE

TANKERS, ADVANTAGE HOLDINGS, and FORWARD HOLDINGS abusively, to wit: to engage in fraudulent corporate restructuring and asset reallocation practices in order to escape their lawful obligation to repair or pay the cost of repairs of the CV STEALTH and also pay bareboat charter hire until the redelivery of the CV STEALTH to Plaintiff - her lawful owner.

79.     Plaintiff has maritime claims against the Defendants arising out of the breach of a maritime contract (*i.e.* – the bareboat charter party of the CV STEALTH dated February 23, 2010, and the performance guarantee dated April 4, 2010).

80.     The amounts of Plaintiff's claims as reasonably as it can be estimated is as follows:

| | | |
|---|---|---:|
| A. | The repaired cost of the CV STEALTH……………….....$ | 18,000,000.00 |
| B. | Unpaid Charter Hire due and owing……………………...$ | 510,208.33 |
| C. | Awarded legal costs………………………………...........$ | 6,515.50 |
| C. | Interest at 6% compounded quarterly for 1 year………...$ | 943,340.00 |
| E. | Recoverable Legal Fees and Costs……………………… $ | 400,000.00 |

**Total Claim………………………………………………………$ 19,860,063.80**

Therefore, Plaintiff's total claim for breach of the maritime contracts against Defendants is in the aggregate sum of **USD 19,860,063.80 (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A.     That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

B.     That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets

expected in this District during the pendency of this action, including, but not limited to the M/T ADVANTAGE START and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.     That judgment be entered against each of the Defendants and each of them in the sum of Nineteen Million Eight Hundred Sixty Thousand Sixty Three Dollars and eighty cents **(USD 19,860,063.80) (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)** together with interest and costs, be applied in satisfaction thereof;

E.     That the Court grant such other and further relief as it deems, just, equitable and proper.

<div align="right">

Respectfully submitted,

GAITAS, KENNEDY & CHALOS, P.C.

</div>

By:     /s/George A. Gaitas
          George A. Gaitas
          Louisiana State Bar No. 05879
          Federal Bar No. 705176
          Sean D. Kennedy
          Louisiana State Bar No. 31809
          Federal Bar No. 1007545
          Jonathan M. Chalos
          Federal Bar No. 3008683
          *Pro Hac Vice forthcoming*
          E-mail:gaitas@gkclaw.com
                    kennedy@gkclaw.com

chalos@gkclaw.com

*Attorneys for Plaintiff*
Psara Energy, Ltd.

# EXHIBIT 1

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon A" and "Barecon B". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

| 1. Shipbroker **Arrow Tankers A/S** **Bredgade 31 B, 4.** **DK-1260 Copenhagen K** **Denmark** | **BIMCO STANDARD BAREBOAT CHARTER** **CODE NAME: "BARECON 2001"**  PART I |
|---|---|
|  | 2. Place and date **Copenhagen, 23rd February 2010** |

| 3. Owners/Place of business (Cl. 1) **Psara Energy Limited** **Ajeltake Road, Ajeltake Island** **Majuro, MH 96960** **Marshall Island** | 4. Bareboat Charterers/Place of business (Cl. 1) **Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed.** |
|---|---|

**5. Vessel's name, call sign and flag (Cl. 1 and 3)**
**Name: m.t. CV STEALTH**
**Flag: Malta**

| 6. Type of Vessel **Crude oil carrier** | 7. GT/NT **58,418 / 31,117** |
|---|---|

| 8. When/Where built **2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | 9. Total DWT (abt.) in metric tons on summer freeboard **104,499** |
|---|---|

| 10. Classification Society (Cl. 3) **ABS** | 11. Date of last special survey by the Vessel's classification society **N/A** |
|---|---|

12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)
**Attached Vessel's Q88. Vessel to be redeliverd with SS passed**

| 13. Port or Place of delivery (Cl. 3) **WW DLOSP at one safe port / safe anchorage ATDNSHINC** **Vessel to be delivered with SS passed** | 14. Time for delivery (Cl. 4) **15th April 2010, 00:01 hrs lt** | 15. Cancelling date (Cl. 5) **30th August 2010, 23:59 hrs lt** |
|---|---|---|

| 16. Port or Place of redelivery (Cl. 15) **DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) **SS/DD passed without extensions** |
|---|---|

| 18. Running days' notice if other than stated in Cl. 4 **See Rider Clause 15.** | 19. Frequency of dry-docking (Cl. 10(g)) **As required by class without extensions** |
|---|---|

20. Trading limits (Cl. 6)
**Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.**

**The vessel not to trade in ice, break ice nor follow ice breakers in ice.**

| 21. Charter period (Cl. 2) **5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | 22. Charter hire (Cl. 11) **USD 9,750 gross pdpr the first 365 days after delivery** **USD 10,750 gross pdpr for the 2nd charter year** **USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year** **USD 10,750 gross pdpr for 4th charter year** **USD 10,750 gross pdpr for 5th charter year** **USD 13,250 for the optional period** |
|---|---|

23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))
**10%**

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

## "BARECON 2001" STANDARD BAREBOAT CHARTER

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to <u>PART IV</u><br><br>**As per Clause 10 F** | 25. Currency and method of payment (<u>Cl. 11</u>)<br><br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (<u>Cl. 11</u>)<br><br>**TBA** | 27. Bank guarantee/bond (sum and place) (<u>Cl. 24</u>) (optional)<br><br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether <u>12(a)</u> or <u>(b)</u> applies; if <u>12(b)</u> applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (<u>Cl. 12</u>) | 29. Insurance (hull and machinery and war risks) (state value acc. to <u>Cl. 13(f)</u> or, if applicable, acc. to <u>Cl. 14(k)</u>) (also state if <u>Cl. 14</u> applies)<br><br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in <u>Cl. 3</u>)<br><br>**N/A** | 33. Brokerage commission and to whom payable (<u>Cl. 27</u>)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (<u>Cl. 28</u>)<br><br>**Seven (7) working days** | 35. Dispute Resolution (state <u>30(a)</u>, <u>30(b)</u> or <u>30(c)</u>; if <u>30(c)</u> agreed Place of Arbitration <u>must</u> be stated (<u>Cl. 30</u>)<br><br>**30a** |
| 36. War cancellation (indicate countries agreed) (<u>Cl. 26(f)</u>)<br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether <u>PART III</u> applies) (optional)<br><br>**N/A** | 38. Name and place of Builders (only to be filled in if <u>PART III</u> applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if <u>PART III</u> applies)<br><br>**N/A** | 40. Date of Building Contract (only to be filled in if <u>PART III</u> applies)<br><br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to <u>Cl. 1</u>)<br><br>a) **N/A**<br><br>b) **N/A**<br><br>c) **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether <u>PART IV</u> applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether <u>PART V</u> applies) (optional)<br><br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if <u>PART V</u> applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if <u>PART V</u> applies)<br><br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include <u>PART I</u> and <u>PART II</u>. In the event of a conflict of conditions, the provisions of <u>PART I</u> shall prevail over those of <u>PART II</u> to the extent of such conflict but no further. It is further mutually agreed that <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> shall only apply and only form part of this Charter if expressly agreed and stated in <u>Boxes 37</u>, <u>42</u> and <u>43</u>. If <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | T. LAYL BKGA |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

## 2nd original
PART I

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| **1. Definitions** | 1 |
| In this Charter, the following terms shall have the | 2 |
| meanings hereby assigned to them: | 3 |
| *"The Owners"* shall mean the party identified in <u>Box 3</u>; | 4 |
| *"The Charterers"* shall mean the party identified in <u>Box 4</u>; | 5 |
| *"The Vessel"* shall mean the vessel named in <u>Box 5</u> and | 6 |
| with particulars as stated in <u>Boxes 6</u> to <u>12</u>. | 7 |
| *"Financial Instrument"* means the mortgage, deed of | 8 |
| covenant or other such financial security instrument as | 9 |
| annexed to this Charter and stated in <u>Box 28</u>. | 10 |

| | |
|---|---|
| **2. Charter Period** | 11 |
| In consideration of the hire detailed in <u>Box 22</u>, | 12 |
| the Owners have agreed to let and the Charterers have | 13 |
| agreed to hire the Vessel for the period stated in <u>Box 21</u> | 14 |
| ("The Charter Period"). | 15 |

| | |
|---|---|
| **3. Delivery** | 16 |
| *(not applicable when Part III applies, as indicated in <u>Box 37</u>)* | 17 |
| **(a)** The Owners shall before and at the time of delivery | 18 |
| exercise due diligence to make the Vessel seaworthy | 19 |
| And in every respect ready in hull, machinery and | 20 |
| equipment for service under this Charter. | 21 |
| The Vessel shall be delivered by the Owners and taken | 22 |
| over by the Charterers at the port or place indicated in | 23 |
| <u>Box 13</u> in such ready safe berth as the Charterers may | 24 |
| direct. | 25 |
| **(b)** The Vessel shall be properly documented on | 26 |
| delivery in accordance with the laws of the flag State | 27 |
| indicated in <u>Box 5</u> and the requirements of the | 28 |
| classification society stated in <u>Box 10</u>. The Vessel upon | 29 |
| delivery shall have her survey cycles up to date and | 30 |
| trading and class certificates valid for at least the number | 31 |
| of months agreed in <u>Box 12</u>. | 32 |
| **(c)** The delivery of the Vessel by the Owners and the | 33 |
| taking over of the Vessel by the Charterers shall | 34 |
| constitute a full performance by the Owners of all the | 35 |
| Owners' obligations under this <u>Clause 3</u>, and thereafter | 36 |
| the Charterers shall not be entitled to make or assert | 37 |
| any claim against the Owners on account of any | 38 |
| conditions, representations or warranties expressed or | 39 |
| implied with respect to the Vessel but the Owners shall | 40 |
| be liable for the cost of but not the time for repairs or | 41 |
| renewals occasioned by latent defects in the Vessel, | 42 |
| her machinery or appurtenances, existing at the time of | 43 |
| delivery under this Charter, provided such defects have | 44 |
| manifested themselves within twelve (12) months after | 45 |
| delivery unless otherwise provided in <u>Box 32</u>. | 46 |

| | |
|---|---|
| **4. Time for Delivery** | 47 |
| *(not applicable when Part III applies, as indicated in <u>Box 37</u>)* | 48 |
| The Vessel shall not be delivered before the date | 49 |
| indicated in <u>Box 14</u> without the Charterers' consent and | 50 |
| the Owners shall exercise due diligence to deliver the | 51 |
| Vessel not later than the date indicated in <u>Box 15</u> as per | 52 |
| Box 18. | 53 |
| ~~Unless otherwise agreed in Box 18, the Owners shall~~ | 53 |
| ~~give the Charterers not less than thirty (30) running days'~~ | 54 |
| ~~preliminary and not less than fourteen (14) running days'~~ | 55 |
| ~~definite notice of the date on which the Vessel is~~ | 56 |
| ~~expected to be ready for delivery.~~ | 57 |
| The Owners shall keep the Charterers closely advised | 58 |
| of possible changes in the Vessel's position. | 59 |

| | |
|---|---|
| **5. Cancelling** | 60 |
| *(not applicable when Part III applies, as indicated in <u>Box 37</u>)* | 61 |
| **(a)** Should the Vessel not be delivered latest by the | 62 |
| cancelling date indicated in <u>Box 15</u>, the Charterers shall | 63 |
| have the option of cancelling this Charter by giving the | 64 |
| Owners notice of cancellation within thirty-six (36) | 65 |
| running hours after the cancelling date stated in Box | 66 |
| 15, failing which this Charter shall remain in full force | 67 |
| and effect. | 68 |
| **(b)** If it appears that the Vessel will be delayed beyond | 69 |
| the cancelling date, the Owners may, as soon as they | 70 |
| are in a position to state with reasonable certainty the | 71 |

| | |
|---|---|
| day on which the Vessel should be ready, give notice | 72 |
| thereof to the Charterers asking whether they will | 73 |
| exercise their option of cancelling, and the option must | 74 |
| then be declared within one hundred and sixty-eight | 75 |
| (168) running hours of the receipt by the Charterers of | 76 |
| such notice or within thirty-six (36) running hours after | 77 |
| the cancelling date, whichever is the earlier. If the | 78 |
| Charterers do not then exercise their option of cancelling, | 79 |
| the seventh day after the readiness date stated in the | 80 |
| Owners' notice shall be substituted for the cancelling | 81 |
| date indicated in <u>Box 15</u> for the purpose of this <u>Clause 5</u>. | 82 |
| **(c)** Cancellation under this <u>Clause 5</u> shall be without | 83 |
| prejudice to any claim the Charterers may otherwise | 84 |
| have on the Owners under this Charter. | 85 |

| | |
|---|---|
| **6. Trading Restrictions** | 86 |
| The Vessel shall be employed in lawful trades for the | 87 |
| carriage of suitable lawful merchandise within the trading | 88 |
| limits indicated in <u>Box 20</u>. | 89 |
| The Charterers undertake not to employ the Vessel or | 90 |
| suffer the Vessel to be employed otherwise than in | 91 |
| conformity with the terms of the contracts of insurance | 92 |
| (including any warranties expressed or implied therein) | 93 |
| without first obtaining the consent of the insurers to such | 94 |
| employment and complying with such requirements as | 95 |
| to extra premium or otherwise as the insurers may | 96 |
| prescribe. **When required by Owner, the Charterers** | 97 |
| **shall keep the Owners and Mortgages advised on** | |
| **intended employment of Vessel.** | |
| The Charterers also undertake not to employ the Vessel | 98 |
| or suffer her employment in any trade or business which | 99 |
| is forbidden by the law of any country to which the Vessel | 100 |
| may sail or is otherwise illicit or in carrying illicit or | 101 |
| prohibited goods or in any manner whatsoever which | 102 |
| may render her liable to condemnation, destruction, | 103 |
| seizure or confiscation. | 104 |
| Notwithstanding any other provisions contained in this | 105 |
| Charter it is agreed that nuclear fuels or radioactive | 106 |
| products or waste are specifically excluded from the | 107 |
| cargo permitted to be loaded or carried under this | 108 |
| Charter. This exclusion does not apply to radio-isotopes | 109 |
| used or intended to be used for any industrial, | 110 |
| commercial, agricultural, medical or scientific purposes | 111 |
| provided the Owners' prior approval has been obtained | 112 |
| to loading thereof. | 113 |

| | |
|---|---|
| **7. Surveys on Delivery and Redelivery** | 114 |
| *(not applicable when Part III applies, as indicated in <u>Box 37</u>)* | 115 |
| The Owners and Charterers shall each appoint | 116 |
| surveyors for the purpose of determining and agreeing | 117 |
| in writing the condition of the Vessel at the time of | 118 |
| delivery and redelivery hereunder. The Owners shall | 119 |
| bear all expenses of the On-hire Survey including loss | 120 |
| of time, if any, and the Charterers shall bear all expenses | 121 |
| of the Off-hire Survey including loss of time, if any, at | 122 |
| the daily equivalent to the rate of hire or pro rata thereof. | 123 |

| | |
|---|---|
| **8. Inspection** | 124 |
| The Owners shall have the right at any time after giving | 125 |
| reasonable notice to the Charterers to inspect or survey | 126 |
| the Vessel or instruct a duly authorised surveyor to carry | 127 |
| out such survey on their behalf:- **provided it does not** | 128 |
| **interfere with the operation of the Vessel a/o crew,** | |
| **but not to be unreasonably withheld.** | |
| **(a)** to ascertain the condition of the Vessel and satisfy | 129 |
| themselves that the Vessel is being properly repaired | 130 |
| and maintained. The costs and fees for such inspection | 131 |
| or survey shall be paid by the Owners unless the Vessel | 132 |
| is found to require repairs or maintenance in order to | 133 |
| achieve the condition so provided; | 134 |
| **(b)** in dry-dock if the Charterers have not dry-docked | 135 |
| Her in accordance with <u>Clause 10(g)</u>. The costs and fees | 136 |
| for such inspection or survey shall be paid by the | 137 |
| Charterers; and | 138 |
| **(c)** for any other commercial reason they consider | 139 |
| necessary (provided it does not unduly interfere with | 140 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.   Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.   Maintenance and Operation** 168
(a)(i)Maintenance and Repairs – During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice, and except as 177
provided for in Clause 14(l), if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. If 182
necessary as deemed by class, the Charterers to
take immediate steps to have the necessary
repairs done within a reasonable time (prior to or
upon SS-drydocking) failing which the Owners
shall have the right of withdrawing the Vessel
from the service of the Charterers and without
prejudice to any claim the Owners may
otherwise have against the Charterers under this
Charter.

(ii)   New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in Box 23, or if 189
Box 23 is left blank, 5 per cent. of the Vessel's 190
insurance value as stated in Box 29, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in Clause 30. 200

(iii)   Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204

or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
(b)   Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel  during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
(c)   The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
(d)   Flag and Name of Vessel – Charterers have the 238
right to reflag the ship and install and display their
funnel insignia and fly their own house flag, but name
cannot be changed. During the Charter
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period.  Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
(e)   Changes to the Vessel – Subject to Clause 10(a)(ii), 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
(f)   Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| Charterers shall assume the obligations and liabilities | 277 |
| of the Owners under any lease contracts in connection | 278 |
| therewith and shall reimburse the Owners for all | 279 |
| expenses incurred in connection therewith, also for any | 280 |
| new equipment required in order to comply with radio | 281 |
| regulations. | 282 |

**(g)**  Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
required by the Classification Society or flag State. 289

**11.  Hire** 290
**(a)**   The Charterers shall pay  hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
**(b)**   Payment of hire shall be made as per daily hire 294
in Box 22 basis per calender month in advance. First
hire payable prorata upto end of the month starting
from vessel's actual delivery date/time. The Charterers
shall pay to the Owners for the hire
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
**(c)**   Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
**(d)**   Final payment of hire, if for a period of less than 304
thirty (30) running days a month, shall be calculated 305
proportionally
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
**(e)**   Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first.  Any hire paid 314
in advance to be adjusted accordingly. 315
**(f)**   Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
**(g)**   Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

**12.  Mortgage** 328
(only to apply if Box 28 has been appropriately filled in) 329
*) **(a)**   The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
*) **(b)**   The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344

themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*) (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

**13.  Insurance and Repairs** 357
**(a)**   During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
**(b)**   If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
**(c)**   The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
**(d)**   Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
**(e)**   The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| be required to enable the Charterers to abandon the | 419 |
| Vessel to insurers and claim a constructive total loss. | 420 |
| **(f)**   For the purpose of insurance coverage against hull | 421 |
| and machinery and war risks under the provisions of | 422 |
| sub-clause 13(a), the value of the Vessel is the sum | 423 |
| indicated in Box 29. | 424 |

**14.   Insurance, Repairs and Classification** 425
*(Optional, only to apply if expressly agreed and stated* 426
*in Box 29, in which event Clause 13 shall be considered* 427
*deleted).* 428
~~**(a)**   During the Charter Period the Vessel shall be kept~~ 429
~~insured by the Owners at their expense against hull and~~ 430
~~machinery and war risks under the form of policy or~~ 431
~~policies attached hereto. The Owners and/or insurers~~ 432
~~shall not have any right of recovery or subrogation~~ 433
~~against the Charterers on account of loss of or any~~ 434
~~damage to the Vessel or her machinery or appurt-~~ 435
~~enances covered by such insurance, or on account of~~ 436
~~payments made to discharge claims against or liabilities~~ 437
~~of the Vessel or the Owners covered by such insurance.~~ 438
~~Insurance policies shall cover the Owners and the~~ 439
~~Charterers according to their respective interests.~~ 440
~~**(b)**   During the Charter Period the Vessel shall be kept~~ 441
~~insured by the Charterers at their expense against~~ 442
~~Protection and Indemnity risks (and any risks against~~ 443
~~which it is compulsory to insure for the operation of the~~ 444
~~Vessel, including maintaining financial security in~~ 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ 446
~~the Owners shall in writing approve which approval shall~~ 447
~~not be unreasonably withheld.~~ 448
~~**(c)**   In the event that any act or negligence of the~~ 449
~~Charterers shall vitiate any of the insurance herein~~ 450
~~provided, the Charterers shall pay to the Owners all~~ 451
~~losses and indemnify the Owners against all claims and~~ 452
~~demands which would otherwise have been covered by~~ 453
~~such insurance.~~ 454
~~**(d)**   The Charterers shall, subject to the approval of the~~ 455
~~Owners or Owners' Underwriters, effect all insured~~ 456
~~repairs, and the Charterers shall undertake settlement~~ 457
~~of all miscellaneous expenses in connection with such~~ 458
~~repairs as well as all insured charges, expenses and~~ 459
~~liabilities, to the extent of coverage under the insurances~~ 460
~~provided for under the provisions of sub-clause 14(a).~~ 461
~~The Charterers to be secured reimbursement through~~ 462
~~the Owners' Underwriters for such expenditures upon~~ 463
~~presentation of accounts.~~ 464
~~**(e)**   The Charterer to remain responsible for and to~~ 465
~~effect repairs and settlement of costs and expenses~~ 466
~~incurred thereby in respect of all other repairs not~~ 467
~~covered by the insurances and/or not exceeding any~~ 468
~~possible franchise(s) or deductibles provided for in the~~ 469
~~insurances.~~ 470
~~**(f)**   All time used for repairs under the provisions of~~ 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ 472
~~defects according to Clause 3 above, including any~~ 473
~~deviation, shall be for the Charterers' account and shall~~ 474
~~form part of the Charter Period.~~ 475
~~The Owners shall not be responsible for any expenses~~ 476
~~as are incident to the use and operation of the Vessel~~ 477
~~for such time as may be required to make such repairs.~~ 478
~~**(g)**   If the conditions of the above insurances permit~~ 479
~~additional insurance to be placed by the parties such~~ 480
~~cover shall be limited to the amount for each party set~~ 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ 482
~~the Charterers as the case may be shall immediately~~ 483
~~furnish the other party with particulars of any additional~~ 484
~~insurance effected, including copies of any cover notes~~ 485
~~or policies and the written consent of the insurers of~~ 486
~~any such required insurance in any case where the~~ 487
~~consent of such insurers is necessary.~~ 488
~~**(h)**   Should the Vessel become an actual, constructive,~~ 489
~~compromised or agreed total loss under the insurances~~ 490
~~required under sub-clause 14(a), all insurance payments~~ 491
~~for such loss shall be paid to the Owners, who shall~~ 492

~~distribute the moneys between themselves and the~~ 493
~~Charterers according to their respective interests.~~ 494
~~**(i)**   If the Vessel becomes an actual, constructive,~~ 495
~~compromised or agreed total loss under the insurances~~ 496
~~arranged by the Owners in accordance with sub-clause~~ 497
~~14(a), this Charter shall terminate as of the date of such~~ 498
~~loss.~~ 499
~~**(j)**   The Charterers shall upon the request of the~~ 500
~~Owners, promptly execute such documents as may be~~ 501
~~required to enable the Owners to abandon the Vessel~~ 502
~~to the insurers and claim a constructive total loss.~~ 503
~~**(k)**   For the purpose of insurance coverage against hull~~ 504
~~and machinery and war risks under the provisions of~~ 505
~~sub-clause 14(a), the value of the Vessel is the sum~~ 506
~~indicated in Box 29.~~ 507
~~**(l)**   Notwithstanding anything contained in sub-clause~~ 508
~~10(a), it is agreed that under the provisions of Clause~~ 509
~~14, if applicable, the Owners shall keep the Vessel's~~ 510
~~Class fully up to date with the Classification Society~~ 511
~~indicated in Box 10 and maintain all other necessary~~ 512
~~certificates in force at all times.~~ 513

**15.   Redelivery** 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Charterers ~~Owners~~ may 518
direct. The 519
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than 5/3/2/1 ~~fourteen (14)~~ running days' 522
definite 522
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

