# EXHIBIT D

Dated  1 February  2019

**US$190,000,000**

**TERM LOAN FACILITY**

**FLEETSCAPE ANTHEM, LLC**
**FLEETSCAPE ARROW, LLC**
**FLEETSCAPE ATOM, LLC**
**FLEETSCAPE AVENUE, LLC**
**FLEETSCAPE AWARD, LLC**
**FLEETSCAPE SKY, LLC**
**FLEETSCAPE SOLAR, LLC**
**FLEETSCAPE SPRING, LLC**
**FLEETSCAPE START, LLC**
**FLEETSCAPE SUMMER, LLC**
**FLEETSCAPE SUN, LLC**
as joint and several Borrowers
and Hedge Guarantors

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Arranger, Underwriter and Bookrunner

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Facility Agent

and

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Security Agent

**FACILITY AGREEMENT**

relating to
the financing of m.v. "ADVANTAGE ANTHEM", m.v. "ADVANTAGE ARROW", m.v. "ADVANTAGE
ATOM", m.v. "ADVANTAGE AVENUE", m.v. "ADVANTAGE AWARD", m.v. "ADVANTAGE SKY", m.v.
"ADVANTAGE SOLAR", m.v. "ADVANTAGE SPRING", m.v. "ADVANTAGE START", m.v. "ADVANTAGE
SUMMER" and m.v. "ADVANTAGE SUN"

W A T S O N   F A R L E Y
&
W I L L I A M S

**Index**

**Clause**                                                                                                                                                          **Page**

Section 1 Interpretation .............................................................................................................. 4
1        Definitions and Interpretation ........................................................................... 4
Section 2 The Facility .................................................................................................................. 40
2        The Facility.......................................................................................................... 40
3        Purpose................................................................................................................ 40
4        Conditions of Utilisation .................................................................................... 40
Section 3 Utilisation ................................................................................................................... 43
5        Utilisation ............................................................................................................ 43
Section 4 Repayment, Prepayment and Cancellation ............................................................. 46
6        Repayment .......................................................................................................... 46
7        Prepayment and Cancellation ............................................................................ 48
Section 5 Costs of Utilisation ..................................................................................................... 52
8        Interest ................................................................................................................ 52
9        Interest Periods .................................................................................................. 55
10       Changes to the Calculation of Interest............................................................... 56
11       Fees...................................................................................................................... 58
Section 6 Additional Payment Obligations ............................................................................... 59
12       Tax Gross Up and Indemnities............................................................................. 59
13       Increased Costs.................................................................................................... 64
14       Other Indemnities ............................................................................................... 65
15       Mitigation by the Finance Parties........................................................................ 68
16       Costs and Expenses ............................................................................................. 68
Section 7 Guarantees and Joint and Several Liability of Borrowers........................................ 70
17       Joint and Several Liability of the Borrowers ....................................................... 70
18       Guarantee and Indemnity – Hedge Guarantors.................................................. 71
Section 8 Representations, Undertakings and Events of Default............................................. 75
19       Representations ................................................................................................... 75
20       Information Undertakings .................................................................................... 82
21       Financial Covenants............................................................................................. 87
22       General Undertakings.......................................................................................... 88
23       Insurance Undertakings....................................................................................... 95
24       MOA and Bareboat Charter Undertakings ........................................................ 101
25       General Ship Undertakings ................................................................................ 102
26       Security Cover.................................................................................................... 108
27       Accounts, application of Earnings and Hedge Receipts .................................... 110
28       Events of Default ............................................................................................... 115
Section 9 Changes to Parties .................................................................................................... 121
29       Changes to the Lenders ..................................................................................... 121
30       Changes to the Transaction Obligors ................................................................ 126
Section 10 The Finance Parties................................................................................................. 127
31       The Facility Agent, the Arranger and the Reference Banks................................ 127
32       The Security Agent ............................................................................................. 137
33       Conduct of Business by the Finance Parties....................................................... 152
34       Sharing among the Finance Parties .................................................................... 152
Section 11 Administration ........................................................................................................ 155
35       Payment Mechanics ........................................................................................... 155
36       Set-Off ............................................................................................................... 158

................................................................................................ 159

37    Bail-In ................................................................................................ 159

38    Notices ............................................................................................... 161

39    Calculations and Certificates .................................................................. 161

40    Partial Invalidity .................................................................................... 162

41    Remedies and Waivers ............................................................................ 162

42    Settlement or Discharge Conditional ...................................................... 162

43    Irrevocable Payment ............................................................................... 162

44    Amendments and Waivers ....................................................................... 165

45    Confidential Information .......................................................................... 169

46    Confidentiality of Funding Rates and Reference Bank Quotations .......... 171

47    Counterparts ......................................................................................... 172

Section 12 Governing Law and Enforcement ...................................................... 172

48    Governing Law ....................................................................................... 172

49    Enforcement ........................................................................................... 172

50    Waiver of Immunity ................................................................................

**Schedules**

................................................................................................................... 174

Schedule 1 The Parties .......................................................................................... 174

    Part A The Obligors ......................................................................................... 176

    Part B The Original Lenders ............................................................................ 181

    Part C The Servicing Parties ........................................................................... 183

Schedule 2 Conditions Precedent and Subsequent ............................................... 183

    Part A Conditions Precedent to Initial Utilisation Request .............................. 186

    Part B Conditions Precedent to Prepositioning of Funds ................................ 188

    Part C Conditions Precedent to disbursement ................................................. 190

    Part D Conditions Subsequent ........................................................................ 191

Schedule 3 Requests .............................................................................................. 191

    Part A Utilisation Request ............................................................................... 194

    Part B Selection Notice ................................................................................... 197

Schedule 4 Form of Transfer Certificate ............................................................... 199

Schedule 5 Form of Assignment Agreement ......................................................... 202

Schedule 6 Repayment Schedule .......................................................................... 203

Schedule 7 Details of the Ships ............................................................................. 205

Schedule 8 Approved Operating and Administrative Expenses ............................. 206

Schedule 9 Timetables ........................................................................................... 207

Schedule 10 Excluded New Lender

**Execution**

................................................................................................................... 209

    Execution Pages ...............................................................................................

**THIS AGREEMENT** is made on ___1 February___ 2019

**PARTIES**

(1)    **FLEETSCAPE ANTHEM, LLC,** a limited liability company formed in the Marshall Islands with registered number 964391 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower A**")

(2)    **FLEETSCAPE ARROW, LLC,** a limited liability company formed in the Marshall Islands with registered number 964393 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower B**")

(3)    **FLEETSCAPE ATOM, LLC,** a limited liability company formed in the Marshall Islands with registered number 964390 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower C**")

(4)    **FLEETSCAPE AVENUE, LLC,** a limited liability company formed in the Marshall Islands with registered number 964392 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower D**")

(5)    **FLEETSCAPE AWARD, LLC,** a limited liability company formed in the Marshall Islands with registered number 964389 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower E**")

(6)    **FLEETSCAPE SKY, LLC,** a limited liability company formed in the Marshall Islands with registered number 964385 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower F**")

(7)    **FLEETSCAPE SOLAR, LLC,** a limited liability company formed in the Marshall Islands with registered number 964386 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower G**")

(8)    **FLEETSCAPE SPRING, LLC,** a limited liability company formed in the Marshall Islands with registered number 964388 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower H**")

(9)    **FLEETSCAPE START, LLC,** a limited liability company formed in the Marshall Islands with registered number 964384 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower I**")

(10)   **FLEETSCAPE SUMMER, LLC,** a limited liability company formed in the Marshall Islands with registered number 964387 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower J**")

(11)   **FLEETSCAPE SUN, LLC,** a limited liability company formed in the Marshall Islands with registered number 964383 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands as a borrower ("**Borrower K**")

(12)   **THE COMPANIES** listed in Part A of Schedule 1 (*The Parties*) as hedge guarantors (the "**Hedge Guarantors**")

(13)   **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as mandated lead arranger (the "**Arranger**")

(14)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as underwriter (the "**Underwriter**")

(15)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as sole bookrunner (the "**Bookrunner**")

(16)    **THE FINANCIAL INSTITUTIONS** listed in Part B of Schedule 1 (*The Parties*) as lenders (the "**Original Lenders**")

(17)    **THE FINANCIAL INSTITUTIONS** listed in Part B of Schedule 1 (*The Parties*) as hedge counterparties (the "**Hedge Counterparties**")

(18)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as agent of the other Finance Parties (the "**Facility Agent**")

(19)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as security agent for the Secured Parties (the "**Security Agent**")

**BACKGROUND**

(A)    The Lenders have agreed to make available to the Borrowers a facility of up to $190,000,000 for the purposes of:

(i)    financing part of the acquisition costs of Ship A by way of a loan in a principal amount of $17,060,000;

(ii)    financing part of the acquisition costs of Ship B by way of a loan in a principal amount of $14,410,000;

(iii)    financing part of the acquisition costs of Ship C by way of a loan in a principal amount of $16,620,000;

(iv)    financing part of the acquisition costs of Ship D by way of a loan in a principal amount of $15,000,000;

(v)    financing part of the acquisition costs of Ship E by way of a loan in a principal amount of $16,620,000;

(vi)    financing part of the acquisition costs of Ship F by way of a loan in a principal amount of $17,350,000;

(vii)    financing part of the acquisition costs of Ship G by way of a loan in a principal amount of $16,470,000;

(viii)    financing part of the acquisition costs of Ship H by way of a loan in a principal amount of $18,090,000;

(ix)    financing part of the acquisition costs of Ship I by way of a loan in a principal amount of $19,120,000;

(x)    financing part of the acquisition costs of Ship J by way of a loan in a principal amount of $17,940,000; and

(xi)    financing part of the acquisition costs of Ship K by way of a loan in a principal amount of $21,320,000.

EUROPE/62707839v19

(B)     The Hedge Counterparties have agreed to enter into interest rate swap transactions with the Borrowers from time to time to hedge the Borrowers' exposure under this Agreement to interest rate fluctuations.

**OPERATIVE PROVISIONS**

EUROPE/62707839v19

# SECTION 1

## INTERPRETATION

**1    DEFINITIONS AND INTERPRETATION**

**1.1    Definitions**

In this Agreement:

"**1992 ISDA Master Agreement**" means the Master Agreement (Multicurrency – Cross Border) as published by the International Swaps and Derivatives Association, Inc.

"**2002 ISDA Master Agreement**" means the 2002 Master Agreement as published by the International Swaps and Derivatives Association, Inc.

"**Account Bank**" means Crédit Agricole Corporate and Investment Bank a French *sociéte anonyme*, acting in such capacity through its office at 12, place des Etats-Unis, CS 70052, 92547 Montrouge Cedex, France, registered under the SIREN No. 304 187 701 of the Registre du Commerce et des Sociétés of Nanterre or any replacement bank or other financial institution as may be approved by the Facility Agent acting with the authorisation of the Majority Lenders.

"**Accounts**" means the Earnings Accounts, the Retention Account, the Drydocking Reserve Accounts, the Balloon Reserve Accounts and the Bareboat Charterer Accounts.

"**Account Security**" means a document creating Security over any Account (other than in relation to each Bareboat Charterer Account where Security is created over each Bareboat Charterer Account pursuant to the Tripartite Assignments) in agreed form.

"**Advance**" means a borrowing of all or part of a Tranche under this Agreement.

"**Administrative Expenses**" means, in relation to a Borrower in respect of any calendar year, the aggregate of all anticipated amounts in respect of that calendar year which are payable by that Borrower or, as the case may be, Fleetscape Advantage for corporate, administrative and filing fees in respect of that Borrower and the fees of legal and taxation advisers of that Borrower, capped at $20,000 per calendar year for that Borrower.

"**Advantage Tankers**" means Advantage Tankers LLC, a limited liability company formed in the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Advantage Tankers Undertaking**" means the letter of undertaking from Advantage Tankers in agreed form.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Approved Brokers**" means any firm or firms of insurance brokers approved in writing by the Facility Agent, acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld).

"**Approved Budget**" has the meaning given to it in paragraph (c) of Clause 20.2 (*Financial statements*).

"**Approved Classification**" means, in relation to a Ship, as at the date of this Agreement, the classification in relation to that Ship specified in Schedule 7 (*Details of the Ships*) or the equivalent classification with another Approved Classification Society.

"**Approved Classification Society**" means, in relation to a Ship, as at the date of this Agreement, the classification society in relation to that Ship specified in Schedule 7 (*Details of the Ships*) or any other classification society approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld).

"**Approved Commercial Manager**" means, in relation to a Ship, as at the date of this Agreement, the manager specified as the approved commercial manager in relation to that Ship in Schedule 7 (*Details of the Ships*) and, at any other time during the Security Period and subject to, inter alia, written prior approval by the Time Charterers at the relevant time, OSM Maritime Group, a company incorporated under the laws of Cyprus with its registered office at 22 Amathountos Avenue, Agios Tychonas Cyprus Limassol CY, 4532, Cyprus or any other person approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld) as the commercial manager of that Ship.

"**Approved Flag**" means, in relation to a Ship, as at the date of this Agreement, the flag in relation to that Ship specified in Schedule 7 (*Details of the Ships*) or such other flag approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld).

"**Approved Manager**" means, in relation to a Ship, the Approved Commercial Manager or the Approved Technical Manager of that Ship from time to time.

"**Approved Operating and Administrative Expenses**" means, in relation to a Ship in respect of any calendar year, the aggregate of all amounts of operating and administrative expenses in relation to that Ship as set out in Schedule 8 (*Approved Operating and Administrative Expenses*).

"**Approved Technical Manager**" in relation to a Ship, as at the date of this Agreement, the manager specified as the approved technical manager in relation to that Ship in Schedule 7 (*Details of the Ships*) and, at any other time during the Security Period and subject to, inter alia, prior written approval by the Time Charterers at the relevant time, OSM Maritime Group, a company incorporated under the laws of Cyprus with its registered office at 22 Amathountos Avenue, Agios Tychonas Cyprus Limassol CY, 4532, Cyprus or any other person approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld) as the technical manager of that Ship.

"**Approved Valuer**" means Arrow Sale & Purchase (UK) Limited, Braemar ACM Shipbroking, Clarksons plc, Fearnleys AS and Maersk Broker K/S (or any Affiliate of such person through which valuations are commonly issued) and any other firm or firms of independent sale and purchase shipbrokers approved in writing by the Facility Agent, acting with the authorisation of the Majority Lenders (such approval not to be unreasonably withheld).

"**Assignment Agreement**" means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation, legalisation or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including the date falling three Months thereafter.

"**Available Commitment**" means, in relation to a Tranche, a Lender's Commitment under that Tranche minus:

(a)     the amount of its participation in the outstanding Advances under that Tranche; and

(b)     in relation to any proposed Utilisation, the amount of its participation in any other Advance that is due to be made under that Tranche on or before the proposed Utilisation Date.

"**Available Facility**" means the aggregate for the time being of each Lender's Available Commitment.

"**Bail-In Action**" means the exercise of any Write-down and Conversion Powers.

"**Bail-In Legislation**" means:

(a)     in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time; and

(b)     in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

"**Balloon Reserve Account**" means, in relation to a Borrower:

(a)     an account in the name of that Borrower with the Account Bank designated "Balloon Reserve Account";

(b)     any other account in the name of that Borrower with the Account Bank which may, with the prior written consent of the Facility Agent, be opened in the place of the account referred to in paragraph (a) above, irrespective of the number or designation of such replacement account; or

(c)     any sub-account of any account referred to in paragraphs (a) or (b) above.

"**Bareboat Charter**" means Bareboat Charter A, Bareboat Charter B, Bareboat Charter C, Bareboat Charter D, Bareboat Charter E, Bareboat Charter F, Bareboat Charter G, Bareboat Charter H, Bareboat Charter I, Bareboat Charter J or Bareboat Charter K.

"**Bareboat Charter A**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship A and made between (i) Borrower A as owner and (ii) Bareboat Charterer A as bareboat charterer in a form acceptable to the Facility Agent.

EUROPE/62707839v19

"**Bareboat Charter B**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship B and made between (i) Borrower B as owner and (ii) Bareboat Charterer B as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter C**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship C and made between (i) Borrower C as owner and (ii) Bareboat Charterer C as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter D**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship D and made between (i) Borrower D as owner and (ii) Bareboat Charterer D as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter E**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship E and made between (i) Borrower E as owner and (ii) Bareboat Charterer E as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter F**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship F and made between (i) Borrower F as owner and (ii) Bareboat Charterer F as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter G**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship G and made between (i) Borrower G as owner and (ii) Bareboat Charterer G as bareboat charterer.

"**Bareboat Charter H**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship H and made between (i) Borrower H as owner and (ii) Bareboat Charterer H as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter I**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship I and made between (i) Borrower I as owner and (ii) Bareboat Charterer I as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter J**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship J and made between (i) Borrower J as owner and (ii) Bareboat Charterer J as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charter K**" means the bareboat charter dated on or around the date of this Agreement in respect of Ship K and made between (i) Borrower K as owner and (ii) Bareboat Charterer K as bareboat charterer in a form acceptable to the Facility Agent.

"**Bareboat Charterer**" means Bareboat Charterer A, Bareboat Charterer B, Bareboat Charterer C, Bareboat Charterer D, Bareboat Charterer E, Bareboat Charterer F, Bareboat Charterer G, Bareboat Charterer H, Bareboat Charterer I, Bareboat Charterer J or Bareboat Charterer K.

"**Bareboat Charterer A**" means Advantage Anthem Shipping LLC, a limited liability company duly formed and existing in the Bahamas with registered number 172813B whose registered office is at Trident Corporate Services (Bahamas) Limited, Suite 200B, 2nd floor, Centre of Commerce, One Bay Street, P.O. Box N-3944, Nassau, Bahamas.

"**Bareboat Charterer Account**" means, in relation to a Bareboat Charterer:

(a)     an account in the name of that Bareboat Charterer with the Account Bank designated "Cash Collection Account";

(b)     any other account in the name of that Bareboat Charterer with the Account Bank
        which may, with the prior written consent of the Facility Agent, be opened in the place
        of the account referred to in paragraph (a) above, irrespective of the number or
        designation of such replacement account; or

(c)     any sub-account of any account referred to in paragraphs (a) or (b) above.

"**Bareboat Charterer B**" means Advantage Arrow Shipping LLC, a limited liability company duly
formed and existing in the Marshall Islands with registered number 963204 whose registered
address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands,
MH 96960.

"**Bareboat Charterer C**" means Advantage Atom Shipping LLC, a limited liability company duly
formed and existing in the Bahamas with registered number 172814B whose registered office
is at Trident Corporate Services (Bahamas) Limited, Suite 200B, 2nd floor, Centre of Commerce,
One Bay Street, P.O. Box N-3944, Nassau, Bahamas.

"**Bareboat Charterer D**" means Advantage Avenue Shipping LLC, a limited liability company
duly formed and existing in the Marshall Islands with registered number 963203 whose
registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro,
Marshall Islands, MH 96960.

"**Bareboat Charterer E**" means Advantage Award Shipping LLC, a limited liability company duly
formed and existing in the Bahamas with registered number 172815B whose registered office
is at Trident Corporate Services (Bahamas) Limited, Suite 200B, 2nd floor, Centre of Commerce,
One Bay Street, P.O. Box N-3944, Nassau, Bahamas.

"**Bareboat Charterer F**" means Advantage Sky Shipping LLC, a limited liability company duly
formed and existing in the Marshall Islands with registered number 963201 whose registered
address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands,
MH 96960.

"**Bareboat Charterer G**" means Advantage Solar Shipping LLC, a limited liability company duly
formed and existing in the Marshall Islands with registered number 963202 whose registered
address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands,
MH 96960.

"**Bareboat Charterer H**" means Advantage Spring Shipping LLC, a limited liability company duly
formed and existing in the Marshall Islands with registered number 963279 whose registered
address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands,
MH 96960.

"**Bareboat Charterer I**" means Advantage Start Shipping LLC, a limited liability company duly
formed and existing in the Marshall Islands with registered number 963200 whose registered
address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands,
MH 96960.

"**Bareboat Charterer J**" means Advantage Summer Shipping LLC, a limited liability company
duly formed and existing in the Marshall Islands with registered number 963280 whose
registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro,
Marshall Islands, MH 96960.

"**Bareboat Charterer K**" means Advantage Sun Shipping LLC, a limited liability company duly formed and existing in the Marshall Islands with registered number 963199 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

"**Borrower**" means Borrower A, Borrower B, Borrower C, Borrower D, Borrower E, Borrower F, Borrower G, Borrower H, Borrower I, Borrower J or Borrower K.

"**Break Costs**" means the amount (if any) by which:

(a)     the interest excluding the Margin which a Lender should have received for the period from the date of receipt of all or any part of its participation in the Loan or an **Unpaid Sum** to the last day of the current Interest Period in relation to the Loan, the relevant part of the Loan or that Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds

(b)     the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Paris, New York, Istanbul, Hamburg and Frankfurt.

"**Change of Control**" means the situation where any person or group of persons acting in concert gains direct or indirect control of any Borrower and/or Fleetscape Advantage and/or any Bareboat Charterer and, in this context:

(a)     "**control**" means:

(i)     the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(A)     cast, or control the casting of, more than 51 per cent. of the maximum number of votes that might be cast at a general meeting of (as the case may be) that Borrower, Fleetscape Advantage or that Bareboat Charterer; or

(B)     appoint or remove all, or the majority, of the directors or other equivalent officers of (as the case may be) that Borrower, Fleetscape Advantage or that Bareboat Charterer; or

(C)     give directions with respect to the operating and financial policies of a Borrower, Fleetscape Advantage or a Bareboat Charterer with which the directors or other equivalent officers of (as the case may be) that Borrower, Fleetscape Advantage or that Bareboat Charterer are obliged to comply; and/or

(ii)    the holding beneficially of more than 51 per cent., so long as 51 per cent. is a controlling stake, of the membership interests of (as the case may be) that Borrower, Fleetscape Advantage or that Bareboat Charterer (excluding any

EUROPE/62707839v19

part of such membership interests that carry no right to participate beyond a specified amount in a distribution of either profits or capital); and

(b)     "**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition directly or indirectly of shares or membership interests in (as the case may be) a Borrower, Fleetscape Advantage or a Bareboat Charterer by any of them, either directly or indirectly, to obtain or consolidate control of (as the case may be) that Borrower, Fleetscape Advantage or that Bareboat Charterer.

"**Charter**" means, in relation to a Ship, any charter relating to that Ship, or other contract for its employment, whether or not already in existence including each of the Bareboat Charter and Time Charter in respect of that Ship.

"**Charter Guarantee**" means any guarantee, bond, letter of credit or other instrument (whether or not already issued) supporting a Charter.

"**Code**" means the US Internal Revenue Code of 1986.

"**Commercial Management Agreement**" means the agreement entered into between a Borrower and the Approved Commercial Manager regarding the commercial management of a Ship.

"**Commitment**" means a Tranche A Commitment or a Tranche B Commitment.

"**Confidential Information**" means all information relating to any Transaction Obligor, the Group, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)     any member of the Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes:

(i)     information that:

(A)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 45 (*Confidential Information*); or

(B)     is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(C)     is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the

Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality; and

(ii)     any Funding Rate or Reference Bank Quotation.

"**Confidentiality Undertaking**" means a confidentiality undertaking in substantially the appropriate form recommended by the LMA from time to time or in any other form agreed between the Borrowers and the Facility Agent.

"**Corresponding Debt**" means any amount, other than any Parallel Debt, which an Obligor owes to a Secured Party under or in connection with the Finance Documents.

"**Default**" means an Event of Default or a Potential Event of Default.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Security Agent.

"**Delivery Date**" means, in relation to a Ship, the date on which that Ship is delivered by the relevant Bareboat Charterer to the relevant Borrower under the MOA relating to that Ship.

"**Disruption Event**" means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties or, if applicable, any Transaction Obligor; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party or, if applicable, any Transaction Obligor preventing that, or any other, Party or, if applicable, any Transaction Obligor:

(i)     from performing its payment obligations under the Finance Documents; or

(ii)     from communicating with other Parties or, if applicable, any Transaction Obligor in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party or, if applicable, any Transaction Obligor whose operations are disrupted.

"**Document of Compliance**" has the meaning given to it in the ISM Code.

"**dollars**" and "**$**" mean the lawful currency, for the time being, of the United States of America.

"**Drydocking Reserve Account**" means, in relation to a Borrower:

(a)     an account in the name of that Borrower with the Account Bank designated "Drydocking Reserve Account";

EUROPE/62707839v19

(b)    any other account in the name of that Borrower with the Account Bank which may, with the prior written consent of the Facility Agent, be opened in the place of the account referred to in paragraph (a) above, irrespective of the number or designation of such replacement account; or

(c)    any sub-account of any account referred to in paragraphs (a) or (b) above.

"**Drydocking Reserve Amount**" has the meaning given to it in paragraph (a) of Clause 21.2 (*Drydocking Reserve Amounts*).

"**Drydocking Reserve Budget**" has the meaning given to it in paragraph (e) of Clause 20.2 (*Financial statements*).

"**Earnings**" means, in relation to a Ship, all moneys whatsoever which are now, or later become, payable (actually or contingently) to a Borrower or a Bareboat Charterer or the Security Agent and which arise out of or in connection with or relate to the use or operation of that Ship, including (but not limited to):

(a)    the following, save to the extent that any of them is, with the prior written consent of the Facility Agent, pooled or shared with any other person:

    (i)    all freight, hire and passage moneys including, without limitation, all moneys payable under, arising out of or in connection with a Charter or a Charter Guarantee;

    (ii)    the proceeds of the exercise of any lien on sub-freights;

    (iii)    compensation payable to a Borrower or a Bareboat Charterer or the Security Agent in the event of requisition of that Ship for hire or use;

    (iv)    remuneration for salvage and towage services;

    (v)    demurrage and detention moneys;

    (vi)    without prejudice to the generality of sub-paragraph (i) above, damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of that Ship;

    (vii)    all moneys which are at any time payable under any Insurances in relation to loss of hire;

    (viii)    all monies which are at any time payable to a Borrower or a Bareboat Charterer in relation to general average contribution; and

(b)    if and whenever that Ship is employed on terms whereby any moneys falling within sub-paragraphs (i) to (viii) of paragraph (a) above are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to that Ship.

"**Earnings Account**" means, in relation to a Borrower:

(a)    an account in the name of that Borrower with the Account Bank designated "Earnings Account";

EUROPE/62707839v19

(b)     any other account in the name of that Borrower with the Account Bank which may, with the prior written consent of the Facility Agent, be opened in the place of the account referred to in paragraph (a) above, irrespective of the number or designation of such replacement account; or

(c)     any sub-account of any account referred to in paragraphs (a) or (b) above.

"**EEA Member Country**" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"**Environmental Approval**" means any applicable present or future permit, ruling, variance or other applicable Authorisation required under Environmental Laws.

"**Environmental Claim**" means any claim by any governmental, judicial or regulatory authority or any other person which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law and, for this purpose, "**claim**" includes a claim for damages, compensation, contribution, injury, fines, losses and penalties or any other similar payment, including in relation to clean-up and removal, if similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

"**Environmental Incident**" means:

(a)     any release, emission, spill or discharge of Environmentally Sensitive Material whether within a Ship or from a Ship into any other vessel or into or upon the air, water, land or soils (including the seabed) or surface water; or

(b)     any incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, water, land or soils (including the seabed) or surface water from a vessel other than any Ship and which involves a collision between any Ship and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Ship and/or any Transaction Obligor and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, water, land or soils (including the seabed) or surface water otherwise than from a Ship and in connection with which a Ship is actually or potentially liable to be arrested and/or where any Transaction Obligor and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action.

"**Environmental Law**" means any applicable present or future law relating to pollution or protection of human health or the environment, to conditions in the workplace, to the carriage, generation, handling, storage, use, release or spillage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material.

"**Environmentally Sensitive Material**" means and includes all contaminants, oil, oil products, toxic substances and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous.

"**EU Bail-In Legislation Schedule**" means the document described as such and published by the LMA from time to time.

"**Event of Default**" means any event or circumstance specified as such in Clause 28 (*Events of Default*).

"**Facility**" means the term loan facility made available under this Agreement as described in Clause 2 (*The Facility*).

"**Facility Office**" means the office or offices notified by a Lender to the Facility Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than 5 Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"**FATCA**" means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Application Date**" means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2019; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2019,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letter**" means any letter or letters dated on or about the date of this Agreement between any of the Arranger, the Facility Agent and the Security Agent and any Obligor setting out any of the fees referred to in Clause 11 (*Fees*).

"**Finance Document**" means:

(a)     this Agreement;

(b)     any Fee Letter;

(c)     each Utilisation Request;

(d)     any Security Document;

(e)     any Hedging Agreement;

(f)     any QEL;

(g)     any Manager's Undertaking;

(h)     any Subordination Agreement;

(i)     the Advantage Tankers Undertaking;

(j)     any other document which is executed for the purpose of establishing any priority or subordination arrangement in relation to the Secured Liabilities; or

(k)     any other document designated as such by the Facility Agent and the Borrowers.

"**Finance Party**" means the Facility Agent, the Security Agent, the Arranger, the Underwriter, the Bookrunner, a Lender or a Hedge Counterparty.

"**Financial Indebtedness**" means any indebtedness for or in relation to:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in relation to any lease or hire purchase contract which would, in accordance with GAAP, be treated as a balance sheet liability (other than any liability in respect of a lease or hire purchase contract which would, in accordance with GAAP in force prior to 1 January 2019, have been treated as an operating lease);

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is

EUROPE/62707839v19

due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h)    any counter-indemnity obligation in relation to a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)    the amount of any liability in relation to any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Fleetscape Advantage**" means Fleetscape Advantage Holdings, LLC, a limited liability company duly formed and existing in the Marshall Islands with registered number 964394 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

"**Fleetscape Capital**" means Fleetscape Capital Limited, a Cayman Islands exempted company, whose registered address is at Walkers Corporate Limited, 27 Hospital Road, George Town, Grand Cayman KY1-9008 Cayman Islands.

"**Funding Rate**" means any individual rate notified by a Lender to the Facility Agent pursuant to sub-paragraph (ii) of paragraph (a) of Clause 10.4 (*Cost of funds*).

"**GAAP**" means generally accepted accounting principles in the US including IFRS.

"**Group**" means Fleetscape Advantage and its Subsidiaries for the time being.

"**Hedge Receipts**" means all moneys whatsoever which are now, or later become, payable (actually or contingently) to a Borrower or the Security Agent by a Hedge Counterparty under a Hedging Agreement.

"**Hedging Agreement**" means any master agreement, confirmation, transaction, schedule or other agreement in agreed form entered into or to be entered into by a Borrower for the purpose of hedging interest payable under this Agreement.

"**Hedging Agreement Security**" means, in relation to a Borrower, a hedging agreement security creating Security over that Borrower's rights and interests in any Hedging Agreement, in agreed form.

"**Hedging Close-Out Liabilities**" means as at any relevant date the amount certified by the Hedge Counterparties as the net aggregate amount in dollars which would be payable by a Borrower under a Hedging Agreement at the relevant determination date as a result of termination or closing out under a Hedging Agreement.

"**Hedging Prepayment Proceeds**" means any Hedge Receipts arising as a result of termination or closing out under a Hedging Agreement.

"**Holding Company**" means, in relation to a person, any other person in relation to which it is a Subsidiary.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Indemnified Person**" has the meaning given to it in Clause 14.2 (*Other indemnities*).

"**Insurances**" means, in relation to a Ship:

(a) all policies and contracts of insurance, including entries of that Ship in any protection and indemnity or war risks association, effected in relation to that Ship, that Ship's Earnings or otherwise in relation to that Ship whether before, on or after the date of this Agreement; and

(b) all rights and other assets relating to, or derived from, any of such policies, contracts or entries, including any rights to a return of premium and any rights in relation to any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Agreement.

"**Interest Payment Date**" has the meaning given to it in paragraph (a) of Clause 8.2 (*Payment of interest*).

"**Interest Period**" means, in relation to the Loan or any part of the Loan, each period determined in accordance with Clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 8.3 (*Default interest*).

"**Interpolated Screen Rate**" means, in relation to the Loan or any part of the Loan, the rate (rounded to the same number of decimal places as the two relevant Screen Rates) which results from interpolating on a linear basis between:

(a) the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period of the Loan or that part of the Loan; and

(b) the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period of the Loan or that part of the Loan,

each as of the Specified Time for dollars.

"**ISDA Master Agreement**" means a 1992 ISDA Master Agreement or a 2002 ISDA Master Agreement.

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention (including the guidelines on its implementation), adopted by the International Maritime Organisation, as the same may be amended or supplemented from time to time.

"**ISPS Code**" means the International Ship and Port Facility Security (ISPS) Code as adopted by the International Maritime Organization's (IMO) Diplomatic Conference of December 2002, as the same may be amended or supplemented from time to time.

"**ISSC**" means an International Ship Security Certificate issued under the ISPS Code.

"**Legal Opinion**" means any legal opinion delivered to the Facility Agent under Clause 4 (*Conditions of Utilisation*).

"**Legal Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(d)     any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with Clause 29 (*Changes to the Lenders*),

which in each case has not ceased to be a Party as such in accordance with this Agreement.

"**LIBOR**" means, in relation to the Loan or any part of the Loan:

(a)     the applicable Screen Rate as of the Specified Time for dollars and for a period equal in length to the Interest Period of the Loan or that part of the Loan; or

(b)     as otherwise determined pursuant to Clause 10.1 (*Unavailability of Screen Rate*),

and if, in either case, that rate is less than zero, LIBOR shall be deemed to be zero.

"**Limitation Acts**" means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

"**List of Foreign Sanctions Evaders**" means the foreign sanctions evaders list published by the Office of Foreign Assets Control of the United States Department of the Treasury and any other list identifying certain persons subject to Sanctions and issued by a Sanctions Authority.

"**LMA**" means the Loan Market Association or any successor organisation.

"**Loan**" means the loan to be made available under the Facility or the aggregate principal amount outstanding for the time being of the borrowings under the Facility and a "**part of the Loan**" means an Advance, a Tranche, a part of a Tranche or any other part of the Loan as the context may require.

"**Major Casualty**" means, in relation to a Ship, any casualty to that Ship in relation to which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $500,000 or the equivalent in any other currency.

"**Majority Lenders**" means:

(a)     if no Advance has yet been made, a Lender or Lenders whose Commitments aggregate more than 66⅔ per cent. of the Total Commitments; or

(b)     at any other time, a Lender or Lenders whose participations in the Loan aggregate more than 66⅔ per cent. of the amount of the Loan then outstanding or, if the Loan has been repaid or prepaid in full, a Lender or Lenders whose participations in the Loan immediately before repayment or prepayment in full aggregate more than 66⅔ per cent. of the Loan immediately before such repayment.

"**Management Agreement**" means a Technical Management Agreement or a Commercial Management Agreement.

"**Manager's Undertaking**" means, in relation to a Ship, the letter of undertaking from its Approved Technical Manager and the letter of undertaking from its Approved Commercial Manager (inter alia) subordinating the rights of such Approved Technical Manager and such Approved Commercial Manager respectively against that Ship, the relevant Borrower and the relevant Bareboat Charterer to the rights of the Finance Parties and that Borrower in agreed form.

"**Margin**" means, in relation to a Ship:

(a)     Tranche A, 1.75 per cent. per annum; and

(b)     Tranche B, 4.25 per cent. per annum.

"**Market Value**" means, in relation to a Ship or any other vessel, at any date, an amount determined by the Facility Agent as being an amount equal to the market value of that Ship or vessel shown by the arithmetic average of two valuations, each prepared:

(a)     as at a date not more than 30 days previously;

(b)     by an Approved Valuer;

(c)     without physical inspection of that Ship or vessel; and

(d)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any Charter.

"**Material Adverse Effect**" means in the reasonable opinion of the Majority Lenders a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of any member of the Group or the Group as a whole; or

(b)     the ability of any Transaction Obligor to perform its obligations under any Finance Document; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or intended to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

"**Minimum Cash Interest**" has the meaning given to it in the Subordinated Loan Agreement.

"**Minimum Cash Reserve**" has the meaning given to it in Clause 21.1 (*Minimum Cash Reserve*).

EUROPE/62707839v19

"**MOA**" means the Ship A MOA, the Ship B MOA, the Ship C MOA, the Ship D MOA, the Ship E MOA, the Ship F MOA, the Ship G MOA, the Ship H MOA, the Ship I MOA, the Ship J MOA or the Ship K MOA.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)    (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)    if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)    if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period.

"**Mortgage**" means, in relation to a Ship, a first preferred Marshall Islands ship mortgage on that Ship in agreed form.

"**Obligor**" means a Borrower or a Hedge Guarantor.

"**Operating and Administrative Expenses**" means, in relation to a Ship in respect of any calendar year, the aggregate of all anticipated amounts as set out in the Approved Budget in respect of that calendar year which are payable by the Borrower owning that Ship or, as the case may be, the Bareboat Charterer in respect of that Ship or Advantage Tankers during that calendar year, including crewing, victualing, insuring, maintaining, operating and managing that Ship, as well as any reimbursable expense under the Time Charter, such as port charges and bunkering expenses payable by that Borrower or, as the case may be, that Bareboat Charterer in relation to that Ship or Advantage Tankers and reimbursed by the Time Charterer.

"**Original Jurisdiction**" means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is formed as at the date of this Agreement.

"**Overseas Regulations**" means the Overseas Companies Regulations 2009 (SI 2009/1801).

"**Parallel Debt**" means any amount which an Obligor owes to the Security Agent under Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*) or under that clause as incorporated by reference or in full in any other Finance Document.

"**Participating Member State**" means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**Perfection Requirements**" means the making or procuring of filings, stampings, registrations, notarisations, endorsements, translations and/or notifications of any Finance Document

(and/or any Security created under it) necessary for the validity, enforceability (as against the relevant Obligor or any relevant third party) and/or perfection of that Finance Document.

"**Permitted Charter**" means, in relation to a Ship, a Charter:

(a)     which is a time, voyage or consecutive voyage charter;

(b)     the duration of which does not exceed and is not capable of exceeding, by virtue of any optional extensions, 12 months plus a redelivery allowance of not more than 30 days;

(c)     which is entered into on *bona fide* arm's length terms at the time at which that Ship is fixed; and

(d)     in relation to which not more than two months' hire is payable in advance,

and any other Charter which is approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders and including the Bareboat Charter and Time Charter in respect of that Ship.

"**Permitted Financial Indebtedness**" means:

(a)     any Financial Indebtedness incurred under the Finance Documents;

(b)     in respect of a Bareboat Charterer in respect of a Ship, until the Utilisation Date in respect of the Tranche relating to that Ship, the outstanding Financial Indebtedness of that Bareboat Charterer under the existing financing made available to that Bareboat Charterer in respect of that Ship; and

(c)     any Financial Indebtedness that is subordinated to all Financial Indebtedness incurred under the Finance Documents pursuant to a Subordination Agreement or otherwise and which is, in the case of any such Financial Indebtedness of a Borrower, the subject of Subordinated Debt Security including any Financial Indebtedness incurred by the Borrowers under each of the Subordinated Loan Agreement and the Seller's Credit Agreements.

"**Permitted Security**" means:

(a)     Security created by the Finance Documents;

(b)     in respect of a Bareboat Charterer in respect of a Ship, until the Utilisation Date in respect of the Tranche relating to that Ship, the existing Security created to secure the outstanding Financial Indebtedness of that Bareboat Charterer under the existing financing made available to that Bareboat Charterer in respect of that Ship;

(c)     liens for unpaid master's and crew's wages in accordance with first class ship ownership and management practice and not being enforced through arrest;

(d)     liens for salvage;

(e)     liens for master's disbursements incurred in the ordinary course of trading in accordance with first class ship ownership and management practice and not being enforced through arrest; and

EUROPE/62707839v19

(f)     any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of any Ship:

   (i)     not as a result of any default or omission by any Borrower;

   (ii)    not being enforced through arrest; and

   (iii)   subject, in the case of liens for repair or maintenance, to Clause 25.16 (*Restrictions on chartering, appointment of managers etc.*),

   provided such lien does not secure amounts more than 45 days overdue (unless the overdue amount is being contested in good faith by appropriate steps and for the payment of which adequate reserves are held and provided further that such proceedings do not give rise to a material risk of the relevant Ship or any interest in it being seized, sold, forfeited or lost).

"**Potential Event of Default**" means any event or circumstance specified in Clause 28 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Prohibited Person**" means any person or entity, whether or not having a separate legal personality (a "**Person**"), whether designated by name or by reason of being included in a class of persons, that is, or that is owned or controlled by Persons that are or any vessel that is:

(a)     listed on, or directly or indirectly owned or controlled by a Person listed on, a Sanctions List, or a person acting on behalf of such a Person;

(b)     located or resident in, incorporated or organised under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a Person located or resident in a country or territory that is or whose government is the subject of Sanctions, broadly prohibiting dealings with such government, country or territory including country or territory wide Sanctions and in each case thereby itself becomes the target of such Sanctions;

(c)     otherwise a target of Sanctions ("**target of Sanctions**", for the purpose of this paragraph (c), amongst other things, signifying a Person with whom a US Person or other national of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities or against whom Sanctions are otherwise directed); or

(d)     acting our purporting to act on behalf of any of the Persons listed in paragraphs (a) to (c) above with which any relevant Lender is prohibited from (i) dealing or (ii) otherwise engaging in any transaction pursuant to Sanctions.

"**Protected Party**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**QEL**" means QEL A, QEL B, QEL C, QEL D, QEL E, QEL F, QEL G, QEL H, QEL I, QEL J or QEL K.

"**QEL A**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship A and entered into between (i) Borrower A, (ii) Bareboat Charterer A, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL B**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship B and entered into between (i) Borrower B, (ii) Bareboat Charterer B, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL C**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship C and entered into between (i) Borrower C, (ii) Bareboat Charterer C, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL D**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship D and entered into between (i) Borrower D, (ii) Bareboat Charterer D, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL E**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship E and entered into between (i) Borrower E, (ii) Bareboat Charterer E, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL F**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship F and entered into between (i) Borrower F, (ii) Bareboat Charterer F, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL G**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship G and entered into between (i) Borrower G, (ii) Bareboat Charterer G, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL H**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship H and entered into between (i) Borrower H, (ii) Bareboat Charterer H, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL I**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship I and entered into between (i) Borrower I, (ii) Bareboat Charterer I, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL J**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship J and entered into between (i) Borrower J, (ii) Bareboat Charterer J, (iii) the Time Charterer and (iv) the Facility Agent.

"**QEL K**" means the quiet enjoyment letter dated on or around the date of this Agreement in respect of Ship K and entered into between (i) Borrower K, (ii) Bareboat Charterer K, (iii) the Time Charterer and (iv) the Facility Agent.

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined, two Business Days before the first day of that period unless market practice differs in the Relevant Interbank Market in which case the Quotation Day will be determined by the Facility Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Security Assets.

"**Reference Bank Quotation**" means any quotation supplied to the Facility Agent by a Reference Bank.

EUROPE/62707839v19

"**Reference Bank Rate**" means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Facility Agent at its request by the Reference Banks:

(a)     if:

    (i)     the Reference Bank is a contributor to the Screen Rate; and

    (ii)     it consists of a single figure,

as the rate (applied to the relevant Reference Bank and the relevant currency and period) which contributors to the Screen Rate are asked to submit to the relevant administrator; or

(b)     in any other case, as the rate at which the relevant Reference Bank could fund itself in dollars for the relevant period with reference to the unsecured wholesale funding market.

"**Reference Banks**" means entities as may be appointed by the Facility Agent in consultation with (but not subject to the approval of) the Borrowers.

"**Related Fund**" in relation to a fund (the "first fund"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Interbank Market**" means the London interbank market.

"**Relevant Jurisdiction**" means, in relation to a Transaction Obligor:

(a)     its Original Jurisdiction;

(b)     any jurisdiction where any asset subject to, or intended to be subject to, any of the Transaction Security created, or intended to be created, by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Security Documents entered into by it.

"**Repayment Date**" means each date on which a Repayment Instalment is required to be paid under Clause 6.1 (*Repayment of Loan*).

"**Repayment Instalment**" has the meaning given to it in Clause 6.1 (*Repayment of Loan*).

"**Repayment Schedule**" means the repayment schedule in Schedule 6 (*Repayment Schedule*) as the same may be replaced in accordance with paragraph (b) of Clause 6.1 (*Repayment of Loan*).

"**Repeating Representation**" means each of the representations set out in Clause 19 (*Representations*) except Clause 19.10 (*Insolvency*), Clause 19.11 (*No filing or stamp taxes*), Clause 19.12 (*Deduction of Tax*) and Clause 19.27 (*Taxes paid*) and any representation of any

Transaction Obligor made in any other Finance Document that is expressed to be a "Repeating Representation" or is otherwise expressed to be repeated.

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Requisition**" means in relation to a Ship:

(a)    any expropriation, confiscation, requisition (excluding a requisition for hire or use which does not involve a requisition for title) or acquisition of that Ship, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected (whether *de jure* or *de facto*) by any government or official authority or by any person or persons claiming to be or to represent a government or official authority; and

(b)    any capture or seizure of that Ship (including any hijacking or theft) by any person whatsoever.

"**Requisition Compensation**" includes all compensation or other moneys payable to a Borrower by reason of any Requisition or any arrest or detention of a Ship in the exercise or purported exercise of any lien or claim.

"**Resolution Authority**" means any body which has authority to exercise any Write-down and Conversion Powers.

"**Retention Account**" means, in relation to a Borrower:

(a)    an account in the name of that Borrower with the Account Bank designated "Retention Account";

(b)    any other account in the name of that Borrower with the Account Bank which may, with the prior written consent of the Facility Agent, be opened in the place of the account referred to in paragraph (a) above, irrespective of the number or designation of such replacement account; or

(c)    any sub-account of any account referred to in paragraphs (a) or (b) above.

"**Safety Management Certificate**" has the meaning given to it in the ISM Code.

"**Safety Management System**" has the meaning given to it in the ISM Code.

"**Sanctions**" means any trade, economic or financial sanctions, laws, regulations, embargoes, freezing provisions, prohibitions or other restrictive measures imposed, administered, enacted or enforced from time to time by any Sanctions Authority.

"**Sanctions Authority**" means the US, including without limitation the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union or any of its member states, including without limitation the Federal Republic of Germany, including without limitation the German Bundesbank, Federal Ministry of Economics and Energy (*Bundesministerium für Wirtschaft und Energie*), the United Kingdom, including Her Majesty's Treasury of the United Kingdom, Switzerland, including without limitation the State Secretariat for Economic Affairs of Switzerland (SECO) or the Swiss Directorate of International Law (DIL), Japan or, without prejudice to the foregoing, any other relevant sanctions authority enacting,

EUROPE/62707839v19

administering or imposing Sanctions applicable by law to any Finance Party or a Transaction Obligor.

"**Sanctions List**" means any list of specially designated nationals and blocked persons or designated persons or vessels, the Sectoral Sanctions Identification List or the List of Foreign Sanctions Evaders (or equivalent) or any similar list maintained by a Sanctions Authority as a measure of imposing, administering, enacting or enforcing Sanctions, in each case as amended, supplemented or substituted from time to time.

"**Screen Rate**" means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for dollars for the relevant period displayed on page LIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters. If such page or service ceases to be available, the Facility Agent may specify another page or service displaying the relevant rate after consultation with the Borrowers.

"**Sectoral Sanctions Identification List**" means a list identifying certain countries and/or certain persons operating in certain sectors of activity which are the subject of Sanctions (e.g. the sectoral sanctions identifications list published by the Office of Foreign Assets Control of the U.S. Department of the Treasury).

"**Secured Liabilities**" means all present and future obligations and liabilities, (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of each Transaction Obligor to any Secured Party under or in connection with each Finance Document.

"**Secured Party**" means each Finance Party from time to time party to this Agreement, a Receiver or any Delegate.

"**Security**" means a mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security.

"**Security Assets**" means all of the assets of the Transaction Obligors which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Security Document**" means:

(a)     any Shares Security;

(b)     any Mortgage;

(c)     any Tripartite Assignment;

(d)     any Account Security;

(e)     any Hedging Agreement Security;

(f)     any Subordinated Debt Security;

(g)     any other document (whether or not it creates Security) which is executed as security for the Secured Liabilities; or

(h)     any other document designated as such by the Facility Agent and the Borrowers.

EUROPE/62707839v19

"**Security Period**" means the period starting on the date of this Agreement and ending on the date on which the Facility Agent is satisfied that there is no outstanding Commitment in force and that the Secured Liabilities have been irrevocably and unconditionally paid and discharged in full.

"**Security Property**" means:

(a)    the Transaction Security expressed to be granted in favour of the Security Agent as trustee for the Secured Parties and all proceeds of that Transaction Security;

(b)    all obligations expressed to be undertaken by a Transaction Obligor to pay amounts in relation to the Secured Liabilities to the Security Agent as trustee for the Secured Parties and secured by the Transaction Security together with all representations and warranties expressed to be given by a Transaction Obligor or any other person in favour of the Security Agent as trustee for the Secured Parties;

(c)    the Security Agent's interest in any turnover trust created under the Finance Documents;

(d)    any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Finance Documents to hold as trustee on trust for the Secured Parties,

except:

(i)    rights intended for the sole benefit of the Security Agent; and

(ii)    any moneys or other assets which the Security Agent has transferred to the Facility Agent or (being entitled to do so) has retained in accordance with the provisions of this Agreement.

"**Selection Notice**" means a notice substantially in the form set out in Part B of Schedule 3 (*Requests*) given in accordance with Clause 9 (*Interest Periods*).

"**Seller's Credit Agreement**" means the Ship A Seller's Credit Agreement, Ship B Seller's Credit Agreement, Ship C Seller's Credit Agreement, Ship D Seller's Credit Agreement, Ship E Seller's Credit Agreement, Ship F Seller's Credit Agreement, Ship G Seller's Credit Agreement, Ship H Seller's Credit Agreement, Ship I Seller's Credit Agreement, Ship J Seller's Credit Agreement or Ship K Seller's Credit Agreement.

"**Servicing Party**" means the Facility Agent or the Security Agent.

"**Shares Security**" means, in relation to a Borrower, a document creating Security over the membership interests in that Borrower in agreed form.

"**Ship**" means Ship A, Ship B, Ship C, Ship D, Ship E, Ship F, Ship G, Ship H, Ship I, Ship J or Ship K.

"**Ship A**" means m.v. "ADVANTAGE ANTHEM", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship A MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower A as buyer and (ii) Bareboat Charterer A for the purchase of Ship A.

"**Ship A Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower A as buyer and (ii) Bareboat Charterer A in respect of the credit arrangements agreed between Borrower A and Bareboat Charterer A in relation to the purchase of Ship A.

"**Ship A Tranche**" means, together, Ship A Tranche A and Ship A Tranche B.

"**Ship A Tranche A**" means that part of the Loan made or to be made available to Borrower A to purchase Ship A in a principal amount of $7,754,545.

"**Ship A Tranche B**" means that part of the Loan made or to be made available to Borrower A to purchase Ship A in a principal amount of $9,305,455.

"**Ship B**" means m.v. "ADVANTAGE ARROW", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship B MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower B as buyer and (ii) Bareboat Charterer B for the purchase of Ship B.

"**Ship B Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower B as buyer and (ii) Bareboat Charterer B in respect of the credit arrangements agreed between Borrower B and Bareboat Charterer B in relation to the purchase of Ship B.

"**Ship B Tranche**" means, together, Ship B Tranche A and Ship B Tranche B.

"**Ship B Tranche A**" means that part of the Loan made or to be made available to Borrower B to purchase Ship B in a principal amount of $8,005,556.

"**Ship B Tranche B**" means that part of the Loan made or to be made available to Borrower B to purchase Ship B in a principal amount of $6,404,444.

"**Ship C**" means m.v. "ADVANTAGE ATOM", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship C MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower C as buyer and (ii) Bareboat Charterer C for the purchase of Ship C.

"**Ship C Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower C as buyer and (ii) Bareboat Charterer C in respect of the credit arrangements agreed between Borrower C and Bareboat Charterer C in relation to the purchase of Ship C.

"**Ship C Tranche**" means, together, Ship C Tranche A and Ship C Tranche B.

"**Ship C Tranche A**" means that part of the Loan made or to be made available to Borrower C to purchase Ship C in a principal amount of $7,554,545.

EUROPE/62707839v19

"**Ship C Tranche B**" means that part of the Loan made or to be made available to Borrower C to purchase Ship C in a principal amount of $9,065,455.

"**Ship D**" means m.v. "ADVANTAGE AVENUE", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship D MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower D as buyer and (ii) Bareboat Charterer D for the purchase of Ship D.

"**Ship D Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower D as buyer and (ii) Bareboat Charterer D in respect of the credit arrangements agreed between Borrower D and Bareboat Charterer D in relation to the purchase of Ship D.

"**Ship D Tranche**" means, together, Ship D Tranche A and Ship D Tranche B.

"**Ship D Tranche A**" means that part of the Loan made or to be made available to Borrower D to purchase Ship D in a principal amount of $7,500,000.

"**Ship D Tranche B**" means that part of the Loan made or to be made available to Borrower D to purchase Ship D in a principal amount of $7,500,000.

"**Ship E**" means m.v. "ADVANTAGE AWARD", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship E MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower E as buyer and (ii) Bareboat Charterer E for the purchase of Ship E.

"**Ship E Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower E as buyer and (ii) Bareboat Charterer E in respect of the credit arrangements agreed between Borrower E and Bareboat Charterer E in relation to the purchase of Ship E.

"**Ship E Tranche**" means, together, Ship E Tranche A and Ship E Tranche B.

"**Ship E Tranche A**" means that part of the Loan made or to be made available to Borrower E to purchase Ship E in a principal amount of $7,554,545.

"**Ship E Tranche B**" means that part of the Loan made or to be made available to Borrower E to purchase Ship E in a principal amount of $9,065,455.

"**Ship F**" means m.v. "ADVANTAGE SKY", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship F MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower F as buyer and (ii) Bareboat Charterer F for the purchase of Ship F.

"**Ship F Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower F as buyer and (ii) Bareboat

Charterer F in respect of the credit arrangements agreed between Borrower F and Bareboat Charterer F in relation to the purchase of Ship F.

"**Ship F Tranche**" means, together, Ship F Tranche A and Ship F Tranche B.

"**Ship F Tranche A**" means that part of the Loan made or to be made available to Borrower F to purchase Ship F in a principal amount of $8,675,000.

"**Ship F Tranche B**" means that part of the Loan made or to be made available to Borrower F to purchase Ship F in a principal amount of $8,675,000.

"**Ship G**" means m.v. "ADVANTAGE SOLAR", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship G MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower G as buyer and (ii) Bareboat Charterer G for the purchase of Ship G.

"**Ship G Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower G as buyer and (ii) Bareboat Charterer G in respect of the credit arrangements agreed between Borrower G and Bareboat Charterer G in relation to the purchase of Ship G.

"**Ship G Tranche**" means, together, Ship G Tranche A and Ship G Tranche B.

"**Ship G Tranche A**" means that part of the Loan made or to be made available to Borrower G to purchase Ship G in a principal amount of $9,150,000.

"**Ship G Tranche B**" means that part of the Loan made or to be made available to Borrower G to purchase Ship G in a principal amount of $7,320,000.

"**Ship H**" means m.v. "ADVANTAGE SPRING", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship H MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower H as buyer and (ii) Bareboat Charterer H for the purchase of Ship H.

"**Ship H Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower H as buyer and (ii) Bareboat Charterer H in respect of the credit arrangements agreed between Borrower H and Bareboat Charterer H in relation to the purchase of Ship H.

"**Ship H Tranche**" means, together, Ship H Tranche A and Ship H Tranche B.

"**Ship H Tranche A**" means that part of the Loan made or to be made available to Borrower H to purchase Ship H in a principal amount of $9,045,000.

"**Ship H Tranche B**" means that part of the Loan made or to be made available to Borrower H to purchase Ship H in a principal amount of $9,045,000.

"**Ship I**" means m.v. "ADVANTAGE START", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

EUROPE/62707839v19

"**Ship I MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower I as buyer and (ii) Bareboat Charterer I for the purchase of Ship I.

"**Ship I Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower I as buyer and (ii) Bareboat Charterer I in respect of the credit arrangements agreed between Borrower I and Bareboat Charterer I in relation to the purchase of Ship I.

"**Ship I Tranche**" means, together, Ship I Tranche A and Ship I Tranche B.

"**Ship I Tranche A**" means that part of the Loan made or to be made available to Borrower I to purchase Ship I in a principal amount of $8,690,909.

"**Ship I Tranche B**" means that part of the Loan made or to be made available to Borrower I to purchase Ship I in a principal amount of $10,429,091.

"**Ship J**" means m.v. "ADVANTAGE SUMMER", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship J MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower J as buyer and (ii) Bareboat Charterer J for the purchase of Ship J.

"**Ship J Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower J as buyer and (ii) Bareboat Charterer J in respect of the credit arrangements agreed between Borrower J and Bareboat Charterer J in relation to the purchase of Ship J.

"**Ship J Tranche**" means, together, Ship J Tranche A and Ship J Tranche B.

"**Ship J Tranche A**" means that part of the Loan made or to be made available to Borrower J to purchase Ship J in a principal amount of $8,970,000.

"**Ship J Tranche B**" means that part of the Loan made or to be made available to Borrower J to purchase Ship J in a principal amount of $8,970,000.

"**Ship K**" means m.v. "ADVANTAGE SUN", details of which are set out opposite its name in Schedule 7 (*Details of the Ships*).

"**Ship K MOA**" means the memorandum of agreement dated on or around the date of this Agreement and made between (i) Borrower K as buyer and (ii) Bareboat Charterer K for the purchase of Ship K.

"**Ship K Seller's Credit Agreement**" means the seller's credit agreement dated on or around the date of this Agreement and made between (i) Borrower K as buyer and (ii) Bareboat Charterer K in respect of the credit arrangements agreed between Borrower K and Bareboat Charterer K in relation to the purchase of Ship K.

"**Ship K Tranche**" means, together, Ship K Tranche A and Ship K Tranche B.

"**Ship K Tranche A**" means that part of the Loan made or to be made available to Borrower K to purchase Ship K in a principal amount of $8,883,333.

"**Ship K Tranche B**" means that part of the Loan made or to be made available to Borrower K to purchase Ship K in a principal amount of $12,436,667.

"**Ship Tranche**" means Ship A Tranche, Ship B Tranche, Ship C Tranche, Ship D Tranche, Ship E Tranche, Ship F Tranche, Ship G Tranche, Ship H Tranche, Ship I Tranche Ship J Tranche or Ship K Tranche.

"**Specified Time**" means a day or time determined in accordance with Schedule 9 (*Timetables*).

"**Subordinated Creditor**" means:

(a)      Fleetscape Capital;

(b)      a Bareboat Charterer; or

(c)      any other person who becomes a Subordinated Creditor in accordance with this Agreement.

"**Subordinated Debt Security**" means a Security over Subordinated Liabilities entered into or to be entered into by a Subordinated Creditor in favour of the Security Agent in an agreed form.

"**Subordinated Finance Document**" means:

(a)      the Subordinated Loan Agreement;

(b)      a Seller's Credit Agreement; and

(c)      any other document relating to or evidencing Subordinated Liabilities.

"**Subordinated Liabilities**" means all indebtedness owed or expressed to be owed by the Borrowers to a Subordinated Creditor whether under the Subordinated Finance Documents or otherwise.

"**Subordinated Loan Agreement**" means a loan agreement dated on or around the date of this Agreement and made between (i) the Borrowers, (ii) the financial institutions listed schedule 1 thereto as lenders which, as at the date of this Agreement, includes Fleetscape Capital as the sole lender, (iii) Fleetscape Capital as agent and (iv) Fleetscape Capital as security trustee pursuant to which the lenders thereto made or shall make available to the Borrowers a loan of up to $75,000,000 to finance part of the acquisition costs of the Ships.

"**Subordination Agreement**" means a subordination agreement entered into or to be entered into by each Subordinated Creditor and the Security Agent in agreed form.

"**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Tax Credit**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Tax Deduction**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Tax Payment**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Technical Management Agreement**" means the agreement entered into between a Borrower and the Approved Technical Manager regarding the technical management of a Ship.

"**Termination Date**" means, in respect of a Ship Tranche, the earlier of (i) the date falling on the fifth anniversary of the Utilisation Date in respect of that Ship Tranche and (ii) the date on which the Bareboat Charter relating to the Ship being financed by that Ship Tranche is terminated.

"**Third Parties Act**" has the meaning given to it in Clause 1.5 (*Third party rights*).

"**Time Charter**" means Time Charter A, Time Charter B, Time Charter C, Time Charter D, Time Charter E, Time Charter F, Time Charter G, Time Charter H, Time Charter I, Time Charter J or Time Charter K.

"**Time Charter A**" means the time charterparty dated on or around the date of this Agreement in respect of Ship A and made between (i) Bareboat Charterer A as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter B**" means the time charterparty dated on or around the date of this Agreement in respect of Ship B and made between (i) Bareboat Charterer B as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter C**" means the time charterparty dated on or around the date of this Agreement in respect of Ship C and made between (i) Bareboat Charterer C as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter D**" means the time charterparty dated on or around the date of this Agreement in respect of Ship D and made between (i) Bareboat Charterer D as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter E**" means the time charterparty dated on or around the date of this Agreement in respect of Ship E and made between (i) Bareboat Charterer E as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter F**" means the time charterparty dated on or around the date of this Agreement in respect of Ship F and made between (i) Bareboat Charterer F as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter G**" means the time charterparty dated on or around the date of this Agreement in respect of Ship G and made between (i) Bareboat Charterer G as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter H**" means the time charterparty dated on or around the date of this Agreement in respect of Ship H and made between (i) Bareboat Charterer H as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter I**" means the time charterparty dated on or around the date of this Agreement in respect of Ship I and made between (i) Bareboat Charterer I as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

EUROPE/62707839v19

"**Time Charter J**" means the time charterparty dated on or around the date of this Agreement in respect of Ship J and made between (i) Bareboat Charterer J as owner and (ii) the Time Charterer as charterer in a form acceptable to the Facility Agent.

"**Time Charter K**" means the time charterparty dated on or around the date of this Agreement in respect of Ship K and made between (i) Bareboat Charterer K as owner and (ii) the Time Charterer as charterer.

"**Time Charterer**" means Shell Western Supply and Trading Limited, a company incorporated and registered in Barbados with company number 1925 having its registered office at Mahogany Court, Wildey Business Park, Wildey, St. Michael BB11000, Barbados or any Affiliate of such company being of substantial significance and acceptable to the Facility Agent (acting on the instructions of the Lenders).

"**Total Commitments**" means the aggregate of the Commitments, being $190,000,000 at the date of this Agreement.

"**Total Loss**" means, in relation to a Ship:

(a)     actual, constructive, compromised, agreed or arranged total loss of that Ship; or

(b)     any Requisition of that Ship unless that Ship is returned to the full control of the relevant Borrower within 30 days of such Requisition.

"**Total Loss Date**" means, in relation to the Total Loss of a Ship:

(a)     in the case of an actual loss of that Ship, the date on which it occurred or, if that is unknown, the date when that Ship was last heard of;

(b)     in the case of a constructive, compromised, agreed or arranged total loss of that Ship, the earlier of:

(i)     the date on which a notice of abandonment is given (or deemed or agreed to be given) to the insurers; and

(ii)    the date of any compromise, arrangement or agreement made by or on behalf of the relevant Borrower with that Ship's insurers in which the insurers agree to treat that Ship as a total loss; and

(c)     in the case of any other type of Total Loss, the date (or the most likely date) on which it appears to the Facility Agent that the event constituting the total loss occurred.

"**Tranche**" means Tranche A or Tranche B.

"**Tranche A**" means, together, Ship A Tranche A, Ship B Tranche A, Ship C Tranche A, Ship D Tranche A, Ship E Tranche A, Ship F Tranche A, Ship G Tranche A, Ship H Tranche A, Ship I Tranche A, Ship J Tranche A and Ship K Tranche A.

"**Tranche A Commitment**" means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading "Tranche A" in Part B of Schedule 1 (*The Parties*) and the amount of any other Tranche A Commitment transferred to it under this Agreement; and

(b)    in relation to any other Lender, the amount of any Tranche A Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Tranche B**" means, together, Ship A Tranche B, Ship B Tranche B, Ship C Tranche B, Ship D Tranche B, Ship E Tranche B, Ship F Tranche B, Ship G Tranche B, Ship H Tranche B, Ship I Tranche B, Ship J Tranche B and Ship K Tranche B.

"**Tranche B Commitment**" means:

(a)    in relation to an Original Lender, the amount set opposite its name under the heading "Tranche B" in Part B of Schedule 1 (*The Parties*) and the amount of any other Tranche B Commitment transferred to it under this Agreement; and

(b)    in relation to any other Lender, the amount of any Tranche B Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Transaction Document**" means:

(a)    a Finance Document;

(b)    a Subordinated Finance Document;

(c)    any Charter;

(d)    any MOA; or

(e)    any other document designated as such by the Facility Agent and a Borrower.

"**Transaction Obligor**" means an Obligor, Fleetscape Advantage, a Bareboat Charterer, any Approved Manager or any other member of the Group who executes a Transaction Document.

"**Transaction Security**" means the Security created or evidenced or expressed to be created or evidenced under the Security Documents.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Facility Agent and the Borrowers.

"**Transfer Date**" means, in relation to an assignment or a transfer, the later of:

(a)    the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)    the date on which the Facility Agent executes the relevant Assignment Agreement or Transfer Certificate.

"**Tripartite Assignment**" means, in relation to Ship, a tripartite deed of assignment to be entered into between (i) the Borrower owning that Ship, (ii) the Bareboat Charterer in respect of that Ship and (iii) the Security Agent pursuant to which, inter alia the rights, title and interests of:

(a)   that Borrower in that Ship's Earnings, its Insurances, any Requisition Compensation in relation to that Ship, the Bareboat Charter in respect of that Ship and any Charter the duration of which exceeds or is capable of exceeding, by virtue of any optional extension, 12 months and any Charter Guarantee in relation to that Ship; and

(b)   that Bareboat Charterer in that Ship's Earnings, its Insurances, any Requisition Compensation in relation to that Ship, the Time Charter in respect of that Ship and any Charter the duration of which exceeds, by virtue of any optional extension, 12 months and any Charter Guarantee in relation to that Ship,

are assigned and/or charged in favour of the Security Agent, in agreed form.

"**UK Establishment**" means a UK establishment as defined in the Overseas Regulations.

"**Unpaid Sum**" means any sum due and payable but unpaid by a Transaction Obligor under the Finance Documents.

"**US**" means the United States of America.

"**US Tax Obligor**" means:

(a)   a person which is resident for tax purposes in the US; or

(b)   a person some or all of whose payments under the Finance Documents are from sources within the US for US federal income tax purposes.

"**Utilisation**" means a utilisation of the Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the relevant Advance is to be made.

"**Utilisation Request**" means a notice substantially in the form set out in Part A of Schedule 3 (*Requests*).

"**VAT**" means:

(a)   any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)   any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"**Write-down and Conversion Powers**" means:

(a)   in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and

(b)   in relation to any other applicable Bail-In Legislation:

(i)   any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution,

to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii)    any similar or analogous powers under that Bail-In Legislation.

## 1.2    Construction

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    the "**Account Bank**", the "**Arranger**", the "**Bookrunner**", the "**Facility Agent**", any "**Finance Party**", any "**Hedge Counterparty**", any "**Lender**", any "**Obligor**", any "**Party**", any "**Secured Party**", the "**Security Agent**", any "**Transaction Obligor**", the "**Underwriter**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents;

(ii)    "**assets**" includes present and future properties, revenues and rights of every description;

(iii)    a liability which is "**contingent**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

(iv)    "**document**" includes a deed and also a letter, fax, email or telex;

(v)    "**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable Tax including VAT;

(vi)    a "**Finance Document**", a "**Security Document**" or "**Transaction Document**" or any other agreement or instrument is a reference to that Finance Document, Security Document or Transaction Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(vii)    a "**group of Lenders**" includes all the Lenders;

(viii)    "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(ix)    "**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any regulation or resolution of the Council of the European Union, the European Commission, the United Nations or its Security Council;

(x)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(xi)    "**proceedings**" means, in relation to any enforcement provision of a Finance Document, proceedings of any kind, including an application for a provisional or protective measure;

(xii) a "**regulation**" includes any regulation, rule, official directive, request or guideline having the force of law of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(xiii) a provision of law is a reference to that provision as amended or re-enacted;

(xiv) a time of day is a reference to London time;

(xv) any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall, in respect of a jurisdiction other than England, be deemed to include that which most nearly approximates in that jurisdiction to the English legal term;

(xvi) words denoting the singular number shall include the plural and vice versa; and

(xvii) "**including**" and "**in particular**" (and other similar expressions) shall be construed as not limiting any general words or expressions in connection with which they are used.

(b) The determination of the extent to which a rate is "**for a period equal in length**" to an Interest Period shall disregard any inconsistency arising from the last day of that Interest Period being determined pursuant to the terms of this Agreement.

(c) Section, Clause and Schedule headings are for ease of reference only and are not to be used for the purposes of construction or interpretation of the Finance Documents.

(d) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under, or in connection with, any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(e) A Potential Event of Default is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been remedied or waived provided that if the Facility Agent has exercised any of its rights under Clause 28.19 (*Acceleration*), an Event of Default is "continuing" if it has not been waived.

## 1.3 Construction of insurance terms

In this Agreement:

"**approved**" means, for the purposes of Clause 23 (*Insurance Undertakings*), approved in writing by the Facility Agent.

"**excess risks**" means, in respect of a Ship, the proportion of claims for general average, salvage and salvage charges not recoverable under the hull and machinery policies in respect of that Ship in consequence of its insured value being less than the value at which that Ship is assessed for the purpose of such claims.

"**obligatory insurances**" means all insurances effected, or which any Borrower is obliged to effect, under Clause 23 (*Insurance Undertakings*) or any other provision of this Agreement or of another Finance Document.

"**policy**" includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms.

EUROPE/62707839v19

"**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association managed in London, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Hull Clauses (1/11/02) (1/11/03), clause 8 of the Institute Time Clauses (Hulls) (1/10/83) (1/11/95) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision.

"**war risks**" includes the risk of mines and all risks excluded by clauses 29, 30 or 31 of the International Hull Clauses (1/11/02), clauses 29 or 30 of the International Hull Clauses (1/11/03), clauses 24, 25 or 26 of the Institute Time Clauses (Hulls) (1/11/95) or clause 23, 24 or 25 of the Institute Time Clauses (Hulls) (1/10/83).

### 1.4    Agreed forms of Finance Documents

References in Clause 1.1 (*Definitions*) to any Finance Document being in "agreed form" are to that Finance Document:

(a)    in a form attached to a certificate dated the same date as this Agreement (and signed by each Borrower and the Facility Agent); or

(b)    in any other form agreed in writing between each Borrower and the Facility Agent acting with the authorisation of the Majority Lenders or, where Clause 44.2 (*All Lender matters*) applies, all the Lenders.

### 1.5    Third party rights

(a)    Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or to enjoy the benefit of any term of this Agreement.

(b)    Subject to Clause 44.3 (*Other exceptions*) but otherwise notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

(c)    Any Affiliate, Receiver, Delegate or any other person described in paragraph (d) of Clause 14.2 (*Other indemnities*), paragraph (b) of Clause 31.11 (*Exclusion of liability*), Clause 31.20 (*Role of Reference Banks*), Clause 31.21 (*Third Party Reference Banks*) or paragraph (b) of Clause 32.11 (*Exclusion of liability*) may, subject to this Clause 1.5 (*Third party rights*) and the Third Parties Act, rely on any Clause of this Agreement which expressly confers rights on it.

    EUROPE/62707839v19

**SECTION 2**

**THE FACILITY**

**2    THE FACILITY**

**2.1    The Facility**

Subject to the terms of this Agreement, the Lenders make available to the Borrowers a dollar term loan facility in 11 Ship Tranches in an aggregate amount not exceeding the Total Commitments.

**2.2    Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under the Finance Documents are several.  Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from a Transaction Obligor is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with paragraph (c) below.  The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of the Loan or any other amount owed by a Transaction Obligor which relates to a Finance Party's participation in the Facility or its role under a Finance Document (including any such amount payable to the Facility Agent on its behalf) is a debt owing to that Finance Party by that Transaction Obligor.

(c)    A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents.

**3    PURPOSE**

**3.1    Purpose**

Each Borrower shall apply all amounts borrowed by it under the Facility only for the purpose stated in the preamble (Background) to this Agreement.

**3.2    Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**4    CONDITIONS OF UTILISATION**

**4.1    Initial conditions precedent**

The Borrowers may not deliver a Utilisation Request unless the Facility Agent has received all of the documents and other evidence listed in Part A of Schedule 2 (*Conditions Precedent and Subsequent*) in form and substance satisfactory to the Facility Agent.

**4.2** **Conditions precedent to prepositioning of funds**

The Lenders will only be obliged to comply with Clause 5.4 (*Lenders' participation*) if:

(a) on the date of the Utilisation Request and on the proposed Utilisation Date and before the Advance is made available:

(i) no Default is continuing or would result from the proposed Advance;

(ii) the Repeating Representations to be made by each Transaction Obligor are true; and

(iii) no Change of Control has occurred; and

(b) on the Utilisation Date, the Facility Agent has received, or is satisfied that it will receive when the Advance is made available, all of the documents and other evidence listed in Part B of Schedule 2 (*Conditions Precedent and Subsequent*) in form and substance satisfactory to the Facility Agent;

**4.3** **Conditions precedent to release of Advance**

The Facility Agent shall only be obliged to release the Advance to the relevant Bareboat Charterer or, as the case may be, the financier of that Bareboat Charterer on the relevant Delivery Date if:

(a) on the relevant Delivery Date and before the Advance is released:

(i) no Default is continuing or would result from the proposed Advance;

(ii) the Repeating Representations to be made by each Transaction Obligor are true;

(iii) no Change of Control has occurred; and

(iv) the Ship in respect of which such Advance is to be made has neither been sold (other than a sale pursuant to the MOA relating to that Ship) or become a Total Loss.

**4.4** **Conditions subsequent**

Save in the case of documentary evidence which must be provided on the relevant Delivery Date (as a same day condition subsequent) that the relevant Mortgage has been duly recorded on that Delivery Date (as required under sub-paragraph 2.1 of paragraph 2 of Part D of Schedule 2 (*Conditions Precedent and Subsequent*)), the Borrowers undertakes to deliver or cause to be delivered to the Facility Agent within ten Business Days after that Delivery Date, the additional documents and other evidence listed in Part D of Schedule 2 (*Conditions Precedent and Subsequent*) in form and substance satisfactory to the Facility Agent.

**4.5** **Notification of satisfaction of conditions precedent**

(a) The Facility Agent shall notify the Borrowers and the Lenders promptly upon being satisfied as to the satisfaction of the conditions precedent referred to in Clause 4.1 (*Initial conditions precedent*), Clause 4.2 (*Conditions precedent to prepositioning of funds*), Clause 4.3 (*Conditions precedent to release of Advance*) and Clause 4.4 (*Conditions subsequent*).

(b) Other than to the extent that the Majority Lenders notify the Facility Agent in writing to the contrary before the Facility Agent gives the notification described in paragraph (a) above, the

Lenders authorise (but do not require) the Facility Agent to give that notification.  The Facility Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

**4.6**     **Waiver of conditions precedent**

If the Majority Lenders, at their discretion, permit an Advance to be prepositioned or released before any of the conditions precedent referred to in Clause 4.1 (*Initial conditions precedent*), Clause 4.2 (*Conditions precedent to prepositioning of funds*) or Clause 4.3 (*Conditions precedent to release of Advance*) has been satisfied, the Borrowers shall ensure that that condition is satisfied within five Business Days after the relevant Utilisation Date or relevant Delivery Date (as applicable) or such later date as the Facility Agent, acting with the authorisation of the Majority Lenders, may agree in writing with the Borrowers.

EUROPE/62707839v19

## SECTION 3

## UTILISATION

**5**      **UTILISATION**

**5.1**    **Delivery of a Utilisation Request**

(a)     The Borrowers may utilise the Facility by delivery to the Facility Agent of a duly completed Utilisation Request not later than the Specified Time.

(b)     The Borrowers may not deliver more than one Utilisation Request under each Ship Tranche.

**5.2**    **Completion of a Utilisation Request**

(a)     Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

   (i)      the proposed Utilisation Date is a Business Day within the relevant Availability Period;

   (ii)     the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*);

   (iii)    all applicable deductible items have been completed in that Utilisation Request; and

   (iv)     the proposed Interest Period complies with Clause 9 (*Interest Periods*).

(b)     Only the Advances under each Ship Tranche may be requested in each Utilisation Request.

**5.3**    **Currency and amount**

(a)     The currency specified in a Utilisation Request must be dollars.

(b)     The amount of the proposed Advance must be an amount which is not more than:

   (i)      in respect of the Advance under the Ship A Tranche, $17,060,000;

   (ii)     in respect of the Advance under the Ship B Tranche, $14,410,000;

   (iii)    in respect of the Advance under the Ship C Tranche, $16,620,000;

   (iv)     in respect of the Advance under the Ship D Tranche, $15,000,000;

   (v)      in respect of the Advance under the Ship E Tranche, $16,620,000;

   (vi)     in respect of the Advance under the Ship F Tranche, $17,350,000;

   (vii)    in respect of the Advance under the Ship G Tranche, $16,470,000;

   (viii)   in respect of the Advance under the Ship H Tranche, $18,090,000;

   (ix)     in respect of the Advance under the Ship I Tranche, $19,120,000;

   (x)      in respect of the Advance under the Ship J Tranche, $17,940,000; and

(xi)     in respect of the Advance under the Ship K Tranche, $21,320,000.

(c)     The amount of the proposed Advance must be an amount which would not oblige the Borrowers to provide additional security or prepay part of the Advance if the ratio set out in Clause 26 (*Security Cover*) were applied and notice was given by the Facility Agent under Clause 26.1 (*Minimum required security cover*) immediately after the Advance was made.

## 5.4    Lenders' participation

(a)     If the conditions set out in this Agreement have been met, each Lender shall make its participation in each Advance available by the Utilisation Date through its Facility Office.

(b)     The amount of each Lender's participation in each Advance will be equal to the proportion borne by its Available Commitment to the Available Facility immediately before making that Advance.

(c)     The Facility Agent shall notify each Lender of the amount of each Advance and the amount of its participation in that Advance by the Specified Time.

## 5.5    Cancellation of Commitments

The Commitments in respect of any Tranche which are unutilised at the end of the Availability Period for such Tranche shall then be cancelled.

## 5.6    Prepositioning of funds

The Facility Agent shall, on each Utilisation Date, preposition the amounts which the Facility Agent receives from the Lenders in respect of the relevant Advance by making payment of such amounts:

(a)     via SWIFT message to such bank (the "**Prepositioning Bank**") as the Borrowers may have agreed with the Facility Agent in advance of that Utilisation Date and as specified in the Utilisation Request in respect of that Advance and on such terms as may be agreed between the Facility Agent and the Prepositioning Bank, on the basis that:

(i)     the funds will be held, unallocated to any account and to the sole order of the Facility Agent until they are either:

(A)     released to the relevant Bareboat Charterer or, as the case may be, its financier upon receipt by the Prepositioning Bank of a copy of the protocol of delivery and acceptance under the MOA relating to the Ship being financed by that Advance and countersigned by the Facility Agent through its representatives;

(B)     returned to the Facility Agent at the account it shall specify, in the event that funds are not released within 5 Business Days to the relevant Bareboat Charterer or, as the case may be, its financier;

(ii)     such prepositioning shall constitute the making of that Advance and the Borrowers shall at that time become indebted, as principal and direct obligors on a joint and several basis, to each Lender in an amount equal to that Lender's participation in that Advance; and

(iii)    the value date on which that Advance is prepositioned shall constitute the Utilisation Date in respect of that Advance.

**5.7    Disbursement of Advance**

The Facility Agent shall, on the relevant Delivery Date, instruct the Prepositioning Bank (through a representative of the Facility Agent countersigning the protocol of delivery and acceptance under the MOA relating to the Ship being financed by that Advance) to release the amount of the Advance to the relevant Bareboat Charterer or, as the case may be, its financier subject to the provisions of Clause 4.3 (*Conditions precedent to release of Advance*) and Clause 4.5 (*Notification of satisfaction of conditions precedent*).

EUROPE/62707839v19

**SECTION 4**

**REPAYMENT, PREPAYMENT AND CANCELLATION**

**6    REPAYMENT**

**6.1    Repayment of Loan**

(a)    The Borrowers shall repay the Loan as follows:

(i)    subject to paragraph (b) below, Tranche A shall be repaid in 20 instalments in accordance with, and in the amounts and on the dates as shown in, the Repayment Schedule;

(ii)    Ship A Tranche B shall be repaid in a single instalment in an amount of $9,305,455 on the relevant Termination Date;

(iii)    Ship B Tranche B shall be repaid in a single instalment in an amount of $6,404,444 on the relevant Termination Date;

(iv)    Ship C Tranche B shall be repaid in a single instalment in an amount of $9,065,455 on the relevant Termination Date;

(v)    Ship D Tranche B shall be repaid in a single instalment in an amount of $7,500,000 on the relevant Termination Date;

(vi)    Ship E Tranche B shall be repaid in a single instalment in an amount of $9,065,455 on the relevant Termination Date;

(vii)    Ship F Tranche B shall be repaid in a single instalment in an amount of $8,675,000 on the relevant Termination Date;

(viii)    Ship G Tranche B shall be repaid in a single instalment in an amount of $7,320,000 on the relevant Termination Date;

(ix)    Ship H Tranche B shall be repaid in a single instalment in an amount of $9,045,000 on the relevant Termination Date;

(x)    Ship I Tranche B shall be repaid in a single instalment in an amount of $10,429,091 on the relevant Termination Date;

(xi)    Ship J Tranche B shall be repaid in a single instalment in an amount of $8,970,000 on the relevant Termination Date; and

(xii)    Ship K Tranche B shall be repaid in a single instalment in an amount of $12,436,667 on the relevant Termination Date,

and each such instalment shall be a "**Repayment Instalment**".

(b)    The amount of each Repayment Instalment in respect of Tranche A as set out in the Repayment Schedule has been calculated on certain assumptions including, without limitation, the assumption that the Borrowers will have utilised Tranche A in an amount of $91,783,434 on 6 February 2019, LIBOR will be 2.70% and Tranche A will be amortised to zero on the relevant

Termination Date. On or before the last Utilisation Date in respect of an Advance under Tranche A, the Parties shall agree a replacement Repayment Schedule based on the actual amount borrowed under Tranche A as at that date (and taking into account any changes to the assumptions upon which the original Repayment Schedule was produced) showing:

(i)     the exact date of each Repayment Date in respect of Tranche A;

(ii)    the amount of each Repayment Instalment due on such Repayment Dates; and

(iii)   the outstanding principal amount in respect of Tranche A after repayment of those Repayment Instalments on those Repayment Dates,

and that replacement Repayment Schedule shall be binding on the Parties and shall replace the then existing Repayment Schedule and shall for all purposes be treated as if it had been the Repayment Schedule from the date of this Agreement.

**6.2     Effect of cancellation and prepayment on scheduled repayments**

(a)    If the Borrowers cancel the whole or any part of any Available Commitment in accordance with Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*) or if the Available Commitment of any Lender is cancelled under Clause 7.1 (*Illegality*) then the Repayment Instalments for the relevant Ship Tranche falling after that cancellation will reduce pro rata by the amount of the Available Commitments so cancelled.

(b)    If the Borrowers cancel the whole or any part of any Available Commitment in accordance with Clause 7.2 (*Automatic cancellation*) or if the whole or part of any Commitment is cancelled pursuant to Clause 5.5 (*Cancellation of Commitments*), the Repayment Instalments for the relevant Ship Tranche for each Repayment Date falling after that cancellation will reduce in inverse chronological order by the amount of the Commitments so cancelled.

(c)    If any part of the Loan is repaid or prepaid in accordance with Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*) or Clause 7.1 (*Illegality*) then the Repayment Instalments for the relevant Ship Tranche for each Repayment Date falling after that repayment or prepayment will reduce pro rata by the amount of the Loan repaid or prepaid.

(d)    If any part of the Loan or a part of a Ship Tranche is partially prepaid in accordance with Clause 7.3 (*Voluntary prepayment of Loan*), then the amount of the Repayment Instalment for the relevant Tranche B shall be reduced by the amount of the Loan or part of a Ship Tranche repaid or prepaid and, once Tranche B has been repaid in full, then the Repayment Instalments in respect of Tranche A for each Repayment Date falling after that repayment or prepayment will reduce in inverse chronological order by the amount of the Loan or part of a Ship Tranche repaid or prepaid.

(e)    If any part of the Loan is prepaid in accordance with Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) or Clause 7.5 (*Mandatory prepayment of Hedging Prepayment Proceeds*) then the amount of the Repayment Instalments for the relevant Ship Tranche for each Repayment Date falling after that repayment or prepayment will reduce in inverse chronological order by the amount of the Loan repaid or prepaid.

EUROPE/62707839v19

**6.3     Termination Date**

On the final Termination Date to occur under this Agreement, the Borrowers shall additionally pay to the Facility Agent for the account of the Finance Parties all other sums then accrued and owing under the Finance Documents.

**6.4     Reborrowing**

No Borrower may reborrow any part of the Facility which is repaid.

**7       PREPAYMENT AND CANCELLATION**

**7.1     Illegality**

(a)     If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in an Advance or the Loan or it becomes unlawful for any Affiliate of a Lender for that Lender to do so:

    (i)     that Lender shall promptly notify the Facility Agent upon becoming aware of that event;

    (ii)    upon the Facility Agent notifying the Borrowers, the Available Commitment of that Lender will be immediately cancelled; and

    (iii)   the Borrowers shall prepay that Lender's participation in the Loan on the last day of the Interest Period for the Loan occurring after the Facility Agent has notified the Borrowers or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no earlier than the last day of any applicable grace period permitted by law) and that Lender's corresponding Commitment shall be cancelled in the amount of the participation prepaid.

(b)     If it becomes unlawful for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan due to:

    (i)     Sanctions (including in each case, without limitation, (A) the non-existence or cessation of legality, validity a binding effect or enforceability of a provision of a Finance Document and (B) the presence of any circumstances resulting in the imposition of any civil, administrative or criminal measures on a Lender) and/or contrary to, or declared by any Sanctions Authority to be contrary to Sanctions for any Affiliate of a Lender for that Lender to do so; or

    (ii)    without prejudice to the generality of the preceding paragraph, the Borrowers or any other member of the Group being or becoming a Prohibited Person, which would result in a breach of Sanctions by a Lender:

        (A)    to the extent permitted by applicable law, that Lender shall promptly notify the Borrowers through the Facility Agent upon becoming aware of that event;

        (B)    such Lender's Commitment will be cancelled on the date (the "**Sanctions Cancellation Date**") falling thirty (30) days after the date on which the Facility Agent has notified the Borrowers, which it shall do promptly upon receipt of a notification from the Lender; and

EUROPE/62707839v19

(C)    the Borrowers shall repay that Lender's participation in the Loan on the last day of the Interest Period for the Loan occurring after the Sanctions Cancellation Date or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no later than the earlier of (x) the Sanctions Cancellation Date and (y) the last day of any applicable grace period permitted by law).

**7.2    Automatic cancellation**

The unutilised Commitment (if any) of each Lender in respect of each Ship Tranche shall be automatically cancelled at close of business on the date on which the Advance under that Ship Tranche is made available.

**7.3    Voluntary prepayment of Loan**

The Borrowers may, if they give the Facility Agent not less than 15 days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the amount of the Loan by a minimum amount of $500,000 or a multiple of that amount).

**7.4    Mandatory prepayment on sale or Total Loss**

(a)    If a Ship is sold (without prejudice to paragraph (a) of Clause 22.11 (*Disposals*)) or becomes a Total Loss, the Borrowers shall on the Relevant Date prepay the Ship Tranche applicable to that Ship.

(b)    On the Relevant Date, the Borrowers shall also prepay such part of the Loan as shall eliminate any shortfall arising if the ratio set out in Clause 26 (*Security Cover*) were applied immediately following the payment referred to in paragraph (a) above.

(c)    Provided that no Default has occurred and is continuing, any remaining proceeds of the sale or Total Loss of a Ship after the prepayments referred to in paragraph (a) and paragraph (b) above have been made together with all other amounts that are payable on any such prepayment pursuant to the Finance Documents shall be paid to the Borrower that owned the relevant Ship for application by that Borrower in accordance with the Subordinated Loan Agreement and Seller's Credit Agreements.

(d)    In this Clause 7.4 (*Mandatory prepayment on sale or Total Loss*):

"**Relevant Date**" means:

(i)    in the case of a sale of a Ship, on the date on which the sale is completed by delivery of that Ship to the buyer of that Ship; and

(ii)    in the case of a Total Loss of a Ship, on the earlier of:

(A)    the date falling 120 days after the Total Loss Date; and

(B)    the date of receipt by the Security Agent of the proceeds of insurance relating to such Total Loss.

**7.5    Mandatory prepayment of Hedging Prepayment Proceeds**

Any Hedging Prepayment Proceeds arising as a result of any cancellation or prepayment under this Agreement shall, following payment into the Retention Account in accordance with Clause 27.2 (*Payment and application of Earnings*), be applied rateably in respect of each Ship Tranche on the last day of the Interest Period for each Ship Tranche which ends after such payment in prepayment of the Loan.

**7.6    Right of repayment and cancellation in relation to a single Lender**

(a)    If:

(i)    any sum payable to any Lender by a Transaction Obligor is required to be increased under paragraph (c) of Clause 12.2 (*Tax gross-up*) or under that clause as incorporated by reference or in full in any other Finance Document; or

(ii)    any Lender claims indemnification from a Borrower under Clause 12.3 (*Tax indemnity*) or Clause 13.1 (*Increased costs*),

the Borrowers may, whilst the circumstance giving rise to the requirement for that increase or indemnification continues, give the Facility Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation in the Loan.

(b)    On receipt of a notice of cancellation referred to in paragraph (a) above, the Commitment of that Lender shall immediately be reduced to zero.

(c)    On the last day of each Interest Period which ends after the Borrowers have given notice of cancellation under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Borrowers in that notice), the Borrowers shall repay that Lender's participation in the Loan.

**7.7    Restrictions**

(a)    Any notice of cancellation or prepayment given by any Party under this Clause 7 (*Prepayment and Cancellation*) shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made, the amount of that cancellation or prepayment and, if relevant, the part of the Loan to be prepaid or cancelled.

(b)    Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and amounts (if any) payable under the Hedging Agreements in connection with that prepayment and, subject to any Break Costs, without premium or penalty.

(c)    No Borrower may reborrow any part of the Facility which is prepaid.

(d)    No Borrower shall repay or prepay all or any part of the Loan or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

(e)    No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

(f)     If the Facility Agent receives a notice under this Clause 7 (*Prepayment and Cancellation*) it shall promptly forward a copy of that notice to either the Borrowers or the affected Lenders and/or Hedge Counterparties, as appropriate.

(g)     If all or part of any Lender's participation in the Loan is repaid or prepaid, an amount of that Lender's Commitment (equal to the amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

**7.8    Application of prepayments**

Any prepayment of any part of the Loan (other than a prepayment pursuant to Clause 7.1 (*Illegality*) or Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*)) shall be applied pro rata to each Lender's participation in that part of the Loan.

EUROPE/62707839v19

**SECTION 5**

**COSTS OF UTILISATION**

**8      INTEREST**

**8.1    Calculation of interest**

The rate of interest on the Loan or any part of the Loan for each Interest Period is the percentage rate per annum which is the aggregate of:

(a)     the applicable Margin; and

(b)     LIBOR.

**8.2    Payment of interest**

(a)     The Borrowers shall pay accrued interest on the Loan or any part of the Loan on the last day of each Interest Period (each an "**Interest Payment Date**").

(b)     If an Interest Period is longer than three Months, the Borrowers shall also pay interest then accrued on the Loan or the relevant part of the Loan on the dates falling at three Monthly intervals after the first day of the Interest Period.

**8.3    Default interest**

(a)     If a Transaction Obligor fails to pay any amount payable by it under a Finance Document other than a Hedging Agreement on its due date, interest shall accrue on the Unpaid Sum from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is two per cent. per annum higher than the rate which would have been payable if the Unpaid Sum had, during the period of non-payment, constituted part of the Loan in the currency of the Unpaid Sum for successive Interest Periods, each of a duration selected by the Facility Agent. Any interest accruing under this Clause 8.3 (*Default interest*) shall be immediately payable by the Obligor on demand by the Facility Agent.

(b)     If an Unpaid Sum consists of all or part of the Loan which became due on a day which was not the last day of an Interest Period relating to the Loan or that part of the Loan:

(i)      the first Interest Period for that Unpaid Sum shall have a duration equal to the unexpired portion of the current Interest Period relating to the Loan or that part of the Loan; and

(ii)     the rate of interest applying to that Unpaid Sum during that first Interest Period shall be two per cent. per annum higher than the rate which would have applied if that Unpaid Sum had not become due.

(c)     Default interest (if unpaid) arising on an Unpaid Sum will be compounded with the Unpaid Sum at the end of each Interest Period applicable to that Unpaid Sum but will remain immediately due and payable.

**8.4     Notification of rates of interest**

(a)     The Facility Agent shall promptly notify the Lenders and the Borrowers of the determination of a rate of interest under this Agreement.

(b)     The Facility Agent shall promptly notify the Borrower of each Funding Rate relating to the Loan, any part of the Loan or any Unpaid Sum.

**8.5     Hedging**

(a)     On or before the first Utilisation Date, the Borrowers shall enter into Hedging Agreements and shall after that date maintain such Hedging Agreements in accordance with this Clause 8.5 (*Hedging*).

(b)     The aggregate notional amount of the transactions in respect of the Hedging Agreements shall be 100 per cent. of the aggregate amount of the Loan.

(c)     Each Hedging Agreement shall:

   (i)     be with a Hedge Counterparty;

   (ii)     be for a term ending no earlier than the final Termination Date to occur under this Agreement;

   (iii)     have settlement dates coinciding with the Interest Payment Dates;

   (iv)     be based on an ISDA Master Agreement and otherwise in form and substance satisfactory to the Facility Agent; and

   (v)     provide that the Termination Currency (as defined in the relevant Hedging Agreement) shall be dollars.

(d)     The rights of each Borrower under the Hedging Agreements shall be charged or assigned by way of security under a Hedging Agreement Security.

(e)     The parties to each Hedging Agreement must comply with the terms of that Hedging Agreement.

(f)     Neither a Hedge Counterparty nor a Borrower may amend, supplement, extend or waive the terms of any Hedging Agreement without the consent of the Security Agent.

(g)     Paragraph (f) above shall not apply to an amendment, supplement or waiver that does not give rise to a conflict with any provision of this Agreement or the Hedging Agreement Security.

(h)     If, at any time, the aggregate notional amount of the transactions in respect of the Hedging Agreements exceeds or, as a result of any repayment or prepayment under this Agreement, will exceed 100 per cent. of the Loan at that time, the Borrowers must promptly notify the Facility Agent and, thereafter, the Borrowers and the Hedge Counterparties must, at the request of the Facility Agent, reduce the aggregate notional amount of those transactions by an amount so that it no longer exceeds or will not exceed 100 per cent. of the Loan then or that will be outstanding.

EUROPE/62707839v19

(i)    Any reductions in the aggregate notional amount of the transactions in respect of the Hedging Agreements in accordance with paragraph (h) above will be apportioned as between those transactions *pro rata*.

(j)    Paragraph (h) above shall not apply to any transactions in respect of any Hedging Agreement under which no Borrower has any actual or contingent indebtedness.

(k)    The Facility Agent must make a request under paragraph (h) above if so required by a Hedge Counterparty.

(l)    Neither a Hedge Counterparty nor a Borrower may terminate or close out any transactions in respect of any Hedging Agreement (in whole or in part) except:

    (i)    in accordance with paragraphs (h)-(k) above;

    (ii)    on the occurrence of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger (as each such expression is defined in the relevant Hedging Agreement);

    (iii)    if an "event of default" occurs pursuant to section 5(a)(i) (*failure to pay or deliver*) of the relevant Hedging Agreement;

    (iv)    if an Event of Default has occurred and is continuing under Clause 28.7 (*Insolvency*) and/or Clause 28.8 (*Insolvency proceedings*);

    (v)    in the case of termination or closing out by a Hedge Counterparty, if the Facility Agent serves notice under sub-paragraph (ii) of paragraph (a) of Clause 28.19 (*Acceleration*) or, having served notice under sub-paragraph (iii) of paragraph (a) of Clause 28.19 (*Acceleration*), makes a demand;

    (vi)    in the case of any other termination or closing out by a Hedge Counterparty or a Borrower, with the consent of the Facility Agent;

    (vii)    if the Secured Liabilities (other than in respect of the Hedging Agreements) have been irrevocably and unconditionally paid and discharged in full or the Loan is refinanced in full; or

    (viii)    if the Hedge Counterparty which is a party to that Hedging Agreement ceases to be a Lender under this Agreement.

(m)    If a Hedge Counterparty or a Borrower terminates or closes out a transaction in respect of a Hedging Agreement (in whole or in part) in accordance with sub-paragraphs (ii), or (in the case of a Hedge Counterparty only) (vi) of paragraph (l) above, it shall promptly notify the Facility Agent of that termination or close out.

(n)    If a Hedge Counterparty is entitled to terminate or close out any transaction in respect of any Hedging Agreement under sub-paragraph (v) of paragraph (l) above, such Hedge Counterparty shall promptly terminate or close out such transaction following a request to do so by the Security Agent.

(o)    A Hedge Counterparty may only suspend making payments under a transaction in respect of a Hedging Agreement if a Borrower is in breach of its payment obligations under any transaction in respect of that Hedging Agreement.

(p)     Each Hedge Counterparty consents to, and acknowledges notices of, the charging or assigning by way of security by each Borrower pursuant to the relevant Hedging Agreement Security of its rights under the Hedging Agreements to which it is party in favour of the Security Agent.

(q)     Any such charging or assigning by way of security is without prejudice to, and after giving effect to, the operation of any payment or close-out netting in respect of any amounts owing under any Hedging Agreement.

(r)     The Security Agent shall not be liable for the performance of any of a Borrower's obligations under a Hedging Agreement.

(s)     No Borrower or Hedge Counterparty shall assign any of its rights or transfer any of its rights or obligations under a Hedging Agreement without the consent of the Security Agent.

## 9      INTEREST PERIODS

### 9.1    Selection of Interest Periods

(a)     The Borrowers may select the Interest Period for the Loan in the Utilisation Request for the first Advance.  Subject to paragraphs (f) and (h) below and Clause 9.2 (*Changes to Interest Periods*), the Borrowers may select each subsequent Interest Period in respect of the Loan in a Selection Notice.

(b)     Each Selection Notice is irrevocable and must be delivered to the Facility Agent by the Borrowers not later than the Specified Time.

(c)     If the Borrowers fail to select an Interest Period in the first Utilisation Request or fail to deliver a Selection Notice to the Facility Agent in accordance with paragraphs (a) and (b) above, the relevant Interest Period will, subject to paragraphs (f) and (h) below and Clause 9.2 (*Changes to Interest Periods*), be three Months.

(d)     Subject to this Clause 9 (*Interest Periods*), the Borrowers may select an Interest Period of 3 Months or any other period under 3 Months agreed between the Borrowers and the Facility Agent (acting on the instructions of all the Lenders).

(e)     An Interest Period in respect of the Loan or any part of the Loan shall not extend beyond the final Termination Date to occur under this Agreement.

(f)     In respect of a Repayment Instalment, the Borrowers may request in the relevant Selection Notice that an Interest Period for a part of the Loan equal to such Repayment Instalment shall end on the Repayment Date relating to it and, subject to paragraph (d) above, select a longer Interest Period for the remaining part of the Loan.

(g)     The first Interest Period for the Loan shall start on the first Utilisation Date and, subject to paragraph (h) below, end on 10 April 2019 and each subsequent Interest Period shall start on the last day of the preceding Interest Period.

(h)     The first Interest Period for the second and any subsequent Advance shall start on the Utilisation Date of such Advance and end on the last day of the Interest Period applicable to the Loan on the date on which such Advance is made.

(i)     Except for the purposes of paragraph (f) and paragraph (h) above and Clause 9.2 (*Changes to Interest Periods*), the Loan shall have one Interest Period only at any time.

**9.2    Changes to Interest Periods**

(a)    In respect of a Repayment Instalment, prior to determining the interest rate for the Loan, the Facility Agent may establish an Interest Period for a part of the Loan equal to such Repayment Instalment to end on the Repayment Date relating to it and the remaining part of the Loan shall have the Interest Period selected in the relevant Selection Notice, subject to paragraph (d) of Clause 9.1 (*Selection of Interest Periods*).

(b)    If the Facility Agent makes any change to an Interest Period referred to in this Clause 9.2 (*Changes to Interest Periods*), it shall promptly notify the Borrowers and the Lenders.

**9.3    Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**10    CHANGES TO THE CALCULATION OF INTEREST**

**10.1    Unavailability of Screen Rate**

(a)    *Interpolated Screen Rate*:  If no Screen Rate is available for LIBOR for the Interest Period of the Loan or any part of the Loan, the applicable LIBOR shall be the Interpolated Screen Rate for a period equal in length to the Interest Period of the Loan or that part of the Loan.

(b)    *Reference Bank Rate*:  If no Screen Rate is available for LIBOR for:

(i)    dollars; or

(ii)    the Interest Period of the Loan or any part of the Loan and it is not possible to calculate the Interpolated Screen Rate,

(iii)    the applicable LIBOR shall be the Reference Bank Rate as of the Specified Time and for a period equal in length to the Interest Period of the Loan or that part of the Loan.

(c)    *Cost of funds*:  If paragraph (b) above applies but no Reference Bank Rate is available for dollars or the relevant Interest Period there shall be no LIBOR for the Loan or that part of the Loan (as applicable) and Clause 10.4 (*Cost of funds*) shall apply to the Loan or that part of the Loan for that Interest Period.

**10.2    Calculation of Reference Bank Rate**

(a)    Subject to paragraph (b) below, if LIBOR is to be determined on the basis of a Reference Bank Rate but a Reference Bank does not supply a quotation by the Specified Time, the Reference Bank Rate shall be calculated on the basis of the quotations of the remaining Reference Banks.

(b)    If at or about noon on the Quotation Day none or only one of the Reference Banks supplies a quotation, there shall be no Reference Bank Rate for the relevant Interest Period.

**10.3    Market disruption**

If before close of business in London on the Quotation Day for the relevant Interest Period the Facility Agent receives notification from a Lender or Lenders (whose participations in the Loan

or the relevant part of the Loan exceed 35 per cent. of the Loan or the relevant part of the Loan as appropriate) that the cost to it of funding its participation in the Loan or that part of the Loan from whatever source it may reasonably select would be in excess of LIBOR then Clause 10.4 (*Cost of funds*) shall apply to the Loan or that part of the Loan (as applicable) for the relevant Interest Period.

**10.4    Cost of funds**

(a)    If this Clause 10.4 (*Cost of funds*) applies, the rate of interest on each Lender's share of the Loan or the relevant part of the Loan for the relevant Interest Period shall be the percentage rate per annum which is the sum of:

(i)    the applicable Margin; and

(ii)    the rate notified to the Facility Agent by that Lender as soon as practicable and in any event before the date on which interest is due to be paid in respect of that Interest Period to be that which expresses as a percentage rate per annum the cost to the relevant Lender of funding its participation in the Loan or that part of the Loan from whatever source it may reasonably select.

(b)    If this Clause 10.4 (*Cost of funds*) applies and the Facility Agent or the Borrowers so require, the Facility Agent and the Borrowers shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest or (as the case may be) an alternative basis for funding.

(c)    Subject to Clause 44.4 (*Replacement of Screen Rate*), any substitute or alternative basis agreed pursuant to paragraph (b) above shall, with the prior consent of all the Lenders and the Borrowers, be binding on all Parties.

(d)    If this Clause 10.4 (*Cost of funds*) applies pursuant to Clause 10.3 (*Market disruption*) and:

(i)    a Lender's Funding Rate is less than LIBOR; or

(ii)    a Lender does not supply a quotation in the time specified in sub-paragraph (ii) of paragraph (a) above,

the cost to that Lender of funding its participation in the Loan or the relevant part of the Loan for that Interest Period shall be deemed, for the purposes of paragraph (a) above, to be LIBOR.

**10.5    Break Costs**

(a)    The Borrowers shall, within five Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of the Loan or Unpaid Sum being paid by a Borrower on a day other than the last day of an Interest Period for the Loan, the relevant part of the Loan or that Unpaid Sum.

(b)    Each Lender shall, as soon as reasonably practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

## 11    FEES

### 11.1    Commitment fee

(a)    The Borrowers shall pay to the Facility Agent (for the account of each Lender) a fee computed at the rate of 40 per cent. of the applicable Margin on that Lender's Available Commitment from time to time for the period commencing on the date falling one Month after the date of this Agreement and ending on the last day of the Availability Period.

(b)    The accrued commitment fee is payable on the last day of each successive period of three Months which ends during the Availability Period, on the last day of the Availability Period and, if cancelled, on the cancelled amount of the relevant Lender's Commitment at the time the cancellation is effective.

### 11.2    Underwriting fee

The Borrowers shall pay to the Underwriter an underwriting fee in the amount and at the times agreed in a Fee Letter.

### 11.3    Facility Agent fee

The Borrowers shall pay to the Facility Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

### 11.4    Arrangement fee

The Borrowers shall pay to the Facility Agent (for the account of each Lender) an arrangement fee in the amount and at the times agreed in a Fee Letter.

EUROPE/62707839v19

**SECTION 6**

**ADDITIONAL PAYMENT OBLIGATIONS**

**12    TAX GROSS UP AND INDEMNITIES**

**12.1    Definitions**

(a)    In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 12.2 (*Tax gross-up*) or a payment under Clause 12.3 (*Tax indemnity*).

(b)    Unless a contrary indication appears, in this Clause 12 (*Tax Gross Up and Indemnities*) reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

(c)    This Clause 12 (*Tax Gross Up and Indemnities*) shall not apply to any Hedging Agreement.

**12.2    Tax gross-up**

(a)    Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    The Borrowers shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Facility Agent accordingly. Similarly, a Lender shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Lender. If the Facility Agent receives such notification from a Lender it shall notify the Borrowers and that Obligor.

(c)    If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)    Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance

Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

**12.3    Tax indemnity**

(a)    The Obligors shall (within five Business Days of demand by the Facility Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)    Paragraph (a) above shall not apply:

(i)    with respect to any Tax assessed on a Finance Party:

(A)    under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident or as having a permanent establishment for tax purposes; or

(B)    under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(ii)    to the extent a loss, liability or cost:

(A)    is compensated for by an increased payment under Clause 12.2 (*Tax gross-up*); or

(B)    relates to a FATCA Deduction required to be made by a Party.

(c)    A Protected Party making, or intending to make, a claim under paragraph (a) above shall promptly notify the Facility Agent of the event which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Obligors.

(d)    A Protected Party shall, on receiving a payment from an Obligor under this Clause 12.3 (*Tax indemnity*), notify the Facility Agent.

**12.4    Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a)    a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was received; and

(b)    that Finance Party or an Affiliate of that Finance Party has obtained and utilised that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

### 12.5    Stamp taxes

The Obligors shall pay and, within five Business Days of demand, indemnify each Secured Party against any cost, loss or liability which that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document except those payable on or by reference to or in consequence of the transfer of the whole or any part of the rights of a Finance Party under a Finance Document (other than when a Default is continuing).

### 12.6    VAT

(a)    All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)    If VAT is or becomes chargeable on any supply made by any Finance Party (the "**Supplier**") to any other Finance Party (the "**Recipient**") under a Finance Document, and any Party other than the Recipient (the "**Relevant Party**") is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this sub-paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)    Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part of it as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)    Any reference in this Clause 12.6 (*VAT*) to any Party shall, at any time when that Party is treated as a member of a group or unity (or fiscal unity) for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the person who is treated at that time as making the supply, or (as appropriate) receiving the supply, under the grouping rules (provided for in Article 11 of Council Directive 2006/112/EC (or as implemented by the relevant member state of the European Union) or any other similar provision in any jurisdiction which

is not a member of the European Union) so that a reference to a Party shall be construed as a reference to that Party or the relevant group or unity (or fiscal unity) of which that Party is a member for VAT purposes at the relevant time or the relevant representative member (or representative or head) of that group or unity (or fiscal unity) at the relevant time (as the case may be).

(e)    In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

**12.7    FATCA Information**

(a)    Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

    (i)    confirm to that other Party whether it is:

        (A)    a FATCA Exempt Party; or

        (B)    not a FATCA Exempt Party; and

    (ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

    (iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other similar law, regulation or exchange of information regime.

(b)    If a Party confirms to another Party pursuant to sub-paragraph (i) of paragraph (a) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Party to do anything which would or might in its reasonable opinion constitute a breach of:

    (i)    any law or regulation;

    (ii)    any fiduciary duty; or

    (iii)    any duty of confidentiality,

provided that the provision of US Internal Revenue Service Forms W-8 or W-9 shall not be deemed to be such a breach.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with sub-paragraphs (i) or (ii) of paragraph (a) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and

payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e)  If a Borrower is a US Tax Obligor, or the Facility Agent reasonably believes that its obligations under FATCA or any other applicable law or regulation require it, each Lender shall, within ten Business Days of:

   (i)  where a Borrower is a US Tax Obligor and the relevant Lender is an Original Lender, the date of this Agreement;

   (ii)  where a Borrower is a US Tax Obligor on a Transfer Date and the relevant Lender is a New Lender, the relevant Transfer Date; or

   (iii)  where a Borrower is not a US Tax Obligor, the date of a request from the Facility Agent,

   supply to the Facility Agent:

   (iv)  a withholding certificate on Form W-8, Form W-9 or any other relevant form; or

   (v)  any withholding statement or other document, authorisation or waiver as the Facility Agent may require to certify or establish the status of such Lender under FATCA or that other law or regulation.

(f)  The Facility Agent shall provide any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) above to the Borrowers.

(g)  If any withholding certificate, withholding statement, document, authorisation or waiver provided to the Facility Agent by a Lender pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, that Lender shall promptly update it and provide such updated withholding certificate, withholding statement, document, authorisation or waiver to the Facility Agent unless it is unlawful for the Lender to do so (in which case the Lender shall promptly notify the Facility Agent).  The Facility Agent shall provide any such updated withholding certificate, withholding statement, document, authorisation or waiver to the Borrowers.

(h)  The Facility Agent may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) or (g) above without further verification.  The Facility Agent shall not be liable for any action taken by it under or in connection with paragraphs (e), (f) or (g) above.

**12.8  FATCA Deduction**

(a)  Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b)  Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment and, in addition, shall notify each Obligor and the Facility Agent and the Facility Agent shall notify the other Finance Parties.

EUROPE/62707839v19

## 13    INCREASED COSTS

### 13.1    Increased costs

(a)    Subject to Clause 13.3 (*Exceptions*), the Borrowers shall, within five Business Days of a demand by the Facility Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

   (i)    the introduction of or any change in (or in the interpretation, administration or application of) any applicable law or regulation; or

   (ii)    compliance with any applicable law or regulation made,

   in each case after the date of this Agreement; or

   (iii)    the implementation, application of or compliance with Basel III or CRD IV or any law or regulation that implements or applies Basel III or CRD IV.

(b)    In this Agreement:

   (i)    "**Basel III**" means:

      (A)    the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

      (B)    the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

      (C)    any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

   (ii)    "**CRD IV**" means:

      (A)    Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending regulation (EU) No. 648/2012;

      (B)    Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC; and

      (C)    any other law or regulation which implements Basel III.

   (iii)    "**Increased Costs**" means:

(A)     a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(B)     an additional or increased cost; or

(C)     a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

## 13.2   Increased cost claims

(a)   A Finance Party intending to make a claim pursuant to Clause 13.1 (*Increased costs*) shall notify the Facility Agent of the event giving rise to the claim, following which the Facility Agent shall promptly notify the Borrowers.

(b)   Each Finance Party shall, as soon as practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Increased Costs.

## 13.3   Exceptions

Clause 13.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(a)   attributable to a Tax Deduction required by law to be made by an Obligor;

(b)   attributable to a FATCA Deduction required to be made by a Party;

(c)   compensated for by Clause 12.3 (*Tax indemnity*) (or would have been compensated for under Clause 12.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 12.3 (*Tax indemnity*) applied);

(d)   attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation; or

(e)   incurred by a Hedge Counterparty in its capacity as such.

## 14    OTHER INDEMNITIES

## 14.1   Currency indemnity

(a)   Subject always to Clause 16 (*Costs and Expenses*), if any sum due from an Obligor under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i)     making or filing a claim or proof against that Obligor; or

(ii)    obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall, as an independent obligation, within five Business Days of demand, indemnify each Secured Party to which that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of

exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)    Subject always to Clause 16 (*Costs and Expenses*), each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

(c)    This Clause 14.1 (*Currency indemnity*) does not apply to any sum due to a Hedge Counterparty in its capacity as such.

**14.2    Other indemnities**

(a)    Subject always to Clause 16 (*Costs and Expenses*), each Obligor shall, within five Business Days of demand (save in respect of paragraph (i) which shall be payable on demand), indemnify each Secured Party against any cost, loss or liability incurred by it as a result of:

    (i)    the occurrence of any Event of Default;

    (ii)    a failure by a Transaction Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 34 (*Sharing among the Finance Parties*);

    (iii)    funding, or making arrangements to fund, its participation in an Advance requested by the Borrowers in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Secured Party alone); or

    (iv)    the Loan (or part of the Loan) not being prepaid in accordance with a notice of prepayment given by the Borrowers.

(b)    Each Obligor shall, within five Business Days of demand, indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate (each such person for the purposes of this Clause 14.2 (*Other indemnities*) an "**Indemnified Person**"), against any cost, loss or liability incurred by that Indemnified Person pursuant to or in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry, in connection with or arising out of the entry into and the transactions contemplated by the Finance Documents, having the benefit of any Security constituted by the Finance Documents or which relates to the condition or operation of, or any incident occurring in relation to, any Ship unless such cost, loss or liability is caused by the gross negligence or wilful misconduct of that Indemnified Person.

(c)    Without limiting, but subject to any limitations set out in paragraph (b) above, the indemnity in paragraph (b) above shall cover any cost, loss or liability incurred by each Indemnified Person in any jurisdiction:

    (i)    arising or asserted under or in connection with any law relating to safety at sea, the ISM Code, any Environmental Law or any applicable Sanctions; or

    (ii)    in connection with any Environmental Claim.

(d)    Any Affiliate or any officer or employee of a Finance Party or of any of its Affiliates may rely on this Clause 14.2 (*Other indemnities*) subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

**14.3    Indemnity to the Facility Agent**

Subject always to Clause 16 (*Costs and Expenses*), each Obligor shall, within five Business Days of demand, indemnify the Facility Agent against:

(a)    any cost, loss or liability incurred by the Facility Agent (acting reasonably) as a result of:

    (i)    investigating any event which it reasonably believes is a Default; or

    (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

    (iii)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under the Finance Documents; and

(b)    any cost, loss or liability incurred by the Facility Agent (otherwise than by reason of the Facility Agent's gross negligence or wilful misconduct) or, in the case of any cost, loss or liability pursuant to Clause 35.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent in acting as Facility Agent under the Finance Documents.

**14.4    Indemnity to the Security Agent**

(a)    Each Obligor shall, within five Business Days of demand (save in respect of sub-paragraphs (i)(A), (i)(C) and (i)(E) which shall be payable on demand), indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them:

    (i)    in relation to or as a result of:

        (A)    any failure by a Borrower to comply with its obligations under Clause 16 (*Costs and Expenses*);

        (B)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

        (C)    the taking, holding, protection or enforcement of the Finance Documents and the Transaction Security;

        (D)    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

        (E)    any default by any Transaction Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents;

        (F)    any action by any Transaction Obligor which vitiates, reduces the value of, or is otherwise prejudicial to, the Transaction Security; and

        (G)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under the Finance Documents.

    EUROPE/62707839v19

(ii)    acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Security Property or the performance of the terms of this Agreement or the other Finance Documents (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Security Assets in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 14.4 (*Indemnity to the Security Agent*) and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all monies payable to it.

## 15    MITIGATION BY THE FINANCE PARTIES

### 15.1    Mitigation

(a)    Each Finance Party shall, in consultation with the Borrowers, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 12 (*Tax Gross Up and Indemnities*) or Clause 13 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Transaction Obligor under the Finance Documents.

### 15.2    Limitation of liability

(a)    Each Obligor shall, within five Business Days of demand, indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 15.1 (*Mitigation*).

(b)    A Finance Party is not obliged to take any steps under Clause 15.1 (*Mitigation*) if either:

(i)    an Event of Default has occurred and is continuing; or

(ii)    in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 16    COSTS AND EXPENSES

### 16.1    Transaction expenses

The Obligors shall, within five Business Days of demand, pay the Facility Agent, the Security Agent and the Arranger the amount of all pre-agreed costs and expenses (including legal fees) reasonably incurred by any Secured Party in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement or in a Security Document; and

(b)    any other Finance Documents executed after the date of this Agreement.

## 16.2    Amendment costs

If:

(a)    a Transaction Obligor requests an amendment, waiver or consent; or

(b)    an amendment is required either pursuant to Clause 35.9 (*Change of currency*) or as contemplated in Clause 44.4 (*Replacement of Screen Rate*); or

(c)    a Transaction Obligor requests, and the Security Agent agrees to, the release of all or any part of the Security Assets from the Transaction Security,

the Obligors shall, within five Business Days of demand, reimburse each of the Facility Agent and the Security Agent for the amount of all pre-agreed costs and expenses (including legal fees) reasonably incurred by each Secured Party in responding to, evaluating, negotiating or complying with that request or requirement.

## 16.3    Enforcement and preservation costs

The Obligors shall, on demand, pay to each Secured Party the amount of all costs and expenses (including legal fees) incurred by that Secured Party in connection with the enforcement of, or the preservation of any rights under, any Finance Document or the Transaction Security and with any proceedings instituted by or against that Secured Party as a consequence of it entering into a Finance Document, taking or holding the Transaction Security, or enforcing those rights.

EUROPE/62707839v19

**SECTION 7**

**GUARANTEES AND JOINT AND SEVERAL LIABILITY OF BORROWERS**

**17    JOINT AND SEVERAL LIABILITY OF THE BORROWERS**

**17.1    Joint and several liability**

All liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be joint and several.

**17.2    Waiver of defences**

The liabilities and obligations of a Borrower shall not be impaired by:

(a)    this Agreement being or later becoming void, unenforceable or illegal as regards any other Borrower;

(b)    any Lender or the Security Agent entering into any rescheduling, refinancing or other arrangement of any kind with any other Borrower;

(c)    any Lender or the Security Agent releasing any other Borrower or any Security created by a Finance Document; or

(d)    any time, waiver or consent granted to, or composition with any other Borrower or other person;

(e)    the release of any other Borrower or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(f)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any other Borrower or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(g)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any other Borrower or any other person;

(h)    any amendment, novation, supplement, extension, restatement (however fundamental, and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(i)    any unenforceability, illegality or invalidity of any obligation or any person under any Finance Document or any other document or security; or

(j)    any insolvency or similar proceedings.

**17.3    Principal Debtor**

Each Borrower declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and the Finance Documents and no

Borrower shall, in any circumstances, be construed to be a surety for the obligations of any other Borrower under this Agreement.

**17.4    Borrower restrictions**

(a)    Subject to paragraph (b) below, during the Security Period no Borrower shall:

(i)    claim any amount which may be due to it from any other Borrower whether in respect of a payment made under, or matter arising out of, this Agreement or any Finance Document, or any matter unconnected with this Agreement or any Finance Document; or

(ii)    take or enforce any form of security from any other Borrower for such an amount, or in any way seek to have recourse in respect of such an amount against any asset of any other Borrower; or

(iii)    set off such an amount against any sum due from it to any other Borrower; or

(iv)    prove or claim for such an amount in any liquidation, administration, arrangement or similar procedure involving any other Borrower; or

(v)    exercise or assert any combination of the foregoing.

(b)    If during the Security Period, the Facility Agent, by notice to a Borrower, requires it to take any action referred to in paragraph (a) above in relation to any other Borrower, that Borrower shall take that action as soon as practicable after receiving the Facility Agent's notice.

**17.5    Deferral of Borrowers' rights**

Until all amounts which may be or become payable by the Borrowers under or in connection with the Finance Documents have been irrevocably paid in full and unless the Facility Agent otherwise directs, no Borrower will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a)    to be indemnified by any other Borrower; or

(b)    to claim any contribution from any other Borrower in relation to any payment made by it under the Finance Documents.

**18    GUARANTEE AND INDEMNITY – HEDGE GUARANTORS**

**18.1    Guarantee and indemnity**

Each Hedge Guarantor irrevocably and unconditionally jointly and severally:

(a)    guarantees to each Hedge Counterparty punctual performance by each Borrower of all that Borrower's obligations under the Hedging Agreements;

(b)    undertakes with each Hedge Counterparty that whenever a Borrower does not pay any amount when due under or in connection with any Hedging Agreement, that Hedge Guarantor shall immediately on demand pay that amount as if it were the principal obligor; and

(c)    agrees with each Hedge Counterparty that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify

that Hedge Counterparty immediately on demand against any cost, loss or liability it incurs as a result of a Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Hedging Agreement on the date when it would have been due.  The amount payable by a Hedge Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*) if the amount claimed had been recoverable on the basis of a guarantee.

## 18.2    Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Borrower under the Hedging Agreements, regardless of any intermediate payment or discharge in whole or in part.

## 18.3    Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Borrower or any security for those obligations or otherwise) is made by a Secured Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Hedge Guarantor under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*) will continue or be reinstated as if the discharge, release or arrangement had not occurred.

## 18.4    Waiver of defences

The obligations of each Hedge Guarantor under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*) and in respect of any Transaction Security will not be affected or discharged by an act, omission, matter or thing which, but for this Clause 18.4 (*Waiver of defences*), would reduce, release or prejudice any of its obligations under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*) or in respect of any Transaction Security (without limitation and whether or not known to it or any Secured Party) including:

(a)    any time, waiver or consent granted to, or composition with, any Transaction Obligor or other person;

(b)    the release of any other Transaction Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect or delay in perfecting, or refusal or neglect to take up or enforce, or delay in taking or enforcing any rights against, or security over assets of, any Transaction Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of a Transaction Obligor or any other person;

(e)    any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)    any insolvency or similar proceedings.

**18.5    Immediate recourse**

Each Hedge Guarantor waives any right it may have of first requiring any Secured Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person (including without limitation to commence any proceedings under any Finance Document or to enforce any Transaction Security) before claiming or commencing proceedings under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*).  This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**18.6    Appropriations**

Until all amounts which may be or become payable by the Borrowers under or in connection with the Hedging Agreements have been irrevocably paid in full, each Secured Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Secured Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Hedge Guarantor shall be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from any Hedge Guarantor or on account of any Hedge Guarantor's liability under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*).

**18.7    Deferral of Hedge Guarantors' rights**

All rights which each Hedge Guarantor at any time has (whether in respect of this guarantee, a mortgage or any other transaction) against any Borrower, any other Transaction Obligor or their respective assets shall be fully subordinated to the rights of the Secured Parties under the Finance Documents and until the end of the Security Period and unless the Facility Agent otherwise directs, no Hedge Guarantor will exercise any rights which it may have (whether in respect of any Finance Document to which it is a Party or any other transaction) by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*):

(a)    to be indemnified by a Transaction Obligor;

(b)    to claim any contribution from any third party providing security for, or any other guarantor of, any Transaction Obligor's obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Secured Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Secured Party;

(d)     to bring legal or other proceedings for an order requiring any Transaction Obligor to make any payment, or perform any obligation, in respect of which any Hedge Guarantor has given a guarantee, undertaking or indemnity under Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*);

(e)     to exercise any right of set-off against any Transaction Obligor; and/or

(f)     to claim or prove as a creditor of any Transaction Obligor in competition with any Secured Party.

If a Hedge Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Secured Parties by the Transaction Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Secured Parties and shall promptly pay or transfer the same to the Facility Agent or as the Facility Agent may direct for application in accordance with Clause 35 (*Payment Mechanics*).

## 18.8    Additional security

This guarantee and any other Security given by a Hedge Guarantor is in addition to and is not in any way prejudiced by, and shall not prejudice, any other guarantee or Security or any other right of recourse now or subsequently held by any Secured Party or any right of set-off or netting or right to combine accounts in connection with the Finance Documents.

## 18.9    Applicability of provisions of Guarantee to other Security

Clauses 18.2 (*Continuing guarantee*), 18.3 (*Reinstatement*), 18.4 (*Waiver of defences*), 18.5 (*Immediate recourse*), 18.6 (*Appropriations*), 18.7 (*Deferral of Hedge Guarantors' rights*) and 18.8 (*Additional security*) shall apply, with any necessary modifications, to any Security which a Hedge Guarantor creates (whether at the time at which it signs this Agreement or at any later time) to secure the Secured Liabilities or any part of them.

EUROPE/62707839v19

## SECTION 8

## REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

**19      REPRESENTATIONS**

**19.1    General**

Each Obligor makes the representations and warranties set out in this Clause 19 (*Representations*) to each Finance Party on the date of this Agreement.

**19.2    Status**

(a)      It is a limited liability company, duly formed and validly existing in good standing under the law of its Original Jurisdiction.

(b)      It and each Transaction Obligor has the power to own its assets and carry on its business as it is being conducted.

**19.3    Membership interests and ownership**

(a)      The legal title to and beneficial interest in the membership interests in each Borrower are held by Fleetscape Advantage free of any Security (other than Permitted Security) or any other claim.

(b)      None of the membership interests in any Borrower is subject to any option to purchase, pre-emption rights or similar rights.

**19.4    Binding obligations**

Subject to the Legal Reservations and the Perfection Requirements, the obligations expressed to be assumed by it in each Transaction Document to which it is a party are legal, valid, binding and enforceable obligations.

**19.5    Validity, effectiveness and ranking of Security**

(a)      Each Finance Document to which it is a party does now or, as the case may be, will upon execution and delivery create, subject to the Legal Reservations and the Perfection Requirements, the Security it purports to create over any assets to which such Security, by its terms, relates, and such Security will, when created or intended to be created, be valid and effective.

(b)      No third party has or will have any Security (except for Permitted Security) over any assets that are the subject of any Transaction Security granted by it.

(c)      Subject to the Legal Reservations and the Perfection Requirement, the Transaction Security granted by it to the Security Agent or any other Secured Party has or will when created or intended to be created have first ranking priority or such other priority it is expressed to have in the Finance Documents and is not subject to any prior ranking or *pari passu* ranking security.

(d)      No concurrence, consent or authorisation of any person is required for the creation of or otherwise in connection with any Transaction Security.

**19.6    Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, each Transaction Document to which it is a party do not and will not conflict with:

(a)    any law or regulation applicable to it;

(b)    the constitutional documents of any member of the Group; or

(c)    any agreement or instrument (for example, any services agreement) binding upon it or any member of the Group or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument.

**19.7    Power and authority**

(a)    It has the power to enter into, perform and deliver, and has taken all necessary action to authorise:

(i)    its entry into, performance and delivery of, each Transaction Document to which it is or will be a party and the transactions contemplated by those Transaction Documents; and

(ii)    in the case of a Borrower, its registration of the Ship belonging to it under its Approved Flag.

(b)    No limit on its powers will be exceeded as a result of the borrowing, granting of security or giving of guarantees or indemnities contemplated by the Transaction Documents to which it is a party.

**19.8    Validity and admissibility in evidence**

All Authorisations required:

(a)    to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party; and

(b)    to make the Transaction Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

**19.9    Governing law and enforcement**

(a)    Subject to the Legal Reservations, the choice of governing law of each Transaction Document to which it is a party will be recognised and enforced in its Relevant Jurisdictions.

(b)    Subject to the Legal Reservations, any judgment obtained in relation to a Transaction Document to which it is a party in the jurisdiction of the governing law of that Transaction Document will be recognised and enforced in its Relevant Jurisdictions.

**19.10    Insolvency**

No:

(a)   corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 28.8 (*Insolvency proceedings*); or

(b)   creditors' process described in Clause 28.9 (*Creditors' process*),

has been taken or, to its actual knowledge, threatened in relation to a member of the Group; and none of the circumstances described in Clause 28.7 (*Insolvency*) applies to a member of the Group.

**19.11  No filing or stamp taxes**

Except as otherwise stated in any Legal Opinion, under the laws of its Relevant Jurisdictions (other than in respect of a Ship) it is not necessary that the Finance Documents to which it is a party be registered, filed, recorded, notarised or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents to which it is a party or the transactions contemplated by those Finance Documents except registration of each Mortgage at the Marshall Islands Ships' Registry which registration will be made and paid on the date of that Mortgage.

**19.12  Deduction of Tax**

It is not required to make any Tax Deduction from any payment it may make under any Finance Document to which it is a party.

**19.13  No default**

(a)   No Event of Default and, on the date of this Agreement, no Default is continuing or might reasonably be expected to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Transaction Document.

(b)   No other event or circumstance is outstanding which constitutes a default or a termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

**19.14  No misleading information**

(a)   Any factual information provided by any member of the Group for the purposes of this Agreement was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b)   The financial projections contained in any such information have been prepared on the basis of recent historical information and on the basis of reasonable assumptions.

(c)   Nothing has occurred or been omitted from any such information and no information has been given or withheld that results in any such information being untrue or misleading in any material respect.

**19.15  Financial Statements**

(a)   There has been no material adverse change in its or Fleetscape Advantage's assets, business or financial condition (or the assets, business or consolidated financial condition of the Group, in the case of Fleetscape Advantage) since the date of this Agreement.

(b)     Its and Fleetscape Advantage's most recent financial statements delivered pursuant to Clause 20.2 (*Financial statements*):

    (i)     have been prepared in accordance with Clause 20.3 (*Requirements as to financial statements*); and

    (ii)    give a true and fair view of (if audited) or fairly represent (if unaudited) its financial condition as at the end of the relevant financial year and operations during the relevant financial year (consolidated in the case of Fleetscape Advantage).

(c)     Since the date of the most recent financial statements delivered pursuant to Clause 20.2 (*Financial statements*) there has been no material adverse change in its or Fleetscape Advantage's business, assets or financial condition (or the business or consolidated financial condition of the Group, in the case of Fleetscape Advantage).

## 19.16  Pari passu ranking

Its payment obligations under the Finance Documents to which it is a party rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

## 19.17  No proceedings pending

(a)     No litigation, arbitration or administrative proceedings or investigations (including proceedings or investigations relating to any breach of the ISM Code or of the ISPS Code) of or before any court, arbitral body or agency have (to the best of its knowledge and belief (having made due and careful enquiry)) been started against it or any other Transaction Obligor or any member of the Group.

(b)     No judgment or order of a court, arbitral tribunal or other tribunal or any order or sanction of any governmental or other regulatory body in respect of which there has not been effected adequate insurance cover (in the reasonable opinion of the Facility Agent acting with the authorisation of the Majority Lenders) and which would reasonably be expected, if adversely determined, to have a Material Adverse Effect has (to the best of its knowledge and belief (having made due and careful enquiry)) been made against it or any other Transaction Obligor or any member of the Group.

## 19.18  Validity and completeness of the MOAs, Bareboat Charters and Time Charters

(a)     Each MOA, each Bareboat Charter and each Time Charter constitutes legal, valid, binding and enforceable obligations of, in the case of the MOAs and the Bareboat Charters, the Bareboat Charterer which is a party to it and, in the case of the Time Charters, the Bareboat Charterer which is a party to that Time Charter and, to the best of their knowledge, the Time Charterer.

(b)     The copies of the MOAs, the Bareboat Charters and the Time Charters delivered to the Facility Agent before the date of this Agreement are true and complete copies.

(c)     No amendments or additions to the MOAs or any Bareboat Charter or any Time Charter have been agreed nor have any rights under the MOAs or any Bareboat Charter or any Time Charter been waived.

**19.19  No rebates etc.**

There is no agreement or understanding to allow or pay any rebate, premium, inducement, commission, discount or other benefit or payment (however described) to any Borrower or any other member of the Group, any Bareboat Charterer or a third party in connection with the purchase by a Borrower of a Ship, other than as disclosed to the Facility Agent in writing on or before the date of this Agreement or under the Seller's Credit Agreements.

**19.20  Valuations**

(a)   All information supplied by it or on its behalf to an Approved Valuer for the purposes of a valuation delivered to the Facility Agent in accordance with this Agreement was true and accurate as at the date it was supplied or (if appropriate) as at the date (if any) at which it is stated to be given.

(b)   It has not omitted to supply any information to an Approved Valuer which, if disclosed, would adversely affect any valuation prepared by such Approved Valuer.

(c)   There has been no change to the factual information provided pursuant to paragraph (a) above in relation to any valuation between the date such information was provided and the date of that valuation which, in either case, renders that information untrue or misleading in any material respect.

**19.21  No breach of laws**

It has not (and no other member of the Group or any Transaction Obligor has) breached any applicable law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

**19.22  No Charter**

No Ship is subject to any Charter other than a Permitted Charter.

**19.23  Compliance with Environmental Laws**

All Environmental Laws relating to the ownership, operation and management of each Ship and the business of each member of the Group and each other Transaction Obligor (as now conducted and as reasonably anticipated to be conducted in the future) and the terms of all Environmental Approvals have been complied with provided that if failure to comply with an Environmental Law or the terms of an Environmental Approval is not reasonably likely to, if adversely determined, have a Material Adverse Effect, such failure shall not render this representation incorrect or misleading.

**19.24  No Environmental Claim**

No Environmental Claim (other than an Environmental Claim arising from an alleged Environmental Incident) has been made against any member of the Group, any other Transaction Obligor or any Ship which, if adversely determined, is reasonably likely to have a Material Adverse Effect.

EUROPE/62707839v19

**19.25    No Environmental Incident**

No Environmental Incident (other than an alleged or potential Environmental Incident) has occurred the result of which is reasonably likely to result in a Material Adverse Effect.

**19.26    ISM and ISPS Code compliance**

All requirements of the ISM Code and the ISPS Code as they relate to each Borrower, each Approved Technical Manager, each Bareboat Charterer and each Ship have been complied with.

**19.27    Taxes paid**

(a)    It is not and no other member of the Group is materially overdue in the filing of any Tax returns and it is not (and no other member of the Group is) overdue in the payment of an amount in respect of Tax in excess of $50,000.

(b)    No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any other member of the Group) with respect to Taxes.

**19.28    Financial Indebtedness**

No Transaction Obligor (other than an Approved Manager) has any Financial Indebtedness outstanding other than Permitted Financial Indebtedness.

**19.29    Overseas companies**

No Transaction Obligor has delivered particulars, whether in its name stated in the Finance Documents or any other name, of any UK Establishment to the Registrar of Companies as required under the Overseas Regulations or, if it has so registered, it has provided to the Facility Agent sufficient details to enable an accurate search against it to be undertaken by the Lenders at the Companies Registry.

**19.30    Good title to assets**

It and each other member of the Group and each other Transaction Obligor has good, valid and marketable title to, or valid leases or licences of, and all applicable Authorisations to use, the assets necessary to perform their obligations pursuant to the Transaction Documents to which they are a party.

**19.31    Ownership**

(a)    On the Utilisation Date of the Advance under a Ship Tranche, the relevant Borrower will be the sole legal and beneficial owner of the Ship being financed by that Ship Tranche, its Earnings and its Insurances.

(b)    With effect on and from the date of its creation or intended creation, each Transaction Obligor will be the sole legal and beneficial owner of any asset that is the subject of any Transaction Security created or intended to be created by such Transaction Obligor.

(c)    The constitutional documents of each Transaction Obligor (other than the Bareboat Charterers and the Approved Manager) do not and could not restrict or inhibit any transfer of the

membership interests of the Borrowers on creation or enforcement of the security conferred by the Security Documents.

**19.32    Place of business**

No Borrower has a place of business in the Republic of the Marshall Islands, the United Kingdom or the US.

**19.33    No employee or pension arrangements**

No Borrower has any employees or any liabilities under any pension scheme.

**19.34    Sanctions**

The following representations in paragraphs (a) to (c) (each inclusive) below are given on the date of this Agreement and to the extent that the making, the receiving of the benefit of and/or, where applicable, the repetition of and the compliance with these representations do not result in a violation of or conflict with Council Regulation (EC) No. 2271/96 of 22 November 1996 ("**EU Blocking Regulation**"), Section 7 of the German Foreign Trade Ordinance (§ 7 *Außenwirtschaftsverordnung*) or a similar applicable anti-boycott statute (together with the EU Blocking Regulation and Section 7 of the of the German Foreign Trade Ordinance the "**Anti Boycott Regulations**").

(a)    Neither the Borrowers nor any other member of the Group nor any other Transaction Obligor nor any of their respective Subsidiaries, directors or officers (or to the Borrowers' best knowledge, none of such member's employees or agents):

(i)    is a Prohibited Person;

(ii)    has violated or is violating any applicable Sanctions;

(iii)    has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority: or

(iv)    is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person, and none of such Persons owns or controls a Prohibited Person.

(b)    No Borrower nor any other member of the Group nor any other Transaction Obligor is using or will use directly or indirectly, the proceeds of the Loan to lend, contribute, provide or otherwise make available such proceeds to any Person (including any Subsidiary or joint venture partners) to (i) fund any activity or business in any jurisdiction that is subject to Sanctions or to (ii) fund any activity of or business of, or with any Person located, organised or residing in any jurisdiction that is subject to Sanctions or who is the subject of any Sanctions, or (iii) in any other manner, and in any case only, if that would result in a violation of Sanctions by any Finance Party, any Borrower or any other member of the Group or any other Transaction Obligor.

(c)    No member of the Group or any other Transaction Obligor (or, to the Borrowers' best knowledge, none of such member's or other Transaction Obligor's directors, officers, employee or agents) has taken or is taking any action resulting in a violation by such Persons of Sanctions.

(d) Restricted Lender:

(i) In connection with any amendment, waiver, determination or direction relating to any part of any representation under this Clause 19.34 (*Sanctions*) of which a Lender does not have the benefit because such benefit would result in a violation by the Lender of any Anti Boycott Regulation (for the purpose of this paragraph (d) each a "**Restricted Lender**") above, the Commitment of that Restricted Lender will, subject to paragraph (ii) below, be excluded for the purpose of determining whether the consent of the Majority Lenders has been obtained or whether the determination or direction by the Majority Lenders has been made or given;

(ii) The Facility Agent is only permitted to exclude the Commitment of a Lender pursuant to paragraph (i) above for the purpose of determining whether the consent of the Majority Lenders has been obtained or whether the determination or direction by the Majority Lenders has been made, if following the Facility Agent's request for such consent, determination or direction by the Majority Lenders the respective Lender notifies the Facility Agent that it is a Restricted Lender for such purpose.

### 19.35 No immunity

In any proceedings taken in respect of a Transaction Obligor in that Transaction Obligor's jurisdiction of incorporation or formation in relation to the Finance Documents to which it is a party, that Transaction Obligor will not be entitled to claim for itself or any of its assets immunity from suit, execution, attachment or other legal process.

### 19.36 Private and commercial acts

Execution by a Transaction Obligor of the Finance Documents to which it is a party constitutes, and its exercise of its rights and performance of its obligations thereunder will constitute, private and commercial acts done and performed for private and commercial purposes.

### 19.37 Money laundering

No Borrower nor any other member of the Group nor any other Transaction Obligor, their respective directors or officers or, to the best knowledge of any of them, any of their respective affiliates, agents or employees have engaged in any activity or conduct which would violate any applicable anti-bribery, anti-corruption or anti-money laundering laws, regulations or rules in any applicable jurisdiction.

### 19.38 Repetition

The Repeating Representations are deemed to be made by each Obligor by reference to the facts and circumstances then existing on the date of each Utilisation Request and the first day of each Interest Period.

## 20 INFORMATION UNDERTAKINGS

### 20.1 General

The undertakings in this Clause 20 (*Information Undertakings*) remain in force throughout the Security Period unless the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders), may otherwise permit.

**20.2    Financial statements**

The Borrowers shall supply to the Facility Agent in sufficient copies for all the Lenders:

(a)    as soon as they become available, but in any event within 120 days after the end of each of their respective financial years:

    (i)    their respective management reports for that financial year; and

    (ii)    the audited consolidated financial statements of Fleetscape Advantage for that financial year;

(b)    as soon as they become available, but in any event within 5 Business Days of receipt by the Borrowers in accordance with the Bareboat Charters:

    (i)    the unaudited financial statements of a Bareboat Charterer for each financial year of that Bareboat Charterer;

    (ii)    the audited consolidated financial statement of Advantage Tankers for each of its financial years;

    (iii)    the unaudited consolidated financial statements of Advantage Tankers for each financial quarter of Advantage Tankers; and

    (iv)    any other information regarding the financial situation, business and operations of the Bareboat Charterers and Advantage Tankers requested by the Borrowers or the Facility Agent;

(c)    as soon as possible, but in no event later than 15 December in each calendar year, a budget prepared by each Borrower in a format and whose contents are approved by the Facility Agent which shows all Operating and Administrative Expenses in respect of the Ship belonging to that Borrower during the next calendar year (an **"Approved Budget"**) **provided that** if the Facility Agent has not informed the Borrowers whether or not it approves the contents of that Approved Budget within 30 days after the Borrowers have provided that Approved Budget in accordance with this paragraph (c), the Facility Agent shall be deemed to have approved the contents of that Approved Budget and, if no agreement is reached as to the contents of that Approved Budget, the Operating and Administrative Expenses in respect of that Ship during the next calendar year will be deemed to be the relevant Approved Operating and Administrative Expenses for that Ship;

(d)    as soon as possible, but in no event later than 15 December in each calendar year, a budget prepared by Fleetscape Advantage in a format and whose contents are approved by the Facility Agent which shows the anticipated cash-flow projections for each Ship including all Operating and Administrative Expenses in respect of each Ship during the next calendar year;

(e)    as soon as possible, but in no event later than 15 December in each calendar year, a budget prepared by each Borrower in a format and whose contents are approved by the Facility Agent which shows the anticipated costs and expenses in respect of any special survey, drydocking survey or ballast water treatment system in respect of the Ship belonging to that Borrower during the next calendar year (the **"Drydocking Reserve Budget"**); and

(f)    any other information regarding the financial situation, business and operations of the Group and any Transaction Obligor as the Facility Agent may request.

EUROPE/62707839v19

**20.3    Requirements as to financial statements**

(a)    Each set of financial statements delivered by a Borrower pursuant to Clause 20.2 (*Financial statements*) shall be certified by the member of the relevant company as giving a true and fair view (if audited) or fairly representing (if unaudited) its financial condition and operations as at the date as at which those financial statements were drawn up.

(b)    The Borrowers shall procure that each set of financial statements of an Obligor and Fleetscape Advantage delivered pursuant to Clause 20.2 (*Financial statements*) is prepared using GAAP and the usual accounting practices and financial reference periods unless, in relation to any set of financial statements, it notifies the Facility Agent that there has been a change in GAAP or the usual accounting practices or reference periods and its auditors (or, if appropriate, the auditors of the Obligor or Fleetscape Advantage) deliver to the Facility Agent a description of any change necessary for those financial statements to reflect the GAAP or the usual accounting practices and reference periods. Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the changes in GAAP and the usual accounting practices and financial reference periods.

**20.4    Information: miscellaneous**

Each Obligor shall and shall procure that each other Transaction Obligor shall supply to the Facility Agent (in sufficient copies for all the Lenders, if the Facility Agent so reasonably requests):

(a)    other than those documents of a strictly administrative nature, all documents dispatched by it to its shareholders or members (other than in relation to an Approved Manager) (or any class of them) or its creditors generally at the same time as they are dispatched;

(b)    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings or investigations (including proceedings or investigations relating to any alleged or actual breach of the ISM Code or of the ISPS Code) which are current, threatened or pending against any member of the Group or any other Transaction Obligor, and which might, if adversely determined, have a Material Adverse Effect and, to the extent permitted by law, details of any claim, action, suit, proceedings or investigation against any Bareboat Charterer with respect to applicable Sanctions by any Sanctions Authority (in sufficient copies for all the Lenders, if the Facility Agent so requests);

(c)    as soon as practicable upon becoming aware of any fact indicating that it or a member of the Group or any other Transaction Obligor may be in breach, or be exposed to a breach, of applicable Sanctions, provided that the notification as such does not constitute a breach of mandatory law applicable to it;

(d)    promptly upon becoming aware of them, the details of any judgment or order of a court, arbitral body or agency which is made against any member of the Group and which has or will have a Material Adverse Effect;

(e)    promptly, its constitutional documents where these have been amended or varied;

(f)    promptly, such further information and/or documents regarding:

(i)    each Ship, goods transported on each Ship, its Earnings and its Insurances;

(ii)    the Security Assets;

(iii)    compliance of:

    (A)    the Transaction Obligors with the terms of the Finance Documents;

    (B)    each Bareboat Charterer with the terms of the Bareboat Charter to which it is a party; and

    (C)    the Time Charterer with the terms of each Time Charter;

(iv)    the financial condition, business and operations of any member of the Group,

as any Finance Party (through the Facility Agent) may reasonably request; and

(g)    promptly, such further information and/or documents as any Finance Party (through the Facility Agent) may reasonably request so as to enable such Finance Party to comply with any laws applicable to it or as may be required by any regulatory authority.

**20.5    Notification of Default**

(a)    Each Obligor shall, and shall procure that each other Transaction Obligor (other than the Bareboat Charterers and any Approved Manager) shall, notify the Facility Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)    Promptly upon a request by the Facility Agent, each Borrower shall supply to the Facility Agent a certificate signed by its member on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

**20.6    Use of websites**

(a)    Each Obligor may satisfy its obligation under the Finance Documents to which it is a party to deliver any information in relation to those Lenders (the "**Website Lenders**") which accept this method of communication by posting this information onto an electronic website designated by the Borrowers and the Facility Agent (the "**Designated Website**") if:

(i)    the Facility Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

(ii)    both the relevant Obligor and the Facility Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(iii)    the information is in a format previously agreed between the relevant Obligor and the Facility Agent.

If any Lender (a "**Paper Form Lender**") does not agree to the delivery of information electronically then the Facility Agent shall notify the Obligors accordingly and each Obligor shall supply the information to the Facility Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event each Obligor shall supply the Facility Agent with at least one copy in paper form of any information required to be provided by it.

    

(b)      The Facility Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Obligors or any of them and the Facility Agent.

(c)      An Obligor shall promptly upon becoming aware of its occurrence notify the Facility Agent if:

         (i)      the Designated Website cannot be accessed due to technical failure;

         (ii)      the password specifications for the Designated Website change;

         (iii)      any new information which is required to be provided under this Agreement is posted onto the Designated Website;

         (iv)      any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

         (v)      if that Obligor becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If an Obligor notifies the Facility Agent under sub-paragraph (i) or (v) of paragraph (c) above, all information to be provided by the Obligors under this Agreement after the date of that notice shall be supplied in paper form unless and until the Facility Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d)      Any Website Lender may request, through the Facility Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website.  The Obligors shall comply with any such request within 10 Business Days.

## 20.7      "Know your customer" checks

(a)      If:

         (i)      the introduction of or any change in (or in the interpretation, administration or application of) any applicable law or regulation made after the date of this Agreement;

         (ii)      any change in the status of a Transaction Obligor (or of a Holding Company of a Transaction Obligor) (including, without limitation, a change of ownership of a Transaction Obligor or of a Holding Company of a Transaction Obligor) after the date of this Agreement; or

         (iii)      a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges a Finance Party (or, in the case of sub-paragraph (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of any Finance Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by a Servicing Party (for itself or on behalf of any other Finance Party) or any Lender (for itself or, in the case of the event described in sub-paragraph (iii) above, on behalf of any prospective new Lender) in order for such Finance Party or, in the case of the event described in sub-paragraph (iii) above, any

prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)     Each Lender shall promptly upon the request of a Servicing Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Servicing Party (for itself) in order for that Servicing Party to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents provided that, in the case of sub-paragraph (iii) of paragraph (a) above, the proposed new Lender must have entered into a Confidentiality Undertaking.

## 21     FINANCIAL COVENANTS

### 21.1    Minimum Cash Reserve

Each Borrower shall, or shall procure that the Bareboat Charterer which is a party to the Bareboat Charter relating to that Borrower's Ship shall, during the period commencing on the Utilisation Date of the Ship Tranche relating to that Ship and ending on the date the relevant Ship Tranche is repaid or, as the case may be, prepaid in full, deposit and maintain in the Bareboat Charterer Account of that Bareboat Charterer an amount of $500,000 (being an amount of $5,500,000 in aggregate on the date the last Ship Tranche is utilised if all Ship Tranches have been utilised, the "**Minimum Cash Reserve**") provided that following repayment or prepayment in full of the Ship Tranche relating to the Ship that is the subject of the Bareboat Charter to which the relevant Bareboat Charterer is a party, together with all other related amounts payable under the Finance Documents, the Minimum Cash Reserve relating to that Ship and maintained in that Bareboat Charterer Account as at the date of such repayment or prepayment shall (in accordance with the irrevocable instructions of the Bareboat Charterer contained in the document creating Security over that Bareboat Charterer Account) be transferred to the Earnings Account of the relevant Borrower and shall be released to that Borrower for application in or towards amounts outstanding under the Subordinated Loan Agreement.

### 21.2    Drydocking Reserve Amounts

(a)     Each Borrower shall, on and from the Utilisation Date in respect of the Ship Tranche relating to the Ship owned by it and until the end of the Security Period, ensure that there is accumulated and maintained in its Drydocking Reserve Account, in relation to:

(i)     each of Borrower A, Borrower B, Borrower C, Borrower D and Borrower E, an amount of at least $1,460,000 in respect of that Borrower's Ship; and

(ii)     each of Borrower F, Borrower G, Borrower H, Borrower I, Borrower J and Borrower K, an amount of at least $1,615,000 in respect of that Borrower's Ship,

(in each case, the "**Drydocking Reserve Amount**") which shall be accumulated in accordance with Clause 27.8 (*Drydocking Reserve Accounts*).

(b)     The Drydocking Reserve Amount in respect of a Ship shall be applied in accordance with Clause 27.8 (*Drydocking Reserve Accounts*) other than in a case of a sale, Total Loss or, subject to this Agreement and the other Finance Documents, any other disposal of that Ship whereupon the Drydocking Reserve Amount in respect of that Ship shall be released to the relevant Borrower

for application in accordance with the Subordinated Loan Agreement and the relevant Bareboat Charter.

(c) Following repayment or prepayment of the Ship Tranche relating to the Borrower's Ship in full other than in the case of a sale, Total Loss or, subject to the terms of this Agreement and the other Finance Documents, any other disposal of that Ship, together with all other related amounts payable under the Finance Documents, the Drydocking Reserve Amount relating to that Ship and maintained in that Borrower's Drydocking Reserve Account as at the date of such repayment or prepayment shall be released to that Borrower for application in accordance with the Subordinated Loan Agreement and the relevant Bareboat Charter.

**21.3    Equal treatment of lenders**

If Fleetscape Advantage agrees with any lender in the context of a financing made or to be made available to any member of the Group, financial covenants (including without limitation any dividend restrictions) or any equivalent provisions in any other document (together, the "**Covenants**") which place such lender or lenders in a more favourable position than that applicable to the Finance Parties pursuant to the Finance Documents, the Borrowers shall procure that Fleetscape Advantage or any Obligor shall give the Finance Parties the benefit of such Covenants which, in the opinion of the Finance Parties, would place them in an equivalent position as that applicable to the other lender or lenders at the relevant time. The Borrowers shall and shall procure that Fleetscape Advantage shall also enter, if required by the Facility Agent (acting on the instructions of all the Lenders), into a supplemental agreement to this Agreement or, as the case may be, any of the other Finance Documents, to amend each such document accordingly (with such supplemental agreement or agreements being entered into on or immediately after the date on which the Covenants are granted).

**22    GENERAL UNDERTAKINGS**

**22.1    General**

The undertakings in this Clause 22 (*General Undertakings*) remain in force throughout the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

**22.2    Authorisations**

Each Obligor shall, and shall procure that each other Transaction Obligor will and further use its best endeavours to procure that the Time Charterer will, promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the Facility Agent of,

any Authorisation required under any applicable law or regulation of a Relevant Jurisdiction or the state of the Approved Flag at any time of each Ship to enable it to:

(i) perform its obligations under the Transaction Documents to which it is a party;

(ii) ensure the legality, validity, enforceability or admissibility in evidence in any Relevant Jurisdiction or in the state of the Approved Flag at any time of each Ship, of any Transaction Document to which it is a party; and

(iii)      own and operate each Ship (in the case of the Borrowers and the Bareboat Charterers).

**22.3    Compliance with laws**

Each Obligor shall, and shall procure that each other Transaction Obligor will, comply in all respects with all laws and regulations to which it may be subject, if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

**22.4    Environmental compliance**

Each Obligor shall, and shall procure that each other Transaction Obligor will and further use its best endeavours to procure that the Time Charterer will:

(a)    comply with all Environmental Laws;

(b)    obtain, maintain and ensure compliance with all requisite Environmental Approvals;

(c)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**22.5    Environmental Claims**

Each Obligor shall, and shall procure that each other Transaction Obligor will, promptly upon becoming aware of the same, inform the Facility Agent in writing of:

(a)    any Environmental Claim against any member of the Group or any Bareboat Charterer which is current, pending or threatened; and

(b)    any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any member of the Group or any Bareboat Charterer,

where the claim, if determined against that member of the Group or that Bareboat Charterer, has or is reasonably likely to have a Material Adverse Effect.

**22.6    Taxation**

(a)    Each Borrower shall, and shall procure that each other Transaction Obligor (other than a Bareboat Charterer or an Approved Manager) will, pay and discharge all Taxes imposed upon it or its assets within the time period allowed and any applicable grace period without incurring penalties unless and only to the extent that:

(i)      such payment is being contested in good faith;

(ii)     adequate reserves are maintained for those Taxes and the costs required to contest them and, in relation to the Borrowers, both have been disclosed in its latest financial statements delivered to the Facility Agent under Clause 20.2 (*Financial statements*); and

(iii)    such payment can be lawfully withheld and failure to pay those Taxes does not have or is not reasonably likely to have a Material Adverse Effect.

(b)    No Borrower shall change its residence for Tax purposes.

**22.7    Overseas companies**

Each Obligor shall, and shall procure that each other Transaction Obligor will, promptly inform the Facility Agent if it delivers to the Registrar particulars required under the Overseas Regulations of any UK Establishment and it shall comply with any directions given to it by the Facility Agent regarding the recording of any Transaction Security on the register which it is required to maintain under The Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009.

**22.8    Pari passu ranking**

Each Obligor shall, and shall procure that each other Transaction Obligor will, ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**22.9    Title**

(a)    From the Utilisation Date of the Advance under a Ship Tranche, the relevant Borrower shall hold the legal title to, and own the entire beneficial interest in the Ship being financed by that Ship Tranche, its Earnings and its Insurances;

(b)    With effect on and from its creation or intended creation, each Obligor shall, and shall procure that each other Transaction Obligor will, hold the legal title to, and own the entire beneficial interest in any other assets the subject of any Transaction Security created or intended to be created by such Obligor.

**22.10    Negative pledge**

(a)    No Obligor shall create or permit to subsist any Security over any of its assets.

(b)    The Obligors shall procure that no other Transaction Obligor or other member of the Group will create or permit to subsist any Security over any of its assets which are, in the case of Transaction Obligors or members of the Group other than the Borrowers, the subject of the Security created or intended to be created by the Finance Documents.

(c)    No Obligor shall, and the Obligors shall procure that no other Transaction Obligor will:

(i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by a Transaction Obligor or any other member of the Group;

(ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)    enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(d)     Paragraphs (a), (b) and (c) above do not apply to any Permitted Security.

**22.11   Disposals**

(a)     No Obligor shall, and the Obligors shall procure that no other Transaction Obligor will, enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset (including without limitation any Ship, its Earnings or its Insurances) other than in relation to an Approved Manager who shall not enter into such a single transaction or series of transactions in respect of its assets which are the subject of the Security created or intended to be created under the Finance Documents and except, in the case of a Ship, in accordance with the Bareboat Charter relating to that Ship and provided that Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) is complied with.

(b)     Paragraph (a) above does not apply to any Charter as all Charters are subject to Clause 25.16 (*Restrictions on chartering, appointment of managers etc.*).

**22.12   Merger**

No Obligor shall enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

**22.13   Change of business**

(a)     The Borrowers shall procure that no substantial change is made to the general nature of the business of Fleetscape Advantage or the Group from that carried on at the date of this Agreement.

(b)     No Borrower shall engage in any business other than the ownership and operation of its Ship.

**22.14   Financial Indebtedness**

No Borrower shall, and shall procure that no other Transaction Obligor will, incur or permit to be outstanding any Financial Indebtedness except Permitted Financial Indebtedness.

**22.15   Expenditure**

No Borrower shall incur any expenditure, except for expenditure reasonably incurred in the ordinary course of owning, operating, maintaining and repairing its Ship.

**22.16   Membership interests**

No Borrower shall:

(a)     purchase, cancel or redeem any of its membership interests;

(b)     increase or reduce its authorised membership interests;

(c)     issue any membership interests except to Fleetscape Advantage and provided such new membership interests are made subject to the terms of the Shares Security applicable to that Borrower immediately upon the issue of such new membership interests in a manner satisfactory to the Security Agent and the terms of that Shares Security are complied with;

(d)    appoint any further director or officer of that Borrower (unless the provisions of the Shares Security applicable to that Borrower are complied with).

**22.17    Dividends and payments under the Subordinated Loan Agreement and the Seller's Credit Agreements**

No Borrower shall following the occurrence of a Potential Event of Default which is continuing or where any of the following would result in the occurrence of an Event of Default:

(a)    declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its membership interests (or any class of its membership interests);

(b)    repay or distribute any dividend or membership interests premium reserve;

(c)    pay any management, advisory or other fee to or to the order of any of its membership interests;

(d)    redeem, repurchase, defease, retire or repay any of its membership interests or resolve to do so; or

(e)    other than as permitted pursuant to Clause 27.2 (*Payment and application of Earnings*), make any payments of any kind under the Subordinated Loan Agreement or any Seller's Credit Agreement.

**22.18    Other transactions**

No Borrower shall:

(a)    be the creditor in respect of any loan or any form of credit to any person other than another Transaction Obligor and where such loan or form of credit is Permitted Financial Indebtedness;

(b)    give or allow to be outstanding any guarantee or indemnity to or for the benefit of any person in respect of any obligation of any other person or enter into any document under which that Borrower assumes any liability of any other person other than any guarantee or indemnity given under the Finance Documents.

(c)    enter into any material agreement other than:

(i)    the Transaction Documents; and

(ii)    any other agreement expressly allowed under any other term of this Agreement; and

(d)    enter into any transaction on terms which are, in any respect, less favourable to that Borrower than those which it could obtain in a bargain made at arms' length; or

(e)    acquire any shares or other securities other than US or UK Treasury bills and certificates of deposit issued by major North American or European banks.

**22.19    Unlawfulness, invalidity and ranking; Security imperilled**

No Obligor shall, and the Obligors shall procure that no other Transaction Obligor or any other member of the Group will, do (or fail to do) or cause or permit another person to do (or omit to do) anything which is likely to:

(a)    make it unlawful for a Transaction Obligor or, in the case of the Time Charters, the Time Charterer to perform any of its obligations under the Transaction Documents;

(b)    cause any obligation of a Transaction Obligor or, in the case of the Time Charters, the Time Charterer under the Transaction Documents to cease to be legal, valid, binding or enforceable;

(c)    cause any Transaction Document to cease to be in full force and effect;

(d)    cause any Transaction Security to rank after, or lose its priority to, any other Security; or

(e)    imperil or jeopardise the Transaction Security.

**22.20    Sanctions**

To the extent that the making and the receiving of the benefit of and the compliance with the undertakings in this Clause 22.20 (*Sanctions*) do not and will not result in a violation of or conflict with the EU Blocking Regulation, Section 7 of the German Foreign Trade Ordinance (§ 7 *Außenwirtschaftsverordnung*) or a similar applicable anti-boycott statute, the Borrowers undertake the following:

(a)    No Borrower shall, and shall not permit or authorize any other member of the Group or any other Transaction Obligor to, directly or indirectly, use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of the Loan or other transaction(s) contemplated by this Agreement to fund any trade, business or other activities:

(i)    involving or for the benefit of any Prohibited Person or any subsidiary or joint venture partner of any Prohibited Person (whether at the time of such funding or otherwise);

(ii)    in any country or territory, that at the time of such funding is or whose government is the subject of Sanctions if and to the extent this would result in a violation of Sanctions by any Borrower or other member of the Group or any other Transaction Obligor; or

(iii)    in any other manner that would result in a violation of Sanctions by any Borrower or any other member of the Group or any other Transaction Obligor.

(b)    The Borrowers will and will ensure that any other member of the Group and any other Transaction Obligor will:

(i)    ensure that no Person that is a Prohibited Person will have any legal or beneficial interest in any funds repaid or remitted by a Borrower to a Lender in connection with the Loan or any part of the Loan;

(ii)    not fund all or any part of any payment or repayment under the Loan out of proceeds directly derived from any activity in a country or territory that is the subject of country-wide or territory-wide Sanctions broadly prohibiting dealings with such country or territory; and

(iii)    not fund all or any part of any payment or repayment under the Loan out of proceeds directly derived from transactions which would be prohibited by Sanctions or would otherwise cause any Finance Party, any Borrower or any other member of the Group or any other Transaction Obligor to be in breach of applicable Sanctions.

EUROPE/62707839v19

(c)  The Borrowers shall (and shall procure that each other member of the Group (through Fleetscape Advantage) and each other Transaction Obligor shall) maintain policies and procedures designed to promote and achieve compliance with applicable Sanctions.

(d)  The Borrowers shall procure that each member of the Group and each other Transaction Obligor will comply in all respects with applicable Sanctions.

(e)  Neither any Borrower nor any other member of the Group nor any other Transaction Obligor shall be a Prohibited Person.

(f)  Restricted Lender:

(i)  In connection with any amendment, waiver, determination or direction relating to any part of the undertaking in paragraphs (a) to (e) (each inclusive) of this Clause 22.20 (*Sanctions*) of which a Lender does not have the benefit because such benefit would result in a violation by the lender of any Anti Boycott Regulations (for the purpose of this paragraph (f), each a "**Restricted Lender**"), the Commitment of that Restricted Lender will, subject to paragraph (ii) below, be excluded for the purpose of determining whether the consent of the Majority Lenders has been obtained or whether the determination or direction by the Majority Lenders has been made or given.

(ii)  The Facility Agent is only permitted to exclude the Commitment of a Lender pursuant to paragraph (i) above for the purpose of determining whether the consent of the Majority Lenders has been obtained or whether the determination or direction by the Majority Lenders has been made, if following the Facility Agent's request for such consent, determination or direction by the Majority Lenders the respective Lender notifies the Facility Agent that it is a Restricted Lender for such purpose.

## 22.21  Further assurance

(a)  Each Obligor shall, and shall procure that each other Transaction Obligor will, promptly, and in any event within the time period specified by the Security Agent do all such acts (including procuring or arranging any registration, notarisation or authentication or the giving of any notice) or execute or procure execution of all such documents (including assignments, transfers, mortgages, charges, notices, instructions, acknowledgments, proxies and powers of attorney), as the Security Agent may reasonably specify (and in such form as the Security Agent may require in favour of the Security Agent or its nominee(s)):

(i)  to create, perfect, vest in favour of the Security Agent or protect the priority of the Security or any right of any kind created or intended to be created under or evidenced by the Finance Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of any of the Secured Parties provided by or pursuant to the Finance Documents or by law;

(ii)  to confer on the Security Agent or confer on the Secured Parties Security over any property and assets of that Transaction Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Finance Documents;

(iii)    to facilitate or expedite the realisation and/or sale of, the transfer of title to or the grant of, any interest in or right relating to the assets which are, or are intended to be, the subject of the Transaction Security or to exercise any power specified in any Finance Document in respect of which the Security has become enforceable; and/or

(iv)    to enable or assist the Security Agent to enter into any transaction to commence, defend or conduct any proceedings and/or to take any other action relating to any item of the Security Property.

(b)    Each Obligor shall, and shall procure that each other Transaction Obligor will, take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Secured Parties by or pursuant to the Finance Documents.

(c)    At the same time as an Obligor delivers to the Security Agent any document executed by itself or another Transaction Obligor pursuant to this Clause 22.21 (*Further assurance*), that Obligor shall deliver, or shall procure that such other Transaction Obligor will deliver, to the Security Agent a certificate signed by one of that Obligor's or Transaction Obligor's members, directors or officers, as applicable, which shall:

(i)    set out the text of a resolution of that Obligor's or Transaction Obligor's directors or members, as applicable, specifically authorising the execution of the document specified by the Security Agent; and

(ii)    state that either the resolution was duly passed at a meeting of the directors or members, as applicable, validly convened and held, throughout which a quorum of directors or members, as applicable, entitled to vote on the resolution was present, or that the resolution has been signed by all the directors, members or officers, as applicable, and is valid under that Obligor's or Transaction Obligor's articles of association or other constitutional documents.

## 23    INSURANCE UNDERTAKINGS

### 23.1    General

The undertakings in this Clause 23 (*Insurance Undertakings*) remain in force from the date of this Agreement throughout the rest of the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

### 23.2    Maintenance of obligatory insurances

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, keep the Ship owned by it insured at its expense against:

(a)    fire and usual marine risks (including hull and machinery and excess risks);

(b)    war risks;

(c)    protection and indemnity risks;

(d)    risk of loss of Earnings; and

(e)  any other risks against which the Facility Agent acting on the instructions of the Majority Lenders considers, having regard to practices and other circumstances prevailing at the relevant time, it would be reasonable for that Borrower and/or Bareboat Charterer to insure and which are specified by the Facility Agent by notice to that Borrower.

**23.3  Terms of obligatory insurances**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, effect such insurances:

(a)  in dollars;

(b)  in the case of fire and usual marine risks and war risks, in an amount on an agreed value basis at least the greater of:

   (i)  120 per cent. of the Ship Tranche relating to the Ship owned by it; and

   (ii)  the Market Value of that Ship;

(c)  in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available, currently $1,000,000,000, under basic protection and indemnity club entry and in the international marine insurance market;

(d)  in the case of protection and indemnity risks, in respect of the full tonnage of its Ship;

(e)  in the case of risk of loss of Earnings insurance, in an amount equal to at least 180 days of hire payable under the relevant Bareboat Charter and/or Time Charter with an excess of the first 45 days of hire;

(f)  on approved terms; and

(g)  through Approved Brokers and with approved insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations.

**23.4  Further protections for the Finance Parties**

In addition to the terms set out in Clause 23.3 (*Terms of obligatory insurances*), each Borrower shall procure that the obligatory insurances effected by it or, as the case may be, the relevant Bareboat Charterer shall:

(a)  subject always to paragraph (b), name only that Borrower, that Bareboat Charterer and each Approved Manager as the named insureds unless the interest of every other named insured is limited:

   (i)  in respect of any obligatory insurances for hull and machinery and war risks;

      (A)  to any provable out-of-pocket expenses that it has incurred and which form part of any recoverable claim on underwriters; and

      (B)  to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against it); and

(ii)     in respect of any obligatory insurances for protection and indemnity risks, to any recoveries it is entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against it;

and every other named insured has undertaken in writing to the Security Agent (in such form as it requires) that any deductible shall be apportioned between that Borrower and that Bareboat Charterer and every other named insured in proportion to the gross claims made or paid by each of them and that it shall do all things necessary and provide all documents, evidence and information to enable the Security Agent to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(b)     whenever the Facility Agent requires, name (or be amended to name) the Security Agent as additional named insured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Security Agent, but without the Security Agent being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(c)     name the Security Agent as loss payee with such directions for payment as the Facility Agent may specify;

(d)     provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Agent shall be made without set off, counterclaim or deductions or condition whatsoever;

(e)     provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Agent or any other Finance Party; and

(f)     provide that the Security Agent may make proof of loss if that Borrower fails to do so.

**23.5     Renewal of obligatory insurances**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will:

(a)     at least 14 days before the expiry of any obligatory insurance effected by it:

(i)     notify the Facility Agent of the Approved Brokers (or other insurers) and any protection and indemnity or war risks association through or with which it proposes to renew that obligatory insurance and of the proposed terms of renewal; and

(ii)     obtain the Facility Agents' approval to the matters referred to in sub-paragraph (i) above;

(b)     at least 14 days before the expiry of any obligatory insurance, renew that obligatory insurance in accordance with the Facility Agent's approval pursuant to paragraph (a) above; and

(c)     procure that the Approved Brokers and/or the approved war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Facility Agent in writing of the terms and conditions of the renewal.

**23.6     Copies of policies; letters of undertaking**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, ensure that the Approved Brokers provide the Security Agent with:

(a)   *pro forma* copies of all policies relating to the obligatory insurances which they are to effect or renew; and

(b)   a letter or letters or undertaking in a form required by the Facility Agent (acting reasonably) and including undertakings by the Approved Brokers that:

    (i)   they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment complying with the provisions of Clause 23.4 (*Further protections for the Finance Parties*);

    (ii)   they will hold such policies, and the benefit of such insurances, to the order of the Security Agent in accordance with such loss payable clause;

    (iii)   they will advise the Security Agent immediately of any material change to the terms of the obligatory insurances;

    (iv)   they will, if they have not received notice of renewal instructions from the relevant Borrower or Bareboat Charterer or their respective agents, notify the Security Agent not less than 14 days before the expiry of the obligatory insurances;

    (v)   if they receive instructions to renew the obligatory insurances, they will promptly notify the Facility Agent of the terms of the instructions;

    (vi)   they will not set off against any sum recoverable in respect of a claim relating to the Ship owned by that Borrower under such obligatory insurances any premiums or other amounts due to them or any other person whether in respect of that Ship or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts; and

    (vii)   they will arrange for a separate policy to be issued in respect of the Ship owned by that Borrower forthwith upon being so requested by the Facility Agent.

## 23.7   Copies of certificates of entry

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, ensure that any protection and indemnity and/or war risks associations in which the Ship owned by it is entered provide the Security Agent with:

(a)   a certified copy of the certificate of entry for that Ship;

(b)   a letter or letters of undertaking in such form as may be reasonably required by the Facility Agent acting on the instructions of Majority Lenders; and

(c)   a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to that Ship.

### 23.8 Deposit of original policies

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, ensure that all policies relating to obligatory insurances effected by it are deposited with the Approved Brokers through which the insurances are effected or renewed.

### 23.9 Payment of premiums

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, punctually pay all premiums or other sums payable in respect of the obligatory insurances effected by it and produce all relevant receipts when so required by the Facility Agent or the Security Agent.

### 23.10 Guarantees

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

### 23.11 Compliance with terms of insurances

(a)     No Borrower shall, and shall procure that no Bareboat Charterer will, do or omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part.

(b)     Without limiting paragraph (a) above, each Borrower shall, and shall procure that the relevant Bareboat Charterer will:

(i)     take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in sub-paragraph (iii) of paragraph (b) of Clause 23.6 (*Copies of policies; letters of undertaking*)) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Facility Agent has not given its prior approval;

(ii)    not make any changes relating to the classification or classification society or manager or operator of the Ship owned by it approved by the underwriters of the obligatory insurances;

(iii)   make (and promptly supply copies to the Facility Agent of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Ship owned by it is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

(iv)    not employ the Ship owned by it, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

### 23.12  Alteration to terms of insurances

No Borrower shall, and shall procure that no Bareboat Charterer will, make or agree to any alteration to the terms of any obligatory insurance or waive any right relating to any obligatory insurance.

### 23.13  Settlement of claims

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will:

(a)  not settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a Major Casualty; and

(b)  do all things necessary and provide all documents, evidence and information to enable the Security Agent to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

### 23.14  Provision of copies of communications

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, on the Security Agent's reasonable request, provide the Security Agent with copies of all written communications between that Borrower and/or Bareboat Charterer and:

(a)  the Approved Brokers;

(b)  the approved protection and indemnity and/or war risks associations; and

(c)  the approved insurance companies and/or underwriters,

which relate directly or indirectly to:

(i)  that Borrower's and/or that Bareboat Charterer's obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

(ii)  any credit arrangements made between that Borrower and/or that Bareboat Charterer and any of the persons referred to in paragraphs (a) or (b) above relating wholly or partly to the effecting or maintenance of the obligatory insurances.

### 23.15  Provision of information

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, promptly provide the Facility Agent (or any persons which it may designate) with any information which the Facility Agent (or any such designated person) reasonably requests for the purpose of:

(a)  obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(b)  effecting, maintaining or renewing any such insurances as are referred to in Clause 23.16 (*Mortgagee's interest and additional perils insurances*) or dealing with or considering any matters relating to any such insurances,

and the Borrowers shall, and shall procure that the Bareboat Charterers will, within five Business Days of demand, indemnify the Security Agent in respect of all fees and other

expenses incurred by or for the account of the Security Agent in connection with any such report as is referred to in paragraph (a) above if such report was obtained either (i) pursuant to Clause 4 (*Conditions of Utilisation*), (ii) following a change in the obligatory insurances effected, (iii) any change in any applicable law occurs which may affect the obligatory insurances and (iv) following the occurrence of an Event of Default which is continuing.

**23.16    Mortgagee's interest and additional perils insurances**

(a)    The Security Agent shall be entitled from time to time to effect, maintain and renew a mortgagee's interest marine insurance and a mortgagee's interest additional perils insurance in such amounts, on such terms, through such insurers and generally in such manner as the Security Agent acting on the instructions of the Majority Lenders may from time to time consider appropriate.

(b)    The Borrowers shall, and shall procure that the Bareboat Charterers will, within five Business Days of fully indemnify the Security Agent in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any insurance referred to in paragraph (a) above or dealing with, or considering, any matter arising out of any such insurance.

**24    MOA AND BAREBOAT CHARTER UNDERTAKINGS**

**24.1    General**

The undertakings in this Clause 24 (*MOA and Bareboat Charter Undertakings*) remain in force throughout the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

**24.2    Performance of MOAs and Bareboat Charters**

Each Borrower shall, in relation to the MOA and Bareboat Charter to which it is a party:

(a)    observe and perform all its obligations and meet all its liabilities under or in connection with that MOA and Bareboat Charter;

(b)    use its best endeavours to ensure performance and observance by the other parties of their obligations and liabilities under that MOA and Bareboat Charter; and

(c)    take any action, or refrain from taking any action, which the Facility Agent may specify in connection with any breach, or possible future breach, of that MOA and Bareboat Charter by that Borrower or any other party or with any other matter which arises or may later arise out of or in connection with that MOA and Bareboat Charter.

**24.3    No variation, release etc. of MOAs and/or Bareboat Charter**

No Borrower shall, in relation to the MOA and/or Bareboat Charter to which it is a party, whether by a document, by conduct, by acquiescence or in any other way:

(a)    vary that MOA and/or Bareboat Charter;

(b)    release, waive, suspend, subordinate or permit to be lost or impaired any interest or right of any kind which that Borrower has at any time to, in or in connection with that MOA and/or

Bareboat Charter or in relation to any matter arising out of or in connection with that MOA and/or Bareboat Charter;

(c)    waive any person's breach of that MOA and/or Bareboat Charter; or

(d)    rescind or terminate that MOA and/or Bareboat Charter or treat itself as discharged or relieved from further performance of any of its obligations or liabilities under that MOA and/or Bareboat Charter.

### 24.4    Action to protect validity of MOAs and Bareboat Charters

Each Borrowers shall use its best endeavours to ensure that all interests and rights conferred by the MOA and Bareboat Charter to which it is a party remain valid and enforceable in all respects and retain the priority which they were intended to have.

### 24.5    No assignment etc. of MOAs and Bareboat Charters

Save as permitted by the Finance Documents, no Borrower shall assign, novate, transfer or dispose of any of its rights or obligations under the MOA or Bareboat Charter to which it is a party.

### 24.6    Provision of information relating to MOAs and Bareboat Charters

Without prejudice to Clause 20.4 (*Information: miscellaneous*) each Borrower shall, in relation to the MOA and Bareboat Charter to which it is a party:

(a)    as soon as practicable but in any event within the same day, inform the Facility Agent if any breach of that MOA or Bareboat Charter occurs or a serious risk of such a breach arises and of any other event or matter affecting that MOA or Bareboat Charter which has or is reasonably likely to have a Material Adverse Effect;

(b)    provide the Facility Agent, promptly after service, with copies of all notices served on or by that Borrower under or in connection with that MOA or Bareboat Charter; and

(c)    provide the Facility Agent with any information which it requests about any interest or right of any kind which that Borrower has at any time to, in or in connection with, that MOA or Bareboat Charter or in relation to any matter arising out of or in connection with that MOA or Bareboat Charter.

### 25    GENERAL SHIP UNDERTAKINGS

### 25.1    General

The undertakings in this Clause 25 (*General Ship Undertakings*) remain in force on and from the date of this Agreement and throughout the rest of the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

### 25.2    Ships' names and registration

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, in respect of the Ship owned by it:

(a)   keep that Ship registered in its name under the Approved Flag from time to time at its port of registration;

(b)   not do or allow to be done anything as a result of which such registration might be suspended, cancelled or imperilled;

(c)   not enter into any dual flagging arrangement in respect of that Ship; and

(d)   not change the name of that Ship,

provided that any change of flag of a Ship shall be subject to:

(i)    that Ship remaining subject to Security securing the Secured Liabilities created by a first priority or preferred ship mortgage on that Ship and, if appropriate, a first priority deed of covenant collateral to that mortgage (or equivalent first priority Security) on substantially the same terms as the Mortgage on that Ship and on such other terms and in such other form as the Facility Agent, acting with the authorisation of the Majority Lenders, shall approve or require; and

(ii)   the execution of such other documentation amending and supplementing the Finance Documents as the Facility Agent, acting with the authorisation of the Majority Lenders, shall approve or require.

## 25.3    Repair and classification

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, keep the Ship owned by it in a good and safe condition and state of repair:

(a)   consistent with first class ship ownership and management practice; and

(b)   so as to maintain the Approved Classification free of overdue recommendations and conditions.

## 25.4    Modifications

Subject to Clause 25.6 (*Scrubbers and water ballast treatment*), no Borrower shall, and shall procure that no Bareboat Charterer will, make any modification or repairs to, or replacement of, any Ship or equipment installed on it which would or might materially alter the structure, type or performance characteristics of that Ship or materially reduce its value.

## 25.5    Removal and installation of parts

(a)   Subject to paragraph (b) below and subject to Clause 25.6 (*Scrubbers and water ballast treatment*), no Borrower shall, and shall procure that no Bareboat Charterer will, remove any material part of any Ship, or any item of equipment installed on any Ship unless:

(i)    the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed;

(ii)   the replacement part or item is free from any Security in favour of any person other than the Security Agent; and

(iii)     the replacement part or item becomes, on installation on that Ship, the property of that Borrower and subject to the security constituted by the Mortgage on that Ship.

(b)     A Borrower and/or a Bareboat Charterer may install equipment owned by a third party if the equipment can be removed without any risk of damage to the Ship owned by that Borrower.

**25.6    Scrubbers and water ballast treatment**

(a)     A Borrower or a Bareboat Charterer shall be permitted to install scrubbers and/or ballast water treatment systems on a Ship with the prior written consent of the Facility Agent (acting with the authorisation of all the Lenders, such authorisation not to be unreasonably withheld) with regards to the proposed technological plan and subject to no third party lien over that Ship.

(b)     Prior to work commencing on a Ship in respect of the installation of scrubbers and/or ballast water treatment systems, the Borrower owning that Ship shall (or shall procure that the relevant Bareboat Charterer will) provide to the Facility Agent evidence that it has sufficient funds for the cost of the work in respect of the installation of scrubbers and/or ballast water treatment systems on that Ship.

**25.7    Surveys**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, submit the Ship owned by it regularly to all periodic or other surveys which may be required for classification purposes and, if so required by the Facility Agent acting on the instructions of the Majority Lenders, provide the Facility Agent, with copies of all survey reports.

**25.8    Inspection**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, permit the Security Agent (acting through surveyors or other persons appointed by it for that purpose) to board the Ship owned by it, whilst no Event of Default is continuing or prior to the occurrence of a Major Casualty, once in each calendar year at all reasonable times (upon reasonable notice being served by the Security Agent and provided that such inspection shall not delay or interfere with that Ship's operation and/or loading or unloading) and, following the occurrence of an Event of Default and whilst the same is continuing or a Major Casualty in respect of which the damage has not been repaired in accordance with the requirements of the Approved Classification Society, at all times to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections. The reasonable costs of one such inspection per Ship per calendar year shall be borne by the Borrowers unless an Event of Default or a Major Casualty has occurred following which the Borrowers shall be liable for the costs of all inspections.

**25.9    Prevention of and release from arrest**

(a)     Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, in respect of the Ship owned by it, promptly discharge:

(i)     all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against that Ship, its Earnings or its Insurances;

(ii)     all Taxes, dues and other amounts charged in respect of that Ship, its Earnings or its Insurances; and

EUROPE/62707839v19

(iii)     all other outgoings whatsoever in respect of that Ship, its Earnings or its Insurances.

(b)     Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, within the same day of receiving notice of the arrest of the Ship owned by it or of its detention in exercise or purported exercise of any lien or claim, take all steps necessary to procure its release by providing bail or otherwise as the circumstances may require.

## 25.10  Compliance with laws etc.

Each Borrower shall, and shall procure that each Bareboat Charterer will:

(a)     comply, or procure compliance with all laws or regulations:

(i)     relating to its business generally; and

(ii)     relating to the Ship owned by it, its ownership, employment, operation, management and registration,

including, but not limited to, the ISM Code, the ISPS Code, all Environmental Laws, all applicable Sanctions and the laws of the Approved Flag;

(b)     obtain, comply with and do all that is necessary to maintain in full force and effect any Environmental Approvals; and

(c)     without limiting paragraph (a) above, not employ the Ship owned by it nor allow its employment, operation or management in any manner contrary to any law or regulation including but not limited to the ISM Code, the ISPS Code, all Environmental Laws and applicable Sanctions (or which would be contrary to applicable Sanctions if such applicable Sanctions were binding on each Transaction Obligor).

## 25.11  ISPS Code

Without limiting paragraph (a) of Clause 25.10 (*Compliance with laws etc.*), each Borrower shall, and shall procure that the relevant Bareboat Charterer will:

(a)     procure that the Ship owned by it and the company responsible for that Ship's compliance with the ISPS Code comply with the ISPS Code; and

(b)     maintain an ISSC for that Ship; and

(c)     notify the Facility Agent as soon as practicable in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC.

## 25.12  Sanctions and Ship trading

(a)     Without limiting Clause 25.10 (*Compliance with laws etc.*), each Borrower shall procure:

(i)     that the Ship owned by it shall not be used by or for the benefit of a Prohibited Person contrary to applicable Sanctions;

(ii)     that such Ship shall not be used in trading in any manner contrary to applicable Sanctions;

(iii)  that such Ship shall not be traded in any manner which would trigger the operation of any sanctions limitation or exclusion clause (or similar) in the Insurances; and

(iv)  that each charterparty in respect of that Ship shall contain, for the benefit of that Borrower, language which gives effect to the provisions of paragraph (c) of Clause 25.10 (*Compliance with laws etc.*) as regards Sanctions and of this Clause 25.12 (*Sanctions and Ship trading*) and which permits refusal of employment or voyage orders if compliance would result in a breach of applicable Sanctions (or which would result in a breach of applicable Sanctions if such applicable Sanctions were binding on each Transaction Obligor).

(b)  Each Borrower shall, and shall procure that each Bareboat Charterer will:

(i)  not directly or to its knowledge (after reasonable enquiry) indirectly use or permit to be used all or any part of the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds directly or to its knowledge (after reasonable enquiry) indirectly, to any person or entity (A) to finance or facilitate any activity or transaction of or with any Prohibited Person contrary to applicable Sanctions, or (B) in any other manner that would result in a violation of any Sanctions by any Party;

(ii)  not fund all or part of any payment under the Loan out of proceeds derived directly or to its knowledge (after reasonable enquiry) indirectly from any activity or transaction with a Prohibited Person contrary to applicable Sanctions or which would otherwise cause any party to be in breach of any Sanctions; and

(iii)  procure that no proceeds to its knowledge (after reasonable enquiry) from activities or business with a Prohibited Person contrary to applicable Sanctions are credited to the Earnings Account or any other Account.

**25.13  Trading in war zones**

In the event of hostilities in any part of the world (whether war is declared or not), no Borrower shall, and shall procure that no Bareboat Charterer will, cause or permit any Ship to enter or trade to any zone which is declared a war zone by any government or by that Ship's war risks insurers unless:

(a)  the prior written consent of the Security Agent acting on the instructions of the Majority Lenders has been given; and

(b)  that Borrower or that Bareboat Charterer has (at its expense) effected any special, additional or modified insurance cover which the Security Agent acting on the instructions of the Majority Lenders may require.

**25.14  Provision of information**

Without prejudice to Clause 20.4 (*Information: miscellaneous*) each Borrower shall, and shall procure that the relevant Bareboat Charterer will, in respect of the Ship owned by it, promptly provide the Facility Agent with any information which it requests regarding:

(a)  that Ship, its employment, position and engagements;

(b)  the Earnings and payments and amounts due to its master and crew;

(c)    any expenditure incurred, or likely to be incurred, in connection with the operation, maintenance or repair of that Ship and any payments made by it in respect of that Ship;

(d)    any towages and salvages; and

(e)    its compliance, the Approved Manager's compliance and the compliance of that Ship with the ISM Code and the ISPS Code,

and, upon the Facility Agent's request, promptly provide copies of any current Charter relating to that Ship, of any current guarantee of any such Charter, the Ship's Safety Management Certificate and any relevant Document of Compliance.

**25.15    Notification of certain events**

Each Borrower shall, and shall procure that the relevant Bareboat Charterer will, in respect of the Ship owned by it, as soon as practicable notify the Facility Agent of:

(a)    any casualty to that Ship which is or is likely to be or to become a Major Casualty;

(b)    any occurrence as a result of which that Ship has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(c)    any requisition of that Ship for hire;

(d)    any requirement or recommendation made in relation to that Ship by any insurer or classification society or by any competent authority which is not immediately complied with;

(e)    any arrest or detention of that Ship or any exercise or purported exercise of any lien on that Ship or the Earnings;

(f)    any intended dry docking of that Ship;

(g)    any Environmental Claim made against that Borrower or that Bareboat Charterer or in connection with that Ship, or any Environmental Incident;

(h)    any claim for breach of the ISM Code or the ISPS Code being made against that Borrower, that Bareboat Charterer an Approved Manager or otherwise in connection with that Ship; or

(i)    any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with,

and each Borrower shall keep the Facility Agent advised in writing on a regular basis and in such detail as the Facility Agent shall require as to that Borrower's, that Bareboat Charterer's any such Approved Manager's or any other person's response to any of those events or matters.

**25.16    Restrictions on chartering, appointment of managers etc.**

No Borrower shall, and shall procure that the relevant Bareboat Charterer will not, in relation to the Ship owned by it:

(a)    let that Ship on demise charter for any period;

(b)    enter into any time, voyage or consecutive voyage charter in respect of that Ship other than a Permitted Charter;

(c)    amend, supplement or terminate a Management Agreement;

(d)    appoint a manager of that Ship other than the Approved Commercial Manager and the Approved Technical Manager or agree to any alteration to the terms of an Approved Manager's appointment;

(e)    de activate or lay up that Ship; or

(f)    put that Ship into the possession of any person for the purpose of work being done upon it in an amount exceeding or likely to exceed $500,000 (or the equivalent in any currency) unless that person has first given to the Security Agent and in terms satisfactory to it a written undertaking not to exercise any lien on that Ship or its Earnings for the cost of such work or for any other reason.

**25.17    Notice of Mortgage**

Each Borrower shall keep the relevant Mortgage registered against the Ship owned by it as a valid first preferred mortgage, carry on board that Ship a certified copy of the relevant Mortgage and place and maintain in a conspicuous place in the navigation room and the master's cabin of that Ship a framed printed notice stating that that Ship is mortgaged by that Borrower to the Security Agent.

**25.18    Sharing of Earnings**

No Borrower shall, and shall procure that no Bareboat Charterer will, enter into any agreement or arrangement for the sharing of any Earnings other than for the purposes of this Agreement.

**25.19    Notification of compliance**

Each Borrower shall promptly provide the Facility Agent from time to time with evidence (in such form as the Facility Agent requires) that it is complying with this Clause 25 (*General Ship Undertakings*).

**26    SECURITY COVER**

**26.1    Minimum required security cover**

Clause 26.2 (*Provision of additional security; prepayment*) applies if, on or after the first Utilisation Date, the Facility Agent notifies the Borrowers that:

(a)    the aggregate Market Value of each Ship then subject to a Mortgage; plus

(b)    the net realisable value of additional Security previously provided under this Clause 26 (*Security Cover*),

is below 140 per cent. of the Loan.

**26.2    Provision of additional security; prepayment**

(a)    If the Facility Agent serves a notice on the Borrowers under Clause 26.1 (*Minimum required security cover*), the Borrowers shall, on or before the date falling one Month after the date (the

"**Prepayment Date**") on which the Facility Agent's notice is served, prepay such part of the Loan as shall eliminate the shortfall.

(b)     A Borrower may, instead of making a prepayment as described in paragraph (a) above, provide, or ensure that a third party has provided, additional security which, in the opinion of the Facility Agent acting on the instructions of the Majority Lenders:

(i)     has a net realisable value at least equal to the shortfall; and

(ii)    is documented in such terms as the Facility Agent may approve or require,

before the Prepayment Date; and conditional upon such security being provided in such manner, it shall satisfy such prepayment obligation.

**26.3    Value of additional vessel security**

The net realisable value of any additional security which is provided under Clause 26.2 (*Provision of additional security; prepayment*) and which consists of Security over a vessel shall be the Market Value of the vessel concerned.

**26.4    Valuations binding**

Any valuation under this Clause 26 (*Security Cover*) shall be binding and conclusive as regards each Borrower.

**26.5    Provision of information**

(a)     Each Borrower shall promptly provide the Facility Agent and any shipbroker acting under this Clause 26 (*Security Cover*) with any information which the Facility Agent or the shipbroker may request for the purposes of the valuation.

(b)     If a Borrower fails to provide the information referred to in paragraph (a) above by the date specified in the request, the valuation may be made on any basis and assumptions which the shipbroker or the Facility Agent considers prudent.

**26.6    Prepayment mechanism**

Any prepayment pursuant to Clause 26.2 (*Provision of additional security; prepayment*) shall be made in accordance with the relevant provisions of Clause 7 (*Prepayment and Cancellation*) and shall be treated as a voluntary prepayment pursuant to Clause 7.3 (*Voluntary prepayment of Loan*).

**26.7    Provision of valuations**

At the Borrowers' cost, in respect of each Ship and any other vessel over which additional Security has been created in accordance with Clause 26.3 (*Value of additional vessel security*), two valuations of that Ship or other vessel will be provided, each from an Approved Valuer, one selected by the Facility Agent and the other by the Borrowers, each addressed to the Finance Parties, to enable the Facility Agent to determine the Market Value of that Ship or other vessel, on two occasions in each year on 30 June and 31 December and on the date falling one year prior to the Termination Date in respect of the Ship Tranche financing that Ship.

EUROPE/62707839v19

**27**  **ACCOUNTS, APPLICATION OF EARNINGS AND HEDGE RECEIPTS**

**27.1**  **Accounts**

No Borrower may, without the prior consent of the Facility Agent, maintain any bank account other than its Earnings Account, its Drydocking Reserve Account, its Balloon Reserve Account and the Retention Account.

**27.2**  **Payment and application of Earnings**

(a)  Each Borrower shall, and shall procure that each Bareboat Charterer will in respect of sub-paragraph (i)(B)below, ensure that:

  (i)  subject only to the provisions of the Tripartite Assignment to which it is a party, all the Earnings in respect of the Ship owned by it and deriving from:

      (A)  the Bareboat Charter relating to that Ship are paid in to its Earnings Account; and

      (B)  the Time Charter relating to that Ship are paid in to the Bareboat Charterer Account of the Bareboat Charterer in respect of that Ship; and

  (ii)  all Hedge Receipts are paid in to the Retention Account.

(b)  The Earnings in respect of a Ship received in the relevant Bareboat Charterer Account during the Security Period shall be applied in the following order on the tenth day in each calendar month during the Security Period (or, if the tenth day of a calendar month does not fall on a Business Day, on the next Business Day to occur in that calendar month):

  (i)  **first**, in or towards payment of the Operating and Administrative Expenses in respect of that Ship as determined by reference to the Approved Budget or, as the case may be and subject to paragraph (c) of Clause 20.2 (*Financial statements*), the Approved Operating and Administrative Expenses by transferring the amount required to make such payment of the Operating and Administrative Expenses or, as the case may be the Approved Operating and Administrative Expenses in respect of that Ship from that Bareboat Charterer Account to the account of the relevant Bareboat Charterer or Advantage Tankers held with QNB Finansbank AS, Bogazici Branch (or such other bank as may be approved by the Facility Agent acting reasonably) only for the purpose of onward payment to the relevant creditors;

  (ii)  **secondly**, in or towards payment of the amounts required to be paid by the Borrower owning that Ship in accordance with Clause 27.8 (*Drydocking Reserve Accounts*); and

  (iii)  **thirdly**, any surplus shall be paid to the Earnings Account of the Borrower owning that Ship for the payment of hire pursuant to the Bareboat Charter in respect of that Ship.

(c)  Subject to Clause 27.3 (*Monthly retentions*), the Earnings paid to the Earnings Account of a Borrower pursuant to a Bareboat Charter in respect of a Ship shall be applied in the following order on the tenth day in each calendar month during the Security Period (or, if the tenth day of a calendar month does not fall on a Business Day, on the next Business Day to occur in that calendar month):

(i) **first**, in or towards payment *pro rata* of any unpaid fees, costs and expenses of, and any other amounts owing to, the Lenders, the Facility Agent, the Security Agent, the Hedge Counterparties, any Receiver or any Delegate under the Finance Documents;

(ii) **secondly**, in respect of each application in accordance with this paragraph (c) on or around 10 January, 10 April, 10 July and 10 October in each calendar year during the Security Period, an amount of $5,000 in respect of that Borrower shall be released to that Borrower for application in or towards payment of the Administrative Expenses in respect of that Borrower;

(iii) **thirdly**, in order towards payment *pro rata* of:

   (A) any accrued interest due but unpaid to the Lenders under this Agreement;

   (B) any periodical payments (not being payments as a result of termination or closing out) due but unpaid to the Hedge Counterparties under the Hedging Agreements; and

   (C) any Repayment Instalment due;

(iv) **fourthly**, in or towards payment of the amounts required to be paid by the Borrower owning that Ship, as necessary, in accordance with Clause 27.9 (*Balloon Reserve Accounts*);

(v) **fifthly**, in or towards payment of the Minimum Cash Interest pursuant to the Subordinated Loan Agreement; and

(vi) **sixthly**, any surplus shall be released to the Borrower owning that Ship for application in or towards other amounts outstanding under the Subordinated Loan Agreement.

**27.3    Monthly retentions**

Each Borrower shall ensure that, in each calendar month following the Utilisation Date in respect of the Ship Tranche financing that Borrower's Ship, on the tenth day in each calendar month during the Security Period (or, if the tenth day of a calendar month does not fall on a Business Day, on the next Business Day to occur in that calendar month), there is transferred to the Retention Account of that Borrower out of the Earnings received by that Borrower in its Earnings Account during the preceding calendar month:

(a) one-third of the amount of any Repayment Instalment falling due under Clause 6.1 (*Repayment of Loan* ) on the next Repayment Date in respect of that Ship Tranche; and

(b) the relevant fraction of the aggregate amount of interest on the part of the Loan corresponding to that Ship Tranche which is payable under this Agreement in respect of any Interest Period then current, reduced by the amount of any corresponding payment from a Hedge Counterparty due to that Borrower under any Hedging Agreement; and

(c) the relevant fraction of the aggregated net amount which is payable by that Borrower to any Hedge Counterparty under any Hedging Agreement on the next due date for payment of such amount under the relevant Hedging Agreement.

The "**relevant fraction**" is a fraction of which:

EUROPE/62707839v19

(i)    the numerator is one; and

(ii)    the denominator is:

    (A)    the number of months comprised in the relevant then current Interest Period; or

    (B)    if the period is shorter, the number of months from the later of the commencement of the relevant current Interest Period or the last due date for payment of interest on the Loan or the relevant part of the Loan to the next due date for payment of interest on the Loan or the relevant part of the Loan under this Agreement.

**27.4**    **Shortfall in Earnings**

(a)    If the aggregate of the credit balance on the relevant Borrower's Earnings Account is insufficient in any calendar month for the required amount to be transferred to the Retention Account under Clause 27.3 (*Monthly retentions*), to the Drydocking Accounts under Clause 27.8 (*Drydocking Reserve Accounts*) and to the Balloon Reserve Accounts under Clause 27.9 (*Balloon Reserve Accounts*), the Borrowers shall make up the amount of the insufficiency on demand from the Facility Agent.

(b)    Without prejudicing the Facility Agent's right to make such demand at any time, the Facility Agent may, if so authorised by the Majority Lenders, permit the Borrowers to make up all or part of the insufficiency by increasing the amount of any transfer under Clause 27.3 (*Monthly retentions*), Clause 27.8 (*Drydocking Reserve Accounts*) and Clause 27.9 (*Balloon Reserve Accounts*) from the Earnings received in the next or subsequent calendar months.

**27.5**    **Application of retentions**

(a)    The Security Agent has sole signing rights in relation to the Retention Account.

(b)    Until an Event of Default occurs, the Facility Agent shall instruct the Security Agent to release to it, on each Repayment Date and on each Interest Payment Date, for distribution to the Finance Parties in accordance with Clause 35.2 (*Distributions by the Facility Agent*) so much of the then balance on the Retention Account as equals:

    (i)    any Repayment Instalment due on that Repayment Date;

    (ii)    the amount of interest payable on that Interest Payment Date;

    (iii)    the amount payable by any Borrower to any Hedge Counterparty under any Hedging Agreement on that Interest Payment Date; and

    (iv)    the amount of any Hedging Prepayment Proceeds paid into the Retention Account during the Interest Period ending on that date,

in discharge of the Borrowers' liability for that Repayment Instalment, that interest, that amount under any Hedging Agreement or its prepayment obligation under Clause 7.5 (*Mandatory prepayment of Hedging Prepayment Proceeds*) as the case may be.

**27.6** **Interest accrued on Retention Account**

Any credit balance on the Retention Account shall bear interest at the rate from time to time offered by the Account Bank to its customers for dollar deposits of similar amounts and for periods similar to those for which such balances appear to the Account Bank likely to remain on the Retention Account.

**27.7** **Release of accrued interest**

Interest accruing under Clause 27.6 (*Interest accrued on Retention Account*) shall be credited to the Retention Account and, to the extent not applied previously pursuant to Clause 27.5 (*Application of retentions*), shall be released to the Borrowers at the end of the Security Period.

**27.8** **Drydocking Reserve Accounts**

(a)    Each Borrower shall ensure that by no later than the date falling three Months prior to a scheduled drydocking or special survey during the Security Period of the Ship belonging to that Borrower which, in respect of a Ship as at the date of this Agreement is as follows:

(i)    in respect of Ship A, on or around September 2021;

(ii)    in respect of Ship B, on or around November 2019;

(iii)    in respect of Ship C, on or around May 2021;

(iv)    in respect of Ship D, on or around June 2020;

(v)    in respect of Ship E, on or around July 2021;

(vi)    in respect of Ship F, on or around February 2020;

(vii)    in respect of Ship G, on or around June 2019;

(viii)    in respect of Ship H, on or around July 2020;

(ix)    in respect of Ship I, on or around January 2021;

(x)    in respect of Ship J, on or around June 2020; and

(xi)    in respect of Ship K, on or around June 2022,

(each such date shall be a "**Scheduled Survey Date**") and subject to the transfers which are required to be made pursuant to Clauses 27.3 (*Monthly retentions*) and 27.9 (*Balloon Reserve Accounts*) having been made in the relevant month, there is transferred to its Drydocking Reserve Account out of that Borrower's Earnings Account the Drydocking Reserve Amount relating to that Ship in accordance with Clause 21.2 (*Drydocking Reserve Amounts*), such Drydocking Reserve Amount to be accumulated as follows:

(A)    in respect of Borrower A, Borrower C, Borrower D and Borrower E, in five equal quarterly instalments of $292,000 the first of which shall be paid into that Borrower's Drydocking Reserve Account on the date falling 15 Months prior to the relevant Scheduled Survey Date and the last on the date falling 3 Months prior to the relevant Scheduled Survey Date;

(B)     in respect of Borrower H, Borrower I, Borrower J and Borrower K, in five equal quarterly instalments of $323,000 the first of which shall be paid into that Borrower's Drydocking Reserve Account on the date falling 15 Months prior to the relevant Scheduled Survey Date and the last on the date falling 3 Months prior to the relevant Scheduled Survey Date;

(C)     in respect of Borrower B, an amount of $584,000 shall be transferred to the Drydocking Reserve Account of Borrower B on the Utilisation Date in respect of the Ship B Tranche and, thereafter, by three equal quarterly instalments of $292,000, the first of which shall be paid on the date falling 3 Months after that Utilisation Date and the last on the date falling 3 Months prior to the relevant Scheduled Survey Date;

(D)     in respect of Borrower F, an amount of $323,000 shall be transferred to the Drydocking Reserve Account of Borrower F on the Utilisation Date in respect of the Ship F Tranche and, thereafter, by four equal quarterly instalments of $323,000, the first of which shall be paid on the date falling 3 Months after that Utilisation Date and the last on the date falling 3 Months prior to the relevant Scheduled Survey Date; and

(E)     in respect of Borrower G, an amount of $1,292,000 shall be transferred to the Drydocking Reserve Account of Borrower G on the Utilisation Date in respect of the Ship G Tranche and, thereafter, an amount of $292,000 shall be transferred to the Drydocking Reserve Account of Borrower G on the date falling 3 Months prior to the relevant Scheduled Survey Date.

(b)     If the Drydocking Reserve Amount in respect of a Ship is not sufficient to cover the actual costs of an upcoming scheduled drydocking or special survey of that Ship, as determined by reference to the Drydocking Reserve Budget in respect of that Ship (the "**Scheduled Survey Shortfall**"), the Borrower owning that Ship shall procure that the relevant Bareboat Charterer transfers to that Borrower's Drydocking Account the Scheduled Survey Shortfall by no later than the date falling 3 Months prior to the Scheduled Survey Date.

(c)     The amounts standing to the credit of a Borrower's Drydocking Reserve Account shall be applied in or towards payment of any costs and expenses in respect of a scheduled drydocking or special survey (including the costs of any ballast water treatment system) in respect of that Borrower's Ship.

(d)     Any amounts standing to the credit of a Borrower's Drydocking Reserve Account following payment of the costs and expenses in accordance with paragraph (c) above shall be maintained in that Drydocking Reserve Account and shall be applied in or towards payment of any costs and expenses in respect of the next scheduled drydocking or special survey (including the costs of any ballast water treatment system) in respect of that Borrower's Ship unless, to the Facility Agent's satisfaction, there will be no requirement by the relevant Approved Classification Society or otherwise for such a further scheduled drydocking or special survey (including the costs of any ballast water treatment system) in respect of that Ship prior to the Termination Date in respect of the Ship Tranche financing that Ship whereupon any amounts standing to the credit of that Borrower's Drydocking Reserve Account following payment of the costs and expenses in accordance with paragraph (c) above in respect of that Ship shall be released to the Borrower owning that Ship for application in accordance with the Subordinated Loan Agreement.

EUROPE/62707839v19

**27.9    Balloon Reserve Accounts**

(a)    If on the date falling one year prior to each Termination Date, the Facility Agent determines that the ratio set out in Clause 26.1 (*Minimum required security cover*) is below 200 per cent. of the Loan, each Borrower shall, subject to the transfers which are required to be made pursuant to Clauses 27.3 (*Monthly retentions*) and 27.8 (*Drydocking Reserve Accounts*) having been made in the relevant month, ensure that there is transferred from its Earnings Account in each calendar month following the Facility Agent's determination and until that Termination Date, on such dates as the Facility Agent may specify, an amount equal to $41,667 to that Borrower's Balloon Reserve Account so that each Borrower accumulates in its Balloon Reserve Account an amount equal to at least $500,000 by no later than the Termination Date relating to the Ship Tranche in respect of the Ship belonging to that Borrower.

(b)    The amounts standing to the credit of a Borrower's Balloon Reserve Account as at each Termination Date shall be applied in or towards payment of the Repayment Instalment in respect of the Tranche B relating to that Borrower's Ship on the relevant Termination Date.

**27.10    Location of Accounts**

Each Borrower shall promptly:

(a)    comply with any requirement of the Facility Agent as to the location or relocation of its Earnings Account, its Drydocking Reserve Account, its Balloon Reserve Account and the Retention Account (or any of them); and

(b)    execute any documents which the Facility Agent specifies to create or maintain in favour of the Security Agent Security over (and/or rights of set-off, consolidation or other rights in relation to) the Earnings Accounts, the Drydocking Reserve Accounts, the Balloon Reserve Accounts and the Retention Account.

**28    EVENTS OF DEFAULT**

**28.1    General**

Each of the events or circumstances set out in this Clause 28 (*Events of Default*) is an Event of Default except for Clause 28.18 (*Events of Default caused by an Approved Manager or a Bareboat Charterer*), Clause 28.19 (*Acceleration*) and Clause 28.20 (*Enforcement of security*).

**28.2    Non-payment**

A Transaction Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)    its failure to pay is caused by:

    (i)    administrative or technical error; or

    (ii)    a Disruption Event; and

(b)    payment is made within 3 Business Days of its due date.

### 28.3 Specific obligations

A breach occurs of Clause 4.6 (*Waiver of conditions precedent*), Clause 21 (*Financial Covenants*), Clause 22.9 (*Title*), Clause 22.10 (*Negative pledge*), Clause 22.19 (*Unlawfulness, invalidity and ranking; Security imperilled*), Clause 23.2 (*Maintenance of obligatory insurances*), Clause 23.3 (*Terms of obligatory insurances*), Clause 23.5 (*Renewal of obligatory insurances*) or Clause 26 (*Security Cover*).

### 28.4 Other obligations

(a) A Transaction Obligor does not comply with any provision of the Finance Documents (other than those referred to in Clause 28.2 (*Non-payment*) and Clause 28.3 (*Specific obligations*) and Clause 22.20 (*Sanctions*)) **provided that** no Event of Default will occur if the failure to comply is capable of remedy and is remedied within 10 Business Days of the Facility Agent giving notice to the Borrowers or (if earlier) any Transaction Obligor becoming aware of the failure to comply.

(b) A Transaction Obligor does not comply with the provisions of Clause 22.20 (*Sanctions*) **provided that** no Event of Default will occur if:

(i) the Borrowers can demonstrate to the Facility Agent that the breach of applicable Sanctions has been caused inadvertently and despite the Borrowers having applied due diligence in avoiding such breach; and

(ii) the failure to comply is capable of remedy and is remedied within 10 Business Days of the Facility Agent giving notice to the Borrowers or (if earlier) any Transaction Obligor becoming aware of the failure to comply.

(c) A Change of Control occurs without the prior written consent of all Lenders.

### 28.5 Misrepresentation

Any representation or statement made or deemed to be made by a Transaction Obligor in the Finance Documents or any other document delivered by or on behalf of any Transaction Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

### 28.6 Cross default

(a) Any Financial Indebtedness of any Transaction Obligor is not paid when due nor within any originally applicable grace period.

(b) Any Financial Indebtedness of any Transaction Obligor is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c) Any commitment for any Financial Indebtedness of any Transaction Obligor is cancelled or suspended by a creditor of any Transaction Obligor as a result of an event of default (however described).

(d) Any creditor of any Transaction Obligor becomes entitled to declare any Financial Indebtedness of any Transaction Obligor due and payable prior to its specified maturity as a result of an event of default (however described).

(e)    No Event of Default will occur under this Clause 28.6 (*Cross default*) in respect of an Approved Manager if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above is less than $500,000 (or its equivalent in any other currency).

**28.7    Insolvency**

(a)    A Transaction Obligor:

      (i)    is unable or admits inability to pay its debts as they fall due;

      (ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

      (iii)    suspends or, other than in the case of a Bareboat Charterer, threatens to suspend making payments on any of its debts; or

      (iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)    The value of the assets of any Transaction Obligor is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of any Transaction Obligor. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

**28.8    Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

      (i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Transaction Obligor;

      (ii)    a composition, compromise, assignment or arrangement with any creditor of any Transaction Obligor;

      (iii)    the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Transaction Obligor or any of its assets; or

      (iv)    enforcement of any Security over any assets of any Transaction Obligor,

    or any analogous procedure or step is taken in any jurisdiction.

(b)    Paragraph (a) above shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 14 days of commencement.

**28.9    Creditors' process**

    Any expropriation, attachment, sequestration, distress or execution (or any analogous process in any jurisdiction) affects any asset or assets of a Transaction Obligor (other than an arrest or detention of a Ship referred to in Clause 28.13 (*Arrest*)) and is not discharged within 14 days.

    

**28.10 Unlawfulness, invalidity and ranking**

(a) It is or becomes unlawful for a Transaction Obligor to perform any of its obligations under the Finance Documents.

(b) Any obligation of a Transaction Obligor under the Finance Documents is not or ceases to be legal, valid, binding or enforceable.

(c) Any Finance Document ceases to be in full force and effect or to be continuing or is or purports to be determined or any Transaction Security is alleged by a party to it (other than a Finance Party) to be ineffective.

(d) Any Transaction Security proves to have ranked after, or loses its priority to, any other Security.

**28.11 Security imperilled**

Any Security created or intended to be created by a Finance Document is in any way imperilled or in jeopardy.

**28.12 Cessation of business**

Any Transaction Obligor suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

**28.13 Arrest**

Any arrest of a Ship or its detention in the exercise or the purported exercise of any lien or claim unless it is redelivered to the full control of the relevant Borrower or Bareboat Charterer within 14 days of such arrest or detention.

**28.14 Expropriation**

The authority or ability of any member of the Group to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets other than:

(a) an arrest or detention of a Ship referred to in Clause 28.13 (*Arrest*); or

(b) any Requisition.

**28.15 Repudiation, rescission and termination of agreements**

(a) A Transaction Obligor (or any other relevant party including, in the case of the Time Charters, the Time Charterer) rescinds or purports to rescind or repudiates or purports to repudiate a Transaction Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Transaction Document or any Transaction Security.

(b) Any Charter or any Management Agreement is terminated for any reason whatsoever by any of the parties to it or otherwise (other than, in respect of a Charter, as a result of (i) the expiry of the charter period in respect of that Charter or (ii) the occurrence of a Total Loss in respect of the Ship which is subject to that Charter provided that the Borrowers comply with their

obligations under Clause 7.4 (*Mandatory prepayment on sale or Total Loss*)) during the Security Period.

### 28.16 Litigation

Any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started, or any judgment or order of a court, arbitral body or agency is made, in relation to any of the Transaction Documents or the transactions contemplated in any of the Transaction Documents or against any member of the Group or its assets which has or is reasonably likely to have a Material Adverse Effect.

### 28.17 Material adverse change

Any event or circumstance occurs which has or is reasonably likely to have a Material Adverse Effect.

### 28.18 Events of Default caused by an Approved Manager or a Bareboat Charterer

(a)     If any of the events or circumstances set out in this Clause 28 (*Events of Default*) is caused by an Approved Manager (the "**Defaulting Manager**") it shall not be an Event of Default if the terms of the relevant QEL allow for substitution of the Defaulting Manager and within 30 days of the occurrence of such event or circumstances each of the following occurs:

(i)      the Defaulting Manager is replaced by an alternative Approved Manager (the "**Substitute Manager**"), which Substitute Manager shall have been approved by the Time Charterer pursuant to the terms of the relevant QEL; and

(ii)     such Substitute Manager enters into a replacement Management Agreement and Manager's Undertaking, each in a form approved by the Facility Agent (acting on the instructions of the Majority Lenders, acting reasonably),

for the avoidance of doubt, if the request for replacement of the Defaulting Manager is initiated by the relevant Borrower pursuant to the relevant QEL, the Security Agent shall act reasonably in respect of any approval it needs to provide for the requested replacement pursuant to the terms of the relevant QEL (and the Lenders shall act reasonably in relation to any request by the Security Agent for instructions or consent in relation to such approval) and shall be deemed to have provided such approval if the terms of this Clause 28.18 (*Events of Default caused by an Approved Manger or a Bareboat Charterer*) have been satisfied.

(b)     If any of the events or circumstances set out in this Clause 28 (*Events of Default*) is caused by a Bareboat Charterer (the "**Defaulting Bareboat Charterer**") it shall not be an Event of Default if the terms of the relevant QEL allow for substitution of the Defaulting Bareboat Charterer and within 30 days of the occurrence of such event or circumstances each of the following occurs:

(i)      the Time Charterer is notified by the relevant Borrower or (as the case may be) the Security Agent that the relevant Borrower or the Security Agent has the right to terminate the relevant Bareboat Charter in accordance with its terms;

(ii)     the Defaulting Bareboat Charterer is replaced by the relevant Borrower or by an alternative third party bareboat charterer (the "**Substitute Bareboat Charterer**"), which Substitute Bareboat Charterer (if a third party) shall have been approved by the Security Agent and the Time Charterer pursuant to the terms of the relevant QEL;

EUROPE/62707839v19

(iii)     such Substitute Bareboat Charterer or, as the case may be, the relevant Borrower enters into a replacement or novated Bareboat Charter and Tripartite Assignment in respect of the relevant Ship or Ships, each in a form approved by the Facility Agent (acting on the instructions of the Majority Lenders, acting reasonably); and

(iv)     such Substitute Bareboat Charterer opens a Bareboat Charter Account and creates Account Security over such account held with the Account Bank in a form approved by the Facility Agent (acting on the instructions of the Majority Lenders, acting reasonably),

for the avoidance of doubt, if the request for replacement of the Defaulting Bareboat Charterer is initiated by the relevant Borrower pursuant to the relevant QEL, the Security Agent shall act reasonably in respect of any approval it needs to provide for the requested replacement pursuant to the terms of the relevant QEL (and the Lenders shall act reasonably in relation to any request by the Security Agent for instructions or consent in relation to such approval) and shall be deemed to have provided such approval if the terms of this Clause 28.18 (*Events of Default caused by an Approved Manger or a Bareboat Charterer*) have been satisfied.

**28.19   Acceleration**

On and at any time after the occurrence of an Event of Default and whilst the same is continuing the Facility Agent may, and shall if so directed by the Majority Lenders:

(a)     by notice to the Borrowers:

(i)     cancel the Total Commitments, whereupon they shall immediately be cancelled;

(ii)     declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon it shall become immediately due and payable; and/or

(iii)     declare that all or part of the Loan be payable on demand, whereupon it shall immediately become payable on demand by the Facility Agent acting on the instructions of the Majority Lenders; and/or

(b)     exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents,

and the Facility Agent may serve notices under sub-paragraphs (i), (ii) or (iii) of paragraph (a) above simultaneously or on different dates and any Servicing Party may take any action referred to in paragraph (b) above or Clause 28.20 (*Enforcement of security*) if no such notice is served or simultaneously with or at any time after the service of any of such notice.

**28.20   Enforcement of security**

On and at any time after the occurrence of an Event of Default and whilst the same is continuing the Security Agent may, and shall if so directed by the Majority Lenders, take any action which, as a result of the Event of Default or any notice served under Clause 28.19 (*Acceleration*), the Security Agent is entitled to take under any Finance Document or any applicable law or regulation.

**SECTION 9**

**CHANGES TO PARTIES**

**29    CHANGES TO THE LENDERS**

**29.1    Assignments and transfers by the Lenders**

Subject to this Clause 29 (*Changes to the Lenders*), a Lender (the "**Existing Lender**") may:

(a)    assign any of its rights; or

(b)    transfer by novation any of its rights and obligations,

under the Finance Documents to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets other than, whilst no Event of Default has occurred and is continuing, to any such bank, financial institution, trust, fund or other entity listed in Schedule 10 (*Excluded New Lenders*) (the "**New Lender**").

**29.2    Conditions of assignment or transfer**

(a)    The consent of the Borrowers is not required for an assignment or transfer by an Existing Lender, but the Borrowers shall be consulted prior to any assignment or transfer by an Existing Lender.

(b)    An assignment will only be effective on:

(i)    receipt by the Facility Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Facility Agent) that the New Lender will assume the same obligations to the other Secured Parties as it would have been under if it had been an Original Lender; and

(ii)    performance by the Facility Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Facility Agent shall promptly notify to the Existing Lender and the New Lender.

(c)    Each Obligor on behalf of itself and each Transaction Obligor agrees that all rights and interests (present, future or contingent) which the Existing Lender has under or by virtue of the Finance Documents are assigned to the New Lender absolutely, free of any defects in the Existing Lender's title and of any rights or equities which the Borrower or any other Transaction Obligor had against the Existing Lender.

(d)    A transfer will only be effective if the procedure set out in Clause 29.5 (*Procedure for transfer*) is complied with.

(e)    If:

(i)    a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii) as a result of circumstances existing at the date the assignment, transfer or change occurs, a Transaction Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 12 (*Tax Gross Up and Indemnities*) or under that clause as incorporated by reference or in full in any other Finance Document or Clause 13 (*Increased Costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.  This paragraph (e) shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facility.

(f) Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Facility Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

## 29.3    Assignment or transfer fee

The New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Facility Agent (for its own account) a fee of $3,000.

## 29.4    Limitation of responsibility of Existing Lenders

(a) Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i) the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents, the Transaction Security or any other documents;

(ii) the financial condition of any Transaction Obligor;

(iii) the performance and observance by any Transaction Obligor of its obligations under the Transaction Documents or any other documents; or

(iv) the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

(b) Each New Lender confirms to the Existing Lender and the other Finance Parties and the Secured Parties that it:

(i) has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Transaction Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other Finance Party in connection with any Transaction Document or the Transaction Security; and

(ii)     will continue to make its own independent appraisal of the creditworthiness of each Transaction Obligor and its related entities throughout the Security Period.

(c)    Nothing in any Finance Document obliges an Existing Lender to:

(i)     accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this Clause 29 (*Changes to the Lenders*); or

(ii)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Transaction Obligor of its obligations under the Transaction Documents or otherwise.

**29.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 29.2 (*Conditions of assignment or transfer*), a transfer is effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender.  The Facility Agent shall, subject to paragraph (b) below as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with this Agreement and delivered in accordance with this Agreement, execute that Transfer Certificate.

(b)    The Facility Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Lender.

(c)    Subject to Clause 29.9 (*Pro rata interest settlement*), on the Transfer Date:

(i)     to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security, each of the Transaction Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the "**Discharged Rights and Obligations**");

(ii)    each of the Transaction Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Transaction Obligor and the New Lender have assumed and/or acquired the same in place of that Transaction Obligor and the Existing Lender;

(iii)   the Facility Agent, the Security Agent, the Arranger, the New Lender and other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Facility Agent, the Security Agent, the Arranger and the Existing Lenders shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Lender shall become a Party as a "Lender".

### 29.6    Procedure for assignment

(a)    Subject to the conditions set out in Clause 29.2 (*Conditions of assignment or transfer*) an assignment may be effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender.  The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b)    The Facility Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c)    Subject to Clause 29.9 (*Pro rata interest settlement*), on the Transfer Date:

    (i)    the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

    (ii)    the Existing Lender will be released from the obligations (the "**Relevant Obligations**") expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

    (iii)    the New Lender shall become a Party as a "Lender" and will be bound by obligations equivalent to the Relevant Obligations.

(d)    Lenders may utilise procedures other than those set out in this Clause 29.6 (*Procedure for assignment*) to assign their rights under the Finance Documents (but not, without the consent of the relevant Transaction Obligor or unless in accordance with Clause 29.5 (*Procedure for transfer*), to obtain a release by that Transaction Obligor from the obligations owed to that Transaction Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender) **provided that** they comply with the conditions set out in Clause 29.2 (*Conditions of assignment or transfer*).

### 29.7    Copy of Transfer Certificate or Assignment Agreement to Borrowers

The Facility Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Borrowers a copy of that Transfer Certificate or Assignment Agreement.

### 29.8    Security over Lenders' rights

In addition to the other rights provided to Lenders under this Clause 29 (*Changes to the Lenders*), each Lender may without consulting with or obtaining consent from any Transaction Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)    any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)    any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Lender as a party to any of the Finance Documents; or

(ii)    require any payments to be made by a Transaction Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the relevant Lender under the Finance Documents.

**29.9    Pro rata interest settlement**

(a)    If the Facility Agent has notified the Lenders that it is able to distribute interest payments on a "*pro rata* basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to Clause 29.5 (*Procedure for transfer*) or any assignment pursuant to Clause 29.6 (*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(i)    any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date ("**Accrued Amounts**") and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six Months, on the next of the dates which falls at six Monthly intervals after the first day of that Interest Period); and

(ii)    the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(A)    when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Lender; and

(B)    the amount payable to the New Lender on that date will be the amount which would, but for the application of this Clause 29.9 (*Pro rata interest settlement*), have been payable to it on that date, but after deduction of the Accrued Amounts.

(b)    In this Clause 29.9 (*Pro rata interest settlement*) references to "Interest Period" shall be construed to include a reference to any other period for accrual of fees.

(c)    An Existing Lender which retains the right to the Accrued Amounts pursuant to this Clause 29.9 (*Pro rata interest settlement*) but which does not have a Commitment shall be deemed not to be a Lender for the purposes of ascertaining whether the agreement of any specified group of Lenders has been obtained to approve any request for a consent, waiver, amendment or other vote of Lenders under the Finance Documents.

    EUROPE/62707839v19

## 30    CHANGES TO THE TRANSACTION OBLIGORS

### 30.1    Assignment or transfer by Transaction Obligors

No Transaction Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

### 30.2    Release of security

(a)    If a disposal of any asset subject to security created by a Security Document is made in the following circumstances:

(i)    the disposal is permitted by the terms of any Finance Document;

(ii)    all the Lenders agree to the disposal;

(iii)    the disposal is being made at the request of the Security Agent in circumstances where any security created by the Security Documents has become enforceable; or

(iv)    the disposal is being effected by enforcement of a Security Document,

the Security Agent shall release the asset(s) being disposed of from any security over those assets created by a Security Document.  However, the proceeds of any disposal (or an amount corresponding to them) must be applied in accordance with the requirements of the Finance Documents (if any).

(b)    If the Security Agent is satisfied that a release is allowed under this Clause 30.2 (*Release of security*) (at the request and expense of the Borrowers) each Finance Party must enter into any document and do all such other things which are reasonably required to achieve that release. Each other Finance Party irrevocably authorises the Security Agent to enter into any such document.  Any release will not affect the obligations of any other Transaction Obligor under the Finance Documents.

### 30.3    Additional Subordinated Creditors

(a)    The Borrowers may request that any person becomes a Subordinated Creditor, with the prior approval of the Facility Agent, by delivering to the Facility Agent:

(i)    a duly executed Subordination Agreement;

(ii)    a duly executed Subordinated Debt Security; and

(iii)    such constitutional documents, corporate authorisations and other documents and matters as the Facility Agent may reasonably require, in form and substance satisfactory to the Facility Agent, to verify that the person's obligations are legally binding, valid and enforceable and to satisfy any applicable legal and regulatory requirements.

(b)    A person referred to in paragraph (a) above will become a Subordinated Creditor on the date the Security Agent enters into the Subordination Agreement and the Subordinated Debt Security delivered under paragraph (a) above.

## SECTION 10

## THE FINANCE PARTIES

**31     THE FACILITY AGENT, THE ARRANGER AND THE REFERENCE BANKS**

**31.1   Appointment of the Facility Agent**

(a)     Each of the Arranger, the Lenders and the Hedge Counterparties appoints the Facility Agent to act as its agent under and in connection with the Finance Documents.

(b)     Each of the Arranger, the Lenders and the Hedge Counterparties authorises the Facility Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Facility Agent under, or in connection with, the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**31.2   Instructions**

(a)     The Facility Agent shall:

    (i)     unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Facility Agent in accordance with any instructions given to it by:

        (A)     all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and

        (B)     in all other cases, the Majority Lenders; and

    (ii)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with sub-paragraph (i) above (or, if this Agreement stipulates the matter is a decision for any other Finance Party or group of Finance Parties, in accordance with instructions given to it by that Finance Party or group of Finance Parties).

(b)     The Facility Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Finance Party or group of Finance Parties, from that Finance Party or group of Finance Parties) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Facility Agent may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

(c)     Save in the case of decisions stipulated to be a matter for any other Finance Party or group of Finance Parties under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Facility Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

(d)     Paragraph (a) above shall not apply:

    (i)     where a contrary indication appears in a Finance Document;

(ii)     where a Finance Document requires the Facility Agent to act in a specified manner or to take a specified action;

(iii)    in respect of any provision which protects the Facility Agent's own position in its personal capacity as opposed to its role of Facility Agent for the relevant Finance Parties.

(e)    If giving effect to instructions given by the Majority Lenders would in the Facility Agent's opinion have an effect equivalent to an amendment or waiver referred to in Clause 44 (*Amendments and Waivers*), the Facility Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Facility Agent) whose consent would have been required in respect of that amendment or waiver.

(f)    In exercising any discretion to exercise a right, power or authority under the Finance Documents where it has not received any instructions as to the exercise of that discretion the Facility Agent shall do so having regard to the interests of all the Finance Parties.

(g)    The Facility Agent may refrain from acting in accordance with any instructions of any Finance Party or group of Finance Parties until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(h)    Without prejudice to the remainder of this Clause 31.2 (*Instructions*), in the absence of instructions, the Facility Agent shall not be obliged to take any action (or refrain from taking action) even if it considers acting or not acting to be in the best interests of the Finance Parties. The Facility Agent may act (or refrain from acting) as it considers to be in the best interest of the Finance Parties.

(i)    The Facility Agent is not authorised to act on behalf of a Finance Party (without first obtaining that Finance Party's consent) in any legal or arbitration proceedings relating to any Finance Document.  This paragraph (i) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Security Documents or enforcement of the Transaction Security or Security Documents.

**31.3**    **Duties of the Facility Agent**

(a)    The Facility Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

(b)    Subject to paragraph (c) below, the Facility Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Facility Agent for that Party by any other Party.

(c)    Without prejudice to Clause 29.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrower*), paragraph (b) above shall not apply to any Transfer Certificate or any Assignment Agreement.

(d)    Except where a Finance Document specifically provides otherwise, the Facility Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

          

(e)    If the Facility Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(f)    If the Facility Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Facility Agent, the Arranger or the Security Agent) under this Agreement, it shall promptly notify the other Finance Parties.

(g)    The Facility Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

**31.4    Role of the Arranger**

Except as specifically provided in the Finance Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

**31.5    No fiduciary duties**

(a)    Nothing in any Finance Document constitutes the Facility Agent or the Arranger as a trustee or fiduciary of any other person.

(b)    Neither the Facility Agent nor the Arranger shall be bound to account to other Finance Party for any sum or the profit element of any sum received by it for its own account.

**31.6    Application of receipts**

Except as expressly stated to the contrary in any Finance Document, any moneys which the Facility Agent receives or recovers in its capacity as Facility Agent shall be applied by the Facility Agent in accordance with Clause 35.5 (*Application of receipts; partial payments*).

**31.7    Business with the Group**

The Facility Agent and the Arranger may accept deposits from, lend money to, and generally engage in any kind of banking or other business with, any member of the Group.

**31.8    Rights and discretions**

(a)    The Facility Agent may:

(i)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(ii)    assume that:

(A)    any instructions received by it from the Majority Lenders, any Finance Parties or any group of Finance Parties are duly given in accordance with the terms of the Finance Documents; and

(B)    unless it has received notice of revocation, that those instructions have not been revoked; and

(iii)    rely on a certificate from any person:

(A)  as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(B)  to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b)  The Facility Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Finance Parties) that:

(i)  no Default has occurred (unless it has actual knowledge of a Default arising under Clause 28.2 (*Non-payment*));

(ii)  any right, power, authority or discretion vested in any Party or any group of Finance Parties has not been exercised; and

(iii)  any notice or request made by any Borrower (other than a Utilisation Request or a Selection Notice) is made on behalf of and with the consent and knowledge of all the Transaction Obligors.

(c)  The Facility Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d)  Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Facility Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Facility Agent (and so separate from any lawyers instructed by the Lenders) if the Facility Agent in its reasonable opinion deems this to be desirable.

(e)  The Facility Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Facility Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)  The Facility Agent may act in relation to the Finance Documents and the Security Property through its officers, employees and agents and shall not:

(i)  be liable for any error of judgment made by any such person; or

(ii)  be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Facility Agent's gross negligence or wilful misconduct.

(g)  Unless a Finance Document expressly provides otherwise the Facility Agent may disclose to any other Party any information it reasonably believes it has received as agent under the Finance Documents.

(h)  Notwithstanding any other provision of any Finance Document to the contrary, neither the Facility Agent nor the Arranger is obliged to do or omit to do anything if it would or might, in

its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i) Notwithstanding any provision of any Finance Document to the contrary, the Facility Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

**31.9    Responsibility for documentation**

Neither the Facility Agent nor the Arranger is responsible or liable for:

(a) the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Facility Agent, the Security Agent, the Arranger, a Transaction Obligor or any other person in, or in connection with, any Transaction Document or the transactions contemplated in the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Transaction Document or the Security Property; or

(c) any determination as to whether any information provided or to be provided to any Finance Party or Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

**31.10    No duty to monitor**

The Facility Agent shall not be bound to enquire:

(a) whether or not any Default has occurred;

(b) as to the performance, default or any breach by any Transaction Obligor of its obligations under any Transaction Document; or

(c) whether any other event specified in any Transaction Document has occurred.

**31.11    Exclusion of liability**

(a) Without limiting paragraph (b) below (and without prejudice to paragraph (e) of Clause 35.11 (*Disruption to Payment Systems etc.*) or any other provision of any Finance Document excluding or limiting the liability of the Facility Agent), the Facility Agent will not be liable for:

(i) any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Transaction Document or the Security Property, unless directly caused by its gross negligence or wilful misconduct;

(ii) exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Transaction Document, the Security Property or any other

agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Transaction Document or the Security Property; or

(iii)    any shortfall which arises on the enforcement or realisation of the Security Property; or

(iv)    without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A)    any act, event or circumstance not reasonably within its control; or

(B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)    No Party other than the Facility Agent may take any proceedings against any officer, employee or agent of the Facility Agent in respect of any claim it might have against the Facility Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Transaction Document or any Security Property and any officer, employee or agent of the Facility Agent may rely on this Clause subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c)    The Facility Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Facility Agent if the Facility Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Facility Agent for that purpose.

(d)    Nothing in this Agreement shall oblige the Facility Agent or the Arranger to carry out:

(i)    any "know your customer" or other checks in relation to any person; or

(ii)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Finance Party,

on behalf of any Finance Party and each Finance Party confirms to the Facility Agent and the Arranger that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Facility Agent or the Arranger.

(e)    Without prejudice to any provision of any Finance Document excluding or limiting the Facility Agent's liability, any liability of the Facility Agent arising under or in connection with any Transaction Document or the Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference

to the date of default of the Facility Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Facility Agent at any time which increase the amount of that loss. In no event shall the Facility Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Facility Agent has been advised of the possibility of such loss or damages.

**31.12    Lenders' indemnity to the Facility Agent**

(a)    Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Facility Agent, within three Business Days of demand, against any cost, loss or liability incurred by the Facility Agent (otherwise than by reason of the Facility Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 35.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) in acting as Facility Agent under the Finance Documents (unless the Facility Agent has been reimbursed by a Transaction Obligor pursuant to a Finance Document).

(b)    Subject to paragraph (c) below, the Borrowers shall within five Business Days of demand reimburse any Lender for any payment that Lender makes to the Facility Agent pursuant to paragraph (a) above.

(c)    Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Facility Agent to an Obligor.

**31.13    Resignation of the Facility Agent**

(a)    The Facility Agent may resign and appoint one of its Affiliates as successor by giving notice to the other Finance Parties and the Borrowers.

(b)    Alternatively, the Facility Agent may resign by giving 30 days' notice to the other Finance Parties and the Borrowers, in which case the Majority Lenders may appoint a successor Facility Agent.

(c)    If the Majority Lenders have not appointed a successor Facility Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the retiring Facility Agent may appoint a successor Facility Agent.

(d)    If the Facility Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Facility Agent is entitled to appoint a successor Facility Agent under paragraph (c) above, the Facility Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Facility Agent to become a party to this Agreement as Facility Agent) agree with the proposed successor Facility Agent amendments to this Clause 31 (*The Facility Agent, the Arranger and the Reference Banks*) and any other term of this Agreement dealing with the rights or obligations of the Facility Agent consistent with then current market practice for the appointment and protection of corporate trustees and those amendments will bind the Parties.

(e)    The retiring Facility Agent shall make available to the successor Facility Agent such documents and records and provide such assistance as the successor Facility Agent may reasonably

request for the purposes of performing its functions as Facility Agent under the Finance Documents. The Borrowers shall, within five Business Days of demand, reimburse the retiring Facility Agent for the costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance up to a maximum amount of $5,000 **provided that** if the same Servicing Party is acting as Facility Agent and Security Agent and that Servicing Party retires from both its capacity as Facility Agent in accordance with this Clause 31.13 (*Resignation of the Facility Agent*) and as Security Agent in accordance with Clause 32.13 (*Resignation of the Security Agent*) at the same time, the Borrowers maximum liability under both those Clauses shall be up to a maximum of $5,000.

(f)   The Facility Agent's resignation notice shall only take effect upon the appointment of a successor.

(g)   Upon the appointment of a successor, the retiring Facility Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (e) above) but shall remain entitled to the benefit of Clause 14.3 (*Indemnity to the Facility Agent*) and this Clause 31 (*The Facility Agent, the Arranger and the Reference Banks*) and any other provisions of a Finance Document which are expressed to limit or exclude its liability (or to indemnify it) in acting as Facility Agent.  Any fees for the account of the retiring Facility Agent shall cease to accrue from (and shall be payable on) that date.  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(h)   The Majority Lenders may, by notice to the Facility Agent, require it to resign in accordance with paragraph (b) above.  In this event, the Facility Agent shall resign in accordance with paragraph (b) above.

(i)   The consent of any Borrower (or any other Transaction Obligor) is not required for an assignment or transfer of rights and/or obligations by the Facility Agent.

## 31.14   Confidentiality

(a)   In acting as Facility Agent for the Finance Parties, the Facility Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)   If information is received by a division or department of the Facility Agent other than the division or department responsible for complying with the obligations assumed by it under the Finance Documents, that information may be treated as confidential to that division or department, and the Facility Agent shall not be deemed to have notice of it nor shall it be obliged to disclose such information to any Party.

(c)   Notwithstanding any other provision of any Finance Document to the contrary, neither the Facility Agent nor the Arranger is obliged to disclose to any other person (i) any Confidential Cnformation or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 31.15   Relationship with the other Finance Parties

(a)   Subject to Clause 29.9 (*Pro rata interest settlement*), the Facility Agent may treat the person shown in its records as Lender or Hedge Counterparty at the opening of business (in the place of the Facility Agent's principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office or, as the case may be, the Hedge Counterparty:

(i)     entitled to or liable for any payment due under any Finance Document on that day; and

(ii)    entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Lender or Hedge Counterparty to the contrary in accordance with the terms of this Agreement.

(b)   Each Finance Party shall supply the Facility Agent with any information that the Security Agent may reasonably specify (through the Facility Agent) as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent. Each Finance Party shall deal with the Security Agent exclusively through the Facility Agent and shall not deal directly with the Security Agent and any reference to any instructions being given by or sought from any Finance Party or group of Finance Parties by or to the Security Agent in this Agreement must be given or sought through the Facility Agent.

(c)   Any Lender may by notice to the Facility Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 38.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the transmission of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address (or such other information), department and officer by that Lender for the purposes of Clause 38.2 (*Addresses*) and sub-paragraph (ii) of paragraph (a) of Clause 38.5 (*Electronic communication*) and the Facility Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

### 31.16   Credit appraisal by the Finance Parties

Without affecting the responsibility of any Transaction Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Finance Party confirms to the Facility Agent and the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under, or in connection with, any Transaction Document including but not limited to:

(a)   the financial condition, status and nature of each member of the Group;

(b)   the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document, the Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Security Property;

(c)   whether that Finance Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under, or in connection with, any Transaction Document, the Security Property, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Security Property;

(d)     the adequacy, accuracy or completeness of any information provided by the Facility Agent, any Party or by any other person under, or in connection with, any Transaction Document, the transactions contemplated by any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

(e)     the right or title of any person in or to or the value or sufficiency of any part of the Security Assets, the priority of any of the Transaction Security or the existence of any Security affecting the Security Assets.

**31.17    Deduction from amounts payable by the Facility Agent**

If any Party owes an amount to the Facility Agent under the Finance Documents, the Facility Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Facility Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

**31.18    Reliance and engagement letters**

Each Secured Party confirms that each of the Arranger and the Facility Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Arranger or the Facility Agent) the terms of any reliance letter or engagement letters or any reports or letters provided by accountants, auditors or providers of due diligence reports in connection with the Finance Documents or the transactions contemplated in the Finance Documents and to bind it in respect of those, reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

**31.19    Full freedom to enter into transactions**

Without prejudice to Clause 31.7 (*Business with the Group*) or any other provision of a Finance Document and notwithstanding any rule of law or equity to the contrary, the Facility Agent shall be absolutely entitled:

(a)     to enter into and arrange banking, derivative, investment and/or other transactions of every kind with or affecting any Transaction Obligor or any person who is party to, or referred to in, a Finance Document (including, but not limited to, any interest or currency swap or other transaction, whether related to this Agreement or not, and acting as syndicate agent and/or security agent for, and/or participating in, other facilities to such Transaction Obligor or any person who is party to, or referred to in, a Finance Document);

(b)     to deal in and enter into and arrange transactions relating to:

(i)     any securities issued or to be issued by any Transaction Obligor or any other person; or

(ii)     any options or other derivatives in connection with such securities; and

(c)     to provide advice or other services to any Borrower or any person who is a party to, or referred to in, a Finance Document,

and, in particular, the Facility Agent shall be absolutely entitled, in proposing, evaluating, negotiating, entering into and arranging all such transactions and in connection with all other matters covered by paragraphs (a), (b) and (c) above, to use (subject only to insider dealing legislation) any information or opportunity, howsoever acquired by it, to pursue its own interests exclusively, to refrain from disclosing such dealings, transactions or other matters or any information acquired in connection with them and to retain for its sole benefit all profits and benefits derived from the dealings transactions or other matters.

**31.20   Role of Reference Banks**

(a)     No Reference Bank is under any obligation to provide a quotation or any other information to the Facility Agent.

(b)     No Reference Bank will be liable for any action taken by it under or in connection with any Finance Document, or for any Reference Bank Quotation, unless directly caused by its gross negligence or wilful misconduct.

(c)     No Party (other than the relevant Reference Bank) may take any proceedings against any officer, employee or agent of any Reference Bank in respect of any claim it might have against that Reference Bank or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document, or to any Reference Bank Quotation, and any officer, employee or agent of each Reference Bank may rely on this Clause 31.20 (*Role of Reference Banks*) subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

**31.21   Third Party Reference Banks**

A Reference Bank which is not a Party may rely on Clause 31.20 (*Role of Reference Banks*), Clause 44.3 (*Other exceptions*) and Clause 46 (*Confidentiality of Funding Rates and Reference Bank Quotations*) subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

**32     THE SECURITY AGENT**

**32.1   Trust**

(a)     The Security Agent declares that it holds the Security Property on trust for the Secured Parties on the terms contained in this Agreement and shall deal with the Security Property in accordance with this Clause 32 (*The Security Agent*) and the other provisions of the Finance Documents.

(b)     Each other Finance Party authorises the Security Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under, or in connection with, the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**32.2   Parallel Debt (Covenant to pay the Security Agent)**

(a)     Each Obligor irrevocably and unconditionally undertakes to pay to the Security Agent its Parallel Debt which shall be amounts equal to, and in the currency or currencies of, its Corresponding Debt.

(b)     The Parallel Debt of an Obligor:

(i)      shall become due and payable at the same time as its Corresponding Debt;

(ii)     is independent and separate from, and without prejudice to, its Corresponding Debt.

(c)     For purposes of this Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*), the Security Agent:

(i)      is the independent and separate creditor of each Parallel Debt;

(ii)     acts in its own name and not as agent, representative or trustee of the Finance Parties and its claims in respect of each Parallel Debt shall not be held on trust; and

(iii)    shall have the independent and separate right to demand payment of each Parallel Debt in its own name (including, without limitation, through any suit, execution, enforcement of security, recovery of guarantees and applications for and voting in any kind of insolvency proceeding).

(d)     The Parallel Debt of an Obligor shall be:

(i)      decreased to the extent that its Corresponding Debt has been irrevocably and unconditionally paid or discharged; and

(ii)     increased to the extent that its Corresponding Debt has increased,

and the Corresponding Debt of an Obligor shall be decreased to the extent that its Parallel Debt has been irrevocably and unconditionally paid or discharged,

in each case provided that the Parallel Debt of an Obligor shall never exceed its Corresponding Debt.

(e)     All amounts received or recovered by the Security Agent in connection with this Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*) to the extent permitted by applicable law, shall be applied in accordance with Clause 35.5 (*Application of receipts; partial payments*).

(f)     This Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*) shall apply, with any necessary modifications, to each Finance Document.

**32.3    Enforcement through Security Agent only**

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any right, power, authority or discretion arising under the Security Documents except through the Security Agent.

**32.4    Instructions**

(a)     The Security Agent shall:

(i)      unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by:

(A)     all Lenders (or the Facility Agent on their behalf) if the relevant Finance Document stipulates the matter is an all Lender decision; and

(B)      in all other cases, the Majority Lenders (or the Facility Agent on their behalf); and

(ii)      not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with sub-paragraph (i) above (or if this Agreement stipulates the matter is a decision for any other Finance Party or group of Finance Parties, in accordance with instructions given to it by that Finance Party or group of Finance Parties).

(b)      The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or the Facility Agent on their behalf) (or, if the relevant Finance Document stipulates the matter is a decision for any other Finance Party or group of Finance Parties, from that Finance Party or group of Finance Parties) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

(c)      Save in the case of decisions stipulated to be a matter for any other Finance Party or group of Finance Parties under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Security Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

(d)      Paragraph (a) above shall not apply:

(i)      where a contrary indication appears in a Finance Document;

(ii)      where a Finance Document requires the Security Agent to act in a specified manner or to take a specified action;

(iii)      in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the relevant Secured Parties.

(iv)      in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of:

(A)      Clause 32.27 (*Application of receipts*);

(B)      Clause 32.28 (*Permitted Deductions*); and

(C)      Clause 32.29 (*Prospective liabilities*).

(e)      If giving effect to instructions given by the Majority Lenders would in the Security Agent's opinion have an effect equivalent to an amendment or waiver referred to in Clause 44 (*Amendments and Waivers*), the Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Security Agent) whose consent would have been required in respect of that amendment or waiver.

(f)      In exercising any discretion to exercise a right, power or authority under the Finance Documents where either:

(i)      it has not received any instructions as to the exercise of that discretion; or

(ii)    the exercise of that discretion is subject to sub-paragraph (iv) of paragraph (d) above,

the Security Agent shall do so having regard to the interests of all the Secured Parties.

(g)    The Security Agent may refrain from acting in accordance with any instructions of any Finance Party or group of Finance Parties until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(h)    Without prejudice to the remainder of this Clause 32.4 (*Instructions*), in the absence of instructions, the Security Agent may (but shall not be obliged to) take such action in the exercise of its powers and duties under the Finance Documents as it considers in its discretion to be appropriate.

(i)    The Security Agent is not authorised to act on behalf of a Finance Party (without first obtaining that Finance Party's consent) in any legal or arbitration proceedings relating to any Finance Document.  This paragraph (i) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Security Documents or enforcement of the Transaction Security or Security Documents.

**32.5    Duties of the Security Agent**

(a)    The Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

(b)    The Security Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

(c)    Except where a Finance Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)    If the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(e)    The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

**32.6    No fiduciary duties**

(a)    Nothing in any Finance Document constitutes the Security Agent as an agent, trustee or fiduciary of any Transaction Obligor.

(b)    The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

**32.7    Business with the Group**

The Security Agent may accept deposits from, lend money to, and generally engage in any kind of banking or other business with, any member of the Group.

**32.8    Rights and discretions**

(a)    The Security Agent may:

    (i)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

    (ii)    assume that:

        (A)    any instructions received by it from the Majority Lenders, any Finance Parties or any group of Finance Parties are duly given in accordance with the terms of the Finance Documents;

        (B)    unless it has received notice of revocation, that those instructions have not been revoked;

        (C)    if it receives any instructions to act in relation to the Transaction Security, that all applicable conditions under the Finance Documents for so acting have been satisfied; and

    (iii)    rely on a certificate from any person:

        (A)    as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

        (B)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

    as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b)    The Security Agent shall be entitled to carry out all dealings with the other Finance Parties through the Facility Agent and may give to the Facility Agent any notice or other communication required to be given by the Security Agent to any Finance Party.

(c)    The Security Agent may assume (unless it has received notice to the contrary in its capacity as security agent for the Secured Parties) that:

    (i)    no Default has occurred;

    (ii)    any right, power, authority or discretion vested in any Party or any group of Finance Parties has not been exercised; and

    (iii)    any notice or request made by any Borrower (other than a Utilisation Request or a Selection Notice) is made on behalf of and with the consent and knowledge of all the Transaction Obligors.

(d)    The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(e)    Without prejudice to the generality of paragraph (c) above or paragraph (f) below, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent

counsel to the Security Agent (and so separate from any lawyers instructed by the Facility Agent or the Lenders) if the Security Agent in its reasonable opinion deems this to be desirable.

(f)    The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(g)    The Security Agent may act in relation to the Finance Documents and the Security Property through its officers, employees and agents and shall not:

(i)    be liable for any error of judgment made by any such person; or

(ii)    be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Security Agent's gross negligence or wilful misconduct.

(h)    Unless a Finance Document expressly provides otherwise the Security Agent may disclose to any other Party any information it reasonably believes it has received as security agent under the Finance Documents.

(i)    Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would or might, in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(j)    Notwithstanding any provision of any Finance Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

**32.9    Responsibility for documentation**

None of the Security Agent, any Receiver or Delegate is responsible or liable for:

(a)    the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Facility Agent, the Security Agent, the Arranger, a Transaction Obligor or any other person in, or in connection with, any Transaction Document or the transactions contemplated in the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Transaction Document or the Security Property; or

(c)    any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

    EUROPE/62707839v19

**32.10    No duty to monitor**

The Security Agent shall not be bound to enquire:

(a)    whether or not any Default has occurred;

(b)    as to the performance, default or any breach by any Transaction Obligor of its obligations under any Transaction Document; or

(c)    whether any other event specified in any Transaction Document has occurred.

**32.11    Exclusion of liability**

(a)    Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Security Agent or any Receiver or Delegate), none of the Security Agent nor any Receiver or Delegate will be liable for:

(i)    any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Transaction Document or the Security Property, unless directly caused by its gross negligence or wilful misconduct;

(ii)    exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Transaction Document, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Transaction Document or the Security Property; or

(iii)    any shortfall which arises on the enforcement or realisation of the Security Property; or

(iv)    without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A)    any act, event or circumstance not reasonably within its control; or

(B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)    No Party other than the Security Agent, that Receiver or that Delegate (as applicable) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Transaction Document or any Security Property and any officer, employee or

    EUROPE/62707839v19

agent of the Security Agent, a Receiver or a Delegate may rely on this Clause subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c)     The Security Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Security Agent if the Security Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Security Agent for that purpose.

(d)     Nothing in this Agreement shall oblige the Security Agent to carry out:

(i)     any "know your customer" or other checks in relation to any person; or

(ii)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Finance Party,

on behalf of any Finance Party and each Finance Party confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(e)     Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Security Agent or any Receiver or Delegate, any liability of the Security Agent or any Receiver or Delegate arising under or in connection with any Transaction Document or the Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, any Receiver or Delegate at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, the Receiver or Delegate has been advised of the possibility of such loss or damages.

## 32.12   Lenders' indemnity to the Security Agent

(a)     Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Security Agent and every Receiver, within three Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the Security Agent's or Receiver's gross negligence or wilful misconduct) in acting as Security Agent or Receiver under the Finance Documents (unless the Security Agent or Receiver has been reimbursed by a Transaction Obligor pursuant to a Finance Document).

(b)     Subject to paragraph (c) below, the Borrowers shall within five Business Days of demand reimburse any Lender for any payment that Lender makes to the Security Agent pursuant to paragraph (a) above.

(c)     Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Security Agent to an Obligor.

EUROPE/62707839v19

**32.13    Resignation of the Security Agent**

(a)    The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the other Finance Parties and the Borrowers.

(b)    Alternatively, the Security Agent may resign by giving 30 days' notice to the other Finance Parties and the Borrowers, in which case the Majority Lenders may appoint a successor Security Agent.

(c)    If the Majority Lenders have not appointed a successor Security Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the retiring Security Agent may appoint a successor Security Agent.

(d)    The retiring Security Agent shall make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents. The Borrowers shall, within five Business Days of demand, reimburse the retiring Security Agent for the costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance up to a maximum amount of $5,000 **provided that** if the same Servicing Party is acting as Facility Agent and Security Agent and that Servicing Party retires from both its capacity as Facility Agent in accordance with Clause 31.13 (*Resignation of the Facility Agent*) and as Security Agent in accordance with this Clause 32.13 (*Resignation of the Security Agent*) at the same time, the Borrowers maximum liability under both those Clauses shall be up to a maximum of $5,000.

(e)    The Security Agent's resignation notice shall only take effect upon:

(i)    the appointment of a successor; and

(ii)    the transfer, by way of a document expressed as a deed, of all the Security Property to that successor.

(f)    Upon the appointment of a successor, the retiring Security Agent shall be discharged, by way of a document executed as a deed, from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of Clause 32.24 (*Winding up of trust*) and paragraph (d) above) but shall remain entitled to the benefit of Clause 14.4 (*Indemnity to the Security Agent*) and this Clause 32 (*The Security Agent*) and any other provisions of a Finance Document which are expressed to limit or exclude its liability (or to indemnify it) in acting as Security Agent. Any fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(g)    The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above. In this event, the Security Agent shall resign in accordance with paragraph (b) above.

(h)    The consent of any Borrower (or any other Transaction Obligor) is not required for an assignment or transfer of rights and/or obligations by the Security Agent.

**32.14  Confidentiality**

(a)  In acting as Security Agent for the Finance Parties, the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any other of its divisions or departments.

(b)  If information is received by a division or department of the Security Agent other than the division or department responsible for complying with the obligations assumed by it under the Finance Documents, that information may be treated as confidential to that division or department, and the Security Agent shall not be deemed to have notice of it nor shall it be obliged to disclose such information to any Party.

(c)  Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

**32.15  Credit appraisal by the Finance Parties**

Without affecting the responsibility of any Transaction Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Finance Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under, or in connection with, any Transaction Document including but not limited to:

(a)  the financial condition, status and nature of each member of the Group;

(b)  the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document, the Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Security Property;

(c)  whether that Finance Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under, or in connection with, any Transaction Document, the Security Property, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Security Property;

(d)  the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under, or in connection with, any Transaction Document, the transactions contemplated by any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

(e)  the right or title of any person in or to or the value or sufficiency of any part of the Security Assets, the priority of any of the Transaction Security or the existence of any Security affecting the Security Assets.

**32.16  Reliance and engagement letters**

Each Secured Party confirms that the Security Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Security

Agent) the terms of any reliance letter or engagement letters or any reports or letters provided by accountants, auditors or providers of due diligence reports in connection with the Finance Documents or the transactions contemplated in the Finance Documents and to bind it in respect of those, reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

### 32.17    No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

(a)    require the deposit with it of any deed or document certifying, representing or constituting the title of any Transaction Obligor to any of the Security Assets;

(b)    obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Finance Document or the Transaction Security;

(c)    register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Finance Document or of the Transaction Security;

(d)    take, or to require any Transaction Obligor to take, any step to perfect its title to any of the Security Assets or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation; or

(e)    require any further assurance in relation to any Finance Document.

### 32.18    Insurance by Security Agent

(a)    The Security Agent shall not be obliged:

(i)    to insure any of the Security Assets;

(ii)    to require any other person to maintain any insurance; or

(iii)    to verify any obligation to arrange or maintain insurance contained in any Finance Document,

(iv)    and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)    Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Lenders request it to do so in writing and the Security Agent fails to do so within 14 days after receipt of that request.

### 32.19    Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any

loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

**32.20    Delegation by the Security Agent**

(a)    Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

(b)    That delegation may be made upon any terms and conditions (including the power to sub delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c)    No Security Agent, Receiver or Delegate shall be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any misconduct, omission or default on the part of any such delegate or sub delegate.

**32.21    Additional Security Agents**

(a)    The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i)    if it considers that appointment to be in the interests of the Secured Parties; or

(ii)    for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii)    for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Borrowers and the Finance Parties of that appointment.

(b)    Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c)    The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

**32.22    Acceptance of title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Transaction Obligor may have to any of the Security Assets and shall not be liable for or bound to require any Transaction Obligor to remedy any defect in its right or title.

EUROPE/62707839v19

### 32.23 Releases

Upon a disposal of any of the Security Assets pursuant to the enforcement of the Transaction Security by a Receiver, a Delegate or the Security Agent, the Security Agent is irrevocably authorised (at the cost of the Obligors and without any consent, sanction, authority or further confirmation from any other Secured Party) to release, without recourse or warranty, that property from the Transaction Security and to execute any release of the Transaction Security or other claim over that asset and to issue any certificates of non-crystallisation of floating charges that may be required or desirable.

### 32.24 Winding up of trust

If the Security Agent, with the approval of the Facility Agent determines that:

(a)    all of the Secured Liabilities and all other obligations secured by the Security Documents have been fully and finally discharged; and

(b)    no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Transaction Obligor pursuant to the Finance Documents,

then

(i)    the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Security Documents; and

(ii)   any Security Agent which has resigned pursuant to Clause 32.13 (*Resignation of the Security Agent*) shall release, without recourse or warranty, all of its rights under each Security Document.

### 32.25 Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

### 32.26 Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement and the other Finance Documents. Where there are any inconsistencies between (i) the Trustee Acts 1925 and 2000 and (ii) the provisions of this Agreement and any other Finance Document, the provisions of this Agreement and any other Finance Document shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement and any other Finance Document shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000.

### 32.27 Application of receipts

All amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Finance Document, under Clause 32.2 (*Parallel Debt (Covenant to pay the Security*

*Agent*)) or in connection with the realisation or enforcement of all or any part of the Security Property (for the purposes of this Clause 32 (*The Security Agent*), the "**Recoveries**") shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law (and subject to the remaining provisions of this Clause 32 (*The Security Agent*), in the following order of priority:

(a)    in discharging any sums owing to the Security Agent (in its capacity as such) (other than pursuant to Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*) or any Receiver or Delegate;

(b)    in payment or distribution to the Facility Agent, on its behalf and on behalf of the other Secured Parties, for application towards the discharge of all sums due and payable by any Transaction Obligor under any of the Finance Documents in accordance with Clause 35.5 (*Application of receipts; partial payments*);

(c)    if none of the Transaction Obligors is under any further actual or contingent liability under any Finance Document, in payment or distribution to any person to whom the Security Agent is obliged to pay or distribute in priority to any Transaction Obligor; and

(d)    the balance, if any, in payment or distribution to the relevant Transaction Obligor.

**32.28    Permitted Deductions**

The Security Agent may, in its discretion:

(a)    set aside by way of reserve amounts required to meet, and to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any applicable law to make from any distribution or payment made by it under this Agreement; and

(b)    pay all Taxes which may be assessed against it in respect of any of the Security Property, or as a consequence of performing its duties, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

**32.29    Prospective liabilities**

Following enforcement of any of the Transaction Security, the Security Agent may, in its discretion, or at the request of the Facility Agent, hold any Recoveries in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) for later payment to the Facility Agent for application in accordance with Clause 32.27 (*Application of receipts*) in respect of:

(a)    any sum to the Security Agent, any Receiver or any Delegate; and

(b)    any part of the Secured Liabilities,

that the Security Agent or, in the case of paragraph (b) only, the Facility Agent, reasonably considers, in each case, might become due or owing at any time in the future.

EUROPE/62707839v19

### 32.30    Investment of proceeds

Prior to the payment of the proceeds of the Recoveries to the Facility Agent for application in accordance with Clause 32.27 (*Application of receipts*) the Security Agent may, in its discretion, hold all or part of those proceeds in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) pending the payment from time to time of those moneys in the Security Agent's discretion in accordance with the provisions of Clause 32.27 (*Application of receipts*).

### 32.31    Currency conversion

(a)    For the purpose of, or pending the discharge of, any of the Secured Liabilities the Security Agent may convert any moneys received or recovered by the Security Agent from one currency to another, at a market rate of exchange.

(b)    The obligations of any Transaction Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

### 32.32    Good discharge

(a)    Any payment to be made in respect of the Secured Liabilities by the Security Agent may be made to the Facility Agent on behalf of the Secured Parties and any payment made in that way shall be a good discharge, to the extent of that payment, by the Security Agent.

(b)    The Security Agent is under no obligation to make the payments to the Facility Agent under paragraph (a) above in the same currency as that in which the obligations and liabilities owing to the relevant Finance Party are denominated.

### 32.33    Amounts received by Obligors

If any of the Obligors receives or recovers any amount which, under the terms of any of the Finance Documents, should have been paid to the Security Agent, that Obligor will hold the amount received or recovered on trust for the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement.

### 32.34    Application and consideration

In consideration for the covenants given to the Security Agent by each Obligor in relation to Clause 32.2 (*Parallel Debt (Covenant to pay the Security Agent)*), the Security Agent agrees with each Obligor to apply all moneys from time to time paid by such Obligor to the Security Agent in accordance with the foregoing provisions of this Clause 32 (*The Security Agent*).

### 32.35    Full freedom to enter into transactions

Without prejudice to Clause 32.7 (*Business with the Group*) or any other provision of a Finance Document and notwithstanding any rule of law or equity to the contrary, the Security Agent shall be absolutely entitled:

(a)    to enter into and arrange banking, derivative, investment and/or other transactions of every kind with or affecting any Transaction Obligor or any person who is party to, or referred to in, a Finance Document (including, but not limited to, any interest or currency swap or other

transaction, whether related to this Agreement or not, and acting as syndicate agent and/or security agent for, and/or participating in, other facilities to such Transaction Obligor or any person who is party to, or referred to in, a Finance Document);

(b)     to deal in and enter into and arrange transactions relating to:

    (i)     any securities issued or to be issued by any Transaction Obligor or any other person; or

    (ii)    any options or other derivatives in connection with such securities; and

(c)     to provide advice or other services to the Borrowers or any person who is a party to, or referred to in, a Finance Document,

and, in particular, the Security Agent shall be absolutely entitled, in proposing, evaluating, negotiating, entering into and arranging all such transactions and in connection with all other matters covered by paragraphs (a), (b) and (c) above, to use (subject only to insider dealing legislation) any information or opportunity, howsoever acquired by it, to pursue its own interests exclusively, to refrain from disclosing such dealings, transactions or other matters or any information acquired in connection with them and to retain for its sole benefit all profits and benefits derived from the dealings transactions or other matters.

## 33    CONDUCT OF BUSINESS BY THE FINANCE PARTIES

Save for Clause 12.7 (*FATCA Information*), no provision of this Agreement will:

(a)     interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)     oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 34    SHARING AMONG THE FINANCE PARTIES

### 34.1    Payments to Finance Parties

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from a Transaction Obligor other than in accordance with Clause 35 (*Payment Mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due to it under the Finance Documents then:

(a)     the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery, to the Facility Agent;

(b)     the Facility Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Facility Agent and distributed in accordance with Clause 35 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Facility Agent in relation to the receipt, recovery or distribution; and

(c)     the Recovering Finance Party shall, within three Business Days of demand by the Facility Agent, pay to the Facility Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Facility Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 35.5 (*Application of receipts; partial payments*).

**34.2     Redistribution of payments**

The Facility Agent shall treat the Sharing Payment as if it had been paid by the relevant Transaction Obligor and distribute it among the Finance Parties (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with Clause 35.5 (*Application of receipts; partial payments*) towards the obligations of that Transaction Obligor to the Sharing Finance Parties.

**34.3     Recovering Finance Party's rights**

On a distribution by the Facility Agent under Clause 34.2 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from a Transaction Obligor, as between the relevant Transaction Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Transaction Obligor.

**34.4     Reversal of redistribution**

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Sharing Finance Party shall, upon request of the Facility Agent, pay to the Facility Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the "**Redistributed Amount**"); and

(b)     as between the relevant Transaction Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Transaction Obligor.

**34.5     Exceptions**

(a)     This Clause 34 (*Sharing among the Finance Parties*) shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Transaction Obligor.

(b)     A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)     it notified that other Finance Party of the legal or arbitration proceedings; and

(ii)     that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

EUROPE/62707839v19

**SECTION 11**

**ADMINISTRATION**

**35    PAYMENT MECHANICS**

**35.1    Payments to the Facility Agent**

(a)    On each date on which a Transaction Obligor or a Lender is required to make a payment under a Finance Document, that Transaction Obligor or Lender shall make an amount equal to such payment available to the Facility Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Facility Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London, as specified by the Facility Agent) and with such bank as the Facility Agent, in each case, specifies.

**35.2    Distributions by the Facility Agent**

Each payment received by the Facility Agent under the Finance Documents for another Party shall, subject to Clause 35.3 (*Distributions to a Transaction Obligor*) and Clause 35.4 (*Clawback and pre-funding*) be made available by the Facility Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Facility Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London), as specified by that Party or, in the case of an Advance, to such account of such person as may be specified by the Borrowers in a Utilisation Request.

**35.3    Distributions to a Transaction Obligor**

The Facility Agent may (with the consent of the Transaction Obligor or in accordance with Clause 36 (*Set-Off*)) apply any amount received by it for that Transaction Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Transaction Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**35.4    Clawback and pre-funding**

(a)    Where a sum is to be paid to the Facility Agent under the Finance Documents for another Party, the Facility Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)    Unless paragraph (c) below applies, if the Facility Agent pays an amount to another Party and it proves to be the case that the Facility Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Facility Agent shall on demand refund the same to the Facility Agent together with interest

on that amount from the date of payment to the date of receipt by the Facility Agent, calculated by the Facility Agent to reflect its cost of funds.

(c)    If the Facility Agent is willing to make available amounts for the account of the Borrowers before receiving funds from the Lenders then if and to the extent that the Facility Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to the Borrowers:

    (i)    the Borrowers shall on demand refund it to the Facility Agent; and

    (ii)    the Lender by whom those funds should have been made available or, if the Lender fails to do so, the Borrowers shall on demand pay to the Facility Agent the amount (as certified by the Facility Agent) which will indemnify the Facility Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

## 35.5    Application of receipts; partial payments

(a)    If the Facility Agent receives a payment that is insufficient to discharge all the amounts then due and payable by a Transaction Obligor under the Finance Documents, the Facility Agent shall apply that payment towards the obligations of that Transaction Obligor under the Finance Documents in the following order:

    (i)    **first**, in or towards payment *pro rata* of any unpaid fees, costs and expenses of, and any other amounts owing to, the Facility Agent, the Security Agent, any Receiver or any Delegate under the Finance Documents;

    (ii)    **secondly**, in or towards payment *pro rata* of:

        (A)    any accrued interest and fees due but unpaid to the Lenders under this Agreement; and

        (B)    any periodical payments (not being payments as a result of termination or closing out) due but unpaid to the Hedge Counterparties under the Hedging Agreements;

    (iii)    **thirdly**, in or towards payment *pro rata* of:

        (A)    any principal due but unpaid to the Lenders under this Agreement; and

        (B)    any payments as a result of termination or closing out due but unpaid to the Hedge Counterparties under the Hedging Agreements; and

    (iv)    **fourthly**, in or towards payment *pro rata* of any other sum due but unpaid under the Finance Documents.

(b)    The Facility Agent shall, if so directed by the Majority Lenders and the Hedge Counterparties, vary, or instruct the Security Agent to vary (as applicable), the order set out in sub-paragraphs (ii) to (iv) of paragraph (a) above.

(c)    Paragraphs (a) and (b) above will override any appropriation made by a Transaction Obligor.

**35.6    No set-off by Transaction Obligors**

(a)    All payments to be made by a Transaction Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

(b)    Paragraph (a) above shall not affect the operation of any payment or close-out netting in respect of any amounts owing under any Hedging Agreement.

**35.7    Business Days**

(a)    Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or an Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**35.8    Currency of account**

(a)    Subject to paragraphs (b) and (c) below, dollars is the currency of account and payment for any sum due from a Transaction Obligor under any Finance Document.

(b)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c)    Any amount expressed to be payable in a currency other than dollars shall be paid in that other currency.

**35.9    Change of currency**

(a)    Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)    any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Facility Agent (after consultation with the Borrowers); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Facility Agent (acting reasonably).

(b)    If a change in any currency of a country occurs, this Agreement will, to the extent the Facility Agent (acting reasonably and after consultation with the Borrowers) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

**35.10    Currency Conversion**

(a)    For the purpose of, or pending any payment to be made by any Servicing Party under any Finance Document, such Servicing Party may convert any moneys received or recovered by it from one currency to another, at a market rate of exchange.

(b)    The obligations of any Transaction Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

**35.11    Disruption to Payment Systems etc.**

If either the Facility Agent determines (in its discretion) that a Disruption Event has occurred or the Facility Agent is notified by a Borrower that a Disruption Event has occurred:

(a)    the Facility Agent may, and shall if requested to do so by a Borrower, consult with the Borrowers with a view to agreeing with the Borrowers such changes to the operation and administration of the Facility as the Facility Agent may deem necessary in the circumstances;

(b)    the Facility Agent shall not be obliged to consult with the Borrowers in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)    the Facility Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)    any such changes agreed upon by the Facility Agent and the Borrowers shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties and any Transaction Obligors as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 44 (*Amendments and Waivers*);

(e)    the Facility Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 35.11 (*Disruption to Payment Systems etc.*); and

(f)    the Facility Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

**36    SET-OFF**

A Finance Party may, following the occurrence of an Event of Default and whilst the same is continuing, set off any matured obligation due from a Transaction Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Transaction Obligor, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off. The relevant Finance Party shall, if practicable, notify the relevant Transaction Obligor following the exercise of any right pursuant to this Clause 36 (*Set-Off*).

37 **BAIL-IN**

Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the parties to a Finance Document, each Party acknowledges and accepts that any liability of any party to a Finance Document under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a) any Bail-In Action in relation to any such liability, including (without limitation):

    (i) a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

    (ii) a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

    (iii) a cancellation of any such liability; and

(b) a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

38 **NOTICES**

38.1 **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

38.2 **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents are:

(a) in the case of the Borrowers, that specified in Schedule 1 (*The Parties*);

(b) in the case of each Lender, each Hedge Counterparty or any other Obligor, that specified in Schedule 1 (*The Parties*) or, if it becomes a Party after the date of this Agreement, that notified in writing to the Facility Agent on or before the date on which it becomes a Party;

(c) in the case of the Facility Agent, that specified in Schedule 1 (*The Parties*); and

(d) in the case of the Security Agent, that specified in Schedule 1 (*The Parties*),

or any substitute address, fax number or department or officer as the Party may notify to the Facility Agent (or the Facility Agent may notify to the other Parties, if a change is made by the Facility Agent) by not less than five Business Days' notice.

38.3 **Delivery**

(a) Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

    (i) if by way of fax, when received in legible form; or

(ii)      if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 38.2 (*Addresses*), if addressed to that department or officer.

(b)      Any communication or document to be made or delivered to a Servicing Party will be effective only when actually received by that Servicing Party and then only if it is expressly marked for the attention of the department or officer of that Servicing Party specified in Schedule 1 (*The Parties*) (or any substitute department or officer as that Servicing Party shall specify for this purpose).

(c)      All notices from or to a Transaction Obligor shall be sent through the Facility Agent unless otherwise specified in any Finance Document.

(d)      Any communication or document made or delivered to the Borrowers in accordance with this Clause will be deemed to have been made or delivered to each of the Transaction Obligors.

(e)      Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**38.4      Notification of address and fax number**

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to Clause 38.2 (*Addresses*) or changing its own address or fax number, the Facility Agent shall notify the other Parties.

**38.5      Electronic communication**

(a)      Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) if those two Parties:

(i)       notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means; and

(ii)      notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice.

(b)      Any such electronic communication as specified in paragraph (a) above to be made between an Obligor and a Finance Party may only be made in that way to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication.

(c)      Any such electronic communication as specified in paragraph (a) above made between any two Parties will be effective only when actually received (or made available) in readable form and in the case of any electronic communication made by a Party to the Facility Agent or the Security Agent only if it is addressed in such a manner as the Facility Agent or the Security Agent shall specify for this purpose.

(d)     Any electronic communication which becomes effective, in accordance with paragraph (c) above, after 5.00 p.m. in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(e)     Any reference in a Finance Document to a communication being sent or received shall be construed to include that communication being made available in accordance with this Clause 38.5 (*Electronic communication*).

**38.6    English language**

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

  (i)     in English; or

  (ii)    if not in English, and if so required by the Facility Agent, accompanied by a certified English translation prepared by a translator approved by the Facility Agent and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**38.7    Hedging Agreement**

Notwithstanding anything in Clause 1.1 (*Definitions*), references to the Finance Documents or a Finance Document in this Clause do not include any Hedging Agreement entered into by a Borrower with a Hedge Counterparty in connection with the Facility.

**39       CALCULATIONS AND CERTIFICATES**

**39.1    Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**39.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**39.3    Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

**40       PARTIAL INVALIDITY**

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or

enforceability of the remaining provisions under the law of that jurisdiction nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 41    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document.  No election to affirm any Finance Document on the part of a Secured Party shall be effective unless it is in writing.  No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 42    SETTLEMENT OR DISCHARGE CONDITIONAL

Any settlement or discharge under any Finance Document between any Finance Party and any Transaction Obligor shall be conditional upon no security or payment to any Finance Party by any Transaction Obligor or any other person being set aside, adjusted or ordered to be repaid, whether under any insolvency law or otherwise.

## 43    IRREVOCABLE PAYMENT

If the Facility Agent considers that an amount paid or discharged by, or on behalf of, a Transaction Obligor or by any other person in purported payment or discharge of an obligation of that Transaction Obligor to a Secured Party under the Finance Documents is capable of being avoided or otherwise set aside on the liquidation or administration of that Transaction Obligor or otherwise, then that amount shall not be considered to have been unconditionally and irrevocably paid or discharged for the purposes of the Finance Documents.

## 44    AMENDMENTS AND WAIVERS

### 44.1    Required consents

(a)    Subject to Clause 44.2 (*All Lender matters*) and Clause 44.3 (*Other exceptions*) any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and, in the case of an amendment, the Obligors and any such amendment or waiver will be binding on all Parties.

(b)    The Facility Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 44 (*Amendments and Waivers*).

(c)    Without prejudice to the generality of Clause 31.8 (*Rights and discretions*), the Facility Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

(d)    Paragraph (c) of Clause 29.9 (*Pro rata interest settlement*) shall apply to this Clause 44 (*Amendments and Waivers*).

**44.2**    **All Lender matters**

Subject to Clause 44.4 (*Replacement of Screen Rate*), an amendment of or waiver or consent in relation to any term of any Finance Document that has the effect of changing or which relates to:

(a)    the definition of "Majority Lenders" in Clause 1.1 (*Definitions*);

(b)    a postponement to or extension of the date of payment of any amount under the Finance Documents;

(c)    a reduction in the Margin or the amount of any payment of principal, interest, fees or commission payable;

(d)    a change in currency of payment of any amount under the Finance Documents;

(e)    an increase in any Commitment or the Total Commitments, an extension of any Availability Period or any requirement that a cancellation of Commitments reduces the Commitments rateably under the Facility;

(f)    a change to any Transaction Obligor other than in accordance with Clause 30 (*Changes to the Transaction Obligors*);

(g)    any provision which expressly requires the consent of all the Lenders;

(h)    this Clause 44 (*Amendments and Waivers*);

(i)    any change to the preamble (Background), Clause 2 (*The Facility*), Clause 3 (*Purpose*), Clause 5 (*Utilisation*), Clause 6.2 (*Effect of cancellation and prepayment on scheduled repayments*), Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) or Clause 7.5 (*Mandatory prepayment of Hedging Prepayment Proceeds*), Clause 8 (*Interest*), Clause 25.10 (*Compliance with laws etc.*), Clause 25.12 (*Sanctions and Ship trading*), Clause 27 (*Accounts, application of Earnings and Hedge Receipts*), Clause 29 (*Changes to the Lenders*), Clause 34 (*Sharing among the Finance Parties*), Clause 48 (*Governing Law*) or Clause 49 (*Enforcement*);

(j)    any release of, or material variation to, any Transaction Security, guarantee, indemnity or subordination arrangement set out in a Finance Document (except in the case of a release of Transaction Security as it relates to the disposal of an asset which is the subject of the Transaction Security and where such disposal is expressly permitted by the Majority Lenders or otherwise under a Finance Document);

(k)    (other than as expressly permitted by the provisions of any Finance Document), the nature or scope of:

(i)    the guarantees and indemnities granted under Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*);

(ii)    the joint and several liability of the Borrowers under Clause 17 (*Joint and Several Liability of the Borrowers*);

(iii)    the Security Assets; or

(iv) the manner in which the proceeds of enforcement of the Transaction Security are distributed,

(except in the case of sub-paragraphs (iii) and (iv) above, insofar as it relates to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document);

(l) the release of the guarantees and indemnities granted under Clause 18 (*Guarantee and Indemnity – Hedge Guarantors*) or the release of the joint and several liability of the Borrowers under Clause 17 (*Joint and Several Liability of the Borrowers*) or of any Transaction Security unless permitted under this Agreement or any other Finance Document or relating to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document, shall not be made, or given, without the prior consent of all the Lenders.

## 44.3 Other exceptions

(a) An amendment or waiver which relates to the rights or obligations of a Servicing Party, the Arranger or a Reference Bank (each in their capacity as such) may not be effected without the consent of that Servicing Party, the Arranger or that Reference Bank, as the case may be.

(b) An amendment or waiver which relates to and would adversely affect the rights or obligations of a Hedge Counterparty (in its capacity as such) may not be effected without the consent of that Hedge Counterparty.

(c) The Borrowers and the Facility Agent, the Arranger or the Security Agent, as applicable, may amend or waive a term of a Fee Letter to which they are party.

(d) The relevant Hedge Counterparty and the relevant Borrower may amend, supplement or waive the terms of any Hedging Agreement if permitted by paragraph (g) of Clause 8.5 (*Hedging*).

## 44.4 Replacement of Screen Rate

(a) Subject to Clause 44.3 (*Other exceptions*), if the Screen Rate is not available for dollars, any amendment or waiver which relates to providing for another benchmark rate to apply in relation to dollars, in place of that Screen Rate (or which relates to aligning any provision of a Finance Document to the use of that benchmark rate) may be made with the consent of the Majority Lenders and the Borrowers.

(b) If any Lender fails to respond to a request for an amendment or waiver described in paragraph (a) above within 5 Business Days (or such longer time period in relation to any request which the Borrowers and the Facility Agent may agree) of that request being made:

(i) its Commitment shall not be included for the purpose of calculating the Total Commitments when ascertaining whether any relevant percentage of Total Commitments has been obtained to approve that request; and

(ii) its status as a Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Lenders has been obtained to approve that request.

EUROPE/62707839v19

**44.5    Obligor Intent**

Without prejudice to the generality of Clauses 1.2 (*Construction*), 17.2 (*Waiver of defences*) and 18.4 (*Waiver of defences*), each Obligor expressly confirms that it intends that any guarantee contained in this Agreement or any other Finance Document and any Security created by any Finance Document shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following: business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

**45    CONFIDENTIAL INFORMATION**

**45.1    Confidentiality**

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 45.2 (*Disclosure of Confidential Information*) and Clause 45.3 (*Disclosure to numbering service providers*) and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

**45.2    Disclosure of Confidential Information**

Any Finance Party may disclose:

(a)    to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)    to any person:

(i)    to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Facility Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Transaction Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii) appointed by any Finance Party or by a person to whom sub-paragraph (i) or (ii) of paragraph (b) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under paragraph (c) of Clause 31.15 (*Relationship with the other Finance Parties*));

(iv) who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in sub-paragraph (i) or (ii) of paragraph (b) above;

(v) to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitrations, administrative or other investigations, proceedings or disputes;

(vii) to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 29.8 (*Security over Lenders' rights*);

(viii) who is a Party, a member of the Group or any related entity of a Transaction Obligor;

(ix) as a result of the registration of any Finance Document as contemplated by any Finance Document or any legal opinion obtained in connection with any Finance Document; or

(x) with the consent of the Obligors;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A) in relation to sub-paragraphs (i), (ii) and (iii) of paragraph (b) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B) in relation to sub-paragraph (iv) of paragraph (b) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C) in relation to sub-paragraphs (v), (vi) and (vii) of paragraph (b) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

EUROPE/62707839v19

(c)    to any person appointed by that Finance Party or by a person to whom sub-paragraph (i) or (ii) of paragraph (b) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered in to a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/ Settlement Service Providers or such other form of confidentiality undertaking agreed between the Borrowers and the relevant Finance Party;

(d)    to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Transaction Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

**45.3    Disclosure to numbering service providers**

(a)    Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facility and/or one or more Transaction Obligors the following information:

(i)    names of Transaction Obligors;

(ii)    country of domicile of Transaction Obligors;

(iii)    place of incorporation or formation of Transaction Obligors;

(iv)    date of this Agreement;

(v)    Clause 48 (*Governing Law*);

(vi)    the names of the Facility Agent and the Arranger;

(vii)    date of each amendment and restatement of this Agreement;

(viii)    amount of Total Commitments;

(ix)    currency of the Facility;

(x)    type of Facility;

(xi)    ranking of Facility;

(xii)    each Termination Date for Facility;

(xiii)    changes to any of the information previously supplied pursuant to sub-paragraphs (i) to (xii) above; and

(xiv)    such other information agreed between such Finance Party and the Borrowers,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

EUROPE/62707839v19

(b)   The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facility and/or one or more Transaction Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c)   Each Obligor represents, on behalf of itself and the other Transaction Obligors, that none of the information set out in sub-paragraphs (i) to (xiv) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d)   The Facility Agent shall notify the Borrowers and the other Finance Parties of:

(i)    the name of any numbering service provider appointed by the Facility Agent in respect of this Agreement, the Facility and/or one or more Transaction Obligors; and

(ii)   the number or, as the case may be, numbers assigned to this Agreement, the Facility and/or one or more Transaction Obligors by such numbering service provider.

**45.4   Disclosure to administration/settlement services providers**

Notwithstanding any other term of any Finance Document or any other agreement between the Parties to the contrary (whether express or implied), any Finance Party may disclose to any person appointed by:

(a)   that Finance Party;

(b)   a person to (or through) whom that Finance Party assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Facility Agent or Security Agent under this Agreement; and/or

(c)   a person with (or through) whom that Finance Party enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made, or may be made, by reference to, one or more Finance Documents and/or one or more Obligors,

to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this Clause 45.4 (*Disclosure to administration/settlement services providers*) if the service provider to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking.

**45.5   Entire agreement**

This Clause 45 (*Confidential Information*) constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

                                        EUROPE/62707839v19

**45.6    Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**45.7    Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Borrowers:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to sub-paragraph (v) of paragraph (b) of Clause 45.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this Clause 45 (*Confidential Information*).

**45.8    Continuing obligations**

The obligations in this Clause 45 (*Confidential Information*) are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with this Agreement have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

**46    CONFIDENTIALITY OF FUNDING RATES AND REFERENCE BANK QUOTATIONS**

**46.1    Confidentiality and disclosure**

(a)    The Facility Agent and each Obligor agree to keep each Funding Rate (and, in the case of the Facility Agent, each Reference Bank Quotation) confidential and not to disclose it to anyone, save to the extent permitted by paragraphs (b), (c) and (d) below.

(b)    The Facility Agent may disclose:

(i)    any Funding Rate (but not, for the avoidance of doubt, any Reference Bank Quotation) to the Borrower pursuant to Clause 8.4 (*Notification of rates of interest*); and

(ii)    any Funding Rate or any Reference Bank Quotation to any person appointed by it to provide administration services in respect of one or more of the Finance Documents to the extent necessary to enable such service provider to provide those services if the service provider to whom that information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other

form of confidentiality undertaking agreed between the Facility Agent and the relevant Lender or Reference Bank, as the case may be.

(c)     The Facility Agent may disclose any Funding Rate or any Reference Bank Quotation, and each Obligor may disclose any Funding Rate, to:

(i)     any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives, if any person to whom that Funding Rate or Reference Bank Quotation is to be given pursuant to this sub-paragraph (i) is informed in writing of its confidential nature and that it may be price sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of that Funding Rate or Reference Bank Quotation or is otherwise bound by requirements of confidentiality in relation to it;

(ii)    any person to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation if the person to whom that Funding Rate or Reference Bank Quotation is to be given is informed in writing of its confidential nature and that it may be price sensitive information except that there shall be no requirement to so inform if, in the opinion of the Facility Agent or the relevant Obligor, as the case may be, it is not practicable to do so in the circumstances;

(iii)   any person to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes if the person to whom that Funding Rate or Reference Bank Quotation is to be given is informed in writing of its confidential nature and that it may be price sensitive information except that there shall be no requirement to so inform if, in the opinion of the Facility Agent or the relevant Obligor, as the case may be, it is not practicable to do so in the circumstances; and

(iv)    any person with the consent of the relevant Lender or Reference Bank, as the case may be.

(d)     The Facility Agent's obligations in this Clause 46 (*Confidentiality of Funding Rates and Reference Bank Quotations*) relating to Reference Bank Quotations are without prejudice to its obligations to make notifications under Clause 8.4 (*Notification of rates of interest*) **provided that** (other than pursuant to sub-paragraph (i) of paragraph (b) above) the Facility Agent shall not include the details of any individual Reference Bank Quotation as part of any such notification.

## 46.2    Related obligations

(a)     The Facility Agent and each Obligor acknowledge that each Funding Rate (and, in the case of the Facility Agent, each Reference Bank Quotation) is or may be price sensitive information and that its use may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and the Facility Agent and each Obligor undertake not to use any Funding Rate or, in the case of the Facility Agent, any Reference Bank Quotation for any unlawful purpose.

(b)     The Facility Agent and each Obligor agree (to the extent permitted by law and regulation) to inform the relevant Lender or Reference Bank, as the case may be:

(i)      of the circumstances of any disclosure made pursuant to sub-paragraph (ii) of paragraph (c) of Clause 46.1 (*Confidentiality and disclosure*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(ii)     upon becoming aware that any information has been disclosed in breach of this Clause 46 (*Confidentiality of Funding Rates and Reference Bank Quotations*).

**46.3    No Event of Default**

No Event of Default will occur under Clause 28.4 (*Other obligations*) by reason only of an Obligor's failure to comply with this Clause 46 (*Confidentiality of Funding Rates and Reference Bank Quotations*).

**47      COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**SECTION 12**

**GOVERNING LAW AND ENFORCEMENT**

**48      GOVERNING LAW**

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

**49      ENFORCEMENT**

**49.1    Jurisdiction**

(a)     Unless specifically provided in another Finance Document in relation to that Finance Document, the courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with any Finance Document (including a dispute regarding the existence, validity or termination of any Finance Document or any non-contractual obligation arising out of or in connection with any Finance Document) (a "**Dispute**").

(b)     The Obligors accept that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Obligor will argue to the contrary.

(c)     This Clause 49.1 (*Jurisdiction*) is for the benefit of the Secured Parties only.  As a result, no Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Secured Parties may take concurrent proceedings in any number of jurisdictions.

**49.2    Service of process**

(a)     Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

    (i)      irrevocably appoints Oaktree Capital Management (Europe) LLP at its registered address for the time being at Verde, 10 Bressenden Place, London SW1E 5DH, England as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

    (ii)     agrees that failure by a process agent to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)     If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Borrowers (on behalf of all the Obligors) must as soon as practicable (and in any event within five days of such event taking place) appoint another agent on terms acceptable to the Facility Agent.  Failing this, the Facility Agent may appoint another agent for this purpose.

**50      WAIVER OF IMMUNITY**

**50.1    Waiver**

Each Obligor waives generally all immunity it or its assets or revenues may otherwise have in any jurisdiction, including immunity in respect of:

(a)      the giving of any relief by way of injunction or order for specific performance or for the
recovery of assets or revenues; and

(b)      the issue of any process against its assets or revenues for the enforcement of a judgment or,
in an action in rem, for the arrest, detention or sale of any of its assets and revenues.

**50.2    English State Immunity Act 1978**

Each Obligor agrees that in any proceedings in England, this waiver shall have the fullest scope
permitted by the English State Immunity Act 1978 and that this waiver is intended to be
irrevocable for the purposes of the English State Immunity Act 1978.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

**SCHEDULE 1**

**THE PARTIES**

**PART A**

**THE OBLIGORS**

| Name of Borrower | Place of Formation | Registration number (or equivalent, if any) | Address for Communication |
|---|---|---|---|
| FLEETSCAPE ANTHEM, LLC | Marshall Islands | 964391 | c/o Oaktree Capital Management, L.P., 333 South Grand Avenue, Los Angeles, CA 90071, United States of America |
| FLEETSCAPE ARROW, LLC | Marshall Islands | 964393 | |
| FLEETSCAPE ATOM, LLC | Marshall Islands | 964390 | |
| FLEETSCAPE AVENUE, LLC | Marshall Islands | 964392 | |
| FLEETSCAPE AWARD, LLC | Marshall Islands | 964389 | with a copy to: |
| FLEETSCAPE SKY, LLC | Marshall Islands | 964385 | Oaktree Capital Management (Europe) LLP, of Verde, 10 Bressenden Place, London, England SW1E 5DH |
| FLEETSCAPE SOLAR, LLC | Marshall Islands | 964386 | |
| FLEETSCAPE SPRING, LLC | Marshall Islands | 964388 | |
| FLEETSCAPE START, LLC | Marshall Islands | 964384 | Email: info@fleetscape.com / accounting@fleetscape.com / jbaker@fleetscape.com |
| FLEETSCAPE SUMMER, LLC | Marshall Islands | 964387 | |
| FLEETSCAPE SUN, LLC | Marshall Islands | 964383 | |

| Name of Hedge Guarantor | Place of Formation | Registration number (or equivalent, if any) | Address for Communication |
|---|---|---|---|

    EUROPE/62707839v19

| | | | |
|---|---|---|---|
| FLEETSCAPE ANTHEM, LLC | Marshall Islands | 964391 | c/o Oaktree Capital Management, L.P., 333 South Grand Avenue, Los Angeles, CA 90071, United States of America |
| FLEETSCAPE ARROW, LLC | Marshall Islands | 964393 | |
| FLEETSCAPE ATOM, LLC | Marshall Islands | 964390 | |
| FLEETSCAPE AVENUE, LLC | Marshall Islands | 964392 | with a copy to: |
| FLEETSCAPE AWARD, LLC | Marshall Islands | 964389 | |
| FLEETSCAPE SKY, LLC | Marshall Islands | 964385 | Oaktree Capital Management (Europe) LLP, of Verde, 10 Bressenden Place, London, England SW1E 5DH |
| FLEETSCAPE SOLAR, LLC | Marshall Islands | 964386 | |
| FLEETSCAPE SPRING, LLC | Marshall Islands | 964388 | |
| FLEETSCAPE START, LLC | Marshall Islands | 964384 | Email: info@fleetscape.com / accounting@fleetscape.com / jbaker@fleetscape.com |
| FLEETSCAPE SUMMER, LLC | Marshall Islands | 964387 | |
| FLEETSCAPE SUN, LLC | Marshall Islands | 964383 | |

EUROPE/62707839v19

## PART B

### THE ORIGINAL LENDERS

| Name of Original Lender | Commitment | Address for Communication |
| --- | --- | --- |
| Crédit Agricole Corporate and Investment Bank | Ship A Tranche A Commitment: $ 5,182,253.14 | 12 place des Etats-Unis, CS 70052 92547 Montrouge Cedex, France Fax: +33 1 41 89 13 34 Att: Shipping Department / Middle Office / Clementine Costil |
| | Ship A Tranche B Commitment: $ 6,268,509.37 | |
| | Ship B Tranche A Commitment: $ 5,350,000.25 | with a copy to: |
| | Ship B Tranche B Commitment: $ 4,314,277.73 | Crédit Agricole Corporate and Investment Bank Neuer Wall 46 20354 Hamburg Germany Fax: +49 40 70 383 854 Attn: Wolfgang Schoon |
| | Ship C Tranche A Commitment: $ 5,048,595.96 | |
| | Ship C Tranche B Commitment: $ 6,106,836.22 | |
| | Ship D Tranche A Commitment: $ 5,012,144.30 | |
| | Ship D Tranche B Commitment: $ 5,052,286.03 | |
| | Ship E Tranche A Commitment: $ 5,048,595.96 | |
| | Ship E Tranche B Commitment: $ 6,106,836.22 | |
| | Ship F Tranche A Commitment: $ 5,797,380.24 | |
| | Ship F Tranche B Commitment: $ 5,843,810.84 | |
| | Ship G Tranche A Commitment: $ 6,114,816.05 | |
| | Ship G Tranche B Commitment: $ 4,931,031.17 | |
| | Ship H Tranche A Commitment: $ 6,044,646.03 | |
| | Ship H Tranche B Commitment: $ 6,093,056.95 | |

EUROPE/62707839v19

Ship I Tranche A Commitment:
$ 5,808,012.00

Ship I Tranche B Commitment:
$ 7,025,433.44

Ship J Tranche A Commitment:
$ 5,994,524.58

Ship J Tranche B Commitment:
$ 6,042,534.09

Ship K Tranche A Commitment:
$ 5,936,606.25

Ship K Tranche B Commitment:
$ 8,377,813.19

BNP Paribas

Ship A Tranche A Commitment:
$ 1,938,636.25

Ship A Tranche B Commitment:
$ 2,326,363.75

Ship B Tranche A Commitment:
$ 2,001,389.00

Ship B Tranche B Commitment:
$ 1,601,111.00

Ship C Tranche A Commitment:
$ 1,888,636.25

Ship C Tranche B Commitment:
$ 2,266,363.75

Ship D Tranche A Commitment:
$ 1,875,000.00

Ship D Tranche B Commitment:
$ 1,875,000.00

Ship E Tranche A Commitment:
$ 1,888,636.25

Ship E Tranche B Commitment:
$ 2,266,363.75

Ship F Tranche A Commitment:
$ 2,168,750.00

Millénaire 4, 35 rue de la Gare
75019 PARIS – France
Attn : Christophe LIENNEL / Julie
BERNARD
Email:
christophe.liennel@bnpparibac.com
/ julie.3.bernard@bnpparibas.com
Tel : +33(0)1 57 43 77 19
Fax +33(0)1 42 98 43 55

Ship F Tranche B Commitment:
$ 2,168,750.00

Ship G Tranche A Commitment:
$ 2,287,500.00

Ship G Tranche B Commitment:
$ 1,830,000.00

Ship H Tranche A Commitment:
$ 2,261,250.00

Ship H Tranche B Commitment:
$ 2,261,250.00

Ship I Tranche A Commitment:
$ 2,172,727.25

Ship I Tranche B Commitment:
$ 2,607,272.75

Ship J Tranche A Commitment:
$ 2,242,500.00

Ship J Tranche B Commitment:
$ 2,242,500.00

Ship K Tranche A Commitment:
$ 2,220,833.25

Ship K Tranche B Commitment:
$ 3,109,166.75

| Siemens Financial Services, Inc. | Ship A Tranche A Commitment: $633,655.61 | 170 Wood Avenue South, Iselin, NJ 08830, United States of America |
| | Ship A Tranche B Commitment: $710,581.88 | |
| | Ship B Tranche A Commitment: $654,166.75 | Tel: +1 732 590 6625 |
| | Ship B Tranche B Commitment: $489,055.27 | Fax: +1 732 590 2490 |
| | Ship C Tranche A Commitment: $617,312.79 | Attn: Bilal Aman |
| | Ship C Tranche B Commitment: $692,255.03 | |

EUROPE/62707839v19

Ship D Tranche A Commitment:
$612,855.70

Ship D Tranche B Commitment:
$572,713.97

Ship E Tranche A Commitment:
$617,312.79

Ship E Tranche B Commitment:
$692,255.03

Ship F Tranche A Commitment:
$708,869.76

Ship F Tranche B Commitment:
$662,439.16

Ship G Tranche A Commitment:
$747,683.95

Ship G Tranche B Commitment:
$558,968.83

Ship H Tranche A Commitment:
$739,103.97

Ship H Tranche B Commitment:
$690,693.05

Ship I Tranche A Commitment:
$710,169.75

Ship I Tranche B Commitment:
$796,384.81

Ship J Tranche A Commitment:
$732,975.42

Ship J Tranche B Commitment:
$684,965.91

Ship K Tranche A Commitment:
$725,893.50

Ship K Tranche B Commitment:
$949,687.06

**THE HEDGE COUNTERPARTIES**

**Name of Hedge Counterparty**                    **Address for Communication**

| Crédit Agricole Corporate and Investment Bank | 12 place des Etats-Unis, CS 70052<br>92547 Montrouge Cedex, France<br>Fax: +33 1 41 89 13 34<br>Att: Shipping Department / Middle Office / Clementine Costil<br><br>with a copy to:<br><br>Crédit Agricole Corporate and Investment Bank<br>Neuer Wall 46<br>20354 Hamburg<br>Germany<br>Fax: +49 40 70 383 854<br>Attn: Wolfgang Schoon |
| --- | --- |
| BNP Paribas | BNP Paribas Head Office<br>Address: 3 rue Taitbout, 75009 Paris<br>Attention: CIB Legal – Global Markets Structuring Hedging<br>ACI CLA03A1<br>Facsimile No: +(33) (0) 1 55 77 75 11, Tel. No: +(33) (0) 1 42 98 38 50<br>Email: dl.cib.legal.paris.itt@bnpparibas.com<br><br>Mandatory copy to:<br><br>BNP Paribas, London branch<br>Address: BNP Paribas, London Branch,10 Harewood Avenue, London NW1 6AA, England<br>Attention: CIB Legal - Master Agreement Team<br>Facsimile No: +(44) 207 595 2555, Tel. No: +(44) 207 595 2000 |

EUROPE/62707839v19

**PART C**

**THE SERVICING PARTIES**

**Name of Facility Agent**                          **Address for Communication**

Crédit Agricole Corporate and Investment Bank        12 place des Etats-Unis, CS 70052
                                                     92547 Montrouge Cedex, France
                                                     Fax: +33 1 41 89 13 34
                                                     Att: Shipping Department / Middle Office /
                                                     Clementine Costil

                                                     with a copy to:

                                                     Crédit Agricole Corporate and Investment Bank
                                                     Neuer Wall 46
                                                     20354 Hamburg
                                                     Germany
                                                     Fax: +49 40 70 383 854
                                                     Attn: Wolfgang Schoon


**Name of Security Agent**                           **Address for Communication**

Crédit Agricole Corporate and Investment Bank        12 place des Etats-Unis, CS 70052
                                                     92547 Montrouge Cedex, France
                                                     Fax: +33 1 41 89 13 34
                                                     Att: Shipping Department / Middle Office /
                                                     Clementine Costil

                                                     with a copy to:

                                                     Crédit Agricole Corporate and Investment Bank
                                                     Neuer Wall 46
                                                     20354 Hamburg
                                                     Germany
                                                     Fax: +49 40 70 383 854
                                                     Attn: Wolfgang Schoon

EUROPE/62707839v19

## SCHEDULE 2

## CONDITIONS PRECEDENT AND SUBSEQUENT

## PART A

## CONDITIONS PRECEDENT TO INITIAL UTILISATION REQUEST

**1      Obligors**

1.1     A copy of the constitutional documents of each Transaction Obligor and, in respect of an Approved Manager, evidence satisfactory to the Facility Agent of the individuals who may bind that Approved Manager by their signature.

1.2     A copy of a resolution of the board of directors or members, as applicable, of each Transaction Obligor (other than an Approved Manager):

(a)     approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute the Finance Documents to which it is a party;

(b)     authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

(c)     authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, a Utilisation Request and each Selection Notice) to be signed and/or despatched by it under, or in connection with, the Finance Documents to which it is a party.

1.3     An original of the power of attorney of any Transaction Obligor (other than an Approved Manager) authorising a specified person or persons to execute the Finance Documents to which it is a party.

1.4     A specimen of the signature of each person authorised by the resolution referred to in paragraph 1.2 above.

1.5     If necessary for the purposes of a Legal Opinion, a copy of a resolution signed by Fleetscape Advantage as the holder of the membership interests in each Borrower, approving the terms of, and the transactions contemplated by, the Finance Documents to which that Borrower is a party.

1.6     A certificate of each Transaction Obligor (signed by a director or sole member, as applicable) (other than an Approved Manager) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on that Transaction Obligor (other than an Approved Manager) to be exceeded.

1.7     A certificate of each Transaction Obligor (other than an Approved Manager) that is incorporated or formed, as applicable, outside the UK (signed by a director or sole member, as applicable) certifying either that (i) it has not delivered particulars of any UK Establishment to the Registrar of Companies as required under the Overseas Regulations or (ii) it has a UK Establishment and specifying the name and registered number under which it is registered with the Registrar of Companies.

1.8    A certificate of an authorised signatory of the relevant Transaction Obligor (other than an Approved Manager) certifying that each copy document relating to it specified in this Part A of Schedule 2 (*Conditions Precedent and Subsequent*) is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

**2    MOAs, Bareboat Charters, Time Charters and other Documents**

2.1    Copies of each MOA duly signed by the relevant Borrower and the relevant Bareboat Charterer.

2.2    Copies of each Bareboat Charter duly signed by the relevant Borrower and the relevant Bareboat Charterer.

2.3    Copies of each Time Charter duly signed by the relevant Bareboat Charterer and the Time Charterer.

2.4    A copy of the Subordinated Loan Agreement duly signed by the Borrowers and Fleetscape Advantage and any other party to it.

2.5    Copies of each Seller's Credit Agreement duly signed by the relevant Borrower and the relevant Bareboat Charterer.

2.6    Such documentary evidence as the Facility Agent and its legal advisers may require in relation to the due authorisation and execution of the Bareboat Charters, the MOAs, the Time Charters, the Subordinated Loan Agreement and the Seller's Credit Agreements by each of the parties to it.

2.7    If applicable, copies of each Hedging Agreement executed by a Hedge Counterparty and the relevant Borrower.

2.8    A letter of undertaking from Fleetscape Advantage in a form acceptable to the Facility Agent in respect of certain items agreed between Fleetscape Advantage and the Facility Agent relating to market conditions.

**3    Finance Documents**

3.1    A duly executed original of the Subordination Agreement and copies of each Subordinated Finance Document not otherwise referred to in this Schedule 2 (*Conditions Precedent and Subsequent*).

3.2    A duly executed original of any Finance Document not otherwise referred to in this Schedule 2 (*Conditions Precedent and Subsequent*).

3.3    A duly executed original of any other document required to be delivered by each Finance Document if not otherwise referred to this Schedule 2 (*Conditions Precedent and Subsequent*).

**4    Security**

4.1    A duly executed original of the Account Security in relation to each Account and of the Shares Security in respect of each Borrower (and of each document to be delivered under each of them).

4.2    A duly executed original of the Hedging Agreement Security in respect of each Borrower (and of each document to be delivered under each of them).

4.3    A duly executed original of the Subordinated Debt Security.

**5    Legal opinions**

5.1    Draft agreed legal opinion of Watson Farley & Williams, legal advisers to the Arranger, the Facility Agent and the Security Agent in England, substantially in the form distributed to the Original Lenders before signing this Agreement.

5.2    If a Transaction Obligor is incorporated or formed, as applicable, in a jurisdiction other than England and Wales, a draft agreed legal opinion of the legal advisers to the Arranger, the Facility Agent and the Security Agent in the relevant jurisdiction, or a draft of such other legal opinion in respect of such matters as the Facility Agent may require substantially in the form distributed to the Original Lenders before signing this Agreement.

**6    Other documents and evidence**

6.1    Evidence that any process agent referred to in Clause 49.2 (*Service of process*), if not an Obligor, has accepted its appointment.

6.2    A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary (if it has notified the Borrowers accordingly) in connection with the entry into and performance of the transactions contemplated by any Transaction Document or for the validity and enforceability of any Transaction Document.

6.3    The original of any mandates or other documents required in connection with the opening or operation of the Accounts.

6.4    The Approved Budget, the anticipated cash-flow projection in respect of the Ship to which the Tranche being requested relates including all Operating and Administrative Expenses in respect of that Ship during the next calendar year and the Drydocking Reserve Budget for that Ship.

6.5    A statement of anticipated flow of funds from the utilisation of the Facility (the "**Funds Flow Statement**"), accompanied by a letter of undertaking from Advantage Tankers to, amongst others, the Facility Agent in a form acceptable to the Facility Agent relating to the Funds Flow Statement undertaking that, inter alia, as at the final Utilisation Date to occur, Advantage Tankers will have an amount of at least $13,000,000 available to it.

6.6    Evidence that the fees, costs and expenses then due from the Borrowers pursuant to Clause 11 (*Fees*) and Clause 16 (*Costs and Expenses*) have been paid or will be paid by the first Utilisation Date.

6.7    Such evidence as the Facility Agent may require for the Finance Parties to be able to satisfy each of their "know your customer" or similar identification procedures in relation to the transactions contemplated by the Finance Documents and each Transaction Obligor.

EUROPE/62707839v19

**PART B**

**CONDITIONS PRECEDENT TO PREPOSITIONING OF FUNDS**

In this Part B, the following expressions shall have the following meanings:

"**Relevant Borrower**" means the Borrower or, as the case may be, Borrowers whose Ship is to be financed by the relevant Advance; and

"**Relevant Ship**" means, in relation to an Advance, the Ship or, as the case may be, Ships which is or are to be financed by such Advance.

**1        Borrowers**

A certificate of an authorised signatory of each Borrower certifying that each copy document which it is required to provide under this Part B of Schedule 2 (*Conditions Precedent and Subsequent*) is correct, complete and in full force and effect as at the relevant Utilisation Date.

**2        Relevant Ship and other security**

2.1     A duly executed but undated original of the Mortgage and the Tripartite Assignment in respect of the Relevant Ship and of each document to be delivered under or pursuant to each of them together with instructions for the Facility Agent or its lawyers to date such documents.

2.2     In respect of the Relevant Ship:

(a)     documents establishing that the Relevant Ship will, as from the relevant Utilisation Date, be managed commercially by its Approved Commercial Manager and managed technically by its Approved Technical Manager on terms acceptable to the Facility Agent acting with the authorisation of all of the Lenders;

(b)     a Manager's Undertaking from each Approved Manager;

(c)     documentary evidence that the Relevant Ship maintains the Approved Classification with the Approved Classification Society free of all overdue recommendations and conditions of the Approved Classification Society; and

(d)     copies of the Document of Compliance of the Relevant Ship's Approved Technical Manager.

2.3     Two valuations of the Relevant Ship, addressed to the Facility Agent on behalf of the Finance Parties, stated to be for the purposes of this Agreement and dated not earlier than 30 days before the relevant Utilisation Date, each from an Approved Valuer to allow the Facility Agent to determine the Market Value of the Relevant Ship.

2.4     Copies of the Relevant Ship's Safety Management Certificate (together with any other details of the applicable Safety Management System which the Facility Agent requires) and of any other documents required under the ISM Code and the ISPS Code in relation to the Relevant Ship including without limitation an ISSC.

2.5     Confirmation from the Facility Agent's insurance team that it is satisfied that the Relevant Ship is insured in accordance with the provisions of this Agreement and all requirement in this Agreement in respect of the insurances have been complied with together with an opinion

from an independent insurance consultant acceptable to the Facility Agent on such matters relating to the Insurances as the Facility Agent may require.

**3    Other documents and evidence**

3.1    Evidence that the fees, costs and expenses then due from the Borrowers pursuant to Clause 11 (*Fees*) and Clause 16 (*Costs and Expenses*) have been paid or will be paid by the relevant Delivery Date.

EUROPE/62707839v19

**PART C**

**CONDITIONS PRECEDENT TO DISBURSEMENT**

In this Part C, the following expressions shall have the following meanings:

"**Relevant Borrower**" means the Borrower or, as the case may be, Borrowers whose Ship is to be financed by the relevant Advance; and

"**Relevant Ship**" means, in relation to an Advance, the Ship or, as the case may be, Ships which is or are to be financed by such Advance.

1    **Borrowers**

A certificate of an authorised signatory of each Borrower certifying that each copy document which it is required to provide under this Part C of Schedule 2 (*Conditions Precedent and Subsequent*) is correct, complete and in full force and effect as at the Utilisation Date of the Advance under Tranche B.

2    **Funds and arrangements under the Subordinated Loan Agreement**

2.1    Evidence that Fleetscape Advantage has made available that part of $75,000,000 under the Subordinated Loan Agreement relating to the Relevant Ship to the Relevant Borrower under the terms of the Subordinated Loan Agreement.

2.2    The original of any mandates or other documents required in connection with the opening or operation of the Accounts.

3    **MOAs, Bareboat Charters, Subordinated Loan Agreement and Time Charters**

3.1    Copies of all documents signed or issued by the Relevant Borrower or relevant Bareboat Charterer (or both of them) under or in connection with the MOA in respect of the Relevant Ship.

3.2    Copies of all documents signed or issued by the Relevant Borrower or relevant Bareboat Charterer (or both of them) under or in connection with the Bareboat Charter in respect of the Relevant Ship.

3.3    Copies of all documents signed or issued by the relevant Bareboat Charterer or Time Charterer (or both of them) under or in connection with the Time Charter in respect of the Relevant Ship.

3.4    Copies of all documents signed or issued by the Borrowers or Fleetscape Advantage (or any of them) under or in connection with the Subordinated Loan Agreement in respect of the Relevant Ship.

3.5    Copies of all documents signed or issued by the Relevant Borrower or relevant Bareboat Charterer (or both of them) under or in connection with the Seller's Credit Agreement in respect of the Relevant Ship.

4    **Ship and other security**

4.1    A duly executed original of the Mortgage and the Tripartite Assignment in respect of the Relevant Ship and of each document to be delivered under or pursuant to each of them

together with, save where the Facility Agent agrees to the provision of the same on the relevant Delivery Date as a condition subsequent under Part D of this Schedule 2 (*Conditions precedent and Subsequent*), documentary evidence that the Mortgage in respect of the Relevant Ship has been duly recorded as a valid first preferred ship mortgage in accordance with the laws of the jurisdiction of its Approved Flag.

4.2     Documentary evidence that the Relevant Ship:

(a)     has been unconditionally delivered by the relevant Bareboat Charterer to, and accepted by, the Relevant Borrower under the MOA in respect of the Relevant Ship and that the full purchase price payable and all other sums due to the relevant Bareboat Charterer under that MOA, other than the sums to be financed pursuant to the Advance relating to that Ship Tranche, have been paid to the relevant Bareboat Charterer;

(b)     has been unconditionally delivered by the Relevant Borrower to, and accepted by, the relevant Bareboat Charterer under the Bareboat Charter in respect of the Relevant Ship;

(c)     is definitively and permanently registered in the name of the Relevant Borrower under the Approved Flag applicable to the Relevant Ship; and

(d)     is in the absolute and unencumbered ownership of the Relevant Borrower save as contemplated by the Finance Documents.

**5       Other documents and evidence**

5.1     Evidence acceptable to the Facility Agent that on the Utilisation Date the Account Bank will receive the Minimum Cash Reserve in respect of the Relevant Ship in the Bareboat Charterer Account of the Bareboat Charterer in respect of the Relevant Ship and, if required as determined pursuant to a Drydocking Reserve Budget, the Drydocking Reserve Amount in respect of the Relevant Borrower in the Drydocking Reserve Account of the Relevant Borrower.

## PART D

## CONDITIONS SUBSEQUENT

In this Part D, the following expressions shall have the following meanings:

"**Relevant Borrower**" means the Borrower or, as the case may be, Borrowers whose Ship is to be financed by the relevant Advance; and

"**Relevant Ship**" means, in relation to an Advance, the Ship or, as the case may be, Ships which is or are to be financed by such Advance.

**1    Legal opinions**

Executed legal opinions in agreed form of the legal advisers to the Arranger, the Facility Agent and the Security Agent in the jurisdiction of the Approved Flag of the Relevant Ship, England and such other relevant jurisdictions as the Facility Agent may require.

**2    Relevant Ship and other security**

2.1    Documentary evidence to be provided on the relevant Delivery Date (as a same day condition subsequent) that the Mortgage over the Relevant Ship has been duly registered on the Delivery Date as a valid first preferred ship mortgage in accordance with the laws of the jurisdiction of the Approved Flag.

2.2    Evidence that the Security Document in respect of the Relevant Ship have been duly registered or recorded in such jurisdictions as the Facility Agent may require and that all notices of assignment required under or in connection with the relevant Security Documents have been served and any acknowledgements in respect of such notice have been received duly executed by the relevant parties.

2.3    A duly executed original letter of undertaking from the Approved Brokers in relation to the Relevant Ship in a form acceptable to the Facility Agent.

2.4    A duly executed original of a letter of undertaking from any protection and indemnity club or war risks association through or with whom any obligatory insurances are placed or effected in relation to the Relevant Ship in a form acceptable to the Facility Agent.

**3    Miscellaneous**

Evidence that all pre-agreed legal fees have been paid within 30 days of the relevant Utilisation Date.

EUROPE/62707839v19

**SCHEDULE 3**

**REQUESTS**

**PART A**

**UTILISATION REQUEST**

From:   FLEETSCAPE ANTHEM, LLC
        FLEETSCAPE ARROW, LLC
        FLEETSCAPE ATOM, LLC
        FLEETSCAPE AVENUE, LLC
        FLEETSCAPE AWARD, LLC
        FLEETSCAPE SKY, LLC
        FLEETSCAPE SOLAR, LLC
        FLEETSCAPE SPRING, LLC
        FLEETSCAPE START, LLC
        FLEETSCAPE SUMMER, LLC
        FLEETSCAPE SUN, LLC


**TO:**   CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK


Dated: [●]


Dear Sirs

**FLEETSCAPE ANTHEM, LLC, FLEETSCAPE ARROW, LLC, FLEETSCAPE ATOM, LLC, FLEETSCAPE AVENUE, LLC, FLEETSCAPE AWARD, LLC, FLEETSCAPE SKY, LLC, FLEETSCAPE SOLAR, LLC, FLEETSCAPE SPRING, LLC, FLEETSCAPE START, LLC, FLEETSCAPE SUMMER, LLC and FLEETSCAPE SUN, LLC – US$190,000,000 Facility Agreement dated [●] (the "Agreement")**

1   We refer to the Agreement.  This is a Utilisation Request.  Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2   We wish to borrow an Advance under Ship Tranche [A][B][C][D][E][F][G][H][I][J][K] on the following terms:

Proposed Utilisation Date:      [●] (or, if that is not a Business Day, the next Business Day)

Amount:       [●] or, if less, the Available Facility

Interest Period for the first Advance:      3 Months

3   [You are authorised and requested to deduct from the Advance prior to funds being remitted the following amounts set out against the following items:

Deductible Items        £

Arrangement Fee

Facility Agent's solicitors' fees inclusive of disbursements and VAT

[●] legal opinion fees (if any)

Net proceeds of Advance            _____ ]

4        We confirm that each condition specified in Clause 4.1 (*Initial conditions precedent*) and paragraph (a) of Clause 4.2 (*Conditions precedent to prepositioning of funds*) of the Agreement as they relate to the Advance to which this Utilisation Request refers is satisfied on the date of this Utilisation Request.

5        The [net] proceeds of this Advance should be credited to [account].

6        This Utilisation Request is irrevocable.

Yours faithfully

_____
[●]
authorised signatory for
FLEETSCAPE ANTHEM, LLC

_____
[●]
authorised signatory for
FLEETSCAPE ARROW, LLC

_____
[●]
authorised signatory for
FLEETSCAPE ATOM, LLC

_____
[●]
authorised signatory for
FLEETSCAPE ATOM, LLC

_____
[●]
authorised signatory for
FLEETSCAPE AWARD, LLC

EUROPE/62707839v19

_____

[●]
authorised signatory for
FLEETSCAPE SKY, LLC

_____

[●]
authorised signatory for
FLEETSCAPE SOLAR, LLC

_____

[●]
authorised signatory for
FLEETSCAPE SPRING, LLC

_____

[●]
authorised signatory for
FLEETSCAPE START, LLC

_____

[●]
authorised signatory for
FLEETSCAPE SUMMER, LLC

_____

[●]
authorised signatory for
FLEETSCAPE SUN, LLC

EUROPE/62707839v19

**PART B**

**SELECTION NOTICE**

From:   FLEETSCAPE ANTHEM, LLC
        FLEETSCAPE ARROW, LLC
        FLEETSCAPE ATOM, LLC
        FLEETSCAPE AVENUE, LLC
        FLEETSCAPE AWARD, LLC
        FLEETSCAPE SKY, LLC
        FLEETSCAPE SOLAR, LLC
        FLEETSCAPE SPRING, LLC
        FLEETSCAPE START, LLC
        FLEETSCAPE SUMMER, LLC
        FLEETSCAPE SUN, LLC

**TO:**    CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK

Dated: [●]

Dear Sirs

**FLEETSCAPE ANTHEM, LLC, FLEETSCAPE ARROW, LLC, FLEETSCAPE ATOM, LLC, FLEETSCAPE AVENUE, LLC, FLEETSCAPE AWARD, LLC, FLEETSCAPE SKY, LLC, FLEETSCAPE SOLAR, LLC, FLEETSCAPE SPRING, LLC, FLEETSCAPE START, LLC, FLEETSCAPE SUMMER, LLC and FLEETSCAPE SUN, LLC – US$190,000,000 Facility Agreement dated [●] (the "Agreement")**

1    We refer to the Agreement.  This is a Selection Notice.  Terms defined in the Agreement have the same meaning in this Selection Notice unless given a different meaning in this Selection Notice.

2    We request [that the next Interest Period for the Loan be [●]].

3    This Selection Notice is irrevocable.

Yours faithfully

_____
[●]
authorised signatory for
FLEETSCAPE ANTHEM, LLC

_____
[●]
authorised signatory for
FLEETSCAPE ARROW, LLC

EUROPE/62707839v19

_____

**[●]**
authorised signatory for
FLEETSCAPE ATOM, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE AVENUE, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE AWARD, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE SKY, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE SOLAR, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE SPRING, LLC


_____

**[●]**
authorised signatory for
FLEETSCAPE START, LLC

EUROPE/62707839v19

_____

**[●]**
authorised signatory for
FLEETSCAPE SUMMER, LLC

_____

**[●]**
authorised signatory for
FLEETSCAPE SUN, LLC

EUROPE/62707839v19

## SCHEDULE 4

## FORM OF TRANSFER CERTIFICATE

To:    [●] as Facility Agent

From:  [The Existing Lender] (the "**Existing Lender**") and [The New Lender] (the "**New Lender**")

Dated: [●]

Dear Sirs

**[Borrowers] – [●] Facility Agreement dated [●] (the "Agreement")**

1      We refer to the Agreement.  This is a Transfer Certificate.  Terms defined in the Agreement have the same meaning in this Transfer Certificate unless given a different meaning in this Transfer Certificate.

2      We refer to Clause 29.5 (*Procedure for transfer*) of the Agreement:

(a)      The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation all of the Existing Lender's rights and obligations under the Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment and participation in the Loan under the Agreement as specified in the Schedule in accordance with Clause 29.5 (*Procedure for transfer*) of the Agreement.

(b)      The proposed Transfer Date is [●].

(c)      The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 38.2 (*Addresses*) of the Agreement are set out in the Schedule.

3      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 29.4 (*Limitation of responsibility of Existing Lenders*) of the Agreement.

4      This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

5      This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are is governed by English law.

6      This Transfer Certificate has been entered into on the date stated at the beginning of this Transfer Certificate.

**Note: The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

EUROPE/62707839v19

**THE SCHEDULE**

**Commitment/rights and obligations to be transferred**

[*insert relevant details*]

[Facility Office address, fax number and attention details

for notices and account details for payments.]

[Existing Lender]          [New Lender]

By: [●]   By: [●]

This Transfer Certificate is accepted by the Facility Agent and the Transfer Date is confirmed as [●].

[Facility Agent]

By: [●]

## SCHEDULE 5

### FORM OF ASSIGNMENT AGREEMENT

To:    [●] as Facility Agent and [●], [●] and [●] as Borrowers, for and on behalf of each [Transaction] Obligor

From:    [the Existing Lender] (the "**Existing Lender**") and [the New Lender] (the "**New Lender**")

Dated: [●]

Dear Sirs

**[Borrowers] - [●] Facility Agreement dated [●] (the "Agreement")**

1      We refer to the Agreement.  This is an Assignment Agreement.  Terms defined in the Agreement have the same meaning in this Assignment Agreement unless given a different meaning in this Assignment Agreement.

2      We refer to Clause 29.6 (*Procedure for assignment*) of the Agreement:

(a)    The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Lender's Commitment and participations in the Loan under the Agreement as specified in the Schedule.

(b)    The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitments and participations in the Loan under the Agreement specified in the Schedule.

(c)    The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

(d)    All rights and interests (present, future or contingent) which the Existing Lender has under or by virtue of the Finance Documents are assigned to the New Lender absolutely, free of any defects in the Existing Lender's title and of any rights or equities which the Borrower or any other [Transaction] Obligor had against the Existing Lender.

3      The proposed Transfer Date is [●].

4      On the Transfer Date the New Lender becomes Party to the Finance Documents as a Lender.

5      The Facility Office and address, fax, number and attention details for notices of the New Lender for the purposes of Clause 38.2 (*Addresses*) of the Agreement are set out in the Schedule.

6      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 29.4 (*Limitation of responsibility of Existing Lenders*) of the Agreement.

7      This Assignment Agreement acts as notice to the Facility Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 29.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*) of the Agreement, to the Borrowers (on behalf of each [Transaction] Obligor) of the assignment referred to in this Assignment Agreement.

          

8      This Assignment Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Assignment Agreement.

9      This Assignment Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

10    This Assignment Agreement has been entered into on the date stated at the beginning of this Assignment Agreement.

**Note: The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

EUROPE/62707839v19

**THE SCHEDULE**

**Commitment rights and obligations to be transferred by assignment, release and accession**

[*insert relevant details*]

[Facility office address, fax number and attention details for notices
and account details for payments]

[Existing Lender]          [New Lender]

By: [●]   By: [●]

This Assignment Agreement is accepted by the Facility Agent and the Transfer Date is confirmed as [●].

Signature of this Assignment Agreement by the Facility Agent constitutes confirmation by the Facility Agent of receipt of notice of the assignment referred to herein, which notice the Facility Agent receives on behalf of each Finance Party.

[Facility Agent]

By:

                    EUROPE/62707839v19

**SCHEDULE 6**

**REPAYMENT SCHEDULE**

| Date | Repayment amount in or towards Tranche A ($) | Interest payment ($) | Outstanding amount in respect of Tranche A ($) |
|---|---|---|---|
| Final Utilisation under Tranche A | | | 91,783,434 |
| 10 April 2019 | 4,122,919 | 714,763 | 87,660,515 |
| 10 July 2019 | 4,168,787 | 975,223 | 83,491,728 |
| 10 October 2019 | 4,215,165 | 928,845 | 79,276,563 |
| 10 January 2020 | 4,262,058 | 881,952 | 75,014,505 |
| 10 April 2020 | 4,309,474 | 834,536 | 70,705,031 |
| 10 July 2020 | 4,357,417 | 786,593 | 66,347,614 |
| 10 October 2020 | 4,405,893 | 738,117 | 61,941,722 |
| 10 January 2021 | 4,454,908 | 689,102 | 57,486,813 |
| 10 April 2021 | 4,504,469 | 639,541 | 52,982,344 |
| 10 July 2021 | 4,554,582 | 589,429 | 48,427,762 |
| 10 October 2021 | 4,605,251 | 538,759 | 43,822,511 |
| 10 January 2022 | 4,656,485 | 487,525 | 39,166,026 |
| 10 April 2022 | 4,708,288 | 435,722 | 34,457,738 |
| 10 July 2022 | 4,760,668 | 383,342 | 29,697,071 |
| 10 October 2022 | 4,813,630 | 330,380 | 24,883,441 |
| 10 January 2023 | 4,867,182 | 276,828 | 20,016,259 |
| 10 April 2023 | 4,921,329 | 222,681 | 15,094,929 |
| 10 July 2023 | 4,976,079 | 167,931 | 10,118,850 |
| 10 October 2023 | 5,031,438 | 112,572 | 5,087,413 |
| 10 January 2024 | 5,087,413 | 56,597 | 0 |

EUROPE/62707839v19

**SCHEDULE 7**

**DETAILS OF THE SHIPS**

| Ship name | Name of the Borrower owner | Type | GRT | NRT | Approved Flag | Approved Classification Society | Approved Classification | Approved Commercial Manager | Approved Technical Manager |
|---|---|---|---|---|---|---|---|---|---|
| ADVANTAGE ANTHEM | Fleetscape Anthem, LLC | Oil Tanker | 61,336 | 35,873 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BMON, CSR, E0, ESP, TMON, VCS(2) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE ARROW | Fleetscape Arrow, LLC | Oil Tanker | 61,341 | 35,396 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BMON, E0, ESP, NAUTICUS (Newbuilding), TMON, VCS(2) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE ATOM | Fleetscape Atom, LLC | Oil Tanker | 61,336 | 35,873 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BMON, CSR, E0, ESP, TMON, VCS(2) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE AVENUE | Fleetscape Avenue, LLC | Oil Tanker | 61,341 | 35,396 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BMON, E0, ESP, NAUTICUS (Newbuilding), TMON, VCS(2) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE AWARD | Fleetscape Award, LLC | Oil Tanker | 61,336 | 35,873 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BMON, CSR, E0, ESP, TMON, VCS(2) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE SKY | Fleetscape Sky, LLC | Oil Tanker | 83,805 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, E0, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE SOLAR | Fleetscape Solar, LLC | Oil Tanker | 83,850 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, E0, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |

                                                    EUROPE/62707839v19

| ADVANTAGE SPRING | Fleetscape Spring, LLC | Oil Tanker | 83,850 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, EO, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE START | Fleetscape Start, LLC | Oil Tanker | 83,850 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, EO, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE SUMMER | Fleetscape Summer, LLC | Oil Tanker | 83,850 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, EO, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |
| ADVANTAGE SUN | Fleetscape Sun, LLC | Oil Tanker | 83,850 | 49,031 | Marshall Islands | DNV GL | *1A1, Tanker for oil, BIS, BMON, CSR, EO, ESP, NAV-O, SPM, TMON, VCS(2, B) | Genel Denizcilik Nakliyati A.S. | Genel Denizcilik Nakliyati A.S. |

EUROPE/62707839v19

**SCHEDULE 8**

**APPROVED OPERATING AND ADMINISTRATIVE EXPENSES**

| Period | Amount | |
|---|---|---|
| The period commencing on the date of the Agreement and ending 31 December 2019 | (a) | $7,500 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $8,000 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |
| The period commencing on 1 January 2020 and ending on 31 December 2020 | (a) | 7,700 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $8,200 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |
| The period commencing 1 January 2021 and ending 31 December 2021 | (a) | $7,922 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $8,437 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |
| The period commencing 1 January 2022 and ending 31 December 2022 | (a) | $8,150 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $8,681 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |
| The period commencing 1 January 2023 ending 31 December 2023 | (a) | $8,386 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $8,932 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |
| The period commencing 1 January 2024 and at all times thereafter | (a) | $8,627 per day for each of Ship A, Ship B, Ship C, Ship D and Ship E; and |
| | (b) | $9,190 per day for each of Ship F, Ship G, Ship H, Ship I, Ship J and Ship K |

or such higher amount as may be agreed between the Borrower and the Facility Agent (acting on the instructions of the Lenders).

    EUROPE/62707839v19

## SCHEDULE 9

### TIMETABLES

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*)) or a Selection Notice (Clause 9.1 (*Selection of Interest* Periods)) | 5 Business Days before the intended Utilisation Date (Clause 5.1 (*Delivery of a Utilisation Request*)) or the expiry of the preceding Interest Period (Clause 9.1 (*Selection of Interest* Periods)) |
| Facility Agent notifies the Lenders of the Advance in accordance with Clause 5.4 (*Lenders' participation*) | 3 Business Days before the intended Utilisation Date. |
| LIBOR is fixed | Quotation Day as of 11:00 am London time |
| Reference Bank Rate calculated by reference to available quotations in accordance with Clause 10.2 (*Calculation of Reference Bank Rate*) | Noon on the Quotation Day |

EUROPE/62707839v19

**SCHEDULE 10**

**EXCLUDED NEW LENDER**

- AGC Equity Partners Limited

- Alterna Capital Partners

- Apollo Global Management, LLC

- Ares Management, L.P.

- Australis Maritime Limited

- BlueMountain Capital Management LLC

- Borealis Maritime Ltd

- Breakwater Capital

- The Carlyle Group, L.P.

- Centerbridge Partners, L.P.

- Cerberus Capital Management, L.P.

- EnTrustPermal Ltd

- Hayfin Capital Management LLP

- HPS Investment Partners, LLC

- Hudson Structured Capital Management Ltd.

- KKR & Co. Inc.

- Maritime Asset Partners

- Northern Shipping Funds

- Oak Hill Capital Partners

- Ocean Yield ASA

- Offshore Merchant Partners AS

- Riverstone Holdings LLC

- Ship Finance Limited

- Silver Point Capital, L.P.

- Sole Shipping AS

EUROPE/62707839v19

- Tufton Oceanics Ltd

- Värde Partners, Inc.

- York Capital Management, LLC

EXECUTION PAGES

**BORROWERS**

| | |
|---|---|
| **SIGNED** by | ) |
| as attorney-in-fact | ) |
| for and on behalf of | ) |
| **FLEETSCAPE ANTHEM, LLC** | ) |
| in the presence of: | ) |

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:      Kieran Ferguson
Witness' address:   Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

| | |
|---|---|
| **SIGNED** by | ) |
| as attorney-in-fact | ) |
| for and on behalf of | ) |
| **FLEETSCAPE ARROW, LLC** | ) |
| in the presence of: | ) |

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:      Kieran Ferguson
Witness' address:   Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

| | |
|---|---|
| **SIGNED** by | ) |
| as attorney-in-fact | ) |
| for and on behalf of | ) |
| **FLEETSCAPE ATOM, LLC** | ) |
| in the presence of: | ) |
| | ) |

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:      Kieran Ferguson
Witness' address:   Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

EUROPE/62707839v19

**SIGNED** by                              )
as attorney-in-fact                        )
for and on behalf of                       )
**FLEETSCAPE AVENUE, LLC**                 )
in the presence of:                        )

Jennifer Ashford
Attorney in fact

Witness' signature:    Kieran Ferguson
Witness' name:         Trainee Solicitor
Witness' address:      Watson Farley & Williams LLP
                       15 Appold Street
                       London EC2A 2HB

**SIGNED** by                              )
as attorney-in-fact                        )
for and on behalf of                       )
**FLEETSCAPE AWARD, LLC**                  )
in the presence of:                        )

Jennifer Ashford
Attorney in fact

Witness' signature:    Kieran Ferguson
Witness' name:         Trainee Solicitor
Witness' address:      Watson Farley & Williams LLP
                       15 Appold Street
                       London EC2A 2HB

**SIGNED** by                              )
as attorney-in-fact                        )
for and on behalf of                       )
**FLEETSCAPE SKY, LLC**                    )
in the presence of:                        )

Jennifer Ashford
Attorney in fact

Witness' signature:    Kieran Ferguson
Witness' name:         Trainee Solicitor
Witness' address:      Watson Farley & Williams LLP
                       15 Appold Street
                       London EC2A 2HB

**SIGNED** by                              )
as attorney-in-fact                        )
for and on behalf of                       )
**FLEETSCAPE SOLAR, LLC**                  )
in the presence of:                        )

Jennifer Ashford
Attorney in fact

Witness' signature:    Kieran Ferguson
Witness' name:         Trainee Solicitor
Witness' address:      Watson Farley & Williams LLP
                       15 Appold Street
                       London EC2A 2HB

EUROPE/62707839v19

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SPRING, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE START, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SUMMER, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SUN, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

EUROPE/62707839v19

**HEDGE GUARANTORS**

**SIGNED** by                                    )
as attorney-in-fact                              )
for and on behalf of                             )
**FLEETSCAPE ANTHEM, LLC**                       )
in the presence of:                              )

Jennifer Ashford
Attorney in fact

Witness' signature:    Kieran Ferguson
Witness' name:         Trainee Solicitor
Witness' address:      Watson Farley & Williams LLP
                       15 Appold Street
                       London EC2A 2HB

**SIGNED** by                                    )
as attorney-in-fact                              )
for and on behalf of                             )
**FLEETSCAPE ARROW, LLC**                        )
in the presence of:                              )

Jennifer Ashford
Attorney in fact

                       Kieran Ferguson
Witness' signature:    Trainee Solicitor
Witness' name:         Watson Farley & Williams LLP
Witness' address:      15 Appold Street
                       London EC2A 2HB

**SIGNED** by                                    )
as attorney-in-fact                              )
for and on behalf of                             )
**FLEETSCAPE ATOM, LLC**                         )
in the presence of:                              )

Jennifer Ashford
Attorney in fact

                       Kieran Ferguson
Witness' signature:    Trainee Solicitor
Witness' name:         Watson Farley & Williams LLP
Witness' address:      15 Appold Street
                       London EC2A 2HB

EUROPE/62707839v19

**SIGNED** by
as attorney-in-fact
for and on behalf of
**FLEETSCAPE AVENUE, LLC**
in the presence of:

)
)
)
)
)

Jennifer Ashford
Attorney in fact

Witness' signature: Kieran Ferguson
Witness' name: Trainee Solicitor
Witness' address: Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**SIGNED** by
as attorney-in-fact
for and on behalf of
**FLEETSCAPE AWARD, LLC**
in the presence of:

)
)
)
)
)

Jennifer Ashford
Attorney in fact

Witness' signature: Kieran Ferguson
Witness' name: Trainee Solicitor
Witness' address: Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**SIGNED** by
as attorney-in-fact
for and on behalf of
**FLEETSCAPE SKY, LLC**
in the presence of:

)
)
)
)
)

Jennifer Ashford
Attorney in fact

Witness' signature: Kieran Ferguson
Witness' name: Trainee Solicitor
Witness' address: Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**SIGNED** by
as attorney-in-fact
for and on behalf of
**FLEETSCAPE SOLAR, LLC**
in the presence of:

)
)
)
)
)

Jennifer Ashford
Attorney in fact

Witness' signature: Kieran Ferguson
Witness' name: Trainee Solicitor
Witness' address: Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

EUROPE/62707839v19

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SPRING, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE START, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SUMMER, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

**SIGNED** by )
as attorney-in-fact )
for and on behalf of )
**FLEETSCAPE SUN, LLC** )
in the presence of: )

Jennifer Ashford
Attorney in fact

Witness' signature:
Witness' name:     Kieran Ferguson
Witness' address:  Trainee Solicitor
                   Watson Farley & Williams LLP
                   15 Appold Street
                   London EC2A 2HB

EUROPE/62707839v19

**ORIGINAL LENDERS**

**SIGNED** by                                          )
duly authorised                                        )
for and on behalf of                                   )
**CRÉDIT AGRICOLE**                                    )
**CORPORATE AND INVESTMENT BANK**                      )
in the presence of:                                    )

S Sadhika
Attorney-in-Fact

Witness' signature:                                    )
Witness' name:                                         )
Witness' address:                                      )

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**SIGNED** by                                          )
duly authorised                                        )
for and on behalf of                                   )
**BNP PARIBAS**                                        )
in the presence of:                                    )

S Sadhika
Attorney-in-Fact

Witness' signature:                                    )
Witness' name:                                         )
Witness' address:                                      )

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**SIGNED** by                                          )
duly authorised                                        )
for and on behalf of                                   )
**SIEMENS FINANCIAL SERVICES, INC.**                   )
in the presence of:                                    )

Witness' signature:                                    )
Witness' name:                                         )
Witness' address:                                      )

EUROPE/62707839v19

**ORIGINAL LENDERS**

**SIGNED** by                                  )
duly authorised                                )
for and on behalf of                           )
**CRÉDIT AGRICOLE**                             )
**CORPORATE AND INVESTMENT BANK** )
in the presence of:                            )


Witness' signature:                            )
Witness' name:                                 )
Witness' address:                              )




**SIGNED** by                                  )
duly authorised                                )
for and on behalf of                           )
**BNP PARIBAS**                                )
in the presence of:                            )


Witness' signature:                            )
Witness' name:                                 )
Witness' address:                              )




**SIGNED** by                                  )
duly authorised                                )
for and on behalf of                           )
**SIEMENS FINANCIAL SERVICES, INC.**           )
in the presence of:                            )

Kevin S. Keaton
Director, Operations

T. P. Blazia.

Tom P. Blaziak
Vice President

Witness' signature:                            )
Witness' name:                                 )
Witness' address:                              )

EDWARD F. KUBICEK

170 WOOD AVENUE SOUTH, ISELIN NJ, 08830

EUROPE/62707839v19

**HEDGE COUNTERPARTIES**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND INVESTMENT BANK** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **BNP PARIBAS** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**ARRANGER**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND INVESTMENT BANK** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**BOOKRUNNER**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND INVESTMENT BANK** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**UNDERWRITER**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND INVESTMENT BANK** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

**FACILITY AGENT**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND INVESTMENT BANK** | ) |
| in the presence of: | ) |

S Sadhika
Attorney-in-Fact

| | |
|---|---|
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

EUROPE/62707839v19

**SECURITY AGENT**

**SIGNED** by                                    )
duly authorised                                  )
for and on behalf of                             )
**CRÉDIT AGRICOLE**                              )
**CORPORATE AND INVESTMENT BANK** )
in the presence of:                              )

S Sadhika
Attorney-in-Fact

Witness' signature:                              )
Witness' name:                                   )
Witness' address:                                )

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB

EUROPE/62707839v19