# EXHIBIT G

Execution version

Dated 01 ~~January~~ February 2019

**FLEETSCAPE SPRING, LLC**
as Buyer

and

**ADVANTAGE SPRING SHIPPING LLC**
as Subordinated Creditor

and

**CRÉDIT AGRICOLE CORPORATE INVESTMENT BANK**
as Security Agent

**SUBORDINATION AGREEMENT**

relating to
a seller's credit of $5,535,000 to the Borrower
in respect of m.v. "ADVANTAGE SPRING"

WATSON FARLEY
&
WILLIAMS

# Index

| Clause | | Page |
|---|---|---|
| 1 | Definitions and Interpretation | 1 |
| 2 | The Subordinated Creditor and Subordinated Liabilities | 5 |
| 3 | Effect of Insolvency Event | 6 |
| 4 | Turnover of Receipts | 8 |
| 5 | Redistribution | 9 |
| 6 | Further Rights of the Security Agent and the other Secured Parties | 9 |
| 7 | Non-Cash Recoveries | 10 |
| 8 | Changes to the Parties | 11 |
| 9 | Information and administration | 11 |
| 10 | Interest, indemnity, costs and expenses | 12 |
| 11 | Notices | 13 |
| 12 | Incorporation of Senior Facility Agreement Provisions | 13 |
| 13 | Preservation | 13 |
| 14 | Governing Law | 14 |
| 15 | Enforcement | 14 |

Execution

| Execution Page | 16 |
|---|---|

**Execution version**

THIS AGREEMENT is made on ~~01 January~~ 01 February 2019

PARTIES

(1) **FLEETSCAPE SPRING, LLC**, a limited liability company formed in the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Buyer**")

(2) **ADVANTAGE SPRING SHIPPING LLC**, a limited liability company formed in the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Subordinated Creditor**")

(3) **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, a French *sociéte anonyme*, acting in its capacity as security agent through its office at 12, place des Etats-Unis, CS 70052, 92547 Montrouge Cedex, France, registered under the SIREN No. 304 187 701 of the Registre du Commerce et des Sociétés of Nanterre (the "**Security Agent**")

BACKGROUND

(A) By the Senior Facility Agreement, the Original Lenders agreed to make available to the Buyer and the other Borrowers a facility of up to $190,000,000.

(B) Crédit Agricole Corporate and Investment Bank, in its capacity as Hedge Counterparty has entered into a Hedging Agreement with the Borrowers dated 01 February 2019 (on the 2002 ISDA form and including the schedule thereto) to hedge the Borrowers' exposure under the Facility Agreement to interest rate fluctuations.

(C) BNP Paribas, in its capacity as Hedge Counterparty has entered into a Hedging Agreement with the Borrowers dated 01 February 2019 (on the 2002 ISDA form and including the schedule thereto) to hedge the Borrowers' exposure under the Facility Agreement to interest rate fluctuations.

(D) It is a condition precedent to the availability of the Facility under the Senior Facility Agreement that the Buyer and the Subordinated Creditor enter into this Agreement.

(E) This Deed supplements the Senior Facility Agreement and is one of the Subordination Agreements referred to in the Senior Facility Agreement.

OPERATIVE PROVISIONS

1   DEFINITIONS AND INTERPRETATION

1.1   Definitions

In this Agreement:

"**Borrowers**" has the meaning given to the term "Borrowers" in the Senior Facility Agreement.

"**Creditor**" means each of the Senior Creditors and the Subordinated Creditor.

"**Debt Document**" means each of this Agreement, the Senior Finance Documents and any Subordinated Finance Document.

