# EXHIBIT H

**$75,000,000**

**Loan Agreement**

Dated 1 February 2019

**(1)**      **Fleetscape Anthem, LLC**
            **Fleetscape Arrow, LLC**
            **Fleetscape Atom, LLC**
            **Fleetscape Avenue, LLC**
            **Fleetscape Award, LLC**
            **Fleetscape Sky, LLC**
            **Fleetscape Solar, LLC**
            **Fleetscape Spring, LLC**
            **Fleetscape Start, LLC**
            **Fleetscape Summer, LLC**
            **Fleetscape Sun, LLC**
            **(as Borrowers)**

**(2)**      **The Financial Institutions listed in Schedule 1 (as Original Junior Lenders)**

**(3)**      **Fleetscape Capital Limited (as Junior Agent)**

**(4)**      **Fleetscape Capital Limited (as Junior Security Agent)**

**Stephenson Harwood LLP**
1 Finsbury Circus, London EC2M 7SH
T. +44 20 7329 4422 | F. +44 20 7329 7100
DX: 64 Chancery Lane | www.shlegal.com



# Contents

|  |  | Page |
|---|---|---|
| **Section 1** | **Interpretation** | **3** |
| 1 | Definitions and Interpretation | 3 |
| **Section 2** | **The Loan** | **32** |
| 2 | The Loan | 32 |
| 3 | Purpose | 32 |
| 4 | Conditions of Utilisation | 32 |
| **Section 3** | **Utilisation** | **35** |
| 5 | Advance | 35 |
| **Section 4** | **Repayment, Prepayment and Cancellation** | **36** |
| 6 | Repayment | 36 |
| 7 | Illegality, Prepayment and Cancellation | 36 |
| **Section 5** | **Costs of Utilisation** | **40** |
| 8 | Interest | 40 |
| 9 | Interest Periods | 40 |
| 10 | Changes to the Calculation of Interest | 41 |
| 11 | Fees | 42 |
| **Section 6** | **Additional Payment Obligations** | **43** |
| 12 | Tax Gross Up and Indemnities | 43 |
| 13 | Increased Costs | 52 |
| 14 | Other Indemnities | 54 |
| 15 | Mitigation by the Junior Lenders | 56 |
| 16 | Costs and Expenses | 57 |
| **Section 7** | **Accounts, Earnings and Application of Moneys** | **59** |
| 17 | Accounts, Earnings and Application of Moneys | 59 |
| **Section 8** | **Representations, Undertakings and Events of Default** | **64** |
| 18 | Representations | 64 |
| 19 | Information Undertakings | 70 |

| 20 | Minimum Liquidity ................................................................ 73 |
| 21 | General Undertakings ........................................................... 74 |
| 22 | Events of Default ................................................................ 83 |
| **Section 9** | **Changes to Parties ....................................................... 89** |
| 23 | Changes to the Junior Lenders ............................................. 89 |
| 24 | Changes to the Obligors ...................................................... 94 |
| **Section 10** | **The Finance Parties .................................................... 95** |
| 25 | Role of the Junior Agent and the Junior Security Agent ............................. 95 |
| 26 | Conduct of Business by the Finance Parties .............................. 106 |
| 27 | Sharing among the Finance Parties ......................................... 107 |
| **Section 11** | **Administration ......................................................... 109** |
| 28 | Payment Mechanics ............................................................. 109 |
| 29 | Set-Off ............................................................................ 112 |
| 30 | Notices ........................................................................... 112 |
| 31 | Calculations and Certificates ............................................... 115 |
| 32 | Partial Invalidity ............................................................... 115 |
| 33 | Remedies and Waivers ....................................................... 116 |
| 34 | Amendments and Waivers ................................................... 116 |
| 35 | Confidentiality ................................................................. 121 |
| 36 | Disclosure of Junior Lender Details by Junior Agent .................... 125 |
| 37 | Counterparts .................................................................... 127 |
| 38 | Joint and Several Liability ................................................... 127 |
| **Section 12** | **Governing Law and Enforcement .................................. 129** |
| 39 | Governing Law .................................................................. 129 |
| 40 | Enforcement ..................................................................... 129 |
| Schedule 1 | The Original Junior Lenders ................................................. 130 |
| Schedule 2 | Part I Conditions Precedent ................................................. 131 |
| | Part II Conditions Subsequent ............................................. 136 |
| Schedule 3 | Utilisation Request ............................................................ 137 |
| Schedule 4 | Time Charter Rate for each Vessel ........................................ 140 |

Schedule 5    Form of Transfer Certificate ................................................................142

Schedule 6    Form of Assignment Agreement...........................................................145

Schedule 7    Approved Operating and Administrative Expenses .....................................149

Schedule 8    PIK Interest Calculation.....................................................................149

**Loan Agreement**

**Dated**  1  *February*  **2019**

**Between:**

(1) **Fleetscape Anthem, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 1"**);
**Fleetscape Arrow, LLC,** a limited liability company incorporated under the law of the Marshall Islands with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 2"**);
**Fleetscape Atom, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with  registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 3"**);
**Fleetscape Avenue, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 4"**);
**Fleetscape Award, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 5"**);
**Fleetscape Sky, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 6"**);
**Fleetscape Solar, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 7"**);
**Fleetscape Spring, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 8"**);
**Fleetscape Start, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 9"**);
**Fleetscape Summer, LLC,** a limited liability company incorporated under the law of the Marshall Islands, with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 10"**);  and
**Fleetscape Sun, LLC,** a limited liability company incorporated under the law of the Marshall Islands with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (**"Borrower 11"** and together the **"Borrowers"** and each a **"Borrower"**) jointly and severally; and

(2) **The Financial Institutions** listed in Schedule 1 (*The Original Junior Lenders*)**,** each acting through its Facility Office (together the **"Original Junior Lenders"** and each an **"Original Junior Lender"**); and

(3) **Fleetscape Capital Limited**, acting as junior agent (the **"Junior Agent"**); and

(4) **Fleetscape Capital Limited**, acting as junior security agent (the **" Junior Security Agent"**).

**Preliminary**

(A)  Each Borrower has agreed to purchase the relevant Vessel from the relevant Seller on the terms of the relevant MOA and intends to register that Vessel under the relevant flag specified below in the definition of "Vessels" and will immediately bareboat charter the relevant Vessel back to the relevant Seller pursuant to the terms and conditions of the relevant Bareboat Charter.

(B)  Each of the Original Junior Lenders has agreed to advance to the Borrowers on a joint and several basis its Commitment (aggregating, with all the other Commitments, up to $75,000,000) to assist the Borrowers to finance part of the aggregate of the purchase price of the Vessels referred to in Preliminary (A) above.

(C)  The Senior Lenders have agreed to make the Senior Loan available to the Borrowers on a joint and several basis to assist the Borrowers to finance part of the aggregate of the purchase price of the Vessels referred to in Preliminary (A) above.

(D)  The Sellers have agreed to provide the Borrowers with the Seller's Credit under the relevant Seller's Credit Agreement to further assist the Borrowers in financing the purchase price of the Vessels referred to in Preliminary (A) above.

**It is agreed** as follows:

**Section 1       Interpretation**

**1        Definitions and Interpretation**

1.1      **Definitions**   In this Agreement:

"**Account Holder**" means Crédit Agricole Corporate & Investment Bank acting through its office at 12, place des Etats-Unis, CS 70052, 92547 Montrouge Cedex, France, registered under the SIREN No. 304 187 701 of the Registre du Commerce et des Sociétés of Nanterre or any other bank or financial institution which at any time, with the Junior Agent's prior written consent, holds an Account.

"**Accounts**" means the Earnings Accounts, the Retention Accounts, the Dry Docking Reserve Accounts, the Balloon Reserve Accounts and the Bareboat Charterers' Accounts.

"**Administration**" has the meaning given to it in paragraph 1.1.3 of the ISM Code.

"**Administrative Expenses**" means, in relation to a Borrower in respect of any calendar year, the aggregate of all anticipated amounts in respect of that calendar year which are payable by that Borrower or, as the case may be, Fleetscape Advantage for corporate, administrative and filing fees in respect of that Borrower and the fees of legal and taxation advisers of that Borrower, capped at $20,000 per calendar year for that Borrower.

"**Advantage**" means Advantage Tankers LLC, a limited liability company incorporated under the laws of the Marshall Islands with its registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Aframax Vessel**" means each of Vessel 1, Vessel 2, Vessel 3, Vessel 4 and Vessel 5.

"**Agreed Rate of Hire**" means the aggregate of the Monthly Bareboat Charter Hire Payments and the Quarterly Bareboat Charter Hire Payments.

"**Annex VI**" means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

"**Approved Budget**" means a budget prepared by each Borrower in a format and whose contents are approved by the Senior Agent and the Junior Agent which shows all Operating and Administrative Expenses in respect of the Vessel belonging to that Borrower during a calendar year, or failing such approval, the Approved Operating and Administrative Expenses for the relevant calendar year for that Vessel.

"**Approved Operating and Administrative Expenses**" means the amount of the Operating and Administrative Expenses in respect of each Vessel during each calendar year, the amount budgeted being the amount set out in Schedule 7 for the relevant period.

"**Approved Flag**" means, in relation to a Vessel, as at the date of this Agreement, the flag of the Marshall Islands or such other flag approved in writing by the Junior Agent acting with the authorisation of the Majority Junior Lenders (such approval not to be unreasonably withheld).

"**Approved Operating and Administrative Expenses Account Holder**" means QNB Finansbank AS, Bogazici Branch or any other bank or financial institution which at any time, with the Junior Agent's prior written consent and the Senior Agent's prior written consent acting reasonably, holds an account from which the Approved Operating and Administrative Expenses are to be paid by a Bareboat Charterer or Advantage.

"**Approved Shipbroker**" means each of (a) Arrow Sale & Purchase (UK) Limited, (b) Braemar ACM Shipbroking, (c) Clarksons plc, (d) Fearnleys AS, (e) Maersk Broker K/S and any other reputable and independent ship brokers acceptable to and appointed by the Junior Agent.

"**Assignment Agreement**" means an agreement substantially in the form set out in Schedule 6 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including the date falling three months thereafter.

"**Balloon Reserve Accounts**" means the bank accounts opened or to be opened in the name of each Borrower with the Account Holder and designated by the relevant Borrower as the "**Balloon Reserve Account**" for that Borrower (each a "**Balloon Reserve Account**").

"**Bareboat Charter Guarantees**" means the guarantee and indemnity of Advantage in favour of each Borrower in respect of the respective obligations of each Bareboat Charterer under its Bareboat Charter and "**Bareboat Charter Guarantee**" means any one of them.

"**Bareboat Charters**" means the hell and high water bareboat charters dated on or around the date of this Agreement on the terms and subject to the conditions of which the Borrowers respectively will bareboat charter the Vessels to the Bareboat Charterers respectively for a period of not less than five years from the relevant Closing Date at the Agreed Rate of Hire and "**Bareboat Charter**" means any one of them.

"**Bareboat Charterer**" means:

(a)    in respect of Vessel 1, Seller 1;

(b)    in respect of Vessel 2, Seller 2;

(c)    in respect of Vessel 3, Seller 3;

(d)    in respect of Vessel 4, Seller 4;

(e)     in respect of Vessel 5, Seller 5;

(f)     in respect of Vessel 6, Seller 6;

(g)     in respect of Vessel 7, Seller 7;

(h)     in respect of Vessel 8, Seller 8;

(i)     in respect of Vessel 9, Seller 9;

(j)     in respect of Vessel 10, Seller 10; and

(k)     in respect of Vessel 11, Seller 11,

(together the "**Bareboat Charterers**").

"**Bareboat Charterers' Accounts**" means the bank accounts opened or to be opened in the name of each Bareboat Charterer with the Account Holder and designated by the relevant Bareboat Charterer as the "Bareboat Charterer's Account" for that Bareboat Charterer (each a "**Bareboat Charterer's Account**").

"**Break Costs**" means the amount (if any) by which:

(a)     the interest excluding the Margin which a Junior Lender should have received for the period from the date of receipt of all or any part of its participation in the Loan or an Unpaid Sum to the last day of the current Interest Period in respect of the Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Junior Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Paris, New York, Istanbul, Hamburg and Frankfurt.

"**Called Principal**" means the principal of the Loan that is to be prepaid pursuant to Clause 7.2 (*Voluntary prepayment of Loan*) or Clause 7.4 (*Mandatory prepayment on sale or Total Loss*).

"**Cash Interest**" means interest accruing on the Loan at the rate set out in Clause 8.1.1 and paid in full on each Interest Payment Date as set out in the cash waterfall in Clause 17.4 (*Application of Earnings*).

"**Charged Property**" means all of the assets of the Obligors which from time to time are, or are expressed to be, the subject of the Security Documents.

**"Closing Date"** means the date of delivery of each Vessel by the relevant Seller to the relevant Borrower under the relevant MOA and by the relevant Borrower to the relevant Bareboat Charterer under the relevant Bareboat Charter.

**"Code"** means the US Internal Revenue Code of 1986.

**"Commercial Manager"** means, in relation to a Vessel, the commercial manager of the Vessel from time to time being as at the date of this Agreement, Genel Denizcilik Nakliyati A.S., a company incorporated under the laws of Turkey with its registered office at Buyukdere Cad. Yapi Kredi Plaza, A Blok K:12, Levent, Istanbul, 34330, Turkey and, at any other time during the Facility Period and subject to, inter alia, written prior approval by the Time Charterer at the relevant time, OSM Maritime Group, a company incorporated under the laws of Cyprus with its registered office at 22 Amathountos Avenue, Agios Tychonas Cyprus Limassol CY, 4532, Cyprus or such other commercial manager as agreed in writing by the Junior Agent and the Senior Agent (acting on the instructions of the Majority Junior Lenders or the relevant Senior Lenders as the case may be) (such approval not to be unreasonably withheld).

**"Commitment"** means:

(a)     in relation to an Original Junior Lender, the amount set opposite its name under the heading "Commitment" in Schedule 1 (*The Original Junior Lenders*) and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Junior Lender, the amount of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

**"Commitment Fee"** means the commitment fee to be paid by the Borrowers to the Junior Agent under Clause 11.1 (*Commitment Fee*).

**"Confidential Information"** means all information relating to any Obligor, the Finance Documents or the Loan of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Loan from either:

(a)     any Obligor or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any Obligor or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 35 (*Confidentiality*); or

(ii) is identified in writing at the time of delivery as non-confidential by any Obligor or any of its advisers; or

(iii) is known by that Finance Party before the date the information is disclosed to it in accordance with (a) or (b) or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with any Obligor and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a recommended form of the Loan Market Association at the relevant time or any other form agreed between the Borrowers and the Junior Agent.

"**CTA**" means the Corporation Tax Act 2009.

"**Default**" means an Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Defaulting Junior Lender**" means any Junior Lender:

(a) which has failed to make its participation in a Tranche available (or has notified the Junior Agent or the Borrowers (which have notified the Junior Agent) that it will not make its participation in a Tranche available) by the relevant Utilisation Date of that Tranche in accordance with Clause 5.3 (*Junior Lenders' participation*); or

(b) which has otherwise rescinded or repudiated a Finance Document; or

(c) with respect to which an Insolvency Event has occurred and is continuing,

unless, in the case of (a):

(i) its failure to pay is caused by:

(A) administrative or technical error; or

(B) a Disruption Event; and

payment is made within three Business Days of its due date; or

(ii) the Junior Lender is disputing in good faith whether it is contractually obliged to make the payment in question.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Junior Security Agent.

"**Disruption Event**" means either or both of:

(a) a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Loan (or otherwise in order

for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)    the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

    (i)    from performing its payment obligations under the Finance Documents; or

    (ii)    from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**DOC**" means, in relation to the ISM Company, a valid Document of Compliance issued for the ISM Company by the Administration under paragraph 13.2 of the ISM Code.

"**Dry Docking Reserve Accounts**" means the bank accounts opened or to be opened in the name of each Borrower with the Account Holder and designated by the relevant Borrower as the "Dry Docking Reserve Account" for that Borrower (each a "**Dry Docking Reserve Account**").

"**Earnings**" means, in relation to a Vessel, all moneys whatsoever which are now, or later become, payable (actually or contingently) to a Borrower, a Bareboat Charterer the Junior Security Agent or the Senior Security Agent and which arise out of or in connection with or relate to the use or operation of that Vessel, including (but not limited to):

(a)    the following, save to the extent that any of them is, with the prior written consent of the Junior Agent and the Senior Agent (acting on the instructions of the Majority Junior Lenders or the relevant Senior Lenders as the case may be) (such approval not to be unreasonably withheld), pooled or shared with any other person:

    (i)    all freight, hire and passage moneys including, without limitation, all moneys payable under, arising out of or in connection with a Charter or a Charter Guarantee;

    (ii)    the proceeds of the exercise of any lien on sub-freights;

    (iii)    compensation payable to a Borrower, a Bareboat Charterer, the Junior Security Agent or the Senior Security Agent in the event of requisition of that Vessel for hire or use;

    (iv)    remuneration for salvage and towage services;

    (v)    demurrage and detention moneys;

(vi)  without prejudice to the generality of sub-paragraph (i) above, damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of that Vessel;

(vii)  all moneys which are at any time payable under any Insurances in relation to loss of hire;

(viii)  all monies which are at any time payable to a Borrower or a Bareboat Charterer in relation to general average contribution; and

(b)  if and whenever that Vessel is employed on terms whereby any moneys falling within sub-paragraphs (i) to (viii) of paragraph (a) above are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to that Vessel.

"**Earnings Accounts**" means the bank accounts opened or to be opened in the name of each Borrower with the Account Holder and designated by the relevant Borrower as the "Earnings Account" for that Borrower (each an "**Earnings Account**").

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Environmental Approval**" means any applicable present or future permit, ruling, variance or other applicable Authorisation required under Environmental Laws.

"**Environmental Claim**" means any claim by any governmental, judicial or regulatory authority or any other person which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law and, for this purpose, "**claim**" includes a claim for damages, compensation, contribution, injury, fines, losses and penalties or any other similar payment, including in relation to clean-up and removal, if similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

"**Environmental Incident**" means:

(a)  any release, emission, spill or discharge of Environmentally Sensitive Material whether within a Vessel or from a Vessel into any other vessel or into or upon the air, water, land or soils (including the seabed) or surface water; or

(b)  any incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, water, land or soils (including the seabed) or surface water from a vessel other than any Vessel and which involves a collision between any Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Vessel is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Vessel and/or any Obligor and/or any operator or manager of a Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, water, land or soils (including the seabed) or surface water otherwise than from a Vessel and in connection with which a Vessel is actually or potentially liable to be arrested and/or where any Obligor and/or any operator or manager of a Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action.

**"Environmental Law"** means any applicable present or future law relating to pollution or protection of human health or the environment, to conditions in the workplace, to the carriage, generation, handling, storage, use, release or spillage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material.

**"Environmentally Sensitive Material"** means and includes all contaminants, oil, oil products, toxic substances and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous.

**"Event of Default"** means any event or circumstance specified as such in Clause 22 (*Events of Default*).

**"Facility Office"** means:

(a)     in respect of a Junior Lender, the office or offices notified by that Junior Lender to the Junior Agent in writing on or before the date it becomes a Junior Lender (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

**"Facility Period"** means the period beginning on the date of this Agreement and ending on the date when the whole of the Indebtedness has been paid in full and the Obligors have ceased to be under any further actual or contingent liability to the Finance Parties under or in connection with the Finance Documents.

**"FATCA"** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in (a); or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in (a) or (b) with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**"FATCA Application Date"** means:

(a)    in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)    in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2019; or

(c)    in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within (a) or (b), 1 January 2019,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letter**" means any letter or letters dated on or about the date of this Agreement between the Junior Agent and the Borrowers setting out any of the fees referred to in Clause 11 (*Fees*).

"**Finance Documents**" means this Agreement, the Security Documents, each Utilisation Request, the Fee Letter and any other document designated as such by the Junior Agent and the Borrowers and "**Finance Document**" means any one of them.

"**Finance Parties**" means the Junior Agent, the Junior Security Agent and the Junior Lenders and "**Finance Party**" means any one of them.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)    moneys borrowed;

(b)    any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)    any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)    the amount of any liability in relation to any lease or hire purchase contract which would, in accordance with GAAP, be treated as a balance sheet liability (other than any liability in respect of a lease or hire purchase contract which would, in accordance with GAAP in force prior to 1 January 2019, have been treated as an operating lease);

(e)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)    any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g)    any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h)    any counter-indemnity obligation in relation to a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)    the amount of any liability in relation to any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Fleetscape Advantage**" means Fleetscape Advantage Holdings, LLC, a limited liability company incorporated under the law of the Marshall Islands with registered number 964394 whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

"**GAAP**" means generally accepted accounting principles in US including IFRS.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**IAPPC**" means a valid international air pollution prevention certificate for a Vessel issued under Annex VI.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Loan outstanding; all accrued and unpaid interest on the Loan; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to any of the Finance Parties under all or any of the Finance Documents.

"**Insolvency Event**" in relation to an entity means that the entity:

(a)    is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)    becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)    makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)    institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or

insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)     has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in (d) and:

   (i)     results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

   (ii)    is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(f)     has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g)     has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h)     seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in (d));

(i)     has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(j)     causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in (a) to (i); or

(k)     takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"**Insurances**" means, in relation to a Vessel:

   (a)    all policies and contracts of insurance, including entries of that Vessel in any protection and indemnity or war risks association, effected in relation to that

Vessel, that Vessel's Earnings or otherwise in relation to that Vessel whether before, on or after the date of this Agreement; and

(b)    all rights and other assets relating to, or derived from, any of such policies, contracts or entries, including any rights to a return of premium and any rights in relation to any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Agreement.

"**Interest Payment Date**" means each date for the payment of interest in accordance with Clause 8.2 (*Payment of interest*).

"**Interest Period**" means each period determined in accordance with Clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 8.3 (*Default interest*).

"**Interpolated Screen Rate**" means, in relation to LIBOR for any Tranche, the rate which results from interpolating on a linear basis between:

(a)    the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the relevant Interest Period of that Tranche; and

(b)    the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the relevant Interest Period of that Tranche,

each as of 11.00 a.m. on the Quotation Day for dollars.

"**ISM Code**" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention.

"**ISM Company**" means, at any given time, the company responsible for a Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code.

"**ISSC**" means a valid international ship security certificate for a Vessel issued under the ISPS Code.

"**ITA**" means the Income Tax Act 2007.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity.

"**Junior Lender**" means:

(a)    any Original Junior Lender; and

(b)    any bank, financial institution, trust, fund or other entity which has become a Party as a Junior Lender in accordance with Clause 23 (*Changes to the Junior Lenders*),

which in each case has not ceased to be a Party as such in accordance with the terms of this Agreement.

**"Legal Opinion"** means any legal opinion delivered to the Junior Agent under Clause 4.1 (*Initial conditions precedent*) or Clause 4.3 (*Conditions subsequent*).

**"Legal Reservations"** means:

(a) the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b) the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c) similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(d) any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

**"LIBOR"** means, in relation to any Tranche:

(a) the applicable Screen Rate as of 11:00 a.m. on the Quotation Date for dollars and for a period equal in length to the Interest Period of that Tranche or that part of that Tranche; or

(b) as otherwise determined pursuant to Clause 10.2 (*Market disruption*),

and if, in either case, that rate is less than two, LIBOR shall be deemed to be two.

**"Limitation Acts"** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

**"List of Foreign Sanctions Evaders"** means the foreign sanctions evaders list published by the Office of Foreign Assets Control of the United States Department of the Treasury and any other list identifying certain persons subject to Sanctions and issued by a Sanctions Authority.

**"Loan"** means the aggregate amount of the Tranches advanced or to be advanced by the Junior Lenders to the Borrowers under Clause 2 (*The Loan*) or, where the context permits, the principal amount of the Tranches advanced and for the time being outstanding.

**"Majority Junior Lenders"** means a Junior Lender or Junior Lenders whose Commitments aggregate more than 50.1 per cent of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 50.1 per cent of the Total Commitments immediately prior to the reduction).

**"Make Whole Amount"** means an amount equal to the interest that would have accrued on the Called Principal from and including the date of a prepayment made

pursuant to Clause 7.2 (*Voluntary prepayment of Loan*) or Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) until and including the date falling 22 months after the Closing Date in respect of the Vessel or Vessels financed by the Tranche or Tranches that have been prepaid or part prepaid (as the case may be) comprising the Margin only.

"**Management Agreements**" means:

(a)     the agreements for the commercial management of the Vessels dated 10 February 2015 or 1 April 2015 (as the case may be) between the Bareboat Charterers respectively and Genel Denizcilik Nakliyati A.S.; and

(b)     the agreements for the technical management of the Vessels dated 10 February 2015 or 1 April 2015 (as the case may be) between the Bareboat Charterers respectively and Genel Denizcilik Nakliyati A.S.,

each on an arm's length basis with reasonably commercial terms and pre-approved by each of the Borrowers and the Junior Lenders and covering all management services required by the Bareboat Charterers.

"**Managers**" means:

(a)     in relation to the commercial management of the Vessels, the applicable Commercial Manager; and

(b)     in relation to the technical management of the Vessels, the applicable Technical Manager,

or, in either case, such other commercial and/or technical managers of the Vessels nominated by the Borrowers as the Junior Agent may approve (acting on the instructions of the Majority Junior Lenders) (such approval not to be unreasonably withheld).

"**Managers' Undertakings**" means, in relation to a Vessel, the letter of undertaking from its Technical Manager and the letter of undertaking from its Commercial Manager (inter alia) subordinating the rights of such Technical Manager and such Commercial Manager respectively against that Vessel, the relevant Borrower and the relevant Bareboat Charterer to the rights of the Senior Finance Parties and the relevant Borrower.

"**Margin**" means nine point seven five (9.75) per cent per annum.

"**Market Value**" means the value of a Vessel conclusively determined by taking the arithmetic average of two desk-top valuations each prepared by an Approved Shipbroker appointed by the Junior Agent on the basis of a charter-free sale for prompt delivery for cash at arm's length on normal commercial terms as between a willing seller and a willing buyer and evidenced in each case by a valuation of that Vessel addressed to the Junior Agent certifying a value for that Vessel.

"**Material Adverse Effect**" means in the reasonable opinion of the Majority Junior Lenders a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of any Obligor; or

(b)     the ability of any Obligor to perform its obligations under any Finance Document; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Encumbrance granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

"**Maximum Loan Amount**" means $75,000,000.

"**Minimum Cash Interest**" means Cash Interest accruing on the Loan at the minimum rate of LIBOR plus two per cent per annum and payable on each Interest Payment Date in the order of application set forth in Clause 17.4.1(h).

"**Minimum Liquidity Amount**" means $500,000 per Vessel.

"**MOAs**" means:

(a)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 1 will sell Vessel 1 to Borrower 1;

(b)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 2 will sell Vessel 2 to Borrower 2;

(c)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 3 will sell Vessel 3 to Borrower 3;

(d)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 4 will sell Vessel 4 to Borrower 4;

(e)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 5 will sell Vessel 5 to Borrower 5;

(f)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 6 will sell Vessel 6 to Borrower 6;

(g)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 7 will sell Vessel 7 to Borrower 7;

(h)     a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 8 will sell Vessel 8 to Borrower 8;

(i)    a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 9 will sell Vessel 9 to Borrower 9;

(j)    a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 10 will sell Vessel 10 to Borrower 10; and

(k)    a memorandum of agreement to be entered into on or around the date of this Agreement on the terms and subject to the conditions of which Seller 11 will sell Vessel 11 to Borrower 11,

in each case, on such terms as the Junior Agent (acting on the instructions of the Majority Junior Lenders) may approve and "**MOA**" means any one of them.

"**Monthly Bareboat Charter Hire Payments**" means, in respect of a Vessel, a monthly hire payment to be paid by the relevant Bareboat Charterer to the relevant Borrower under the relevant Bareboat Charter in an amount of not less than the aggregate of the sum of the payments set out in Clauses 17.4.1(d) to 17.4.1(h) inclusive.

"**New Junior Lender**" has the meaning given to that term in Clause 23.1 (*Assignments and transfers by the Junior Lenders*).

"**Non-Consenting Junior Lender**" has the meaning given to that term in Clause 34.4.4 (*Replacement of Junior Lender*).

"**Obligors**" means each Borrower, Advantage, each Bareboat Charterer and any other person who may at any time during the Facility Period be liable for, or provide security for, all or any part of the Indebtedness, and "**Obligor**" means any one of them.

"**Operating and Administrative Expenses**" means, in relation to a Vessel in respect of any calendar year, the aggregate of all anticipated amounts as set out in the Approved Budget in respect of that calendar year which are payable by the Borrower owning that Vessel or, as the case may be, the Bareboat Charterer in respect of that Vessel during that calendar year, including crewing, victualing, insuring, maintaining, operating and managing that Vessel, as well as any reimbursable expense under the relevant Time Charter, such as port charges and bunkering expenses payable by that Borrower or, as the case may be, that Bareboat Charterer in relation to that Vessel or Advantage and reimbursed by the Time Charterer.

"**Original Financial Statements**" means the audited consolidated financial statements of Advantage for the financial year ended 31 December 2017.

"**Original Jurisdiction**" means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated as at the date of this Agreement.

"**Party**" means a party to this Agreement.

"**Permitted Disposal**" means any sale, lease, licence, transfer or other disposal is on arm's length terms:

(a)    of assets in exchange for other assets comparable or superior as to type, value and quality;

(b)    of obsolete or redundant vehicles, plant and equipment for cash;

(c)    arising as a result of any Permitted Encumbrance; and

(d)    a sale of a Vessel **provided that** the Borrowers have complied with the terms of Clause 7.4 (*Mandatory prepayment on sale or Total Loss*).