**16.   Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

**17.   Indemnity** 560
**(a)**   The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply, BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

by the Charterers, and against any lien of whatsoever | 564
nature arising out of an event occurring during the | 565
Charter Period.  If the Vessel be arrested or otherwise | 566
detained by reason of claims or liens arising out of her | 567
operation hereunder by the Charterers, the Charterers | 568
shall at their own expense take all reasonable steps to | 569
secure that within a reasonable time the Vessel is | 570
released, including the provision of bail. | 571
Without prejudice to the generality of the foregoing, the | 572
Charterers agree to indemnify the Owners against all | 573
consequences or liabilities arising from the Master, | 574
officers or agents signing Bills of Lading or other | 575
documents. | 576
**(b)**  If the Vessel be arrested or otherwise detained by | 577
reason of a claim or claims against the Owners, **by the** | 578
**mortgage holder** the | 
Owners shall at their own expense take all reasonable | 579
steps to secure that within a reasonable time the Vessel | 580
is released, including the provision of bail. | 581
In such circumstances the Owners shall indemnify the | 582
Charterers against any loss, damage or expense | 583
incurred by the Charterers (including hire paid under | 584
this Charter) as a direct consequence of such arrest or | 585
detention. | 586

**18.  Lien** | 587
The Owners to have a lien upon all cargoes, sub-hires | 588
and sub-freights belonging or due to the Charterers or | 589
any sub-charterers and any Bill of Lading freight for all | 590
claims under this Charter, and the Charterers to have a | 591
lien on the Vessel for all moneys paid in advance and | 592
not earned. | 593

**19.  Salvage** | 594
All salvage and towage performed by the Vessel shall | 595
be for the Charterers' benefit and the cost of repairing | 596
damage occasioned thereby shall be borne by the | 597
Charterers. | 598

**20.  Wreck Removal** | 599
In the event of the Vessel becoming a wreck or | 600
obstruction to navigation the Charterers shall indemnify | 601
the Owners against any sums whatsoever which the | 602
Owners shall become liable to pay and shall pay in | 603
consequence of the Vessel becoming a wreck or | 604
obstruction to navigation. | 605

**21.  General Average** | 606
The Owners shall not contribute to General Average. | 607

**22.  Assignment, Sub-Charter and Sale** | 608
**(a)**  The Charterers shall not assign this Charter nor | 609
sub-charter the Vessel on a bareboat basis except with | 610
the prior consent in writing of the Owners, which shall | 611
not be unreasonably withheld, and subject to such terms | 612
and conditions as the Owners shall approve. | 613
**(b)**  The Owners shall not sell the Vessel during the | 614
currency of this Charter except with the prior written | 615
consent of the Charterers, which shall not be unreason- | 616
ably withheld, and subject to the buyer accepting an | 617
assignment of this Charter. | 618

**23.  Contracts of Carriage** | 619
*)  **(a)**  The Charterers are to procure that all documents | 620
issued during the Charter Period evidencing the terms | 621
and conditions agreed in respect of carriage of goods | 622
shall contain a paramount clause incorporating any | 623
legislation relating to carrier's liability for cargo | 624
compulsorily applicable in the trade; if no such legislation | 625
exists, the documents shall incorporate the Hague-Visby | 626
Rules. The documents shall also contain the New Jason | 627
Clause and the Both-to-Blame Collision Clause. | 628
*)  (b)  The Charterers are to procure that all passenger | 629
tickets issued during the Charter Period for the carriage | 630
of passengers and their luggage under this Charter shall | 631
contain a paramount clause incorporating any legislation | 632
relating to carrier's liability for passengers and their | 633
luggage compulsorily applicable in the trade; if no such | 634
legislation exists, the passenger tickets shall incorporate | 635
the Athens Convention Relating to the Carriage of | 636
Passengers and their Luggage by Sea, 1974, and any | 637
protocol thereto. | 638
*)  *Delete as applicable.* | 639

**24.  Bank Guarantee** | 640
*(Optional, only to apply if Box 27 filled in)* | 641
The Charterers undertake to furnish, before delivery of | 642
the Vessel, a first class bank guarantee or bond in the | 643
sum and at the place as indicated in Box 27 as guarantee | 644
for full performance of their obligations under this | 645
Charter. **Corporate Guarantee to be attached to the** | 646
**BBCHP.** | 

**25.  Requisition/Acquisition** | 647
**(a)**  In the event of the Requisition for Hire of the Vessel | 648
by any governmental or other competent authority | 649
(hereinafter referred to as "Requisition for Hire") | 650
irrespective of the date during the Charter Period when | 651
"Requisition for Hire" may occur and irrespective of the | 652
length thereof and whether or not it be for an indefinite | 653
or a limited period of time, and irrespective of whether it | 654
may or will remain in force for the remainder of the | 655
Charter Period, this Charter shall not be deemed thereby | 656
or thereupon to be frustrated or otherwise terminated | 657
and the Charterers shall continue to pay the stipulated | 658
hire in the manner provided by this Charter until the time | 659
when the Charter would have terminated pursuant to | 660
any of the provisions hereof always provided however | 661
that in the event of "Requisition for Hire" any Requisition | 662
Hire or compensation received or receivable by the | 663
Owners shall be payable to the Charterers during the | 664
remainder of the Charter Period or the period of the | 665
"Requisition for Hire" whichever be the shorter. | 666
**(b)**  In the event of the Owners being deprived of their | 667
ownership in the Vessel by any Compulsory Acquisition | 668
of the Vessel or requisition for title by any governmental | 669
or other competent authority (hereinafter referred to as | 670
"Compulsory Acquisition"), then, irrespective of the date | 671
during the Charter Period when "Compulsory Acqui- | 672
sition" may occur, this Charter shall be deemed | 673
terminated as of the date of such "Compulsory | 674
Acquisition". In such event Charter Hire to be considered | 675
as earned and to be paid up to the date and time of | 676
such "Compulsory Acquisition". | 677

**26.  War** | 678
**(a)**  For the purpose of this Clause, the words "War | 679
Risks" shall include any war (whether actual or | 680
threatened), act of war, civil war, hostilities, revolution, | 681
rebellion, civil commotion, warlike operations, the laying | 682
of mines (whether actual or reported), acts of piracy, | 683
acts of terrorists, acts of hostility or malicious damage, | 684
blockades (whether imposed against all vessels or | 685
imposed selectively against vessels of certain flags or | 686
ownership, or against certain cargoes or crews or | 687
otherwise howsoever), by any person, body, terrorist or | 688
political group, or the Government of any state | 689
whatsoever, which may be dangerous or are likely to be | 690
or to become dangerous to the Vessel, her cargo, crew | 691
or other persons on board the Vessel. | 692
**(b)**  The Charterers shall be at liberty to trade the | 693
Vessel in War Risk Areas and any applicable
additional premium shall be for the Charterers'
account, but with full indemnity to Owners in regards
to ransoms/accidents/deaths or loss of cargo,
Charterers to show evidence of extra premia being
paid. The Vessel, unless the written consent of the | 
Owners be first obtained, shall not continue to or go | 694
through any port, place, area or zone (whether of land | 695
or sea), or any waterway or canal, where it reasonably | 696
appears that the Vessel, her cargo, crew or other | 697
persons on board the Vessel, in the reasonable | 698
judgement of the Owners, may be, or are likely to be, | 699

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous; or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704
**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712
~~(d)   If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721
**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; ~~France;~~ and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27.   Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. ~~If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~the actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable therefor shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773

~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

**28.   Termination** 778
**(a)   Charterers' Default** 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11.  However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
**(ii)** the Charterers fail to comply with the requirements of: 800
**(1)** Clause 6 (Trading Restrictions) 801
**(2)** Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)   Owners' Default** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)   Loss of Vessel** 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss.  For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
~~(d)   Either party shall be entitled to terminate this~~ 837
~~Charter with immediate effect by written notice to the~~ 838
~~other party in the event of an order being made or~~ 839
~~resolution passed for the winding up, dissolution,~~ 840
~~liquidation or bankruptcy of the other party (otherwise~~ 841
~~than for the purpose of reconstruction or amalgamation)~~ 842
~~or if a receiver is appointed, or if it suspends payment,~~ 843
~~ceases to carry on business or makes any special~~ 844
~~arrangement or composition with its creditors.~~ 845
**(e)** The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

prior to the date of termination and to any claim that | 848
either party might have. | 849

**29. Repossession** | 850
In the event of the termination of this Charter in | 851
accordance with the applicable provisions of Clause 28, | 852
the Owners shall have the right to repossess the Vessel | 853
from the Charterers at her current or next port of call, or | 854
at a port or place convenient to them without hindrance | 855
or interference by the Charterers, courts or local | 856
authorities.  Pending physical repossession of the Vessel | 857
in accordance with this Clause 29, the Charterers shall | 858
hold the Vessel as gratuitous bailee only to the Owners. | 859
The Owners shall arrange for an authorised represent- | 860
ative to board the Vessel as soon as reasonably | 861
practicable following the termination of the Charter. The | 862
Vessel shall be deemed to be repossessed by the | 863
Owners from the Charterers upon the boarding of the | 864
Vessel by the Owners' representative.  All arrangements | 865
and expenses relating to the settling of wages, | 866
disembarkation and repatriation of the Charterers' | 867
Master, officers and crew shall be the sole responsibility | 868
of the Charterers. | 869

**30. Dispute Resolution** | 870
*)  **(a)**   This Contract shall be governed by and construed | 871
in accordance with English law and any dispute arising | 872
out of or in connection with this Contract shall be referred | 873
to arbitration in London in accordance with the Arbitration | 874
Act 1996 or any statutory modification or re-enactment | 875
thereof save to the extent necessary to give effect to | 876
the provisions of this Clause. | 877
The arbitration shall be conducted in accordance with | 878
the London Maritime Arbitrators Association (LMAA) | 879
Terms current at the time when the arbitration proceed- | 880
ings are commenced. | 881
The reference shall be to three arbitrators.  A party | 882
wishing to refer a dispute to arbitration shall appoint its | 883
arbitrator and send notice of such appointment in writing | 884
to the other party requiring the other party to appoint its | 885
own arbitrator within 14 calendar days of that notice and | 886
stating that it will appoint its arbitrator as sole arbitrator | 887
unless the other party appoints its own arbitrator and | 888
gives notice that it has done so within the 14 days | 889
specified.  If the other party does not appoint its own | 890
arbitrator and give notice that it has done so within the | 891
14 days specified, the party referring a dispute to | 892
arbitration may, without the requirement of any further | 893
prior notice to the other party, appoint its arbitrator as | 894
sole arbitrator and shall advise the other party | 895
accordingly.  The award of a sole arbitrator shall be | 896
binding on both parties as if he had been appointed by | 897
agreement. | 898
Nothing herein shall prevent the parties agreeing in | 899
writing to vary these provisions to provide for the | 900
appointment of a sole arbitrator. | 901
In cases where neither the claim nor any counterclaim | 902
exceeds the sum of US$50,000 (or such other sum as | 903
the parties may agree) the arbitration shall be conducted | 904
in accordance with the LMAA Small Claims Procedure | 905
current at the time when the arbitration proceedings are | 906
commenced. | 907
*)  ~~(b)   This Contract shall be governed by and construed~~ | 908
~~in accordance with Title 9 of the United States Code~~ | 909
~~and the Maritime Law of the United States and  any~~ | 910
~~dispute  arising out of or in connection with this Contract~~ | 911
~~shall be referred to three persons at New York, one to~~ | 912
~~be appointed by each of the parties hereto, and the third~~ | 913
~~by the two so chosen; their decision or that of any two~~ | 914
~~of them shall be final, and for the purposes of enforcing~~ | 915
~~any award,  judgement may be entered on an award by~~ | 916
~~any court of competent jurisdiction.  The proceedings~~ | 917
~~shall be conducted in accordance with the rules of the~~ | 918
~~Society of Maritime Arbitrators, Inc.~~ | 919
~~In cases where neither the claim nor any counterclaim~~ | 920

~~exceeds the sum of US$50,000 (or such other sum as~~ | 921
~~the parties may agree) the arbitration shall be conducted~~ | 922
~~in accordance with the Shortened Arbitration Procedure~~ | 923
~~of the Society of Maritime Arbitrators, Inc.  current at~~ | 924
~~the time when the arbitration proceedings are commenced.~~ | 925
*)  ~~(c)   This Contract shall be governed by and construed~~ | 926
~~in accordance with the laws of the place mutually agreed~~ | 927
~~by the parties and any dispute arising out of or in~~ | 928
~~connection with this Contract shall be referred to~~ | 929
~~arbitration at a mutually agreed place, subject to the~~ | 930
~~procedures applicable there.~~ | 931
**(d)**   Notwithstanding (a), (b) or (c) above, the parties | 932
may agree at any time to refer to mediation any | 933
difference and/or dispute arising out of or in connection | 934
with this Contract. | 935
In the case of a dispute in respect of which arbitration | 936
has been commenced under (a), (b) or (c) above, the | 937
following shall apply:- | 938
  **(i)**   Either party may at any time and from time to time | 939
elect to refer the dispute or part of the dispute to | 940
mediation by service on the other party of a written | 941
notice (the "Mediation Notice") calling on the other | 942
party to agree to mediation. | 943
  **(ii)**   The other party shall thereupon within 14 calendar | 944
days of receipt of the Mediation Notice confirm that | 945
they agree to mediation, in which case the parties | 946
shall thereafter agree a mediator within a further | 947
14 calendar days, failing which on the application | 948
of either party a mediator will be appointed promptly | 949
by the Arbitration Tribunal ("the Tribunal") or such | 950
person as the Tribunal may designate for that | 951
purpose.  The mediation shall be conducted in such | 952
place and in accordance with such procedure and | 953
on such terms as the parties may agree or, in the | 954
event of disagreement, as may be set by the | 955
mediator. | 956
  **(iii)**   If the other party does not agree to mediate, that | 957
fact may be brought to the attention of the Tribunal | 958
and may be taken into account by the Tribunal when | 959
allocating the costs of the arbitration as between | 960
the parties. | 961
  **(iv)**   The mediation shall not affect the right of either | 962
party to seek such relief or take such steps as it | 963
considers necessary to protect its interest. | 964
  **(v)**   Either party may advise the Tribunal that they have | 965
agreed to mediation.  The arbitration procedure shall | 966
continue during the conduct of the mediation but | 967
the Tribunal may take the mediation timetable into | 968
account when setting the timetable for steps in the | 969
arbitration. | 970
  **(vi)**   Unless otherwise agreed or specified in the | 971
mediation terms, each party shall bear its own costs | 972
incurred in the mediation and the parties shall share | 973
equally the mediator's costs and expenses. | 974
  **(vii)**   The mediation process shall be without prejudice | 975
and confidential and no information or documents | 976
disclosed during it shall be revealed to the Tribunal | 977
except to the extent that they are disclosable under | 978
the law and procedure governing the arbitration. | 979
(Note: The parties should be aware that the mediation | 980
process may not necessarily interrupt time limits.) | 981
  **(e)**   If Box 35 in Part I is not appropriately filled in, sub-clause | 982
30(a) of this Clause shall apply.  Sub-clause 30(d) shall | 983
apply in all cases. | 984
*)  Sub-clauses 30(a), 30(b) and 30(c) are alternatives; | 985
indicate alternative agreed in Box 35. | 986

**31. Notices** | 987
  **(a)**   Any notice to be given by either party to the other | 988
party shall be in writing and may be sent by fax, telex, e- | 989
mail | 
registered or recorded mail or by personal service. | 990
  **(b)**   The address including e-mail(s) of the Parties for | 991
service of such | 
communication shall be as stated in Boxes 3 and 4 | 992
respectively. | 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## "BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

OPTIONAL PART

**1.  Specifications and Building Contract**
(a)  The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.
(b)  No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.
(c)  The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.
(d)  The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

**2.  Time and Place of Delivery**
(a)  Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.
(b)  If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.
(c)  If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon
(i)  if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or
(ii)  if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers;
(iii)  in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;
(iv)  if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.
(d)  Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.

**3.  Guarantee Works**
If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

**4.  Name of Vessel**
The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.

**5.  Survey on Redelivery**
The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## "BARECON 2001" Standard Bareboat Charter

### PART IV
### HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

<div style="text-align:right">

OPTIONAL
PART

</div>

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. — 1 2 3 4 5 6 7

In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers. — 8 9

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. — 10 11

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. — 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. — 28 29 30 31 32 33 34

The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. — 35 36 37 38

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. — 39 40 41

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. — 42 43 44 45 46 47 48

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. — 49 50 51 52 53



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"BARECON 2001" Standard Bareboat Charter**

<div style="border:1px solid">OPTIONAL PART</div>

**PART V**
**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**
*(Optional, only to apply if expressly agreed and stated in Box 43)*

| | |
|---|---|
| 1.   ~~Definitions~~ | |
| ~~For the purpose of this PART V, the following terms shall~~ | 1 |
| ~~have the meanings hereby assigned to them:~~ | 2 |
| ~~"The Bareboat Charter Registry" shall mean the registry~~ | 3 |
| ~~of the State whose flag the Vessel will fly and in which~~ | 4 |
| ~~the Charterers are registered as the bareboat charterers~~ | 5 |
| ~~during the period of the Bareboat Charter.~~ | 6 |
| ~~"The Underlying Registry" shall mean the registry of the~~ | 7 |
| ~~state in which the Owners of the Vessel are registered~~ | 8 |
| ~~as Owners and to which jurisdiction and control of the~~ | 9 |
| ~~Vessel will revert upon termination of the Bareboat~~ | 10 |
| ~~Charter Registration.~~ | 11 |
| | 12 |
| 2.   ~~Mortgage~~ | |
| ~~The Vessel chartered under this Charter is financed by~~ | 13 |
| ~~a mortgage and the provisions of Clause 12(b) (Part II)~~ | 14 |
| ~~shall apply.~~ | 15 |
| | 16 |

| | |
|---|---|
| 3.   ~~Termination of Charter by Default~~ | 17 |
| ~~If the Vessel chartered under this Charter is registered~~ | 18 |
| ~~in a Bareboat Charter Registry as stated in Box 44, and~~ | 19 |
| ~~if the Owners shall default in the payment of any amounts~~ | 20 |
| ~~due under the mortgage(s) specified in Box 28, the~~ | 21 |
| ~~Charterers shall, if so required by the mortgagee, direct~~ | 22 |
| ~~the Owners to re-register the Vessel in the Underlying~~ | 23 |
| ~~Registry as shown in Box 45.~~ | 24 |
| ~~In the event of the Vessel being deleted from the~~ | 25 |
| ~~Bareboat Charter Registry as stated in Box 44, due to a~~ | 26 |
| ~~default by the Owners in the payment of any amounts~~ | 27 |
| ~~due under the mortgage(s), the Charterers shall have~~ | 28 |
| ~~the right to terminate this Charter forthwith and without~~ | 29 |
| ~~prejudice to any other claim they may have against the~~ | 30 |
| ~~Owners under this Charter.~~ | 31 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**ARROW**
TANKERS A/S

## RIDER CLAUSES TO CHARTER PARTY
## M.T. "CV STEALTH "
## DATED 23rd February 2010

### CLAUSE 1.   CANCELLATION OF BAREBOAT CHARTER:

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

### CLAUSE 2.   DRY DRY-DOCKS:

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

### CLAUSE 3.   BUNKER CLAUSE:

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

### CLAUSE 4.   CHARTERERS LIABILITIES:

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

### CLAUSE 5.   OIL POLLUTION:

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1





m.t. CV STEALTH – CP dated 23rd February 2010

cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6.   RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk  of      the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of  Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2





ARROW
TANKERS A/S

to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv)To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v)Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi)To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x)Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi)Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3

2nd original




**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii)all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers  expense, such  alternative insurance as the Owners may in their discretion determine to be necessary  to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

**CLAUSE 7.   INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers

to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

4





ARROW
TANKERS A/S

**m.t. CV STEALTH – CP dated 23rd February 2010**

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. <u>CHARTERERS' COVENANTS:</u>

The Charterers Covenant with the Owners undertake throughout the term of this
Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;



5





ARROW
TANKERS A/S

**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) They will notify the Owners forthwith by telex, telefax or e -mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.

**CLAUSE 9.   INDEMNITY:**

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying

up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

6

**2nd original**



ARROW
TANKERS A/S

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10. **TERMINATION EVENTS:**

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;





m.t. CV STEALTH – CP dated 23rd February 2010

ARROW
TANKERS A/S

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

8

**2nd original**



m.t. CV STEALTH – CP dated 23rd February 2010

ARROW
TANKERS A/S

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

**CLAUSE 12.  <u>CONTRADICTION CLAUSE</u>**

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

**CLAUSE 13.  <u>THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:</u>**

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.





**m.t. CV STEALTH – CP dated 23rd February 2010**

**CLAUSE 14.**
MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**
Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.
Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**
Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**
Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**
Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**
Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)



10

2nd original



**ARROW**
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET )  to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

11

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :                                    Charterers:

By    : Himoza Dimareli          By   :  Burak Tedecer
Title : Director                        Title :  Director

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery

USD 9,750 gross pdpr for the 2nd charter year

USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year

USD 9,750 gross pdpr for the 4th charter year

USD 9,750 gross pdpr for the 5th charter year

USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By : Mimoza Dimaseli
Title : DIRECTOR

Charterers:

By : Tugran Tokan
Title : DIRECTOR

**ADDENDUM NO 3**

Dated 2 9   January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")**
**as amended by an Addendum No 1 dated 2nd June 2010**
**and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed
that:

1.  The payment of a portion of the daily charter hire of an amount of USD 3.225 arising
    from the charter hires starting 1st December 2012 until 1st December 2013 shall be
    deferred. With effect from 1st December 2013 the total amount of deferred charter
    hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal
    instalments until 22nd June 2015 and added to the daily charter hire.

2.  Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box
    22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3.  In the event of default of payment by the charterers under the bareboat charters of the
    Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as
    Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or
undertakings thereto remain unaltered and in full force and effect.

----------------------
For and on behalf of
the Charterers

----------------------
For and on behalf of
the Guarantor

----------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director

# EXHIBIT 2

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

## IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty and MoA as per rider clause 13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT CV STEALTH under the Charterparty according to the Contract, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of  (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010             GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010             SUPER SHIPPING LTD of MALTA

# EXHIBIT 3

SCHEDULE 11 – Organisational Chart



**Mr. Ali Tugrul Tokgoz**

**Mrs. Gulsun Nazli Karamehmet Williams**

85 % owned

15 % owned

**Forward Holdings LLC**
*Managed by Board of Directors*

100 % owned

**Advantage Holdings LLC**
*Member-managed*

100 % owned

**Advantage Tankers LLC**
*Managed by Board of Directors*

All 100% owned

Advantage Sun Shipping LLC

Advantage Start Shipping LLC

Advantage Sky Shipping LLC

Advantage Solar Shipping LLC

Advantage Award Shipping LLC

Advantage Azure Shipping LLC

Advantage Anthem Shipping LLC

Advantage Avenue Shipping LLC

Advantage Arrow Shipping LLC

*All Nine Advantage Shipping Entities are Member-managed*

149

1.14.6180.00 21327756 v4

# EXHIBIT 4

CONSENT LETTER

From:   Geden Holdings Ltd (the "Shareholder")
        85 St.John's Street, Valletta, Malta

To:     Shell Western Supply and Trading Limited (the "Charterer")
        Barbados

06.02. 2015

Dear Sirs

1   We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2   As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

3   Upon each Vessel Sale:

    (a)   the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant New Owner will register that Vessel in its name under Marshall Islands flag;

    (b)   the relevant ship mortgage over that Vessel registered in the name of the banks and financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged and shall be replaced (as part of the financing and/or refinancing arrangements between that New Owner and its financiers) with a new ship mortgage s to be registered in the name of the banks and financial institutions listed in Annex 1 hereto as New Mortgagees;

    (c)   subject to the respective New Owners being acceptable to Charterer following Charterer's KYC and other relevant checks, the Existing Charters will be terminated by mutual agreement between the respective Existing Owners and Charterer and new charters (the "New Charters") will be entered into between the Charterer and the relevant New Owner on terms, inter alia, as follows:

        (i)   each New Charter shall come into effect on the time on which the relevant Vessel is delivered to, and accepted by, the relevant New Owner from the relevant Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

        (ii)   the duration of each New Charter shall be 5 years from the Vessel Sale Effective Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

        (iii)   the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New Owner shall be US$17,500 per day other than the vessels Advantage Sun, Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be US$18,500 during the initial period of 24 months (the "Base Rate"); The PSA will be calculated as the monthly averages of certain trading routes as described in the relevant charter parties.