"**Enforcement Action**" means:

(a) the acceleration of any Subordinated Liabilities or the making of any declaration that any Subordinated Liabilities are prematurely due and payable;

(b) the making of any declaration that any Subordinated Liabilities are payable on demand;

(c) the making of a demand in relation to a Subordinated Liability that is payable on demand;

(d) the making of any demand under any guarantee or indemnity in respect of any Subordinated Liabilities;

(e) the exercise of any right of set-off, account combination or payment netting against the Buyer in respect of any Subordinated Liabilities;

(f) the exercise of any right to require the Buyer to acquire any Subordinated Liability (including exercising any put or call option against the Buyer for the redemption or purchase of any Subordinated Liability);

(g) the suing for, commencing or joining of any legal or arbitration proceedings against the Buyer to recover any Subordinated Liabilities;

(h) the taking of any steps to enforce or require the enforcement of any Security in respect of any Subordinated Liabilities (including the crystallisation of any floating charge forming part of that Security);

(i) the entering into of any composition, compromise, assignment or arrangement with the Buyer which owes any Subordinated Liabilities, or has given any Security, guarantee, indemnity or other assurance against loss in respect of any Subordinated Liabilities; or

(j) the petitioning, applying or voting for, or the taking of any steps (including the appointment of any liquidator, receiver, administrator or similar officer) in relation to, the winding up, dissolution, administration or reorganisation of the Buyer which owes any Subordinated Liabilities, or has given any Security, guarantee, indemnity or other assurance against loss in respect of any of the Subordinated Liabilities, or any of Buyer's assets or any suspension of payments or moratorium of any indebtedness of the Buyer, or any analogous procedure or step in any jurisdiction,

except that the taking of any action falling within paragraphs (g) or (j) above which is necessary (but only to the extent necessary) to preserve the validity, existence or priority of claims in respect of any Subordinated Liabilities, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent any loss of the right to bring, support or join proceedings by reason of applicable limitation periods shall not constitute Enforcement Action.

"**Insolvency Event**" means, in relation to any person:

(a) any resolution is passed or order made for the winding up, dissolution, administration or reorganisation of that person, a moratorium is declared in relation to any indebtedness of that person or an administrator is appointed to that person;

(b)     any composition, compromise, assignment or arrangement is made with any of its creditors;

(c)     the appointment of any liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of that person or any of its assets; or

(d)     any analogous procedure or step is taken in any jurisdiction.

"**Liabilities**" means all present and future liabilities and obligations of the Buyer to any Senior Creditor under the Debt Documents or to any Subordinated Creditor, both actual and contingent and whether incurred solely or jointly or as principal or surety or in any other capacity together with any of the following matters relating to or arising in respect of those liabilities and obligations:

(a)     any refinancing, novation, deferral or extension;

(b)     any claim for breach of representation, warranty or undertaking or on an event of default or under any indemnity given under or in connection with any document or agreement evidencing or constituting any other liability or obligation falling within this definition;

(c)     any claim for damages or restitution; and

(d)     any claim as a result of any recovery by the Buyer of a Payment on the grounds of preference or otherwise,

and any amounts which would be included in any of the above but for any discharge, non-provability, unenforceability or non-allowance of those amounts in any insolvency or other proceedings.

"**MOA**" means the memorandum of agreement dated 01 February 2019 [handwritten: "01 February", "January" struck through] and made between the Buyer and the Subordinated Creditor in respect of the sale of the Ship from the Subordinated Creditor to the Buyer, as from time to time amended or supplemented pursuant to the terms of the Senior Facility Agreement.

"**Non-Cash Consideration**" means consideration in a form other than cash.

"**Non-Cash Recoveries**" means any amount distributed to the Security Agent pursuant to Clause 4.1 (*Turnover by the Subordinated Creditor*) which is in the form of Non-Cash Consideration.

"**Party**" means a party to this Agreement.

"**Payment**" means, in respect of any Liabilities (or any other liabilities or obligations), a payment, prepayment, repayment, redemption, defeasance or discharge of those Liabilities (or other liabilities or obligations).

"**Permitted Payment**" means a Payment in relation to any Subordinated Liabilities permitted pursuant to the Senior Facility Agreement.

"**Seller's Credit**" means the amount of $5,535,000 granted by the Subordinated Creditor to the Buyer as deferred payment of part of the purchase price in respect of the Ship payable pursuant to the terms of the MOA.

"**Seller's Credit Agreement**" means the agreement dated 01 February 2019 and made between the Buyer and the Subordinated Creditor, as from time to time amended or supplemented in accordance with the terms of this Agreement.

"**Senior Creditor**" means the Security Agent and each other Secured Party.

"**Senior Discharge Date**" means the first date on which all Senior Liabilities have been fully and finally discharged to the satisfaction of the Facility Agent, whether or not as the result of an enforcement, and the Senior Creditors are under no further obligation to provide financial accommodation to the Buyer under any Senior Finance Document.