"**Permitted Encumbrance**" means:

(a)    any Encumbrance which has the prior written approval of the Junior Agent;

(b)    any Encumbrance arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by an Obligor;

(c)    any Quasi-Security arising as a result of a disposal which is a Permitted Disposal;

(d)    any liens for current crews' wages and salvage and liens incurred in the ordinary course of trading a Vessel up to an aggregate amount at any time not exceeding $500,000.

(e)    any Encumbrance arising under the Senior Finance Documents.

"**PIK Accrued Interest**" means any interest charged on the accrued balance of PIK Interest as set out in Clause 8.1.2 and is payable in accordance with the proviso to Clause 8.2 and Clause 17.4.1.

"**PIK Interest**" means any unpaid Cash Interest above the Minimum Cash Interest which accrues and is added to the principal balance of the Loan and is payable in accordance with the proviso to Clause 8.2 and Clause 17.4.1 and an example calculation of which is set out at Schedule 8 (*PIK Interest Calculation*).

"**PIK Interest Accrual**" mean the total balance of PIK Accrued Interest from time to time.

"**PIK Interest Margin**" means twelve point six seven five (12.675) per cent per annum.

"**PIK Interest Rate**" means the rate per cent per annum equal to the aggregate of LIBOR plus the PIK Interest Margin.

"**Prepayment Fee**" means:

(a)    at any time from and including the relevant Closing Date until and including the date falling 22 months after the relevant Closing Date, a fee equal to 4 per cent of the amount prepaid plus the Make Whole Amount;

(b)    from the day after the date falling 22 months after the relevant Closing Date until and including the third anniversary of the relevant Closing Date, a fee equal to 4 per cent of the amount prepaid;

(c)    from the day after the third anniversary of the relevant Closing Date until and including the fourth anniversary of the relevant Closing Date, a fee equal to 2 per cent of the amount prepaid; and

(d)    from the day after the fourth anniversary of the relevant Closing Date until and including the end of the Facility Period, a fee equal to 1 per cent of the amount prepaid.

**"Profit Share"** means the profit share element in relation to each Purchase Option Price due to a Borrower, being 10 per cent of the positive difference between (i) the relevant Vessel's Market Value determined no more than 30 days prior to the date of completion of the purchase of the relevant Vessel by the relevant Bareboat Charterer under the relevant Purchase Option and (ii) the relevant Purchase Option Price.

**"Prohibited Person"** means any person or entity, whether or not having a separate legal personality (a **"Person"**), whether designated by name or by reason of being included in a class of persons, that is, or that is owned or controlled by Persons that are or any vessel that is:

(a)    listed on, or directly or indirectly owned or controlled by a Person listed on, a Sanctions List, or a person acting on behalf of such a Person;

(b)    located or resident in, incorporated or organised under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a Person located or resident in a country or territory that is or whose government is the subject of Sanctions, broadly prohibiting dealings with such government, country or territory including country or territory wide Sanctions and in each case thereby itself becomes the target of such Sanctions;

(c)    otherwise a target of Sanctions (**"target of Sanctions"**, for the purpose of this paragraph (c), amongst other things, signifying a Person with whom a US Person or other national of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities or against whom Sanctions are otherwise directed); or

(d)    acting our purporting to act on behalf of any of the Persons listed in paragraphs (a) to (c) above with which any relevant Lender is prohibited from (i) dealing or (ii) otherwise engaging in any transaction pursuant to Sanctions.

**"Purchase Option"** means, in respect of a Vessel, the option of the relevant Bareboat Charterer contained in the relevant Bareboat Charter to purchase that Vessel on the terms and conditions contained therein.

**"Purchase Option Price"** has the meaning ascribed thereto in each Bareboat Charter.

**"Put Option"** means, in respect of a Vessel, the option of the relevant Borrower contained in the relevant Bareboat Charter to sell that Vessel to the Bareboat Charterer on the terms and conditions contained therein.

"**Quarterly Bareboat Charter Hire Payments**" means, in respect of a Vessel, a quarterly hire payment to be paid by the relevant Bareboat Charterer to the relevant Borrower under the relevant bareboat charter no later than 15 days after the end of each calendar quarter in an amount of not less than the aggregate of the sum of the payments set out in Clause 17.4.1(i) to Clause 17.4.1(m) inclusive.

"**Quasi-Security**" has the meaning given to that term in Clause 21.11 (*Negative pledge*).

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined (for dollars) two Business Days before the first day of that period, unless market practice differs in the Relevant Interbank Market, in which case the Quotation Day will be determined by the Junior Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

"**Reference Bank Rate**" means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Junior Agent at its request by the Reference Banks:

(a)     if:

      (iii)     the Reference Bank is a contributor to the Screen Rate; and

      (iv)     it consists of a single figure,

      the rate (applied to the relevant Reference Bank and the relevant currency and period) which contributors to the applicable Screen Rate are asked to submit to the relevant administrator; or

(b)     in any other case, the rate at which the relevant Reference Bank could fund itself in the relevant currency for the relevant period with reference to the unsecured wholesale funding market.

"**Reference Banks**" means entities as may be appointed by the Junior Agent in consultation with (but not subject to the approval of) the Borrowers.

"**Related Fund**" in relation to a fund (the "**first fund**"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Documents**" means the Finance Documents, the MOAs, the Bareboat Charters, the Time Charters, the Time Charter QELs, the Management Agreements, the Bareboat Charter Guarantees, the Seller's Credit Agreements and the Managers' Undertakings.

"**Relevant Interbank Market**" means the London interbank market.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)     its Original Jurisdiction;

(b)     any jurisdiction where any asset subject to or intended to be subject to a Security Document to be executed by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Security Documents entered into by it.

"**Repeating Representations**" means each of the representations set out in Clause 18.1.1 (*Status*) to Clause 18.1.6 (*Governing law and enforcement*), Clause 18.1.10 (*No default*) to Clause 18.1.20 (*Pari passu ranking*) and 18.1.26 (*Sanctions*).

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Requisition Compensation**" means all compensation or other money which may from time to time be payable to a Borrower and/or a Bareboat Charterer as a result of a Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"**Retention Accounts**" means the bank accounts opened or to be opened in the name of each Borrower with the Account Holder and designated by the relevant Borrower as the "Retention Account" for that Borrower (each a "**Retention Account**").

"**Sanctions**" means any trade, economic or financial sanctions, laws, regulations, embargoes, freezing provisions, prohibitions or other restrictive measures imposed, administered, enacted or enforced from time to time by any Sanctions Authority.

"**Sanctions Authority**" means the US, including without limitation the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union or any of its member states, including without limitation the Federal Republic of Germany, including without limitation the German Bundesbank, Federal Ministry of Economics and Energy (*Bundesministerium für Wirtschaft und Energie*), the United Kingdom, including Her Majesty's Treasury of the United Kingdom, Switzerland, including without limitation the State Secretariat for Economic Affairs of Switzerland (SECO) or the Swiss Directorate of International Law (DIL), Japan or, without prejudice to the foregoing, any other relevant sanctions authority of any other country which is in the normal trading range of the Vessels which enacts, administers or imposes Sanctions applicable by law to any Finance Party or an Obligor or a Vessel.

"**Sanctions List**" means any list of specially designated nationals and blocked persons or designated persons or vessels, the Sectoral Sanctions Identification List or the List of Foreign Sanctions Evaders (or equivalent) or any similar list which, in each case, is maintained by a Sanctions Authority as a measure of imposing, administering, enacting or enforcing Sanctions, in each case as amended, supplemented or substituted from time to time.

**"Screen Rate"** means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for dollars for the relevant period displayed on page LIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters. If such page or service ceases to be available, the Junior Agent may specify another page or service displaying the relevant rate after consultation with the Borrowers.

**"Sectoral Sanctions Identification List"** means a list identifying certain countries and/or certain persons operating in certain sectors of activity which are the subject of Sanctions (e.g. the sectoral sanctions identifications list published by the Office of Foreign Assets Control of the U.S. Department of the Treasury).

**"Secured Parties"** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate.

**"Security Documents"** means the Subordination Agreements and any agreement or document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and **"Security Document"** means any one of them.

**"Sellers"** means the persons specified as such in the definition of **"Vessels"** below and **"Seller"** means any one of them.

**"Seller's Credit"** means a fully subordinated, non-amortizing and non-interest bearing Seller's Credit in an aggregate amount of $58,000,000 granted by the Sellers to the Borrowers under the Seller's Credit Agreements with each Vessel's share of such Seller's Credit being as listed in the relevant column of the definition of "Vessels" below.

**"Seller's Credit Agreement"** means each seller's credit agreement dated on or around the date of this Agreement entered into between the relevant Borrower (as buyer) and the relevant Seller (as seller) pursuant to which the Sellers agreed to advance the Seller's Credit to the relevant Borrower.

**"Senior Agent"** means Crédit Agricole Corporate & Investment Bank acting through its office at place des Etats-Unis, CS 70052, 92547 Montrouge Cedex, France.

**"Senior Finance Documents"** means the Senior Loan Agreement, any Senior Swap Agreement, the Senior Security Documents and any other document designated as such by the Senior Agent and the Borrowers and **"Senior Finance Document"** means any one of them.

**"Senior Finance Parties"** means the Senior Agent, the Senior Security Agent, the Senior Lenders and the Senior Swap Providers and **"Senior Finance Party"** means any one of them.

**"Senior Indebtedness"** means the aggregate from time to time of: the amount of the Senior Loan outstanding; all accrued and unpaid interest on the Senior Loan; and all other sums of any nature (together with all accrued and unpaid interest on any of

those sums) payable to any of the Senior Finance Parties under all or any of the Senior Finance Documents.

"**Senior Lenders**" means Crédit Agricole Corporate & Investment Bank and the other senior lenders listed in schedule 1 of the Senior Loan Agreement from time to time and "**Senior Lender**" means any one of them.

"**Senior Loan**" means a loan in an amount of up to $190,000,000 to be made available by the Senior Lenders to the Borrowers subject to the terms and conditions set out in the Senior Loan Agreement.

"**Senior Loan Agreement**" means a loan agreement in respect of the Senior Loan dated on or around the date of this Agreement entered into between the Senior Lenders, the Senior Agent, the Senior Security Agent, the Senior Swap Providers and the Borrowers.

"**Senior Security Agent**" means Crédit Agricole Corporate & Investment Bank acting through its office at place des Etats-Unis, CS 70052, 92547 Montrouge Cedex, France.

"**Senior Security Documents**" means the "Security Documents" as defined in the Senior Loan Agreement.

"**Senior Swap Agreement**" means any ISDA Master Agreement and Schedule to be entered into between a Senior Swap Provider and the Borrowers in respect of the Senior Loan and each Confirmation (as defined therein) exchanged under that Senior Swap Agreement.

"**Senior Swap Providers**" means Crédit Agricole Corporate & Investment Bank acting through its office at 12, place des États-Unis, CS70052, 92547 Montrouge cedex, France and BNP Paribas SA acting through its office at 3 rue Taitbout, 75009 Paris.

"**SMC**" means a valid safety management certificate issued for a Vessel by or on behalf of the Administration under paragraph 13.7 of the ISM Code.

"**Subordination Agreements**" means the subordination agreements in respect of the Seller's Credit pursuant to the relevant Seller's Credit Agreement to be entered into between each Borrower, the relevant Bareboat Charterer and the Junior Security Agent, and "**Subordination Agreement**" means any one of them.

"**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

"**Suezmax Vessel**" means each of Vessel 6, Vessel 7, Vessel 8, Vessel 9, Vessel 10 and Vessel 11.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Technical Manager**" means, in relation to a Vessel, the commercial manager of the Vessel from time to time being as at the date of this Agreement, Genel Denizcilik

Nakliyati A.S., a company incorporated under the laws of Turkey with its registered office at Buyukdere Cad. Yapi Kredi Plaza, A Blok K:12, Levent, Istanbul, 34330, Turkey and, at any other time during the Facility Period and subject to, inter alia, written prior approval by the Time Charterer at the relevant time, OSM Maritime Group, a company incorporated under the laws of Cyprus with its registered office at 22 Amathountos Avenue, Agios Tychonas Cyprus Limassol CY, 4532, Cyprus or such other technical manager as agreed in writing by the Junior Agent and the Senior Agent (acting on the instructions of the Majority Junior Lenders or the relevant Senior Lenders as the case may be) (such approval not to be unreasonably withheld).

"**Termination Date**" means the date falling five years after the relevant Closing Date.

"**Time Charter QELs**" means, in respect of each Vessel, the letter of Quiet Enjoyment between the Senior Agent, the Senior Security Agent, the Junior Agent, the relevant Borrower and the relevant Bareboat Charterer (each a "**Time Charter QEL**").

"**Time Charter Rate**" means, in relation to each Vessel, the rate of hire and profit share set out in Schedule 4 (*Time Charter Rates for each Vessel*).

"**Time Charterer**" means Shell Western Supply and Trading Limited, a company incorporated according to the law of Barbados whose registered office is at Mahogany Court, Wildey Business Park, Wildey, St Michael BB11000, Barbados.

"**Time Charters**" means the time charters dated on or around the date of this Agreement entered into between the Time Charterer and the relevant Bareboat Charterer on the terms and subject to the conditions of which the relevant Bareboat Charterer will time charter the relevant Vessel to the Time Charterer for the applicable Time Charter Rate and for a term of not less than that detailed in Schedule 4 and "**Time Charter**" means any one of them.

"**Total Commitments**" means the aggregate of the Commitments.

"**Total Loss**" means in relation to a Vessel:

(a)    actual, constructive, compromised, agreed or arranged total loss of that Vessel; or

(b)    any Requisition of that Vessel unless that Vessel is returned to the full control of the relevant Borrower within 30 days of such Requisition.

"**Total Loss Date**" means, in relation to the Total Loss of a Vessel:

(a)    in the case of an actual loss of that Vessel, the date on which it occurred or, if that is unknown, the date when that Vessel was last heard of;

(b)    in the case of a constructive, compromised, agreed or arranged total loss of that Vessel, the earlier of:

(i)    the date on which a notice of abandonment is given (or deemed or agreed to be given) to the insurers; and

(ii)     the date of any compromise, arrangement or agreement made by or on behalf of the relevant Borrower with that Vessel's insurers in which the insurers agree to treat that Vessel as a total loss; and

(c)     in the case of any other type of Total Loss, the date (or the most likely date) on which it appears to the Junior Agent that the event constituting the total loss occurred.

**"Tranches"** means each of Tranche 1, Tranche 2, Tranche 3, Tranche 4, Tranche 5, Tranche 6, Tranche 7, Tranche 8, Tranche 9, Tranche 10 and Tranche 11 and **"Tranche"** means any one of them.

**"Tranche 1"** means an amount up $6,610,000.

**"Tranche 2"** means an amount up $5,425,000.

**"Tranche 3"** means an amount up $6,600,000.

**"Tranche 4"** means an amount up $5,920,000.

**"Tranche 5"** means an amount up $6,640,000.

**"Tranche 6"** means an amount up $6,850,000.

**"Tranche 7"** means an amount up $6,545,000.

**"Tranche 8"** means an amount up $7,200,000.

**"Tranche 9"** means an amount up $7,420,000.

**"Tranche 10"** means an amount up $7,165,000.

**"Tranche 11"** means an amount up $8,625,000.

**"Transfer Certificate"** means a certificate substantially in the form set out in Schedule 5 (*Form of Transfer Certificate*) or any other form agreed between the Junior Agent and the Borrowers.

**"Transfer Date"** means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)     the date on which the Junior Agent executes the relevant Assignment Agreement or Transfer Certificate.

**"Trust Property"** means:

(a)     all benefits derived by the Junior Security Agent from Clause 17 (*Security and Application of Moneys*); and

(b)     all benefits arising under (including, without limitation, all proceeds of the enforcement of) each of the Security Documents,

with the exception of any benefits arising solely for the benefit of the Junior Security Agent.

**"Unpaid Sum"** means any sum due and payable but unpaid by any Obligor under the Finance Documents.

**"US"** means the United States of America.

**"US Tax Obligor"** means:

(a)     an Obligor which is resident for tax purposes in the US; or

(b)     an Obligor some or all of whose payments under the Finance Documents are from sources within the US for US federal income tax purposes.

**"Utilisation Date"** means the date on which a Tranche is advanced under Clause 5 (*Advance*).

**"Utilisation Request"** means a notice substantially in the form set out in Schedule 3 (*Utilisation Request*).

**"VAT"** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112) or any other similar provision in any jurisdiction which is not a member state of the European Union); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in (a), or imposed elsewhere.

**"Vessels"** means the following vessels, and everything now or in the future belonging to them on board and ashore, currently registered under the respective flags set out below in the ownership of the respective Sellers set out below and intended to be sold to the respective Borrowers set out below on the terms of the MOAs and **"Vessel"** means any one of them:

| Name of Vessel | IMO no | Flag | Seller | Borrower | Seller's Credit |
|---|---|---|---|---|---|
| m.v. "ADVANTAGE ANTHEM" (**"Vessel 1"**) | 9472634 | Marshall Islands | Advantage Anthem Shipping LLC (**"Seller 1"**) | Borrower 1 | $5,180,000 |
| m.v. "ADVANTAGE ARROW" (**"Vessel 2"**) | 9419448 | Marshall Islands | Advantage Arrow Shipping LLC (**"Seller 2"**) | Borrower 2 | $4,340,000 |
| m.v. "ADVANTAGE ATOM" (**"Vessel 3"**) | 9472622 | Marshall Islands | Advantage Atom Shipping LLC (**"Seller 3"**) | Borrower 3 | $5,080,000 |

| m.v. "ADVANTAGE AVENUE" ("Vessel 4") | 9419450 | Marshall Islands | Advantage Avenue Shipping LLC ("Seller 4") | Borrower 4 | $4,580,000 |
|---|---|---|---|---|---|
| m.v. "ADVANTAGE AWARD" ("Vessel 5") | 9470131 | Marshall Islands | Advantage Award Shipping LLC ("Seller 5") | Borrower 5 | $5,090,000 |
| m.v. "ADVANTAGE SKY" ("Vessel 6") | 9419888 | Marshall Islands | Advantage Sky Shipping LLC ("Seller 6") | Borrower 6 | $5,300,000 |
| m.v. "ADVANTAGE SOLAR" ("Vessel 7") | 9408683 | Marshall Islands | Advantage Solar Shipping LLC ("Seller 7") | Borrower 7 | $5,035,000 |
| m.v. "ADVANTAGE SPRING" ("Vessel 8") | 9466582 | Marshall Islands | Advantage Spring Shipping LLC ("Seller 8") | Borrower 8 | $5,535,000 |
| m.v. "ADVANTAGE START" ("Vessel 9") | 9466570 | Marshall Islands | Advantage Start Shipping LLC ("Seller 9") | Borrower 9 | $5,810,000 |
| m.v. "ADVANTAGE SUMMER" ("Vessel 10") | 9419890 | Marshall Islands | Advantage Summer Shipping LLC ("Seller 10") | Borrower 10 | $5,495,000 |
| m.v. "ADVANTAGE SUN" ("Vessel 11") | 9513141 | Marshall Islands | Advantage Sun Shipping LLC ("Seller 11") | Borrower 11 | $6,555,000 |

1.2    **Construction**    Unless a contrary indication appears, any reference in this Agreement to:

1.2.1    any **"Junior Lender"**, any **"Borrower"**, any other **Obligor**, the **"Junior Agent"**, any **"Secured Party"**, the **"Junior Security Agent"**, any **"Finance Party"** or any **"Party"** shall be construed so as to include its successors in title, permitted assignees and permitted transferees;

1.2.2   **"assets"** includes present and future properties, revenues and rights of every description;

1.2.3   a **"Finance Document"**, a **"Security Document"**, a **"Relevant Document"** or any other document is a reference to that Finance Document, Security Document, Relevant Document or other document as amended, novated, supplemented, extended or restated from time to time;

1.2.4   a **"group of Junior Lenders"** includes all the Junior Lenders;

1.2.5   **"indebtedness"** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

1.2.6   a **"person"** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership or other entity (whether or not having separate legal personality);

1.2.7   a **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

1.2.8   a provision of law is a reference to that provision as amended or re-enacted from time to time; and

1.2.9   a time of day (unless otherwise specified) is a reference to London time.

1.3   **Headings**   Section, Clause and Schedule headings are for ease of reference only.

1.4   **Defined terms**   Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

1.5   **Default**   A Default is "continuing" if it has not been remedied or waived and an Event of Default is "continuing" if it has not been remedied or waived **provided that** if the Junior Agent has exercised any of its rights under Clause 22.2(*Acceleration*), an Event of Default is "continuing" if it has not been waived.

1.6   **Currency symbols and definitions**   **"$"**, **"USD"** and **"dollars"** denote the lawful currency of the United States of America.

1.7   **Third party rights**   A person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **"Third Parties Act"**) to enforce or to enjoy the benefit of any term of this Agreement.

1.8   **Offer letter**   This Agreement supersedes the terms and conditions contained in any correspondence relating to the subject matter of this Agreement exchanged between any Finance Party and the Borrowers or their representatives before the date of this Agreement.

1.9     **Contractual recognition of bail-in**

1.9.1   In this Clause 1.9:

**"Bail-In Action"** means the exercise of any Write-down and Conversion Powers.

**"Bail-In Legislation"** means:

(a)     in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time; and

(b)     in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

**"EEA Member Country"** means any member state of the European Union, Iceland, Liechtenstein and Norway.

**"EU Bail-In Legislation Schedule"** means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

**"Resolution Authority"** means any body which has authority to exercise any Write-down and Conversion Powers.

**"Write-down and Conversion Powers"** means:

(a)     in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and

(b)     in relation to any other applicable Bail-In Legislation:

(i)     any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

          (ii)     any similar or analogous powers under that Bail-In Legislation.

1.9.2    Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

     (a)    any Bail-In Action in relation to any such liability, including (without limitation):

          (i)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

          (ii)     a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

          (iii)     a cancellation of any such liability; and

     (b)    a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

**Section 2        The Loan**

**2        The Loan**

2.1    **Amount**    Subject to the terms of this Agreement, the Junior Lenders agree to make available to the Borrowers on a joint and several basis a term loan comprising up to eleven Tranches in an aggregate amount not exceeding the Maximum Loan Amount.

2.2    **Finance Parties' rights and obligations**

2.2.1    The obligations of each Finance Party under the Finance Documents are several.  Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents.  No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

2.2.2    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with Clause 2.2.3.  The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of the Loan or any other amount owed by an Obligor which relates to a Finance Party's participation in the Loan or its role under a Finance Document (including any such amount payable to the Junior Agent on its behalf) is a debt owing to that Finance Party by that Obligor.

2.2.3    A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents.

**3        Purpose**

3.1    **Purpose**    The Borrowers shall apply the Loan for the purposes referred to in Preliminary (B).

3.2    **Monitoring**    No Finance Party is bound to monitor or verify the application of any amount borrowed under this Agreement.

**4        Conditions of Utilisation**

4.1    **Initial conditions precedent**

4.1.1    The Junior Lenders will only be obliged to comply with Clause 5.3 (*Junior Lenders' participation*) in relation to the advance of a Tranche if, on or before the relevant Utilisation Date, the Junior Agent has received all of the documents and other evidence listed in Part I of Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to the Junior Agent, save that references in Section 2 of that Part I to "the Vessel" or to any person or document relating to a Vessel shall be deemed to relate solely to the Vessel to which the Tranche or Tranches specified in the relevant Utilisation Request or to any person or document relating to that Vessel respectively.

The Junior Agent shall notify the Borrowers and the Junior Lenders promptly upon being so satisfied.

4.1.2   Other than to the extent that the Majority Junior Lenders notify the Junior Agent in writing to the contrary before the Junior Agent gives the notification described in Clause 4.1.1, the Junior Lenders authorise (but do not require) the Junior Agent to give that notification.  The Junior Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

## 4.2   Further conditions precedent

4.2.1   The Junior Lenders will only be obliged to advance a Tranche if on the date of the relevant Utilisation Request and on the relevant proposed Utilisation Date:

(a)   no Default is continuing or would result from the advance of that Tranche; and

(b)   the representations made by each Borrower under Clause 18 (*Representations*) are true in all material respects.

4.2.2   The Junior Lenders will only be obliged to advance a Tranche if the advance in respect of that Tranche will not amount to more than the amount of the relevant Tranche nor increase the Loan to a sum in excess of the Maximum Loan Amount.

## 4.3   Conditions subsequent   The Borrowers undertake to deliver or to cause to be delivered to the Junior Agent within 30 days after the relevant Utilisation Date the additional documents and other evidence listed in Part II of Schedule 2 (*Conditions Subsequent*), save that references in that Part II to "the Vessel" or to any person or document relating to a Vessel shall be deemed to relate solely to the Vessel specified in the relevant Utilisation Request or to any person or document relating to that Vessel respectively.

## 4.4   No waiver   If the Junior Lenders in their sole discretion agree to advance a Tranche to the Borrowers before all of the documents and evidence required by Clause 4.1 (*Initial conditions precedent*) have been delivered to or to the order of the Junior Agent, the Borrowers undertake to deliver all outstanding documents and evidence to or to the order of the Junior Agent no later than 30 days after the relevant Utilisation Date or such other date specified by the Junior Agent (acting on the instructions of all the Junior Lenders).

The advance of a Tranche under this Clause 4.4 shall not be taken as a waiver of the Junior Lenders' right to require production of all the documents and evidence required by Clause 4.1 (*Initial conditions precedent*).

## 4.5   Form and content   All documents and evidence delivered to the Junior Agent under this Clause shall:

4.5.1   be in form and substance acceptable to the Junior Agent; and

4.5.2    if required by the Junior Agent, be certified, notarised, legalised or attested in a manner acceptable to the Junior Agent.

28

## Section 3      Utilisation

**5      Advance**

5.1      **Delivery of a Utilisation Request**    The Borrowers may request a Tranche to be advanced by delivery to the Junior Agent of a duly completed Utilisation Request not more than ten and not fewer than three Business Days before the proposed Utilisation Date.

5.2      **Completion of a Utilisation Request**    A Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

    5.2.1      it is signed by an authorised signatory of each Borrower;

    5.2.2      the proposed Utilisation Date is a Business Day within the Availability Period; and

    5.2.3      the proposed Interest Period complies with Clause 9 (*Interest Periods*).

5.3      **One Utilisation Request per Tranche**    Only one Utilisation Request may be delivered in respect of each Tranche.

5.4      **Junior Lenders' participation**

    5.4.1      Subject to Clauses 2 (*The Loan*), 3 (*Purpose*) and 4 (*Conditions of Utilisation*), each Junior Lender shall make its participation in a Tranche available by the relevant Utilisation Date through its Facility Office.

    5.4.2      The amount of each Junior Lender's participation in a Tranche will be equal to the proportion borne by its Commitment to the Total Commitments.

5.5      **Cancellation of Commitment**    The Total Commitments shall be cancelled at the end of the Availability Period to the extent that they are unutilised at that time.

**Section 4        Repayment, Prepayment and Cancellation**

**6        Repayment**

6.1      **Repayment of Loan**      Subject to Clause 17.4 (*Application of Earnings*) and the Senior Indebtedness being discharged in full, the Borrowers agree to repay each Tranche to the Junior Agent for the account of the Junior Lenders in one amount on the relevant Termination Date.

6.2      **Reborrowing**      The Borrowers may not reborrow any part of the Loan which is repaid or prepaid.

**7        Illegality, Prepayment and Cancellation**

7.1      **Illegality**

7.1.1      If in any applicable jurisdiction it becomes unlawful for a Junior Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in the Loan or it becomes unlawful for any Affiliate of a Junior Lender for that Junior Lender to do so:

(a)      that Junior Lender shall promptly notify the Junior Agent upon becoming aware of that event;

(b)      upon the Junior Agent notifying the Borrowers, the Commitment of that Junior Lender will be immediately cancelled; and

(c)      the Borrowers shall repay that Junior Lender's participation in each Tranche on the last day of the current Interest Period or, if earlier, the date specified by that Junior Lender in the notice delivered to the Junior Agent and notified by the Junior Agent to the Borrowers (being no earlier than the last day of any applicable grace period permitted by law).

7.1.2      If it becomes unlawful for a Junior Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan due to:

(a)      Sanctions (including in each case, without limitation, (A) the non-existence or cessation of legality, validity a binding effect or enforceability of a provision of a Finance Document and (B) the presence of any circumstances resulting in the imposition of any civil, administrative or criminal measures on a Junior Lender) and/or contrary to, or declared by any Sanctions Authority to be contrary to Sanctions for any Affiliate of a Junior Lender for that Junior Lender to do so; or

(b)      without prejudice to the generality of the preceding paragraph, the Obligors being or becoming a Prohibited Person, which would result in a breach of Sanctions by a Junior Lender:

(i)    to the extent permitted by applicable law, that Junior Lender shall promptly notify the Borrowers through the Junior Agent upon becoming aware of that event;

(ii)    such Junior Lender's Commitment will be cancelled on the date (the "**Sanctions Cancellation Date**") falling 30 days after the date on which the Junior Agent has notified the Borrowers, which it shall do promptly upon receipt of a notification from the Junior Lender; and

(iii)    the Borrowers shall repay that Junior Lender's participation in the Loan on the last day of the Interest Period for the Loan occurring after the Sanctions Cancellation Date or, if earlier, the date specified by the Junior Lender in the notice delivered to the Junior Agent (being no later than the earlier of (x) the Sanctions Cancellation Date and (y) the last day of any applicable grace period permitted by law).