DOC

54142984v2

D01248

(iv)   the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4    A pro-forma of New Charter is annexed to this Letter as Annex 2.

5    The Shareholder confirms to the Charterer that:

(a)   it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

(b)   it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6    The Shareholder hereby:

(a)   notifies the Charterer of its intention to complete the Vessel Sales;

(b)   confirms that it shall be keep the Charterer (i) updated of the intended dates and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

(c)   requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

(d)   agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

(e)   agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7    For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters fails to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8    The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.



54142984v2

D01249

9    This Letter and any non-contractual obligations arising under or in connection with it shall be governed by English law.

Yours faithfully

..................................
For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title:   Director

Agreed, consented and accepted:

..................................
For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name:  David Chapman
Title:   General Manager

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom ) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start ) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |



54142964v2

D01251

| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
|---|---|---|---|---|
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |



# EXHIBIT 5

Dave Chapman

1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
  PSARA ENERGY, LTD.,          )
3       Plaintiff,             )
                               )
4  VS.                         )  CIV. ACTION NO. 16-CV-04840
                               )
5  SPACE SHIPPING, LTD.;       )
  ADVANTAGE AVENUE             )
6  SHIPPING, LLC; GENEL        )
  DENIZCILIK NAKLIYATI A.S.)
7  A/K/A GEDEN LINES;          )
  ADVANTAGE TANKERS, LLC,      )
8  ADVANTAGE HOLDINGS, LLC;    )
  FORWARD HOLDINGS, LLC;       )
9  MEHMET EMIN KARAMEHMET       )
  and GULSUN NAZLI             )
10  KARAMEHMET WILLIAMS,        )
       Defendants.             )
11
              ************************************
12
                   ORAL DEPOSITION OF
13                   DAVE CHAPMAN
                  NOVEMBER 30, 2016
14
              ************************************
15

16        ORAL DEPOSITION of DAVE CHAPMAN, produced as a

17   witness at the instance of the Plaintiff, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on November 30, 2016, from 1:22 p.m. to 2:32 p.m.,

20   before Patricia L. Fairley, RPR, CSR in and for the

21   State of Texas, reported by machine shorthand at the

22   offices of DepoTexas, 13101 Northwest Freeway,

23   Suite 210, Houston, Texas, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated in the

25   record or attached hereto.

Dave Chapman

2

1              A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        Mr. George A. Gaitas
         Mr. Jonathan M. Chalos
5        CHALOS & CO., P.C.
         7210 Tickner Street
6        Houston, Texas   77055
         (713)936-2427        (866)702-4577 Facsimile
7        georgegaitas@chaloslaw.com
         jmc@chaloslaw.com

8

9   FOR THE DEFENDANTS ADVANTAGE AVENUE SHIPPING, LLC,
    ADVANTAGE TANKERS, LLC AND ADVANTAGE HOLDINGS, LLC:
10
         Mr. Marc Matthews (Not Present)
11       PHELPS DUNBAR, LLP
         500 Dallas Street
12       Suite 1300
         Houston, Texas   77002
13       (713)626-1386        (713)626-1388 Facsimile
         marc.matthews@phelps.com
14

15  FOR SHELL OIL COMPANY:

16       Mr. Marcus A. Carter
         SHELL OIL COMPANY
17       P.O. Box 2463
         Houston, Texas   77252-2463
18       (713)241-1232        (713)241-1427 Facsimile
         m.carter2@shell.com
19

20                    *   *   *   *   *

21

22

23

24

25

DepoTexas, Inc.

Dave Chapman

42

1      A.  I believe that's correct.

2      Q.  It was acknowledged on behalf of Shell Western?

3      A.  Yes.

4      Q.  And would -- would you agree with me that these

5  were binding contracts on Shell Western?

6      A.  Yes, I would agree.

7      Q.  And if someone told you in one of these time

8  charters that the daily rate was going to be $50,000 a

9  day and the charter itself said 18 1/2 thousand, they

10  would be wrong?  The charter party would be correct?

11  What it says in the charter would be correct?

12      A.  Well, it depends upon what other agreements

13  were entered into beyond the charter party agreement.

14  You can write amendments to various agreements.

15      Q.  Of course.  But if -- if the charter party

16  specifies 18 1/2 thousand dollars daily rate, that would

17  be correct?  These are correct documents that you were

18  signing; they were not fictitious or --

19      A.  No.  Those are binding documents that I signed.

20      Q.  Binding and accurate?

21      A.  They should be accurate.

22      Q.  Truthful?

23      A.  Yes.  Correct.

24      Q.  So I want to show you now a document,

25  Exhibit 17.

Dave Chapman

51

1    executing the document.  There were people in Shell that

2    had done that work, I'm certain, because I would have

3    asked for evidence to that effect; but I wouldn't have

4    done the work myself.

5         Q.  So if you look at Paragraph 2 again, "It has

6    been proposed that each Existing Owner will sell, the

7    Vessel Sales, all its title, interest to and right in

8    its Vessel to the relevant companies listed in Annex 1

9    hereto as new owners, and each wholly owned by the

10   Shareholder, the New Owners."

11              What sense does this make to you?  Who owns

12   the new owners?

13        A.  It says, "each wholly owned by the Shareholder,

14   the New Owner."  I mean, I can't -- I can't interpret it

15   any differently than it says in the paragraph.

16        Q.  Right.  And would you -- would you look at the

17   very first line, please, where it says, "From" --

18        A.  Yes.

19        Q.  -- "Geden Holdings, Limited" --

20        A.  Yes.

21        Q.  -- "the Shareholder"?

22        A.  Correct.

23        Q.  Do you have any reason to believe -- reason to

24   believe this is -- there is anything in here that's

25   untrue or inaccurate?

Dave Chapman

52

1        A.   No, I have no reason to believe that.

2        Q.   Give us a minute.

3        A.   Yeah, please.

4                 (Discussion off the record)

5        Q.   (BY MR. GAITAS)  All right.  Let's go back on

6   the record.

7        A.   Okay.

8        Q.   Or do you want to take a break?

9        A.   No, I'm good.  I just don't normally talk this

10   much.  No one at the office lets me.

11        Q.   Right.  Then I'll -- I'll ask you to please

12   look at -- there's -- there's an Appendix 1 that is --

13   Annex 1 that is attached to this.

14        A.   Yes.

15        Q.   Do you see that?

16        A.   I do see that.

17        Q.   And if you -- if you go to the Consent Letter,

18   the front -- the front page --

19        A.   Yes.

20        Q.   -- Item 3, "Upon each Vessel Sale:  the

21   relevant Existing Owner will delete the Vessel from the

22   Maltese flag and the relevant New Owner will register

23   the vessel in its name under the Marshall Islands flag."

24        A.   Yes, I can see that.

25        Q.   From -- from the documents that we saw before,

Dave Chapman

53

1    Exhibits 1 with the exception of that letter of

2    Mr. Soudant, this was done?

3        A.  I presume so.  I --

4        Q.  If you look -- if you look at the -- if you

5    look at the Appendix 1 -- Annex 1 --

6        A.  Yes.

7        Q.  -- vessel PROFIT was renamed ADVANTAGE SOLAR?

8        A.  Correct, and went from --

9        Q.  And --

10       A.  -- the Malta flag to the Marshall flag.

11       Q.  -- went -- and from the charter parties you've

12   seen or if you can see, if you want to -- to look at

13   them closely, indeed, the flag changed?

14       A.  I -- yes, I presume so.

15       Q.  Yeah.  And from the documents we have seen

16   before, the previous exhibits, the condition of this

17   Consent Letter, (b), "the relevant ship mortgage

18   registered in the name of the banks and financial

19   institutions listed in Annex 1 hereto as Existing

20   Mortgagees shall be discharged and shall be replaced

21   with a new ship mortgage to be registered in the name of

22   the banks and financial institutions listed in Annex 1

23   hereto as New Mortgagees," again, from the documents you

24   have seen, this has taken place, has it not?

25       A.  I presume so.

# EXHIBIT 6

| SHIP MANAGEMENT AGREEMENT | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT CODE NAME: "SHIPMAN 98"    PART I |
|---|---|

| 1. Date of Agreement<br>10 February 2015 | Name of Vessel<br>ADVANTAGE START |
|---|---|
| 2. Owners (name, place of registered office and law of registry) (Cl. 1) | 3. Managers (name, place of registered office and law of registry) (Cl. 1) |
| Name<br>Advantage Start Shipping LLC | Name<br>Genel Denizcilik Nakliyati A.Ş. |
| Place of registered office<br>Trust Company Complex, Ajeltake Road, Ajeltake Islands, Majuro, Marshall Islands MH96960 | Place of registered office<br>Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul |
| Law of registry<br>MARSHALL ISLAND | Law of registry<br>Turkiye |

| 4. Day and year of commencement of Agreement (Cl. 2)      February 2015 | |
|---|---|
| 5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1)<br>YES | 6. Technical Management (state "yes" or "no" as agreed) (Cl.3.2)<br>YES |
| 7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3)<br>YES | 8. Insurance Arrangements (state "yes" or "no" as agreed)  Cl. 3.4)<br>YES |
| 9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5)<br>YES | 10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl.3.6)<br>YES |
| 11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7)<br>YES | 12. Bunkering (state "yes" or "no" as agreed) (Cl, 3.8)<br>YES |
| 13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl. 3.3 (I))<br>5 YEARS | 14. Owners' Insurance (state alternative (I), (II) or (III) of Cl. 6.3)<br>YES |
| 15. Annual Management Fee (state annual amount) (Cl. 8.1)<br>USD 365,000 (per annum) | 16. Severance Costs (state maximum amount) (Cl. 8.4(II))<br>As per Crewing agreement |
| 17. Day and year of termination of Agreement (Cl. 17)<br><br>5 YEARS FROM DATE OF AGREEMENT | 18. Law and Arbitration (state alternative 19.1, 19.2 or 19.3; If 19.3 place of arbitration must be stated) (Cl. 19)<br>English Law |
| 19. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Owners (Cl. 20)<br><br>operations@advantagetankers.com | 20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20)<br>Genel Denizcilik Nakliyati A.Ş.<br>Büyükdere Caddesi Yapı Kredi Plaza A Blok<br>Kat:12 34330 Levent / İstanbul<br>Fax: +90 212 283 16 04-05<br>Tel: +90 212 319 51 00 |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) "C" ("Initial Budget") and "D" (Associated Vessels) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C" and "D" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners)<br><br>Signed by:<br><br>For & On behalf of the Owner<br>TUGRUL TOKGOZ | Signature(s) (Managers)<br><br>Signed by:<br><br>For & On behalf of the Manager<br>ORHAN KARADEMIR / COO |
|---|---|

D02475

PART II
"Shipman 98" Standard Ship Management Agreement

1    **1. Definitions**
2 In this Agreement save where the context
3 otherwise requires, the following words and
4 expressions shall have the meanings hereby
5 assigned to them.
6 "Owners" means the party identified in Box 2.
7 "Managers" means the party identified in Box 3.
8 "Vessel" means the vessel or vessels details of
9 which are set out in Annex "A" attached hereto.
10 "Crew" means the Master, officers and ratings of
11 the numbers, rank and nationality specified in
12 Annex "B" hereto.
13 "Crew Support Costs" means all expenses of a
14 general nature which are not particularly
15 referable to any individual vessel for the time
16 being managed by the Managers and which are
17 incurred by the Managers for the purpose of
18 providing an efficient and economic management
19 and, without prejudice to the generality of
20 the foregoing, shall include the cost of crew
21 standby pay, training schemes for officers and
22 ratings, cadet training schemes, sick pay, study
23 pay, recruitment and interviews.
24 "Severance Costs" means the costs which the
25 employers are legally obliged to pay to or in
26 respect of the Crew as a result of the early
27 termination of any employment contract for
28 service on the Vessel.
29 "Crew Insurances" means insurances against crew
30 risks which shall include but not limited to death,
31 sickness, repatriation, injury, shipwreck
32 unemployment indemnity and loss of personal
33 effects.
34 "Management Services" means the services
35 specified in sub-clauses 3.1 to 3.8 as indicated
36 affirmatively in Boxes 5 to 12.
37 "ISM Code" means the International Management
38 Code for the Safe Operation of Ships and for
39 Pollution Prevention as adopted by the
40 International Maritime Organization (IMO) by
41 resolution A.741 (18) or any subsequent
42 amendment thereto.
43 "STCW 95" means the International Convention
44 on Standards of Training, Certification and
45 Watchkeeping for Seafarers, 1978, as amended in
46 1995 or any subsequent amendment thereto.
47    **2. Appointment of Managers**
48 With effect from the day and year stated in Box 4
49 and continuing unless and until terminated as
50 provided herein, the Owners hereby appoint the
51 Managers, and the Managers hereby agree to act
52 as the Managers of the Vessel.
53    **3. Basis of Agreement**
54 Subject to the terms and conditions herein
55 provided, during the period of this Agreement,
56 the Managers shall carry out Management
57 Services in respect of the Vessel as agents for and
58 on behalf of the Owners. The Managers shall have
59 authority to take such actions as they may from
60 time to time in their absolute discretion consider
61 to be necessary to enable them to perform this
62 Agreement in accordance with sound ship
63 management practice.

64    **3.1 Crew Management**
65 (only applicable if agreed according to Box 5)
66 The Managers shall provide suitably qualified
67 Crew for the Vessel as required by the Owners in
68 accordance with the STCW 95 requirements,
69 provision of which includes but is not limited to
70 the following functions:
71 (i) selecting and engaging the Vessel's Crew,
72     including payroll arrangements, pension
73     administration, and insurances for the Crew
74     other than those mentioned in Clause 6;
75 (ii) ensuring that the applicable requirements
76     of the law of the flag of the Vessel are
77     satisfied in respect of manning levels, rank,
78     qualification and certification of the Crew
79     and employment regulations including
80     Crew's tax, social insurance, discipline and
81     other requirements;
82 (iii) ensuring that all members of the Crew have
83     passed a medical examination with a
84     qualified doctor certifying that they are fit
85     for the duties for which they are engaged
86     and are in possession of valid medical
87     certificates issued in accordance with
88     appropriate flag State requirements. In the
89     absence of applicable flag State
90     requirements the medical certificate shall
91     be dated not more than three months prior
92     to the respective Crew members leaving
93     their country of domicile and maintained
94     for the duration of their service on board
95     the Vessel;
96 (iv) ensuring that the Crew shall have a
97     command of the English language of a
98     sufficient standard to enable them to
99     perform their duties safely;
100 (v) arranging transportation of the Crew,
101     including repatriation;
102 (vi) training the Crew and supervising their
103     efficiency;
104 (vii) conducting union negotiations;
105 (viii) operating the Managers' drug and alcohol
106     policy unless otherwise agreed.
107
108    **3.2 Technical Management**
109 (only applicable if agreed according to Box 6)
110 The Managers shall provide technical
111 management, which includes, but is not limited
112 to, the following functions:
113 (i) provision of competent personnel to
114     supervise the maintenance and general
115     efficiency of the Vessel;
116 (ii) arrangement and supervision of dry
117     dockings, repairs, alterations and the
118     upkeep of the Vessel to the standards
119     required by the Owners provided that the
120     Managers shall be entitled to incur the
121     necessary expenditure to ensure that the
122     Vessel will comply with the law of the flag
123     of the Vessel and of the places where she
124     trades, and all requirements and
125     recommendations of the classification
126     society;

D02476

127 (iii) arrangement of the supply of necessary
128 stores, spares and lubricating oil;
129 (iv) appointment of surveyors and
130 technical consultants as the
131 Managers may consider from time to
132 time to be necessary;
133 (v) development, implementation and
134 maintenance of a Safety
135 Management System (SMS)in
136 accordance with the ISM Code (see
137 sub-clauses 4.2 and 5.3).
138 (vi) development, implementation and
139 compliance with International Port Facility
140 Security Code (ISPS)
141     3.3  Commercial Management
142 (only applicable if agreed according to Box 7)
143 The Managers shall provide the commercial
144 operation of the Vessel, as required by the
145 Owners, which includes, but is not limited to, the
146 following functions:
147 (i) providing chartering services in
148 accordance with the Owners'
149 instructions which include, but are not
150 limited to, seeking and negotiating
151 employment for the Vessel and the
152 conclusion (including the execution
153 thereof) of charter parties or other
154 contracts relating to the employment
155 of the Vessel. If such a contract
156 exceeds the period stated in Box 13,
157 consent thereto in writing shall first be
158 obtained from the Owners.
159 (ii) arranging of the proper payment to
160 Owners or their nominees of all hire
161 and/or freight revenues or other
162 moneys of whatsoever nature to which
163 Owners may be entitled arising out of
164 the employment of or otherwise in
165 connection with the Vessel.
166 (iii) providing voyage estimates and
167 accounts and calculating of hire,
168 freights, demurrage and/or despatch
169 moneys due from or due to the
170 charterers of the Vessel;
171 (iv) issuing of voyage instructions;
172 (v) appointing agents;
173 (vi) appointing stevedores;
174 (vii) arranging surveys associated with
175 the commercial operation of the
176 Vessel.
177     3.4  Insurance Arrangements
178 (only applicable if agreed according to Box 8)
179 The Managers shall arrange insurances in
180 accordance with Clause 6, on such terms and
181 conditions as the Owners shall have instructed or
182 agreed, in particular regarding conditions, insured
183 values, deductibles and franchises.
184
185     3.5  Accounting Services
186 (only applicable if agreed according to Box 9)
187 The Managers shall
188 (i) establish an accounting system which
189 meets the requirements of the
190 Owners and provide regular

191 accounting services, supply regular
192 reports and records,
193 (ii) maintain the records of all costs and
194 expenditure incurred as well as data
195 necessary or proper for the
196 settlement of accounts between the
197 parties.
198
199  3.6 Sale or Purchase of the Vessel
200 (only applicable if agreed according to Box 10)
201 The Managers shall, in accordance with
202 Owners' instructions, supervise the sale or
203 purchase of the Vessel, including the performance
204 of any sale or purchase agreement, but not
205 negotiation of the same.
206  3.7 Provisions (only applicable if agreed according
207 to Box 11)
208 The Managers shall arrange for the supply of
209 provisions.
210  3.8 Bunkering (only applicable if agreed according
211 to Box 12)The Managers shall arrange for the
212 provision of bunker fuel of the quality specified by
213 the Owners as required for the Vessel's trade.
214
215  4.  Managers' Obligations
216  4.1 The Managers undertake to use their best
217 endeavors to provide the agreed Management
218 Services as agents for and on behalf of the
219 Owners in accordance with sound ship
220 management practice and to protect and promote
221 the interests of the Owners in all matters relating
222 to the provision of services hereunder.
223     Provided, however, that the Managers in the
224 performance of their management responsibilities
225 under this Agreement shall be entitled to have
226 regard to their overall responsibility in relation to
227 all vessels as may from time to time be entrusted
228 to their management and in particular, but
229 without prejudice to the generality of the
230 foregoing, the Managers shall be entitled to
231 allocate available supplies, manpower and
232 services in such manner as in the prevailing
233 circumstances the Managers in their absolute
234 discretion consider to be fair and reasonable.
235  4.2 Where the Managers are providing Technical
236 Management in accordance with sub-clause 3.2,
237 they shall procure that the requirements of the
238 law of the flag of the Vessel are satisfied and they
239 shall in particular be deemed to be the
240 "Company" as defined by the ISM Code, assuming
241 the responsibility for the operation of the Vessel
242 and taking over the duties and responsibilities
243 imposed by the ISM Code when applicable.
244  5.  Owners' Obligations
245  5.1 The Owners shall pay all sums due to the
246 Managers punctually in accordance with the
247 terms of this Agreement.
248  5.2 Where the Managers are providing Technical
249 Management in accordance with sub-clause 3.2,
250 the Owners shall:
251 (i) procure that all officers and ratings
252 supplied by them or on their behalf comply
253 with the requirements of STCW 95;
254 (ii) instruct such officers and ratings to obey
255 all reasonable orders of the Managers in

256 connection with the operation of the
257 Managers' safety management system.
258 5.3 Where the Managers are not providing
259 Technical Management in accordance with sub-
260 clause 3.2, the Owners shall procure that the
261 requirements of the law of the flag of the Vessel
262 are satisfied and that they, or such other entity as
263 may be appointed by them and identified to the
264 Managers, shall be deemed to be the "Company"
265 as defined by the ISM Code assuming the
266 responsibility for the operation of the Vessel and
267 taking over the duties and responsibilities
268 imposed by the ISM Code when applicable.
269    6.    Insurance Policies
270 The Owners shall procure, whether by instructing
271 the Managers under sub-clause 3.4 or otherwise,
272 that throughout the period of this Agreement:
273 6.1 at the Owners' expense, the Vessel is insured
274    for not less than her sound market value or
275    entered for her full gross tonnage, as the
276    case may be:
277       (i)   usual hull and machinery marine
278          risks (including crew negligence)
279          and excess liabilities;
280       (ii)  protection and indemnity risks
281          (including pollution risks, and Crew
282          Insurances); and
283       (iii) war risks (including protection and
284          indemnity and crew risks) in
285          accordance with the best practice
286          of prudent owners of vessels of a
287          similar type to the Vessel, with first
288          class      insurance     companies
289          underwriters or associations ("the
290          Owners' Insurances");
291 6.2 all premiums and calls on the Owners'
292    insurances are paid promptly by their due
293    date,
294 6.3 the Owners' Insurances name the Managers
295    and, subject to underwriters' agreement, any
296    third party designated by the Managers as a
297    joint assured, with full cover, with the
298    Owners obtaining cover in respect of each of
299    the insurances specified in sub-clause 6.1:
300       (i)   on terms whereby the Managers
301          and any such third party are liable
302          in respect of premiums or calls
303          arising in connection with the
304          Owners' Insurances;
305       (ii)  if reasonably obtainable, on terms
306          such that neither the Managers nor
307          any such third party shall be under
308          any liability in respect of premiums
309          or calls arising in connection with
310          the Owners' Insurances or
311       (iii) on such other terms as may be
312          agreed in writing.
313    Indicate alternative (i), (ii) or (iii) in Box 14. If
314    Box 14 is left blank then (i) applies
315 6.4 written evidence is provided, to the
316    reasonable satisfaction of the Managers, of
317    their compliance with their obligations under
318    Clause 6 within a reasonable time of the
319    commencement of the Agreement, and of
320    each renewal date and, if specifically