"**Senior Facility Agreement**" means the facility agreement dated 01 February 2019 and made between, amongst others, (i) the Buyer and several other companies as joint and several Borrowers (ii) the companies listed in Part A of Schedule 1 thereof as Hedge Guarantors, (iii) the financial institutions listed in Part B of Schedule 1 thereof as Original Lenders, (iv) the financial institutions listed in Part B of Schedule 1 thereof as Hedge Counterparties, (v) Crédit Agricole Corporate and Investment Bank as Arranger, Underwriter and Book Runner, (vi) Crédit Agricole Corporate and Investment Bank as Facility Agent and (vii) the Security Agent, as from time to time amended or supplemented.

"**Senior Finance Document**" has the meaning given to the term "Finance Documents" in the Senior Facility Agreement.

"**Senior Liabilities**" means the Liabilities owed by the Buyer to the Senior Creditors under the Senior Finance Documents.

"**Ship**" means m.v. "ADVANTAGE SPRING" to be purchased by the Buyer from the Subordinated Creditor pursuant to the terms of the relevant MOA and upon sale to be registered in the ownership of the Buyer under the laws of an Approved Flag.

"**Subordinated Finance Document**" means:

(a)     the Seller's Credit Agreement; and

(b)     any other document relating to or evidencing Liabilities of the Buyer in respect of the Seller's Credit and any other amount relevant thereto.

"**Subordinated Liabilities**" means the Liabilities owed to the Subordinated Creditor by the Buyer under on in connection with any Subordinated Finance Document.

1.2     **Defined expressions**

Defined expressions in the Senior Facility Agreement shall have the same meanings when used in this Agreement unless the context otherwise requires or unless otherwise defined in this Agreement.

1.3 **Construction and interpretation**

Clause 1.2 (*construction*) of the Senior Facility Agreement applies to this Agreement as if it were expressly incorporated in it with any necessary modifications.

1.4 **Third party rights**

Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement.

2 **THE SUBORDINATED CREDITOR AND SUBORDINATED LIABILITIES**

2.1 **Subordination**

Each of the Parties agree that the Subordinated Liabilities are postponed and subordinated to the Senior Liabilities in the manner and subject to the terms of this Agreement.

2.2 **Restriction on Payment**

Prior to the Senior Discharge Date, the Buyer shall not make any Payment of the Subordinated Liabilities other than a Permitted Payment at any time unless the taking or receipt of that Payment is permitted under Clause 3.2 (*Filing of claims and other actions after Insolvency Event*).

2.3 **Payment obligations continue**

The Buyer shall not be released from liability to make any Payment (including of default interest, which shall continue to accrue) under any Subordinated Finance Document by the operation of Clause 2.2 (*Restriction on Payment*) even if its obligation to make that Payment is restricted at any time by the terms of that Clause.

2.4 **No disposal of Subordinated Liabilities**

Prior to the Senior Discharge Date, the Subordinated Creditor shall not dispose of any of the Subordinated Liabilities or of any interest in them.

2.5 **Amendments and Waivers**

Prior to the Senior Discharge Date, the Subordinated Creditor may not amend the repayment terms, the interest provisions, the parties to the contract or the governing law of any of the documents or instruments pursuant to which the Subordinated Liabilities are constituted nor waive or agree to amend the terms thereof nor extend further credit or increase the amount of the Subordinated Liabilities unless the prior consent of the Security Agent is obtained.

2.6 **Validity of Senior Finance Documents not to be contested**

The Subordinated Creditor will not, in any proceedings or otherwise, claim

(a) that any Senior Finance Document is invalid, should be set aside or adjusted or lacks the priority which it was intended to have; or

(b) that any Payment made, or transaction entered into, under or in connection with any Senior Finance Document was invalid or should be set aside or adjusted.

### 2.7 Security

The Subordinated Creditor may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from the Buyer in respect of any of the Subordinated Liabilities prior to the Senior Discharge Date without the prior written consent of the Security Agent.