7.2    **Voluntary prepayment of Loan**    Subject to the Senior Indebtedness being discharged in full, the Borrowers may prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the Loan by an amount which is an integral multiple of $100,000) subject as follows:

7.2.1    they give the Junior Agent not less than five Business Days' (or such shorter period as the Majority Junior Lenders may agree) prior notice; and

7.2.2    they pay to the Junior Agent for the account of the Junior Lenders any relevant Prepayment Fee, provided that no such Prepayment Fee shall be payable if (a) a Vessel is sold pursuant to the exercise of a Purchase Option and such sale and voluntary prepayment is part of the process required in order for Advantage to obtain a listing of its shares on a major internationally recognised stock exchange and (b) the Profit Share for the relevant Vessel due to the relevant Borrower is converted into common shares in Advantage registered in the name of such Borrower.

Any prepayment under this Clause 6.1 shall satisfy the obligations under Clause 6.1 (*Repayment of Loan*) on a pro rata basis across each of the Tranches.

7.3    **Right of cancellation and prepayment in relation to a single Junior Lender**

7.3.1    Subject to the Senior Indebtedness being discharged in full, if:

(a)    any sum payable to any Junior Lender by the Borrowers is required to be increased under Clause 12.2.2 (*Tax gross-up*); or

(b)    any Junior Lender claims indemnification from the Borrowers under Clause 12.3 (*Tax indemnity*) or Clause 13.1 (*Increased costs*),

the Borrowers may, whilst the circumstance giving rise to the requirement for that increase or indemnification continues, give the Junior Agent notice of cancellation of the Commitment(s) of that Junior Lender and their

intention to procure the repayment of that Junior Lender's participation in the Loan.

7.3.2    On receipt of a notice referred to in Clause 7.3.1 in relation to a Junior Lender, the Commitment(s) of that Junior Lender shall immediately be reduced to zero.

7.3.3    On the last day of the Interest Period in respect of each Tranche which ends after the Borrowers have given notice under Clause 7.3.1 in relation to a Junior Lender (or, if earlier, the date specified by the Borrowers in that notice), the Borrowers shall repay that Junior Lender's participation in that Tranche together with all interest and other amounts accrued under the Finance Documents.

7.4    **Mandatory prepayment on sale or Total Loss**    Subject to the Borrowers having complied with the terms of clause 7.5 (*Mandatory prepayment on sale or Total Loss*) of the Senior Loan Agreement or if the Senior Indebtedness has been discharged in full, if a Vessel is sold by a Borrower or becomes a Total Loss, the Borrowers shall, simultaneously with any such sale or on the earlier of the date falling 120 days after the Total Loss Date and the date of receipt by the Borrowers of the proceeds of insurance relating to such Total Loss, make a prepayment of the Tranche relating to that Vessel. In the case of a sale but not in the case of a Total Loss, the Borrowers shall, simultaneously with that sale, pay to the Junior Agent for the account of the Junior Lenders, in addition to the amount prepaid, any relevant Prepayment Fee, provided that no such Prepayment Fee shall be payable if:

7.4.1    the relevant Vessel is the first Vessel to be sold and is sold on or before the first anniversary of the Closing Date in respect of that Vessel; or

7.4.2    a Vessel is sold pursuant to the exercise of a Purchase Option and (i) such sale and mandatory prepayment is part of the process required in order for Advantage to obtain a listing of its shares on a major internationally recognised stock exchange and (ii) the Profit Share for the relevant Vessel due to the relevant Borrower is converted into common shares in Advantage registered in the name of such Borrower.

Any surplus sale proceeds or insurance proceeds resulting from a Total Loss shall be:

7.4.3    if a Default is continuing, be applied in prepayment of the Loan on a pro rata basis across each of the Tranches; and

7.4.4    at all other times, be paid by the Borrowers to the relevant Bareboat Charterer as a rebate of charter hire pursuant to the relevant Bareboat Charter.

7.5    **Right of cancellation in relation to a Defaulting Junior Lender**    Subject to the Senior Indebtedness being discharged in full, if any Junior Lender becomes a Defaulting Junior Lender, the Borrowers may, at any time whilst the Junior Lender continues to be a Defaulting Junior Lender, give the Junior Agent five Business Days' notice of cancellation of the Commitment of that Junior Lender. On that notice becoming effective, the Commitment of the Defaulting Junior Lender shall

immediately be reduced to zero.  The Junior Agent shall as soon as practicable after receipt of that notice notify all the Junior Lenders.

7.6    **Restrictions**    Any notice of prepayment or cancellation given under this Clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant prepayment or cancellation is to be made and the amount of that prepayment or cancellation.

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs and subject to Clause 7.2.2 (*Voluntary prepayment of Loan*) and Clause 7.4 (*Mandatory prepayment on sale or Total Loss*), without premium or penalty.

The Borrowers shall not repay, prepay or cancel all or any part of a Tranche except at the times and in the manner expressly provided for in this Agreement.

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

If the Junior Agent receives a notice under this Clause 7 it shall promptly forward a copy of that notice to the Borrowers or the affected Junior Lender, as appropriate.

**Section 5        Costs of Utilisation**

**8        Interest**

**8.1        Calculation of interest**

8.1.1    The rate of interest on each Tranche for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a)    Margin; and

(b)    LIBOR,

where such interest is paid in full on each Interest Payment Date in accordance with the order of application set out in Clause 17.4.1(c) (*Application of Earnings*).

8.1.2    If the Borrowers are not able to pay Cash Interest in full on each Interest Payment Date as per the order of application set out in Clause 17.4.1(c) (*Application of Earnings*), any unpaid Cash Interest above the Minimum Cash Interest shall accrue as PIK Interest.

8.1.3    If the Borrowers have accrued PIK Interest, interest on the balance of the PIK Interest shall accrue at the PIK Interest Rate and shall be added to the balance of the Loan or Tranche.

**8.2        Payment of interest**    The Borrowers shall pay accrued interest on each Tranche on the last day of each Interest Period, provided that PIK Interest shall be payable to the extent possible in accordance with the order of application set out in Clause 17.4 (*Application of Earnings*) and any unpaid PIK Interest shall be capitalised quarterly in arrears and shall be added as PIK Interest Accrual to the principal amount of the Loan or Tranche.

**8.3        Default interest**    If the Borrowers fail to pay any amount payable by them under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is two per cent per annum higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Tranche in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Junior Agent (acting reasonably).  Any interest accruing under this Clause 8.3 shall be immediately payable by the Borrowers on demand by the Junior Agent.

Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

**8.4        Notification of rates of interest**    The Junior Agent shall promptly notify the Borrowers of the determination of a rate of interest under this Agreement.

**9        Interest Periods**

**9.1        Selection of Interest Periods**    The Borrowers may select in a written notice to the Junior Agent the duration of an Interest Period for each Tranche subject as follows:

9.1.1    each notice is irrevocable and must be delivered to the Junior Agent by the Borrowers not later than 11.00 a.m. on the Quotation Day;

9.1.2    if the Borrowers fail to give a notice in accordance with Clause 9.1.1, the relevant Interest Period will, subject to Clause 9.2 (*Non-Business Days*), be three months;

9.1.3    subject to this Clause 9, the Borrowers may select an Interest Period of three months only or any other period agreed between the Borrowers and the Junior Agent (acting on the instructions of all the Junior Lenders);

9.1.4    an Interest Period shall not extend beyond the relevant Termination Date; and

9.1.5    the first Interest Period in respect of each Tranche shall start on the Utilisation Date of the relevant Tranche and end on 10 April 2019 (if the relevant Utilisation Date occurs prior to 10 April 2019) or 10 July 2019 (if the relevant Utilisation Date occurs on or after 10 April 2019), and all subsequent Interest Periods in respect of each Tranche shall start on the last day of the then current Interest Period and end three months thereafter.

9.2    **Non-Business Days**   If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

## 10    Changes to the Calculation of Interest

10.1    **Absence of quotations**   Subject to Clause 10.2 (*Market disruption*), if LIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by 11.00 am on the Quotation Day, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

10.2    **Market disruption**   If a Market Disruption Event occurs for any Interest Period, then the rate of interest on each Junior Lender's share of the relevant Tranche for that Interest Period shall be the percentage rate per annum which is the sum of:

10.2.1   the Margin; and

10.2.2   the rate notified to the Junior Agent by that Junior Lender as soon as practicable, and in any event by close of business on the date falling three Business Days after the Quotation Day (or, if earlier, on the date falling three Business Days prior to the date on which interest is due to be paid in respect of that Interest Period), to be that which expresses as a percentage rate per annum the cost to that Junior Lender of funding its participation in that Tranche from whatever source it may reasonably select.

In this Agreement "**Market Disruption Event**" means:

(a)    at or about noon on the Quotation Day for the relevant Interest Period LIBOR is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate

to the Junior Agent to determine LIBOR for dollars and the relevant Interest Period; or

(b)     before close of business in London on the Quotation Day for the relevant Interest Period, the Junior Agent receives notifications from a Junior Lender or Junior Lenders (whose participations in the relevant Tranche exceed 50.1 per cent of that Tranche) that the cost to it of funding its participation in that Tranche from whatever source it may reasonably select would be in excess of LIBOR.

## 10.3    Alternative basis of interest or funding

10.3.1    If a Market Disruption Event occurs and the Junior Agent or the Borrowers so require, the Junior Agent and the Borrowers shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest.

10.3.2    Any alternative basis agreed pursuant to Clause 10.3.1 shall, with the prior consent of all the Junior Lenders and the Borrowers, be binding on all Parties.

## 10.4    **Break Costs**    The Borrowers shall, within five Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Tranche or Unpaid Sum being paid by the Borrowers on a day other than the last day of an Interest Period for that Tranche or Unpaid Sum.

Each Junior Lender shall, as soon as reasonably practicable after a demand by the Junior Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

## 11    Fees

## 11.1    **Commitment Fee**    The Borrowers shall pay to the Junior Agent (for the account of the Junior Lenders in proportion to their Commitments) a fee computed at the rate of four (4) per cent per annum on the undrawn amount of the Loan for the period commencing on the date falling four (4) weeks after the first Closing Date until the end of the Availability Period.

The accrued commitment fee is calculated and payable on the last day of each successive period of three (3) months which ends during the Availability Period, on the last day of the Availability Period, on the Utilisation Date of the final Tranche to be advanced and (on the cancelled amount of the relevant Junior Lender's Commitment) at the time the cancellation is effective.

## 11.2    **Up front fee**    The Borrowers shall pay to the Junior Agent an upfront fee in the amount and at the times agreed in the Fee Letter.

## 11.3    **Break fee**    The Borrowers shall pay to the Junior Agent a break fee in the amount and at the times agreed in the Fee Letter.

**Section 6      Additional Payment Obligations**

**12      Tax Gross Up and Indemnities**

12.1    **Definitions**   In this Agreement:

"**Borrower DTTP Filing**" means an HM Revenue & Customs' Form DTTP2 duly completed and filed by the relevant Borrower, which:

(a)     where it relates to a Treaty Lender that is an Original Junior Lender, contains the scheme reference number and jurisdiction of tax residence stated opposite that Junior Lender's name in Schedule 1 (*The Original Junior Lenders*) and is filed with HM Revenue & Customs within 30 days of the date of this Agreement; or

(b)     where it relates to a Treaty Lender that is not an Original Junior Lender, contains the scheme reference number and jurisdiction of tax residence stated in respect of that Junior Lender in the documentation which it executes on becoming a Party as a Junior Lender and is filed with HM Revenue & Customs within 30 days of the relevant Transfer Date.

"**Protected Party**" means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Qualifying Lender**" means a Junior Lender which is beneficially entitled to interest payable to that Junior Lender in respect of an advance under a Finance Document and:

(a)     which is a bank (as defined for the purpose of section 879 of the ITA) making an advance under a Finance Document and is within the charge to United Kingdom corporation tax as respects any payments of interest made in respect of that advance or would be within such charge as respects such payments apart from section 18A of the CTA; or in respect of an advance made under a Finance Document by a person that was a bank (as defined for the purpose of section 879 of the ITA) at the time that that advance was made and within the charge to United Kingdom corporation tax as respects any payments of interest made in respect of that advance; or

(b)     which is:

(i)     a company resident in the United Kingdom for United Kingdom tax purposes;

(ii)    a partnership each member of which is:

(A)     a company so resident in the United Kingdom; or

(B)     a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of

section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

(iii)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company; or

(c)    which is a Treaty Lender.

**"Tax Confirmation"** means a confirmation by a Junior Lender that the person beneficially entitled to interest payable to that Junior Lender in respect of an advance under a Finance Document is either:

(a)    a company resident in the United Kingdom for United Kingdom tax purposes;

(b)    a partnership each member of which is:

    (i)    a company so resident in the United Kingdom; or

    (ii)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

(c)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.

**"Tax Credit"** means a credit against, relief or remission for, or repayment of any Tax.

**"Tax Deduction"** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**"Tax Payment"** means either the increase in a payment made by an Obligor to a Finance Party under Clause 12.2 (*Tax gross-up*) or a payment under Clause 12.3 (*Tax indemnity*).

**"Treaty Lender"** means a Junior Lender which:

(a)    is treated as a resident of a Treaty State for the purposes of the Treaty;

(b)    does not carry on a business in the United Kingdom through a permanent establishment with which that Junior Lender's participation in the Loan is effectively connected.

"**Treaty State**" means a jurisdiction having a double taxation agreement (a "**Treaty**") with the United Kingdom which makes provision for full exemption from tax imposed by the United Kingdom on interest.

"**UK Non-Bank Lender**" means a Junior Lender which is not an Original Junior Lender and which gives a Tax Confirmation in the documentation which it executes on becoming a Party as a Junior Lender.

Unless a contrary indication appears, in this Clause 12 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

12.2 **Tax gross-up**   Each Borrower shall (and shall procure that each other Obligor shall) make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law, subject as follows:

12.2.1 a Borrower shall promptly upon becoming aware that it or any other Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Junior Agent accordingly.  Similarly, a Junior Lender shall notify the Junior Agent on becoming so aware in respect of a payment payable to that Junior Lender.  If the Junior Agent receives such notification from a Junior Lender it shall notify the Borrowers and any such other Obligor;

12.2.2 if a Tax Deduction is required by law to be made by a Borrower or any other Obligor, the amount of the payment due from that Borrower or that other Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required;

12.2.3 a payment shall not be increased under Clause 12.2.2 by reason of a Tax Deduction on account of Tax imposed by the United Kingdom, if on the date on which the payment falls due:

(a) the payment could have been made to the relevant Junior Lender without a Tax Deduction if the Junior Lender had been a Qualifying Lender, but on that date that Junior Lender is not or has ceased to be a Qualifying Lender other than as a result of any change after the date it became a Junior Lender under this Agreement in (or in the interpretation, administration, or application of) any law or Treaty or any published practice or published concession of any relevant taxing authority; or

(b) the relevant Junior Lender is a Qualifying Lender solely by virtue of (b) of the definition of Qualifying Lender and:

(i) an officer of H.M. Revenue & Customs has given (and not revoked) a direction (a "**Direction**") under section 931 of the ITA which relates to the payment and that Junior Lender has received from the Borrower or from the other Obligor making the payment a certified copy of that Direction; and

        (ii)     the payment could have been made to the Junior Lender without any Tax Deduction if that Direction had not been made; or

(c)     the relevant Junior Lender is a Qualifying Lender solely by virtue of (b) of the definition of Qualifying Lender and:

        (i)     the relevant Junior Lender has not given a Tax Confirmation to the Borrowers; and

        (ii)     the payment could have been made to the Junior Lender without any Tax Deduction if the Junior Lender had given a Tax Confirmation to the Borrowers, on the basis that the Tax Confirmation would have enabled the Borrowers to have formed a reasonable belief that the payment was an "excepted payment" for the purpose of section 930 of the ITA; or

(d)     the relevant Junior Lender is a Treaty Lender and the Borrower or the other Obligor making the payment is able to demonstrate that the payment could have been made to that Junior Lender without the Tax Deduction had that Junior Lender complied with its obligations under Clause 12.2.6 or Clause 12.2.7 (as applicable);

12.2.4    if a Borrower or any other Obligor is required to make a Tax Deduction, that Borrower shall (and shall procure that such other Obligor shall) make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law;

12.2.5    within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower making that Tax Deduction shall (and shall procure that such other Obligor shall) deliver to the Junior Agent for the Finance Party entitled to the payment a statement under section 975 of the ITA or other evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority;

12.2.6   (a)     Subject to (b), a Treaty Lender and each Borrower which makes a payment to which that Treaty Lender is entitled shall co-operate (and the Borrowers shall procure that each other Obligor which makes a payment to which that Treaty Lender is entitled shall co-operate) in completing any procedural formalities necessary for that Borrower or that other Obligor to obtain authorisation to make that payment without a Tax Deduction or with a reduced Tax Deduction, as the case may be (whether under any domestic law or double taxation agreement or otherwise).

      (b)   (i)     A Treaty Lender which is an Original Junior Lender and that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, shall confirm its scheme reference number

and its jurisdiction of tax residence opposite its name in Schedule 1 (*The Original Junior Lenders*); and

(ii) a Treaty Lender which is not an Original Junior Lender and that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, shall confirm its scheme reference number and its jurisdiction of tax residence in the documentation which it executes on becoming a Party as a Junior Lender,

and, having done so, that Junior Lender shall be under no obligation pursuant to (a).

12.2.7 If a Junior Lender has confirmed its scheme reference number and its jurisdiction of tax residence in accordance with Clause 12.2.6(b) and:

(a) a Borrower making a payment to that Junior Lender has not made a Borrower DTTP Filing in respect of that Junior Lender; or

(b) a Borrower making a payment to that Junior Lender has made a Borrower DTTP Filing in respect of that Junior Lender but:

(i) that Borrower DTTP Filing has been rejected by HM Revenue & Customs; or

(ii) HM Revenue & Customs has not given that Borrower authority to make payments to that Junior Lender without a Tax Deduction within 60 days of the date of the Borrower DTTP Filing,

and in each case, that Borrower has notified that Junior Lender in writing, that Junior Lender and that Borrower shall co-operate in completing any additional procedural formalities necessary for that Borrower to obtain authorisation to make that payment without a Tax Deduction.

12.2.8 If a Junior Lender has not confirmed its scheme reference number and jurisdiction of tax residence in accordance with Clause 12.2.6(b), no Borrower shall make a Borrower DTTP Filing or file any other form relating to the HMRC DT Treaty Passport scheme in respect of that Junior Lender's Commitment(s) or its participation in the Loan unless the Junior Lender otherwise agrees.

12.2.9 A Borrower shall, promptly on making a Borrower DTTP Filing, deliver a copy of that Borrower DTTP Filing to the Junior Agent for delivery to the relevant Junior Lender.

12.2.10 A UK Non-Bank Lender shall promptly notify the Borrowers and the Junior Agent if there is any change in the position from that set out in the Tax Confirmation.

12.3    **Tax indemnity**

12.3.1  Each Borrower shall (within three Business Days of demand by the Junior Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

12.3.2  Clause 12.3.1 shall not apply:

(a)     with respect to any Tax assessed on a Finance Party:

(i)     under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident or as having a permanent establishment for tax purposes; or

(ii)    under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(b)     to the extent a loss, liability or cost:

(i)     is compensated for by an increased payment under Clause 12.2 (*Tax gross-up*);

(ii)    would have been compensated for by an increased payment under Clause 12.2 (*Tax gross-up*) but was not so compensated solely because one of the exclusions in Clause 12.2.3 (*Tax gross-up*) applied; or

(iii)   relates to a FATCA Deduction required to be made by a Party.

12.3.3  A Protected Party making, or intending to make a claim under Clause 12.3.1 shall promptly notify the Junior Agent of the event which will give, or has given, rise to the claim, following which the Junior Agent shall notify the Borrowers.

12.3.4  A Protected Party shall, on receiving a payment from a Borrower under this Clause 12.3, notify the Junior Agent.

12.4    **Tax Credit**   If a Borrower or any other Obligor makes a Tax Payment and the relevant Finance Party determines that:

12.4.1  a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

12.4.2   that Finance Party or an Affiliate of that Finance Party has obtained and utilised that Tax Credit,

that Finance Party shall pay an amount to that Borrower or to that other Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been made by that Borrower or that other Obligor.

12.5   **Junior Lender status confirmation**   Each Junior Lender which is not an Original Junior Lender shall indicate, in the documentation which it executes on becoming a Party as a Junior Lender, and for the benefit of the Junior Agent and without liability to any Obligor, which of the following categories it falls in:

12.5.1   not a Qualifying Lender;

12.5.2   a Qualifying Lender (other than a Treaty Lender); or

12.5.3   a Treaty Lender.

If such a Junior Lender fails to indicate its status in accordance with this Clause 12.5 then that Junior Lender shall be treated for the purposes of this Agreement (including by each Obligor) as if it is not a Qualifying Lender until such time as it notifies the Junior Agent which category applies (and the Junior Agent, upon receipt of such notification, shall inform the Borrowers).   For the avoidance of doubt, the documentation which a Junior Lender executes on becoming a Party as a Junior Lender shall not be invalidated by any failure of a Junior Lender to comply with this Clause 12.5.

12.6   **Stamp taxes**   The Borrowers shall pay and, within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

12.7   **VAT**

12.7.1   All amounts expressed to be payable under a Finance Document by any Party or any Obligor to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to Clause 12.7.2, if  VAT is or becomes chargeable on any supply made by any Finance Party to any Party or any Obligor under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party or Obligor must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to the Borrowers).

12.7.2   If VAT is or becomes chargeable on any supply made by any Finance Party (the **"Supplier"**) to any other Finance Party (the **"Recipient"**) under a Finance Document, and any Party other than the Recipient (the **"Relevant Party"**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather

than being required to reimburse or indemnify the Recipient in respect of that consideration):

(a)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this Clause 12.7.2(a) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(b)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

12.7.3   Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

12.7.4   Any reference in this Clause 12.7 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994).

12.7.5   In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

## 12.8   FATCA information

12.8.1   Subject to Clause 12.8.3, each Party shall, within ten Business Days of a reasonable request by another Party:

(a)    confirm to that other Party whether it is:

(i)    a FATCA Exempt Party; or

        (ii)      not a FATCA Exempt Party;

    (b)      supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

    (c)      supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

12.8.2    If a Party confirms to another Party pursuant to Clause 12.8.1(a)(i) that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

12.8.3    Clause 12.8.1 shall not oblige any Finance Party to do anything, and Clause 12.8.1(c) shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

    (a)      any law or regulation;

    (b)      any fiduciary duty; or

    (c)      any duty of confidentiality.

12.8.4    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with Clause 12.8.1(a) or 12.8.1(b) (including, for the avoidance of doubt, where Clause 12.8.3 applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

12.8.5    If a Borrower is a US Tax Obligor or the Junior Agent reasonably believes that its obligations under FATCA or any other applicable law or regulation require it, each Junior Lender shall, within ten Business Days of:

    (a)      where a Borrower is a US Tax Obligor and the relevant Junior Lender is an Original Junior Lender, the date of this Agreement;

    (b)      where a Borrower is a US Tax Obligor on a date on which any other Junior Lender becomes a Party as a Junior Lender, that date; or

    (c)      where a Borrower is not a US Tax Obligor, the date of a request from the Junior Agent,

supply to the Junior Agent:

        (i)      a withholding certificate on Form W-8 or Form W-9 or any other relevant form; or

(ii) any withholding statement or other document, authorisation or waiver as the Junior Agent may require to certify or establish the status of such Junior Lender under FATCA or that other law or regulation.

12.8.6 The Junior Agent shall provide any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Junior Lender pursuant to Clause 12.8.5 to the Borrowers.

12.8.7 If any withholding certificate, withholding statement, document, authorisation or waiver provided to the Junior Agent by a Junior Lender pursuant to Clause 12.8.5 is or becomes materially inaccurate or incomplete, that Junior Lender shall promptly update it and provide such updated withholding certificate, withholding statement, document, authorisation or waiver to the Junior Agent unless it is unlawful for the Junior Lender to do so (in which case the Junior Lender shall promptly notify the Junior Agent). The Junior Agent shall provide any such updated withholding certificate, withholding statement, document, authorisation or waiver to the Borrowers.

12.8.8 The Junior Agent may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Junior Lender pursuant to Clause 12.8.5 or 12.8.7 without further verification. The Junior Agent shall not be liable for any action taken by it under or in connection with Clause 12.8.5, 12.8.6 or 12.8.7.

## 12.9 FATCA Deduction

12.9.1 Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

12.9.2 Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction) notify the Party to whom it is making the payment and, in addition, shall notify the Borrowers and the Junior Agent and the Junior Agent shall notify the other Finance Parties.

## 13 Increased Costs

13.1 **Increased costs**   Subject to Clause 13.3 (*Exceptions*) the Borrowers shall, within three Business Days of a demand by the Junior Agent, pay to the Junior Agent for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement or (iii) the implementation or application of or compliance with Basel III, CRR or CRD IV or any other law or regulation which implements Basel III, CRR or CRD IV (whether such implementation, application or compliance is by a government, regulator, that Finance Party or any of that Finance Party's Affiliates).

In this Agreement:

(a)     "**Basel III**" means:

      (i)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

      (ii)    the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

      (iii)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

(b)     "**CRD IV**" means Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC, as amended, supplemented or restated.

(c)     "**CRR**" means Regulation EU No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation EU No 648/2012, as amended, supplemented or restated.

(d)     "**Increased Costs**" means:

      (i)     a reduction in the rate of return from the Loan or on a Finance Party's (or its Affiliate's) overall capital;

      (ii)    an additional or increased cost; or

      (iii)   a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into any Finance Document or funding or performing its obligations under any Finance Document.

## 13.2    Increased cost claims

13.2.1  A Finance Party intending to make a claim pursuant to Clause 13.1 (*Increased costs*) shall notify the Junior Agent of the event giving rise to the claim, following which the Junior Agent shall promptly notify the Borrowers.

13.2.2  Each Finance Party shall, as soon as practicable after a demand by the Junior Agent, provide a certificate confirming the amount of its Increased Costs.

13.3  **Exceptions**  Clause 13.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

13.3.1  attributable to a Tax Deduction required by law to be made by a Borrower;

13.3.2  attributable to a FATCA Deduction required to be made by a Party;

13.3.3  compensated for by Clause 12.3 (*Tax indemnity*) (or would have been compensated for under Clause 12.3 but was not so compensated solely because any of the exclusions in Clause 12.3 applied);

13.3.4  attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation; or

13.3.5  attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) ("**Basel II**") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates).

In this Clause 13.3, a reference to a "**Tax Deduction**" has the same meaning given to the term in Clause 12.1 (*Definitions*).

## 14  **Other Indemnities**

14.1  **Currency indemnity**  If any sum due from a Borrower under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

14.1.1  making or filing a claim or proof against that Borrower, or

14.1.2  obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Borrower shall as an independent obligation, within three Business Days of demand, indemnify each Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (a) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (b) the rate or rates of exchange available to that Finance Party at the time of its receipt of that Sum.

Each Borrower waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

14.2    **Other indemnities**

14.2.1    The Borrowers shall, within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability incurred by that Finance Party as a result of:

(a)    the occurrence of any Event of Default;

(b)    a failure by a Borrower to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 27 (*Sharing among the Finance Parties*);

(c)    funding, or making arrangements to fund, a Tranche following delivery by the Borrowers of the relevant Utilisation Request but that Tranche not being advanced by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by a Finance Party alone); or

(d)    the Loan (or part of the Loan) not being prepaid in accordance with a notice of prepayment given by the Borrowers.

14.2.2    The Borrowers shall promptly indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate (each such person for the purposes of this Clause 14.2 an **"Indemnified Person"**) against any cost, loss or liability incurred by that Indemnified Person pursuant to or in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry, in connection with or arising out of the entry into and the transactions contemplated by the Finance Documents, having the benefit of any Encumbrance constituted by the Finance Documents or which relates to the condition or operation of, or any incident occurring in relation to, a Vessel, unless such cost, loss or liability is caused by the gross negligence or wilful misconduct of that Indemnified Person.

14.2.3    Subject to any limitations set out in Clause 14.2.2, the indemnity in that Clause shall cover any cost, loss or liability incurred by each Indemnified Person in any jurisdiction:

(a)    arising or asserted under or in connection with any law relating to safety at sea, the ISM Code, any Environmental Law or any applicable Sanctions; or

(b)    in connection with any Environmental Claim.

14.3    **Indemnity to the Junior Agent**    The Borrowers shall promptly indemnify the Junior Agent against:

14.3.1    any cost, loss or liability incurred by the Junior Agent (acting reasonably) as a result of:

(a)    investigating any event which it reasonably believes is a Default; or

(b)      acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

(c)      instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

14.3.2    any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Junior Agent (otherwise than by reason of the Junior Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 28.11 (*Disruption to payment systems etc.*) notwithstanding the Junior Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Junior Agent) in acting as Junior Agent under the Finance Documents.

14.4    **Indemnity to the Junior Security Agent**   The Borrowers shall promptly indemnify the Junior Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

14.4.1    any failure by the Borrowers to comply with their obligations under Clause 16 (*Costs and Expenses*);

14.4.2    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

14.4.3    the taking, holding, protection or enforcement of the Security Documents;

14.4.4    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Junior Security Agent and each Receiver and Delegate by the Finance Documents or by law;

14.4.5    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

14.4.6    acting as Junior Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant Junior Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

14.5    **Indemnity survival**   The indemnities contained in this Agreement shall survive repayment of the Loan.