321 requested, of each payment date of the
322 Owners' Insurances.
323    7.    Income Collected and Expenses Paid on
324       Behalf of Owners
325 7.1 All moneys collected by the Managers under
326    the terms of this Agreement (other than
327    moneys payable by the Owners to the
328    Managers) and any interest thereon shall be
329    held to the credit of the Owners in a
330    separate bank account.
331 7.2 All expenses incurred by the Managers under
332    the terms of this Agreement on behalf of the
333    Owners (including expenses as provided in
334    Clause 8) may be debited against the Owners
335    in the account referred to under sub-clause
336    7.1 but shall in any event remain payable by
337    the Owners to the Managers on demand.
338    8.    Management Fee
339 8.1 The Owners shall pay to the Managers for
340    their services as Managers under this Agreement
341    an annual management fee as stated in Box 15,
342    which shall be payable by equal monthly
343    instalments in advance, the first instalment being
344    payable on the commencement of this Agreement
345    (see Clause 2 and Box 4) and subsequent
346    instalments being payable every month.
347 8.2 The management fee is fixed (see Box 15) for
348    the first two years and increasing by 5% per year
349    thereafter.
350 8.3 The Managers shall, at no extra cost to the
351    Owners, provide their own office accommodation,
352    office staff, facilities and stationery. Without
353    limiting the generality of Clause 7 the Owners shall
354    reimburse the Managers for postage and
355    communication expenses, travelling expenses, and
356    other out of pocket expenses properly incurred by
357    the Managers in pursuance of the Management
358    Services.
359 8.4 In the event of the appointment of the
360    Managers being terminated by the Owners or the
361    Managers in accordance with the provisions of
362    Clauses 17 and 18 other than by reason of default
363    by the Managers, or if the Vessel is lost, sold or
364    otherwise disposed of, the "management fee"
365    payable to the Managers according to the
366    provisions of sub-clause 8.1, shall continue to be
367    payable for a further period of three calendar
368    months as from the termination date. In addition,
369    provided that the Managers provide Crew for the
370    Vessel in accordance with sub-clause 3.1:
371 (i) the Owners shall continue to pay Crew Support
372    Costs during the said further period of *three*
373    *calendar months and*
374 (ii) The Owners shall pay an equitable proportion
375    of any Severance Costs which may materialize,
376    not exceeding the amount stated in Box 16.
377 8.5 If the Owners decide to lay-up the Vessel
378    whilst this Agreement remains in force and such
379    lay-up lasts for more than three months, an
380    appropriate reduction of the management fee for
381    the period exceeding three months until one
382    month before the Vessel is again put into service
383    shall be mutually agreed between the parties.
384 8.6 Unless otherwise agreed in writing all
385    discounts and commissions obtained by the

D02478

386 Managers in the course of the management of the
387 Vessel shall be credited to the Owners.
388   **9.   Budgets and Management of Funds**
389
390 **9.1** The Managers shall present to the Owners
391 annually a budget for the following twelve
392 months in such form as the Owners require. The
393 budget for the first year hereof is set out in
394 Annex "C" hereto. Subsequent annual budgets
395 shall be prepared by the Managers and
396 submitted to the Owners not less than three
397 months before the anniversary date of the
398 commencement of this Agreement (see Clause 2
399 and Box 4).
400 **9.2** The Owners shall indicate to the Managers
401 their acceptance and approval of the annual
402 budget within one month of presentation and in
403 the absence of any such indication the Managers
404 shall be entitled to assume that the Owners have
405 accepted the proposed budget.
406 **9.3** Following the agreement of the budget, the
407 Managers shall prepare and present to the
408 Owners their estimate of the working capital
409 requirement of the Vessel and the Managers
410 shall each month update this estimate, based
411 thereon, the Managers shall each month request
412 the Owners in writing for the funds required to
413 run the Vessel for the ensuing month including
414 the payment of any occasional or extraordinary
415 item of expenditure, such as emergency repair
416 costs, additional insurance premiums, bunkers,
417 or provisions. Such funds shall be received by the
418 Managers within ten running days after the
419 receipt by the Owners of the Managers' written
420 request and shall be held to the credit of the
421 Owners in a separate bank account.
422 **9.4** The Managers shall produce a comparison
423 between budgeted and actual income and
424 expenditure of the Vessel in such form as
425 required by the Owners monthly or at such other
426 intervals as mutually agreed.
427 **9.5** Notwithstanding anything contained herein
428 to the contrary, the Managers shall in no
429 circumstances be required to use or commit
430 their own funds to finance the provision of the
431 Management Services.
432   **10.   Managers' Right to Sub-Contract**
433 The Managers shall not have the right to sub-
434 contract any of their obligations hereunder,
435 including those mentioned in sub-clause 3.1
436 without the prior written consent of the Owners
437 which shall not be unreasonably withheld. In the
438 event of such a sub-contract, the Managers shall
439 remain fully liable for the due performance of
440 their obligations under this Agreement.
441   **11.   Responsibilities**
442 **11.1** Force Majeure - Neither the Owners nor
443 the Managers shall be under any liability for any
444 failure to perform any of their obligations
445 hereunder by reason of any cause whatsoever of
446 any nature or kind beyond their reasonable
447 control.
448 **11.2** Liability to Owners –
449   (i)

450 Without prejudice to sub-clause 11.1, the
451 Managers shall be under no liability
452 whatsoever to the Owners for any loss,
453 damage, delay or expense of whatsoever
454 nature, whether direct or indirect,
455 (including but not limited to loss of profit
456 arising out of or in connection with
457 detention of or delay to the Vessel) and
458 howsoever arising in the course of
459 performance of the Management
460 Services UNLESS same is proved to have
461 resulted solely from the negligence, gross
462 negligence or wilful default of the
463 Managers or their employees, or agents
464 or sub-contractors employed by them in
465 connection with the Vessel, in which case
466 (save where loss, damage, delay or
467 expense has resulted from the Managers'
468 personal act or omission committed with
469 the intent to cause same or recklessly
470 and with knowledge that such loss,
471 damage, delay or expense would
472 probably result) the Managers' liability
473 for each incident or series of incidents
474 giving rise to a claim or claims shall never
475 exceed a total of ten times the annual
476 management fee payable hereunder.
477   (ii)   Notwithstanding anything that
478 may appear to the contrary in this
479 Agreement, the Managers shall not be
480 liable for any of the actions of the Crew,
481 even if such actions are negligent, grossly
482 negligent or wilful, except only to the
483 extent that they are shown to have
484 resulted from a failure by the Managers
485 to discharge their obligations under sub-
486 clause 3.1, in which case their liability
487 shall be limited in accordance with the
488 terms of this Clause 11.
489 **11.3** Indemnity - Except to the extent and solely
490 for the amount therein set out that the Managers
491 would be liable under sub- clause 11.2, the
492 Owners hereby undertake to keep the Managers
493 and their employees, agents and sub-contractors
494 indemnified and to hold them harmless against all
495 actions, proceedings, claims, demands or
496 liabilities whatsoever or howsoever arising which
497 may be brought against them or incurred or
498 suffered by them arising out of or in connection
499 with the performance of the Agreement, and
500 against and in respect of all costs, losses, damages
501 and expenses (including legal costs and expenses
502 on a full indemnity basis) which the Managers
503 may suffer or incur (either directly or indirectly) in
504 the course of the performance of this Agreement.
505 **11.4** "Himalaya" - It is hereby expressly agreed
506 that no employee or agent of the Managers
507 (including every sub - contractor from time to
508 time employed by the Managers) shall in any
509 circumstances whatsoever be under any liability
510 whatsoever to the Owners for any loss, damage or
511 delay of whatsoever kind arising or resulting
512 directly or indirectly from any act, neglect or
513 default on his party while acting in the course of
514 or in connection with his employment and,

515 without prejudice to the generality of the
516 foregoing provisions in this Clause 11, every
517 exemption, limitation, condition and liberty
518 herein contained and every right, exemption from
519 liability, defence and immunity of whatsoever
520 nature applicable to the Managers or to which the
521 Managers are entitled hereunder shall also be
522 available and shall extend to protect every such
523 employee or agent of the Managers acting as
524 aforesaid and for the purpose of all the foregoing
525 provisions of this Clause 11 the Managers are or
526 shall be deemed to be acting as agent or trustee
527 on behalf of and for the benefit of all persons who
528 are or might be their servants or agents from time
529 to time (including sub-contractors as aforesaid)
530 and all such persons shall to this extent be or be
531 deemed to be parties to this Agreement.

532 **12. Documentation**
533 Where the Managers are providing Technical
534 Management in accordance with sub-clause 3.2
535 and/or Crew Management in accordance with
536 sub-clause 3.1, they shall make available, upon
537 Owners' request, all documentation and records
538 related to the Safety Management System (SMS)
539 and/or the Crew which the Owners need in order
540 to demonstrate compliance with the ISM Code
541 and STCW 95 or to defend a claim against a third
542 party.

543 **13. General Administration**
544 **13.1** The Managers shall notify Owners of all
545 claims arising out of the Management Services
546 hereunder and keep the Owners informed
547 regarding any incident of which the Managers
548 become aware which gives or may give rise to
549 claims or disputes involving third parties.
550 **13.2** The owners shall bring or defend actions,
551 suits or proceedings in connection with matters
552 entrusted to the Managers according to this
553 Agreement.
554 **13.3** The Owners shall obtain legal or technical
555 or other outside expert advice in relation to the
556 handling and settlement of claims and disputes or
557 all other matters affecting the interests respect of
558 the Vessel.
559 **13.4** The Owners shall arrange for the provision
560 of any necessary guarantee bond or other
561 security.
562 **13.5** Any costs reasonably incurred by the
563 Managers in carrying out their obligations
564 according to Clause 13 shall be reimbursed by the
565 Owners.

566 **14. Auditing**
567 The Managers shall at all times maintain and keep
568 true and correct accounts and shall make the
569 same available for inspection and auditing by the
570 Owners at such times as may be mutually agreed.
571 On the termination, for whatever reasons, of this
572 Agreement, the Managers shall release to the
573 Owners, if so requested, the originals where
574 possible, or otherwise certified copies, of all such
575 accounts and all documents specifically relating to
576 the Vessel and her operation.

577 **15. Inspection of Vessel**
578 The Owners shall have the right at any time after
579 giving reasonable notice to the Managers to

580 inspect the Vessel for any reason they consider
581 necessary.

582 **16. Compliance with Laws and Regulations**
583 The Managers will not do or permit to be done
584 anything which might cause any breach or
585 infringement of the laws and regulations of the
586 Vessel's flag, or of the places where she trades.

587 **17.   Duration of the Agreement**
588 This Agreement shall come into effect on the day
589 and year stated in Box 4 and shall continue until
590 the date stated in Box 17. Thereafter it shall
591 continue until terminated by either party giving to
592 the other notice in writing, in which event the
593 Agreement shall terminate upon the expiration of
594 a period of two months from the date upon which
595 such notice was given.

596 **18.   Termination**
597 **18.1  Owners' Default**
598      (i)  The Managers shall be entitled to
599           terminate  the  Agreement  with
600           immediate effect by notice in writing if
601           any moneys payable by the Owners
602           under this Agreement and/or ~~the owners~~
603           ~~of any associated vessel, details of which~~
604           ~~are listed in Annex "D",~~ shall not have
605           been  received  in  the  Managers'
606           nominated account within ten running
607           days of receipt by the Owners of the
608           Manager's written request or if the
609           Vessel is repossessed by the Mortgagees.
610     (ii)  If the Owners:
611     (a)   fail to meet their obligations under
612           clause 5.2 and 5.3 of this Agreement
613           for any reason within their control, or
614     (b)   proceed with the employment of or
615           continue to employ the Vessel in the
616           carriage of contraband, blockade
617           running, or an unlawful trade, or on a
618           voyage which in the reasonable
619           opinion of the Managers is unduly
620           hazardous or improper,
621 The Managers may give notice of the default to
622 the Owners, requiring them to remedy it as soon
623 as practically possible. In the event that the
624 Owners fail to remedy it within a reasonable time
625 to the satisfaction of the Managers, the Managers
626 shall be entitled to terminate the Agreement with
627 immediate effect by notice in writing.

628 **18.2  Managers' Default**
629 If the Managers fail to meet their obligations
630 under Clauses 3 and 4 of this Agreement for any
631 reason within the control of the Managers, the
632 Owners may give notice to the Managers of the
633 default, requiring them to remedy it as soon as
634 practically possible. In the event that the
635 Managers fail to remedy it within a reasonable
636 time to the satisfaction of the Owners, the
637 Owners shall be entitled to terminate the
638 Agreement with immediate effect by notice in
639 writing.

640 **18.3  Extraordinary Termination**
641 This Agreement shall be deemed to be terminated
642 in the case of the sale of the Vessel or if the
643 Vessel becomes a total loss or is declared as a

D02480

644 constructive or compromised or arranged total
645 loss or is requisitioned.
646 18.4 For the purpose of sub-clause 18.3 hereof
647     (i) the date upon which the Vessel is to be
648         treated as having been sold or otherwise
649         disposed of shall be the date on which the
650         Owners cease to be registered as Owners
651         of the Vessel;
652     (ii) the Vessel shall not be deemed to be lost
653         unless either she has become an actual
654         total loss or agreement has been reached
655         with her underwriters in respect of her
656         constructive, compromised or arranged
657         total loss or if such agreement with her
658         underwriters is not reached it is adjudged
659         by a competent tribunal that a
660         constructive total loss of the Vessel has
661         occurred.
662 18.5 This Agreement shall terminate forthwith in
663 the event of an order being made or resolution
664 passed for the winding up, dissolution, liquidation
665 or bankruptcy of either party (otherwise than for
666 the purpose of reconstruction or amalgamation)
667 or if a receiver is appointed, or it if suspends
668 payment, ceases to carry on business or makes
669 any special arrangement or composition with its
670 creditors.
671 18.6 The termination of this Agreement shall be
672 without prejudice to all rights accrued due
673 between the parties prior to the date of
674 termination.
675 **19.   Law and Arbitration**
676 19.1 This Agreement shall be governed by and
677 construed in accordance with English law and any
678 dispute arising out of or in connection with this
679 Agreement shall be referred to arbitration in
680 London in accordance with the Arbitration Act
681 1996 or any statutory modification or re-
682 enactment thereof save to the extent necessary
683 to give effect to the provisions of this Clause. The
684 arbitration shall be conducted in accordance with
685 the London Maritime Arbitrators Association
686 (LMAA) Terms current at the time when the
687 arbitration proceedings are commenced.
688 The reference shall be to three arbitrators. A
689 party wishing to refer a dispute to arbitration shall
690 appoint its arbitrator and send notice of such
691 appointment in writing to the other party
692 requiring the other party to appoint its own
693 arbitrator within 14 calendar days of that notice
694 and stating that it will appoint its arbitrator as
695 sole arbitrator unless the other party appoints its
696 own arbitrator and gives notice that it has done so
697 within the 14 days specified. If the other party
698 does not appoint its own arbitrator and give
699 notice that it has done so within the 14 days
700 specified, the party referring a dispute to
701 arbitration may, without the requirement of any
702 further prior notice to the other party, appoint its
703 arbitrator as sole arbitrator and shall advise the
704 other party accordingly. The award of a sole
705 arbitrator shall be binding on both parties as if he
706 had been appointed by agreement.

707 Nothing herein shall prevent the parties agreeing
708 in writing to vary these provisions to provide for
709 the appointment of a sole arbitrator.
710 In cases where neither the claim nor any
711 counterclaim exceeds the sum of USD 50,000 (or
712 such other sum as the parties may agree) the
713 arbitration shall be conducted in accordance with
714 the LMAA Small Claims Procedure current at the
715 time when the arbitration proceedings are
716 commenced.
717 ~~19.2 This Agreement shall be governed by and~~
718 ~~construed in accordance with Title 9 of the~~
719 ~~United States Code and the Maritime Law of the~~
720 ~~United States and any dispute arising out of or in~~
721 ~~connection with this Agreement shall be referred~~
722 ~~to three persons at New York, one to be~~
723 ~~appointed by each of the parties hereto, and the~~
724 ~~third by the two so chosen; their decision that of~~
725 ~~any two of them shall be final, and for the~~
726 ~~purposes of enforcing any award, judgment may~~
727 ~~be entered on an award by any court of~~
728 ~~competent jurisdiction. The proceedings shall be~~
729 ~~conducted in accordance with the rules of the~~
730 ~~Society of Maritime Arbitrators, Inc. In cases~~
731 ~~where neither the claim not any counterclaim~~
732 ~~exceeds the sum of USD 50,000 (or such other~~
733 ~~sum as the parties may agree) the arbitration~~
734 ~~shall be conducted in accordance with the~~
735 ~~Shortened Arbitration Procedure of the Society~~
736 ~~of Maritime Arbitrators, Inc. current at the time~~
737 ~~when the arbitration proceedings are~~
738 ~~commenced.~~
739 19.3 This Agreement shall be governed by and
740 construed in accordance with the laws of the
741 ~~place mutually agreed by the parties and any~~
742 ~~dispute arising out of or in connection with this~~
743 ~~Agreement shall be referred to arbitration at a~~
744 ~~mutually agreed place, subject to the procedures~~
745 ~~applicable there.~~
746 19.4 If Box 18 in Part I is not appropriately filled
747 in, sub-clause 19.1 of this Clause shall apply.
748 Note: 19.1, 19.2 and 19.3 are alternatives;
749 indicate alternative agreed in Box 18.
750 **20.   Notices**
751 20.1 Any notice to be given by either party to the
752 other party shall be in writing and may be sent
753 by fax, telex, registered or recorded mail or by
754 personal service.
755 20.2 The address of the Parties for service of
756 such communication shall be as stated in Boxes
757 19 and 20, respectively.

D02481

ANNEX "A" (DETAILS OF VESSEL OR VESSELS) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| | |
|---|---|
| NAME OF VESSEL : | ADVANTAGE START |
| OWNER: | ADVANTAGE START SHIPPING LLC |
| IMO no: | 9466570 |
| Type: | Oil Tanker |
| Built: | JIANGSU RONGSHEN HEAVY IND.GROUP CO.LTD - RUGAO HARBOR,NANTONG CHINA / 2011 |
| Class: | 1A1 , ' TANKER FOR OIL ESP ' CSR, SPM, EO, VCS-2B, BIS, NAV-O, TMON |
| Tonnage: | 83805 GT / 49031 NT |
| Deadweight: | 156597 Metric Tonnes |
| LOA: | 274.5 Metres |
| Breadth: | 48 Metres |
| Main Engine: | 6S70 MC-C MAN B&W |

D02482

ANNEX "B" (DETAILS OF CREW) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| Date of Agreement | : | As mentioned in box 1 |
|---|---|---|
| Detail of Crew | ; | 25 Crew Members in total |
| Contract Duration | ; | abt 4 months Senior Officers |
| | | abt 5 -7 months Junior Officers, |
| | | abt 6 months Ratings |

| Numbers | Rank | Nationality |
|---|---|---|
| 1 | Master | Turkish |
| 1 | Chief Officer | Turkish |
| 1 | 2nd Officer | Turkish |
| 1 | 3rd Officer | Turkish |
| 1 | 4th Officer | Turkish |
| 1 | Extra Officer | Turkish |
| 1 | Chief Engineer | Turkish |
| 1 | 2nd Engineer | Turkish |
| 1 | 3rd Engineer | Turkish |
| 1 | 4th Engineer | Turkish |
| 1 | Elect. Eng. | Turkish |
| 1 | Pumpman | Turkish |
| 5 | Able Seaman | Turkish |
| 2 | Ordinary Seaman | Turkish |
| 1 | Fitter | Turkish |
| 3 | Oiler | Turkish |
| 1 | Chief Cook | Turkish |
| 1 | Steward | Turkish |

This complement is for standard trade. In case of Special requirements (STS, Storage etc.) the complement may be
adopted accordingly.

D02483

ANNEX "C" (BUDGET) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement          :          10 FEBRUARY 2015
Manager's Budget for the first year with the effect from the commencement date of this agreement:
Please refer to operating Expense budget with detailed break down of the operating expenses

Estimated budget for 2015 in USD for MT ADVANTAGE START

| | Budget In USD |
|---|---|
| | Perday |
| Crewing | 4,600 |
| Victualing | 250 |
| Luboil | 500 |
| Technical | 1,200 |
| Insurance and other miscellaneous items | 1,200 |
| G&A - inclusive of management fees | 1,000 |
| Total | 8,750 |

Remarks:
Crewing is based on complement of 25 crew members with Turkish officers & ratings.
Luboil based on 270 seagoing days and on today's prices.
Technical expenses include all costs for stores , spares services,class for engine and deck department
General include all costs for ; communication,represantations,travelling,vetting,transportation,ISM/ISPS,port expenses.
Excluding dry docking and related costs.

D02484

# EXHIBIT 7

**$61,000,000 Secured Loan Agreement**

**Dated**        16      **March 2015**

(1)    **Advantage Sun Shipping LLC and Advantage Start Shipping LLC**
        **(as Borrowers)**

(2)    **The Financial Institutions**
        **listed in Schedule 1**
        **(as Original Lenders)**

(3)    **CIT Finance LLC**
        **(as Agent)**

(4)    **CIT Finance LLC**
        **(as Security Agent)**



Stephenson Harwood LLP
1 Finsbury Circus
London EC2M 7SH
Tel +44 20 7329 4422
Fax +44 20 7329 7100
DX No 64 Chancery Lane
www.shlegal.com

**STEPHENSON HARWOOD**

**$61,000,000 Secured Loan Agreement**

Dated      16    March 2015

(1)     **Advantage Sun Shipping LLC and Advantage Start Shipping LLC**
          **(as Borrowers)**

(2)     **The Financial Institutions**
          **listed in Schedule 1**
          **(as Original Lenders)**

(3)     **CIT Finance LLC**
          **(as Agent)**

(4)     **CIT Finance LLC**
          **(as Security Agent)**

Stephenson Harwood LLP
1 Finsbury Circus
London EC2M 7SH
Tel +44 20 7329 4422
Fax +44 20 7329 7100
DX No. 64 Chancery Lane
www.shlegal.com



**STEPHENSON HARWOOD**

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with Clause 23 (Changes to the Lenders),

which in each case has not ceased to be a Lender in accordance with the terms of this Agreement.

"**LIBOR**" means:

(a)     the applicable Screen Rate; or

(b)     (if (i) no Screen Rate is available for the currency of the Loan or (ii) no Screen Rate is available for the relevant Interest Period) the Reference Bank Rate,

as of 11.00 a.m. on the Quotation Day for dollars and for a period equal in length to the relevant Interest Period and, if that rate is less than zero, LIBOR shall be deemed to be zero.

"**Loan**" means the aggregate amount advanced or to be advanced by the Lenders to the Borrowers under Clause 2 (*The Loan*) or, where the context permits, the principal amount advanced and for the time being outstanding.

"**Majority Lenders**" means a Lender or Lenders whose Commitments aggregate more than $66^2/_3\%$ of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than $66^2/_3\%$ of the Total Commitments immediately prior to the reduction).

"**Management Agreement**" means, for each Vessel, the agreement for the commercial and technical management of that Vessel entered into or to be entered into between the Borrower owning the Vessel and the Manager upon the terms acceptable to the Agent.

"**Manager**" means Genel Denizcilik Nakilyati A.S. in its capacity as both the commercial and technical manager of each Vessel under a Management Agreement and as corporate administrator of each Borrower and the Guarantor under an Administration Agreement or such other commercial and/or technical manager of each Vessel or corporate administrator of each Borrower and the Guarantor nominated by the relevant Borrower as the Agent may approve.

"**Manager's Undertakings**" means the written undertakings of the Manager whereby, throughout the Facility Period unless otherwise agreed by the Agent:

(a)    it will remain the commercial and technical managers of the Vessels and the corporate administrator of the Borrowers and the Guarantor;

(b)    it will not, without the prior written consent of the Agent, subcontract or delegate the commercial or technical management of the Vessels (as the case may be) or the corporate administration of the Borrowers and the Guarantor to any third party;

(c)    the interests of the Manager in the Insurances will be assigned to the Security Agent with first priority; and

(d)    all claims of the Manager against the Borrowers shall be subordinated to the claims of the Finance Parties under the Finance Documents.

**"Margin"** means, in respect of each Tranche three point seven five (3.75%) per cent per annum.

**"Material Adverse Effect"** means in the reasonable opinion of the Majority Lenders a material adverse effect on:

(a)    the business, operations, property, condition (financial or otherwise) or prospects of any Security Party; or

(b)    the ability of any Security Party to perform its obligations under any Finance Document; or

(c)    the validity or enforceability of, or the effectiveness or ranking of any Encumbrance granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

**"Maximum Loan Amount"** means $61,000,000.

**"Maximum Tranche Amount"** means the lesser of (a) $30,500,000 and (b) 60.00% of the Fair Market Value of the relevant Vessel in respect of each Tranche (evidenced by the valuations received by the Agent under Clause 4.1 (*Initial conditions precedent*)).