### 2.8 Restriction on Enforcement

Subject to Clause 3.2 (*Filing of claims and other actions after Insolvency Event*), the Subordinated Creditor shall not be entitled to take any Enforcement Action in respect of any of the Subordinated Liabilities at any time before the Senior Discharge Date.

### 2.9 Representations

The Subordinated Creditor represents and warrants to the Security Agent that:

(a) it is a limited liability company, duly incorporated or formed and validly existing under the laws of its jurisdiction of incorporation or formation;

(b) subject to the Legal Reservations, the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable obligations;

(c) the entry into and performance by it of this Agreement does not and will not:

   (i) conflict with any law or regulation applicable to it, its constitutional documents or any agreement or instrument binding upon it or any of its assets; or

   (ii) constitute a default or termination event (however described) under any agreement or instrument binding on it or any of its assets); and

(d) it is fully familiar with, and agrees to all the provisions of, the Senior Facility Agreement and the other Senior Finance Documents to which it is not a party.

### 2.10 Release of Subordinated Liabilities

Before the Senior Discharge Date, if the Security Agent so requests, the Subordinated Creditor shall promptly execute and deliver to the Security Agent such documents as the Security Agent may reasonably require to release the Buyer from all or part of the Subordinated Liabilities if:

(a) the Security Agent, or any Receiver appointed by the Security Agent under any Senior Finance Document, sells limited liability company interests in the capital of the Buyer under a power of sale arising under any Senior Finance Document or otherwise enforces any Security in respect of such limited liability company interests; or

(b) the Buyers' member or any administrator sells such limited liability company interests with the consent or at the request of the Security Agent.

## 3 EFFECT OF INSOLVENCY EVENT

### 3.1 Distributions

(a) After the occurrence of an Insolvency Event in relation to the Buyer and prior to the Senior Discharge Date, if the Subordinated Creditor is entitled to receive a distribution out of the

assets of the Buyer in respect of Subordinated Liabilities it shall, to the extent it is able to do so, direct the person responsible for the distribution of the assets of the Buyer to make that distribution to the Security Agent (or to such other person as the Security Agent shall direct) until the Liabilities owing to the Senior Creditors have been paid in full.

(b) The Security Agent shall apply distributions made to it under paragraph (a) above in accordance with clause 35.5 (*application of receipts; partial payments*) of the Senior Facility Agreement.

### 3.2 Filing of claims and other actions after Insolvency Event

After the occurrence of an Insolvency Event in relation to the Buyer and prior to the Senior Discharge Date, the Subordinated Creditor irrevocably authorises the Security Agent, on its behalf, to:

(a) take any Enforcement Action (in accordance with the terms of this Agreement) against the Buyer;

(b) demand, sue, prove and give receipt for any or all of the Subordinated Liabilities;

(c) collect and receive all distributions on, or on account of, any or all of the Subordinated Liabilities; and

(d) file claims, take proceedings and do all other things the Security Agent considers reasonably necessary to recover the Subordinated Liabilities,

and shall, if and as instructed by the Security Agent, itself take such action and otherwise shall take no such action.

### 3.3 Further assurance - Insolvency Event

The Subordinated Creditor will prior to the Senior Discharge Date:

(a) do all things that the Security Agent reasonably requests in order to give effect to this Clause 3 (*Effect of Insolvency Event*); and

(b) if the Security Agent is not entitled to take any of the actions contemplated by this Clause 3 (*Effect of Insolvency Event*) or if the Security Agent requests that the Subordinated Creditor take that action, undertake that action itself in accordance with the instructions of the Security Agent or grant from time to time any power of attorney to the Security Agent (in addition to any power of attorney already granted under this Agreement or otherwise and on such terms as the Security Agent may reasonably require) to enable the Security Agent to take such action.

### 3.4 Exercise of voting rights

Prior to the Senior Discharge Date, the Subordinated Creditor will cast its vote in any proposal put to the vote by or under the supervision of any judicial or supervisory authority in respect of any insolvency, pre-insolvency or rehabilitation or similar proceedings relating to the Buyer as instructed by the Security Agent.