## 15    Mitigation by the Junior Lenders

15.1    **Mitigation**   Each Finance Party shall, in consultation with the Borrowers, take all reasonable steps to mitigate any circumstances which arise and which would result in all or any part of a Tranche ceasing to be available or any amount becoming payable under or pursuant to any of Clause 7.1 (*Illegality*) (unless caused by Sanctions), Clause 12 (*Tax Gross Up and Indemnities*) or Clause 13 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance

Documents to another Affiliate or Facility Office.  The above does not in any way limit the obligations of any Obligor under the Finance Documents.

15.2 **Limitation of liability**  The Borrowers shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 15.1 (*Mitigation*).  A Finance Party is not obliged to take any steps under Clause 15.1 if, in its opinion (acting reasonably), to do so might be prejudicial to it.

## 16    Costs and Expenses

16.1 **Transaction expenses**  The Borrowers shall within three Business Days of demand pay the Junior Agent and the Junior Security Agent the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (and, in the case of the Junior Security Agent, by any Receiver or Delegate) in connection with:

16.1.1  the negotiation, preparation, printing, execution, syndication and perfection of this Agreement and any other documents referred to in this Agreement;

16.1.2  the negotiation, preparation, printing, execution and perfection of any other Finance Documents executed after the date of this Agreement;

16.1.3  any other document which may at any time be required by a Finance Party to give effect to any Finance Document or which a Finance Party is entitled to call for or obtain under any Finance Document (including, without limitation, any valuation of a Vessel); and

16.1.4  any discharge, release or reassignment of any of the Security Documents.

16.2 **Amendment costs**  If (a) an Obligor requests an amendment, waiver or consent or (b) an amendment is required under Clause 28.10 (*Change of currency*), the Borrowers shall, within three Business Days of demand, reimburse each of the Junior Agent and the Junior Security Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Junior Agent and the Junior Security Agent (and, in the case of the Junior Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

16.3 **Junior Agent and Junior Security Agent's management time and additional remuneration**  Any amount payable to the Junior Agent under Clause 14.3 (*Indemnity to the Junior Agent*) or to the Junior Security Agent under Clause 14.4 (*Indemnity to the Junior Security Agent*) or to either of them under this Clause 16 or Clause 25.10 (*Junior Lenders' indemnity to the Junior Agent*) shall include the cost of utilising the management time or other resources of the Junior Agent or the Junior Security Agent (as the case may be) and will be calculated on the basis of such reasonable daily or hourly rates as the Junior Agent or the Junior Security Agent may notify to the Borrowers and the Junior Lenders, and is in addition to any other fee paid or payable to the Junior Agent or the Junior Security Agent.

16.4 **Enforcement and preservation costs**  The Borrowers shall, within three Business Days of demand, pay to each Finance Party and each other Secured Party the amount of all costs and expenses (including legal fees) incurred by that Finance Party

in connection with the enforcement of, or the preservation of any rights under, any Finance Document and any proceedings instituted by or against the Junior Security Agent as a consequence of taking or holding the Security Documents or enforcing those rights including (without limitation) any losses, costs and expenses which that Finance Party or other Secured Party may from time to time sustain, incur or become liable for by reason of that Finance Party or other Secured Party being mortgagee of a Vessel and/or a lender to a Borrower, or by reason of that Finance Party or other Secured Party being deemed by any court or authority to be an operator or controller, or in any way concerned in the operation or control, of a Vessel.

16.5 **Other costs**   The Borrowers shall, within three Business Days of demand, pay to each Finance Party and each other Secured Party the amount of all sums which that Finance Party or other Secured Party may pay or become actually or contingently liable for on account of a Borrower in connection with a Vessel (whether alone or jointly or jointly and severally with any other person) including (without limitation) all sums which that Finance Party or other Secured Party may pay or guarantees which it may give in respect of the Insurances, any expenses incurred by that Finance Party or other Secured Party in connection with the maintenance or repair of a Vessel or in discharging any lien, bond or other claim relating in any way to a Vessel, and any sums which that Finance Party or other Secured Party may pay or guarantees which it may give to procure the release of a Vessel from arrest or detention.

**Section 7        Accounts, Earnings and Application of Moneys**

**17        Accounts, Earnings and Application of Moneys**

17.1    **Accounts**    The Borrowers shall establish and maintain or procure the establishment or maintenance by the Bareboat Charterers (as the case may be) of the Accounts with the Account Holder for the duration of the Facility Period free of Encumbrances and rights of set off other than those created by or under the Senior Finance Documents or the Bareboat Charters.

17.2    **Earnings**    The Borrowers shall procure that:

17.2.1    each Vessel's Earnings for the account of a Bareboat Charterer are credited to the relevant Bareboat Charterer's Account by the Time Charterer;

17.2.2    each Vessel's Earnings for the account of a Borrower are credited to the Earnings Account relating to that Borrower and its Vessel by the relevant Bareboat Charterer; and

17.2.3    each Vessel's Requisition Compensation is  credited to the Earnings Account relating to the relevant Borrower and its Vessel.

17.3    **Dry Docking Reserve Accounts**

17.3.1    The Borrowers shall maintain the Dry Docking Reserve Accounts with the Account Holder throughout the Facility Period and use such accounts solely for the purpose of accruing sums to pay for the expected cost of each Vessel's next dry docking and special survey expenses as well as Ballast-Water-Treatment-System ("**BWTS**") procurement and installation.

17.3.2    The Borrowers shall procure that three months prior to each Vessel's dry docking date, the relevant Bareboat Charterer funds the relevant Dry Docking Reserve Account with $1,460,000 for each Aframax Vessel and $1,615,000 for each Suezmax Vessel (each such amount the "**Dry Dock Reserve**").  The Dry Dock Reserve for each Vessel shall be accrued in the relevant Dry Docking Reserve Account over a period of five quarters prior to the relevant Vessel's dry docking date (being by way of example, $292,000 per quarter for each Aframax Vessel and $323,000 per quarter for each Suezmax Vessel as set out in an Approved Budget).  Any partial prefunding of the Dry Dock Reserve in respect of a Vessel falling due before utilisation of the relevant Tranche shall be funded in full by the relevant Utilisation Date.

17.3.3    Funds may only be withdrawn from the Dry Docking Reserve Accounts to pay for dry docking, special surveys and BWTS in accordance with an Approved Budget.  If the Dry Docking Reserves are not sufficient to cover the actual dry docking and special survey expenses, the Borrowers shall procure that any shortfall is funded in full by the Bareboat Charterers.

17.3.4    Any amount in the Dry Docking Reserve Accounts which exceeds the actual dry docking and special survey costs for a Vessel may be applied towards the next dry docking costs and expenses of the other Vessels.

17.3.5   The Finance Parties agree that, subject to the provisions of the Senior Finance Documents, if there is a sale or Total Loss of a Vessel and both:

   (a)   the Borrowers have complied with clause 7.5 (*Mandatory prepayment on sale or Total Loss*) of the Senior Loan Agreement or the Senior Indebtedness has been repaid in full; and

   (b)   all amounts due pursuant to Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) have been paid,

the balance remaining in the Dry Docking Reserve Account for that Vessel shall be applied as follows:

   (i)   first, be applied by the relevant Borrower in payment or (as the case may be) part payment of the Purchase Option Price or (as the case may be) the Termination Sum (as defined in the relevant Bareboat Charter); and

   (ii)   second, if all amounts due under the relevant Bareboat Charter have been paid, be repaid by the relevant Borrower to the relevant Bareboat Charterer.

17.3.6   Following repayment or prepayment of a Tranche in full other than as a result of a sale or Total Loss of a Vessel, together with all other related amounts payable under the Senior Finance Documents and the Finance Documents, the balance remaining in the Dry Docking Reserve Account for that Vessel as at the date of such repayment or prepayment shall:

   (a)   if no Event of Default is continuing, be released to the relevant Bareboat Charterer; or

   (b)   if an Event of Default is continuing, be applied in prepayment of the Loan on a pro rata basis across each of the Tranches.

## 17.4   Application of Earnings

17.4.1   The Earnings in respect of a Vessel received in the relevant Bareboat Charterer's Account during the Facility Period shall be applied in the following order on the 10th day in each calendar month during the Facility Period:

   (a)   firstly, towards payment of Approved Operating and Administrative Expenses in respect of the Vessels as determined by reference to the Approved Budget by transferring the amount required to make such payment of the Operating and Administrative Expenses or (as the case may be) the Approved Operating and Administrative Expenses in respect of that Vessel from that Bareboat Charterer's Account to the account of the relevant Bareboat Charterer or Advantage held with the Approved Operating and Administrative Expenses Account Holder only for the purpose of onward payment to the relevant creditors;

(b)    secondly, towards funding the quarterly payments to the Dry Docking Reserve Accounts as set out in Clause 17.3; and

(c)    thirdly, any surplus Earnings towards payment of hire pursuant to the Bareboat Charters; and

subject to Clause 27.3 (*Monthly retentions*) and Clause 21.1 (*Minimum Cash Reserve*) of the Senior Loan Agreement, the Earnings paid to the Earnings Account of a Borrower pursuant to a Bareboat Charter in respect of a Vessel shall be applied in the following order on the 10th day in each calendar month during the Facility Period:

(d)    firstly, towards payment of all fees, costs and expenses due to the Senior Finance Parties under the Senior Finance Documents;

(e)    secondly, in respect of each application made on the 10th day of January, the 10th day of April, the 10th day of July and the 10th day of October of each year during the Facility Period, an amount of $5,000 per Borrower shall be released to the Borrowers for application in or towards Administrative Expenses (and provided that any amount applied in or towards Administrative Expenses pursuant to this Clause shall be deemed to reduce amounts outstanding under this Agreement by a corresponding amount as follows:

(i)    firstly, towards payment of all fees and expenses due to the Finance Parties under the Finance Documents;

(ii)    secondly, towards paying the balance of any unpaid Cash Interest above the Minimum Cash Interest;

(iii)    thirdly, towards paying accrued unpaid PIK Interest; and

(iv)    fourthly, towards prepayment of the Loan on a pro rata basis across each of the Tranches);

(f)    thirdly, in order towards payment pro rata of:

(i)    any accrued interest due but unpaid to the Senior Lenders under the Senior Loan Agreement;

(ii)    any periodical payments (not being payments as a result of termination or closing out) due but unpaid to the Swap Providers under the Senior Swap Agreements; and

(iii)    any Repayment Instalment (as defined in the Senior Loan Agreement) due;

(g)    fourthly, towards funding the Balloon Reserve Accounts (if required in accordance with clause 27.9 (*Balloon Reserve Accounts*) of the Senior Loan Agreement); and

(h)    fifthly, towards funding the Minimum Cash Interest; and

any balance shall be applied as follows:

(i)    firstly, towards payment of all fees and expenses due to the Finance Parties under the Finance Documents;

(j)    secondly, towards paying the balance of any unpaid Cash Interest above the Minimum Cash Interest;

(k)    thirdly, towards paying accrued unpaid PIK Interest;

(l)    fourthly, towards funding unrestricted working capital retention for the relevant Bareboat Charterer in an amount of up to $250,000 in respect of its Vessel (which may subsequently be used to pay hire under the relevant Bareboat Charter); and

(m)    fifthly, towards prepayment of the Loan on a pro rata basis across each of the Tranches.

17.5    **Restriction on withdrawal**   During the Facility Period no sum may be withdrawn from the Accounts (except in accordance with this Clause 17) without the prior written consent of the Senior Security Agent. The Accounts shall not be overdrawn.

17.6    **Access to information**   The Borrowers agree that the Junior Agent (and its nominees) may from time to time during the Facility Period review the records held by the Account Holder (whether in written or electronic form) in relation to the Accounts, and irrevocably waive any right of confidentiality which may exist in relation to those records.

17.7    **Statements**   Without prejudice to the rights of the Junior Agent under Clause 17.6 (*Access to information*), the Borrowers shall procure that the Account Holder provides to the Junior Agent, no less frequently than each calendar month during the Facility Period, written statements of account showing all entries made to the credit and debit of each of the Accounts during the immediately preceding calendar month.

17.8    **Application of moneys by Junior Agent or Junior Security Agent**   From and after the giving of notice to the Borrowers by the Junior Agent under Clause 22.2.1 (*Acceleration*), the Borrowers and the Finance Parties irrevocably authorise the Junior Agent or the Junior Security Agent (as the case may be) or any Receiver or Delegate to apply all moneys which they receive and are entitled to receive under or in connection with any Finance Document in or towards satisfaction of the Indebtedness in the following order:

17.8.1    first, any unpaid fees, costs, expenses and default interest due to the Junior Agent and the Junior Security Agent (and, in the case of the Junior Security Agent, to any Receiver or Delegate) under all or any of the Finance Documents, such application to be apportioned between the Junior Agent and the Junior Security Agent pro rata to the aggregate amount of such items due to each of them;

17.8.2    second, any unpaid fees, costs, expenses (including any sums paid by the Junior Lenders under Clause 25.10 (*Indemnity*)) of the Junior Lenders due under this Agreement, such application to be apportioned between the

Junior Lenders pro rata to the aggregate amount of such items due to each of them;

17.8.3    third, any accrued but unpaid default interest due to the Junior Lenders under this Agreement, such application to be apportioned between the Junior Lenders pro rata to the aggregate amount of such default interest due to each of them;

17.8.4    fourth, any other accrued but unpaid interest due to the Junior Lenders under this Agreement, such application to be apportioned between the Junior Lenders pro rata to the aggregate amount of such interest due to each of them;

17.8.5    fifth, any principal of the Loan due and payable but unpaid under this Agreement, such application to be apportioned between the Junior Lenders pro rata to the aggregate amount of such principal due to each of them; and

17.8.6    sixth, any other sum due and payable to any Finance Party but unpaid under all or any of the Finance Documents, such application to be apportioned between the Finance Parties pro rata to the aggregate amount of any such sum due to each of them;

**Provided that** the balance (if any) of the moneys received shall be paid to the Obligors from whom or from whose assets those sums were received or recovered or to any other person entitled to them.

17.9    **Retention on account**    Moneys to be applied by the Junior Agent or the Junior Security Agent (as the case may be) or any Receiver or Delegate under Clause 17.8 (*Application of moneys by Junior Agent or Junior Security Agent*) shall be applied as soon as practicable after the relevant moneys are received by it, or otherwise become available to it, save that (without prejudice to any other provisions contained in any of the Security Documents) the Junior Agent or the Junior Security Agent (as the case may be) or any Receiver or Delegate may retain any such moneys by crediting them to a suspense account for so long and in such manner as the Junior Agent or the Junior Security Agent (as the case may be) or such Receiver or Delegate may from time to time determine with a view to preserving the rights of the Finance Parties or any of them to prove for the whole of the Indebtedness (or any relevant part) against the Borrowers or any of them or any other person liable.

**Section 8        Representations, Undertakings and Events of Default**

**18        Representations**

18.1      **Representations**   Each Borrower makes the representations and warranties set out in this Clause 18 to each Finance Party.

18.1.1   **Status**   Each of the Obligors:

(a)     is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation; and

(b)     has the power to own its assets and carry on its business as it is being conducted.

18.1.2   **Binding obligations**   Subject to the Legal Reservations:

(a)     the obligations expressed to be assumed by each of the Obligors in each of the Relevant Documents to which it is a party are legal, valid, binding and enforceable obligations; and

(b)     (without limiting the generality of Clause 18.1.2(a)) each Security Document to which it is a party creates the security interests which that Security Document purports to create and those security interests are valid and effective.

18.1.3   **Non-conflict with other obligations**   The entry into and performance by each of the Obligors of, and the transactions contemplated by, the Relevant Documents do not conflict with:

(a)     any law or regulation applicable to such Obligor;

(b)     the constitutional documents of such Obligor; or

(c)     any agreement or instrument binding upon such Obligor or any of such Obligor's assets or constitute a default or termination event (however described) under any such agreement or instrument.

18.1.4   **Power and authority**

(a)     Each of the Obligors has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Relevant Documents to which it is or will be a party and the transactions contemplated by those Relevant Documents.

(b)     No limit on the powers of any Obligor will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Relevant Documents to which it is a party.

18.1.5   **Validity and admissibility in evidence**   All Authorisations required or desirable:

(a)    to enable each of the Obligors lawfully to enter into, exercise its rights and comply with its obligations in the Relevant Documents to which it is a party or to enable each Finance Party to enforce and exercise all its rights under the Relevant Documents; and

(b)    to make the Relevant Documents to which any Obligor is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect, with the exception only of the registrations referred to in Part II of Schedule 2 (*Conditions Subsequent*).

### 18.1.6    Governing law and enforcement

(a)    The choice of governing law of any Finance Document will be recognised and enforced in the Relevant Jurisdictions of each relevant Obligor.

(b)    Any judgment obtained in relation to any Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in the Relevant Jurisdictions of each relevant Obligor.

**18.1.7    Insolvency**    No corporate action, legal proceeding or other procedure or step described in Clause 22.1.7 (*Insolvency proceedings*) or creditors' process described in Clause 22.1.8 (*Creditors' process*) has been taken or, to the knowledge of any Borrower, threatened in relation to an Obligor; and none of the circumstances described in Clause 22.1.6 (*Insolvency*) applies to an Obligor.

**18.1.8    No filing or stamp taxes**    Under the laws of the Relevant Jurisdictions of each relevant Obligor (other than in respect of a Vessel) it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in any of those jurisdictions or that any stamp, registration, notarial or similar tax or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

**18.1.9    Deduction of Tax**    None of the Obligors is required under the law of its jurisdiction of incorporation to make any deduction for or on account of Tax from any payment it may make under any Finance Document to a Junior Lender which is:

(a)    a Qualifying Lender falling within (a) of the definition of Qualifying Lender; or, except where a Direction has been given under section 931 of the ITA in relation to the payment concerned, a Qualifying Lender falling within (b) of the definition of Qualifying Lender; or

(b)    a Treaty Lender and the payment is one specified in a direction given by the Commissioners of Revenue & Customs under Regulation 2 of the Double Taxation Relief (Taxes on Income) (General) Regulations 1970 (SI 1970/488).

### 18.1.10 **No default**

(a)  No Event of Default and, on the date of this Agreement and each Utilisation Date, no Default is continuing or is reasonably likely to result from the advance of any Tranche or the entry into, the performance of, or any transaction contemplated by, any of the Relevant Documents.

(b)  No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (howsoever described) under any other agreement or instrument which is binding on any of the Obligors or to which its assets are subject which has or is reasonably likely to have a Material Adverse Effect.

### 18.1.11 **No misleading information**

(a)  all material information provided to a Finance Party by or on behalf of any of the Obligors on or before the date of this Agreement and not superseded before that date is accurate and not misleading in any material respect and all projections provided to any Finance Party on or before the date of this Agreement have been prepared in good faith on the basis of assumptions which were reasonable at the time at which they were prepared and supplied; and

(b)  all other written information provided by any of the Obligors (including its advisers) to a Finance Party was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

(c)  The Original Financial Statements were prepared in accordance with GAAP consistently applied.

(d)  The unaudited Original Financial Statements fairly represent Advantage's financial condition and results of operations for the relevant financial quarter.

(e)  The audited Original Financial Statements fairly present Advantage's financial condition and results of operations during the relevant financial year.

(f)  There has been no material adverse change in Advantage's assets, business or financial condition since the date of the Original Financial Statements.

(g)  Advantage's most recent financial statements delivered pursuant to Clause 19.1 (*Financial statements*):

(i)  have been prepared in accordance with GAAP as applied to the Original Financial Statements; and

(ii)    fairly present its consolidated financial condition as at the end of, and its consolidated results of operations for, the period to which they relate.

(h)    Since the date of the most recent financial statements delivered pursuant to Clause 19.1 (*Financial statements*) there has been no material adverse change in the business, assets or financial condition of Advantage.

### 18.1.12 No proceedings

(a)    No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against any of the Obligors.

(b)    No judgment or order of a court, arbitral body or agency which is reasonably likely to have a Material Adverse Effect has (to the best of its knowledge and belief (having made due and careful enquiry)) been made against any of the Obligors.

### 18.1.13 No breach of laws
None of the Obligors has breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

### 18.1.14 Compliance with Environmental Laws
All Environmental Laws relating to the ownership, operation and management of each Vessel and the business of each Obligor (as now conducted and as reasonably anticipated to be conducted in the future) and the terms of all Environmental Approvals have been complied with provided that if failure to comply with an Environmental Law or the terms of an Environmental Approval is not reasonably likely to, if adversely determined, have a Material Adverse Effect, such failure shall not render this representation incorrect or misleading.

### 18.1.15 No Environmental Claim
No Environmental Claim (other than an Environmental Claim arising from an alleged Environmental Incident) has been made against any Obligor or any Vessel which, if adversely determined, is reasonably likely to have a Material Adverse Effect.

### 18.1.16 No Environmental Incident
No Environmental Incident (other than an alleged or potential Environmental Incident) has occurred the result of which is reasonably likely to result in a Material Adverse Effect.

### 18.1.17 Taxation

(a)    None of the Obligors is materially overdue in the filing of any Tax returns or is overdue in the payment of any amount in respect of Tax.

(b)    No claims or investigations are being, or are reasonably likely to be, made or conducted against any of the Obligors with respect to Taxes.

(c)     Each of the Obligors is resident for Tax purposes only in its Original Jurisdiction.

18.1.18 **Anti-corruption law**     Each of the Obligors and each Affiliate of any of them has conducted its businesses in compliance with applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

18.1.19 **No Encumbrance or Financial Indebtedness**

(a)     No Encumbrance exists over all or any of the present or future assets of any of the Borrowers.

(b)     None of the Borrowers has any Financial Indebtedness outstanding other than as permitted by this Agreement, the Senior Indebtedness and Encumbrances created pursuant to the Senior Finance Documents.

18.1.20 **Pari passu ranking**     The payment obligations of each of the Obligors under the Finance Documents to which it is a party rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

18.1.21 **No adverse consequences**

(a)     It is not necessary under the laws of the Relevant Jurisdictions of any of the Obligors:

(i)     in order to enable any Finance Party to enforce its rights under any Finance Document; or

(ii)    by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in any of the Relevant Jurisdictions of any of the Obligors.

(b)     No Finance Party is or will be deemed to be resident, domiciled or carrying on business in any of the Relevant Jurisdictions of any of the Obligors by reason only of the execution, performance and/or enforcement of any Finance Document.

18.1.22 **Disclosure of material facts**     No Borrower is aware of any material facts or circumstances which have not been disclosed to the Junior Agent and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make loan facilities of the nature contemplated by this Agreement available to the Borrowers.

18.1.23 **Completeness of Relevant Documents**     The copies of any Relevant Documents provided or to be provided by the Borrowers to the Junior Agent

in accordance with Clause 4 (*Conditions of Utilisation*) are, or will be, true and accurate copies of the originals and represent, or will represent, the full agreement between the parties to those Relevant Documents in relation to the subject matter of those Relevant Documents and there are no commissions, rebates, premiums or other payments due or to become due in connection with the subject matter of those Relevant Documents other than in the ordinary course of business or as disclosed to, and approved in writing by, the Junior Agent.

18.1.24 **No Immunity**    No Borrower or any of its assets is immune to any legal action or proceeding.

18.1.25 **Money laundering**    Any borrowing by a Borrower under this Agreement, and the performance of its obligations under this Agreement and under the other Finance Documents, will be for its own account and will not involve any breach by it of any law or regulatory measure relating to "**money laundering**" as defined in Article 1 of the Directive ((EU) 2015/849) of the European Parliament and of the Council of the European Communities.

18.1.26 **Sanctions**    The following representations in paragraphs (a) to (c) (each inclusive) below are given on the date of this Agreement and to the extent that the making, the receiving of the benefit of and/or, where applicable, the repetition of and the compliance with these representations do not result in a violation of or conflict with Council Regulation (EC) No. 2271/96 of 22 November 1996 ("**EU Blocking Regulation**"), Section 7 of the German Foreign Trade Ordinance (§ 7 *Außenwirtschaftsverordnung*) or a similar applicable anti-boycott statute (together with the EU Blocking Regulation and Section 7 of the of the German Foreign Trade Ordinance the "**Anti Boycott Regulations**").

(a)    Neither the Borrowers nor any other Obligor nor any of their respective Subsidiaries, directors or officers (or to the Borrowers' best knowledge, none of such member's employees or agents):

(i)    is a Prohibited Person;

(ii)    has violated or is violating any applicable Sanctions;

(iii)    has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority: or

(iv)    is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person, and none of such Persons owns or controls a Prohibited Person.

(b)    No Borrower nor any other Obligor is using or will use directly or indirectly, the proceeds of the Loan to lend, contribute, provide or otherwise make available such proceeds to any Person (including any Subsidiary or joint venture partners) to (i) fund any activity or business in any jurisdiction that is subject to Sanctions or to (ii) fund any activity of or business of, or with any Person

located, organised or residing in any jurisdiction that is subject to Sanctions or who is the subject of any Sanctions, or (iii) in any other manner, and in any case only, if that would result in a violation of Sanctions by any Finance Party, any Borrower or any other Obligor.

(c)    No Obligor (or, to the Borrowers' best knowledge, none of such member's or other Obligor's directors, officers, employee or agents) has taken or is taking any action resulting in a violation by such Persons of Sanctions.

(d)

(i)    In connection with any amendment, waiver, determination or direction relating to any part of any representation under this Clause 18.1.26 (*Sanctions*) of which a Junior Lender does not have the benefit because such benefit would result in a violation by the Junior Lender of any Anti Boycott Regulation (for the purpose of this paragraph (d) each a "**Restricted Lender**") above, the Commitment of that Restricted Lender will, subject to paragraph (ii) below, be excluded for the purpose of determining whether the consent of the Majority Junior Lenders has been obtained or whether the determination or direction by the Majority Junior Lenders has been made or given.

(ii)   The Junior Agent is only permitted to exclude the Commitment of a Junior Lender pursuant to paragraph (i) above for the purpose of determining whether the consent of the Majority Junior Lenders has been obtained or whether the determination or direction by the Majority Junior Lenders has been made, if following the Junior Agent's request for such consent, determination or direction by the Majority Junior Lenders the respective Junior Lender notifies the Junior Agent that it is a Restricted Lender for such purpose.

18.2   **Repetition**    Each Repeating Representation is deemed to be repeated by each Borrower by reference to the facts and circumstances then existing on the date of each Utilisation Request, on each Utilisation Date, on the first day of each Interest Period.

## 19   **Information Undertakings**

The undertakings in this Clause 19 remain in force for the duration of the Facility Period.

19.1   **Financial statements**    The Borrowers shall procure that Advantage supplies to the Junior Agent in sufficient copies for all of the Junior Lenders:

19.1.1   as soon as the same become available, but in any event within 120 days after the end of each of its financial years (other than the financial year

ending 31 December 2018) its audited consolidated financial statements for that financial year; and

19.1.2   as soon as the same become available, but in any event within 45 days after the end of each quarter during each of its financial years (other than the financial quarter ending 31 December 2018), its unaudited quarterly financial statements and management accounts for that quarter containing details of off balance sheet commitments.

19.2    **Requirements as to financial statements**

Each set of financial statements delivered under Clause 19.1 (*Financial statements*):

19.2.1   shall be certified by a director of Advantage as fairly presenting its financial condition as at the date as at which those financial statements were drawn up;

19.2.2   in the case of consolidated financial statements of Advantage, shall be accompanied by a statement by the directors of Advantage comparing actual performance for the period to which the financial statements relate to the actual performance for the corresponding period in the preceding financial year of Advantage; and

19.2.3   shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, it notifies the Junior Agent that there has been a change in GAAP, the accounting practices or reference periods and its auditors deliver to the Junior Agent:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Junior Agent, to enable the Junior Agent to determine whether Clause 20 (*Minimum Liquidity*) has been complied with.

Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the Original Financial Statements were prepared.

19.3    **Information: miscellaneous**   Each Borrower shall supply to the Junior Agent (in sufficient copies for all the Junior Lenders, if the Junior Agent so requests):

19.3.1   at the same time as they are dispatched, copies of all documents dispatched by it to its shareholders or members (or any class of them) or its creditors generally at the same time as they are dispatched other than those documents of a strictly administrative nature;

19.3.2   promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings or investigations (including proceedings or investigations relating to any alleged or actual breach of the ISM Code or of the ISPS Code) which are current, threatened or pending against any Obligor, and which might, if adversely determined, have a Material Adverse Effect and, to the extent permitted by law, details of any claim, action, suit, proceedings or investigation against any Bareboat Charterer with respect to applicable Sanctions by any Sanctions Authority (in sufficient copies for all the Junior Lenders, if the Junior Agent so requests);

19.3.3   as soon as practicable upon becoming aware of any fact indicating that it any other Obligor may be in breach, or be exposed to a breach, of applicable Sanctions, provided that the notification as such does not constitute a breach of mandatory law applicable to it;

19.3.4   promptly upon becoming aware of them, the details of any judgment or order of a court, arbitral body or agency which is made against any Obligor and which has or will have a Material Adverse Effect;

19.3.5   promptly, its constitutional documents where these have been amended or varied;

19.3.6   promptly, such further information and/or documents regarding:

(a)   each Vessel, goods transported on each Vessel, its Earnings and its Insurances;

(b)   the Charged Property;

(c)   compliance of:

(i)   the Obligors with the terms of the Finance Documents;

(ii)   each Bareboat Charterer with the terms of the Bareboat Charter to which it is a party; and

(iii)   the Time Charterer with the terms of each Time Charter;

(d)   the financial condition, business and operations of any Obligor,

as any Finance Party (through the Junior Agent) may reasonably request; and

19.3.7   promptly, such further information and/or documents as any Finance Party (through the Junior Agent) may reasonably request so as to enable such Finance Party to comply with any laws applicable to it or as may be required by any regulatory authority.