**"MoA"** means in relation to each Borrower, a memorandum of agreement entered into between it and the relevant Seller on the terms and conditions of which the relevant Vessel is transferred into the ownership of that Borrower.

**"Mortgages"** means the first preferred mortgages referred to in Clause 17.1.1 (*Security Documents*) and **"Mortgage"** means any one of them.

**"New Lender"** has the meaning given to that term in Clause 23.1 (*Assignments and transfers by the Lenders*).

**"Non-Consenting Lender"** has the meaning given to that term in Clause 34.4.4 (*Replacement of Lender*).

**"OFAC"** means the Office of Foreign Assets Control of the United States Department of Treasury.

**Signatures**

**The Borrowers**

| **Advantage Sun Shipping LLC** | ) |
| | ) |
| By: | ) |
| | ) |
| Address: Yapi Kredi Plaza, A Blok Kat 15, | ) |
| Levent, Istanbul, Turkey | ) |
| | ) |
| Fax no.: +902123255814 | ) |
| Department/Officer: Mehmet Mat | ) |

MEHMET MAT

| **Advantage Start Shipping LLC** | ) |
| | ) |
| By: | ) |
| | ) |
| Address: Yapi Kredi Plaza, A Blok Kat 15, | ) |
| Levent, Istanbul, Turkey | ) |
| | ) |
| Fax no.: +902123255814 | ) |
| Department/Officer: Mehmet Mat | ) |

MEHMET MAT

**The Agent**

| **CIT Finance LLC** | ) |
| | ) |
| By: | ) |
| | ) |
| Address: 11 West 42nd Street, New York, | ) |
| New York 10036, USA | ) |
| Fax no.: +1 212 771 1095 | ) |
| Department/Officer: Chief Credit Officer, | ) |
| Maritime | ) |

and with respect to insurance matters only,
with a copy to:

Address: CIT Group Inc., 1 CIT Drive,
Livingston, NJ 07039, USA
Fax No.: +1 973 535 3767
E-mail: InsuranceRenewals@CIT.com
Department: Corporate Insurance

# EXHIBIT 8

# GEDEN HOLDINGS LTD.

85 St.John's Street , Valletta . Malta

Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14

Messrs.

PSARA ENERGY LIMITED

Ajeltake Road, Ajeltake Island

Majuro, MH 96960

Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for all single purpose companies which owns one vessel each. The borrowers for the bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd., Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

# EXHIBIT 9

 Enterprise Improvement

 Corporate Turnaround and Restructuring

 Financial Advisory Services

 Information Management Services



Chicago  Dallas  Detroit  Düsseldorf  London  Los Angeles  Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo  Washington, DC

# Project Hermitage
# Restructuring

March 6 2013



EXHIBIT

F

tabbies

www.alixpartners.com

DEKABANK copy, March 6 2013

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1.  The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.

2.  The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.

3.  The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy  March 6 2013

AlixPartners

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising. Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk. Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

AlixPartners

DEKABANK copy, March 6 2013

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

DEKABANK copy, March 8 2013

AlixPartners



## Contents

I.   Executive Summary / Remarks from the Company

II.   Background

III.   Restructuring Proposal

IV.   Financial Analysis

V.   Conclusions

DEKABANK copy. March 6 2013

5

AlixPartners



I. Executive Summary

DEKABANK copy, March 6 2013

AlixPartners

# Executive Summary

▸ The November 20 Proposal provides the basis for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

▸ The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

▸ In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  – Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  – Constrain cross subsidization between stakeholders related to different underlying assets
  – Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  – Maximize options for stakeholders and potential for self-selection

▸ A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

▸ This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D: the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

DEKABANK copy, March 6 2013

AlixPartners



## II. Background

DEKABANK copy, March 6 2013

AlixPartners



# Background
## The Market

▸ Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
  − The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
  − The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013

▸ Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
  − 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
  − 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m





Source: Clarkson Research

AlixPartners

DEKABANK copy, March 6 2013



# Background
## The Company

- The Company has actively been managing its portfolio since 2008, mainly via:
  - The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  - The Sale of 12 vessels upon delivery for net proceeds of $136m
  - The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  - The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)

- Earnings from vessels  financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels  have fallen $43m short of obligations in the period 2011-2012.

- In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  - Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  - Deferral of some November and December 2012 principal repayments
  - Deferral of 35% of the bareboat hire payments
  - Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue [1]
  - Management of supplier overdue through the quarter

- While all stakeholders have reserved their rights, some specific stakeholder actions have affected the  cash flows
  - Unicredit has drawn on its deposit accounts
  - Icon issued a lien notice to the charterers and has directly received charter income

- With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and  c.$7.5m in restricted cash deposits

---

[1] Does not include default interest, margin increases and bank fees

AlixPartners



# Company and Fleet Overview

The Company – Recent Events

‣ Flash

  1. The Flash ran aground at the end of June and is currently arrested in Tunisia
  2. The customer has invoked damage of goods (wet coal) and has refused to take delivery
  3. 180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m
  4. The claim has been rejected by the Club on the basis that the damage is to cargo
  5. An arbitrator is to be appointed week of Mar 4 2013

‣ Baytur

  1. Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

‣ Royal Refinancing

  1. The Royal was refinanced through a $37.5m facility with Credit Europe
  2. Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal
  3. $10m has been paid to HSH and $10m is outstanding to the yard

DEKABANK copy   March 6 2013

AlixPartners



# Company and Fleet Overview
Employment, Tanker

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Tankers** | | | | | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Apr-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

AlixPartners

DEKABANK copy March 6 2013

DRAFT - PRELIMINARY

# Company and Fleet Overview
## Employment, Bulk

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Bulkers** | | | | | | | | | |

| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
|---|---|---|---|---|---|---|---|---|---|
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | May-14 | 7 |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | - | - | - | Jan-00 | - |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | Jun-14 | - |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | Mar-13 | - |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | May-13 | 3 |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | 7,014 | Apr-13 | 3 |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | 7,267 | May-13 | 3 |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | 6,978 | Jul-13 | 2 |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | Feb-13 | - |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | 5,850 | May-13 | - |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | 7,256 | Apr-13 | 3 |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | 8,422 | Feb-13 | - |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | 7,219 | Apr-13 | 3 |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | 8,422 | Apr-13 | 3 |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | Jan-00 | - |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | 8,265 | Jul-13 | - |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | 11,700 | Apr-13 | 1 |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | 12,255 | Mar-13 | - |

DER BANK copy March 5 2013

AlixPartners



III. Restructuring Proposal

DEKABANK copy, March 6 2013

AlixPartners



# Restructuring Proposal
## Key Assumptions

▸ Key assumptions under the Plan include
- – All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
- – There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
- – Stakeholders in groups **C and D will have the option to move into A** subject to loan modifications adhering to the conditions prevalent in that entity.
- – Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.

▸ The Company would prefer a coordinated financing approach in Newco

▸ The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here

▸ Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco A
## Newco A Example

▸ **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities

▸ **Assumptions : 1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.



Note: Indicative transaction structure subject to legal due diligence
[1] Equity of $1.1m also as a result of transfer of Namrun at value greater than senior debt
[2] $52.6m financed in excess of market value of assets

16

AlixPartners

# Plan B – Split of Fleet via Newco: Alpha

Structuring: Facility #1

---

▸ **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m)

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan [1] | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY #1 | | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | | |
| Aframax | NLB | Target | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| Aframax | Unicredit | Value | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Bravo | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Power | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| Suezmax | CB NLB BrLB | Blue | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| Suezmax | HSH 1 | Hero | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| MR | HSH 2 | Citron | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| MR | HSH 2 | Citrus | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| Handy | DVB NLB SAN | Acor | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| Handy | DVB NLB SAN | Carry | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB SAN | Rova | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cotton | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cargo | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| Handy | DVB NLB | Rock | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handy | DVB NLB | Rocket | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handymax | DVB | Asia | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| Mini Bulker | DVB | Earth | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| Mini Bulker | DVB | Wind | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | | **20** | **99%** | **95%** | **504.7** [1] | **511.0** | **(5.9)** [2] | **25.6** | **31.5** [3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)
[2] Represents sum of shortfall only
[3] Total amount of equity related to sale / purchase of vessels in Facility #1
[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

DEKABANK copy, March 8 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #1

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | 2.4 | 1.6 | 4.0 | 0.0 | 29.5 |

1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%





# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #2

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|------|------|------|------|------|------|------|
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the <u>excess cash remains in Oldco (C)</u>. Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%



AlixPartners

DEKABANK copy. March 6 2013

# Plan B – Split of Fleet via Newco: Alpha
## Structuring

- Facility#2: Lloyds vessels sold and refinancing provided on the same terms
- Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
- Facility#4: Credit Europe sold and refinancing provided on the same terms
- Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
- Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #2** | **Lloyds facility rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| **FACILITY #3** | **Natixis facilities rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| **FACILITY #4** | **Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun** | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| **FACILITY #5** | **Deka facility rolled over into Newco but paid only from available cash from these vessels** | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| **FACILITY #6** | **NSF 2nd Lien facilities** | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | n/a | | | | 25.5 |
| **TOTAL Newco Alpha** | | | 29 | 97% | 95% | 799.3 | 795.0 | (5.9) [3] | 58.5 | 64.4 | 44.6 | 784.0 |

MV of Newco Alpha Assets

Total Capital required

New Alpha debt

(1) Royal refinancing includes second lien ; LTV on first lien is 75%
(2) Equity value from the rollover of the Namrun loan an $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
(3) Represents sum of shortfall only

20

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha
## Structuring – Example #3

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |

1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) <u>no new equity is required upon refinancing of Newco with $37.3m in debt</u>





# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #4



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|------------------------------|------------------------------|------------------------------------------|-------------------------------|-------------------------------------------------------------------------------------|-------------------------------------------|-------------------------------|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

Amount of loan novated is beyond market value at the time of the transaction; no recapitalization



DRAFT & PRELIMINARY

DEKABANK copy March 6 2013

# Plan B – Split of Fleet via Newco: Alpha
Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---|---|---|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

[1] Does not include additional liquidity for operational cash

23

AlixPartners

DEKABANK copy. March 6 2013



# Plan B – Split of Fleet via Newco: Beta
Structuring

---

▸ **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.

▸ **Assumptions :**  Loans novated to Newco Beta on existing terms.  **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Capesize | CCB | Flash | 100% | 100% | 33.1 | 33.0 |
| Capesize | CCB | Proud | 100% | 100% | 33.1 | 33.0 |
| Capesize | CDB | Angel | 119% | 119% | 43.0 | 36.0 |
| Capesize | CDB | Pretty | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

AlixPartners



# Plan B – Split of Fleet via Newco: Group C
Structuring

▸ **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.

▸ **Assumptions :**  Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Kamsarmax | GB Global | Cash | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | Coll./Chance | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | City | 96% | 96% | 26.0 | 27.0 |
| Handymax | NSF | South | 84% | 84% | 19.3 | 23.0 |
| Handymax | NSF | East | 84% | 84% | 19.3 | 23.0 |
| Handymax | GB Global | West | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Secret | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Sharp | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Capital | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Metropol | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | World | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

DEKA BANK copy, March 8 20

AlixPartners



# Plan B – Split of Fleet: Residual Oldco: Group D
## Structuring

▸ **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.

▸ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan (PV of leases) | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| **Aframax** | FSL | **Aqua** | 234% | 234% | 60.8 | 26.0 |
| **Aframax** | FSL | **Action** | 234% | 234% | 60.8 | 26.0 |
| **Aframax** | Stealth | **Spike** | 177% | 177% | 55.0 | 31.0 |
| **Aframax** | Stealth | **Avor** | 176% | 176% | 54.5 | 31.0 |
| **Suezmax** | Icon 1 | **Center** | 145% | 145% | 67.9 | 47.0 |
| **Panamax** | Octavian 1 | **Enjoy** | 141% | 141% | 42.2 | 30.0 |
| **Panamax** | Octavian 2 | **Marka** | 128% | 128% | 41.0 | 32.0 |
| **Handymax** | Icon 2 | **Fantastic** | 157% | 157% | 29.9 | 19.0 |
| **Handymax** | Icon 2 | **Amazing** | 157% | 157% | 29.9 | 19.0 |
| Chartered - Afra_Tanker | not ours | CV Stealth | | | | |
| Chartered - Afra_Tanker | not ours | CS Stealth | | | | |
| **Subtotal SPVs** | | **11** [1] | **169%** | **169%** | **441.9** | **261.0** |
| **Corporate facility** | Bank Asya | | | | 39.5 | |
| **Total Group D** | | | | | **481.4** | |

[1] Baytur sold before the transaction

DEKABANK copy, March 2013

AlixPartners

# Plan B – Summary

Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB SAN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

AlixPartners

DEKABANK copy. March 6 2012

DRAFT & PRELIMINARY

# Plan B – Summary

Bank Exposure: By Bank

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

AlixPartners



IV. Financial Analysis

DEKABANK copy, March 6 2013

AlixPartners



# Assumptions
## General

▸ Business plan is based on the following main assumptions:

### Operations

— 20 offhire days for drydocking
— Rates applied to reflect type of vessel, adjusted for contract terms

— Charter-out options exercised if below market rate
— No Opex inflation
— No working capital movements

### Investments

— Dry docking taken from technical management schedule
— No asset sales
— Capex as per financing commitments

— Charter-in come off upon expiry
— Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

### Financing

— No variation in current base rate
— Margins as per specific facilities (following pages)
— Amortization as per specific facilities
— No interest rate swap

— Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
— Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

### Restructuring

— No mechanism for bareboat catch-up
— Bareboat purchase options not exercised

— No restructuring fees
— All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

AlixPartners

DEKABANK copy, March 6 2013

## Assumptions
Rates

▸ The Company's market projections imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

▸ The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%



AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 15 |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - Lloyds |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - Natixis |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - NSF 2nd Lien (behind Unicredit) |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - Dekabank |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

DEKABANK copy, March 6 2013

33

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

▸ The below tables summarises the features of debt on Newco Alpha



Note: surface area represents percentage share of total facility

DEKABANK copy, March 6 2013

AlixPartners

34

# Financial Analysis

## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | - | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | **66.7** | **(12.2)** | **(12.1)** | **(23.0)** | **(25.6)** | **(25.4)** | **(26.0)** | **(26.1)** | **(26.0)** | **(25.9)** |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | **(64.4)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | **21.0** | **5.6** | **7.1** | **(2.7)** | **(5.6)** | **(5.5)** | **1.2** | **0.0** | **(1.0)** | **0.1** |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | **20.8** | **26.4** | **33.5** | **30.7** | **25.1** | **19.6** | **20.8** | **20.8** | **19.9** | **20.0** |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Senior Debt Balance* | - | (754.5) | (754.5) | (750.0) | (745.5) | (730.0) | (711.7) | (693.4) | (674.4) | (655.1) | (635.6) |
| *NSF 2nd lien Balance* | - | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% | |
| Hamburg Jumbo Value (depreciated) | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 | |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

[1] 9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.

[2] Asset purchases net of new financing

[3] Equity cure for 85% covenant in Q4 14 and 80% for Q4 16

[4] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis
## Summary of Terms: Newco Beta

▸ The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 8 2013

36

AlixPartners

# Financial Analysis

## Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | (7.4) | (7.4) | (7.3) | (7.6) | (7.6) | (7.5) | (7.4) | (7.4) | (4.4) | (4.4) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | (0.4) | (0.4) | (0.9) | (1.8) | (3.3) | (3.3) | (2.4) | (2.3) | 0.8 | 0.7 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | (0.4) | (0.8) | (1.7) | (3.5) | (6.8) | (10.2) | (12.6) | (14.8) | (14.1) | (13.3) |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | (161.3) | (155.2) | (149.0) | (142.9) | (136.5) | (130.0) | (123.6) | (117.2) | (110.8) | (107.3) |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis
## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| Working capital changes [1] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| | | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | 54.0 | (38.0) | (48.2) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| | | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | [2] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| **Net Investment** | (82.7) | (36.8) | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| | | | | | | | | | | | | |
| **Net cashflow for period** | 6.0 | (45.5) | 8.2 | (8.9) | (7.7) | (6.9) | (7.4) | (7.6) | (0.9) | (1.4) | (26.2) | (0.8) |
| | | | | | | | | | | | | |
| **Cumulative net cash balance** | 41.0 | (4.5) | 3.7 | (5.3) | (12.9) | (19.8) | (27.2) | (34.8) | (35.7) | (37.1) | (63.4) | (64.2) |
| | | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | (1,109.5) | (1,064.2) | - | - | - | - | - | - | - | - | - | - |
| *Bareboat balance* | (471.3) | (453.4) | (433.7) | (412.8) | (392.0) | (371.7) | (351.1) | (330.3) | (309.6) | (289.3) | (268.8) | (250.3) |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[1]  Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m ooutstanding to Rongsheng is left unpaid
[2]  Purchase obligations on sale leasebacks assumed to generate cash loss  equivalent to deficiency between current outstanding obligation and market value

AlixPartners



V. Conclusions

DEKABANK copy, March 6 2013

AlixPartners

# Current Proposal
## Strategy and Objectives

▸   The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

DEKABANK copy   March 6 2013

AlixPartners



# Contents

A.   Facility Description
B.   Financials: Existing
C.   Market Overview

DEKABANK copy, March 6 2013

41

AlixPartners

DRAFT & PRELIMINARY

# Appendix
## Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

DEKABANK copy  March 6 2013

AlixPartners

# Appendix: Transaction Analysis
Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

AlixPartners

# Appendix: Transaction Analysis
Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

DEKABANK copy, March © 2013

AlixPartners


DRAFT & PRELIMINARY

## Assumptions
Revenue





DEKABANK copy March 6 2013

AlixPartners



# Assumptions
Revenue





# Appendix: Additional Financial Analysis

Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **54.4** | **(86.2)** | **(104.0)** | **(102.7)** | **(98.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | **(64.4)** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net cashflow for period** | **26.4** | **(6.8)** | **0.4** | **4.9** | **18.4** |
| | | | | | |
| **Cumulative net cash balance** | **26.4** | **19.6** | **20.0** | **24.9** | **43.3** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | (754.5) | (749.8) | (693.2) | (616.0) | (536.9) |
| *NSF 2nd lien Balance* | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

AlixPartners

# Appendix: Additional Financial Analysis
Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | 14.1 | 20.6 | 20.4 | 21.3 | 23.4 |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | 14.1 | 20.6 | 20.4 | 21.3 | 23.4 |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | (14.8) | (30.0) | (23.6) | (23.5) | (22.8) |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | (0.8) | (9.4) | (3.2) | (2.2) | 0.5 |
| | | | | | |
| **Cumulative net cash balance** | (0.8) | (10.2) | (13.3) | (15.6) | (15.0) |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | (161.3) | (149.0) | (123.6) | (103.9) | (83.8) |
| *Bareboat balance* | | | | | |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK corr., March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis
Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | **(53.0)** | **(82.4)** | **(77.9)** | **(64.0)** | **(49.6)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | **(75.0)** | **-** | **(23.9)** | **(37.2)** | **(24.1)** |
| | | | | | |
| **Net cashflow for period** | **(40.3)** | **(29.5)** | **(29.4)** | **(21.5)** | **(4.2)** |
| | | | | | |
| **Cumulative net cash balance** | **(5.3)** | **(34.8)** | **(64.2)** | **(85.7)** | **(89.9)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(1,109.5)* | *-* | *-* | *-* | *-* |
| *Bareboat balance* | *(471.3)* | *(392.0)* | *(309.6)* | *(231.7)* | *(167.7)* |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013

AlixPartners



# Appendix

Bank Exposure: Hamburg reduced to 90% LTV

‣ Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

DEKABANK copy. March    13

AlixPartners

DRAFT & PRELIMINARY

# Appendix

Potential loss on bareboat purchase obligations

▸ There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

| | Purchase obligation ($m) | Estimated value today ($m) | Loss on resale | Depreciated value ($m) | Loss on resale | Purchase Ob. Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| **TOTAL** | **234.5** | **178** | **-56.5** | **149.2** | **-85.3** | | | |

DEKABANK copy. March 6 2013


AlixPartners

# Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

| **Chicago** | **Dallas** | **Detroit** | **Dubai** | **Düsseldorf** | **London** | **Los Angeles** | **Milan** |
|---|---|---|---|---|---|---|---|
| 300 N. LaSalle Street | 2101 Cedar Springs Road | 2000 Town Center | Gate Village 10, Level 03 | Königsallee 59 a | 20 North Audley Street | 515 S. Flower Street | Corso Matteotti 9 |
| Suite 1900 | Suite 1100 | Suite 2400 | P.O. Box 125115 | 40215 Düsseldorf | London W1K 6WE | Suite 3050 | 20121 Milan |
| Chicago, IL 60654 | Dallas, TX 75201 | Southfield, MI 48075 | Dubai Intl Financial Centre | Germany | United Kingdom | Los Angeles, CA 90071 | Italy |
| 312.346.2500 | 214.647.7500 | 248. 358.4420 | Dubai, United Arab Emirates | +49.211.97.55.10.00 | +44.20.7098.7400 | 213.437.7100 | +39.02.360.12000 |
| | | | +971.4.401.9246 | | | | |

| **Munich** | **New York** | **Paris** | **San Francisco** | **Shanghai** | **Tokyo** | **Washington, DC** |
|---|---|---|---|---|---|---|
| Mauerkircherstr. 1 a | 40 West 57th Street | 49/51 Avenue George V | 4 Embarcadero Center | Suite 6111 | Marunouchi Building 33F | 1602 L Street, NW |
| 81679 München | New York, NY 10019 | 75008 Paris | 31st Floor, Suite 3110 | Plaza 66 Building I | 2-4-1 Marunouchi | Suite 300 |
| Germany | 212.490.2500 | France | San Francisco, CA 94111 | 1266 Nan Jing West Road | Chiyoda-ku | Washington, DC 20036 |
| +49.89.20.30.40.00 | | +33.1.76.74.72.00 | 415.848.0283 | Shanghai, 200040 China | Tokyo 100-6333 Japan | 202.756.9000 |
| | | | | +8621.6171.7555 | +81.3.5533.4800 | |

© AlixPartners, LLP, 2010

AlixPartners

DEKABANK copy, March 8 2013

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : | |
| **LTD.; ADVANTAGE START SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI  KARAMEHMET -** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## ATTORNEY DECLARATION

Pursuant to 28 U.S.C. § 1746, this declaration is executed by George A. Gaitas, counsel for Plaintiff, PSARA ENERGY, LTD., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.

I, George A. Gaitas, declare under the penalty of perjury:

I am a Member of the firm of GAITAS, KENNEDY & CHALOS, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Original Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.; ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET;

1

GULSUN NAZLI KARAMEHMET-WILLIAMS; and TUGRUL TOKGOZ, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the Defendants in this District.

I have directed attorneys in my firm to check with the office of the Louisiana Secretary of State, using the Secretary of State's database, to determine whether the Defendants can be located within this District. SPACE SHIPPING LTD.; ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; GEDEN HOLDINGS, LTD; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET-WILLIAMS; TUGRUL TOKGOZ are not registered with the Louisiana Secretary of State. Accordingly, I have determined that, as of April 20, 2018, none of these Defendants are incorporated or registered as foreign corporations pursuant to the laws of Louisiana, and have neither nominated nor appointed any agent for the service of process within this District.

I have directed attorneys in my firm to engage a search of the Superpages telephone directory on the internet, and determined that there are no telephone listings or addresses for the Defendants within this District.

I have engaged in a "Google search" in order to determine whether any of the Defendants can be located within this District. The Google search results did not provide a listing for the named Defendants save for GEDEN HOLDINGS, LTD. for which it showed a former registration with the Secretary of State of Louisiana, which was withdrawn in 2016, and remains inactive.