## 4 TURNOVER OF RECEIPTS

### 4.1 Turnover by the Subordinated Creditor

If at any time prior to the Senior Discharge Date, the Subordinated Creditor receives or recovers (including, without limitation, pursuant to Clause 3.2 (*Filing of claims and other actions after Insolvency Event*):

(a) any Payment or distribution of, or on account of or in relation to, any of the Subordinated Liabilities;

(b) any amount by way of set-off in respect of any of the Subordinated Liabilities;

(c) notwithstanding paragraphs (a) and (b) above, any amount on account of, or in relation to, any of the Subordinated Liabilities as a result of any other litigation or proceedings against the Buyer (other than after the occurrence of an Insolvency Event in respect of the Buyer); or

(d) any distribution or Payment of, or on account of or in relation to, any of the Subordinated Liabilities which is made as a result of, or after, the occurrence of an Insolvency Event in respect of the Buyer,

other than a Permitted Payment, the Subordinated Creditor will:

(i) in relation to receipts and recoveries not received or recovered by way of set-off hold an amount of that receipt or recovery equal to the Senior Liabilities (or if less, the amount received or recovered) on trust for the Security Agent and promptly pay or distribute that amount to the Security Agent for application in accordance with the terms of the Senior Facility Agreement; and

(ii) in relation to receipts and recoveries received or recovered by way of set-off, promptly pay an amount equal to that recovery to the Security Agent for application in accordance with the terms of the Senior Facility Agreement.

### 4.2 Saving provision

If, for any reason, any of the trusts expressed to be created in this Clause 4 (*Turnover of Receipts*) should fail or be unenforceable, the Subordinated Creditor will promptly pay or distribute an amount equal to the receipt or recovery in respect of which the relevant trust was expressed to be created to the Security Agent for application in accordance with the terms of the Senior Facility Agreement.

### 4.3 Turnover of Non-Cash Consideration

For the purposes of this Clause 4 (*Turnover of Receipts*), if the Subordinated Creditor receives or recovers any amount or distribution in the form of Non-Cash Consideration which is subject to Clause 4.1 (*Turnover by the Subordinated Creditor*) the cash value of that Non-Cash Consideration shall be determined in accordance with Clause 7.1 (*Cash value of Non-Cash Recoveries*).

## 5    REDISTRIBUTION

### 5.1    Subordinated Creditor's rights

(a)    Any amount paid or distributed by the Subordinated Creditor to the Security Agent under Clause 3 (*Effect of Insolvency Event*) or Clause 4 (*Turnover of Receipts*) shall be treated as having been paid or distributed by the Buyer to the Security Agent and shall be applied by the Security Agent in accordance with the terms of the Senior Facility Agreement.

(b)    On an application by the Security Agent as described in paragraph (a) above, as between the Buyer and the Subordinated Creditor, an amount equal to the amount received or recovered by the Subordinated Creditor and paid or distributed to the Security Agent by the Subordinated Creditor (the "**Shared Amount**") will be treated as not having been paid or distributed by the Buyer to the Subordinated Creditor.

### 5.2    Deferral of subrogation prior to the Senior Discharge Date

The Subordinated Creditor will not exercise any rights which it may have by reason of the performance by it of its obligations under the Debt Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights under the Senior Finance Documents until the Senior Discharge Date.

## 6    FURTHER RIGHTS OF THE SECURITY AGENT AND THE OTHER SECURED PARTIES

### 6.1    Changes to the Senior Finance Documents

The Senior Finance Documents (other than this Agreement) may be amended, supplemented or novated from time to time without the consent of the Subordinated Creditor unless such amendments provide for:

(a)    the advance of principal to the Borrowers under the Senior Finance Documents which would result in the total outstanding principal amount of the Loan exceeding $190,000,000;

(b)    the amendment of the Senior Finance Documents to secure debts other than the Senior Liabilities;

(c)    an increase in the Margin above:

  (i)    1.75 per cent. per annum in respect of Tranche A; or

  (ii)    4.25 per cent. per annum in respect of Tranche B; or

(d)    an increase in the obligations of the Borrowers under clause 11 (*Fees*), clause 12 (*Tax Gross Up and* Indemnities), clause 13 (*Increased Costs*), clause 14 (*Other Indemnities*), clause 15 (*Mitigation by the Finance Parties*) or clause 16 (*Costs and Expenses*) of the Senior Facility Agreement,

in which case the prior written consent of the Subordinated Creditor shall be required if such amendments are made while an Event of Default has occurred and same remains unwaived.