## 19.4   Notification of default

19.4.1   Each Borrower shall notify the Junior Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

19.4.2 Promptly upon a request by the Junior Agent, each Borrower shall supply to the Junior Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

## 19.5 "Know your customer" checks

19.5.1 If:

(a) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(b) any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Agreement; or

(c) a proposed assignment or transfer by a Junior Lender of any of its rights and obligations under this Agreement to a party that is not a Junior Lender prior to such assignment or transfer,

obliges the Junior Agent or any Junior Lender (or, in the case of Clause 19.5.1(c), any prospective new Junior Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Borrower shall promptly upon the request of the Junior Agent or any Junior Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Junior Agent (for itself or on behalf of any Junior Lender) or any Junior Lender (for itself or, in the case of the event described in Clause 19.5.1(c), on behalf of any prospective new Junior Lender) in order for the Junior Agent, such Junior Lender or, in the case of the event described in Clause 19.5.1(c), any prospective new Junior Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

19.5.2 Each Junior Lender shall promptly upon the request of the Junior Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Junior Agent (for itself) in order for the Junior Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 20 Minimum Liquidity

The Borrowers shall or shall procure that the relevant Bareboat Charterer shall, on or before the Utilisation Date in respect of the Tranche relating to the Vessel of which the relevant Bareboat Charterer is the bareboat charterer, credit the relevant Bareboat Charterer's Account with the Minimum Liquidity Amount. At all times

throughout the Facility Period the Borrowers shall procure that each Bareboat Charterer ensures that the Minimum Liquidity Amount is maintained in each Bareboat Charterer's Account **provided that** following repayment or prepayment in full of the Tranche relating to the Vessel that is the subject of the Bareboat Charter to which the relevant Bareboat Charterer is a party, together with all other related amounts payable under the Finance Documents, the Minimum Liquidity Amount relating to that Vessel and maintained in that Bareboat Charterer's Account as at the date of such repayment or prepayment shall be transferred to the Earnings Account of the relevant Borrower in respect of that Vessel and shall be:

(a)    if no Event of Default is continuing, be released to the relevant Bareboat Charterer; or

(b)    if an Event of Default is continuing, be applied in prepayment of the Loan on a pro rata basis across each of the Tranches.

The Minimum Liquidity Amount for each Vessel shall exclude any amounts credited to the Dry Docking Reserve Account for such Vessel.

## 21    General Undertakings

The undertakings in this Clause 21 remain in force for the duration of the Facility Period.

21.1    **Authorisations**    Each Borrower shall, and shall procure that each other Obligor will and further use its best endeavours to procure that the Time Charterer will, promptly:

21.1.1    obtain, comply with and do all that is necessary to maintain in full force and effect; and

21.1.2    supply certified copies to the Junior Agent of,

any Authorisation required under any applicable law or regulation of a Relevant Jurisdiction or the state of the Approved Flag at any time of each Vessel to enable it to:

(a)    perform its obligations under the Relevant Documents to which it is a party;

(b)    ensure the legality, validity, enforceability or admissibility in evidence in any Relevant Jurisdiction or in the state of the Approved Flag at any time of each Vessel, of any Relevant Document to which it is a party; and

(c)    own and operate each Vessel (in the case of the Borrowers and the Bareboat Charterers).

21.2    **Compliance with laws**

21.2.1    Each Borrower shall comply (and shall procure that each other Obligor and each Affiliate of any of them shall comply) in all respects with all laws to which it may be subject, if (except as regards Sanctions, to which Clause 21.2.2 applies, and anti-corruption laws, to which Clause 21.5 applies)

failure so to comply has or is reasonably likely to have a Material Adverse Effect.

21.2.2    To the extent that the making and the receiving of the benefit of and the compliance with the undertakings in this Clause 21.2.2 do not and will not result in a violation of or conflict with the EU Blocking Regulation, Section 7 of the German Foreign Trade Ordinance (§ 7 *Außenwirtschaftsverordnun*g) or a similar applicable anti-boycott statute, the Borrowers undertake the following:

(a)    No Borrower shall, and shall not permit or authorise any other Obligor to, directly or indirectly, use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of the Loan or other transaction(s) contemplated by this Agreement to fund any trade, business or other activities:

(i)    involving or for the benefit of any Prohibited Person or any subsidiary or joint venture partner of any Prohibited Person (whether at the time of such funding or otherwise);

(ii)    in any country or territory, that at the time of such funding is or whose government is the subject of Sanctions if and to the extent this would result in a violation of Sanctions by any Borrower or any other Obligor; or

(iii)    in any other manner that would result in a violation of Sanctions by any Borrower or any other Obligor.

(b)    The Borrowers will and will ensure that any other Obligor will:

(i)    ensure that no Person that is a Prohibited Person will have any legal or beneficial interest in any funds repaid or remitted by a Borrower to a Junior Lender in connection with the Loan or any part of the Loan;

(ii)    not fund all or any part of any payment or repayment under the Loan out of proceeds directly derived from any activity in a country or territory that is the subject of country-wide or territory-wide Sanctions broadly prohibiting dealings with such country or territory; and

(iii)    not fund all or any part of any payment or repayment under the Loan out of proceeds directly derived from transactions which would be prohibited by Sanctions or would otherwise cause any Finance Party, any Borrower or any other Obligor to be in breach of applicable Sanctions.

(c)    The Borrowers shall (and shall procure that each other Obligor shall) maintain policies and procedures designed to promote and achieve compliance with applicable Sanctions.

(d)    The Borrowers shall procure that each other Obligor will comply in all respects with applicable Sanctions.

(e)    Neither any Borrower nor any other Obligor shall be a Prohibited Person.

(f)

(i)    In connection with any amendment, waiver, determination or direction relating to any part of the undertaking in paragraphs (a) to (e) (each inclusive) of this Clause 21.2.2 (*Sanctions*) of which a Junior Lender does not have the benefit because such benefit would result in a violation by the lender of any Anti Boycott Regulations (for the purpose of this paragraph (f), each a **"Restricted Lender"**), the Commitment of that Restricted Lender will, subject to paragraph (ii) below, be excluded for the purpose of determining whether the consent of the Majority Junior Lenders has been obtained or whether the determination or direction by the Majority Junior Lenders has been made or given.

(ii)    The Junior Agent is only permitted to exclude the Commitment of a Junior Lender pursuant to paragraph (i) above for the purpose of determining whether the consent of the Majority Junior Lenders has been obtained or whether the determination or direction by the Majority Junior Lenders has been made, if following the Junior Agent's request for such consent, determination or direction by the Majority Junior Lenders the respective Junior Lender notifies the Junior Agent that it is a Restricted Lender for such purpose.

## 21.3    Environmental compliance

Each Borrower shall (and shall procure that each other Obligor and each Affiliate of shall):

21.3.1    comply with all Environmental Laws;

21.3.2    obtain, maintain and ensure compliance with all requisite Environmental Approvals; and

21.3.3    implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

## 21.4    Environmental Claims

Each Borrower shall promptly upon becoming aware of the same, inform the Junior Agent in writing of:

21.4.1 any Environmental Claim against any of the Obligors which is current, pending or threatened; and

21.4.2 any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any of the Obligors,

where the claim, if determined against that Obligor, has or is reasonably likely to have a Material Adverse Effect.

## 21.5 **Anti-corruption law**

21.5.1 Each Borrower shall not (and shall procure that no other Obligor will) directly or indirectly use the proceeds of the Loan for any purpose which would breach the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977 or other similar legislation in other jurisdictions.

21.5.2 Each Borrower shall (and shall procure that each other Obligor shall):

(a) conduct its businesses in compliance with applicable anti-corruption laws; and

(b) maintain policies and procedures designed to promote and achieve compliance with such laws.

## 21.6 **Taxation**

21.6.1 Each Borrower shall (and shall procure that each other Obligor shall) pay and discharge all Taxes imposed upon it or its assets within the time period allowed and any applicable grace period without incurring penalties unless and only to the extent that:

(a) such payment is being contested in good faith;

(b) adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Junior Agent under Clause 19.1 (*Financial statements*); and

(c) such payment can be lawfully withheld and failure to pay those Taxes does not have or is not reasonably likely to have a Material Adverse Effect.

21.6.2 No Borrower may (and no other Obligor may) change its residence for Tax purposes.

21.7 **Evidence of good standing**   Each Borrower will from time to time if requested by the Junior Agent provide the Junior Agent with evidence in form and substance satisfactory to the Junior Agent that the Obligors and all corporate shareholders of any of the Obligors remain in good standing.

21.8 **Overseas companies**   Each Borrower shall (and shall procure that each other Obligor will) promptly inform the Junior Agent if it delivers to the Registrar particulars required under the Overseas Regulations of any UK Establishment and it

shall comply with any directions given to it by the Junior Agent regarding the recording of any Security Documents on the register which it is required to maintain under The Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009.

21.9 **Pari passu ranking**   Each Borrower shall (and shall procure that each other Obligor will) ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

21.10 **Title**

21.10.1 From the Utilisation Date in respect of a Tranche, the relevant Borrower shall hold the legal title to, and own the entire beneficial interest in the Vessel being financed by that Tranche, its Earnings and its Insurances.

21.10.2 With effect on and from its creation or intended creation, each Borrower shall (and shall procure that each other Obligor will) hold the legal title to, and own the entire beneficial interest in any other assets the subject of any Security Documents created or intended to be created by such Obligor.

21.11 **Negative pledge**

In this Clause 21.10 **"Quasi-Security"** means an arrangement or transaction described in Clause 21.11.2.

Except as permitted under Clause 21.11.3:

21.11.1 No Borrower shall (and the Borrowers shall procure that no other Obligor will) create nor permit to subsist any Encumbrance over any of its assets.

21.11.2 No Borrower shall (and the Borrowers shall procure that no other Obligor will):

(a) sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor other than pursuant to the Bareboat Charters;

(b) sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(c) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(d) enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

21.11.3 Clauses 21.11.1 and 21.11.2 do not apply to any Encumbrance or (as the case may be) Quasi-Security, which is a Permitted Encumbrance.

## 21.12  Disposals

21.12.1 Except as permitted under Clause 21.12.2, no Borrower shall (and shall procure that no other Obligor will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset (including without limitation any Vessel, its Earnings or its Insurances) except, in the case of a Vessel, in accordance with the Bareboat Charter relating to that Vessel and provided that Clause 7.4 (*Mandatory prepayment on sale or Total Loss*) is complied with.

21.12.2 Clause 21.12.1 does not apply to any sale, lease, transfer or other disposal which is a Permitted Disposal.

## 21.13  Arm's length basis

21.13.1 Except as permitted under Clause 21.13.2, no Borrower shall enter into any transaction on terms which are, in any respect, less favourable to that Borrower than those which it could obtain in a bargain made at arm's length.

21.13.2 Fees, costs and expenses payable under the Relevant Documents in the amounts set out in the Relevant Documents delivered to the Junior Agent under Clause 4.1 (*Initial conditions precedent*) or agreed by the Junior Agent shall not be a breach of this Clause 21.13.

21.14  **Merger**    No Borrower shall (and the Borrowers shall procure that no other Obligor will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

21.15  **Change of business**    No Borrower shall (and the Borrowers shall procure that Fleetscape Advantage will not) make any substantial change to the general nature of its business  from that carried on at the date of this Agreement.

21.16  **No other business**    No Borrower shall engage in any business other than the ownership, operation, chartering and management of the relevant Vessel.

21.17  **No acquisitions**    No Borrower shall acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them) or incorporate a company.

21.18  **No Joint Ventures**    No Borrower shall:

21.18.1 enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture (other than US or UK Treasury bills and certificates of deposit issued by major North American or European banks); or

21.18.2 transfer any assets or lend to or guarantee or give an indemnity for or give security for the obligations of a Joint Venture or maintain the solvency of or

provide working capital to any Joint Venture (or agree to do any of the foregoing).

21.19 **No borrowings**   No Borrower shall incur or allow to remain outstanding any Financial Indebtedness other than the Loan, the Senior Loan or the Seller's Credit.

21.20 **Expenditure**   No Borrower shall incur any expenditure, except for expenditure reasonably incurred in the ordinary course of owning, operating, maintaining and repairing its Vessel.

21.21 **Membership interests**

No Borrower shall:

21.21.1 purchase, cancel or redeem any of its membership interests;

21.21.2 increase or reduce its membership interests;

21.21.3 issue any membership interests except to Fleetscape Advantage and provided such new membership interests are made subject to the terms of the Shares Security (as defined in the Senior Loan Agreement) applicable to that Borrower immediately upon the issue of such new membership interests in a manner satisfactory to the Junior Agent and the terms of that Shares Security are complied with; or

21.21.4 appoint any further director, officer or secretary of that Borrower (unless the provisions of the Shares Security applicable to that Borrower are complied with).

21.22 **Dividends and payments under the Seller's Credit Agreements**

No Borrower shall following the occurrence of a Default which is continuing or where any of the following would result in the occurrence of an Event of Default:

21.22.1 declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its membership interests (or any class of its membership interests);

21.22.2 repay or distribute any dividend or membership interest premium reserve;

21.22.3 pay any management, advisory or other fee to or to the order of any of its members;

21.22.4 redeem, repurchase, defease, retire or repay any of its membership interests or resolve to do so; or

21.22.5 subject always to the provisions of the relevant Subordination Agreement, make any payments of any kind under any Seller's Credit Agreement.

21.23 **No substantial liabilities**   Except in the ordinary course of business, no Borrower shall incur any liability to any third party which is in the Junior Agent's opinion of a substantial nature.

21.24 **No loans or credit**    No Borrower shall be a creditor in respect of any Financial Indebtedness other than another Obligor and where such Financial Indebtedness is the Loan, the Senior Loan or the Seller's Credit.

21.25 **No guarantees or indemnities**    No Borrower shall give or allow to be outstanding any guarantee or indemnity to or for the benefit of any person in respect of any obligation of any other person or enter into any document under which that Borrower assumes any liability of any other person other than any guarantee or indemnity given under the Finance Documents.

21.26 **No material agreements**    No Borrower shall enter into any material agreement other than:

21.26.1 the Relevant Documents; and

21.26.2 any other agreement expressly allowed under any other term of this Agreement.

21.27 **Unlawfulness, invalidity and ranking; Encumbrances imperilled**

No Borrower shall (and the Borrowers shall procure that no other Obligor will) do (or fail to do) or cause or permit another person to do (or omit to do) anything which is likely to:

21.27.1 make it unlawful for an Obligor or the Time Charterer to perform any of its obligations under the Relevant Documents;

21.27.2 cause any obligation of an Obligor or the Time Charterer under the Relevant Documents to cease to be legal, valid, binding or enforceable;

21.27.3 cause any Relevant Document to cease to be in full force and effect;

21.27.4 cause any Encumbrance the subject of a Security Document to rank after, or lose its priority to, any other Encumbrance; or

21.27.5 imperil or jeopardise any Encumbrance the subject of a Security Document.

21.28 **Inspection of records**    Each Borrower will permit the inspection of its financial records and accounts from time to time by the Junior Agent or its nominee.

21.29 **No change in Relevant Documents**    No Borrower shall amend, vary, novate, supplement, supersede, waive or terminate any term of, any of the Relevant Documents which are not Finance Documents, or any other document delivered to the Junior Agent pursuant to Clause 4.1 (*Initial conditions precedent*) or Clause 4.2 (*Further conditions precedent*) or Clause 4.3 (*Conditions subsequent*).

21.30 **Further assurance**

21.30.1 Each Borrower shall (and shall procure that each other Obligor will) promptly, and in any event within the time period specified by the Junior Security Agent, do all such acts (including procuring or arranging any registration, notarisation or authentication or the giving of any notice) or execute or procure execution of all such documents (including assignments, transfers, mortgages, charges, notices, instructions, acknowledgments,

proxies and powers of attorney) as the Junior Security Agent may reasonably specify (and in such form as the Junior Security Agent may reasonably require in favour of the Junior Security Agent or its nominee(s)):

(a) to create, perfect, vest on favour of the Junior Security Agent or protect the priority of any Encumbrance or any right of any kind created or intended to be created under or evidenced by the Security Documents (which may include the execution of a mortgage, charge, assignment or other Encumbrance over all or any of the assets are intended to be, the subject of the Security Documents) or for the exercise of any rights, powers and remedies of the Junior Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

(b) to confer on the Junior Security Agent or confer on the Finance Parties an Encumbrance over any property and assets of that Borrower located in any jurisdiction equivalent or similar to the Encumbrance intended to be conferred by or pursuant to the Security Documents;

(c) to facilitate or expedite the realisation and/or sale of, the transfer of title to or the grant of, any interest in or right relating to the assets which are, or are intended to be, the subject of the Security Documents or to exercise any power specified in any Finance Document in respect of which the Encumbrance has become enforceable; and/or

(d) to enable or assist the Junior Security Agent to enter into any transaction to commence, defend or conduct any proceedings and/or to take any other action relating to any item of the Charged Property.

21.30.2 Each Borrower shall (and shall procure that each other Obligor will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Encumbrance conferred or intended to be conferred on the Junior Security Agent or the Finance Parties by or pursuant to the Finance Documents.

21.30.3 At the same time as a Borrower delivers to the Junior Security Agent any document executed by itself or another Obligor pursuant to this Clause 21.30 (*Further assurance*), that Borrower shall deliver, or shall procure that such other  Obligor will deliver, to the Junior Security Agent a certificate signed by two of that Obligor's directors or officers which shall:

(a) set out the text of a resolution of that Obligor's directors specifically authorising the execution of the document specified by the Junior Security Agent; and

(b) state that either the resolution was duly passed at a meeting of the directors validly convened and held, throughout which a quorum of directors entitled to vote on the resolution was present, or that the

resolution has been signed by all the directors or officers and is valid under that Obligor's articles of association or other constitutional documents.

21.31 **Vessel Inspections**   Each Borrower agrees to permit the Junior Agent and all persons appointed by it to conduct a physical inspection and survey of its Vessel (i) once a year during the Facility Period at the cost and expense of the relevant Bareboat Charterer and (ii) at any time where an Event of Default has occurred and is continuing at the relevant Bareboat Charterer's cost and expense and (iii) at any other time at the Junior Agent's cost and expense.

## 22     Events of Default

22.1 **Events of Default**   Each of the events or circumstances set out in this Clause 22.1 is an Event of Default.

22.1.1 **Non-payment**   An Obligor does not pay on the due date any amount payable by it under a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)     its failure to pay is caused by:

(i)     administrative or technical error; or

(ii)     a Disruption Event; and

(b)     payment is made within two Business Days of its due date.

22.1.2 **Other specific obligations**

(a)     Any requirement of Clause 20 (*Minimum Liquidity*) is not satisfied.

(b)     An Obligor does not comply with any obligation in a Finance Document relating to the Insurances.

(c)     Any Bareboat Charterer or Advantage does not pay any Agreed Rate of Hire or any other sum payable under a Bareboat Charter or Bareboat Charter Guarantee when due unless payment is made within three Business Days of its due date or if the Bareboat Charterer or Advantage as the case may be demonstrates to the satisfaction of the relevant Borrower that its failure to pay is caused by administrative or technical error and payment is made within five Business Days of its due date.

22.1.3 **Other obligations**

(a)     An Obligor does not comply with any provision of a Finance Document (other than those referred to in Clause 22.1.1 (*Non-payment*) and Clause 22.1.2 (*Other specific obligations*)).

(b)     No Event of Default under this Clause 22.1.3 will occur if:

(i)     the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Junior

Agent giving notice to the Borrowers and (ii) the Borrowers becoming aware of the failure to comply; or

(ii)     in respect of a failure to comply with the provisions of Clause 22.1.22 (*Sanctions*), the Borrowers can demonstrate to the Junior Agent that the breach of applicable Sanctions has been caused inadvertently and despite the Borrowers having applied due diligence in avoiding such breach and the failure to comply is capable of remedy and is remedied within ten Business Days of the earlier of (i) the Junior Agent giving notice to the Borrowers and (ii) the Borrowers becoming aware of the failure to comply.

22.1.4   **Misrepresentation**   Any representation or statement made or deemed to be repeated by an Obligor in any Finance Document or any other document delivered by or on behalf of an Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

22.1.5   **Cross default**

(a)     Any Financial Indebtedness of an Obligor is not paid when due nor within any originally applicable grace period.

(b)     Any Financial Indebtedness of an Obligor is declared to be, or otherwise becomes, due and payable prior to its specified maturity as a result of an event of default (however described).

(c)     Any commitment for any Financial Indebtedness of an Obligor is cancelled or suspended by a creditor of an Obligor as a result of an event of default (however described).

(d)     Any creditor of an Obligor becomes entitled to declare any Financial Indebtedness of an Obligor due and payable prior to its specified maturity as a result of an event of default (however described).

(e)     No Event of Default will occur under this Clause 22.1.5 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within (a) to (d) is less than $1,000,000 (or its equivalent in any other currency or currencies).

22.1.6   **Insolvency**

(a)     An Obligor is unable or admits inability to pay its debts as they fall due, is deemed to, or is declared to, be unable to pay its debts under applicable law, suspends or threatens to suspend making payments on any of its debts, or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.

(b)     The value of the assets of an Obligor is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of an Obligor. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

22.1.7   **Insolvency proceedings**  Any corporate action, legal proceedings or other procedure or step is taken for:

(a)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, bankruptcy or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of an Obligor;

(b)    a composition, compromise, assignment or arrangement with any creditor of an Obligor;

(c)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or trustee or other similar officer in respect of an Obligor or any of its assets; or

(d)    enforcement of any Encumbrance over any assets of an Obligor,

or any analogous procedure or step is taken in any jurisdiction.

This Clause 22.1.7 shall not apply to (i) any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 30 days of commencement or (ii) any arrest or detention of a Vessel from which that Vessel is released within 15 days from the date of that arrest or detention.

22.1.8   **Creditors' process**  Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of an Obligor is not discharged within 15 days.

22.1.9   **Unlawfulness and invalidity**

(a)    It is or becomes unlawful for an Obligor to perform any of its obligations under the Finance Documents or any Encumbrance created or expressed to be created or evidenced by the Security Documents ceases to be effective.

(b)    Any obligation or obligations of any Obligor under any Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Junior Lenders under the Finance Documents.

(c)    Any Finance Document ceases to be in full force and effect or any Encumbrance created or expressed to be created or evidenced by the Security Documents.

22.1.10  **Cessation of business**  An Obligor ceases, or threatens to cease, to carry on all or a substantial part of its business.

22.1.11  **Change in ownership or control of a Bareboat Charterer or Advantage**  There is any change in the legal or beneficial ownership or

control of a Bareboat Charterer or Advantage from that advised to the Junior Agent by the Borrowers at the date of this Agreement.

22.1.12 **Expropriation**   The authority or ability of an Obligor to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to an Obligor or any of its assets.

22.1.13 **Repudiation and rescission of agreements**

(a)   An Obligor rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or evidences an intention to rescind or repudiate a Finance Document.

(b)   Subject to Clause 22.1.13(c), any party to any of the Relevant Documents that is not a Finance Document rescinds or purports to rescind or repudiates or purports to repudiate that Relevant Document in whole or in part where to do so has or is, in the reasonable opinion of the Majority Junior Lenders, likely to have a material adverse effect on the interests of the Junior Lenders under the Finance Documents.

(c)   Any of the Management Agreements, Bareboat Charters, Time Charters or Bareboat Charter Guarantees is terminated, cancelled or otherwise ceases to remain in full force and effect at any time prior to its contractual expiry date and is not immediately replaced by a similar agreement in form and substance satisfactory to the Majority Junior Lenders, there occurs a material breach by any party under any Time Charter, any Bareboat Charter or any Time Charter QEL or there occurs a Termination Event (as defined in each Bareboat Charter).

22.1.14 **Conditions subsequent**   Any of the conditions referred to in Clause 4.3 (*Conditions subsequent*) is not satisfied within the time reasonably required by the Junior Agent.

22.1.15 **Revocation or modification of Authorisation**   Any Authorisation of any governmental, judicial or other public body or authority which is now, or which at any time during the Facility Period becomes, necessary to enable any of the Obligors or any other person (except a Finance Party) to comply with any of their obligations under any Relevant Document is not obtained, is revoked, suspended, withdrawn or withheld, or is modified in a manner which the Junior Agent considers is, or may be, prejudicial to the interests of any Finance Party, or ceases to remain in full force and effect.

22.1.16 **Loss of Vessel**   A Vessel suffers a Total Loss or is otherwise destroyed or abandoned, except that a Total Loss shall not be an Event of Default if:

(a)   that Vessel is insured in accordance with the Senior Security Documents and a claim for Total Loss is available under the terms of the relevant insurances; and

(b)    no insurer has refused to meet or has disputed the claim for Total Loss and it is not apparent to the Junior Agent in its discretion that any such refusal or dispute is likely to occur; and

(c)    payment of all insurance proceeds in respect of the Total Loss is made in full to the Senior Security Agent within 180 days of the occurrence of the casualty giving rise to the Total Loss in question (save that, in relation to a Total Loss under part (c) of the definition of Total Loss, an Event of Default shall not occur if payment of all insurance proceeds in respect of that Total Loss is made in full to the Senior Security Agent within 180 days after that Total Loss has occurred) or (in each such case) such longer period as the Senior Agent may in its discretion agree; or

(d)    in the case of an arrest or detention of a Vessel, that Vessel is released within 15 days.

22.1.17 **Challenge to registration**    The registration of a Vessel is contested or becomes void or voidable or liable to cancellation or termination.

22.1.18 **War**    The country of registration of a Vessel becomes involved in war (whether or not declared) or civil war or is occupied by any other power and the Junior Agent in its discretion considers that, as a result, the security conferred by any of the Senior Security Documents is materially prejudiced.

22.1.19 **Notice of determination**    Advantage gives notice to the Borrowers to determine any obligations under a Bareboat Charter Guarantee.

22.1.20 **Withdrawal of class or Vessel lay up**    The classification certification of any Vessel is withdrawn or a Vessel is laid up.

22.1.21 **Litigation**    Any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started or threatened, or any judgment or order of a court, arbitral body or agency is made, in relation to the Relevant Documents or the transactions contemplated in the Relevant Documents or against an Obligor or its assets which have, or has, or are, or is, reasonably likely to have a Material Adverse Effect.

22.1.22 **Sanctions**

(a)    Any of the Obligors or any Affiliate of any of them becomes a Prohibited Person or becomes owned or controlled by, or acts directly or indirectly on behalf of, a Prohibited Person or any of such persons becomes the owner or controller of a Prohibited Person.

(b)    Any proceeds of the Loan are made available, directly or indirectly, to or for the benefit of a Prohibited Person or otherwise is, directly or indirectly, applied in a manner or for a purpose prohibited by Sanctions.

       (c)      Any of the Obligors or any Affiliate of any of them is not in compliance with all Sanctions.

22.2    **Acceleration**   On and at any time after the occurrence of an Event of Default which is continuing, the Junior Agent may, and shall if so directed by the Majority Junior Lenders:

22.2.1   by notice to the Borrowers:

      (a)     cancel the Total Commitments, at which time they shall immediately be cancelled;

      (b)     declare that the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents are immediately due and payable, at which time they shall become immediately due and payable; and/or

      (c)     declare that the Loan is payable on demand, at which time it shall immediately become payable on demand by the Junior Agent on the instructions of the Majority Junior Lenders; and/or

22.2.2   exercise or direct the Junior Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

**Section 9        Changes to Parties**

**23        Changes to the Junior Lenders**

23.1    **Assignments and transfers by the Junior Lenders**   Subject to this Clause 23, a Junior Lender (the "**Existing Junior Lender**") may:

23.1.1   assign any of its rights; or

23.1.2   transfer by novation any of its rights and obligations,

under any Finance Document to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the "**New Junior Lender**").

23.2    **Conditions of assignment or transfer**

23.2.1   An assignment will only be effective on:

(a)   receipt by the Junior Agent of written confirmation from the New Junior Lender (in form and substance satisfactory to the Junior Agent) that the New Junior Lender will assume the same obligations to the other Finance Parties as it would have been under if it was an Original Junior Lender; and

(b)   performance by the Junior Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Junior Lender, the completion of which the Junior Agent shall promptly notify to the Existing Junior Lender and the New Junior Lender.

23.2.2   If:

(a)   a Junior Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(b)   as a result of circumstances existing at the date the assignment, transfer or change occurs, a Borrower would be obliged to make a payment to the New Junior Lender or Junior Lender acting through its new Facility Office under Clause 12 (*Tax Gross Up and Indemnities*) or Clause 13 (*Increased Costs*),

then the New Junior Lender or Junior Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Junior Lender or Junior Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.  This Clause 23.2.2 shall not apply:

(c)   in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Loan; or

(d)   in relation to Clause 12.2 (*Tax gross-up*), to a Treaty Lender that has included a confirmation of its scheme reference number and its

jurisdiction of tax residence in accordance with Clause 12.2.6(b)(ii) (*Tax gross-up*) if the Borrower making the payment has not made a Borrower DTTP Filing in respect of that Treaty Lender.

23.2.3   Each New Junior Lender confirms, for the avoidance of doubt, that the Junior Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Junior Lender or Junior Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Junior Lender would have been had it remained a Junior Lender.

## 23.3   Assignment or transfer fee

23.3.1   Subject to Clause 23.3.2, the New Junior Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Junior Agent (for its own account) a fee of $5,000.

23.3.2   No fee is payable pursuant to Clause 23.3.1 if:

(a)   the Junior Agent agrees that no fee is payable; or

(b)   the assignment or transfer is made by an Existing Junior Lender:

(i)   to an Affiliate of that Existing Junior Lender;

(ii)   to a fund which is a Related Fund of that Existing Junior Lender; or

(iii)   in connection with the primary syndication of the Loan.