I am unaware of any general or managing agent(s) of the named Defendants within this District.

In that I have been able to determine that the Defendants have not appointed agent for service of process within the Eastern District of Louisiana, and that I have found no indication that the Defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief based on my own investigation and that of the attorneys under my direction that the Defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District that may defeat the conditions for issuance of process of maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my investigation and that performed by attorneys in my firm under my direction that the Defendants cannot be found within this District for purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: April 20, 2018          Respectfully submitted,
       Houston, Texas
                              Gaitas, Kennedy & Chalos, P.C.

                              By:    _/s/ George A. Gaitas_____

                                     George A. Gaitas
                                     Louisiana State Bar No. 05879
                                     Federal Bar No. 705176
                                     6250 Westpark Dr.
                                     Suite 222
                                     Houston, Texas 77057
                                     Telephone: 281-501-1800
                                     Fax: 832-962-8178
                                     E-mail:gaitas@gkclaw.com

3

*Attorneys for Plaintiff*

PSARA ENERGY, LTD.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : | |
| **LTD.; ADVANTAGE START SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI  KARAMEHMET** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Despoina Bacha, declares under the penalty of perjury:

1.      I am an individual of sound mind, and have never been convicted of a crime of moral turpitude.

2.      I am a citizen of Greece and a resident of Athens and a lawful representative of the Plaintiff in the above action and duly authorized on its behalf to make this verification.

3.      I have read the foregoing Verified Complaint and exhibits thereto in the above captioned action and know the contents thereof; and

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed in Athens, Greece this 18ᵗᵘ day of  April, 2018.

Despoina Bacha

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PSARA ENERGY, LTD. | Space Shipping, Ltd.; Geden Holdings, Ltd.; Advantage Start Shipping, LLC; Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines; Advantage Tankers, LLC; Advantage Holdings, LLC; Forward Holdings, LLC; Mehmet Emin Karamehmet; Gulsun Nazli Karamehmet Williams; Tugrol Tokgoz |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gaitas, Kennedy & Chalos, P.C.
6250 Westpark Dr., Ste. 222, Houston, Texas, 77057
281-501-1800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☒ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1333; 9 U.S.C. §§ 4, 8

Brief description of cause:
Fed. R. Civ. P. Rule 9(h) Breach of Maritime Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 04/20/2018 | /s/George A. Gaitas |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

PSARA ENERGY, LTD.,

              Plaintiff,

vs.                                                                                    NO.1:18-CV-00178-MAC

SPACE SHIPPING, LTD., et al.,

              Defendants.

## ORDER FOR SUBSTITUTE SECURITY

This case is assigned to the Honorable Marcia A. Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial management.  Pending before the court is the "Advantage Defendants' Motion to Vacate Attachment or, Alternatively, for Reduction in Security."  Doc. No. 7.

## I.  Background

On April 20, 2018, Plaintiff Psara Energy, Ltd. (Psara) filed suit for breach of contract against the Defendants pursuant to Fed. R. Civ. P. 9(h), Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B"), and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.  Doc. No. 1, at 1–2.  According to the complaint, Psara alleges it entered into a bareboat charter agreement in 2010 with Defendant Geden Holdings, Ltd. to charter the CV STEALTH vessel.  *Id.* at 5.  The charter was amended so that Defendant Geden Holdings became the "performance guarantor" of Defendant Space Shipping, Ltd.  *Id.*  Though Defendant Space Shipping, Ltd. was obligated to keep the vessel in a good state of repair with up-to-date classifications, it failed to do so.  *Id.*  In 2014, the CV STEALTH was detained in Venezuela for more than three years by prosecutorial authorities, and Defendant Space Shipping, Ltd. failed

to return the ship by the contractual redelivery date.  *Id.* at 7.  When the CV STEALTH was finally released from Venezuela, it was out-of-class and so extensively damaged due to neglect that it was incapable of sailing and in need of extensive repairs.  Doc. No. 1, at 8.  Defendant Space Shipping, Ltd. towed the CV STEALTH to Trinidad where Psara took possession on March 24, 2018.  *Id.* Due to the extensive damage to the CV STEALTH, Psara has initiated a London maritime arbitration claim for damages equivalent to the repaired market value of the ship ($18,000,000.00) and amounts for unpaid charter hire, legal costs, interest, and other costs (an additional $1,860,063.80).  *Id.* at 10, 25.  Due to the transfer of a vessel fleet from Defendant Geden Holdings, Ltd. to other corporate entities (including Defendants), Psara brings suit against the current slate of Defendants under fraudulent transfer and corporate succession theories.  *See generally id.*

Psara filed its "Motion for Order Authorizing Issuance of Process of Maritime Attachment and Garnishment" (Doc. No. 3) on the same day as the complaint.  The motion requested the court issue a writ of maritime attachment for a shipping vessel—the M/T ADVANTAGE ARROW, IMO #: 9419448, Call Sign: V7KZ7—located within this judicial district.  Doc. No. 3, at 2.  An *ex parte* order was entered directing the United States Marshal for the Eastern District of Texas to seize and attach the M/T ADVANTAGE ARROW, and a bond to obtain the release of the vessel was fixed at $19,860,063.80.[1]  Doc. No. 4.  The vessel was seized and attached.  *See* Doc. No. 8.

On April 26, 2018, Defendants Advantage Arrow Shipping, LLC, Advantage Tankers, LLC, Advantage Holdings, LLC, and Forward Holdings, LLC ("Advantage Defendants") made a special appearance to file their "Motion to Vacate Attachment or, Alternatively, for Reduction in Security."  Doc. No. 7.  Psara filed a response to the motion to vacate (Doc. No. 11), and a hearing was held on the motion before the undersigned on April 30, 2018.  Doc. No. 13.  At the hearing,

---

[1] All monetary figures are in U.S. Dollars.

the parties were instructed to attempt to reach an agreement by May 4, 2018, concerning the amount of substitute security to be provided in lieu of keeping the M/T ADVANTAGE ARROW under attachment, otherwise the court would determine the amount of substitute security.  On May 1, 2018, the Advantage Defendants informed the court that the parties are unable to reach an agreement because of "an apparent fundamental disagreement regarding how the amount of security should be calculated," and the Advantage Defendants request the court determine the amount of substitute security at the court's earliest convenience.  Doc. No. 14, at 2.  Psara's response, though blaming the Advantage Defendants for unilaterally deciding to cease negotiations, illustrates the fundamental disagreement regarding which figures should be used in calculating substitute security.  *See* Doc. No. 15.  At the hearing, and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees for the attachment of the M/T ADVANTAGE ARROW.

## II.  Legal Standard

Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule E") addresses substitute security:

> In the event of the inability or refusal of the parties [to stipulate the amount and nature of the security,] the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller. The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum.

Rule E(5)(a).  Rule E itself provides no further instructions on calculating the "fairly stated" value of a plaintiff's claim, and "guiding standards are sparse."  *Billfish Marina One, Inc. v. M/Y Hideaway*, 2017 A.M.C. 1743 (S.D. Fla. Jan. 23, 2017).  Evidence from outside the complaint (i.e. affidavits) may be considered in determining the fairly stated amount of a plaintiff's claim.  *20th*

*Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1429, 1430 (M.D. Fla. 1997) (The court "may look beyond the 'four corners' of the claim" in determining the "fairly stated" claim amount) (citing 7A Moores Fed. Prac. 2d Ed. ¶ E.13[2] at E–612–613); *see also Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp.*, 2009 A.M.C. 2628 (2d Cir. 2009) ("In light of the historical practice and purpose of maritime attachments, we conclude that a court may assess preliminarily the reasonableness of plaintiff's damages claim when setting a security under Rule E(5)."). A plaintiff does not need to prove damages with "exactitude," but the court should satisfy itself during the preliminary assessment that a plaintiff's claims are not "frivolous." *Transportes Navieros*, 2009 A.M.C. 2628.

The Advantage Defendants argue that under English law "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach." Doc. No. 7, at 17 (citing M. Davis, Bareboat Charters § 15.12 at 90 (Informa Law 2005), citing *Channel Island Ferries Ltd. v. Cenargo Navigation Ltd.* (The "Rozel"), [1994] 2 Lloyd's Rep. 161). Psara does not explicitly refute this articulation of English law. Psara sets out a formula for all of the variables involved in such a calculation in the instant case. *See* Doc. No. 15, at 3–4.

The substitute security for the release of the vessel must include not only the amount that would be due at the time of the substitute security hearing, but a sufficient sum to cover payment of the claim when the case would ultimately come to trial. *Angad v. M/V Fareast Trader*, 1989 A.M.C. 2721 (S.D. Tex. 1989). "Any ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434.

Under federal law, courts have not included attorney's fees in the substitute security amount because there is no federal statute authorizing such an award. *See Billfish Marina One*,

2017 A.M.C. at 1746; *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995) (holding, under the well-established "American Rule," prevailing parties do not recover attorney's fees from the losing party, absent a statute or contractual provision to the contrary.). Accordingly, the Advantage Defendants are likely not entitled to attorney's fees for defending the instant case in this court. However, Rule E(2)(b) does appear to authorize including attorney's fees as part of the substitute security amount (when appropriate), and Psara has requested its attorney's fees for London arbitration to be included. Doc. No. 1, at 11. The English legal system does not follow the "American Rule," and arbitration tribunals commonly tax costs and attorneys' fees to the losing party. *Arbitration Act of 1996*, c. 23, § 61 (Eng.).

### III.  Analysis

#### A.      Substitute Security Formula

As stated previously, the Advantage Defendants argue "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach" under English law. Doc. No. 7, at 17. Accordingly, the Advantage Defendants simply calculate the proper amount of substitute security as the repaired value of the CV STEALTH ($9,500,000) subtracted by its scrap value ($7,825,000), resulting in $1,675,000. Doc. No. 7-4.

Psara's most recent filing argues the proper method to calculate the "quantum of its claim fairly stated" is to:

- begin with the **repaired value of the CV STEALTH vessel**;
- subtract the **scrap value of the vessel**;
- add the **towage fees related to scrapping the vessel**;
- add the **amount of unpaid charter hire**;
- add **interest**;
- add **costs**; and
- add **lawyer's fees**.

Doc. No. 15, at 3–4.  Based on the figures suggested by Psara, this calculation results in a claim for "$15,910,208.30 at the very least."  *Id.* at 4.[2]  Though Rule E(5)(a) might allow them to request it, Psara does not request a substitute security of up to twice that amount.  Instead, Psara requests a substitute security of $16,000,000 even.  The formula suggested by Psara for calculating the value of the CV STEALTH itself is the same as the Advantage Defendants' formula, though Psara also specifically addresses the other damages that may be included in the overall claim amount. The parties obviously differ on the value of the variables within the formula.

### B.      Substitute Security Variables

#### 1. Value of the CV STEALTH

Psara argues that the market value of the CV STEALTH (fully repaired) is $18,000,000.00. Doc. No. 15, at 4.  Psara arrived at this market value based on a claim written by Barrister Alexander Wright with Chambers at 4 Pump Court in London in March 2018.  Doc. No. 11, at 15. However, Barrister Wright does not provide *any* facts underlying the bald assertion that the "(repaired) market value of the Vessel . . . is USD 18 million."  Doc. No. 11, Ex. 5, at 5–6. Accordingly, the claim from Barrister Wright is unhelpful in determining the value of the CV STEALTH because he does not point to any underlying evidence that aided him in his conclusion.

By coincidence, one month *after* Barrister Wright made his claim that the CV STEALTH's repaired value was $18,000,000, an April 2018 valuation letter from "international ship sale and purchase brokers Cass Technava in Piraeus, Greece," states that the CV STEALTH (in good repair) is worth approximately $18,000,000.  Doc. No. 11-6.  Psara relies on Cass Technava's

---

[2] Psara's figures: $18,000,000 repaired value − $3,600,000 scrap value after towing fees + $510,208.33 unpaid charter hire + $1,000,000 for interest, legal costs, and recoverable legal fees = $15,910,208.33 (Psara miscalculated the figure by three cents).  Doc. No. 15, at 3–4.  The combined value for interest, legal costs, and recoverable legal fees is listed as $1,000,000 in Doc. No. 15, but in the complaint it was listed as $6515.50 in awarded legal costs, $943,340 in interest and $400,000 in recoverable legal fees.  Doc. No. 1, at 25.

valuation in their argument concerning the market value of the ship.  Doc. No. 11, at 15.  However, the Cass Technava letter is also of little value for the following reasons: (1) no information is provided about the qualifications of the authors; and (2) there is no underlying factual basis for arriving at the valuation figure (i.e. the valuation does not specify if it has taken into account similar vessels which have been sold for comparable amounts).  Doc. No. 11-6.

Psara's most recent filing addresses, for the first time, how the scrap value of the CV STEALTH should be subtracted from its market value when calculating the substitute security. Doc. No. 15.  Without any supporting documentation of the scrap value or towing costs, Psara posits that the scrap value is $3,600,000 *after* towage fees to Trinidad.  *Id.* at 3.  The CV STEALTH is already in Trinidad according to Psara.  Doc. No. 1, at 8.  Psara bases its figure on a declaration from an English Solicitor, Jeremy Biggs, who represents Psara in London arbitration proceedings. Doc. No. 15-1, at 1.  Mr. Biggs makes his claim that the scrap value is $3,600,000 after towing without *any* supporting documentation or reference to any external sources.  *Id.* at 3.  Mr. Biggs' estimate is conclusory because he does not point to any underlying evidence that aided him in his conclusion.

The Advantage Defendants provided a declaration and ship valuation from Mr. Paul Willcox of C.W. Kellock & Co., a ship valuation company based in London.  Doc. No. 7-4.  Mr. Willcox values the CV STEALTH "in sound trading condition" at $9,500,000, and the "demolition value" as $7,825,000.  Mr. Willcox's valuations appear reliable for the following reasons: (1) Mr. Willcox is employed as a "senior ship valuer"; (2) he has prepared expert reports and given evidence in two separate cases in the United States Bankruptcy Court for the Southern District of Texas in 2011 and 2012; (3) under penalty of perjury, Mr. Willcox declares that the two valuation reports attached are true and accurate copies of the originals; (4) both valuations specify that Mr.

Willcox has taken into account similar vessels which have been offered for sale in light of the market knowledge and experience of C.W. Kellock & Co. within the industry; and (5) pursuant to his declaration, the Advantage Defendants have Mr. Willcox's written permission to rely on the valuations in this court. Doc. No. 7-4. Because Mr. Willcox's valuations have some factual basis, he sets forth his qualifications for his expertise (including the admission of his expert testimony in an adjacent federal district), and the Advantage Defendants have his permission to use his valuation in court, the undersigned finds his valuation more credible than Psara's valuation. The values from Mr. Willcox's valuation will be used in the substitute security amount.

### 2. Towing Costs

Neither party has specifically addressed the costs of actually towing the CV STEALTH for demolition. Psara argues that the scrap value itself is $3,600,000 *after* towing costs to Trinidad, but they do not offer an estimation of what the towing costs would be or any information about alternative destinations. Doc. No. 15-1, at 3. The Advantage Defendants rely on Mr. Willcox's valuation which assumes the ship will be delivered to India for demolition, but he does not specify the cost of towing to India or any alternative destination. It is the responsibility of Psara to state with "particularity" in the complaint the circumstances from which the claim arises to allow the Defendants to investigate and frame their responsive pleading. Rule E(2)(a). *See Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000) ("[I]t was incumbent on [plaintiff] under Rule E to state the amount of its claim with particularity, indicating the basis for arriving at that amount, inasmuch as [the parties] could not agree on the amount of the bond to be posted to secure release of his boat."). Because Psara has not stated towing costs with any particularity— Psara has not even given an estimated figure—no towing costs will be included in the substitute security amount.

### 3. Interest

Psara claims reasonable interest at 6% (compounded quarterly for one year) amounts to $943,340, but they did not inform the court exactly how this amount was calculated.  Doc. No. 1, at 25.  The Advantage Defendants implicitly concede that some interest may be proper in the substitute security amount, but they argue the interest amount requested by Psara is too high based on the CV STEALTH's proper valuation and should be "adjusted according[]" to the ship's true, lower valuation.  Doc. No. 7, at 18.  However, the Advantage Defendants also fail to inform the court exactly how the interest should be calculated.  Based on a the calculated damages for the CV STEALTH at $1,675,000.00 (Mr. Willcox's fair market value minus scrap value), the interest rate of 6% (compounded quarterly for one year) results in an interest amount of $102,783.95.  This amount will be included in the substitute security amount.

### 4. Legal Costs

For previously awarded legal costs, Psara claims $6515.50.  The Advantage Defendants mention, but never challenge, the previously awarded legal costs claimed by Psara. *See* Doc. No. 7, at 17.  Accordingly, this amount will be included in the substitute security amount.  Psara also seeks $400,000 in legal costs that "will be incurred to pursue these claims in London maritime arbitration proceedings" because it is customary in London arbitration for the prevailing party to be entitled to legal costs and lawyers' fees.  Doc. No. 1, at 11; *see also Arbitration Act of 1996*, c. 23, § 61 (Eng.).  The Advantage Defendants argue that Psara has provided "no support or evidence for its claimed entitlement to security for $400,000 in recoverable legal fees and costs," but they do not provide the court with what they believe to be a reasonable figure.  Doc. No. 7, at 18–19.

Given the already contentious nature of the proceedings in this court[3] concerning the Rule B attachment, $400,000 appears to be a reasonable figure if the parties pursue the claim in London arbitration.  Psara will likely be awarded its costs if it wins in arbitration, and $400,000 will be included in the substitute security amount.

### C.    Dockage Fees

At the hearing on April 30, 2018 (Doc. No. 13), and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees after the attachment of the M/T ADVANTAGE ARROW.  In *Beauregard*, the court required all seizing parties to share in the cost of maintaining a seized ship.  *Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 353 (5th Cir. 1997) ("Often the party that filed a suit will pay the entire cost of maintaining the *res* until the resolution of the case. At the judicially ordered sale, the cost of maintenance is deducted from the sale proceeds before the remaining proceeds are divided among the claimants. Therefore, even when a single litigant advances the cost of maintenance, all claimants are eventually required to share in this cost.").  Under 28 U.S.C. § 1921(a)(1)(E), the United States marshals shall collect fees for "keeping of attached property," including ships.  United States Marshal Service Policy Directive 11.9 implies that arresting parties are ordinarily responsible for dockage fees.  *See* Doc. No. 17-5, at 8 ("The 'initial' arresting party is responsible for making the payments.").  This appears to be the case even when the Marshal uses another entity to store the property.  *See Marastro Compania Naviera S.A. v. Canadian Mar. Carriers, Ltd.*, 963 F.2d 754, 757 (5th Cir. 1992) ("The court holds the marshal responsible for the execution of the writ, including the storage and safekeeping of the seized property although it is customary and common practice for the

---

[3] Psara has also attached another ship owned by a related Advantage entity in the Eastern District of Louisiana based upon similar allegations.  *See Psara Energy, Ltd. et al v. Space Shipping, Ltd. et al.*, Case No. 2:18-cv-4111-ILRL-JCW.

marshal on occasion to delegate certain of these duties, including storage and safekeeping to others."). Accordingly, the court determines, at this time, that Psara is responsible to pay the dockage fees (and other fees) associated with arresting the vehicle and docking it since the arrest.

### D.   Conclusions

For the purposes of this order for substitute security, the undersigned makes the following calculations:

| | |
|---|---:|
| Repaired Value of CV STEALTH | $9,500,000.00 |
| Scrap Value of CV STEALTH | ($7,825,000.00) |
| Unpaid Charter Hire[4] | $510,208.33 |
| Towing | $0.00 |
| Interest | $102,783.95 |
| Awarded Legal Costs | $6,515.50 |
| Future Legal Costs | $400,000.00 |
| | |
| **TOTAL of Fairly Stated Claim:** | **$2,694,507.78** |

Under Rule E(5)(a), the parties were unable (or refused) to stipulate to a substitute security amount, and the court fixes the sum. Psara's claim, fairly stated, amounts to $2,694,507.78. **The undersigned fixes the substitute security amount at $4,000,000.00** because "[a]ny ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434. The substitute security of $4,000,000 does not, under Rule E(5)(a) "exceed (i) twice the amount of the Plaintiff's claim," nor does it exceed "(ii) the value of the property on due appraisement." Rule E(5)(a).

It is, therefore, **ORDERED** that the Advantage Defendants' "Motion to Vacate Attachment or, Alternatively, for Reduction in Security" is **GRANTED in part** because a

---

[4] *See* Doc. No. 7, at 17 (Advantage Defendants mention, but never challenge, the unpaid charter hire figure claimed by Psara).

reduction in security is appropriate at this time.  The court will address the "Motion to Vacate Attachment" at a later time.

It is further **ORDERED** that upon the posting of **$4,000,000.00** in cash security into the registry of the Court as substitute security, the attachment of the M/T ADVANTAGE ARROW shall then be released.  This order is intended to set substitute security for the claims alleged by Psara in this action, without additional seizure of the M/T ADVANTAGE ARROW, and is not intended to be and is not a waiver of any rights, remedies, claims, counterclaims, or defenses that may be available to any Party.

It is further **ORDERED** that Psara shall be responsible for paying the custodial costs associated with the attachment and docking of the ship in connection with the instant case.  Should the Advantage Defendants not post the substitute security by 8:00 AM on May 11, 2018, the Advantage Defendants will then be responsible for the costs associated with docking of the ship after that date.

It is further **ORDERED** that the Advantage Defendants' "Emergency Opposed Motion for Order Regarding Payment of Custodial Costs" (Doc. No. 17) is **DENIED** as moot.

SIGNED this 4th day of May, 2018.

_____
Zack Hawthorn
United States Magistrate Judge

# EXHIBIT D

**PSARA ENERGY, LTD.**

### Plaintiff

**SPACE SHIPPING, LTD.; GEDEN
HOLDINGS: LTD.; ADVANTAGE ARROW
SHIPPING, : LLC; GENEL DENIZCILIK
NAKLIYATI A.S. : A/K/A GEDEN LINES;
ADVANTAGE TANKERS, LLC; ADVANTAGE
HOLDINGS, : LLC; FORWARD HOLDINGS,
LLC; MEHMET EMIN KARAMEHMET;
GULSUN NAZLI KARAMEHMET-
WILLIAMS; and TUGRUL TOKGOZ**

**C.A. NO. 1:18-CV-00178**

**ADMIRALTY**

### Defendants

Bond No SU55698

### SPECIAL RELEASE BOND

TO THE HONORABLE JUDGES OF SAID COURT:

**WHEREAS** a Verified Complaint was filed in this Court on April 20, 2018, by Plaintiff

Psara Energy, Ltd. ("PSARA") against several defendants including: Advantage Arrow

Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings,

LLC; and

**WHEREAS** PSARA attached property belonging to Advantage Tankers, LLC i.e., the

MT ADVANTAGE ARROW IMO No. 9419448 and international call sign V7KZ7, registered

in the Marshall Islands to Defendant Advantage Arrow Shipping, LLC, pursuant to Rule B of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions

("Supplemental Rules") to the Federal Rules of Civil Procedure; and

**WHEREAS** on April 26, 2018 Advantage Arrow Shipping, LLC; Advantage Tankers,

LLC; Advantage Holdings, LLC; and Forward Holdings, LLC; made a restricted appearance

1

pursuant to Rule E(8) of the Supplemental Rules; and

WHEREAS on May 4, 2018, the Court ordered that, to obtain release of the MT ADVANTAGE ARROW from seizure and attachment "...upon the posting of **$4,000,000.00** in cash security into the registry of the Court as substitute security, the attachment of the MIT ADVANTAGE ARROW shall then be released."