6.2 **Consents of Security Agent**

Any consent or approval given by the Security Agent under this Agreement may be given subject to such conditions or requirements as it considers fit; any right or power which this Agreement confers on the Security Agent may be exercised whenever the Security Agent considers appropriate; and a certificate or determination of the Security Agent as to any matter provided for in this Agreement shall, in the absence of manifest error, be conclusive and binding on the Buyer and the Subordinated Creditor.

6.3 **No Buyer rights**

The Buyer will not have any rights under this Agreement and none of the undertakings in this Agreement by the Security Agent or the Subordinated Creditor are given (or be deemed to have been given) to, or for the benefit of, the Buyer.

6.4 **Agreement to override**

Unless expressly stated otherwise in this Agreement, this Agreement overrides anything in the Subordinated Finance Documents to the contrary.

6.5 **Power of Attorney from Subordinated Creditors**

(a) For the purpose of securing the due and punctual performance of its obligations to the Security Agent under or in connection with this Agreement, the Subordinated Creditor irrevocably and by way of security appoints the Security Agent as its attorney, on its behalf and in its name or otherwise, to execute or sign any document and do any act or thing which in this Agreement the Subordinated Creditor has authorised the Security Agent to execute or do on its behalf or which the Subordinated Creditor is obliged to do under this Agreement and has failed to do **provided that** the power of attorney constituted by this Clause 6.5 (*Power of Attorney from Subordinated Creditors*) shall be exercisable only when an Event of Default is continuing.

(b) The Security Agent may sub-delegate to any person or persons all or any of the powers conferred by this Clause 6.5 (*Power of Attorney from Subordinated Creditors*) and may do so on terms authorising successive sub delegations.

(c) This power of attorney shall not be valid on and after the Senior Discharge Date.

7 **NON-CASH RECOVERIES**

7.1 **Cash value of Non-Cash Recoveries**

(a) The cash value of any Non-Cash Recoveries shall be determined by reference to a valuation obtained by the Security Agent from a financial adviser appointed by it, taking into account any notional conversion made pursuant to Clause 9.5 (*Currency conversion*).

(b) If any Non-Cash Recoveries are distributed to any of the Senior Creditors pursuant to terms of the Senior Facility Agreement, the extent to which such distribution is treated as discharging the Senior Liabilities shall be determined by reference to the cash value of those Non-Cash Recoveries determined pursuant to paragraph (a) above.

### 7.2 Security Agent protection

If Non-Cash Consideration is or Non-Cash Recoveries are received or recovered before the Senior Discharge Date by the Security Agent, it may immediately realise and dispose of that Non-Cash Consideration for cash consideration (and distribute any cash proceeds of that Non-Cash Consideration to the relevant Senior Creditors in accordance with the terms of the Senior Facility Agreement) and shall be under no obligation to manage, exploit or collect that Non-Cash Consideration.

## 8 CHANGES TO THE PARTIES

### 8.1 Change of Security Agent

The Security Agent may:

(a) assign any of its rights; or

(b) transfer by novation any of its rights and obligations,

in respect of this Agreement if that assignment or transfer is in accordance with the terms of the Senior Facility Agreement.

### 8.2 Change of Subordinated Creditor

The Subordinated Creditor may not:

(a) assign any of its rights; or

(b) transfer by novation any of its rights and obligations,

in respect of any of this Agreement, the Subordinated Finance Documents or the Subordinated Liabilities.

## 9 INFORMATION AND ADMINISTRATION

### 9.1 Disclosure between Creditors

Notwithstanding any agreement to the contrary, the Buyer consents to the disclosure by the Creditors to each other of such information concerning the Buyer as any Creditor shall see fit.

### 9.2 Default

The Subordinated Creditor shall inform the Security Agent promptly on the occurrence of any breach or event of default under any of the Subordinated Finance Documents.

### 9.3 Amount of Subordinated Liabilities

On the request of the Security Agent, the Subordinated Creditor will promptly notify the Security Agent in writing of the amount of the Subordinated Liabilities.

### 9.4 Production of documents

The Subordinated Creditor shall promptly on request by the Security Agent, deliver to the Security Agent certified true copy of any Subordinated Finance Document.