## 23.4   Limitation of responsibility of Existing Junior Lenders

23.4.1   Unless expressly agreed to the contrary, an Existing Junior Lender makes no representation or warranty and assumes no responsibility to a New Junior Lender for:

(a)   the legality, validity, effectiveness, adequacy or enforceability of the Relevant Documents or any other documents;

(b)   the financial condition of any Obligor;

(c)   the performance and observance by any Obligor of its obligations under the Relevant Documents or any other documents; or

(d)   the accuracy of any statements (whether written or oral) made in or in connection with any of the Relevant Documents or any other document,

and any representations or warranties implied by law are excluded.

23.4.2   Each New Junior Lender confirms to the Existing Junior Lender and the other Finance Parties that it:

(a) has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Junior Lender in connection with any of the Relevant Documents; and

(b) will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

23.4.3 Nothing in any Finance Document obliges an Existing Junior Lender to:

(a) accept a re-transfer or re-assignment from a New Junior Lender of any of the rights and obligations assigned or transferred under this Clause 23; or

(b) support any losses directly or indirectly incurred by the New Junior Lender by reason of the non-performance by any Obligor of its obligations under the Relevant Documents or otherwise.

## 23.5 Procedure for transfer

23.5.1 Subject to the conditions set out in Clause 23.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with Clause 23.5.3 when the Junior Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Junior Lender and the New Junior Lender. The Junior Agent shall, subject to Clause 23.2.1(b), as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

23.5.2 The Junior Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Junior Lender and the New Junior Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Junior Lender.

23.5.3 Subject to Clause 23.9 (*Pro rata interest settlement*), on the Transfer Date:

(a) to the extent that in the Transfer Certificate the Existing Junior Lender seeks to transfer by novation its rights and obligations under the Finance Documents each Borrower and the Existing Junior Lender shall be released from further obligations towards one another under the Finance Documents and their respective rights against one another shall be cancelled (being the **"Discharged Rights and Obligations"**);

(b) each Borrower and the New Junior Lender shall assume obligations towards one another and/or acquire rights against one another

which differ from the Discharged Rights and Obligations only insofar as that Borrower and the New Junior Lender have assumed and/or acquired the same in place of that Borrower and the Existing Junior Lender;

(c) the Junior Agent, the Junior Security Agent, the New Junior Lender and other Junior Lenders shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the New Junior Lender been an Original Junior Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Junior Agent, the Junior Security Agent  and the Existing Junior Lender shall each be released from further obligations to each other under this Agreement; and

(d) the New Junior Lender shall become a Party as a "Junior Lender".

### 23.6 Procedure for assignment

23.6.1 Subject to the conditions set out in Clause 23.2 (*Conditions of assignment or transfer*) an assignment may be effected in accordance with Clause 23.6.3 when the Junior Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Junior Lender and the New Junior Lender.  The Junior Agent shall, subject to Clause 23.6.2, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

23.6.2 The Junior Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Junior Lender and the New Junior Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Junior Lender.

23.6.3 Subject to Clause 23.9 (*Pro rata interest settlement*), on the Transfer Date:

(a) the Existing Junior Lender will assign absolutely to the New Junior Lender its rights under the Finance Documents and in respect of any Encumbrance created or expressed to be created or evidenced by the Security Documents and expressed to be the subject of the assignment in the Assignment Agreement;

(b) the Existing Junior Lender will be released from the obligations (the "**Relevant Obligations**") expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of any Encumbrance created or expressed to be created or evidenced by the Security Documents); and

(c)     the New Junior Lender shall become a Party as a "Junior Lender" and will be bound by obligations equivalent to the Relevant Obligations.

23.6.4   Junior Lenders may utilise procedures other than those set out in this Clause 23.6 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 23.5 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Junior Lenders nor the assumption of equivalent obligations by a New Junior Lender) **provided that** they comply with the conditions set out in Clause 23.2 (*Conditions of assignment or transfer*).

23.7   **Copy of Transfer Certificate or Assignment Agreement to Borrowers**   The Junior Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Borrowers a copy of that Transfer Certificate or Assignment Agreement.

23.8   **Security over Junior Lenders' rights**   In addition to the other rights provided to Junior Lenders under this Clause 23, each Junior Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Encumbrances in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Junior Lender including, without limitation:

23.8.1   any charge, assignment or other Encumbrance to secure obligations to a federal reserve or central bank; and

23.8.2   any charge, assignment or other Encumbrance granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Junior Lender as security for those obligations or securities,

except that no such charge, assignment or Encumbrance shall:

(a)     release a Junior Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Encumbrance for the Junior Lender as a party to any of the Finance Documents; or

(b)     require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the relevant Junior Lender under the Finance Documents.

23.9   **Pro rata interest settlement**

23.9.1   If the Junior Agent has notified the Junior Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Junior Lenders and New Junior Lenders then (in respect of any transfer pursuant to Clause 23.5 (*Procedure for transfer*) or any assignment pursuant to Clause 23.6 (*Procedure for assignment*) the Transfer Date of which is after the date of such notification and is not on the last day of an Interest Period):

(a)    any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Junior Lender up to but excluding the Transfer Date (**"Accrued Amounts"**) and shall become due and payable to the Existing Junior Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than three months, on the next of the dates which falls at three monthly intervals after the first day of that Interest Period); and

(b)    the rights assigned or transferred by the Existing Junior Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(i)    when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Junior Lender; and

(ii)    the amount payable to the New Junior Lender on that date will be the amount which would, but for the application of this Clause 23.9, have been payable to it on that date, but after deduction of the Accrued Amounts.

23.9.2    In this Clause 23.9 references to "Interest Period" shall be construed to include a reference to any other period for accrual of fees.

23.9.3    An Existing Junior Lender which retains the right to the Accrued Amounts pursuant to this Clause 23.9 but which does not have a Commitment shall be deemed not to be a Junior Lender for the purposes of ascertaining whether the agreement of any specified group of Junior Lenders has been obtained to approve any request for a consent, waiver, amendment or other vote of Junior Lenders under the Finance Documents.

## 24    Changes to the Obligors

24.1    **No assignment or transfer by Obligors**    No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

## Section 10     The Finance Parties

## 25     Role of the Junior Agent and the Junior Security Agent

### 25.1     Appointment of the Junior Agent

25.1.1    Each of the Junior Lenders appoints the Junior Agent to act as its agent under and in connection with the Finance Documents and each of the Junior Lenders and the Junior Agent appoints the Junior Security Agent to act as its security agent for the purpose of the Security Documents.

25.1.2    Each of the Junior Lenders authorises the Junior Agent and each of the Junior Lenders and the Junior Agent authorises the Junior Security Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Junior Agent or the Junior Security Agent (as the case may be) under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

25.1.3    Except in Clause 25.13 (*Replacement of the Junior Agent*) or where the context otherwise requires, references in this Clause 25 to the "**Junior Agent**" shall mean the Junior Agent and the Junior Security Agent individually and collectively.

### 25.2     Instructions

25.2.1    The Junior Agent shall:

(a)    unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Junior Agent in accordance with any instructions given to it by:

(i)    all Junior Lenders if the relevant Finance Document stipulates the matter is an all Junior Lender decision; and

(ii)    in all other cases, the Majority Junior Lenders; and

(b)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with Clause 25.2.1(a).

25.2.2    The Junior Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Junior Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Junior Lender or group of Junior Lenders, from that Junior Lender or group of Junior Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Junior Agent may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

25.2.3    Save in the case of decisions stipulated to be a matter for any other Junior Lender or group of Junior Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any

instructions given to the Junior Agent by the Majority Junior Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

25.2.4   The Junior Agent may refrain from acting in accordance with any instructions of any Junior Lender or group of Junior Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

25.2.5   In the absence of instructions, the Junior Agent may act (or refrain from acting) as it considers to be in the best interest of the Junior Lenders.

25.2.6   The Junior Agent is not authorised to act on behalf of a Junior Lender (without first obtaining that Junior Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.   This Clause 25.2.6 shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Finance Documents or the enforcement of the Finance Documents.

## 25.3   Duties of the Junior Agent

25.3.1   The Junior Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

25.3.2   Subject to Clause 25.3.3, the Junior Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Junior Agent for that Party by any other Party.

25.3.3   Without prejudice to Clause 23.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), Clause 25.3.1 shall not apply to any Transfer Certificate or any Assignment Agreement.

25.3.4   Except where a Finance Document specifically provides otherwise, the Junior Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

25.3.5   If the Junior Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Finance Parties.

25.3.6   If the Junior Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Junior Agent or the Junior Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

25.3.7   The Junior Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

25.4    **No fiduciary duties**

25.4.1    Subject to Clause 25.11 (*Trust*) which relates to the Junior Security Agent only, nothing in any Finance Document constitutes the Junior Agent as a trustee or fiduciary of any other person.

25.4.2    The Junior Agent shall not be bound to account to any Junior Lender for any sum or the profit element of any sum received by it for its own account.

25.5    **Business with Obligors**    The Junior Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Borrower, any other Obligor or its Affiliate.

25.6    **Rights and discretions of the Junior Agent**

25.6.1    The Junior Agent may:

(a)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(b)    assume that:

(i)    any instructions received by it from the Majority Junior Lenders, any Junior Lenders or any group of Junior Lenders are duly given in accordance with the terms of the Finance Documents; and

(ii)    unless it has received notice of revocation, that those instructions have not been revoked; and

(iii)    rely on a certificate from any person:

(A)    as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(B)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of (A), may assume the truth and accuracy of that certificate.

25.6.2    The Junior Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Junior Lenders or security agent for the Finance Parties (as the case may be)) that:

(a)    no Default has occurred (unless it has actual knowledge of a Default arising under Clause 22.1 (*Events of Default*));

(b)    any right, power, authority or discretion vested in any Party or the Majority Junior Lenders has not been exercised; and

(c) any notice or request made by the Borrowers (other than a Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors.

25.6.3 The Junior Agent may engage and pay for the advice or services of any lawyers, accountants, surveyors or other experts.

25.6.4 Without prejudice to the generality of Clause 25.6.3 or Clause 25.6.5, the Junior Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Junior Agent (and so separate from any lawyers instructed by the Junior Lenders) if the Junior Agent in its reasonable opinion deems this to be desirable.

25.6.5 The Junior Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Junior Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

25.6.6 The Junior Agent may act in relation to the Finance Documents through its officers, employees and agents and the Junior Agent shall not:

(a) be liable for any error of judgment made by any such person; or

(b) be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by the Junior Agent's gross negligence or wilful misconduct.

25.6.7 Unless a Finance Document expressly provides otherwise the Junior Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

25.6.8 Without prejudice to the generality of Clause 25.6.7, the Junior Agent:

(a) may disclose; and

(b) on the written request of the Borrowers or the Majority Junior Lenders shall, as soon as reasonably practicable, disclose,

the identity of a Defaulting Junior Lender to the Borrowers and to the other Finance Parties.

25.6.9 Notwithstanding any other provision of any Finance Document to the contrary, the Junior Agent is not obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

25.6.10 The Junior Agent is not obliged to disclose to any Finance Party any details of the rate notified to the Junior Agent by any Junior Lender or the identity

of any such Junior Lender for the purpose of Clause 10.2.2 (*Market Disruption*).

25.6.11 Notwithstanding any provision of any Finance Document to the contrary, the Junior Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

25.7   **Responsibility for documentation**   The Junior Agent is not responsible or liable for:

25.7.1 the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Junior Agent, an Obligor or any other person given in or in connection with any Relevant Document or the transactions contemplated in the Finance Documents; or

25.7.2 the legality, validity, effectiveness, adequacy or enforceability of any Relevant Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Relevant Document; or

25.7.3 any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

25.8   **No duty to monitor**   The Junior Agent shall not be bound to enquire:

25.8.1 whether or not any Default has occurred;

25.8.2 as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

25.8.3 whether any other event specified in any Finance Document has occurred.

25.9   **Exclusion of liability**

25.9.1 Without limiting Clause 25.9.2 (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Junior Agent) the Junior Agent shall not be liable (including, without limitation, for negligence or any other category of liability whatsoever) for:

(a)   any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or any Encumbrance created or expressed to be created or evidenced by the Security Documents, unless directly caused by its gross negligence or wilful misconduct;

(b)     exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, any Encumbrance created or expressed to be created or evidenced by the Security Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or any Encumbrance created or expressed to be created or evidenced by the Security Documents;

(c)     any shortfall which arises on the enforcement or realisation of the Trust Property; or

(d)     without prejudice to the generality of Clauses 25.9.1(a), 25.9.1(b) and 25.9.1(c), any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(i)     any act, event or circumstance not reasonably within its control; or

(ii)    the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

25.9.2  No Party (other than the Junior Agent) may take any proceedings against any officer, employee or agent of the Junior Agent in respect of any claim it might have against the Junior Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Relevant Document and any officer, employee or agent of the Junior Agent may rely on this Clause subject to Clause 1.7 (*Third Party Rights*) and the provisions of the Third Parties Act.

25.9.3  The Junior Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Junior Agent if the Junior Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Junior Agent for that purpose.

25.9.4  Nothing in this Agreement shall oblige the Junior Agent to carry out:

(a)     any "know your customer" or other checks in relation to any person;

(b)     any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Junior Lender,

on behalf of any Junior Lender and each Junior Lender confirms to the Junior Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Junior Agent.

25.9.5   Without prejudice to any provision of any Finance Document excluding or limiting the Junior Agent's liability, any liability of the Junior Agent arising under or in connection with any Finance Document or any Encumbrance created or expressed to be created or evidenced by the Security Documents shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Junior Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Junior Agent at any time which increase the amount of that loss.  In no event shall the Junior Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Junior Agent has been advised of the possibility of such loss or damages.

## 25.10  Junior Lenders' indemnity to the Junior Agent

25.10.1  Each Junior Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Junior Agent and every Receiver and Delegate, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by any of them (otherwise than by reason of the relevant Junior Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 28.11 (*Disruption to payment systems etc.*) notwithstanding the Junior Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Junior Agent) in acting as Junior Agent, Receiver or Delegate under, or exercising any authority conferred under, the Finance Documents (unless the relevant Junior Agent, Receiver or Delegate has been reimbursed by an Obligor pursuant to a Finance Document).

25.10.2  Subject to Clause 25.10.3, the Borrowers shall immediately on demand reimburse any Junior Lender for any payment that Junior Lender makes to the Junior Agent pursuant to Clause 25.10.1

25.10.3  Clause 25.10.2 shall not apply to the extent that the indemnity payment in respect of which the Junior Lender claims reimbursement relates to a liability of the Junior Agent to an Obligor.

25.11   **Trust**  The Junior Security Agent agrees and declares, and each of the other Finance Parties acknowledges, that, subject to the terms and conditions of this Clause 25.11,

the Junior Security Agent holds the Trust Property on trust for the Finance Parties absolutely.  Each of the other Finance Parties agrees that the obligations, rights and benefits vested in the Junior Security Agent shall be performed and exercised in accordance with this Clause 25.11.  The Junior Security Agent shall have the benefit of all of the provisions of this Agreement benefiting it in its capacity as security agent for the Finance Parties, and all the powers and discretions conferred on trustees by the Trustee Act 1925 (to the extent not inconsistent with this Agreement).    In addition:

25.11.1   the Junior Security Agent and any Delegate may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Junior Security Agent or any Delegate by or pursuant to the Security Documents or in respect of anything else done or omitted to be done in any way relating to the Security Documents;

25.11.2   the other Finance Parties acknowledge that the Junior Security Agent shall be under no obligation to insure any property nor to require any other person to insure any property and shall not be responsible for any loss which may be suffered by any person as a result of the lack or insufficiency of any insurance;

25.11.3   the Finance Parties agree that the perpetuity period applicable to the trusts declared by this Agreement shall be the period of 125 years from the date of this Agreement;

25.11.4   the Junior Security Agent shall not be liable for any failure, omission, or defect in perfecting the security constituted or created by any Finance Document including, without limitation, any failure to register the same in accordance with the provisions of any of the documents of title of any Obligor to any of the assets thereby charged or effect or procure registration of or otherwise protect the security created by any Security Document under any registration laws in any jurisdiction and may accept without enquiry such title as any Obligor may have to any asset;

25.11.5   the Junior Security Agent shall not be under any obligation to hold any title deed, Finance Document or any other documents in connection with the Finance Documents or any other documents in connection with the property charged by any Finance Document or any other such security in its own possession or to take any steps to protect or preserve the same, and may permit any Obligor to retain all such title deeds, Finance Documents and other documents in its possession; and

25.11.6   save as otherwise provided in the Finance Documents, all moneys which under the trusts therein contained are received by the Junior Security Agent may be placed on deposit in the name of or under the control of the Junior Security Agent at such bank or institution (including the Junior Security Agent) and upon such terms as the Junior Security Agent may think fit

pending application of those moneys in accordance with Clause 17.8 (*Application of moneys by Junior Security Agent*).

The provisions of Part I of the Trustee Act 2000 shall not apply to the Junior Security Agent or the Trust Property.

### 25.12 Resignation of the Junior Agent

25.12.1 The Junior Agent may resign and appoint one of its Affiliates acting through an office as successor by giving notice to the other Finance Parties and the Borrowers.

25.12.2 Alternatively the Junior Agent may resign by giving 30 days' notice to the other Finance Parties and the Borrowers, in which case the Majority Junior Lenders (after consultation with the Borrowers) may appoint a successor Junior Agent.

25.12.3 If the Majority Junior Lenders have not appointed a successor Junior Agent in accordance with Clause 25.12.2 within 20 days after notice of resignation was given, the retiring Junior Agent (after consultation with the Borrowers) may appoint a successor Junior Agent.

25.12.4 If the Junior Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Junior Agent is entitled to appoint a successor Junior Agent under Clause 25.12.3, the Junior Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Junior Agent to become a party to this Agreement as Junior Agent) agree with the proposed successor Junior Agent amendments to this Clause 25 and any other term of this Agreement dealing with the rights or obligations of the Junior Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Junior Agent's normal fee rates and those amendments will bind the Parties.

25.12.5 The retiring Junior Agent shall, make available to the successor Junior Agent such documents and records and provide such assistance as the successor Junior Agent may reasonably request for the purposes of performing its functions as Junior Agent under the Finance Documents. The Borrowers shall, within three Business Days of demand, reimburse the retiring Junior Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

25.12.6 The Junior Agent's resignation notice shall only take effect upon the appointment of a successor and (in the case of the Junior Security Agent) the transfer of all the Trust Property to that successor.

25.12.7 Upon the appointment of a successor, the retiring Junior Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 25.12.5) but shall remain entitled to

the benefit of Clause 14.3 (*Indemnity to the Junior Agent*) and this Clause 25 (and any agency fees for the account of the retiring Junior Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

25.12.8 The Junior Agent shall resign in accordance with Clause 25.12.2 (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Junior Agent pursuant to Clause 25.12.3) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Junior Agent under the Finance Documents, either:

(a)    the Junior Agent fails to respond to a request under Clause 12.8 (*FATCA information*) and a Junior Lender reasonably believes that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(b)    the information supplied by the Junior Agent pursuant to Clause 12.8 (*FATCA information*) indicates that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(c)    the Junior Agent notifies the Borrowers and the Junior Lenders that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) a Junior Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Junior Agent were a FATCA Exempt Party, and that Junior Lender, by notice to the Junior Agent, requires it to resign.

## 25.13    Replacement of the Junior Agent

25.13.1 After consultation with the Borrowers, the Majority Junior Lenders may, by giving 30 days' notice to the Junior Agent, replace the Junior Agent by appointing a successor Junior Agent.

25.13.2 The retiring Junior Agent shall (at the expense of the Junior Lenders) make available to the successor Junior Agent such documents and records and provide such assistance as the successor Junior Agent may reasonably request for the purposes of performing its function as Junior Agent under the Finance Documents.

25.13.3 The appointment of the successor Junior Agent shall take effect on the date specified in the notice from the Majority Junior Lenders to the retiring Junior Agent.  As from this date, the retiring Junior Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 25.13.2) but shall remain entitled to the benefit of Clause 14.3 (*Indemnity to the Junior Agent*) and this Clause 25 (and any agency fees for the account of the retiring Junior Agent shall cease to accrue from (and shall be payable on) that date).

25.13.4 Any successor Junior Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 25.14 Confidentiality

25.14.1 In acting as agent for the Finance Parties, the Junior Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

25.14.2 If information is received by another division or department of the Junior Agent, it may be treated as confidential to that division or department and the Junior Agent shall not be deemed to have notice of it.

## 25.15 Relationship with the Junior Lenders

25.15.1 Subject to Clause 23.9 (*Pro rata interest settlement*), the Junior Agent may treat the person shown in its records as Junior Lender at the opening of business (in the place of the Junior Agent's principal office as notified to the Finance Parties from time to time) as the Junior Lender acting through its Facility Office:

(a) entitled to or liable for any payment due under any Finance Document on that day; and

(b) entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Junior Lender to the contrary in accordance with the terms of this Agreement.

25.15.2 Any Junior Lender may by notice to the Junior Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or dispatched to that Junior Lender under the Finance Documents. Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 30.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Junior Lender for the purposes of Clause 30.2 (*Addresses*) and Clause 30.5.1(b) (*Electronic communication*) and the Junior Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Junior Lender.

## 25.16 Credit appraisal by the Junior Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Relevant Document, each Junior Lender confirms to the Junior Agent that it has

been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Relevant Document including but not limited to:

25.16.1 the financial condition, status and nature of each Obligor;

25.16.2 the legality, validity, effectiveness, adequacy or enforceability of any Relevant Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Relevant Document;

25.16.3 whether that Junior Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Relevant Document, the transactions contemplated by the Relevant Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of under or in connection with any Relevant Document; and

25.16.4 the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any Encumbrance created or expressed to be created or evidenced by the Security Documents or the existence of any Encumbrance affecting the Charged Property.

25.17 **Reference Banks**    If a Reference Bank (or, if a Reference Bank is not a Junior Lender, the Junior Lender of which it is an Affiliate) ceases to be a Junior Lender, the Junior Agent shall (in consultation with the Borrowers) appoint another Junior Lender or an Affiliate of a Junior Lender to replace that Reference Bank.

25.18 **Junior Agent's management time**    Any amount payable to the Junior Agent under Clause 14.3 (*Indemnity to the Junior Agent*), Clause 14.4 (*Indemnity to the Junior Security Agent*), Clause 16 (*Costs and expenses*) and Clause 25.10 (*Junior Lenders' indemnity to the Junior Agent*) shall include the cost of utilising the Junior Agent's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Junior Agent may notify to the Borrowers and the Junior Lenders, and is in addition to any fee paid or payable to the Junior Agent under Clause 11 (*Fees*).

25.19 **Deduction from amounts payable by the Junior Agent**    If any Party owes an amount to the Junior Agent under the Finance Documents the Junior Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Junior Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

## 26    Conduct of Business by the Finance Parties

Save for Clause 12.4 (*Tax Credit*) and Clause 12.7 (*FATCA Information*), no provision of this Agreement will:

26.1 interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

26.2    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

26.3    oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 27    Sharing among the Finance Parties

27.1    **Payments to Finance Parties**    If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from an Obligor other than in accordance with Clause 28 (*Payment Mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due under the Finance Documents then:

27.1.1    the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery, to the Junior Agent;

27.1.2    the Junior Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Junior Agent and distributed in accordance with Clause 28 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Junior Agent in relation to the receipt, recovery or distribution; and

27.1.3    the Recovering Finance Party shall, within three Business Days of demand by the Junior Agent, pay to the Junior Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Junior Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 28.5 (*Partial payments*).

27.2    **Redistribution of payments**    The Junior Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with Clause 28.5 (*Partial payments*) towards the obligations of that Obligor to the Sharing Finance Parties.

27.3    **Recovering Finance Party's rights**    On a distribution by the Junior Agent under Clause 27.2 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

27.4    **Reversal of redistribution**    If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

27.4.1    each Sharing Finance Party shall, upon request of the Junior Agent, pay to the Junior Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that

Recovering Finance Party is required to pay) (the **"Redistributed Amount"**); and

27.4.2   as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

## 27.5    Exceptions

27.5.1   This Clause 27 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Obligor.

27.5.2   A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(a)   it notified that other Finance Party of the legal or arbitration proceedings; and

(b)   that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

## Section 11    Administration

**28    Payment Mechanics**

28.1    **Payments to the Junior Agent**    On each date on which an Obligor or a Junior Lender is required to make a payment under a Finance Document, that Obligor or that Junior Lender shall make the same available to the Junior Agent for value on the due date at the time and in such funds specified by the Junior Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

Payment shall be made to such account in the principal financial centre of the country of that currency with such bank as the Junior Agent specifies.

28.2    **Distributions by the Junior Agent**    Each payment received by the Junior Agent under the Finance Documents for another Party shall, subject to Clause 28.3 (*Distributions to an Obligor*) and Clause 28.4 (*Clawback and pre-funding*) be made available by the Junior Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Junior Lender, for the account of its Facility Office), to such account as that Party may notify to the Junior Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency.

28.3    **Distributions to an Obligor**    The Junior Agent may (with the consent of an Obligor or in accordance with Clause 29 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

28.4    **Clawback and pre-funding**

28.4.1    Where a sum is to be paid to the Junior Agent under the Finance Documents for another Party, the Junior Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

28.4.2    Unless Clause 28.4.3 applies, if the Junior Agent pays an amount to another Party and it proves to be the case that the Junior Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Junior Agent shall on demand refund the same to the Junior Agent together with interest on that amount from the date of payment to the date of receipt by the Junior Agent, calculated by the Junior Agent to reflect its cost of funds.

28.4.3    If the Junior Agent has notified the Junior Lenders that it is willing to make available amounts for the account of a Borrower before receiving funds from the Junior Lenders then if and to the extent that the Junior Agent does so but it proves to be the case that it does not then receive funds from a Junior Lender in respect of a sum which it paid to a Borrower:

(a) the Junior Agent shall notify the Borrowers of that Junior Lender's identity and the Borrower to whom that sum was made available shall on demand refund it to the Junior Agent; and

(b) the Junior Lender by whom those funds should have been made available or, if that Junior Lender fails to do so, the Borrower to whom that sum was made available, shall on demand pay to the Junior Agent the amount (as certified by the Junior Agent) which will indemnify the Junior Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Junior Lender.

## 28.5    Partial payments

28.5.1 If the Junior Agent receives a payment that is insufficient to discharge all the amounts then due and payable by an Obligor under the Finance Documents, the Junior Agent shall apply that payment towards the obligations of that Obligor under the Finance Documents  in the following order:

(a) first, in or towards payment pro rata of any unpaid fees, costs and expenses of the Junior Agent or the Junior Security Agent under the Finance Documents;

(b) secondly, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under this Agreement;

(c) thirdly, in or towards payment pro rata of any principal due but unpaid under this Agreement; and

(d) fourthly, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

28.5.2 The Junior Agent shall, if so directed by the Majority Junior Lenders, vary the order set out in Clauses 28.5.1(b) to 28.5.1(d).

28.5.3 Clauses 28.5.1 and 28.5.2 will override any appropriation made by an Obligor.

28.6    **No set-off by Obligors**   All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

28.7    **Business Days**   Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

28.8 **Currency of account**

28.8.1 Subject to Clauses 28.8.2 to 28.8.5, dollars is the currency of account and payment for any sum due from an Obligor under any Finance Document.

28.8.2 A repayment or payment of all or part of the Loan or an Unpaid Sum shall be made in the currency in which the Loan or Unpaid Sum is denominated on its due date.

28.8.3 Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

28.8.4 Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

28.8.5 Any amount expressed to be payable in a currency other than dollars shall be paid in that other currency.

28.9 **Control account**    The Junior Agent shall open and maintain on its books a control account in the names of the Borrowers showing the advance of the Loan and the computation and payment of interest and all other sums due under this Agreement. The Borrowers' obligations to repay the Loan and to pay interest and all other sums due under this Agreement shall be evidenced by the entries from time to time made in the control account opened and maintained under this Clause 28.9 and those entries will, in the absence of manifest error, be conclusive and binding.

28.10 **Change of currency**

28.10.1 Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(a) any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Junior Agent (after consultation with the Borrowers); and

(b) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Junior Agent (acting reasonably).

28.10.2 If a change in any currency of a country occurs, this Agreement will, to the extent the Junior Agent (acting reasonably and after consultation with the Borrowers) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

28.11 **Disruption to payment systems etc.**    If either the Junior Agent determines in its discretion that a Disruption Event has occurred or the Junior Agent is notified by the Borrowers that a Disruption Event has occurred:

28.11.1 the Junior Agent may, and shall if requested to do so by the Borrowers, consult with the Borrowers with a view to agreeing with the Borrowers such changes to the operation or administration of the Loan as the Junior Agent may deem necessary in the circumstances;

28.11.2 the Junior Agent shall not be obliged to consult with the Borrowers in relation to any changes mentioned in Clause 28.11.1 if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to any such changes;

28.11.3 the Junior Agent may consult with the Finance Parties in relation to any changes mentioned in Clause 28.11.1 but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

28.11.4 any such changes agreed upon by the Junior Agent and the Borrowers shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 34 (*Amendments and Waivers*);

28.11.5 the Junior Agent shall not be liable for any damages, costs or losses whatsoever (including, without limitation, for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Junior Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 28.11; and

28.11.6 the Junior Agent shall notify the Finance Parties of all changes agreed pursuant to Clause 28.11.4.

## 29    Set-Off

29.1    **Set-off**    A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 30    Notices

30.1    **Communications in writing**    Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

30.2    **Addresses**    The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

30.2.1    in the case of each Borrower, that identified with its name below;

30.2.2   In the case of each Junior Lender, that notified in writing to the Junior Agent on or prior to the date on which it becomes a Party; and

30.2.3   In the case of the Junior Agent or the Junior Security Agent, that identified with its name below,

or any substitute address, fax number, or department or officer as the Party may notify to the Junior Agent (or the Junior Agent may notify to the other Parties, if a change is made by the Junior Agent) by not less than five Business Days' notice.