NOW, THEREFORE, for the benefit of PSARA that Advantage Arrow Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, as principals, and Aspen American Insurance Company, as surety, are held and firmly bound to PSARA in the principal fixed sum of, and not to exceed, FOUR MILLION DOLLARS ($ 4,000,000), upon condition that if Advantage Arrow Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC shall abide by orders of the Court, or of any appellate court to which this action may proceed should an appeal be taken, and shall pay the amount, if any, awarded against Advantage Arrow Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, or any of them by final order rendered in this action, after any appeal, including any and all interest, costs and attorney's fees awarded by the Court, after any appeal, then this obligation shall be void; otherwise, it shall remain in full force.

This Special Release Bond is written entirely without prejudice to any rights or defenses which Advantage Arrow Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, may have, including, but not limited to, the right to restrict any appearance pursuant to Rule E(8) of the Supplemental Rules, and the right to seek dismissal of any action filed in this Court or other court under any of the Federal Rules of Civil Procedure. This Special Release Bond is intended to set substitute security for the claims alleged by PSARA in this action, and is not intended to be and is not a waiver of any rights, remedies, claims, counterclaims, or defenses that may be available to any Party. This Special Release Bond is not

2

to be construed as an admission of liability or as a waiver of any rights or defenses available to Advantage Arrow Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, all of which are fully reserved.

Executed on this ____day of May, 2018

> By: Advantage Arrow Shipping, LLC;
>
> Advantage Tankers, LLC;
>
> Advantage Holdings, LLC;
>
> and Forward Holdings, LLC;
>
> By: Marcus Matthews
>
> _____
>
> As Attorney-in-fact

Taken and acknowledge before me as to Defendants this ___ day of May, 2018

> _____
>
> Notary Public in and for The State of Texas

> Aspen American Insurance Company,
> Surety
>
> By: *Martha Lynn Coor*
>
> Martha Lynn Coor, Attorney-in-Fact

Taken and acknowledge before me as to Attorney-in-Fact this *11* day of May, 2018

BRANDY S. BOND
Notary Public
STATE OF TEXAS
My Comm. Exp. August 11, 2018

*Brandy S. Bond*
Notary Public in and for The State of Texas



**ASPEN**

**Aspen American Insurance Company**
175 Capital Boulevard, Rocky Hill, CT 06067

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, THAT Aspen American Insurance Company, a corporation duly organized under the laws of the State of Texas, and having its principal offices in Rocky Hill, Connecticut, (hereinafter the "Company") does hereby make, constitute and appoint: **Michael Lance Abbott; Martha Lynn Coor** of **BevCap Management, LLC** its true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred to sign, execute and acknowledge on behalf of the Company, at any place within the United States, the following instrument(s) by his/her sole signature and act: any and all bonds, recognizances, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking and any and all consents incident thereto, and to bind the Company thereby as fully and to the same extent as if the same were signed by the duly authorized officers of the Company. All acts of said Attorney(s)-in-Fact done pursuant to the authority herein given are hereby ratified and confirmed. This appointment is made under and by authority of the following Resolutions of the Board of Directors of said Company effective on April 7, 2011, which Resolutions are now in full force and effect;

VOTED: All Executive Officers of the Company (including the President, any Executive, Senior or Assistant Vice President, any Vice President, any Treasurer, Assistant Treasurer, or Secretary or Assistant Secretary) may appoint Attorneys-in-Fact to act for and on behalf of the Company to sign with the Company's name and seal with the Company's seal, bonds, recognizances, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said Executive Officers at any time may remove any such appointee and revoke the power given him or her.

VOTED: The foregoing authority for certain classes of officers of the Company to appoint Attorneys-in-Fact by virtue of a Power of Attorney to sign and seal bonds, recognizances, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, as well as to revoke any such Power of Attorney, is hereby granted specifically to the following individual officers of Aspen Specialty Insurance Management, Inc.:

**Michael Toppi**, Executive Vice President, **Scott Sadowsky**, Senior Vice President, **Kevin W. Gillen**, Senior Vice President, **Mathew Raino**, Senior Vice President, **Ryan Field**, Senior Vice President; **Timothy P. Griffin**, Vice President, **Casey Sullivan**, Vice President, **Keith Flannery**, Vice President, **Mary Duroska**, Vice President, **Frank Campiglia**, Vice President and **Ray Philippon**, Assistant Vice President.

This Power of Attorney may be signed and sealed by facsimile (mechanical or printed) under and by authority of the following Resolution voted by the Boards of Directors of Aspen American Insurance Company, which Resolution is now in full force and effect:

VOTED: That the signature of any of the Officers identified by title or specifically named above may be affixed by facsimile to any Power of Attorney for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any and all consents incident thereto, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company. Any such power so executed and certified by such facsimile signature and/or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking so executed.

IN WITNESS WHEREOF, Aspen American Insurance Company has caused this instrument to be signed and its corporate seal to be hereto affixed this 6th day of June , 2017.

STATE OF CONNECTICUT

          SS. ROCKY HILL

COUNTY OF HARTFORD

Aspen American Insurance Company

Michael Toppi, Executive Vice President

On this 6th day of June, 2017 before me personally came Michael Toppi, Executive Vice President to me known, who being by me duly sworn, did depose and say; that he/she is Executive Vice President of Aspen American Insurance Company, the Company described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to the said instrument is such corporate seal; and that he/she executed the said instrument on behalf of the Company by authority of his/her office under the above Resolutions thereof.

Notary Public
My commission expires: 2/28/2019

**Vanessa Arias**
**Notary Public**
**State of Connecticut**
**My Commission Expires February 28, 2019**

## CERTIFICATE

I, the undersigned, Michael Toppi of Aspen American Insurance Company, a stock corporation of the State of Texas, do hereby certify that the foregoing Power of Attorney remains in full force and has not been revoked; and furthermore, that the Resolutions of the Boards of Directors, as set forth above, are now and remain in full force and effect.

Given under my hand and seal of said Company, in Rocky Hill, Connecticut, this ____ day of _____, _____.



By: _____ Name: Michael Toppi, Executive Vice President

* For verification of the authenticity of the Power of Attorney you may call (860) 760-7728 or email:Patricia.Taber@aspen-insurance.com

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

PSARA ENERGY, LTD.                    CIVIL ACTION

VERSUS                                NO. 18-4111

SPACE SHIPPING, LTD., ET AL           SECTION "B"(2)

<u>ORDER</u>

A *Rule E(4)(f)* hearing was held on Wednesday, May 16, 2018, with counsel for the parties, Plaintiff Psara Energy and Defendant Advantage Start Shipping. The Court found Plaintiff's valuations in the newly submitted evidence to be excessive. Pursuant to oral reasons given in open court, including that mentioned above,

**IT IS ORDERED** that $800,000.00 is sufficient additional security for fair valuation of Plaintiff's claim in order to cover reasonable towage costs that was heretofore unavailable when fair value computations were originally made in related proceedings in the Eastern District of Texas. This additional security is also given in reliance upon the decision by the latter jurisdiction of which neither party ever sought reconsideration or appeal. Suitable security may be made in the form of cash, bond, or combination thereof, using the form approved in the related Eastern District of Texas proceeding.

**IT IS FURTHER ORDERED** that the parties are to submit memoranda on the propriety of transferring this action to the Eastern District of Texas, or staying this action pending resolution of the underlying arbitration proceedings in London, England. Such memoranda is to be submitted **no later than fourteen (14) days from entry of this Order**.

New Orleans, Louisiana, this 18th day of May, 2018.

SENIOR UNITED STATES DISTRICT JUDGE

# EXHIBIT F

 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
     **************************************************************
 3   PSARA ENERGY, LTD.

 4                                    Civil Action No. 18-4111
     VS.                             Section "B"
 5                                    New Orleans, Louisiana
                                     May 16, 2018 at 4:00 p.m.
 6
     SPACE SHIPPING, LTD., ET AL.
 7   **************************************************************

 8                   TRANSCRIPT OF MOTION HEARING
           HEARD BEFORE THE HONORABLE IVAN L.R. LEMELLE
 9                 UNITED STATES DISTRICT JUDGE
                              DAY 2
10
     APPEARANCES:
11
     FOR THE PLAINTIFF:          GEORGE A. GAITAS
12                               JONATHAN MICHAEL CHALOS
                                 Gaitas, Kennedy & Chalos, PC
13                               6250 Westpark Drive
                                 Suite 222
14                               Houston, TX 77057

15   FOR THE DEFENDANT:          KEVIN J. LAVIE
                                 Phelps Dunbar, LLP
16                               Canal Place
                                 365 Canal Street
17                               Suite 2000
                                 New Orleans, LA 70130
18
                                 MARC MATTHEWS
19                               Phelps Dunbar, LLP
                                 Allen Center
20                               500 Dallas Street
                                 Suite 1300
21                               Houston, TX 77002

22   Official Court Reporter:    Nichelle N. Drake, RPR, CRR
                                 500 Poydras Street, B-275
23                               New Orleans, Louisiana 70130
                                 (504) 589-7775
24
         Proceedings recorded by mechanical stenography,
25   transcript produced via computer.

**P R O C E E D I N G S**

(Call to order of the court.)

**3**          THE DEPUTY CLERK:  Civil Action 18-4111, Psara

**4**     Energy, Ltd., versus Space Shipping, Ltd., et al.

**5**          THE COURT:  All right.  Counsel, make your

**6**     appearances.

**7**          MR. GAITAS:  George Gaitas, Your Honor, for the

**8**     plaintiff, and also Mr. Jonathan Chalos, my partner, who is

**9**     -- has applied for *pro hac* admission.  It's in the pipeline.

**10**          THE COURT:  All right.

**11**          MR. LAVIE:  Your Honor, Kevin LaVie for Defendant

**12**     Advantage Start Shipping, LLC, and with me is Mr. Marc

**13**     Matthews.  He's with our Houston office.  He was involved in

**14**     hearings in Texas.  We have not yet moved to admit him and we

**15**     don't know if we are, but he's here in case there are any

**16**     questions that arise.

**17**          THE COURT:  All right.  Both of the attorneys who

**18**     were involved in the Texas matters will be considered as

**19**     potential witnesses that the Court may have to question.

**20**          Let's begin with going back to where we ended off

**21**     yesterday.  We received an estimate for towage costs and

**22**     other items from the Plaintiffs.  It had a range of $2.5 to

**23**     $3 million concerning towage costs.  There were some other

**24**     items as well that were attached to a report from what

**25**     appears to be a salvage company.

1        The Defendant shipowners were given an opportunity

2    then to respond to that report.  They submitted a memorandum

3    that basically said that they did not have an opportunity to

4    obtain someone, like a salvage or other type of expert, to

5    respond, but they urged that the Court not consider this

6    information from the Plaintiff on the basis that the Texas --

7    the Magistrate Judge in Texas, who gave his valuation, a fair

8    value of the Plaintiff's claim as well as some other

9    information, did not include a valuation or an estimate for

10   towage costs.

11       Clearly, when I read the Magistrate Judge's opinion,

12   he indicated that neither side had information concerning the

13   towage costs.  But in the memorandum from the Defendants that

14   I received here, you argued in here, Mr. LaVie, on page -- on

15   Page 1, Numbered Paragraph 1, that "towage costs were in fact

16   considered in Texas.  The Court ruled that the Plaintiff had

17   failed to submit satisfactory evidence."  You have in parens,

18   "the burden being on the Plaintiff to do so."  "The

19   Plaintiff" did not -- "had not requested an adjournment to

20   enable it to submit such evidence and did not make the

21   excuses it now makes for not having provided such evidence."

22   You go on to state that "the Texas Court accordingly ruled

23   that no allowance would be given in respect to towage costs."

24       I didn't interpret the Magistrate Judge's ruling as

25   saying that if towage costs would have been presented that he

would have rejected or excluded it.  I know that in reaching

a fair value for the claim the Magistrate Judge considered

evidence from both the Plaintiff and the Defendant rejecting

the Plaintiff's evidence concerning fair value on the basis

that the valuation given was not -- either wasn't credible or

didn't have sufficient indication of trustworthiness for

reasons concerning the background of the evaluator for the

Plaintiffs as well as some other things.  He thought it was

speculative without any real support.

His ruling in that regard, as I stated yesterday, is

the law of the case as far as I'm concerned.  But I go back

to what I said earlier, yesterday as well as today.  I got

the indication from reading his opinion, which is what I'm

going by, that -- that he would have considered towage costs

had that evidence been presented to him.  Your argument here

seems to suggest that he wouldn't have allowed towage costs.

Or is it simply that he didn't allow it because he didn't

have evidence of it at the time?

MR. LAVIE:  Well, our argument remains primarily,

Your Honor, that you should not have multiple bites at the

apple.  This was all litigated.  And we had two ships tied up

for long periods of time.  This one's still tied up for a

claim that was originally stated to be $19 million, which was

ultimately found to be $2.6 million plus maybe towage costs.

That's an abuse of situation.  It's an abuse of process.

1      There is some requirement of specific -- specific

2  pleading in getting your ducks in a row when you go to a

3  hearing.  We went to that hearing in Texas, and that was

4  their opportunity to present it.  That's our primary

5  argument.

6      We're also --

7      THE COURT:  But, again -- go ahead.

8      MR. LAVIE:  Yeah, if I may.

9      We've also kind of sat back and wondered why the

10  towage costs weren't included, and there's always been a

11  suspicion here that there's really no attempt to salvage this

12  vessel or to tow it anywhere or to do anything with it.

13      THE COURT:  Well, I was going to get to that point

14  because I was going to address that with your opponent.

15      Your other part of the argument, among other things,

16  was that if it is indeed "a wreck" as the Plaintiff

17  characterized it yesterday as well as in the Southern

18  District of Texas, that's not worthy of anything other than

19  salvage, breaking it apart, selling the scrap metal or what

20  have you, then why do you need to tow it?  But I'm going to

21  save that for your opponent.

22      My question for you though is -- while you're

23  correct, you should only be given one bite at the apple, and

24  if you're given an opportunity then to present your evidence,

25  then you can't come back later and try to either re-litigate

something that's already been litigated or present something new that you -- you had a reasonable amount of time to present at the original hearing as opposed to later.

As you know, the case law allows for new evidence to be presented where there is a -- a reasonable basis why it was not available at the time of the original hearing. So there is an exception to that rule.

You argue I know in your memo that you thought that the Plaintiff had sufficient time to obtain the towage estimate that's given to me, but I think you had also stated something to the effect that you believe they already had it at the time of the Texas proceeding?

MR. LAVIE: Well, no. What we state very clearly is that they moved for a continuance of this whole hearing on Monday, which was the 14th of May. In the valuation they ultimately produced, which they claimed they needed time to produce, it's dated May 10th, which is just another example of what we're fighting here where nothing's a square solid target.

Again, they came into the court on Monday and said, "We need time for valuations." The Court did not grant that, and all of a sudden, they produce a valuation from May 10th, which, again, gave us no opportunity to respond because had we got it on May 10th, we would have had more than 24 hours to try to get some valuations.

1      THE COURT:  When was the Magistrate Judge's ruling?

2  May 7th?  3rd?  What was it?

3      MR. LAVIE:  May 4th.

4      THE COURT:  May 4th.

5      MR. LAVIE:  The hearing was held on April 30th, so

6  actually they had from April 30th to May 4th to get

7  information then and to try and supplement that record

8  because I believe -- and Mr. Matthews can talk if we need him

9  to, but I believe the issue must have been addressed during

10  the hearing.

11      They knew then that they didn't have the evidence.

12  They had until -- until May 4th to produce it.  And then, of

13  course, they also could have asked for some prompt

14  reconsideration of that or motion to supplement even after

15  May 4th.

16      THE COURT:  Did they -- did they seek an extension of

17  the hearing to get that information?

18      MR. LAVIE:  No, Your Honor.

19      THE COURT:  I know we talked yesterday about checking

20  the record in Texas, and I didn't see, nor any of the lawyers

21  indicated, any post-hearing appeals or reconsiderations.  Is

22  that still the case to your knowledge?

23      MR. LAVIE:  Yes, to my knowledge, correct, Your

24  Honor.

25      THE COURT:  What about the status of the London

1    arbitration proceedings?  Are you all in a position to tell

2    me anything about what's the status of that?

3         MR. LAVIE:  I think Mr. Gaitas may be in this case

4    longer than the two of us here, but my understanding is that

5    their -- their claim has been put forth.  I don't think our

6    defense has yet been filed.  If it has been filed, it's only

7    been recently.  So the arbitration is still fairly new.

8         THE COURT:  You said something --

9         MR. LAVIE:  And to be clear, Your Honor, the

10   arbitration -- and I'm sorry to interrupt.  But the

11   arbitration is against Space Shipping.  And, of course, here

12   we're dealing with alter-ego fraudulent transfer.  Advantage

13   Tankers or Advantage Start Shipping, we are not a party to

14   that arbitration.  They are seeking security if they can

15   pierce these corporate veils, which they already failed to do

16   in 2016 in very similar litigation.

17        So we're not a direct party to the arbitration.  Of

18   course, we tried to find out some aspects about it, and I

19   think that's where the status stands, but, you know, I can't

20   verify that.

21        THE COURT:  Now, there were two Texas Federal Court

22   proceedings, one in Southern Texas and one in East Texas,

23   correct?

24        MR. LAVIE:  Yes, Your Honor.

25        THE COURT:  The one in Southern Texas in 2016 led to

a dismissal on the merits and vacating the attachment.  And I
take it there's been no appeals or anything of that
proceedings to your knowledge?

MR. LAVIE:  I'll defer to others.

MR. MATTHEWS:  If I may, Your Honor --

THE COURT:  Again, for the record, your name.

MR. MATTHEWS:  Marc Matthews.

My understanding, Your Honor, is that Magistrate
Stacy entered her memorandum and recommendation.  There may
have been objections filed to that, but the underlying case
was resolved prior to the District Judge adopting that
memorandum and recommendation.

THE COURT:  How was it resolved?

MR. MATTHEWS:  I was not a party to that, so I'm not
exactly -- I don't -- I can't speak to exactly what the
resolution was, Your Honor.

THE COURT:  It sounds like an amicable resolution.

MR. MATTHEWS:  I believe it was.

THE COURT:  As you know, even the District Judge's
opinion that's the subject of appeal that -- that settled
before the Appellate Court renders a decision is not
ordinarily given any presidential value.  But the Eastern
Texas proceedings is the main one that I was concentrating
on.  It's the most recent one.  It's the one where there was
a full hearing, no appeals, no post-trial proceedings that I

1 know of, seeking appeal of that Magistrate's ruling to the

2 District Court or even to the Appellate Court. My statements

3 before concerning it being the law of the case remains.

4 But I don't get the impression from that Magistrate

5 Judge's actual opinion that they would have excluded evidence

6 of towage costs had it been presented to them or that it

7 would automatically be excluded if the Plaintiff was able to

8 show reasonable basis why it was not produced at that

9 original proceedings. You're arguing to me that by the fact

10 that they were able to produce it, a few days after getting

11 notice of these proceedings, coming to hearing yesterday,

12 which was May 15th, that they had this estimate. At least it

13 was dated May 10th.

14 All right. Anything else from your side?

15 MR. LAVIE: No, Your Honor.

16 THE COURT: Well, I do have one other question. I'm

17 sorry.

18 You propose as an alternative and, again, you state

19 "and only given the massive losses being suffered due to the

20 detention of your client's vessel that no more than an

21 additional 800,000 to $1 million in security above the

22 $1.4 million cushion that the Magistrate Judge in Eastern

23 Texas gave should be ordered which more than adequately

24 secures the claim for towage costs during the spring or

25 summer."

1      Is that a best-guess estimate, or is that based on

2 something else?

3      MR. LAVIE:  Well, what we're basing it on is the

4 estimate they produced for towage, which we think is probably

5 high like every other estimate given.  It was 2.2, I believe,

6 to 2.5 for summer or calm weather towage.  So if you take the

7 1.4 million cushion that the Texas Judge allowed and add

8 $800,000 for that, then that's an additional 2.2 million over

9 and above what he ordered for the other elements that he

10 found.

11      THE COURT:  What would be the cost of a bond for 800

12 -- to secure or have substitute security for $800,000 to

13 release the vessel and using again the bond that the

14 Magistrate Judge ultimately approved?  Because I know there

15 were some issues about the original proposals.

16      MR. LAVIE:  Well, it's two parts to that.  The bond

17 cost, I think, is generally around two percent.  But the

18 problem is that you can't obtain a bond unless you have some

19 kind of counter-security out there.

20      And what happens in some of these situations -- and

21 I'm not -- I'd have to think about this one for a second, but

22 in a normal P&I Club situation, everybody thinks if you have

23 P&I, you're fine.  But, usually, the P&I Club signs off on

24 the bond, which means you only pay the two percent premium.

25 Behind the scenes, the P&I Club is asking for

```
 1   counter-security in the full amount of the claim, either in a

 2   bank letter of guarantee or something else.  So, you know,

 3   the actual cost is --

 4        THE COURT:  Can it be a pledge of security, like the

 5   vessel?

 6        MR. LAVIE:  Sometimes you can.  You're right.  I mean

 7   -- but, you know, here -- you know, that's a -- not -- not

 8   really an option I don't think.  If it's an in rem claim,

 9   sometimes you can, maybe be able to work out something like

10   that, but there has to be some kind of counter-security.  So

11   it ties up -- in one way, shape or form, it ties up

12   100 percent or close to 100 percent of the amount of the bond

13   in some type of counter-security, less than two percent.

14        THE COURT:  I've seen it perfected, the bond

15   perfected, within 24 hours after, you know, the request for

16   the substitute security is made, sometimes longer.  Do you

17   have any idea here?

18        MR. LAVIE:  It took us a good while to get the bond

19   in Texas, and it was because of counter-security issues as I

20   understand it.  It took a while -- I mean, yeah, a cash-rich

21   shipowner can usually get a bond within 24 hours.  Somebody

22   else who has to look for bank guarantees or scrape together

23   money, it can take -- I think in Texas it took about six days

24   maybe, five or six days, to get the counter-security worked

25   out.
```

1      THE COURT:  Assuming that the London arbitration is

2 proceeding on some timely footing or basis and if you get a

3 decision from the London arbitrator prior to any disposition

4 of the case here or the case in Eastern Texas, would that

5 arguably moot both actions?

6      MR. LAVIE:  Yes, I think it would.  If there -- I

7 mean, if there was an arbitration -- well, I'm not familiar

8 enough with -- familiar enough with the arbitration to say

9 definitively.  If there's a finding that Space Shipping,

10 which is not related, which is not Advantage Shipping --

11      THE COURT:  Right.  I understand.

12      MR. LAVIE:  -- if there's an argument that Space

13 Shipping is not liable, it definitely moots these issues.  If

14 it's part of the arbitration, they're making the argument

15 there, which I don't think they are, but if they are making

16 the argument, then they have the double hurdle.  They have to

17 prove Space Shipping is liable.  Then they have to somehow

18 prove that these other entities are related.  So I think it

19 could be a situation, if they get a decision at arbitration

20 just against Space Shipping, then I guess these issues may

21 still exist.

22      THE COURT:  And I know that the question I'm asking

23 you now about the arbitration proceeding really is not

24 totally relevant to this -- this instant stage of this

25 proceeding, dealing with the vessel's security or substitute

security.  And this next question is sort of probably the
same category, questionably relevant, but, you know, I guess
I sit up in these robes and I can ask my questions anyway.

What's the position of your client?  Have you all
thought about consolidating or possibly transferring these
actions so that they'd be heard in one jurisdiction, one
venue to avoid duplicative proceedings, discovery, et cetera?

MR. LAVIE:  We haven't thought about that.  I mean, I
-- that all depends --

THE COURT:  I mean, and under the rules, if you're
just talking about, say, venue issues, it's -- we go at a
first-filed rule.  But, again, I didn't know what position
the parties were in in that regard.