### 9.5 Currency conversion

(a) For the purpose of, or pending the discharge of, any of the Senior Liabilities, the Security Agent may:

    (i) convert any moneys received or recovered by the Security Agent (including, without limitation, any cash proceeds of any Non-Cash Consideration) from one currency to another, at a market rate of exchange; and

    (ii) notionally convert the valuation provided in any opinion or valuation from one currency to another, at a market rate of exchange.

(b) the Senior Liabilities will not be reduced save to the extent of:

    (i) in the case of sub-paragraph (i) of paragraph (a) above, the amount of the due currency purchased after deducting the costs of conversion; and

    (ii) in the case of sub-paragraph (ii) of paragraph (a) above, the amount of the due currency which results from the notional conversion referred to in that paragraph.

## 10 INTEREST, INDEMNITY, COSTS AND EXPENSES

### 10.1 Interest

(a) Any sum payable by the Subordinated Creditor under this Agreement shall bear interest from its due date until the date of actual payment (both before and after judgment) at the rate set out in clause 8.3 (*default interest*) of the Senior Facility Agreement.

(b) Such interest will be compounded in accordance with the provisions of clause 8.3 (*default interest*) of the Senior Facility Agreement.

(c) Interest shall accrue and be calculated in accordance with clause 39.3 (*day count convention*) of the Senior Facility Agreement.

### 10.2 Indemnity

The Subordinated Creditor shall, on demand, fully indemnify each Senior Creditor against any costs, expenses or losses of any kind which such Senior Creditor incurs and which it would not have incurred but for:

(a) this Agreement, or any of its provisions, not being, or ceasing to be binding on the Buyer or any liquidator or administrator of the Buyer; or

(b) the Subordinated Creditor, the Buyer, any such liquidator or administrator or any other person challenging the validity of this Agreement or any of its provisions.

### 10.3 Enforcement costs

The Subordinated Creditor shall reimburse to the Security Agent on demand all costs, fees, taxes and expenses incurred by the Security Agent under or in connection with this Agreement and/or its enforcement and/or the preservation of the Security Agent's rights under this Agreement.

## 11 NOTICES

Clause 38 (*notices*) of the Senior Facility Agreement applies to this Agreement as if it were expressly incorporated in this Agreement with any necessary modifications including that, for the purposes of clause 38.2 (*addresses*) the address and fax number of the Subordinated Creditor shall be:

Levent Mah.
Comert Sokak
YKB Plaza A Blok K. 18
34330 Levent
Istanbul
Turkey
Fax No.:     + 90 212 325 5814
Email:       finance@advantagetankers.com
Attention:   Mehmet Mat

## 12 INCORPORATION OF SENIOR FACILITY AGREEMENT PROVISIONS

### 12.1 Incorporation of specific provisions

The following provisions of the Senior Facility Agreement apply to this Agreement as if they were expressly incorporated in this Agreement with any necessary modifications:

clause 40 (*partial invalidity*);

clause 41 (*remedies and waivers*);

clause 43 (*irrevocable payment*); and

clause 47 (*counterparts*).

### 12.2 Incorporation of general provisions

Clause 12.1 (*Incorporation of specific provisions*) is without prejudice to the application to this Agreement of any provision of the Senior Facility Agreement which, by its terms, applies or relates to the Senior Finance Documents generally or this Agreement specifically.

## 13 PRESERVATION

### 13.1 No impairment

If, at any time after its date, any provision of a Debt Document (including this Agreement) is not binding on or enforceable in accordance with its terms against a person expressed to be a party to that Debt Document, neither the binding nature nor the enforceability of that provision or any other provision of that Debt Document will be impaired as against any other party to that Debt Document.

### 13.2 Waiver of defences

The provisions of this Agreement or any Transaction Security will not be affected by an act, omission, matter or thing which, but for this Clause 13.2 (*Waiver of defences*) would reduce,

release or prejudice the subordination and priorities expressed to be created by this Agreement including (without limitation and whether or not known to any Party):

(a) any time, waiver or consent granted to, or composition with, the Buyer or any other person;

(b) the release of the Buyer or any other person under the terms of any composition or arrangement with any creditor of the Buyer;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, the Buyer or any other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any Security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of the Buyer or any other person;

(e) any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Senior Finance Document or any other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Senior Finance Document or any other document or security;

(g) any intermediate Payment of any of the Senior Liabilities in whole or in part; or

(h) any insolvency or similar proceedings.