30.3   **Delivery**   Any communication or document made or delivered by one Party to another under or in connection with the Finance Documents will only be effective:

30.3.1   if by way of fax, when received in legible form; or

30.3.2   if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 30.2 (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Junior Agent or the Junior Security Agent will be effective only when actually received by the Junior Agent or the Junior Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Junior Agent's or the Junior Security Agent's signature below (or any substitute department or officer as the Junior Agent or the Junior Security Agent shall specify for this purpose).

All notices from or to an Obligor shall be sent through the Junior Agent.

Any communication or document which becomes effective, in accordance with this Clause 30.3, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

30.4   **Notification of address and fax number**   Promptly upon changing its address or fax number, the Junior Agent shall notify the other Parties.

30.5   **Electronic communication**

30.5.1   Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

(a)   notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(b)   notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice.

30.5.2 Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Junior Agent or the Junior Security Agent only if it is addressed in such a manner as the Junior Agent or the Junior Security Agent shall specify for this purpose.

30.5.3 Any electronic communication which becomes effective, in accordance with Clause 30.5.2, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

## 30.6 Use of websites

30.6.1 Each Borrower may satisfy its obligations under this Agreement to deliver any information in relation to those Junior Lenders (the "**Website Lenders**") who accept this method of communication by posting this information onto an electronic website designated by the Borrowers and the Junior Agent (the "**Designated Website**") if:

(a) the Junior Agent expressly agrees (after consultation with each of the Junior Lenders) that it will accept communication of the information by this method;

(b) both the Borrowers and the Junior Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(c) the information is in a format previously agreed between the Borrowers and the Junior Agent.

If any Junior Lender (a "**Paper Form Lender**") does not agree to the delivery of information electronically then the Junior Agent shall notify the Borrowers accordingly and each Borrower shall supply the information to the Junior Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event each Borrower shall supply the Junior Agent with at least one copy in paper form of any information required to be provided by it.

30.6.2 The Junior Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Borrowers and the Junior Agent.

30.6.3 Each Borrower shall promptly upon becoming aware of its occurrence notify the Junior Agent if:

(a) the Designated Website cannot be accessed due to technical failure;

(b) the password specifications for the Designated Website change;

(c) any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(d)     any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(e)     that Borrower becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If a Borrower notifies the Junior Agent under Clause 30.6.3(a) or Clause 30.6.3(e), all information to be provided by a Borrower under this Agreement after the date of that notice shall be supplied in paper form unless and until the Junior Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

30.6.4   Any Website Lender may request, through the Junior Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. Each Borrower shall comply with any such request within ten Business Days.

30.7   **English language**   Any notice given under or in connection with any Finance Document must be in English. All other documents provided under or in connection with any Finance Document must be:

30.7.1   in English; or

30.7.2   if not in English, and if so required by the Junior Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 31      Calculations and Certificates

31.1   **Accounts**   In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by the Junior Agent pursuant to Clause 28.9 (*Control account*) are *prima facie* evidence of the matters to which they relate.

31.2   **Certificates and determinations**   Any certification or determination by the Junior Agent of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

31.3   **Day count convention**   Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

## 32      Partial Invalidity

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**33    Remedies and Waivers**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**34    Amendments and Waivers**

**34.1    Required consents**

34.1.1    Subject to Clause 34.2 (*Exceptions*) any term of the Finance Documents may be amended or waived only with the consent of the Majority Junior Lenders and the Borrowers and any such amendment or waiver will be binding on all Parties.

34.1.2    The Junior Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 34.

34.1.3    Without prejudice to the generality of Clauses 25.6.3, 25.6.4 and 25.6.5 (*Rights and discretions of the Junior Agent*), the Junior Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

34.1.4    Clause 23.9.3 (*Pro rata interest settlement*) shall apply to this Clause 34.

**34.2    Exceptions**

34.2.1    An amendment, waiver or (in the case of a Security Document) a consent of, or in relation to, any term of any Finance Document that has the effect of changing or which relates to:

(a)    the definition of **"Majority Junior Lenders"** in Clause 1.1 (*Definitions*);

(b)    an extension to the date of payment of any amount under the Finance Documents;

(c)    a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(d)    a change in currency of payment of any amount under the Finance Documents;

(e)    an increase in any Commitment, an extension of the Availability Period or any requirement that a cancellation of Commitments reduces the Commitments of the Junior Lenders rateably;

(f)       any provision which expressly requires the consent of all the Junior Lenders;

(g)       Clause 2.2 (*Finance Parties' rights and obligations*), Clause 5.1 (*Delivery of a Utilisation Request*), Clause 7.1 (*Illegality*), Clause 7.4 (*Mandatory prepayment on sale or Total Loss*), Clause 23 (*Changes to the Junior Lenders*), Clause 24 (*Changes to the Obligors*), this Clause 34, Clause 39 (*Governing Law*) or Clause 40.1 (*Jurisdiction of English courts*);

(h)       (other than as expressly permitted by the provisions of any Finance Document) the nature or scope of:

      (i)      the Charged Property; or

      (ii)     the manner in which the proceeds of enforcement of the Security Documents are distributed; or

(i)       the release of any Encumbrance created or expressed to be created or evidenced by the Security Documents unless permitted under this Agreement or any other Finance Document or relating to a sale or disposal of an asset which is the subject of any Encumbrance created or expressed to be created or evidenced by the Security Documents where such sale or disposal is expressly permitted under this Agreement or any other Finance Document;

shall not be made, or given, without the prior consent of all the Junior Lenders.

34.2.2    An amendment or waiver which relates to the rights or obligations of the Junior Agent or the Junior Security Agent (each in their capacity as such) may not be effected without the consent of the Junior Agent or the Junior Security Agent as the case may be.

34.2.3    If any Screen Rate is not available for a relevant currency, any amendment or waiver which relates to providing for another benchmark rate to apply in relation to that currency in place of that Screen Rate (or which relates to aligning any provision of a Finance Document to the use of that other benchmark rate) may be made with the consent of the Majority Junior Lenders and the Borrowers.

## 34.3    **Excluded Commitments**

If:

34.3.1    any Defaulting Junior Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any term of any Finance Document or any other vote of Junior Lenders under the terms of this Agreement within five Business Days of that request being made; or

34.3.2    any Junior Lender which is not a Defaulting Junior Lender fails to respond to such a request (other than an amendment, waiver or consent referred to in

Clauses 34.2.1(b), 34.2.1(c) and 34.2.1(e) (*Exceptions*)) or such a vote within five Business Days of that request being made,

(unless, in either case, the Borrowers and the Junior Agent agree to a longer time period in relation to any request):

(a)     its Commitment(s) shall not be included for the purpose of calculating the Total Commitments when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of Total Commitments has been obtained to approve that request; and

(b)     its status as a Junior Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Junior Lenders has been obtained to approve that request.

## 34.4    Replacement of Junior Lender

34.4.1    If:

(a)     any Junior Lender becomes a Non-Consenting Junior Lender (as defined in Clause 34.4.4); or

(b)     a Borrower or any other Obligor becomes obliged to repay any amount in accordance with Clause 7.1 (*Illegality*) or to pay additional amounts pursuant to Clause 12.2 (*Tax gross-up*), Clause 12.3 (*Tax Indemnity*) or Clause 13.1 (*Increased costs*) to any Junior Lender,

then the Borrowers may, on ten Business Days' prior written notice to the Junior Agent and such Junior Lender, replace such Junior Lender by requiring such Junior Lender to (and, to the extent permitted by law, such Junior Lender shall) transfer pursuant to Clause 23 (*Changes to the Junior Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Junior Lender or other bank, financial institution, trust, fund or other entity (a "**Replacement Junior Lender**") selected by the Borrowers, which confirms its willingness to assume and does assume all the obligations of the transferring Junior Lender in accordance with Clause 23 (*Changes to the Junior Lenders*) for a purchase price in cash payable at the time of transfer in an amount equal to the outstanding principal amount of such Junior Lender's participation in the outstanding Loan and all accrued interest (to the extent that the Junior Agent has not given a notification under Clause 23.9 (*Pro rata interest settlement*)), Break Costs and other amounts payable in relation thereto under the Finance Documents.

34.4.2    The replacement of a Junior Lender pursuant to this Clause 34.4 shall be subject to the following conditions:

(a)     the Borrowers shall have no right to replace the Junior Agent or Junior Security Agent;

(b)     neither the Junior Agent nor the Junior Lender shall have any obligation to the Borrowers to find a Replacement Junior Lender;

(c)    in the event of a replacement of a Non-Consenting Junior Lender such replacement must take place no later than 30 days after the date on which that Junior Lender is deemed a Non-Consenting Junior Lender;

(d)    in no event shall the Junior Lender replaced under this Clause 34.4 be required to pay or surrender to such Replacement Junior Lender any of the fees received by such Junior Lender pursuant to the Finance Documents; and

(e)    the Junior Lender shall only be obliged to transfer its rights and obligations pursuant to Clause 34.4.1 once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

34.4.3    A Junior Lender shall perform the checks described in Clause 34.4.2(e) as soon as reasonably practicable following delivery of a notice referred to in Clause 34.4.1 and shall notify the Junior Agent and the Borrowers when it is satisfied that it has complied with those checks.

34.4.4    In the event that:

(a)    the Borrowers or the Junior Agent (at the request of the Borrowers) have requested the Junior Lenders to give a consent in relation to, or to agree to a waiver or amendment of, any provisions of the Finance Documents;

(b)    the consent, waiver or amendment in question requires the approval of all the Junior Lenders; and

(c)    Junior Lenders whose Commitments aggregate more than 50.1 per cent of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 50.1 per cent of the Total Commitments prior to that reduction) have consented or agreed to such waiver or amendment,

then any Junior Lender who does not and continues not to consent or agree to such waiver or amendment shall be deemed a "**Non-Consenting Junior Lender**".

## 34.5    Disenfranchisement of Defaulting Junior Lenders

34.5.1    For so long as a Defaulting Junior Lender has any Commitment, in ascertaining:

(a)    the Majority Junior Lenders; or

(b)    whether:

(i)    any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments; or

(ii)    the agreement of any specified group of Junior Lenders,

has been obtained to approve any request for a consent, waiver, amendment or other vote of Junior Lenders under the Finance Documents, that Defaulting Junior Lender's Commitment will be reduced by the amount of its participation in the Loan it has failed to make available and, to the extent that that reduction results in that Defaulting Junior Lender's Commitment being zero, that Defaulting Junior Lender shall be deemed not to be a Junior Lender for the purposes of (i) and (ii).

34.5.2   For the purposes of this Clause 34.5, the Junior Agent may assume that the following Junior Lenders are Defaulting Junior Lenders:

(a)   any Junior Lender which has notified the Junior Agent that it has become a Defaulting Junior Lender;

(b)   any Junior Lender in relation to which it is aware that any of the events or circumstances referred to in (a), (b) or (c) of the definition of "Defaulting Junior Lender" has occurred,

unless it has received notice to the contrary from the Junior Lender concerned (together with any supporting evidence reasonably requested by the Junior Agent) or the Junior Agent is otherwise aware that the Junior Lender has ceased to be a Defaulting Junior Lender.

## 34.6   Replacement of a Defaulting Junior Lender

34.6.1   The Borrowers may, at any time a Junior Lender has become and continues to be a Defaulting Junior Lender, by giving ten Business Days' prior written notice to the Junior Agent and such Junior Lender, replace such Junior Lender by requiring such Junior Lender to (and, to the extent permitted by law, such Junior Lender shall) transfer pursuant to Clause 23 (*Changes to the Junior Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Junior Lender or other bank, financial institution, trust, fund or other entity (a "**Replacement Junior Lender**") selected by the Borrowers which confirms its willingness to assume and does assume all the obligations, or all the relevant obligations, of the transferring Junior Lender in accordance with Clause 23 (*Changes to the Junior Lenders)* for a purchase price in cash payable at the time of transfer which is either:

(a)   in an amount equal to the outstanding principal amount of such Junior Lender's participation in the outstanding Loan and all accrued interest (to the extent that the Junior Agent has not given a notification under Clause 23.9 (*Pro rata interest settlement*)), Break Costs and other amounts payable in relation thereto under the Finance Documents; or

(b)   in an amount agreed between that Defaulting Junior Lender, the Replacement Junior Lender and the Borrowers and which does not exceed the amount described in (a).

34.6.2   Any transfer of rights and obligations of a Defaulting Junior Lender pursuant to this Clause 34.6 shall be subject to the following conditions:

(a)     the Borrowers shall have no right to replace the Junior Agent or Junior Security Agent;

(b)     neither the Junior Agent nor the Defaulting Junior Lender shall have any obligation to the Borrowers to find a Replacement Junior Lender;

(c)     the transfer must take place no later than 10 Business Days after the notice referred to in Clause 34.6.1;

(d)     in no event shall the Defaulting Junior Lender be required to pay or surrender to the Replacement Junior Lender any of the fees received by the Defaulting Junior Lender pursuant to the Finance Documents; and

(e)     the Defaulting Junior Lender shall only be obliged to transfer its rights and obligations pursuant to 34.6.1 once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer to the Replacement Junior Lender.

34.6.3   The Defaulting Junior Lender shall perform the checks described in Clause 34.6.2(e) as soon as reasonably practicable following delivery of a notice referred to in Clause 34.6.1 and shall notify the Junior Agent and the Borrowers when it is satisfied that it has complied with those checks.

## 35      Confidentiality

35.1     **Confidential Information**      Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 35.2 (*Disclosure of Confidential Information*) and Clause 35.3 (*Disclosure to numbering service providers*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

35.2     **Disclosure of Confidential Information**    Any Finance Party may disclose:

35.2.1   to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this Clause 35.2.1 is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

35.2.2   to any person:

(a)     to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under

one or more Finance Documents or which succeeds (or which may potentially succeed) it as Junior Agent or Junior Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(b)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(c)    appointed by any Finance Party or by a person to whom Clause 35.2.2(a) or 35.2.2(b) applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under Clause 25.15.2 (*Relationship with the Junior Lenders*));

(d)    who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in Clause 35.2.2(a) or 35.2.2(b);

(e)    to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(f)    to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(g)    to whom or for whose benefit that Finance Party charges, assigns or otherwise creates security (or may do so) pursuant to Clause 23.8 (*Security over Junior Lenders' rights*);

(h)    who is a Party; or

(i)    with the consent of the Borrowers;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(i)    in relation to Clauses 35.2.2(a), 35.2.2(b) and 35.2.2(c), the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to

maintain the confidentiality of the Confidential Information;

(ii)    in relation to Clause 35.2.2(d), the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(iii)    in relation to Clauses 35.2.2(e), 35.2.2(f) and 35.2.2(g), the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances; and

35.2.3    to any person appointed by that Finance Party or by a person to whom Clause 35.2.2(a) or 35.2.2(b) applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this Clause 35.2.3 if the service provider to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking; and

35.2.4    to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

## 35.3    Disclosure to numbering service providers

35.3.1    Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Loan and/or one or more Obligors the following information:

(a)    names of Obligors;

(b)    country of domicile of Obligors;

(c)    place of incorporation of Obligors;

(d)    date of this Agreement;

(e)     Clause 39 (*Governing law*);

(f)     the name of the Junior Agent;

(g)     date of each amendment and restatement of this Agreement;

(h)     amount of Total Commitments;

(i)     currency of the Loan;

(j)     type of Loan;

(k)     ranking of the Loan;

(l)     Termination Date;

(m)     changes to any of the information previously supplied pursuant to (a) to (l); and

(n)     such other information agreed between such Finance Party and that Obligor,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

35.3.2  The Parties acknowledge and agree that each identification number assigned to this Agreement, the Loan and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

35.3.3  Each Borrower represents that none of the information set out in Clauses 35.3.1(a) to 35.3.1(n) is, nor will at any time be, unpublished price-sensitive information.

35.3.4  The Junior Agent shall notify the Borrowers and the other Finance Parties of:

(a)     the name of any numbering service provider appointed by the Junior Agent in respect of this Agreement, the Loan and/or one or more Obligors; and

(b)     the number or, as the case may be, numbers assigned to this Agreement, the Loan and/or one or more Obligors by such numbering service provider.

35.4    **Entire agreement**   This Clause 35 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

35.5    **Inside information**   Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including

securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

35.6 **Notification of disclosure**   Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Borrowers:

35.6.1 of the circumstances of any disclosure of Confidential Information made pursuant to Clause 35.2.2(e) (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that Clause during the ordinary course of its supervisory or regulatory function; and

35.6.2 upon becoming aware that Confidential Information has been disclosed in breach of this Clause 35.

35.7 **Continuing obligations**   The obligations in this Clause 35 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

35.7.1 the date on which all amounts payable by the Obligors under or in connection with the Finance Documents have been paid in full and the Loan has been cancelled or otherwise ceases to be available; and

35.7.2 the date on which such Finance Party otherwise ceases to be a Finance Party.

## 36 Disclosure of Junior Lender Details by Junior Agent

36.1 **Supply of Junior Lender details to Borrowers**   The Junior Agent shall provide to the Borrowers within ten Business Days of a request by the Borrowers (but no more frequently than once per calendar month) a list (which may be in electronic form) setting out the names of the Junior Lenders as at that Business Day, their respective Commitments, the address and fax number (and the department or officer, if any, for whose attention any communication is to be made) of each Junior Lender for any communication to be made or document to be delivered under or in connection with the Finance Documents, the electronic mail address and/or any other information required to enable the sending and receipt of information by electronic mail or other electronic means to and by each Junior Lender to whom any communication under or in connection with the Finance Documents may be made by that means and the account details of each Junior Lender for any payment to be distributed by the Junior Agent to that Junior Lender under the Finance Documents.

36.2 **Supply of Junior Lender details at Borrowers' direction**

36.2.1 The Junior Agent shall, at the request of the Borrowers, disclose the identity of the Junior Lenders and the details of the Junior Lenders' Commitments to any:

(a) other Party or any other person if that disclosure is made to facilitate, in each case, a refinancing of the Financial Indebtedness arising under the Finance Documents or a material waiver or amendment of any term of any Finance Document; and

(b)    Obligor.

36.2.2    Subject to Clause 36.2.3, the Borrowers shall procure that the recipient of information disclosed pursuant to Clause 36.2.1 shall keep such information confidential and shall not disclose it to anyone and shall ensure that all such information is protected with security measures and a degree of care that would apply to the recipient's own confidential information.

36.2.3    The recipient may disclose such information to any of its officers, directors, employees, professional advisers, auditors and partners as it shall consider appropriate if any such person is informed in writing of its confidential nature, except that there shall be no such requirement to so inform if that person is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by duties of confidentiality in relation to the information.

### 36.3    Supply of Junior Lender details to other Junior Lenders

36.3.1    If a Junior Lender (a "**Disclosing Junior Lender**") indicates to the Junior Agent that the Junior Agent may do so, the Junior Agent shall disclose that Junior Lender's name and Commitment to any other Junior Lender that is, or becomes, a Disclosing Junior Lender.

36.3.2    The Junior Agent shall, if so directed by the Requisite Junior Lenders, request each Junior Lender to indicate to it whether it is a Disclosing Junior Lender.

### 36.4    Junior Lender enquiry    If any Junior Lender believes that any entity is, or may be, a Junior Lender and:

36.4.1    that entity ceases to have an Investment Grade Rating; or

36.4.2    an Insolvency Event occurs in relation to that entity,

the Junior Agent shall, at the request of that Junior Lender, indicate to that Junior Lender the extent to which that entity has a Commitment.

### 36.5    Junior Lender details definitions    In this Clause 36:

"**Investment Grade Rating**" means, in relation to an entity, a rating for its long-term unsecured and non-credit-enhanced debt obligations of BBB- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or Baa3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency.

"**Requisite Junior Lenders**" means a Junior Lender or Junior Lenders whose Commitments aggregate 15 per cent (or more) of the Total Commitments (or if the Total Commitments have been reduced to zero, aggregated 15 per cent (or more) of the Total Commitments immediately prior to that reduction).

**37    Counterparts**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**38    Joint and Several Liability**

38.1    **Nature of liability**    The representations, warranties, covenants, obligations and undertakings of the Borrowers contained in this Agreement shall be joint and several so that each Borrower shall be jointly and severally liable with all the Borrowers for all of the same and such liability shall not in any way be discharged, impaired or otherwise affected by:

38.1.1    any forbearance (whether as to payment or otherwise) or any time or other indulgence granted to any other Borrower or any other Obligor under or in connection with any Finance Document;

38.1.2    any amendment, variation, novation or replacement of any other Finance Document;

38.1.3    any failure of any Finance Document to be legal valid binding and enforceable in relation to any other Borrower or any other Obligor for any reason;

38.1.4    the winding-up or dissolution of any other Borrower or any other Obligor;

38.1.5    the release (whether in whole or in part) of, or the entering into of any compromise or composition with, any other Borrower or any other Obligor; or

38.1.6    any other act, omission, thing or circumstance which would or might, but for this provision, operate to discharge, impair or otherwise affect such liability.

38.2    **No rights as surety**    Until the Indebtedness has been unconditionally and irrevocably paid and discharged in full, each Borrower agrees that it shall not, by virtue of any payment made under this Agreement on account of the Indebtedness or by virtue of any enforcement by a Finance Party of its rights under this Agreement or by virtue of any relationship between, or transaction involving, the relevant Borrower and any other Borrower or any other Obligor:

38.2.1    exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by a Finance Party or any other person; or

38.2.2    exercise any right of contribution from any other Borrower or any other Obligor under any Finance Document; or

38.2.3    exercise any right of set-off or counterclaim against any other Borrower or any other Obligor; or

38.2.4    receive, claim or have the benefit of any payment, distribution, security or indemnity from any other Borrower or any other Obligor; or

38.2.5   unless so directed by the Junior Agent (when the relevant Borrower will prove in accordance with such directions), claim as a creditor of any other Borrower or any other Obligor in competition with any Finance Party

and each Borrower shall hold in trust for the Finance Parties and forthwith pay or transfer (as appropriate) to the Junior Agent any such payment (including an amount equal to any such set-off), distribution or benefit of such security, indemnity or claim in fact received by it.

## Section 12    Governing Law and Enforcement

### 39    Governing Law

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

### 40    Enforcement

#### 40.1    Jurisdiction of English courts

40.1.1    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").  Each Party agrees that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

40.1.2    Notwithstanding Clause 40.1.1, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, any Finance Party may take concurrent proceedings in any number of jurisdictions.

#### 40.2    Service of process

40.2.1    Without prejudice to any other mode of service allowed under any relevant law, each Borrower:

(a)    irrevocably appoints SH Process Agents Limited of 1 Finsbury Circus, London EC2M 7SH as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(b)    agrees that failure by a process agent to notify that Borrower of the process will not invalidate the proceedings concerned.

40.2.2    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process or terminates its appointment as agent for service of process, the relevant Borrower must immediately (and in any event within five days of such event taking place) appoint another agent on terms acceptable to the Junior Agent.  Failing this, the Junior Agent may appoint another agent for this purpose.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

**Schedule 1**

**The Original Junior Lenders**

| Name of Original Junior Lender | Commitment |
|---|---|
| Fleetscape Capital Limited | $75,000,000 |

**Schedule 2**

**Part I**

**Conditions Precedent**

1    **Obligors**

(a)    **Constitutional documents**    Copies of the constitutional documents of each Obligor together with such other evidence as the Junior Agent may reasonably require that each Obligor is duly incorporated in its country of incorporation and remains in existence with power to enter into, and perform its obligations under, the Relevant Documents to which it is or is to become a party.

(b)    **Certificates of good standing**    A certificate of good standing in respect of each Obligor (if such a certificate can be obtained).

(c)    **Board resolutions**    A copy of a resolution of the board of directors of each Obligor:

(i)    approving the terms of, and the transactions contemplated by, the Relevant Documents to which it is a party and resolving that it execute those Relevant Documents; and

(ii)    authorising a specified person or persons to execute those Relevant Documents (and all documents and notices to be signed and/or dispatched under those documents) on its behalf.

(d)    **Specimen signatures**    A specimen of the signature of each person actually executing any of the Relevant Documents pursuant to the resolutions referred to in (c).

(e)    **Shareholder resolutions**    If required by the Junior Agent acting on appropriate legal advice, a copy of a resolution signed by all the holders of the issued shares in each Obligor, approving the terms of, and the transactions contemplated by, the Relevant Documents to which that Obligor is a party.

(f)    **Officer's certificates**    An original certificate of a duly authorised officer of each Obligor:

(i)    certifying that each copy document relating to it specified in this Part I of Schedule 2 is correct, complete and in full force and effect;

(ii)    setting out the names of the directors, officers and shareholders of that Obligor and the proportion of shares held by each shareholder; and

(iii)    confirming that borrowing or guaranteeing or securing, as appropriate, the Loan would not cause any borrowing, guarantee, security or similar limit binding on that Obligor to be exceeded.

(g)  **Evidence of registration**    Where such registration is required or permitted under the laws of the relevant jurisdiction, evidence that the names of the directors, officers and shareholders of each Obligor are duly registered in the companies registry or other registry in the country of incorporation of that Obligor.

(h)  **Powers of attorney**    The original notarially attested and legalised power of attorney of each of the Obligors under which the Relevant Documents to which it is or is to become a party are to be executed or transactions undertaken by that Obligor.

## 2    Security and related documents

(a)  **Vessel documents**    Photocopies, certified as true, accurate and complete by a director or the secretary or the legal advisers of the relevant Borrower, of:

    (i)  the MOAs;

    (ii)  the Seller's Credit Agreements;

    (iii)  the bill of sale transferring title in the Vessel to the relevant Borrower free of all encumbrances, maritime liens or other debts;

    (iv)  the protocol of delivery and acceptance evidencing the unconditional physical delivery of the Vessel by the relevant Seller to the relevant Borrower pursuant to the MOA relating to the Vessel;

    (v)  the Bareboat Charters;

    (vi)  the Time Charters;

    (vii)  the on hire certificate pursuant to the Time Charter relating to the Vessel and the protocol of delivery and acceptance evidencing the unconditional physical delivery of the Vessel by the relevant Borrower to the relevant Bareboat Charterer pursuant to the Bareboat Charter relating to the Vessel;

    (viii)  the Bareboat Charter Guarantees;

    (ix)  the Time Charter QEL relating to the Vessel;

    (x)  the Management Agreements;

    (xi)  the Vessel's current Safety Construction, Safety Equipment, Safety Radio and Load Line Certificates;

    (xii)  evidence of the Vessel's current Certificate of Financial Responsibility issued pursuant to the United States Oil Pollution Act 1990;

    (xiii)  the Vessel's current SMC;

(xiv)    the ISM Company's current DOC;

(xv)    the Vessel's current ISSC;

(xvi)    the Vessel's current IAPPC;

(xvii)    the Vessel's current Tonnage Certificate;

in each case together with all addenda, amendments or supplements.

(b)    **Evidence of Seller's title**    Certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the Vessel's current flag confirming that the Vessel is owned by the relevant Seller and free of registered Encumbrances.

(c)    **Evidence of Borrower's title**    Evidence that on the relevant Closing Date (i) the Vessel will be at least provisionally registered under the flag stated in Preliminary (A) in the ownership of the relevant Borrower and (ii) the relevant Mortgage (as defined in the Senior Loan Agreement) will be capable of being registered against the Vessel with first priority.

(d)    **Evidence of insurance**    Evidence that the Vessel is insured in the manner required by the Senior Security Documents and that letters of undertaking will be issued in the manner required by the Senior Security Documents, together with (if required by the Senior Agent) the written approval of the Insurances by an insurance adviser appointed by the Senior Agent.

(e)    **Confirmation of class**    A Certificate of Confirmation of Class for hull and machinery confirming that the Vessel is classed with the highest class applicable to vessels of her type with DNV GL or such other classification society as may be acceptable to the Junior Agent free of recommendations affecting class.

(f)    **Survey report**    A report by a surveyor instructed by the Junior Agent to inspect the Vessels confirming that the technical condition of the Vessel is in all respects acceptable to the Junior Agent.

(g)    **Valuations**    Two valuations of the Vessel addressed to the Junior Agent from Approved Shipbrokers certifying the Market Value for that Vessel, acceptable to the Junior Agent, it being understood that the aggregate Market Value for all Vessels shall not be less than $323,000,000.

(h)    **Mandates**    Such duly signed forms of mandate, and/or other evidence of the opening of the Accounts, as the Junior Agent may require.

(i)    **Managers' Undertakings**    The Managers' Undertaking relating to the Vessel.

(j)    **No disputes**    The written confirmation of the Borrowers that there is no dispute under any of the Relevant Documents as between the parties to any such document.

(k)    **Account Holder's confirmation**    The written confirmation of the Account Holder that the Accounts have been opened with the Account Holder and to

its actual knowledge are free from Encumbrances other than as created by or pursuant to the Senior Security Documents and the Bareboat Charters and rights of set off in favour of the Account Holder as account holder.

(l)     **Dry Docking Reserve Accounts**   Evidence that on the relevant Utilisation Date any full or partial prefunding of the Dry Dock Reserves required pursuant to Clause 17.3.2 (*Dry Docking Reserve Accounts*) has been made.

(m)    **Minimum Liquidity Amount**    Evidence that on the relevant Utilisation Date the Minimum Liquidity Amount required pursuant to Clause 20 (*Minimum Liquidity Amount*) has been credited to the Bareboat Charterer's Account.

(n)    **Subordination Agreements**    The Subordination Agreements duly executed.

(o)    **Other Relevant Documents**   Copies of each of the Relevant Documents not otherwise comprised in the documents listed in this Part I of Schedule 2.