MR. LAVIE:  Yeah.  We've been too busy with
everything else to think about that.  I mean, generally, I --
certainly we always recommend --

THE COURT:  All right.  Because that --

MR. LAVIE:  It saves everybody --

THE COURT:  -- would be my next step, once we resolve
this thing, is to consider a transfer to Eastern Texas.

MR. LAVIE:  We don't know which -- I mean, I don't
know which one was filed first.  They were filed the same
day.

THE COURT:  Oh, they were?

MR. LAVIE:  Yes, sir.  And so I don't -- I guess you

1   would have to look at -- you know, bar in agreement of the

2   parties, you may have to look at exactly what time one was

3   filed, but they were both filed on April 20th.

4       THE COURT:  I was frankly surprised though that the

5   Texas Federal Courts, Southern and Eastern, were still using

6   the magistrates for this purpose, for vessel seizure

7   purposes.  That surprised me, but that's neither here nor

8   there.

9       Let's go to your opponent.

10      MR. GAITAS:  Yes, Your Honor.

11      May I address some of the questions that Your Honor

12  asked?

13      THE COURT:  Please.

14      MR. GAITAS:  My friend did not have answers for them

15  because he didn't know, for example, the arbitration.

16      The arbitration points of claim were served on Space

17  Shipping, Limited, more than two months ago, and they have

18  not served a response, which is due 14 days after they are

19  served.  They have asked the -- I was informed today that

20  they have asked for some more time and they identified within

21  a week or two.

22      One thing I would like to correct on the record is

23  that we did not move the Court for a continuance on the 14th

24  of May.  We did so yesterday, the 15th, and we did get the

25  continuance.  We have filed nothing on -- as far as I know on

1    earlier in -- in these proceedings apart from the application

2    for the attachment for Advantage Start.

3         THE COURT:  But more importantly, did you seek an

4    extension or continuance of the Eastern Texas proceeding?

5         MR. GAITAS:  We did not, Your Honor, because it

6    was -- the attachment there was getting extremely expensive.

7    It was $10,000 a day dockage.  So because we had done both of

8    these attachments almost simultaneously because of concerns

9    over the solvency of these defendants and especially the size

10   of the market these two ships had, we let go of that one and

11   proceeded to seek the additional security, which we felt that

12   we -- we could ask for from this Court.

13        THE COURT:  So what are you paying for dockage in

14   this attachment?

15        MR. GAITAS:  Much smaller, Your Honor.  It is --

16   there is no dockage.  It's anchorage dues.  It's in the --

17   the ship is in Plaquemines Parish, and they have a much

18   smaller tariff.  And it is in the range of -- I would say

19   below $5,000 for the first 15 days.  So that makes -- makes

20   economic sense.

21        THE COURT:  What about the idea of -- you know,

22   you're telling me for practical business reasons you did not

23   seek an extension, but, again, you had a legal right to do so

24   and that in addition you thought that the attachment here

25   would somehow give you whatever security you think you

1  needed.  Was that even raised with the Magistrate Judge or

2  presented to the Magistrate Judge as to why you didn't give

3  towage cost estimates?

4         MR. GAITAS:  It was -- it was raised with the -- the

5  towage cost estimate or lack thereof, Your Honor, was raised

6  at the Rule E4(f) hearing.  I raised it and I pointed that we

7  did not have that evidence on hand, that this was an element

8  necessary to enter in the calculation.  I mentioned I believe

9  the Indian Ocean has the range of -- warships are broken up

10 generally, up over other places, and we didn't have that

11 figure.  I mean, I was --

12         THE COURT:  There's no -- there's no closer companies

13 that could break up the ship as you -- as you put it?

14         MR. GAITAS:  Your Honor, yes.  There is -- there is

15 and it is included in the valuation of Mr. English who gave

16 in addition to the valuation of the hull, if she was in

17 repaired state.  He also gave a valuation of the vessel as

18 scrap where she lies.

19         I was puzzled by that because I'm not aware of any

20 ship breakers in the Caribbean.  And I learned that there is

21 a ship breaking facility in Corpus Christi, and that would

22 fetch a price of $3.6 million if she was to be demolished

23 there.

24         THE COURT:  What would be the towage from, what,

25 Trinidad I think to --

1      MR. GAITAS:  That -- it would not figure, Your Honor,

         2  in the equation from Trinidad to Corpus -- to go to Corpus

         3  because that is as is, where is.  So that would burden the

         4  ship breaker.

         5      THE COURT:  Well, I'm not certain I understand your

         6  position in that regard if there's a ship breaker in Corpus

         7  and it could be towed to Corpus from its present berth.  That

         8  would seem to mitigate the towage cost amount as opposed to

         9  going to India.

        10      MR. GAITAS:  It would, Your Honor, but the difference

        11  is the price in India would be double the price for the

        12  scrap.  The owner --

        13      THE COURT:  Well, there's a give and a take when you

        14  talk about other contingencies as well, the profitability of

        15  being lost to bad weather.  I mean, who wants to tow "a

        16  wreck," as you put it --

        17      MR. GAITAS:  Your Honor --

        18      THE COURT:  -- across the open seas?

        19      MR. GAITAS:  Your Honor, it is a wreck, but she is

        20  54,000 pounds of steel.  We're talking about the gross weight

        21  of the vessel.  That's a lot of steel and it commands --

        22  scrap commands evidently a very high price.  And if you

        23  deliver to the ship breakers --

        24      THE COURT:  And you're going around the Cape?

        25      MR. GAITAS:  She would go around the Cape of Africa,

1  Your Honor, because she cannot go through the Panama Canal.

2  She's not fitted for that.  And I think it's a higher risk to

3  go down the Magellan.  She wouldn't fit through the canal for

4  sure.

5       One thing that I would like -- and I think the Court

6  has picked up on this point, but I want to add something.  In

7  the Southern District of Texas, there was never a *vacatur* of

8  an attachment by the plaintiff of any action.  There was a

9  dismissal by consent of the parties as the Court noted, and

10  it was by reason of a settlement of outstanding claims

11  against Space Shipping that were settled for approximately

12  $7 million.  And in return, there was a dismissal and the

13  return of cash bond to be deposited for the release of three

14  vessels.  That was what was left over after it -- they were

15  interim settlements.

16       THE COURT:  So there was a release of vessels

17  pursuant to the settlement?

18       MR. GAITAS:  There was a -- there was a -- all three

19  vessels -- and I can give you -- if it will be useful for the

20  Court, I will give you the civil action number.

21       There was a cash deposit without a challenge.  There

22  was no challenge to the attachment at the time of the

23  attachment.  They were released by cash deposit.

24       THE COURT:  My only question was, did that settlement

25  lead to release of the vessels?

1    MR. GAITAS:  Oh, yes, Your Honor.  The vessels were
2  released way before -- before the settlement, way before the
3  settlement --
4    THE COURT:  All right.
5    MR. GAITAS:  -- with cash deposit.
6    THE COURT:  All right.
7    MR. GAITAS:  This argument --
8    THE COURT:  So if you were able to get this salvage
9  estimate within a few days for our purposes here, why wasn't
10  it possible in Texas?
11    MR. GAITAS:  The statement -- frankly, Your Honor,
12  when we went through the Rule E4(f) hearing, we didn't have
13  the estimate.  We asked for it subsequently when the Court,
14  the Magistrate Judge, gave his reasons.  And you have to go
15  in the market and look for it because people are reluctant to
16  commit because of the hold --
17    THE COURT:  How did you ask for it from the
18  Magistrate Judge?
19    MR. GAITAS:  I did not ask for -- I think I was
20  misunderstood.
21    THE COURT:  Okay.
22    MR. GAITAS:  I didn't ask -- I made the point in
23  argument that the scrap -- the scrap value has to be modified
24  by the cost of the scraping plans, the towage, because this
25  is a dead ship.

```
 1          THE COURT:  But if you don't ask for it, couldn't

 2    that be considered a waiver?

 3          MR. GAITAS:  Your Honor, I asked for -- I asked for

 4    this.  I did not at the time have the evidence.  I did not.

 5    And I presented it to this Court when I had the evidence on

 6    hand.

 7          As for the dates, my opponents have said that on the

 8    10th we had the estimate.  The estimate was issued on the

 9    10th, but we did -- where were we going to file it on the

10    10th?  There was no Rule E4(F) here.

11          The ship in Houston was released against the bond

12    which was posted on -- when was it posted?

13          MR. CHALOS:  The 7th.  Or the 4th.

14          MR. GAITAS:  No.  No.

15          MR. CHALOS:  A week later.

16          MR. GAITAS:  Yeah.

17          It was released, but the bond was -- the bond was

18    provided on the 11th.

19          THE COURT:  What's the status of the Texas

20    proceedings?  Do you have a hearing date, another hearing

21    date, trial date?

22          MR. GAITAS:  No, we do not have another hearing date.

23    The Magistrate is going to -- the Magistrate Judge is going

24    to consider other arguments in the case that go to issues of

25    successor corporation and fraudulent transfer.  But what the
```

```
 1   Judge wanted to do is let the ship go.

 2          THE COURT:  So do you have dates for those hearings

 3   yet?

 4          MR. GAITAS:  Not yet, Your Honor.

 5          THE COURT:  The Magistrate Judge in that case, is the

 6   Magistrate Judge proceeding by reference of the Court and

 7   consent of the parties for all proceedings or just limited?

 8          MR. GAITAS:  It was by -- by order of the Court.

 9          THE COURT:  So there's no what we call a 636(c)

10   consent for the magistrate to enter final judgment on the

11   merits?

12          MR. GAITAS:  No, not -- Your Honor, not yet.

13          THE COURT:  What's your response to their alternative

14   suggestion of an $800,000 substitute security?

15          MR. GAITAS:  Your Honor, that would not even come

16   close to securing the owners because of -- of the CV STEALTH.

17   Because if you take -- if you take the numbers, it is -- it's

18   impossible to get -- we had a hard time finding a contractor

19   to commit.

20          THE COURT:  Well, let's take the Magistrate Judge's

21   determinations, as I said, as the rule of law in this matter,

22   the rule of case.  Two point, what, seven million dollars is

23   what -- a little less than three million is what they

24   estimated your fair value to be of the wreck I think?

25          MR. GAITAS:  Yes, Your Honor.
```

1      THE COURT:  They gave you a cushion of another $1.3

2   or $4 million.

3      MR. GAITAS:  Yes.

4      THE COURT:  And that cushion was, I would imagine,

5   which is in their discretion, to do for maybe some other

6   costs or what have you that they didn't have, like towage,

7   even though they didn't give a figure for that.  And here

8   they're alternatively suggesting an additional 800 to that

9   1.4 to raise it up to $2.2 million in cushion, plus a 2.7.

10  That's a pretty good amount based upon what I'm hearing from

11  you.

12      MR. GAITAS:  About these numbers, Your Honor, if

13  they're put together, they add up to approximately five to

14  six million dollars and five with -- five or six million

15  dollars cannot go in the market and buy a 2005-built Aframax

16  tanker.

17      THE COURT:  You know, again, though, you all had a

18  right to appeal the Magistrate Judge's decision back then and

19  you didn't.  That -- if it's final, which appears to be that

20  it is, why shouldn't I give the Magistrate Judge's ruling

21  preclusive effect, like I said, as a rule of law that -- rule

22  of case I would apply here.  Even though it's not in this

23  case, I certainly can adopt it by reference.  You seem to be

24  re-urging your claim for a $18, $19 million claim.

25      MR. GAITAS:  No, Your Honor.  I would moderate -- I

1   would moderate the amount.

2       THE COURT:  So what -- I don't follow you.  You say

3   that a five or six million dollar amount in security is not

4   sufficient to cover what the Magistrate found to be fair

5   value plus additional cushions, theirs as well as what's

6   being proposed by your opponent.

7       MR. GAITAS:  It is not, Your Honor, because it is the

8   value -- the replacement value of the ship.  She's -- she is

9   a total loss, cannot be repaired.  It will take in excess of

10  $30 million I'm told to repair her.

11      And the equitable rule that the English follow -- and

12  think an American court would follow -- is the replacement

13  value of the ship.  That's --

14      THE COURT:  Have you all -- and your opponent says

15  you've been in the case longer than he has.  Has there been

16  any discovery, informal or formal, about how the vessel got

17  to be "a wreck," as you call it, in Venezuela?

18      MR. GAITAS:  Yes.  Yes, Your Honor.  There has been

19  some discovery, but it not -- it does not address how it came

20  to become a wreck.

21      The claim comes under a warranty of the Defendants to

22  indemnify the owners for whatever happens to the ship, by

23  reason or for trade.  So if she was chartered to someone who

24  was a bad charterer, sub-charterer, bad chartering, sent to

25  jurisdiction such as the one where she was sent and she was

arrested for criminal actions of the charterer, the liability
is there.  And the arbitrator have held consistently that
until redelivery, Space Shipping is liable for the hire, and
we believe ultimately they will be held liable for the damage
of the ship, the total -- total loss.

If I may add voluntarily about Space Shipping,
Limited, Your Honor, it's a special purpose vehicle as they
call them.  It's a Maltese company.  It was sold by Geden
Holdings, Limited, which was -- is also performance
guarantor, to an employee in 2017 for 2,300 euro.  I think
this is a clear indication of how much our charter is worth.

THE COURT:  Here's my concern --

MR. GAITAS:  This is why -- this is why --

THE COURT:  I didn't interrupt you, Counsel.

MR. GAITAS:  I beg your pardon, Your Honor?

THE COURT:  I did not interrupt you.

MR. GAITAS:  I'm sorry.

This is --

THE COURT:  When we talk about court rulings and we
talk about relief from court rulings, I look at not just the
legal recourses, but practical considerations too.  And I'm
saying all of this to come to a concern that I had when I saw
these different proceedings, that when you are dissatisfied
by a ruling that doesn't give you the valuation that you were
seeking, the question becomes, well, what relief should you

take? Should you appeal or seek reconsideration of the adverse ruling to your client's interest? Or do you keep attaching vessels in hopes that you'll get, as you put it, additional securities?

Problem with that is, if you don't exhaust your appellate grounds for relief and if ultimately there's a ruling that the attachment should not have -- even have been made, it's evidence then of possible bad faith. I'm not saying that occurred here. I'm just saying those are the practical and legal considerations that I'm certain you discussed with your client, they're aware of and authorize you to take the actions that you're taking here. I'm not holding you accountable for that. You're dealing with a client that I imagine gives you instructions to proceed based on whatever advice you're giving them.

I just hate to see a series of attachments because you want additional security and the reason you want additional security is because you got a magistrate's ruling that didn't give you the valuation you thought you should get on fair value of the so-called "wreck," when the other recourse, the natural recourse, would appear to me to have been an appeal or reconsideration of that ruling. And that would have been easy by simply appealing the record to the district judge.

I know you're saying practical considerations

1  prevented you or led to the business decision to not appeal

2  or seek reconsideration, but there's also practical

3  consideration too that when you seize another vessel, that

4  issue is going to follow the cases.  But, again, I'm not

5  making accusations.  I'm just pointing out some concerns that

6  people may have to address later on.

7      I've heard enough in this case.  I believe that the

8  Plaintiff's valuations here are excessive.  I believe that

9  additional cushions were made by the -- in the Texas

10  proceedings of about $1.4 million and I believe that the

11  alternative suggestion here offered by the Defendant is both

12  reasonable and, in my opinion, very complementary, because

13  I've not really got, to my total satisfaction, the reason why

14  that estimate of towage costs was not presented at the Texas

15  proceedings.  But I'm going to add an additional $800,000 to

16  the cushion you already have from the Eastern District Court

17  proceedings on the basis that we have that discretion, on the

18  basis that your claim, including the fair value, as given by

19  the Eastern District Court, was reasonable and it's final.

20  It wasn't appealed or subject to reconsideration.  It more

21  than covers fair value plus the so-called cushion and

22  discretionary increases that the Court can make.

23      Obviously, I say that the Defendant's offer to go to

24  $800,000 additional cushion actually puts the -- puts the

25  amount of the substitute security at either 50 percent or

maybe more than 50 percent of the original fair value up to

point-something million given by the Magistrate.  I think the

Defendants are being generous in that regard.

I know it's an alternative argument.  I know they

wanted me to rely upon excluding it entirely, but, again, I'm

exercising my discretion to allow an $800,000 substitute

security for the vessel attached in this jurisdiction.  That

could be made by either cash or bond.  And once we do that,

we'll get this vessel released and moved to its next berth.

My next order is going to require each side to give

me within 14 days your memoranda on my proposal to consider a

transfer of this case to the Eastern District of Texas, which

seems to have done more than we have so far in this case

including getting to the point where they're actually going

to have some hearings on the -- on whether or not the

Defendants here, owners of this vessel, and the one that was

released in Eastern Texas are indeed the proper parties,

successors or what have you to the interest of the original

debtor.  So $800,000 substitute security, release of the

vessel, plus 14 days for a memoranda -- memoranda from the

parties on the issue of transfer to Eastern Texas.

There's another option, which I don't particularly

like doing because I have no knowledge of just how far

advance the arbitrations are going and how quickly it's going

to proceed in London.  And that would have been to stay the

```
 1   case until the arbitration in London is over with.  That's

 2   the least satisfactory option.  I don't want memoranda on

 3   that, but if you choose to give it, I'll look at it.

 4        Once I get the memoranda from the parties on that

 5   particular issue of transfer, then I may want to do a

 6   telephone status conference with everyone just to see where

 7   we're heading with this matter.

 8        So anything else?

 9        MR. LAVIE:  One small thing, maybe just to save time

10   down the road, I'm assuming the bond in the same exact form

11   as the one in Texas would be acceptable?

12        MR. GAITAS:  It would be acceptable, Your Honor, yes.

13        MR. LAVIE:  I mean, perhaps not the same surety

14   because there's different lists of -- you have to be admitted

15   in certain states and all, but in terms of the form, just to

16   make sure we're okay with that, we can move ASAP to get --

17        THE COURT:  You're talking about the one that was

18   approved by the Magistrate Judge?

19        MR. LAVIE:  Yes, sir, Your Honor.

20        And, you know, to some extent, we needed the

21   Magistrate.  We were having a little trouble agreeing on it.

22   Ultimately, we did agree on it.  So, as long it's that same

23   form, we can move a lot more quickly to get it done.

24        THE COURT:  Just make certain whatever you have you

25   give it to the other side before it's submitted to the Court.
```

1        MR. LAVIE:  Absolutely.

2        THE COURT:  All right.  Good luck, gentlemen.  Thank

3   you.

4        MR. GAITAS:  Thank you.

5        MR. LAVIE:  Thank you, Your Honor.

6                         *  *  *  *

7     (WHEREUPON, the proceedings were adjourned 4:43 p.m.)

8                         *  *  *  *

9                   REPORTER'S CERTIFICATE

10        I, Nichelle N. Drake, RPR, CRR, Official Court
     Reporter, United States District Court, Eastern District of
11   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
12   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

13

14              ____/s/ Nichelle N. Drake____
                   Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

─────────────────── OFFICIAL TRANSCRIPT ───────────────────
Page 30

# EXHIBIT G

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PSARA ENERGY, LTD.** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 18-04111** |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS LTD.; ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET – WILLIAMS; and TUĞRUL TOKGÖZ** | **SECTION "B" (2)** |
| | **JUDGE LEMELLE** |
| | **MAGISTRATE WILKINSON** |

## <u>SPECIAL RELEASE BOND</u>

TO THE HONORABLE JUDGES OF SAID COURT:

WHEREAS a Verified Complaint was filed in this Court on April 20, 2018, by Plaintiff Psara Energy, Ltd. ("PSARA") against several defendants including: Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC; and

WHEREAS PSARA attached property belonging to Advantage Tankers, LLC i.e., the MT ADVANTAGE START IMO No. 9466570 and international call sign V7KY9, registered in the Marshall Islands to Defendant Advantage Start Shipping, LLC, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") to the Federal Rules of Civil Procedure; and

WHEREAS on May 11, 2018 Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC; made a restricted appearance pursuant to Rule E(8) of the Supplemental Rules; and

1

WHEREAS on May 16, 2018, the Court ordered that, to obtain release of the MT ADVANTAGE START from seizure and attachment, Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, may post a bond in the amount of $800,000 as substitute security for the MT ADVANTAGE START.

NOW, THEREFORE, for the benefit of PSARA,  Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, as principals, and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, as surety, are held and firmly bound to PSARA in the principal fixed sum of, and not to exceed, EIGHT HUNDRED THOUSAND DOLLARS ($800,000), upon condition that if Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC shall abide by orders of the Court, or of any appellate court to which this action may proceed should an appeal be taken, and shall pay the amount, if any, awarded against Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, or any of them by final order rendered in this action, after any appeal, including any and all interest, costs and attorney's fees awarded by the Court, after any appeal, then this obligation shall be void; otherwise, it shall remain in full force.

This Special Release Bond is written entirely without prejudice to any rights or defenses which Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, may have, including, but not limited to, the right to restrict any appearance pursuant to Rule E(8) of the Supplemental Rules, and the right to seek dismissal of any action filed in this Court or other court under any of the Federal Rules of Civil Procedure. This Special Release Bond is intended to set substitute security for the claims alleged by PSARA in this action, and is not intended to be and is not a waiver of any rights, remedies, claims,

2

counterclaims, or defenses that may be available to any Party. This Special Release Bond is not to be construed as an admission of liability or as a waiver of any rights or defenses available to Advantage Start Shipping, LLC; Advantage Tankers, LLC; Advantage Holdings, LLC; and Forward Holdings, LLC, all of which are fully reserved.

Executed on this _18th_ day of May, 2018.

> By: Advantage Start Shipping, LLC;
> Advantage Tankers, LLC;
> Advantage Holdings, LLC;
> and Forward Holdings, LLC;
>
> By: Kevin LaVie
>
> _____
> As Attorney-in-fact

Taken and acknowledged before me as to Defendants this _18th_ day of May, 2018.

> _____
> Notary Public in and for The State of Louisiana

> TRAVELERS CASUALTY AND SURETY
> COMPANY OF AMERICA, Surety
> By:
> _____
> Conway C. Marshall, Attorney-in-Fact

Taken and acknowledged before me as to attorney-in-fact this _18th_ day of May, 2018.

> _____
> Notary Public in and for The State of Louisiana

Timothy D. DePaula
Notary No. 87857
Bar No. 31699
Expires at Death

3

 **TRAVELERS**

| | Travelers Casualty and Surety Company of America<br>Travelers Casualty and Surety Company<br>St. Paul Fire and Marine Insurance Company |
|---|---|

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**: That Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company are corporations duly organized under the laws of the State of Connecticut (herein collectively called the "Companies"), and that the Companies do hereby make, constitute and appoint **Conway C. Marshall**, of **New Orleans, Louisiana**, their true and lawful Attorney-in-Fact to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed, and their corporate seals to be hereto affixed, this **3rd** day of **February, 2017**.

  

State of Connecticut

City of Hartford ss.

By: _____
Robert L. Raney, Senior Vice President

On this the **3rd** day of **February, 2017**, before me personally appeared **Robert L. Raney**, who acknowledged himself to be the Senior Vice President of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

**In Witness Whereof**, I hereunto set my hand and official seal.

My Commission expires the **30th** day of **June, 2021**



*Marie C. Tetreault*
Marie C. Tetreault, Notary Public

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, which resolutions are now in full force and effect, reading as follows:

**RESOLVED**, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the Company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her; and it is

**FURTHER RESOLVED**, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary; and it is

**FURTHER RESOLVED**, that any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary; or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority; and it is

**FURTHER RESOLVED**, that the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding on the Company in the future with respect to any bond or understanding to which it is attached.

I, **Kevin E. Hughes**, the undersigned, Assistant Secretary of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which remains in full force and effect.

Dated this **18** day of **May, 2018**

_____
Kevin E. Hughes, Assistant Secretary

*To verify the authenticity of this Power of Attorney, please call us at 1-800-421-3880.*
*Please refer to the above-named Attorney-in-Fact and the details of the bond to which the power is attached.*