**13.3 Effect of this Agreement**

Nothing contained in this Agreement will:

(a) require any Creditor to make any advance or provide any facility to the Buyer;

(b) make the Creditors partners with each other or with the Buyer; or

(c) as between the Buyer and the Security Agent, affect or prejudice any rights or remedies of the Security Agent under the Senior Finance Documents, which will remain in full force and effect.

**14 GOVERNING LAW**

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

**15 ENFORCEMENT**

**15.1 Jurisdiction**

(a) The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement ) (a "**Dispute**").

(b)     Each of the Buyer and the Subordinated Creditor accepts that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly neither of them will argue to the contrary.

(c)     This Clause 15.1 (*Jurisdiction*) is for the benefit of the Security Agent only. As a result, the Security Agent shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Security Agent may take concurrent proceedings in any number of jurisdictions.

## 15.2 Service of process

(a)     Without prejudice to any other mode of service allowed under any relevant law:

       (i)     the Buyer irrevocably appoints SH Process Agents Limited at its registered address for the time being at 1 Finsbury Circus, London EC2M 7SH, England as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement and agrees that failure by a process agent to notify it of the process will not invalidate the proceedings concerned;

       (ii)     the Subordinated Creditor irrevocably appoints Outline Shipping Services Limited Lilac Cottage, at its registered address for the time being at Brightwalton, Newbury, Berkshire, RG20 7BP, England, UK as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement; and

       (iii)     each of the Buyer and the Subordinated Creditor agrees that failure by a process agent to notify it of the process will not invalidate the proceedings concerned; and

(b)     If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Buyer and the Subordinated Creditor must each as soon as practicable (and in any event within five days of such event taking place) appoint another agent on terms acceptable to the Security Agent. Failing this, the Security Agent may appoint another agent for this purpose.

**This Agreement has been entered into on the date stated at the beginning of this Agreement and executed as a deed by each of the Buyer and the Subordinated Creditor and is intended to be and is delivered by them as a deed on the date specified above.**

EXECUTION PAGE

**BUYER**

| | |
|---|---|
| **EXECUTED AS A DEED** ) | |
| by **FLEETSCAPE SPRING, LLC** ) | *[signature]* |
| acting by ) | |
| being an attorney-in-fact ) | |
| expressly authorised in ) | |
| accordance with the laws of the Marshall Islands ) | |
| in the presence of: ) | Jennifer Ashford |
| ) | Attorney in fact |
| Witness' signature: *[signature]* ) | |
| Witness' name: Kieran Ferguson ) | |
| Witness' address: Trainee Solicitor | |
| Watson Farley & Williams LLP | |
| 15 Appold Street | |
| London EC2A 2HB | |

**SUBORDINATED CREDITOR**

| | |
|---|---|
| **EXECUTED AS A DEED** ) | |
| by **ADVANTAGE SPRING SHIPPING LLC** ) | *[signature]* |
| acting by ) | |
| being an attorney-in-fact ) | |
| expressly authorised in ) | |
| accordance with the laws of the Marshall Islands ) | |
| in the presence of: ) | |
| ) | |
| Witness' signature: *[signature]* ) | |
| Witness' name: Kieran Ferguson ) | |
| Witness' address: Trainee Solicitor | |
| Watson Farley & Williams LLP | |
| 15 Appold Street | |
| London EC2A 2HB | |

**SECURITY AGENT**

| | |
|---|---|
| SIGNED by ) | *[signature]* |
| duly authorised for and ) | |
| on behalf of ) | S Sadhika |
| **CRÉDIT AGRICOLE CORPORATE** ) | Attorney-in-Fact |
| **AND INVESTMENT BANK** ) | |
| in the presence of: ) | |
| ) | |
| Witness' signature: ) *[signature]* | |
| Witness' name: ) | |
| Witness' address: ) | |

Jamie Tiru
Trainee Solicitor
Watson Farley & Williams LLP
15 Appold Street
London EC2A 2HB