3       **Legal opinions**

The following legal opinions, each addressed to the Junior Agent, or confirmation satisfactory to the Junior Agent that such opinions will be given:

(a)    a legal opinion of Stephenson Harwood LLP, legal advisers to the Junior Agent as to English law substantially in the form distributed to the Junior Lenders prior to signing this Agreement; and

(b)    a legal opinion of Poles, Tublin, Stratakis & Gonzalez, legal advisers to the Junior Agent as to Marshall Islands law.

4       **Other documents and evidence**

(a)    **Utilisation Request**   A duly completed Utilisation Request.

(b)    **Process agent** Evidence that any process agent referred to in Clause 40.2 (*Service of process*) and any process agent appointed under any other Finance Document has accepted its appointment.

(c)    **Other Authorisations**    A copy of any other Authorisation or other document, opinion or assurance which the Junior Agent considers to be necessary or desirable (if it has notified the Borrowers accordingly) in connection with the entry into and performance of the transactions contemplated by any Relevant Document or for the validity and enforceability of any Relevant Document.

(d)    **Financial statements**    A copy of each of the Original Financial Statements.

(e)    **Fees**   The Fee Letter and evidence that the fees, costs and expenses then due from the Borrowers under Clause 11 (*Fees*) and Clause 16 (*Costs and Expenses*) have been paid or will be paid by the relevant Utilisation Date.

(f)  **"Know your customer" documents**   Such documentation and other evidence as is reasonably requested by the Junior Agent in order for the Junior Lenders to comply with all necessary "know your customer" or similar identification procedures in relation to the transactions contemplated in the Finance Documents.

(g)  **Investment Committee Approval**   Evidence that the Investment Committee for each of the Borrowers and the Junior Lenders have approved the transactions contemplated by this Agreement.

(h)  **Senior Credit Committee Approval and Senior Finance Documents**   Evidence that the credit committees of the Senior Lenders have approved the Senior Loan and that the Senior Loan will be made available by the Senior Lenders to the Borrowers and certified true copies of the Senior Finance Documents duly executed by all parties thereto in form and substance satisfactory to the Junior Agent.

(i)  **Repayment of existing Advantage debt**   Evidence satisfactory to the Junior Agent (acting on the instructions of the Majority Junior Lenders) that the existing debt of the relevant Bareboat Charter in respect of the Vessel has been or will be repaid no later than the Closing Date relating to the Vessel.

(j)  **No Material Adverse Effect**   Evidence that no Material Adverse Effect has occurred in relation to any Obligor.

(k)  **Funds Flow Statement**   A statement of anticipated flow of funds from the utilisation of the Loan (the "**Funds Flow Statement**"), accompanied by a letter of undertaking from Advantage to, amongst others, the Senior Agent and the Borrowers in a form acceptable to the Junior Agent relating to the Funds Flow Statement undertaking that, inter alia, as at the final Utilisation Date to occur, Advantage will have an amount of at least $13,000,000 available to it.

(l)  **Ring-fencing**   A letter of undertaking from Advantage to the Senior Agent in a form acceptable to the Senior Agent relating to the ring-fencing of Advantage's business.

**Part II**
**Conditions Subsequent**

1       **Evidence of Borrower's title**   Certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the flag stated in Preliminary (A) confirming that (a) the Vessel is permanently registered under that flag in the ownership of the relevant Borrower, (b) the relevant Mortgage (as defined in the Senior Loan Agreement) has been registered with first priority against the Vessel and (c) there are no Encumbrances registered against the Vessel other than pursuant to the relevant Senior Security Documents.

2       **Legal opinions**   Such of the legal opinions specified in Part I of this Schedule 2 as have not already been provided to the Junior Agent.

**Schedule 3**

**Utilisation Request**

From: [*Borrowers*]

To:    [*Junior Agent*]

Dated:

Dear Sirs

**$75,000,000 Loan Agreement dated [              ] 2019 (the "Agreement")**

1    We refer to the Agreement.   This is a Utilisation Request. Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2    We wish to borrow Tranche [1][2][3][4][5][6][7][8][9][10][11] on the following terms:

   Proposed Utilisation Date:         [          ] (or, if that is not a Business Day, the next Business Day)

   Amount:                           [          ]

   Interest Period:                  [three] months

3    We confirm that each condition specified in Clause 4.2 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request.

4    The proceeds of the Tranche[s] should be paid to the following account in accordance with the provisions of the relevant MOA towards payment of the purchase price of Vessel [1][2][3][4][5][6][7][8][9][10][11]:

   [   ]

5    This Utilisation Request is irrevocable.

Yours faithfully


.......................................

authorised signatory for

**Fleetscape Anthem, LLC**


.......................................

authorised signatory for

**Fleetscape Arrow, LLC**

....................................

authorised signatory for

**Fleetscape Atom, LLC**


....................................

authorised signatory for

**Fleetscape Avenue, LLC**


....................................

authorised signatory for

**Fleetscape Award, LLC**


....................................

authorised signatory for

**Fleetscape Sky, LLC**

....................................


authorised signatory for

**Fleetscape Solar, LLC**


....................................

authorised signatory for

**Fleetscape Spring, LLC**


....................................

authorised signatory for

**Fleetscape Start, LLC**


....................................

authorised signatory for

**Fleetscape Summer, LLC**

........................................

authorised signatory for

**Fleetscape Sun, LLC**

**Schedule 4**

**Time Charter Rate for each Vessel**

The Vessels on Time Charter shall be fixed on the following rates and terms:

| Vessel name | Charter Rate I | | Charter Rate II | | Profit Share Index |
|---|---|---|---|---|---|
| | Rate | Until | Rate | Until | |
| Advantage Anthem | $16,500 | 14 May 2020 | $15,500 | 14 May 2023 | TD 9: Caribs - US Gulf |
| Advantage Arrow | $16,500 | 3 Apr 2020 | $15,500 | 3 April 2023 | TD 9: Caribs - US Gulf |
| Advantage Atom | $16,500 | 30 May 2020 | $15,500 | 30 May 2023 | TD 7: North Sea - Continental Europe |
| Advantage Avenue | $16,500 | 3 Apr 2020 | $15,500 | 3 April 2023 | TD 7: North Sea - Continental Europe |
| Advantage Award | $16,500 | 22 May 2020 | $15,500 | 22 May 2023 | TD 7: North Sea - Continental Europe |
| Advantage Sky | $16,500 | 7 May 2020 | $16,500 | 7 May 2023 | TD 20: W. Africa - Continental Europe |
| Advantage Solar | $16,500 | 18 Feb 2020 | $16,500 | 18 Feb 2023 | TD 20: W. Africa - Continental Europe |
| Advantage Spring | $23,500 | 1 May 2020 | $16,500 | 1 May 2023 | TD 20: W. Africa - Continental Europe |
| Advantage Start | $16,500 | 1 May 2020 | $16,500 | 1 May 2023 | TD 20: W. Africa - Continental Europe |
| Advantage Summer | $23,500 | 11 May 2020 | $16,500 | 11 May 2023 | TD 20: W. Africa - Continental Europe |
| Advantage Sun | $16,500 | 8 Jun 2020 | $16,500 | 8 Jun 2023 | TD 20: W. Africa - Continental Europe |

The above rates outline the base time charter rate payable by the Time Charterer to the Bareboat Charterers on a monthly basis. In addition, the Vessels are subject to a profit share payment, where any positive difference between the Time Charter Rate and the market rate, as evidenced by the relevant Profit Share Index benchmark specified above up to a maximum of $45,000 per day in respect of a Vessel, shall be split 50/50 between the relevant Bareboat Charterers and the Time Charterer. Any amount over $45,000 per day in respect of a Vessel shall be paid to the relevant Bareboat Charterer. Such profit share calculation shall be conducted on a monthly basis.

The Bareboat Charterers have an option to shorten or lengthen the relevant Time Charter by up to three months.

The Time Charterer has an option to shorten or lengthen each Time Charter by up to 30 days.

**Schedule 5**

**Form of Transfer Certificate**

To:     Fleetscape Capital Limited as Junior Agent and Fleetscape Capital Limited as Junior
Security Agent

From:    [*The Existing Junior Lender*] (the "**Existing Junior Lender**") and [*The New Junior
Lender*] (the "**New Junior Lender**")

Dated:

**$75,000,000 Loan Agreement dated [              ] 2019 (the "Loan Agreement")**

1       We refer to the Loan Agreement.  This agreement (the "**Agreement**") shall take
        effect as a Transfer Certificate for the purposes of the Loan Agreement.  Terms
        defined in the Loan Agreement have the same meaning in this Agreement unless
        given a different meaning in this Agreement.

2       We refer to Clause 23.5 (*Procedure for transfer*) of the Loan Agreement:

        (a)     The Existing Junior Lender and the New Junior Lender agree to the Existing
                Junior Lender transferring to the New Junior Lender by novation and in
                accordance with Clause 23.5 (*Procedure for transfer*) all of the Existing
                Junior Lender's rights and obligations under the Loan Agreement and the
                other Finance Documents which relate to that portion of the Existing Junior
                Lender's Commitment(s) and participations in the Loan under the Loan
                Agreement as specified in the Schedule.

        (b)     The proposed Transfer Date is [                    ].

        (c)     The Facility Office and address, fax number and attention details for notices
                of the New Junior Lender for the purposes of Clause 30.2 (*Addresses*) of the
                Loan Agreement are set out in the Schedule.

3       The New Junior Lender expressly acknowledges the limitations on the Existing Junior
        Lender's obligations set out in Clause 23.4.1(c) (*Limitation of responsibility of
        Existing Junior Lenders*) of the Loan Agreement.

4       The New Junior Lender confirms, for the benefit of the Junior Agent and without
        liability to any Obligor, that it is:

        (a)     [a Qualifying Lender other than a Treaty Lender;]

        (b)     [a Treaty Lender;]

        (c)     [not a Qualifying Lender].[i]

[5]     [The New Junior Lender confirms that the person beneficially entitled to interest
        payable to that Junior Lender in respect of an advance under a Finance Document is
        either:

---

[i] Delete as applicable – each New Junior Lender is required to confirm which of these three categories it falls within.

(a)    a company resident in the United Kingdom for United Kingdom tax purposes;

(b)    a partnership each member of which is:   '

    (i)    a company so resident in the United Kingdom; or

    (ii)   a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

(c)    a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.][ii]

[5]   [The New Junior Lender confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [                    ]) and is tax resident in [                ]][iii], so that interest payable to it by borrowers is generally subject to full exemption from UK withholding tax, and requests that the Junior Agent notify the Borrowers that it wishes that scheme to apply to the Agreement.][iv]

[5/6]  This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

[6/7]  This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

[7/8]  This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:** **The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Junior Lender's interest in any Encumbrance created or expressed to be created or evidenced by the Security Documents in all jurisdictions.  It is the responsibility of the New Junior Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

---

[ii] Include if New Junior Lender comes within (b) of the definition of Qualifying Lender in Clause 12.1 (*Definitions*).

[iii] Insert jurisdiction of tax residence.

[iv] Include if New Junior Lender holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Agreement.

**The Schedule**

**Commitment/rights and obligations to be transferred**

[*insert relevant details*]

[*Facility Office address, fax number and attention details for notices and account details for payments,*]

[Existing Junior Lender]                    [New Junior Lender]

By:                                          By:

This Agreement is accepted as a Transfer Certificate for the purposes of the Loan Agreement by the Junior Agent, and the Transfer Date is confirmed as [                    ].

Fleetscape Capital Limited

By:

**Schedule 6**

**Form of Assignment Agreement**

To:      Fleetscape Capital Limited as Junior Agent and Fleetscape Capital Limited as Junior
         Security Agent and [          ] as Borrowers, for and on behalf of each Obligor

From:    [the *Existing Junior Lender*] (the "**Existing Junior Lender**") and [the *New Junior
         Lender*] (the "**New Junior Lender**")

Dated:

**$75,000,000 Loan Agreement dated [        ] 2019 (the "Loan Agreement")**

1        We refer to the Loan Agreement.   This is an Assignment Agreement.   This
         agreement (the "**Agreement**") shall take effect as an Assignment Agreement for
         the purpose of the Loan Agreement.  Terms defined in the Loan Agreement have
         the same meaning in this Agreement unless given a different meaning in this
         Agreement.

2        We refer to Clause 23.6 (*Procedure for assignment*) of the Loan Agreement:

         (a)    The Existing Junior Lender assigns absolutely to the New Junior Lender all
                the rights of the Existing Junior Lender under the Loan Agreement, the other
                Finance Documents and in respect of any Encumbrance created or
                expressed to be created or evidenced by the Security Documents which
                correspond to that portion of the Existing Junior Lender's Commitment(s)
                and participations in the Loan under the Loan Agreement as specified in the
                Schedule.

         (b)    The Existing Junior Lender is released from all the obligations of the Existing
                Junior Lender which correspond to that portion of the Existing Junior
                Lender's Commitment(s) and participations in the Loan under the Loan
                Agreement specified in the Schedule.

         (c)    The New Junior Lender becomes a Party as a Junior Lender and is bound by
                obligations equivalent to those from which the Existing Junior Lender is
                released under paragraph (b).[v]

3        The proposed Transfer Date is [       ].

4        On the Transfer Date the New Junior Lender becomes Party to the relevant Finance
         Documents as a Junior Lender; and

5        The Facility Office and address, fax number and attention details for notices of the
         New Junior Lender for the purposes of Clause 30.2 (*Addresses*) of the Loan
         Agreement are set out in the Schedule.

---

[v] If the Assignment Agreement is used in place of a Transfer Certificate in order to avoid a novation of
rights/obligations for reasons relevant to a civil jurisdiction, local law advice should be sought to check the suitability of
the Assignment Agreement due to the assumption of obligations contained in paragraph 2(c).  This issue should be
addressed at Primary documentation stage.  This footnote is not intended to be included in the scheduled form of
Assignment Agreement in the signed Loan Agreement.

6      The New Junior Lender expressly acknowledges the limitations on the Existing Junior Lender's obligations set out in Clause 23.4.3 (*Limitation of responsibility of Existing Junior Lenders*) of the Loan Agreement.

7      The New Junior Lender confirms, for the benefit of the Junior Agent and without liability to any Obligor, that it is:

    (a)      [a Qualifying Lender (other than a Treaty Lender);]

    (b)      [a Treaty Lender;]

    (c)      [not a Qualifying Lender]. vi

8      [The New Junior Lender confirms that the person beneficially entitled to interest payable to that Junior Lender in respect of an advance under a Finance Document is either:

    (a)      a company resident in the United Kingdom for United Kingdom tax purposes;

    (b)      a partnership each member of which is:

        (i)      a company so resident in the United Kingdom; or

        (ii)     a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account in computing its chargeable profits (within the meaning of section 19 of the CTA) the whole of any share of interest payable in respect of that advance that falls to it by reason of Part 17 of the CTA; or

    (c)      a company not so resident in the United Kingdom which carries on a trade in the United Kingdom through a permanent establishment and which brings into account interest payable in respect of that advance in computing the chargeable profits (within the meaning of section 19 of the CTA) of that company.]vii

9      [The New Junior Lender confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [ ]) and is tax resident in [ ]*, so that interest payable to it by borrowers is generally subject to full exemption from UK withholding tax and hereby notifies the Borrowers that it wishes that scheme to apply to the Loan Agreement.]**

[8/9]   This Agreement acts as notice to the Junior Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 23.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), to the Borrowers (on behalf of each Obligor) of the assignment referred to in this Agreement.

---

vi Delete as applicable - each New Junior Lender is required to confirm which of these three categories it falls within.

vii Include only if New Junior Lender is a UK Non-Bank Lender i.e. falls within (b) of the definition of Qualifying Lender in Clause 12.1 (*Definitions*).

* Insert jurisdiction of tax residence.

** Include if the New Junior Lender holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Loan Agreement.

[9/10]    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

[10/11]    This Agreement [and any non-contractual obligations arising out of or in connection with it] [is/are]ᵛⁱⁱⁱ governed by English law.

[11/12]    This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:**    **The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Junior Lender's interest in any Encumbrance created or expressed to be created or evidenced by the Security Documents in all jurisdictions.  It is the responsibility of the New Junior Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

---

viii This clause should follow the approach adopted as regards non-contractual obligations in Clause 39 (*Governing Law*).  This should be done (and this footnote deleted) before the Agreement is signed.

**The Schedule**

**Commitment/rights and obligations to be transferred by assignment, release and accession**

[*insert relevant details*]

[*Facility office address, fax number and attention details for notices and account details for payments*]

[Existing Junior Lender]                    [New Junior Lender]

By:                                         By:

This Agreement is accepted as an Assignment Agreement for the purposes of the Loan Agreement by the Junior Agent, and the Transfer Date is confirmed as [                    ].

Signature of this Agreement by the Junior Agent constitutes confirmation by the Junior Agent of receipt of notice of the assignment referred to in this Agreement, which notice the Junior Agent receives on behalf of each Finance Party.

Fleetscape Capital Limited

By:

**Schedule 7**

**Approved Operating and Administrative Expenses**

| Period | Amount |
|---|---|
| The date of the relevant Bareboat Charter until 31 December 2019 | $8,000 per day for each Suezmax Vessel and $7,500 per day for each Aframax Vessel |
| 1 January 2020 until 31 December 2020 | $8,200 per day for each Suezmax Vessel and $7,700 per day for each Aframax Vessel |
| 1 January 2021 until 31 December 2021 | $8,437 per day for each Suezmax Vessel and $7,922 per day for each Aframax Vessel |
| 1 January 2022 until 31 December 2022 | $8,681 per day for each Suezmax Vessel and per day $8,150 for each Aframax Vessel |
| 1 January 2023 until 31 December 2023 | $8,932 per day for each Suezmax Vessel and per day $8,386 for each Aframax Vessel |
| Thereafter | $9,190 per day for each Suezmax Vessel and per day $8,627 for each Aframax Vessel |

or such higher amount as may be agreed by the Borrowers, the Junior Agent and the Senior Agent (acting on the instructions of the relevant Junior Lenders or Senior Lenders as the case may be under the relevant Finance Documents or Senior Finance Documents as the case may be).

# Schedule 8

## PIK Interest Calculation

| Hestcape Junior Debt / All Vessels / Year / Year outstanding | Dec-18 2018 | Mar-19 2019 | Jun-19 2019 | Sep-19 2019 | Dec-19 2019 | Mar-20 2020 | Jun-20 2020 | Sep-20 2020 | Dec-20 2020 | Mar-21 2021 | Jun-21 2021 | Sep-21 2021 | Dec-21 2021 | Mar-22 2022 | Jun-22 2022 | Sep-22 2022 | Dec-22 2022 | Mar-23 2023 | Jun-23 2023 | Sep-23 2023 | Dec-23 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIBOR Curve (Assumed Fixed) | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 | 2.75 |
| Opening Balance (Principal + PIK) (A) | – | 75.0 | 76.3 | 76.8 | 74.2 | 75.6 | 76.0 | 75.4 | 76.8 | 78.3 | 79.7 | 81.3 | 82.9 | 84.6 | 86.3 | 88.1 | 89.9 | 91.7 | 93.6 | 95.5 | 97.5 |
| Interest - PIK | – | (1.3) | (0.4) | – | (1.4) | (0.4) | – | (1.4) | (1.5) | (1.5) | (1.5) | (1.6) | (1.7) | (1.7) | (1.7) | (1.8) | (1.9) | (1.9) | (1.9) | (2.0) | (2.0) |
| Drawdown | 75.0 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Principal Payment (Dec-23) | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (99.6) |
| Sweep | – | – | – | (2.5) | – | – | (0.6) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Ending Balance (Principal + PIK) (A) | 75.0 | 76.3 | 76.8 | 74.2 | 75.6 | 76.0 | 75.4 | 76.8 | 78.3 | 79.7 | 81.3 | 82.9 | 84.6 | 86.3 | 88.1 | 89.9 | 91.7 | 93.6 | 95.5 | 97.5 | – |
| Pik - Addition | – | 1.3 | 0.4 | – | 1.4 | 0.4 | – | 1.4 | 1.5 | 1.5 | 1.5 | 1.6 | 1.7 | 1.7 | 1.8 | 1.8 | 1.9 | 1.9 | 1.9 | 2.0 | 2.0 |
| Pik - Sweep | – | – | – | (1.8) | – | – | (0.6) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| PIK (B) | – | 1.3 | 1.8 | – | 1.4 | 1.8 | 1.2 | 2.6 | 4.1 | 5.5 | 7.1 | 8.7 | 10.4 | 12.1 | 13.8 | 15.6 | 17.5 | 19.4 | 21.3 | 23.3 | – |
| Principal (C) | 75.0 | 75.0 | 75.0 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | 74.2 | (25.3) |
| **Sweep Calculations** | | | | | | | | | | | | | | | | | | | | | |
| Free Cash Flow, Pre-Junior | | 1.0 | 2.0 | 5.0 | 1.0 | 2.0 | 3.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Minimum Cash Interest (=A x (1+2.00% /4)   1+2.00% | | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Excess Cash Flow 1 | | 0.1 | 1.1 | 4.1 | 0.1 | 1.1 | 2.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.2 |
| o/w I applied to residual Junior Interest | | (0.1) | (1.1) | (1.5) | (0.1) | (1.1) | (1.5) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| o/w I applied to Junior Amortization | | – | – | (2.5) | – | – | (0.6) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **PIK Calculations** | | | | | | | | | | | | | | | | | | | | | |
| Junior Interest - Cash (=C x (1+9.75% / 4)   L+9.75% | | 2.3 | 2.4 | 2.4 | 2.4 | 2.3 | 2.4 | 2.4 | 2.4 | 2.3 | 2.3 | 2.4 | 2.4 | 2.3 | 2.3 | 2.4 | 2.4 | 2.3 | 2.3 | 2.4 | 2.4 |
| Junior Interest - PIK (=B x (1+11.70% / 4)   12x   L+11.70% | | 0.0 | 0.0 | 0.1 | – | 0.1 | 0.1 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.7 | 0.8 | 0.9 |
| Junior Interest - Cash + PIK | | 2.3 | 2.4 | 2.5 | 2.4 | 2.4 | 2.4 | 2.4 | 2.5 | 2.5 | 2.5 | 2.6 | 2.7 | 2.7 | 2.8 | 2.9 | 2.9 | 3.0 | 3.1 | 3.2 | 3.2 |
| o/w I Minimum Interest | | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.1) | (1.1) | (1.1) | (1.1) | (1.2) | (1.2) |
| Residual Junior Interest, post-Minimum Cash Interest | | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 | 1.7 | 1.7 | 1.8 | 1.8 | 1.9 | 1.9 | 2.0 | 2.0 |
| o/w I Payable in Cash | | (0.1) | (1.1) | (1.5) | (0.1) | (1.1) | (1.5) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | – | – | – | – | – | – | – | – | – |
| PIK for Period | | 1.3 | 0.4 | – | 1.4 | 0.4 | – | 1.4 | 1.5 | 1.5 | 1.6 | 1.6 | 1.7 | 1.7 | 1.8 | 1.8 | 1.9 | 1.9 | 1.9 | 2.0 | 2.0 |

LONLIVE33651252.12

**Signatures**

**The Borrowers**

| **Fleetscape Anthem, LLC** | ) |
| | ) |
| By: | ) |
| | ) |
| Address: c/o Oaktree Capital Management, | ) |
| L.P., 333 South Grand Avenue, Los Angeles, | ) |
| CA 90071, United States of America | ) |
| with a copy to: Oaktree Capital | ) |
| Management (Europe) LLP of Verde, | ) |
| 10 Bressenden Place, London, England, | ) |
| SW1E 5DH | ) |
| Email:   info@fleetscape.com/ | ) |
| accounting@fleetscape.com/ | ) |
| jbaker@fleetscape.com | ) |

Jennifer Ashford
Attorney in fact


| **Fleetscape Arrow, LLC** | ) |
| | ) |
| By: | ) |
| | ) |
| Address: c/o Oaktree Capital Management, | ) |
| L.P., 333 South Grand Avenue, Los Angeles, | ) |
| CA 90071, United States of America | ) |
| with a copy to: Oaktree Capital | ) |
| Management (Europe) LLP of Verde, | ) |
| 10 Bressenden Place, London, England, | ) |
| SW1E 5DH | ) |
| Email:   info@fleetscape.com/ | ) |
| accounting@fleetscape.com/ | ) |
| jbaker@fleetscape.com | ) |

Jennifer Ashford
Attorney in fact

**Fleetscape Atom, LLC** )
)
By: )
)
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles, )
CA 90071, United States of America )
with a copy to: Oaktree Capital )
Management (Europe) LLP of Verde, )
10 Bressenden Place, London, England, )
SW1E 5DH )
Email:   info@fleetscape.com/ )
accounting@fleetscape.com/ )
jbaker@fleetscape.com )

Jennifer Ashford
Attorney in fact

**Fleetscape Avenue, LLC** )
)
By: )
)
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles, )
CA 90071, United States of America )
with a copy to: Oaktree Capital )
Management (Europe) LLP of Verde, )
10 Bressenden Place, London, England, )
SW1E 5DH )
Email:   info@fleetscape.com/ )
accounting@fleetscape.com/ )
jbaker@fleetscape.com )

Jennifer Ashford
Attorney in fact

**Fleetscape Award, LLC**                     )
                                              )
By:                                           )
                                              )
Address: c/o Oaktree Capital Management,      )
L.P., 333 South Grand Avenue, Los Angeles,    )
CA 90071, United States of America            )
with a copy to: Oaktree Capital               )
Management (Europe) LLP of Verde,             )
10 Bressenden Place, London, England,         )
SW1E 5DH                                      )
Email:    info@fleetscape.com/                )
accounting@fleetscape.com/                    )
jbaker@fleetscape.com                         )

Jennifer Ashford
Attorney in fact


**Fleetscape Sky, LLC**                       )
                                              )
By:                                           )
                                              )
Address: c/o Oaktree Capital Management,      )
L.P., 333 South Grand Avenue, Los Angeles,    )
CA 90071, United States of America            )
with a copy to: Oaktree Capital               )
Management (Europe) LLP of Verde,             )
10 Bressenden Place, London, England,         )
SW1E 5DH                                      )
Email:    info@fleetscape.com/                )
accounting@fleetscape.com/                    )
jbaker@fleetscape.com                         )

Jennifer Ashford
Attorney in fact

**Fleetscape Solar, LLC**    )
                             )
By:                          )
                             )
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles,)
CA 90071, United States of America   )
with a copy to: Oaktree Capital      )
Management (Europe) LLP of Verde,    )
10 Bressenden Place, London, England, )
SW1E 5DH                             )
Email:    info@fleetscape.com/       )
accounting@fleetscape.com/           )
jbaker@fleetscape.com                )

Jennifer Ashford
Attorney in fact


**Fleetscape Spring, LLC**    )
                             )
By:                          )
                             )
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles,)
CA 90071, United States of America   )
with a copy to: Oaktree Capital      )
Management (Europe) LLP of Verde,    )
10 Bressenden Place, London, England, )
SW1E 5DH                             )
Email:    info@fleetscape.com/       )
accounting@fleetscape.com/           )
jbaker@fleetscape.com                )

Jennifer Ashford
Attorney in fact

**Fleetscape Start, LLC**  )
)
By:  )
)
Address: c/o Oaktree Capital Management,  )
L.P., 333 South Grand Avenue, Los Angeles, )
CA 90071, United States of America  )
with a copy to: Oaktree Capital  )
Management (Europe) LLP of Verde,  )
10 Bressenden Place, London, England,  )
SW1E 5DH  )
Email:  info@fleetscape.com/  )
accounting@fleetscape.com/  )
jbaker@fleetscape.com  )

Jennifer Ashford
Attorney in fact

**Fleetscape Summer, LLC**  )
)
By:  )
)
Address: c/o Oaktree Capital Management,  )
L.P., 333 South Grand Avenue, Los Angeles, )
CA 90071, United States of America  )
with a copy to: Oaktree Capital  )
Management (Europe) LLP of Verde,  )
10 Bressenden Place, London, England,  )
SW1E 5DH  )
Email:  info@fleetscape.com/  )
accounting@fleetscape.com/  )
jbaker@fleetscape.com  )

Jennifer Ashford
Attorney in fact

**Fleetscape Sun, LLC**                     )
                                            )
By:                                         )
                                            )
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles,)
CA 90071, United States of America          )
with a copy to: Oaktree Capital             )
Management (Europe) LLP of Verde,           )
10 Bressenden Place, London, England,       )
SW1E 5DH                                    )
Email:   info@fleetscape.com/               )
accounting@fleetscape.com/                  )
jbaker@fleetscape.com                       )

Jennifer Ashford
Attorney in fact


**The Junior Agent**

**Fleetscape Capital Limited**              )
                                            )
By:                                         )
                                            )
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles,)
CA 90071, United States of America          )
with a copy to: Oaktree Capital             )
Management (Europe) LLP of Verde,           )
10 Bressenden Place, London, England,       )
SW1E 5DH                                    )
Email:   info@fleetscape.com/               )
accounting@fleetscape.com/                  )
jbaker@fleetscape.com                       )

Jennifer Ashford
Attorney in fact

**The Junior Security Agent**

**Fleetscape Capital Limited**                    )
                                                   )
By:                                                )
                                                   )
Address: c/o Oaktree Capital Management, )
L.P., 333 South Grand Avenue, Los Angeles,)
CA 90071, United States of America                )
with a copy to: Oaktree Capital                   )
Management (Europe) LLP of Verde,                 )
10 Bressenden Place, London, England,             )
SW1E 5DH                                           )
Email:    info@fleetscape.com/                    )
accounting@fleetscape.com/                        )
jbaker@fleetscape.com                             )

Jennifer Ashford
Attorney in fact

**The Original Junior Lenders**

**Fleetscape Capital Limited**                    )
                                                   )
By:                                                )

Jennifer Ashford
Attorney in fact